UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                                Plaintiff,

   v.

CRAIG CARTON and MICHAEL WRIGHT,

                                Defendants.

Case No. 17 Cr. 680 (CM)

## MEMORANDUM OF LAW IN OPPOSITION TO THE GOVERNMENT'S MOTION TO QUASH RULE 17(C) SUBPOENAS

GOTTLIEB & JANEY LLP
111 Broadway, Suite 701
New York, NY 10006
Tel.: (212) 566-7766
Fax: (212) 374-1506

*Attorneys for Defendant*
*Craig Carton*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................... iii

I.     PRELIMINARY STATEMENT ............................................................................ 1

II.    FACTUAL BACKGROUND .................................................................................. 3

III.   HISTORY OF DISCOVERY ................................................................................. 8

IV.   ARGUMENT .......................................................................................................... 12

      A.      MR. CARTON'S RULE 17 SUBPOENAS ARE NARROWLY TAILORED, REQUEST RELEVANT AND ADMISSIBLE DOCUMENTS, AND OTHERWISE MEET THE *NIXON* STANDARD ................................................................................ 12

           1.   The Rule 17(c) Subpoenas Sought to Be Quashed by the Government Meet the *Nixon* Standard ............................ 14

           2.   Mr. Carton's Rule 17 Subpoenas Not Addressed in the Government's Motion to Quash Also Meet the *Nixon* Standard ................................................................................ 22

      B.      THE RULE 17(C) SUBPOENAS ARE PROCEDURALLY PROPER ............................................................................................ 26

V.     CONCLUSION ...................................................................................................... 28

# TABLE OF AUTHORITIES

Page

**Constitutional Provisions**

U.S. CONST. amend. VI ....................................................................................................1

**Rules and Statutes**

15 U.S.C. § 78ff .........................................................................................................6, 7

15 U.S.C. § 78j (b) .....................................................................................................6, 7

18 U.S.C § 2 ...............................................................................................................6, 7

18 U.S.C § 1343 .............................................................................................................7

17 C.F.R § 240.10b-5 .....................................................................................................7

Fed. R. Crim. P. 16 ......................................................................................................27

Fed. R. Crim. P. 17(c) ............................................................................................ *passim*

**Cases**

*Bowman Dairy Co. v. U.S.*,
    341 U.S. 214, 220 (1951) ........................................................................... 13

*United States v. Beckford*,
    964 F. Supp. 1010 (E.D. Va. 1997) ............................................... 1, 12, 26, 27

*United States v. Brown*,
    1995 WL 387698 at *9 (S.D.N.Y. 1995) ............................................... 13

*United States v. Daniels*,
    95 F.Supp.2d 1160 (D. Kan. 2000) ................................................... 1, 2, 12

*United States v. Ferguson*,
    37 F.R.D. 6 (D.D.C. 1965) ........................................................................ 26

*United States v. Jabar*,
    9-CR-170V, 2016 WL 8671207, at *1 (W.D.N.Y. July 22, 2016) ................................... 27

*United States v. Llanez-Garcia,*
    735 F.3d, 483 (6th Cir. 2013)........................................................................... 26, 28

*United States v. Nachamie,*
    91 F. Supp. 2d 552 (S.D.N.Y. 2000) .............................................................. 8, 12

*United States v. Nixon,*
    418 U.S. 683 (1974) .................................................................................. *passim*

*United States v. Peters,*
    2007 WL 4105671 (W.D.N.Y. 2007) ................................................................ 1

*United States v. Raineri,*
    670 F.2d 702, 712 (7th Cir. 1982) .................................................................... 8

*United States v. Sawinski,*
    2000 WL 1702032 at *2 (S.D.N.Y. 2000) ...................................................... 13

*United States v. Smith,*
    245 F.R.D. 605 (N.D. Ohio 2007).............................................................. 26, 28

*United States v. Tomison,*
    969 F. Supp. 587 (E.D. Cal. 1997).................................................................. 12

*United States v. Urlacher,*
    136 F.R.D. 550, 554 (W.D. N.Y. 1991) .......................................................... 26

*United States v. Weissman,*
    2002 WL 1467845 (S.D.N.Y. 2002) ................................................................ 1

*United States v. Williams,*
    2007 WL 2287819, at *2 (E.D. La. Aug. 8, 2007) ...........................................12

Defendant Craig Carton, by and through his undersigned counsel, Gottlieb & Janey LLP, hereby submits this memorandum of law in opposition to the Government's motion to quash Rule 17(c) subpoenas. **This memorandum is submitted on an *ex parte* basis in order to thoroughly describe the necessity of each of the Rule 17(c) subpoenas**. Thus, this opposition inevitably reveals trial strategy so that the Court might take this information into account in adjudicating the Government's motion to quash.[1]

## I.  PRELIMINARY STATEMENT

Pursuant to the Sixth Amendment of the United States Constitution, Mr. Carton possesses the right to a fair trial and the right to compulsory process to defend himself at trial. The Government is attempting to deny Mr. Carton this constitutional right by failing to provide relevant and admissible documents, and subsequently objecting to Mr. Carton's attempt to obtain these documents himself. The documents sought pursuant to Rule 17(c) are crucial to Mr. Carton's defense and are not sought for impeachment purposes, but rather to be used as evidence in his case-in-chief.

---

[1] If parties were not permitted to file *ex parte* regarding Rule 17(c) subpoenas, they would be deterred from seeking such subpoenas where their applications would necessarily reveal trial strategy. *See United States v. Daniels*, 95 F.Supp.2d 1160, 1163 (D. Kan. 2000); *see also, e.g., United States v. Peters*, 2007 WL 4105671 (W.D.N.Y. 2007) (the court sealed various *ex parte* documents relating to the issuance of pretrial subpoenas under Rule 17 to protect defendant's right to compulsory process under the Sixth Amendment and to avoid defendant having to disclose his trial strategy to the Government): *United States v. Weissman*, 2002 WL 1467845 (S.D.N.Y. 2002) (*ex parte* submissions are allowed where a party can demonstrate that it would be required to prematurely disclose its trial strategy, witness list, or other privileged information); *United States v. Beckford*, 964 F. Supp. 1010, 1027 (E.D. Va. 1997) (forcing any defendant to confront the choice between issuing a pre-trial subpoena *duces tecum* and disclosing his defense to the Government places an unconstitutional limitation on the defendant's right to compulsory process. In the absence of an *ex parte* procedure, the constitutionally-prohibited "Hobson's choice" would be forced upon all defendants).

In preparation for the upcoming trial scheduled for October 29, 2018, Mr. Carton issued seven (7) subpoenas *duces tecum* "to produce documents, information, or objects in a criminal case" pursuant to Fed. R. Crim. P. 17(c)[2], all of which were signed and sealed by the Clerk of the Court, Rudy J. Krajick.[3]  The subpoenas *duces tecum* are returnable to the Court on September 10, 2018, in order to provide the parties an opportunity to review the produced documents and not delay the trial.

Despite its objection, the Government does **not** have standing to challenge the Rule 17(c) subpoenas issued by Mr. Carton, including the particular subpoenas identified in the Government's motion to quash.  More particularly, the Government does not have a privilege or proprietary interest in the subpoenaed materials.  A "party only has standing to move to quash the subpoena addressed to another when the subpoena infringes on the movant's legitimate interest." *United States v. Daniels*, 95 F.Supp.2d 1160, 1164 (D. Kan. 2000).  Here, the Government does not and cannot show that it has any privileged or proprietary interest in the contents of the materials, nor has it articulated any basis for its objection within these rubrics.  Therefore, the Government's objection via a motion to quash is improperly asserted and should be disregarded in its entirety.

Nevertheless, *assuming arguendo* that the Court considers the arguments asserted by the Government, the Government's motion to quash must be denied as the Rule 17(c) subpoenas were properly issued and narrowly tailored in accordance with the standards set forth in *United*

---

[2] Copies of each of the Rule 17(c) subpoenas *duces tecum* are annexed to the accompanying Affirmation of Derrelle M. Janey, Esq.

[3] Neither the Federal Rules of Criminal Procedure, the Local Rules of the Southern District of New York, nor the Individual Practices and Procedures of this Court require a party to make a motion before the Court to secure the issuance of Rule 17(c) subpoenas.

*States v. Nixon*, 418 U.S. 683 (1974).   Each of these subpoenas satisfies the three-prong test of *Nixon* pertaining to relevancy, admissibility, and specificity.

## II.   **FACTUAL BACKGROUND**

Craig Carton was a nationally renowned, successful sports radio broadcaster, most recently on the "Boomer and Carton" show on WFAN-CBS Radio in New York.  Aside from his career as a radio broadcaster, Mr. Carton established a business acquiring bulk tickets to live events, including sporting events and concerts, which he in turn would resell on the secondary ticket market.   As part of his ticket resale business, Mr. Carton developed substantial relationships with senior staff members at Barclays Center[4], a sports and concert venue located in Brooklyn, New York.  Beginning in 2015, employees of Barclays Center began presenting Mr. Carton with opportunities to buy tickets to live events at Barclays Center and Nassau Coliseum for Mr. Carton to then resell on the secondary ticket market.

In May 2016, Mr. Carton formed Tier One Tickets, LLC with Michael Wright and subsequently acquired a license with the State of New York to resell tickets on the secondary ticket market.  In the summer of 2016, Mr. Carton started purchasing tickets in bulk and reselling them.   In order to effectively manage his inventory and distribution on the secondary ticket market, Mr. Carton utilized the third-party online platform provided by Ticket Utils, Inc.

In addition to his career as a radio broadcaster and his ticket resale business, Mr. Carton gambled prolifically at casinos such as Resorts World Bimini in the Bahamas; Atlantis Paradise Island Resort and Casino located in the Bahamas; Borgata Casino, Hotel and Spa located in Atlantic City, New Jersey; and Sands Casino located in Bethlehem, Pennsylvania, among others.

---

[4] The legal name for the Barclays Center is the Brooklyn Sports and Entertainment Company. This entity also controls the Nassau Coliseum located in Hempstead, New York.

In partnership with Michael Wright and Joseph Meli, Mr. Carton sought loans and investors to fund the gambling operation.  In some instances, Mr. Carton gambled on behalf of others, persons who invested large sums of money with him based on his gambling prowess.  One of these investors in Mr. Carton's gambling operation was Harvey Klein.  Mr. Klein also simultaneously provided personal loans to Mr. Meli, and his company, Advance Entertainment, LLC.

Unrelated to the gambling operation, in or around August 2016, Joseph Meli represented to Mr. Carton that he had helped orchestrate a $75 million investment by CVC Capital Partners and New Amsterdam Growth Capital, private equity firms, in DTI Management (DTI).  DTI operated a web-based portal that sold tickets to live events and worked with sports teams and ticket brokers providing software solutions and fulfillment services.  As part of the investment, Mr. Carton understood that Mr. Meli would be appointed co-Chief Executive Officer of DTI.  Mr. Meli further represented to Mr. Carton that he had deals in place with Anschutz Entertainment Group[5] (AEG) to purchase tickets in bulk to several live events.  As Mr. Meli told it, he planned to use a separate business that he owned, Advance Entertainment LLC, to purchase the AEG tickets.  Relying on Mr. Meli's representations and purported relationships, Mr. Carton then sought outside investments to fund purchases of the tickets with Advance Entertainment (the entity controlled by Meli) and Barclays Center (a pre-existing relationship shaped by Mr. Carton).

In or around September 2016, Mr. Carton began discussions with Brigade Capital Management ("Brigade"), a hedge fund, regarding a potential investment in his ticket resale

_____

[5] AEG is an American worldwide sporting and music entertainment presenter and a subsidiary of The Anschutz Corporation.  Under the AEG Live brand, it is the world's second largest presenter of live music and entertainment events.

business.  Brigade had prior experience in the ticket resale business as they previously invested in an online ticket reseller, Vivid Seats.  Brigade informed Mr. Carton that they would be conducting due diligence into Mr. Carton, Tier One Tickets LLC, Joseph Meli, Advance Entertainment, the DTI investment, as well as undertaking market analysis concerning the secondary ticket market in general.  Additionally, Brigade requested to meet with Mr. Meli and Alex Guira, the managing partner of New Amsterdam Growth Capital, to discuss New Amsterdam Growth Capital's investment in DTI, the ticket acquisition process, and Mr. Carton's ability to purchase tickets through their relationships with AEG.  During this process, Mr. Meli sent Mr. Carton several letter agreements for deals Mr. Meli purported to have in place with AEG—the purpose of the deals focused on bulk ticket purchases to various upcoming live performances.  Mr. Carton, in turn, forwarded the letter agreements to Brigade.  Ultimately, following the due diligence and background investigation, Brigade invested in Mr. Carton's ticket business.  Throughout this process, Brigade relied heavily on its legal counsel, Milbank, Tweed, Hadley & McCloy LLP ("Milbank") for due diligence and negotiations with Mr. Carton and his deal counsel.

On December 8, 2016, Brigade agreed to provide Mr. Carton with a revolving loan agreement ("Loan Agreement") of up to $10,000,000, for the purpose of funding investments in the purchase of tickets to live events.  In conjunction with the deal, Mr. Carton created a company, Ticket Jones, LLC, for the purpose of purchasing tickets with Brigade's funds.  Brigade subsequently provided advances under the Loan Agreement in the amounts of $2,600,000 and $2,000,000 to be used by Mr. Carton to place deposits for the purchase of ticket events from and/or through Advance Entertainment and Barclays, respectively.  In total, Brigade loaned Mr. Carton approximately $4,600,000.  To ensure complete transparency and oversight,

Brigade was given unfettered access to independently review Mr. Carton's accounts with Ticket Utils, Inc., the third-party electronic ticket processing and tracking platform; Brigade was able to monitor activity related to the purchases in real-time. Over the course of Mr. Carton's business relationship with Brigade, thousands of tickets were purchased and sold.

On January 27, 2017, Joseph Meli[6] was arrested and charged in the Southern District of New York under indictment No. 17 Cr. 127 (KMW). The government alleged that Mr. Meli duped investors and misrepresented his agreements to purchase tickets. Unbeknownst to Mr. Carton, Mr. Meli's agreements with AEG were fabricated.

On or about February 2, 2017, following Mr. Meli's arrest, a conference call was held involving Mr. Carton, Brigade employees John Baylis and Chris Chaice, and Barclays Chief of Staff Fred Mangione regarding the status of Brigade's investment in ticket purchases from Barclays, and to confirm that Mr. Meli was not involved in the agreement between Barclays Center and Mr. Carton. Notably, after investigating the circumstances of Mr. Meli's arrest, Brigade continued its business relationship with Mr. Carton. Over the next few months, Mr. Carton continued to sell hundreds of tickets through opportunities provided by Barclays Center.

Mr. Meli's arrest, however, resulted in the cessation of Advance Entertainment's operations. Furthermore, Advance Entertainment had failed, prior to Mr. Meli's arrest, to deliver any tickets to Mr. Carton or refund to Mr. Carton any of the deposits submitted by Mr. Carton to Advance Entertainment. As a result, Mr. Carton was financially unable to abide by the terms of the Loan Agreement. Brigade sent Mr. Carton a Notice of Default on July 28, 2017.

---

[6] Mr. Meli pleaded guilty on October 31, 2017 to securities fraud in violation of 15 U.S. Code, Sections 78j(b) & 78ff; S.E.C Code 1085; and 18 U.S. Code, Section 2. On April 3, 2018, he was sentenced to 78 months imprisonment and restitution in the amount of $58,777,813.

On August 18, 2017—prior to Mr. Carton's arrest—Mr. Carton entered into a Forbearance Agreement with Brigade regarding the money loaned to Mr. Carton, through which family and friends served as guarantors on the loan.

On September 6, 2017, Mr. Carton was arrested. Mr. Carton is alleged to have conspired with Michael Wright and an unnamed individual, later learned to be Mr. Meli (*see* Gov't Sentencing Memo, *United States v. Meli*, No. 17 Cr. 127 (KMW)), in a scheme to solicit investments in a ticket resale business. In announcing his arrest, the Government stated that Mr. Carton defrauded his investors and had never, in fact, purchased tickets for the live events.

On November 2, 2017, a grand jury Indictment was filed in the Southern District of New York against Mr. Carton, along with Michael Wright, charging them with (1) Conspiracy to Commit Securities Fraud and Wire Fraud in violation of 15 U.S.C. §§ 78j (b) & 78ff, 17 C.F.R § 240.10b-5; and 18 U.S.C § 1343; (2) Wire Fraud in violation of 18 U.S.C. §§ 1343 and 2; and (3) Securities Fraud in violation of 15 U.S.C. §§ 78j (b) & 78ff, 17 C.F.R § 240.10b-5; and 18 U.S.C § 2. The Indictment alleges that Mr. Carton misappropriated investor funds (i.e. Brigade) in connection with his ticket resale business—purportedly, *inter alia*, for the purpose of repaying gambling debts.

Subsequently, the Forbearance Agreement was fully satisfied and Brigade was repaid any monies allegedly lost.

On the basis of the facts underlying the factual allegations against Mr. Carton, the following individuals, among others, are reasonably expected to be potential witnesses at Mr. Carton's trial: Joseph Meli; Harvey Klein; Alex Guira; former and current employees of Barclays Center Brett Yormark, Fred Mangione, Paul Kavanaugh, and Keith Sheldon; current Brigade employees John Baylis and Chris Chaice; and current partner at Milbank, Tweed,

Hadley & McCloy LLP George Canellos.  These potential witnesses are all recipients of the Rule 17(c) subpoenas issued by Mr. Carton.  However, simply because the Government claims that some of these third parties are potential witnesses does not automatically provide the Government with the required privilege or a propriety interest to have standing to challenge the Rule 17(c) subpoenas.[7]

### III.   HISTORY OF DISCOVERY

Discovery has been produced by the Government in this case on a rolling basis since shortly after the filing of the Indictment in November 2017 and has been provided in at least eleven separate productions.[8]  To date, the Government has produced over four hundred and fifty thousand documents to Mr. Carton.  Having reviewed these productions, Mr. Carton concludes that there is information in the possession of individuals and entities—the subjects of the Rule 17(c) subpoenas—not contained in these productions that will be crucial to Mr. Carton's defense at trial.  While the subject matter of some of the Rule 17(c) subpoenas may slightly overlap with documents produced during discovery, only a scintilla of evidence produced by the Government covers the documents requested in the Rule 17(c) subpoenas by Mr. Carton. Further, the documents produced that do overlap with the Rule 17(c) subpoenas do not cover the entire time frame or scope of the documents requested by Mr. Carton, all of which are necessary for Mr. Carton's defense.

---

[7] *See United States v. Nachamie*, 91 F. Supp. 2d 552, 560 (S.D.N.Y. 2000).  Rather, the Government must have a legitimate interest in "preventing undue lengthening of the trial, undue harassment of its witness, and prejudicial overemphasis on [the witness'] credibility." *Id.* (quoting *United States v. Raineri*, 670 F.2d 702, 712 (7th Cir. 1982).  The Government is unable to identify such a critical interest in relation to the Rule 17(c) subpoenas issued by Mr. Carton.

[8] The Government has produced additional discovery as recently as August 27, 2018—the week of the filing of  this memorandum.  This most recent production included additional relevant email communications, which raises the specter the Government has not produced all relevant communications.

A.  Discovery Regarding Brooklyn Sports and Entertainment Company (a.k.a. Barclays Center)

On November 11, 2017, the Government produced various documents, emails and other records obtained from Barclays Center. (Bates #s USAO CartonWright_10200-10233, 12927-13058, and 58539-587270).   However, this production is limited in that it only includes a few dozen selected communications between Mr. Carton and Barclays Center and is limited to the time period between October 2016 and June 2017.   The documents produced do not cover communications between Mr. Carton and Barclays Center from the time period prior to October 2016, including when their business relationship first began in 2015.   These productions also do not include the following pertinent documents from Barclays Center: any internal communications concerning Mr. Carton and the sale of event tickets to Mr. Carton or any related entity; any communications with the United States Government concerning Mr. Carton; any documents from the personnel file of Fred Mangione; and any documents pertaining to the conference call on or about February 2, 2017 with Mr. Carton, Barclays employees, and Brigade employees in which it was confirmed that Mr. Meli was not involved in the agreement between Barclays Center and Mr. Carton.

B.  Discovery Regarding Brigade Leveraged Capital Structures Fund LP (a.k.a. Brigade)

On November 11, 2017, the Government produced various documents, emails and other records obtained from Brigade. (Bates #'s USAO CartonWright_134-439, 516-582, 10234-12698, 12924-12926, 27964-28230, and 58728-61568).   While these productions do contain some communications and documents involving Brigade and Mr. Carton, pertinent documents known to exist and not produced include: due diligence and investigative reports pertaining to Mr. Carton and Mr. Meli; market analysis reports undertaken by Brigade in connection with their investment in Mr. Carton's ticket business; market analysis reports pertaining to prior

9

investments made by Brigade in the secondary ticket market; documents reflecting the conference call on or about February 2, 2017; documents reflecting the satisfaction of the Forbearance Agreement; and information regarding Brigade's account and log-in information with Ticket Utils, Inc., the third-party platform Brigade used to monitor purchases and sales related to the ticket resale business.

### C.  Discovery Regarding Milbank, Tweed, Hadley & McCloy LLP (a.k.a. Milbank)

The Government has not produced any records, documents, or communications obtained directly from Milbank.   While some of the Government's productions have included communications between employees of Milbank and Mr. Carton and employees of Brigade, the Government has not produced any communications between the Government and employees of Milbank concerning Mr. Carton and/or Brigade.  Communications between Milbank and the Government as part of the Government's investigation are discoverable since Milbank is a potential witness at trial.  While Mr. Carton recognizes that not all communications between Milbank and the Government may be admissible at trial, the documents and business records, among other forms, provided by Milbank to the Government are admissible at trial.  Thus, the communications and other documents provided by Milbank are necessary.

### D.  Discovery Regarding Harvey Klein

The Government has not produced any records, documents, or communications explicitly obtained from Harvey Klein.  While some of the Government's productions have included communications involving Harvey Klein and Mr. Carton and/or Mr. Wright, the Government has not produced any communications between Harvey Klein and Mr. Meli or Advance Entertainment.  While the Government has produced a draft of one agreement between Mr.

Klein and Mr. Meli (Bates # USAO_Carton-Wright_2_000081163), this draft is unsigned and it is believed there are other loan agreements between Mr. Klein and Mr. Meli.

E.  Discovery Regarding Ticket Utils, Inc.

On December 5, 2017, the Government produced some files pertaining to Ticket Utils, Inc. (Bates #s USAO_CartonWright_92110- 92124).  While this production includes some individual confirmations of transactions involving Mr. Carton and a few communications involving Mr. Carton, they are limited in scope and do not cover the entire course of the business relationship between Ticket Utils, Inc. and Mr. Carton.  The Government's productions also do not include any documents reflecting Brigade's use of the Ticket Utils, Inc. platform.

F.  Discovery Regarding Bank of America

On November 11, 2017, the Government produced records obtained from Bank of America relating to Advance Entertainment, LLC's bank accounts. (Bates #s USAO CartonWright_13924-13927, 44515-46283, 49939-51041, and 51516-51753).  However, in regards to the Advance Entertainment, LLC account with Bank of America (account # 6550113516), the Government has only produced letters from Merrill Lynch on changes to the account or to confirm recent activity and records of a few individual wire transfers.  The Government has not produced bank account records or wire transfer authorization forms for this account during the relevant time period—2015-2017. These bank records will illustrate the scheme perpetrated by Mr. Meli, and indicate that Mr. Carton was one of Mr. Meli's many victims—not a co-conspirator.

G.  Discovery Regarding Alex Guira

The Government has not produced any records, documents, or communications explicitly obtained from Alex Guira and/or New Amsterdam Growth Capital.  While some of the

Government's productions have included some limited communications and records involving Mr. Guira and Mr. Meli, Advance Entertainment, DTI Management and Brigade, these documents only appear in productions pertaining to Mr. Carton's emails, and thus only include instances when Mr. Carton was a named recipient on the communication. There have been no documents produced regarding communications between Mr. Guira and Mr. Meli, Advance Entertainment, DTI and/or Brigade, when Mr. Carton was not a recipient.

IV.   **ARGUMENT**

A.   **MR. CARTON'S RULE 17 SUBPOENAS ARE NARROWLY TAILORED, REQUEST RELEVANT AND ADMISSIBLE DOCUMENTS, AND OTHERWISE MEET THE *NIXON* STANDARD.**

Even if the Government had standing to challenge the subpoenas—which the law is clear that the Government does not[9]—the subpoenas were properly issued and narrowly tailored to

---

[9] A party is able to move to quash a subpoena to a non-party only if it has a protectable interest in the materials being subpoenaed, and the government will not often have such an interest in materials held by a non-party. *See United States v. Tomison*, 969 F. Supp. 587, 596 (E.D. Cal. 1997); *see also, e.g., United States v. Daniels*, 95 F. Supp. 2d 1164 (D. Kan. 2000) ("The government will often lack standing to challenge a subpoena issued to a third party absent a claim of privilege, proprietary interest in the subpoenaed material, or some other interest in the subpoenaed material.") (citing *United States v. Beckford*, 964 F. Supp. 1010, 1023 (E.D. Va. 1997)); *United States v. Williams*, 2007 WL 2287819, at *2 (E.D. La. Aug. 8, 2007) (holding that government lacked standing to quash subpoena issued to non-parties where law enforcement privilege was not applicable and government failed to establish that the subpoena would delay trial or result in undue harassment of the subpoena recipients); *United States v. Nachamie*, 91 F. Supp. 2d 552, 560 (S.D.N.Y. 2000) (government lacked standing to challenge subpoenas served on non-parties as the government did not assert a legitimate interest in the materials being sought). The court in *United States v. Nachamie* further held that **"[i]f the Government had standing to move to quash whenever a subpoena was served on a potential witness, then it could move to quash virtually every Rule 17(c) subpoena merely by claiming that the recipient might become a witness. Surely, the concept of standing was not meant to be so elastic."** *Id.*

The Government argues that it has standing "in light of the facial overbreadth of the subpoenas" and because the subpoenaed parties are Government witnesses at the upcoming trial. The Court must reject this basis for asserting standing. The Government's contention does not demonstrate that the Government has any of the interests required for a party to have standing to quash a

comply with the standards set forth by the Supreme Court in *Nixon*. According to the Supreme Court in *Nixon*, the purpose of Rule 17(c) of the Federal Rules of Criminal Procedure is to facilitate and expedite the trial by designating a time and place prior to trial to obtain and inspect evidentiary material obtained via subpoena. *Nixon*, 418 U.S. at 698-99.

In order to withstand a challenge to a subpoena *duces tecum* under Rule 17(c), the *Nixon* standard requires a subpoenaing party must show:

> (1) that the documents are evidentiary and relevant;
> (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence;
> (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and
> (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'

*Id.* at 699-700. To meet these requirements, the materials sought by the moving party must satisfy three criteria: (1) relevancy; (2) admissibility; and (3) specificity. *Id.* at 700. The defendant "has the burden of specifically identifying the materials sought, and showing that they are relevant and admissible." *United States v. Brown*, 1995 WL 387698 at \*9 (S.D.N.Y. 1995). In order to satisfy the specificity requirement of *Nixon,* the party seeking production of the materials must "reasonably specify the information contained or believed to be contained in the documents sought" rather than merely hope that something useful will turn up. *United States v. Sawinski*, 2000 WL 1702032 at \*2 (S.D.N.Y. 2000) (quotations omitted). **A subpoena meets**

---

subpoena. Further, the Government has not demonstrated, nor could they, that the subpoena is unreasonable or oppressive to the Government, nor has the Government asserted that its issuance will result in a delay of the trial. To the contrary, a subpoena returnable before trial will avoid delay in the government's prosecution of the case. *See Bowman Dairy Co. v. U.S.*, 341 U.S. 214, 220 (1951). Thus, the Government does not meet its burden of demonstrating that it has standing to move to quash the subpoenas.

**the specificity requirement if the defendant is able to specify what he believes to be contained in the documents he seeks.** *Id.*

Mr. Carton respectfully submits that the *Nixon* standards have been met for each of the seven Rule 17(c) subpoenas that have been issued, three of which are challenged by the Government's motion to quash (subpoenas issued to Brigade, Barclays Center, and Milbank). The Government also requests a blanket stay of all Rule 17(c) subpoenas issued by Mr. Carton.[10] Not only does the Government fail to analyze each document request in each subpoena, but instead generally contends that the subpoenas are overbroad and constitute improper "fishing expeditions." Here, Mr. Carton addresses each subpoena and document request individually in order to demonstrate to the Court that each complies with the *Nixon* standards.

Further, Mr. Carton illustrates that the materials sought are not impeachment materials, but rather evidence that Mr. Carton intends to submit in the case-in-chief. Documents which go to the heart of Mr. Carton's defense do not constitute impeachment materials solely because the documents may reflect poorly on the Government's witnesses.

1. **The Rule 17(c) Subpoenas Sought to Be Quashed by the Government Meet the *Nixon* Standard**

   a. **The Subpoena Issued to Barclays Center Meets the *Nixon* Standard (*See Exhibit 1*)**

The subpoena contains five separate and specific requests for documents.

Document Request One

Mr. Carton seeks documents and communications between Barclays Center employees, on the one hand, and Mr. Carton and/or Brigade, on the other hand. This request seeks documents and communications during the entire time period of the business relationship

---

[10] The Government presents no basis or authority to stay compliance of all Rule 17(c) subpoenas issued by Mr. Carton.

between Mr. Carton and Barclays Center (2015-2017), and identifies certain employees (Brett Yormark, Fred Mangione, Brett Kavanaugh, Keith Sheldon) who regularly communicated with Mr. Carton and/or Brigade.  While documents reflecting communications between October 2016 and June 2017 have been produced in discovery, the entire time period is not covered and all of Mr. Carton's communications are not provided.  The requested documents are not only relevant, but they are crucial to Mr. Carton's defense in this case.  The Government alleges that Mr. Carton did not have a legitimate ticket resale business and the purported ticket entities were only vehicles to defraud Brigade. (*See* U.S. Attorney's Office, S.D.N.Y. Press Release dated September 6, 2017).  Communications between Barclays Center and Mr. Carton will directly contravene the Government's allegations and will demonstrate the existence of a legitimate business relationship, and Mr. Carton's purchase of premium tickets to live events worth hundreds of thousands of dollars.  Additionally, the documents and communications requested will demonstrate that Brigade communicated directly with Barclays Center regarding their investment in the purchase of tickets to live events.

Furthermore, this request is reasonably specific with regards to the documents sought and does **not** seek "all documents" in a blanket request.

Document Request Two

Mr. Carton seeks documents and internal communications between employees of Barclays Center concerning the sale of tickets to Mr. Carton.  This request is similar to the request above in that it seeks documents and communications during the entire time period of the business relationship between Mr. Carton and Barclays Center.  The requested documents are relevant and admissible because, according to the Government's Complaint, Barclays Center alleges it did not have any agreement with Mr. Carton for the sale of tickets to live events. (*See*

Complaint).   These internal communications will demonstrate the discussions employees of Barclays Center had regarding the sale of tickets to Mr. Carton and their understanding of the business relationship with Mr. Carton.  This request is reasonably specific in that the documents sought are limited and identified and the request does not blindly seek "all documents" in a blanket request.

### Document Request Three

Mr. Carton seeks documents reflecting communications by the Barclays Center with the Government concerning Mr. Carton.  This request includes any documents, reports, and records generated by Mr. Carton or others that were then sent to the Government.  These documents are relevant to Mr. Carton's defense and admissible as they pertain to the lack of thoroughness and completeness of the Government's investigation.   Mr. Carton intends to argue that the Government failed to conduct a thorough investigation prior to his arrest.  This request is reasonably specific as the documents requested can be readily identified.

### Document Request Four

Mr. Carton seeks the personnel file of Fred Mangione, the former Chief of Staff at Barclays Center.  Mr. Mangione was Mr. Carton's primary contact at Barclays Center.  Based on discovery received thus far, Mr. Mangione approved Barclays Center's deal with Mr. Carton—a deal which the Government alleges was fraudulent.  Mr. Mangione ceased being employed with Barclays Center in or around April 2017 after 17 years with the company and, upon information and belief, this is related to Mr. Mangione approving the deal with Mr. Carton.

The Government cites this request as an example of impeachment material requested by Mr. Carton because Mr. Mangione is one of the many anticipated Government witnesses who are or were employed by Barclays Center.   However, this request does not seek to obtain

impeachment materials; rather, Mr. Carton seeks documents that will be used on the case-in-chief reflecting whether Mr. Mangione was disciplined for his conduct in selling tickets at face value to Mr. Carton; whether this conduct was condoned, permitted, or encouraged by Barclays Center; and whether Mr. Mangione's conduct relating to Mr. Carton was any basis for him leaving the employ of Barclays Center in April 2017.   The fact that Mr. Mangione is a Government witness does **not** make all documents relevant to him solely impeachment material. Again, this request identifies the documents sought with specificity, and is not an overly broad blanket request.

> Document Request Five

Mr. Carton seeks documents pertaining to a conference call on or about February 2, 2017—following Mr. Meli's arrest—involving Mr. Carton, Mr. Mangione, and Brigade employees John Baylis and Chris Chaice.   These documents are relevant and admissible to demonstrate that despite the Government's contention, there was a legitimate ticket resale business being operated by Mr. Carton and there was an agreement between Barclays Center and Mr. Carton for the allotment of certain tickets to live events.   Further, the evidence requested will demonstrate that after investigating the circumstances of Mr. Meli's arrest, Brigade continued its business relationship with Mr. Carton, and that over the next few months, Mr. Carton continued to sell hundreds of tickets through opportunities provided by Barclays Center.   This request is extremely specific and cannot be mistaken for a "fishing expedition."

> ### b.  **The Subpoena Issued to Brigade Meets the *Nixon* Standard (*See Exhibit 2)*

The subpoena contains seven separate and specific requests for documents.

<u>Document Request One</u>

Mr. Carton seeks due diligence and investigative reports obtained by Brigade regarding Mr. Carton, Tier One Tickets LLC, Joseph Meli, and Advance Entertainment, as Brigade indicated to Mr. Carton it performed such due diligence (*See* USAO Carton/Wright_12492-3 & 12506). Mr. Carton also seeks internal communications between Brigade employees regarding these due diligence reports. The Government contends this request constitutes an improper "fishing expedition;" however, this contention is wholly inaccurate. The due diligence conducted by Brigade prior to entering into an agreement with Mr. Carton is known to exist and will demonstrate the steps taken by Brigade to confirm the legitimacy of Mr. Carton's ticket business. This evidence will also illustrate an important element of Mr. Carton's defense—the lack of intent. Further, these documents will rebut the allegation by the Government that Mr. Carton's ticket business was merely a vehicle to commit the alleged fraud. These documents are clearly relevant and admissible in the case-in-chief. Further, this request is narrowly tailored and reasonably specific in the documents it requests as these documents are readily identifiable. Other than broadly claiming this request is a "fishing expedition," the Government has not put forth any more legitimate argument as to why this request is improper.

<u>Document Request Two</u>

Mr. Carton seeks copies of all market analysis reports underlying prospective investments by Brigade in the secondary ticket market. Leading up to the Loan Agreement in December 2016, Brigade informed Mr. Carton that they were undertaking such evaluation in the secondary ticket market in general. These documents are relevant and admissible in Mr. Carton's defense to indicate the legality and legitimacy of the business model reselling tickets to live events. Like

the other due diligence evidence sought by Mr. Carton, the documents requested here will also bolster Mr. Carton's lack of criminal intent.

Document Request Three

Mr. Carton also seeks copies of all market analysis reports underlying Brigade's prior investments in the secondary ticket market, *i.e.,* those pre-dating the investment involving Mr. Carton, including but not limited to Brigade's investment in Vivid Seats, an online ticket reseller. Again, this is a reasonably specific request for prior market analysis reports created by Brigade regarding the secondary ticket business.  These reports will establish that Brigade possessed extensive knowledge regarding the secondary ticket market as it was a sophisticated and experienced investor in this industry.  The Government cites this request as an example of a "fishing expedition" because the evidence sought, the Government purports, has nothing to do with the events set forth in the Indictment.  However, again, these reports will demonstrate Brigade was a knowledgeable investor in the secondary ticket market, and that Brigade would **not** have invested with Mr. Carton if he did not have a legitimate ticket business, contrary to the Government's contention.

Document Request Four

As discussed above in Document Request Five of the subpoenas *duces tecum* issued to Barclays Center, Mr. Carton seeks documents pertaining to a conference call on or about February 2, 2017—following Mr. Meli's arrest—involving Mr. Carton, Mr. Mangione, and Brigade employees John Baylis and Chris Chaice.  These documents are also relevant and admissible to demonstrate that despite the Government's contention, there was a legitimate ticket resale business being operated by Mr. Carton and that he had an agreement with Barclays Center for the allotment of certain tickets to live events.  Further, the evidence requested will

demonstrate that after investigating the circumstances of Mr. Meli's arrest, Brigade **continued** its business relationship with Mr. Carton, and that over the next few months, Mr. Carton continued to sell hundreds of tickets through opportunities provided by Barclays Center.   Again, this request is extremely specific and cannot be mistaken for a "fishing expedition."

Document Request Five

Mr. Carton seeks documents pertaining to the satisfaction of the Forbearance Agreement entered into between Mr. Carton and Brigade on August 18, 2017.   The Forbearance Agreement—which Brigade entered into after issues arose with the initial loan and prior to Mr. Carton's arrest—demonstrates Brigade's state of mind in dealing with Mr. Carton and the lack of intent to defraud on the part of Mr. Carton.   Further, documents pertaining to the **full satisfaction** of the Forbearance Agreement will exhibit that Mr. Carton did not have the requisite intent to defraud Brigade.   This request is reasonably specific in the documents requested.

Document Request Six

Mr. Carton seeks records indicating any account(s) Brigade setup with Ticket Utils, Inc. These account records are relevant and admissible in Mr. Carton's defense as they will demonstrate that Brigade had unfettered access to Mr. Carton's ticket inventory to monitor their investment in real time.   These records will demonstrate the direct access Brigade was provided to monitor the purchases and sales of tickets.   Furthermore, the control exercised by Brigade is pertinent to Mr. Carton's defense that the Loan Agreement does not constitute a "security" under the statute.   Lastly, these records will, again, demonstrate the legitimacy of Mr. Carton's ticket business, as well as reflect that Mr. Carton did not possess intent to defraud Brigade as tickets were purchased and sold as agreed upon.   This request is sufficiently specific in that the documents sought are readily identifiable.

20

Document Request Seven

Mr. Carton seeks copies of documents reflecting each log-in date and time on the Ticket Utils, Inc. platform by Brigade employees. After investing in Mr. Carton's ticket business in December 2017, Brigade was provided access to Mr. Carton's accounts with Ticket Utils, Inc.— enabling Brigade to track in real time all ticket sales in relation to its investment with Mr. Carton. The requested records would evidence the extensive level of oversight and transparency that Brigade was given in its investment with Mr. Carton. Such records are fundamental in proving that Mr. Carton had a legitimate business relationship with Brigade and did not have intent to defraud Brigade. Additionally, Mr. Carton is narrowly requesting records of Brigade's use of the Ticket Utils, Inc. platform. The request is narrowly tailored to gather specific records in support of Mr. Carton's defense.

### c.   **The Subpoena Issued to Milbank Meets the *Nixon* Standard (*See Exhibit 3*)**

The subpoena contains one specific request for documents. Mr. Carton seeks documents reflecting communications by Milbank with the Government concerning Mr. Carton or Brigade. This request includes any documents, reports, and records generated by Mr. Carton or other individuals or entities sent to the Government. These documents are relevant and admissible in Mr. Carton's defense as they pertain to the thoroughness and completeness of the Government's investigation. Mr. Carton intends to argue that the Government failed to conduct a thorough investigation prior to his arrest. This request is reasonably specific in the documents requested can be readily identified.

21

### 2. Mr. Carton's Rule 17 Subpoenas Not Addressed in the Government's Motion to Quash Also Meet the *Nixon* Standard

In addition to the subpoenas raised in the Government's motion to quash, Mr. Carton also recently issued Rule 17(c) subpoenas upon Alex Guira, Harvey Klein, Bank of America, and Ticket Utils, Inc. All of these subpoenas should also be upheld by the Court as they comply with the *Nixon* standards and are relevant, admissible and specific.

### a. The Subpoena Issued to Harvey Klein Meets the *Nixon* Standard (*See Exhibit 4*)

The subpoena contains **one** specific request for documents. Mr. Carton issued a subpoena to Harvey Klein for a copy of loan documents, agreements and communications in 2016 with Joseph Meli and/or Advance Entertainment, Mr. Meli's company. This evidence is **essential** in disproving the Government's allegation that Mr. Carton misappropriated Brigade's investment to pay off his personal debts. Specifically, the Government alleges in the Indictment that, on December 12, 2016, Michael Wright authorized the wiring of $500,000 of Brigade's investment from "CARTON-WRIGHT Entity-2 Account to an individual who had previously provided Carton with a short-term loan." This individual was Harvey Klein. (*See* USAO_Carton-Wright_2_000084711). The requested communications between Mr. Klein and Mr. Meli would demonstrate this allegation to be unfounded. In 2016, Mr. Klein provided multiple loans, not only loans to Mr. Carton, but also to Mr. Meli. The requested communications between Mr. Klein and Mr. Meli would demonstrate that the funds sent to Mr. Klein on December 12, 2016 were a repayment of Mr. Meli's debts with Mr. Klein—**not** Mr. Carton's. Thus, Mr. Carton's subpoena for Mr. Klein's agreements and communications with Mr. Meli would disprove a critical allegation by the Government by illustrating that Brigade's funds were not used to repay Mr. Carton's debts. Thus, the requested documents are both

relevant and admissible. This request is also sufficiently specific as it is limited to the time period in which Mr. Klein provided loans to Mr. Meli, and specifically identifies documents that will comply with the request.

### b. The Subpoena Issued to Ticket Utils, Inc. Meets the *Nixon* Standard (*See Exhibit 5*)

The subpoena contains three separate and specific requests for documents.

Document Request One

Mr. Carton's first request seeks copies of records maintained by Ticket Utils, Inc. regarding accounts maintained by Mr. Carton and his entities relating to the sale of tickets to live events through the Ticket Utils, Inc. platform. These records are relevant as they that would directly rebut the Government's allegations that Mr. Carton did not have a legitimate ticket business and that he intended to defraud Brigade. Ticket Utils, Inc. provides ticket broker software for inventory management and distribution on the secondary ticket market. Mr. Carton utilized Ticket Utils, Inc.'s platform to manage his tickets business. This request is also adequately specific as it is limited to records from the specific time period that Mr. Carton utilized the platform in connection to the specific companies (Tier One Tickets, LLC and Ticket Jones, LLC) that comprised Mr. Carton's ticket business.

Document Request Two

Mr. Carton's second request seeks copies of communications between Ticket Utils, Inc. and Mr. Carton. Once again, these records are relevant as they that would directly rebut the Government's allegations that Mr. Carton did not have a legitimate ticket business and that he intended to defraud Brigade. This request is also adequately specific as it is limited in both time and scope.

23

Document Request Three

Mr. Carton's third request seeks copies of documents reflecting the log-in information on the Ticket Utils, Inc. platform for Brigade employees. After investing in Mr. Carton's ticket business in December 2017, Brigade was provided access to Mr. Carton's accounts with Ticket Utils, Inc. enabling Brigade to track in real time all ticket sales in relation to its investment with Mr. Carton. These documents will reflect the direct access provided to Brigade to track Mr. Carton's sales in relation to Brigade's investment. This would evidence the extensive level of oversight and transparency that Brigade was given in its investment with Mr. Carton. Such records are also fundamental in proving that Mr. Carton had a legitimate business relationship with Brigade and did not intend to defraud the hedge fund. Additionally, Mr. Carton is narrowly requesting records of Brigade's use of the ticket resale platform, and only during the particular time period of Brigade's investment with Mr. Carton. This subpoena is narrowly tailored to gather specific records in support of Mr. Carton's defense.

### c. **The Subpoena Issued to Bank of America Meets the *Nixon* Standard (*See Exhibit 6)***

The subpoena contains two specific requests for documents.

Document Request One

Mr. Carton's request seeks Advance Entertainment's bank records from Bank of America during the relevant time period. These bank records are relevant because they would aid Mr. Carton's defense by illustrating that he was not a co-conspirator with Joseph Meli but rather a victim of Mr. Meli's scheme to dupe investors and business partners. The Government alleges that Mr. Meli's business, Advance Entertainment, was one of the vehicles used by Mr. Carton to misappropriate Brigade's investment. However, the requested bank records of Advance Entertainment would contravene this allegation and enable Mr. Carton to demonstrate that he

24

was a victim of Mr. Meli's scheme for which Mr. Meli has been separately indicted, convicted and sentenced. The request for bank documents is reasonably and the documents readily identifiable.

Document Request Two

Mr. Carton requests wire transfer authorization forms for Advance Entertainment's bank account. For the same reason as above, these records will demonstrate that Mr. Carton was not a co-conspirator of Mr. Meli's. These bank records will illustrate the scheme perpetrated by Mr. Meli, and indicate that Mr. Carton was one of Mr. Meli's many victims.

### d. The Subpoena Issued to Alex Guira Meets the *Nixon* Standard (*See Exhibit 7*)

The subpoena contains two specific requests for documents.

Document Request One

Mr. Carton requests any agreements or communications between Mr. Guira and Mr. Meli, Advance Entertainment, and DTI Management during 2016. Amsterdam Growth Capital, for which Mr. Guira is the managing partner, invested in DTI and appointed Mr. Meli co-Chief Executive Officer of DTI. Mr. Meli then sent Mr. Carton several letter agreements for deals Mr. Meli allegedly had in place with AEG to purchase tickets in bulk to various upcoming live performances, which Mr. Carton passed on to Brigade. However, these agreements turned out to be fabricated. These requested documents are relevant and admissible to Mr. Carton's defense that he too was duped by Mr. Meli and was not a co-conspirator. This request is reasonably specific in subject matter and temporal scope.

Document Request Two

Mr. Carton also requests any communications in 2016 between Mr. Guira and Brigade. Brigade requested to meet with Mr. Guira to discuss New Amsterdam Growth Capital's

investment in DTI and the ticket acquisition process during the due diligence phase of negotiations with Mr. Carton.  These documents are relevant and admissible to Mr. Carton's defense that he had a legitimate ticket business and that he was a victim of Mr. Meli.  Once again, this request is not a "fishing expedition" as it requests specific communications known to exist between Mr. Guira and Brigade.

## B.   THE RULE 17(C) SUBPOENAS ARE PROCEDURALLY PROPER

Subdivision (c) of Rule 17 of the Federal Rules of Criminal Procedure authorizes a party to require the production of documents or other physical evidence within the custody and control of the named witness. Fed. R. Crim. P. 17(c)(1).  Rule 17(c) also provides an opportunity for the witness or custodian to challenge a subpoena *duces tecum* by a motion to "quash or modify the subpoena if compliance would be unreasonable or oppressive."  Fed. R. Crim. P. 17(c)(2). While discretion is given to the court to potentially direct production and inspection of the subpoenaed items before the court at a time prior to trial or when they are to be offered in evidence, Fed. R. Crim. P. 17(c)(1), Rule 17 does **not** mandate such court involvement when a subpoena is made returnable in advance of trial.  *See United States v. Urlacher*, 136 F.R.D. 550, 554 (W.D. N.Y. 1991).  "[N]either a plain-language reading of the rule's text, nor a rendering of its purpose, nor a review of decisional law unequivocally supports a pre-issuance approval requirement."  *United States v. Llanez-Garcia*, 735 F.3d, 483, 499 (6th Cir. 2013); *see also United States v. Smith*, 245 F.R.D. 605, 610 (N.D. Ohio 2007) (there is "no authority for [the] argument that a party must first procure an order of this court before issuing a subpoena under Rule 17.").  Further, the Local Rules for the Southern District of New York and this Court's Individual Practices and Procedures do not require Court approval of Rule 17(c) subpoenas prior to their issuance.

26

The Government fails to cite any federal rules or statutes **requiring** so-ordered subpoenas in this context.  The Government relies on two cases (*United States v. Ferguson*, 37 F.R.D. 6, 7-8 (D.D.C. 1965) and *United States v. Beckford*, 964 F. Supp. 1010, 1020-21 (E.D. Va. 1997)) for its contention that the subpoenas *duces tecum* issued by Mr. Carton are procedurally improper. However, neither of the two cases relied upon are from courts in the Second Circuit or Southern District of New York.  In *Beckford*, the court held that the use of a motion as the procedural means for invoking the court's discretion in advance of issuance of a pre-trial subpoena *duces tecum* "is an orderly and desirable procedure and one frequently followed," although Rule 17 "does not clearly require it." *Id.* at 1021.

The lack of a requirement for prior judicial authorization is also evident from a reading of the actual subpoena *duces tecum* form used by many of the district courts, including this District. The subpoena *duces tecum* contains the following "notice to those who use this form to request a subpoena."

> Before requesting and serving a subpoena pursuant to Fed. R. Crim. P. 17(c), the party seeking the subpoena is advised to consult the rules of practice of the court in which the criminal proceeding is pending to determine whether any local rules or orders establish requirements in connection with the issuance of such a subpoena. If no local rules or orders govern practice under Rule 17(c), counsel should ask the assigned judge whether the court regulates practice under Rule 17(c) to 1) require prior judicial approval for the issuance of the subpoena, either on notice or ex parte; 2) specify where the documents must be returned (e.g., to the court clerk, the chambers of the assigned judge, or counsel's office); and 3) require that counsel who receives produced documents provide them to opposing counsel absent a disclosure obligation under Fed. R. Crim. P. 16.

Thus, the face of the subpoena form illustrates that it is not a requirement that prior judicial approval be obtained for the issuance of a subpoena *duces tecum*.

Instead, Rule 17(c) clearly provides a specific mechanism through a motion to quash for the court to review such subpoenas. Fed. R. Crim. P. 17(c)(2). "The text of Rule 17(c)(1) does not impose any requirements, but to survive a motion to quash, the subpoenaed materials must be 'reasonable' so that compliance with the subpoena is not 'oppressive.'" *United States v. Jabar*, 9-CR-170V, 2016 WL 8671207, at *1 (W.D.N.Y. July 22, 2016). A hearing on a motion to quash provides "the best opportunity to challenge the propriety of a subpoena by subjecting it to the requirements of the *Nixon* test, at which time the requesting party can clear the hurdles of relevancy, admissibility, and specificity." *Llanez-Garcia*, 735 F.3d at 499 (citing *Smith*, 245 F.R.D. at 610). Thus, the Court should evaluate the merits of Mr. Carton's subpoenas as discussed above and not on the basis of an indeterminate requirement of Rule 17(c) as put forth by the Government.

## V.   **CONCLUSION**

For the reasons described above, Mr. Carton respectfully submits that the Government's motion to quash Rule 17(c) subpoenas be denied.

Dated: New York, New York
      August 31, 2018

By: _____
    Derrelle M. Janey
    Robert C. Gottlieb
    Seth J. Zuckerman

    GOTTLIEB & JANEY LLP
    111 Broadway, Suite 701
    New York, NY 10006
    Tel.: (212) 566-7766
    Fax: (212) 374-1506

    *Attorneys for Defendant*
    *Craig Carton*

To:    All counsel of record (via ECF)