UNITED STATES DISTRICT CORUT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/26/18
```

----------------------------------------x

UNITED STATES OF AMERICA,

    -against-                                                        17 Cr. 680 (CM)

CRAIG CARTON,

              Defendant.

----------------------------------------x

# DECISION AND ORDER GRANTING GOVENRMENT'S *MOTION IN LIMINE* BARRING THE ADMISSION OF THE VICTIM NOTIFICATION SYSTEM LETTER RECEIVED BY DEFENDANT

McMahon, C.J.:

      Defendant Craig Carton has been charged with, in essence, perpetrating a Ponzi scheme.

      Carton was not the original target of the investigation into the ticket purchase and resale endeavor that ended with his indictment; one Joseph Meli was. In connection with the Meli investigation, AUSA Elisha Kobre asked Sweeney to prepare "a good estimate of the number of investors and sum of investments" for each of two fraudulent schemes that Meli allegedly perpetrated – the Sentinel Fraud Scheme and the Ticket Fraud Scheme. (DX 1, email dated Fed. 19, 2017.) On February 19, 2017, Kobre forwarded Sweeney a spreadsheet that had been prepared by the SEC, using bank records that showed money flowing into and out of Meli's bank accounts. At Kobre's direction, Sweeney participated in a telephone call with an attorney and an accountant from the SEC to "walk you through [the SEC's] analysis" – following which, Sweeney prepared the requested "good estimate" for Kobre by creating an Excel spreadsheet that incorporated the SEC's data. (*Id.*)

      As someone whose name had come up during the analysis of bank records, Carton appears on that spreadsheet as one of Meli's investors. So does a company of his, Dark Knight Ventures LLC.

      At the time he created the spreadsheet, Sweeney does not appear to have made any judgments about whether particular people who had been identified by the SEC from bank records were (or were not) actual victims of any fraud. In particular, Sweeney testified, credibly, that he had no opinion one way or the other whether Carton had been victimized by Meli at the time he prepared his Excel version of the SEC's spreadsheet.

      But shortly thereafter, in March 2017, Sweeney interviewed Carton. After that interview, Sweeney formed the definite opinion that Carton was not Meli's victim, but was himself engaged

in fraudulent conduct. From that time on, Carton was the target of an investigation, and he was arrested in September 2017 on the basis of a criminal complaint signed by the very same Special Agent Sweeney.

But although Carton assumed a new status in Sweeney's mind after the March interview, the agent did not go back and remove Carton's name or the name of the company he controlled from the Excel spreadsheet he had created the previous month. That was hardly a fatal error, since the purpose of the spread sheet was to obtain an "estimate" of Meli's wrongdoing for purposes of drafting his indictment.

Meli was indicted in April 2017.

In the summer of 2017 – shortly before Carton's arrest – the United States Attorney's Office for the Southern District of New York was doing two things simultaneously: preparing to indict Carton (together with a co-defendant, Michael Wright), and preparing to advise Meli's victims about the case against Meli (who, in October 2017, would plead guilty to one count of securities fraud before my colleague, The Hon. Kimba Wood). Sweeney was on and off the Meli and Carton cases during this period, because he was also working on two trials in the Eastern District of New York.

On August 16, 2017, Kobre sent Sweeney an email, asking that he prepare a list of Meli's victims, so they could be notified about court dates by the USAO's Victim-Witness coordinator. Kobre had obviously forgotten about the SEC spread sheet that he had forwarded to Sweeney months earlier, as well as Sweeney's Excel spreadsheet, because he said, "On the Meli side, I think SEC provided us, verbally, the names of likely investors. Can you please put that into spreadsheet form and then let's work on getting contact info[rmation] for those victims?" (DX 2, email dated Aug. 16, 2017.)

A week later, Kobre asked if this work could be done "soon, maybe even while you're out?" (DX 2, email dated Aug. 24, 2017.) Sweeney said he would start working on the project and hand it off to someone else. (DX 2, email dated Aug. 24, 2017.) Kobre – who still did not recall that Sweeney had prepared an investor spreadsheet in February – reiterated that "We also need to do this for the Meli scheme. I think Dahlia [an SEC attorney] gave us over the phone the SEC's list of likely victims. We can start with that." (DX 2, email dated Aug. 24, 2017.)

Sweeney did not "start with" any information that the SEC had given over the phone. He pulled out the Excel spreadsheet he had prepared months earlier and handed it off to FBI Staff Operations Specialist Merlin Ferantovic, who was tasked with obtaining contact information for the people and entities on that list. Ferantovic returned the list to Sweeney on September 5, 2017, having found emails and addresses for 115 of 138 entries on the spreadsheet he had been given. One of those, of course, was Carton, whose name had never been removed from the spreadsheet. Another was Dark Knight.

Ironically, on the very day that Ferantovic emailed Sweeney the updated spreadsheet with contact information – September 5, 2017 – Sweeney swore out a criminal complaint against Carton, which commenced the case now pending before this court. That criminal complaint

2

referred to "CC-1" – an individual who, in retrospect, is obviously Meli – and who was identified as a co-conspirator of Carton's. (Compl., dated Sept. 5, 2017, Dkt. No. 1.) Obviously Sweeney was well aware on September 5, 2017 that Carton was not, in the opinion of the Department of Justice, a victim of Meli's fraud. However, Sweeney candidly admitted on the stand that he did not review the spreadsheet or notice that Carton's name remained thereon. Instead, a week later, he forwarded the list, complete with contact information, to AUSA Kobre, with a note that read, "Updated list of *potential Meli victims*. Still some blanks, but we will work to get those filled in." (DX3, email dated Sept. 12, 2017) (emphasis added).)

AUSA Kobre also did not review the spreadsheet before he, in turn, forwarded it to the Victim Impact Unit with the message, "Wendy and Ivy, here is a list of *additional victims* in 17 cr. 127. Thanks!" (*Id.* (emphasis added).) Therefore, he, too, did not notice that Carton and Dark Kight remained on the list. Significantly, AUSA Kobre removed Special Agent Sweeney's cautionary caveat that there were only "*potential* Meli victims" when he sent the spreadsheet on to the Victim Impact people.

The Victim Impact Unit generated an automated mailing to everyone whose name appeared on the list that Kobre sent to the Victim Impact Unit. This was a ministerial task, involving no judgment or assessment on the part of the Victim Impact Unit; its job was simply to contact everyone on the list that was sent by the AUSA.

Carton received a victim impact letter shortly after being arrested on the criminal complaint and just before he was indicted on November 2, 2017. Immediately after his arraignment on that indictment – which also discussed "CC-1"(Meli) and identified him as Carton's co-conspirator – Carton and his attorney held a press conference to announce to the world that the very same United States Attorney's Office that was prosecuting him actually considered him to be a victim of a fraud perpetrated by Meli (Indictment, dated Nov. 2, 2017, Dkt. No. 18.). *See* Kaja Whitehouse, *Craig Carton: I've Got Proof that Clears Me in Ponzi Scheme*, New York Post, Nov. 3, 2017, https://nypost.com/2017/11/03/craig-carton-claims-hes-the-real-victim-in-massive-ponzi-scheme/.

Carton wants to introduce the Victim Impact letter at trial as an admission against interest/prior inconsistent statement by the prosecution team.[1] The Government moves *in limine* to keep the letter out.

## DISCUSSION

While the Government is a "party" in a criminal case, historically statements by government agents could not be used substantively against the government in a criminal prosecution; they were only admissible to impeach the agents if inconsistent with their testimony. *See United States v. Santos*, 372 F.2d 177, 179–180 (2d Cir. 1967) (inconsistent out-of-court statements of government agent made in course and scope of agent's authority are not admissions binding on the government in criminal prosecution; after agent testified inconsistently, however,

---

[1] The letter cannot come in as a "prior inconsistent statement," because (*i*) the Criminal Complaint was prior in time to the Victim Impact letter and (*ii*) the statement was not given under penalty of perjury at a trial, hearing or other proceeding or in a deposition, pursuant to Fed. R. Evid. 801(d)(1)(A).

3

"statement would have been admissible as evidence tending to impeach his credibility"). This principle had two rationales: (1) government agents have no personal interest in the outcome of trials, and (2) historically, agents cannot "bind the sovereign." *See, e.g., U.S. v. Kampiles*, 609 F.2d 1233, 1246 (7th Cir. 1979).

*Santos* was decided prior to enactment of Fed. R. Evid. 801(d)(2), and some courts have concluded that the enactment of this rule of evidence abrogated the common law rule. *See, e.g., United States v. Kattar*, 840 F.2d 118, 130–31 (1st Cir. 1988) (citing *United States v. Morgan*, 581 F.2d 933, 937 n.10 (D.C. Cir. 1978)). However, nothing in the Advisory Committee notes suggested that *Santos* was not still good law, and after the adoption of Rule 801(d)(2), the Second Circuit has reaffirmed the common-law rule that out of court statements of a government agent (in that case, an informant, rather than a government employee) were not admissible in criminal trials as admissions against interest by a party opponent. *United States v. Yildiz*, 355 F.3d 80, 81–82 (2d Cir. 2004). My colleague, The Hon. Kimba M. Wood, recently invoked this rule in *United States v. Skelos*, No. 15-CR-317 (KMW), 2018 WL 2254538, at *5 (S.D.N.Y. May 17, 2018). In that case, the defendants served a subpoena duces tecum on the New York Department of Financial Services ("DFS"), seeking access to communications between DFS and prosecutors about a related investigation that might undermine a key government witness. Judge Wood rejected this request, reiterating the traditional rule: "Although the Government is a party to this case, out-of-court statements by Government agents are generally not admissible as party admissions under Federal Rule of Evidence 801 (d)(2)." *Id.* (citations omitted).

There are, however, limited exceptions to this rule. Where the Government retries a case and "chooses to change its strategy in successive trials and contradict its previous theories of the case and versions of the historical facts, the jury is entitled to be aware of what the Government previously claimed." *United States v. GAF Corp.*, 928 F.2d 1253, 1262 (2d Cir. 1991). In *United States v. Salerno*, 937 F.2d 797, 812 (2d Cir. 1991), the Second Circuit blessed the introduction, at retrial, of the closing argument delivered by the Assistant United States Attorney at the prior trial, because it had "taken the same evidentiary clay" and "resculpted" the defendant's role in the conspiracy. Even a defense lawyer's opening statement at a prior trial was deemed admissible at a retrial where is "was a calculated act factually inconsistent with the version of events" the defendant argued at the retrial. *United States v. McKeon*, 738 F.2d 26, 34 (2d Cir. 1984).

But in all such circumstances, the court acts as a gatekeeper, by assessing whether a prior Government (or defense) statement that is allegedly inconsistent with its position at trial should come in as an admission against interest. For the prior statement to be admissible, the proponent of the evidence (in this case, the defendant) must convince the court of three things:

(1) The prior argument involves an assertion of fact inconsistent with similar assertions – that is, there is an actual inconsistency between the statement of the Government agent and the position taken by the Government at trial;

(2) The statements were such as to be the equivalent of testimonial statements made by the Government; and

> (3) By a preponderance of the evidence, the inference that the proponent wishes the jury to draw is both a fair one *and* one for which no innocent explanation exists.

This tri-partite test was first set out in *McKeon*. 738 F.3d at 33. There, in affirming the decision to admit into evidence at a retrial defense counsel's inconsistent argument made at his client's previous trial, the Court of Appeals explained that it was not prepared to bless the introduction of any and every purportedly inconsistent statement made by an adversary; indeed, the court expressly:

> .....circumscribe[d] the evidentiary use of prior jury argument. Before permitting such use, the district court must be satisfied that the prior argument involves an assertion of fact inconsistent with similar assertions in a subsequent trial. Speculations of counsel, advocacy as to the credibility of witnesses, arguments as to weaknesses in the prosecution's case or invitations to a jury to draw certain inferences should not be admitted. *The inconsistency, moreover, should be clear and of a quality which obviates any need for the trier of fact to explore other events at the prior trial.*
>
> The court must further determine that the statements of counsel were such as to be the equivalent of testimonial statements by the defendant. The formal relationship of the lawyer as agent and the client as principal by itself will rarely suffice to show this since, while clients authorize their attorneys to act on their behalf, considerable delegation is normally involved and such delegation tends to drain the evidentiary value from such statements. Some participatory role of the client must be evident, either directly or inferentially as when the argument is a direct assertion of fact which in all probability had to have been confirmed by the defendant.
>
> Finally, the district court should, in a Fed. R. Evid. 104(a) hearing outside the presence of the jury, determine by a preponderance of the evidence that the inference the prosecution seeks to draw from the inconsistency is a fair one and that an innocent explanation for the inconsistency does not exist. Where the evidence is in equipoise or the preponderance favors an innocent explanation, the prior opening statement should be excluded.

*Id.* (emphasis added).

The *McKeon* rule was specifically extended to statements made by attorneys for the Government in *GAF* and *Salerno*, and the rule articulated above was affirmed yet again in *United States v. Ford*, 435 F.3d 204, 215 (2d Cir. 2006). In that case, the Court of Appeals held that it was not error for a trial court to exclude evidence that an Assistant United States Attorney had previously said that the Government's principal witness was "a dirty dog and he's got no credibility." In *Ford*, the AUSA's opinion about the credibility of a witness was deemed inadmissible as a party admission because it was neither "an assertion of fact inconsistent with prior assertions [of fact]," nor "the equivalent of testimonial statements" made by and on behalf of the Government (which is, of course, its own client).

Here, the Government relied principally on the defendant's failure to satisfy the third prong of the *McKeon* test: the "innocent mistake" exception. The defense argues that the repeated failure,

5

over a period of eight months, to remove Carton's name from the list of victims makes it necessary for the jury, not the court, to decide whether this was a mistake or a change of theory.

I side with the Government.

In this case, there are three Government speakers to consider: Special Agent Sweeney,[2] AUSA Kobre, and the Victim Impact Unit.

The argument that Special Agent Sweeney made a statement that qualifies as an admission against interest under the *McKeon/Ford* test can be easily dismissed. Sweeney's statement that the individuals listed on the spread sheet that he sent to AUSA Kobre were "*potential* victims" of Meli's frauds is not inconsistent with the position the Government is taking at this trial, because it does not meet the aspect of the *McKeon* test that requires that, "The inconsistency.....should be clear and of a quality which obviates any need for the trier of fact to explore other events at the prior trial." *McKeon*, 738 F.2d at 33. There is nothing "clearly inconsistent" about Sweeney's statement to Kobre. Any individual listed on the spreadsheet that he forwarded was at most a "potential" victim; none of them was explicitly identified as an actual victim. Certainly Carton was not.

To the extent that the defense might argue that Sweeney's failure to remove Carton from the list after ascertaining that he was not in fact a Meli victim is a "statement" that qualifies as an admission (which it has not yet done, but which I anticipate that it will), this essentially negative "statement" runs afoul of both the second and third prongs of the *McKeon/Ford* test. It does not rise to the level of testimonial equivalence; and it is innocently explained (entirely credibly, I might add) as a rookie mistake, made by a busy and inexperienced FBI agent, who simply did not recognize that the results of an interview conducted in March 2017 might require revision of a document created for an entirely different purpose a month earlier.

As for AUSA Kobre, the poor man is going through every lawyer's worst nightmare right now (and in one way and another, we have all been there). He made a silly, inexcusable and easily avoidable mistake; he failed to review Sweeney's list before forwarding it to the Victim Impact team; and he compounded the error by referring to the entries on the spread sheet as "victims" rather than as "potential victims" in his cover email. But there is not a scintilla of evidence that could lead this court to conclude that AUSA Kobre did anyting other that make a regrettable mistake; and as the Government points out, a mistake is the quintessential example of an "innocent explanation" for what was plainly a misstatement. *See United States v. Forbes*, No. 3:02 Cr. 624 (AHN), 2007 WL 141952, at *8 (D. Conn. Jan. 17, 2007); *cf. United States v. Sweet*, 630 F.3d 477, 483 (6th Cir. 2011); *Tokidoki, LLC v. Fortune Dynamic, Inc.*, No. 07 Civ. 1928 (DSF), 2008 WL 11338730, at *3 (C.D. Cal. May 27, 2008).

---

[2] I was briefly concerned that the *McKeon/Ford* rule might apply only to attorneys like Mr. Kobre, and not to non-attorney members of the prosecution team like Special Agent Sweeney. That was the situation in every Second Circuit case called to the court's attention. However, after some cursory research, I am satisfied that the rule extends beyond the members of the prosecution team. *See, e g , United States v Pandililis*, 524 F.2d 644, 650 (6th Cir. 1975)(prior actions of IRS actions not admissible); *United States v. Arroyo*, 406 F.3d 881, 888(7th Cir. 2005)(IRS agents); *Kattar*, 840 F.2d at 130–131 (considering statements of FBI agent as "agent or employee" of Government, for purpose of analyses under Federal Rule of Evidence 801); *Skelos*, 2018 WL 2254538, at *5 (DFS agents).

Finally, the Victim Impact Unit's sending of the letter was simply a ministerial act performed by individuals who took the erroneous information that they were mistakenly given and used it to address envelopes that were sent as part of a mass mailing. That the employees of the Victim Impact Unit were agents/employees of the Department of Justice, and that they were acting because AUSA Kobre authorized them to do so, does not mean that sending the letter to Carton qualifies as an admissible Government admission. Of course, sending Carton a "victim" letter is embarrassing, but it does not espouse a position that the Government at any time consciously considered – as borne out by the fact that, in both the Criminal Complaint (which was sworn out before Carton was sent the Victim Impact Letter) and the Indictment (which was handed down shortly after he received it), Carton was identified as a co-conspirator with "CC-1," who, again, is plainly and easily identifiable as Meli. The fact that the allegedly inconsistent statements were made more or less simultaneously is strongly consistent with the "innocent explanation" that has been offered by the Government and not rebutted in the slightest by the defense – which, on this point, bears the burden of persuasion by a preponderance of the evidence.

In short, I am persuaded that the Victim Impact letter received by Carton is not admissible as a Government admission that is inconsistent with the position it took when it handed down the indictment or that it is presently taking at trial. Its introduction would lead to all of the evils that the Second Circuit identified in *McKeon* – most especially, a frolic and detour through the details of how the letters came to be sent – while in the end having no probative value at all.[3]

Dated: October 26, 2018

                                                             _____
                                                                   Chief Judge

BY ECF TO ALL COUNSEL

---

[3] I might note that, had I ruled otherwise, Agent Sweeney would undoubtedly have testified at trial about how the victim impact letter came to be sent – and the jury would get to hear, as I heard yesterday at the Rule 104(a) hearing, how Sweeney became convinced that Carton was not a victim as soon as he interviewed the defendant. One should be careful what one wishes for.