IAUHCar1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        17 Cr. 680 (CM)

5   CRAIG CARTON,

6                                        Trial
               Defendant.
7   ------------------------------x

8
                                        New York, N.Y.
9                                        October 30, 2018
                                        10:30 a.m.
10

11  Before:

12                     HON. COLLEEN MCMAHON,

13                                       Chief District Judge

14                        APPEARANCES

15  GEOFFREY S. BERMAN
         United States Attorney for the
16       Southern District of New York
    ELISHA KOBRE
17  BRENDAN QUIGLEY
         Assistant United States Attorneys
18
    GOTTLIEB & JANEY LLP
19       Attorneys for Defendant
    BY:  ROBERT C. GOTTLIEB
20       DERRELLE M. JANEY
         SETH J. ZUCKERMAN
21       SARAH LEDDY

22  ALSO PRESENT:   MICHAEL ZAVONA, Special Agent FBI
                    SEAN SWEENEY, Special Agent FBI
23

24

25

IAUHCar1

```
 1                    (A jury of 12 and 4alternates was impaneled and sworn)

 2                    THE COURT:  Good morning.  All right.  So let's get

 3     off and running, and I want to get off and running because I

 4     want you to understand that, consistent with my overriding job

 5     of giving both the government and Mr. Carton the fairest

 6     possible trial that can be devised, my secondary goal is to get

 7     you back to your ordinary pursuits ASAP.  I know what a

 8     tremendous sacrifice you are making, and we will not be

 9     dragging this out.  We will be pushing this along so that we

10     can get done with the trial on the schedule that I promised

11     you.

12                    Let's start by having a few preliminary instructions.

13     As I told you previously, it is your function as the jurors to

14     decide the issues of fact.  Your decision on those issues is to

15     be based on two things: the law as I give it to you and the

16     evidence that you hear in this courtroom.  Nothing else.

17                    Now, a lot of what you will hear in the courtroom

18     turns out not to be evidence.  Nothing I say is evidence.  I

19     have no idea what happened on particular days between

20     particular people.  I wasn't a participant in these events.

21     I'll be actually learning a lot of the evidence for the first

22     time when you do as well.

23                    Nothing the lawyers say is evidence.  They do most of

24     the talking, so that seems kind of counterintuitive, but

25     nothing that the lawyers say to you is evidence.
```

IAUHCar1

1       The questions that the lawyers ask in and of

2   themselves are not evidence.  So thoughts that are put in your

3   head by questions should be brushed away by you.  The question

4   only becomes part of the evidence when it has an answer, and

5   it's the combination of the question and the answer that is

6   evidence.

7       The lawyers have obligations to call to my attention

8   anything that they think violates the Rules of Evidence, and

9   from time to time I am sure they will jump up and object.

10  Their objections are not evidence.  And you should not draw any

11  conclusions from any ruling that I make that I think this side

12  or that side has the better of the argument or ought to win the

13  case, because the rulings I make are true referee rulings.  I

14  am not sending you signals about how I think you should decide

15  the case.

16      So what is evidence?  Well, it's everything else.  The

17  evidence is the sworn testimony of the witnesses who will sit

18  here on the stand, and they'll swear or affirm to tell the

19  truth.  They'll answer questions, and the question and answer

20  responses taken together are evidence.

21      There will be exhibits introduced into evidence at

22  this trial.  Documents, copies of emails, letters, various

23  communications in writing -- those will be the principal

24  exhibits.  There may be some other kinds of exhibits that come

25  in as well, and if I admit them, they're evidence and you may

IAUHCar1

consider them.

There may be facts or there may be testimony about which the lawyers are able to agree among themselves in order to save you time, which is a good thing for lawyers to do, and those are called stipulations.  If there are stipulations, I will read them to you, and you will regard them as evidence.

There are two kinds of evidence.  Evidence falls into two classifications: direct evidence and circumstantial evidence.  Direct evidence is proof of a fact through the testimony of a witness who testifies about what he or she perceives through his or her senses.  I was standing halfway down the block when I saw the light turn red.  I heard the squeal of brakes, but I smelled rubber from tires trying to stop.  But I saw the green car go through the light and hit the van.  I saw, I heard, I smelled, those are percipient sense impressions and evidence about what you see or hear or taste or smell.  Those kinds of evidence are called direct evidence.

Circumstantial evidence is direct evidence of fact A from which you're free to draw the conclusion that fact B exists.  Example:  It's a beautiful sunny day.  Let's suppose this room were in the interior of the building so we couldn't see or hear anything about the weather.  Let's assume that over the course of the morning people arrived and their hair was wet and it was plastered down to their heads and they were brushing water off their coats or their clothes and maybe one or two of

IAUHCar1

them were shaking out umbrellas.

Now, that's what you have direct evidence of, direct evidence of what those people looked like.  You have no direct evidence about what the weather is, but you could draw the conclusion from the way those people looked that the weather had changed and that it had begun to rain outside.  That's circumstantial evidence, direct evidence of fact A from which you can draw the conclusion, based on your reason and common sense, that fact B exists.

Both kinds of evidence are admissible, and a verdict may be based on direct evidence, on circumstantial evidence, or on some combination of direct evidence and circumstantial evidence.  One kind of evidence isn't better than the other necessarily.  So you can listen to and evaluate it all.

Your principal function during this trial is going to be to decide what you believe and what you don't believe, and in order to do that, you're going to do consciously something that you do without thinking about it 20 times a day.  You're going to look at this person who's sitting on the witness stand, and you're going to evaluate what that person is saying.  Does that person seem to know what he's talking about?  Does she strike you as being open and candid or maybe evasive, or does she sound like she's trying to hide something?  Does that person have a reason why he might want to falsify or exaggerate or distort what he's saying to you?  You'll think consciously

IAUHCar1

about all those things, and you'll use your common sense and
your good judgment to evaluate the testimony of the witnesses
based on all the circumstances.

          Now, it's very important that you keep an open mind
until you start deliberating and that you not form any
preliminary judgments.  This is a hard thing that we ask of
jurors, but we don't want you to form any judgments until
you've heard all of the evidence and until the lawyers have had
an opportunity to talk to you about the evidence and to explain
to you each from his own perspective what that evidence shows.
That's called summary or oral argument at the end of the case.
And I have to tell you what the law is, and that puts a frame
around the pictures that are painted by the lawyers with the
evidence.  Until you have all of that information, you're not
in a position to make a judgment about the question you have to
decide, which is has the government overcome the presumption of
innocence and proven Mr. Carton guilty beyond a reasonable
doubt?

          That's your question.  That question's never going to
change.  That's the question you have to answer.  So we want to
be sure that before you start really deep thinking about this,
you have all the information that you need.  That is why we ask
you not to discuss the case.  It is so unnatural.  I understand
that.  You're in this room for seven hours a day.  What would
be more natural than meeting your spouse or your friend at a

IAUHCar1

```
1    bar at 6 p.m. and saying, "And here's what went on in court

2    today"?  Well, we don't want you to do that, and you've

3    promised that you won't do that.  The reason we don't want you

4    to do that is psychological research shows that opinions begin

5    to form and minds begin to get made up if you start talking

6    about things.  So we do ask you to do this most unnatural of

7    things and not discuss the case, "discuss" used in the broadest

8    sense of the term.  Don't talk, don't phone, don't email, don't

9    IM, don't tweet, don't blog, don't Instagram, don't pin, don't

10   do anything about this case, either in the real world or in the

11   ether world, until it's time for you to deliberate.

12          Your friends and relatives are certainly welcome to

13   join us here at the trial, but if you know somebody who's out

14   in the peanut gallery, I wish you would tell Jim so that he can

15   talk to that person and remind that person how important it is

16   not to discuss the case with you.

17          All right.  Now, this is a gorgeous, magnificent,

18   palatial courthouse.  It happens to have been built just before

19   they changed the guidelines for courthouse construction to

20   provide for a separate entrance and separate elevators for

21   jurors.  As a result, we're all going to meet each other in the

22   elevators.  I happened to come up in the elevator this morning

23   with the gentleman who was juror No. 30 yesterday.  I kept my

24   sunglasses on.  I looked at the floor.  I knew who he was.  I

25   had my little hat on.  I had my neck brace on.  My neck hurts.
```

IAUHCar1

1    I'm trying not to look at him.

2           The lawyers, their teams, Mr. Carton, his family, all

3    those people are not supposed to talk to you, and they're not

4    supposed to interact with you in any way.  I know Mr. Gottlieb

5    and Mr. Janey have told that to Mr. Carton and to his family.

6    I know the government team knows the rules.  We are not being

7    rude to you.  We are being professional.  So if you see us, and

8    that includes me, and we look away or we look down, we're not

9    being rude.  Don't hold it against us.

10          There is one person to whom you can speak.  You see

11   this man?  See this man?  You may speak to him, and you should

12   feel free to speak to him about any concerns that you have, and

13   he will get them to me.  But he is it, the one and only channel

14   of speech during the course of the trial.

15          Now let me tell you how we're going to proceed.  We're

16   going to start with opening statements from the lawyers.

17   Opening statements, like everything the lawyers say, are not

18   evidence.  They're also not argument.  They are simply an

19   overview, an overview of what each side thinks the evidence is

20   going to show.

21          Now, very important thing to start with, I will tell

22   the government to open.  I think Mr. Quigley is going to open.

23   I will tell him to get up and open.  I will ask Mr. Janey and

24   Mr. Gottlieb if they wish to open.  Why is there a difference?

25   Because their client is presumed innocent.  They have nothing

IAUHCar1

to prove.  They have no obligation to do anything at all.  I

happen to know they're going to open, but it's the first of

many instances where I will quite deliberately highlight the

fact that it's the government that has the burden of proof,

that Mr. Carton is presumed innocent.  And until the government

rebuts that presumption, overcomes that presumption, he

continues to be cloaked with that presumption of innocence, and

the defense has no obligation to prove anything at all.

All right.  So we'll hear the opening statements, then

the government will put on its case.  It will put on its case

by putting on witnesses.  You'll hear the testimony of the

witnesses.  They'll be sworn to tell the truth.  They'll be

examined by one of the lawyers for the government.  They'll be

cross-examined by a member of the defense team.  We'll hear all

of those witnesses, and the government will introduce its

exhibits.  Some of those exhibits will be displayed to you on

those TV cameras, and some of the exhibits may be read to you

from the witness stand.  And if there are any stipulations to

be introduced, they will come in, those agreements between the

lawyers.

When all that is done, the government will say three

magic words:  "The government rests."  At that point I will

excuse you from the room, and I will talk to the lawyers about

legal matters, which is something I have to do outside your

hearing.

IAUHCar1

1          When you all come back, I will look at Mr. Gottlieb

2     and Mr. Janey, and I will say, "Gentlemen, do you wish to put

3     on a case?"  Why?  Because they have no obligation to put on a

4     case because they have nothing to prove because their client is

5     presumed innocent.  That said, they may want to make some

6     points.  They may want to get some information to you that they

7     think rebuts something the government has to say.  That doesn't

8     mean they've assumed the burden of proof, but the defense is

9     free to put on witnesses or exhibits if it wants to do so.

10         If the defense puts on a case, the government will

11    have an opportunity, if it wishes to do so, to put on rebuttal

12    evidence, which rarely happens, and when it does, it's

13    generally quite brief.  At that point we will have the

14    arguments of the lawyers, and they will argue the case to you

15    and they will take the evidence and they will suggest to you

16    what conclusions you ought to draw.  Then I'll give you the

17    charge on the law, which, by the way, you will have in writing

18    back in the jury room to aid you in your deliberations.  At

19    that point you'll be able to deliberate.  Then you can discuss

20    the case.  Then you're free to discuss the case with each

21    other, and hopefully you will reach a verdict.  I am sure you

22    will reach a verdict.

23         That's the procedure we're going to follow, and I

24    think we should begin.

25         Is the government ready?

1          MR. QUIGLEY:  Government is ready.

2          THE COURT:  Is the defendant Craig Carton ready?

3          MR. GOTTLIEB:  Yes, your Honor.

4          THE COURT:  Mr. Quigley, you may open.

5          MR. QUIGLEY:  Thank you, your Honor.

6          Good morning.  This is a case about lies.  On about

7   ck    December 2016 to the spring of 2017, the defendant got

8   investors to give him millions of dollars.  He promised those

9   investors that he would use their money to purchase tickets to

10  concerts, concerts by performers like Adele, Metallica, and

11  Katie Perry.  The tickets would be then resold and make a nice

12  profit for everyone.

13         His biggest investor insisted on seeing signed written

14  contracts giving the defendant access to those tickets.  The

15  defendant said, no problem, and gave them a coppy of the

16  contracts.

17         These were lies.  This defendant, Craig Carton, lied

18  and lied repeatedly to his investors.  He took their money and

19  he spent it not tickets but at casinos, used it to pay back

20  other people he owed debts to, even used some of it to pay a

21  landscaping bill.  And those written contracts that the

22  defendant gave to his big investor, they were fake.  They

23  didn't exist.  They were made up out of whole cloth by the

24  defendant and his partners in crime.

25         Once the defendant got his investors' money, the lies

IAUHCar1                    Opening – Mr. Quigley

didn't stop.  He continued to mislead them about the status of

their investments.  He told an investor, for example, that

their money was on deposit with an arena company when in fact

it was long gone because he had stolen it once before.

       The evidence will show that one reason the defendant

was able to do this was because people trusted him.  As you

heard yesterday, the defendant had one of the most influential

and well-known radio voices in New York.  He cohosted the

morning show on WFAN radio.  People liked him.  People listened

to him.  People trusted him.  He lied to those people.  When

you lie to people who trusted you with their money, that's

fraud and it's a serious crime, and that's what brings us here

today.

       Now, this opening statement is the government's

opportunity to give you an overview of this case, to tell you

about what we think the evidence will show and what the

evidence will be.  So for the next few minutes, I'm going to

spend some time doing that.

       The evidence will show that in addition to hosting a

sports radio show, the defendant had a number of side gigs.

And in around the spring of 2016, he along with one of his

partners, a man named Michael Wright, formed a company called

Tier One Tickets.  They were working with a third man, a man

named Joseph Meli.  And the idea that they pitched to investors

was that Carton and Meli would use their contacts in the

1    entertainment industry to get access to lots and lots of

2    tickets.  They would then resell those tickets on the Internet

3    big markups.

4            By the end of the summer, the defendant had problems,

5    though.  He was piling up a lot of debts unrelated to his

6    ticket venture, gambling-related debts, debts to people who

7    owed him money, debts from other business ventures.  So what

8    did the defendant decide to do?  To lie, to commit fraud.  He

9    convinced an investor to give him a million dollars.  He

10   promised that investor that the money would be used by Meli to

11   invest in concerts, tickets to concerts by the singer Adele.

12   They would then be resold to make a profit for everyone.

13           So the investor sent the defendant that million

14   dollars, and the defendant sent about $990,000 of that money on

15   to Meli, his partner, except the money wasn't used to buy Adele

16   tickets.  Instead, Carton and Meli redirected it right back to

17   one of Carton's other personal bank accounts.  Didn't go to

18   Adele.  Most of it, in fact, almost all of it, went to Craig

19   Carton, and Carton used that money like it was his personal

20   piggy bank.  Some of it went to casinos.  Some of it used to

21   pay back somebody that Carton owed money to.  Even sent some of

22   it to the landscaping company.

23           In the months that followed, the defendant and Meli

24   continued their scheme by telling the Adele investor that his

25   investment was safe, the concerts had been a great success, and

IAUHCar1                    Opening - Mr. Quigley

1   his returns were on the way.  Simply not true because the money

2   was long gone, and it had been used to benefit Craig Carton,

3   plain and simple.

4            As the fall continued, Carton was on the lookout for

5   an even bigger fish to hook.  He had spent that Adele

6   investor's money, but he needed more, more debts to pay, other

7   endeavors to finance, and he had to pay back that Adele

8   investor's million dollars.  So what did he do?  He continued

9   the scheme that he had worked with the Adele investor, just on

10  a bigger scale.  He told an investment fund call Brigade

11  Capital about his idea to buy lots and lots of tickets and to

12  resell those tickets for a profit and his need for financing to

13  get those tickets, and Brigade found this idea intriguing.

14  They looked into it, and they thought that investing in

15  Carton's ticket enterprise was worth exploring.  They hired

16  lawyers to negotiate a contract called a revolving loan

17  agreement with Carton and his attorney, and ultimately, Brigade

18  agreed through that agreement to invest money into a company

19  controlled by Carton to finance his purchase of tickets, and

20  they would get a share of the defendant's profits from the

21  resale of those tickets.

22            Now, the investment fund Brigade took a number of

23  steps to protect itself.  One of those, they made clear that

24  the money that they were sending to Carton, investing with

25  Carton, could be used only to purchase tickets.  Additionally,

1    before they invested money, they insisted that the defendant

2    show them written contracts, legally binding agreements giving

3    the defendant and his partners access to those tickets.  The

4    defendant, though, didn't have any such contracts in place, so

5    what did he do?  He made them up.  He lied.

6            First Carton sent Brigade contracts between his

7    partner, Joe Meli, and a company called AEG, a major concert

8    promotion company.  Those contracts supposedly gave Meli access

9    to tens of millions of dollars of tickets to shows put on by

10   AEG.

11           Second, the defendant also sent Brigade a contract

12   supposedly between him and a company Brooklyn Sports &

13   Entertainment.  That company runs the Barclays Center in

14   Brooklyn, and the Nassau Coliseum out on Long Island.  That

15   contract gave Carton the right to purchase tickets to shows by

16   Metallica and Barbra Streisand and was signed by Brooklyn's

17   CEO.

18           The evidence at this trial will show that those

19   agreements were fake.  AEG never signed the contracts with

20   Meli.  Brooklyn Sports & Entertainment never signed the

21   contract with Carton.  Now, to be clear, Carton had done

22   business with Brooklyn Sports & Entertainment for a number of

23   years; knew the higher-ups.  He bought tickets from them and

24   even discussed a larger, more formal ticketing partnership.

25   But what he didn't have was one of the things that his

IAUHCar1                    Opening – Mr. Quigley

1    investors had insisted on, a legally binding contract giving

2    him access to the tickets.  So he made one up, and that is

3    fraud.

4            Brigade now invested a total of $4.6 million into

5    Carton's venture.  What happened to the money?  Well, it wasn't

6    used to buy tickets.  Fraud on top of fraud.  $2.6 million went

7    to Meli's company, his partner's company.  The evidence will

8    show that once again, within a matter of days, Carton, Meli,

9    and another one of their partners in crime had diverted that

10   money.  They sent it not to AEG, the big concert promotion

11   company, but they used it for themselves.  The other 2 million

12   was sent directly to Brooklyn Sports & Entertainment.  Brigade

13   sent it directly to Brooklyn Sports & Entertainment, and that

14   was a protection that Brigade had insisted on, sending it

15   directly to the source of the tickets.

16           So how did the defendant get around that?  He lied.

17   He told Brooklyn people he'd known for years, people he'd

18   worked with, that this $2 million wire coming from Brigade

19   Capital, it's all a big mistake.  Redivert it into one of my

20   bank accounts.  They did that.  People trusted Carton, and

21   Carton lied to them.

22           (Continued on next page)

23

24

25

1            MR. QUIGLEY:  Once again, through Carton, through his

2    fraud, he got millions of dollars of the investment fund's

3    money, and the same thing happened as it happened with the

4    Adele fund.  Carton again spent it on pretty much everything

5    other than tickets.  Money went to casinos.  Money went to

6    people who he owed money to, had personal loans with.  Money

7    went to other business ventures.  And remember that investor

8    who invested in the Adele tickets in September 2016?  Some of

9    the money even went back to that Adele investor as a return on

10   his investment.  Robbing Peter to pay Paul.

11           Now, in January and February of 2017, after Brigade's

12   investment, a couple things happened.  One of them was that Joe

13   Meli, Carton's partner in crime, got arrested for his role in

14   the scheme.  So how did the defendant deal with that problem?

15   He lied.  He told his investors that he had been a victim ever

16   Meli, that Meli had schemed him, even though just weeks prior

17   Meli had diverted over a million dollars of Brigade's

18   investment to the defendant and to his bank accounts that the

19   defendant controlled.  And he even finessed his way through a

20   call involving himself, Brigade and Brooklyn's chief of staff,

21   about concerts at arena's that Brooklyn runs, and he scrambled

22   to buy tickets to the Streisand and Metallica contracts, that

23   were the subject of the agreement with Brigade.  But he did

24   this not with Brigade's money -- because that was long gone --

25   instead, he got a loan from another guy to put hundreds of

1      thousands of dollars in charges on his Amex card.  And you may

2      even hear about other tickets Carton bought, other events and

3      concerts that were sold, but the issue in this case is not

4      whether the defendant ever brought tickets and how many tickets

5      he bought, it's what he told particular investors about what he

6      was going to do with their money and what he did with it.  And

7      the evidence will be clear that he lied and lied repeatedly to

8      those investors about what he was going to do with their money,

9      and those lies continued into the spring of 2017.  When Brigade

10     continued to ask about their investment, the defendant

11     continued to lie; he told them that they had over a million

12     dollars on deposit at Brooklyn Sport & Entertainment, when in

13     fact that money was long gone because it almost never got there

14     in the first place because Carton diverted it into one of his

15     own bank accounts.

16             When they asked about when they would start seeing

17     returns on their investments, the defendant lied again too,

18     making excuses for the lack of payment, when the real reason

19     was that he had stolen the money in the first place.

20             Now, eventually his luck ran out, the fraud caught up

21     with him, and that's why we're here today, because the

22     defendant lied to people who trusted him with their money, and

23     he committed fraud.

24             Now, I spent the last few minutes telling you or

25     giving you a preview of what we think the evidence will show at

IAU7CAR2                    Opening - Mr. Quigley

1    this trial, and I want to talk briefly about some of the types

2    of evidence that you'll see.

3         First, you're going to see a lot of the defendant's

4    own words, his own words in e-mails and other electronic

5    communications.  You will see him sending those fake contracts

6    to investors.  You will see him telling investors about how

7    their money would be invested in particular concerts.  You will

8    even see how he doctored up e-mails from Brooklyn Sports

9    Entertainment before sending them on to Brigade Capital to make

10   them sound more definite, more official, more to his investors'

11   liking.  And you will see him ask Brooklyn Sports Entertainment

12   about finalizing an agreement for contracts, including for

13   those Streisand and Metallica concerts, weeks after he told

14   Brigade that he already had a contract in place.

15        You will see his own words to his partners in crime

16   where he talks about his debts, about using investors' money to

17   repay those debts, and using investors' money for themselves.

18        You will hear from witnesses like some of his

19   investors who tell you about what the defendant told them about

20   his ticket business, about how it was exciting and interesting,

21   and how it was important to them that the defendant use their

22   money as he had promised them.

23        You will hear from executives at Brooklyn and AEG, the

24   concert promotion company, and they will tell you that they

25   never signed those agreements that the defendant sent to these

1    investors.

2            And you will hear from some of the people who got the

3    money that was supposed to be spent on ticket investments, and

4    it will be abundantly clear to you that the defendant did not

5    spend that money as he had told his investors he would.

6            You will see documents like bank records, bank records

7    that show, for example, just what happened to that investor

8    money, how time and again it was not used on tickets but it was

9    used to benefit defendant and his partners in crime.

10           And when you see and you hear all of those things, you

11   will know beyond any reasonable doubt that the defendant lied

12   to his investors and that he and his partners in crime

13   committed fraud.

14           I am about to sit down, but before I do that, I'd ask

15   that you do three things in this trial:  First, pay close

16   attention to the evidence; second, listen to the Judge's

17   instructions; and, third, use your common sense, the same

18   common sense you use in your everyday lives.  If you do those

19   three things, the defendant will get a fair trial, the

20   government will get a fair trial, and you will reach the only

21   verdict that is consistent with the law and the evidence in

22   this case:  That Craig Carton is guilty as charged.

23           Thank you.

24           THE COURT:  Mr. Gottlieb, do you wish to open?

25           MR. GOTTLIEB:  Yes, your Honor, please.

IAU7CAR2                      Opening – Mr. Gottlieb

1          May it please the Court, Judge McMahon, counsel, and

2     ladies and gentlemen.

3          We just sat here with you.  We too listened to what

4     the government just claimed this case is about and what they

5     claim the evidence will show.  By the time this trial is over,

6     this is what you will conclude:  The government is wrong.  The

7     government is dead wrong, and the government has been dead

8     wrong about this case from the time it arrested Craig Carton on

9     September 6, 2017.

10          You -- not the government, not the prosecutor -- you

11     will decide what really happened based on the evidence, not

12     based on argument, but on actual proveable facts.  So, let's

13     get right to it.

14          You will conclude that contrary to what was just said

15     by the government, Mr. Carton always told the truth.  What I

16     lay out for you this morning, and what you will see for

17     yourselves, and you will see unfold during this trial, is all

18     directed and bears directly on the central issue in this case:

19     Intent -- Mr. Carton's intent -- throughout the time period you

20     are going to be talking about.  And when you focus on that, and

21     when you focus on the evidence that will be presented, you will

22     conclude that when Mr. Carton said what he said, and did what

23     he did, he told the truth, and with the undeniable intent to

24     fulfill his obligations to everyone, without exception,

25     including to Brigade Capital Management, and he never, ever for

1    a moment intended to cause them any harm.

2            You will learn that at the center of why we are all

3    here, and why Mr. Carton find himself in that chair, begins

4    with that man named Joseph Meli -- Meli, a man who turned out

5    to be an out-and-out con man, a liar, a thief.  You will hear

6    how Meli stole millions of dollars from unsuspecting businesses

7    and people; Meli, who conned and tricked countless people,

8    including Craig Carton.

9            You will learn that the government is wrong with what

10   they just told you in the opening.  Once you hear about a

11   second man, David Molner, Meli's right-hand man, who assisted

12   Meli in his fraud, who is directed by Meli, you will conclude

13   based on the evidence that Molner prepared fraudulent

14   agreements for Meli and then sent those fraudulent agreements

15   to the businesses and people Meli set out to defraud, and who

16   he did defraud, including Craig Carton.

17           So, right at the outset let me lay out what the

18   evidence will establish that goes directly to the issues.

19           First, Mr. Carton during the entire period of time

20   that's at the heart of this case had a real legitimate,

21   ongoing, licensed ticket resale business.  Second, during the

22   period of time that's at the heart of this case, Mr. Carton

23   developed and entered into a real, legitimate and ongoing

24   business relationship to buy tickets from Barclays Sports and

25   Entertainment.  Third, during the same period of time,

1    Mr. Carton purchased for resale thousands of tickets from

2    Barclays, as a result of that business relationship with

3    Barclays, and he purchased these tickets for and on behalf of

4    Brigade Capital Management.  And, fourth, based on everything

5    you will hear, you will conclude, therefore, that contrary to

6    what was just said, Mr. Carton is not guilty of each and every

7    single count with which he is charged.

8            Just as a brief background, you will learn that

9    Mr. Carton at the time of this case professionally was one of

10   the most successful and popular sports radio talk show hosts in

11   the country.  He was on WFAN here in New York in a morning

12   drive-time show along with his partner former Jets quarterback

13   Boomer Esiason.  You will hear that Mr. Carton has always been

14   more than just a radio personality; he was always incredibly

15   hard working, an entrepreneur, always looking for other

16   interesting creative small businesses.  This interest in other

17   ventures is important, because it's this entrepreneur spirit

18   that explains why he ever considered even getting involved in

19   this ticket reselling business in the first place.

20           The evidence will show that going back to 2007

21   Mr. Carton, because of his prominence in the sports world,

22   having the show on WFAN, met executives at Barclays Sports,

23   Fred Mangione, chief of staff, and Brett Yormark, Brooklyn

24   Sports and Entertainment CEO.  You will learn that their

25   relationship evolved over the years, it grew over the years,

IAU7CAR2                    Opening – Mr. Gottlieb

over dinners, lunches, conferences, charity events, and it grew

to the point that Barclays offered him the chance to buy a

small number of premium tickets for concerts and other events

that were booked at Barclays and Nassau Coliseum on Long

Island, owned by the same company, tickets to purchase and then

resell on the secondary ticket market.  You will hear all about

that market.  It's a legitimate ticket market, a legitimate

business, you will understand and learn; and it's a growing

business by which anyone can buy tickets and then sell them for

a profit.

And the evidence will establish then that beginning in

May of 2015 Mr. Carton began to dabble in that market once he

entered into a business deal with Barclays.  You will see proof

of the business deals in the numerous e-mails and other

documents that will be introduced, and slowly the evidence will

show in small quantities Mr. Carton tried it out by purchasing

and reselling a number of those tickets to see if it really

worked, could it be profitable; and once Mr. Carton saw that

the Barclays relationship was real, and was legitimate, and

that he could have access to top premium seats for tickets, he

decided to take it to the next step.  You will hear how he

teamed up with Michael Wright in May of 2016 to start that new

company you just heard about, it's called Tier One, and that

they acquired a license in New York to do exactly that

business.  The evidence will show that by the summer of 2016

now Mr. Carton began purchasing tickets in bulk in larger

numbers from Barclays.  You will learn and see from yourselves

that this business relationship then began to even grow bigger,

to continue to evolve and grow, to the point that Barclays

offered Mr. Carton the opportunity to buy larger lots of

tickets both at Barclays in Brooklyn and at the Nassau

Coliseum.  And you are going to read for yourself the e-mails

confirming this business deal from Brett Yormark, CEO at

Brooklyn Sports, October 17, 2016, where he says, "Assuming you

have a given our chat some more thought, let me see if we can

put a deal together.  Happy to discuss and formalize at your

convenience."  And then from Fred Mangione, an e-mail to

Mr. Carton in November of 2016 that states, "This will start

the beginning of our deal and rev" -- revenue sharing, I think

it will be clear, revenue sharing.  From Mr. Mangione on

December 15, 2017, "We are willing to work with $30 million of

our inventory in Nassau and Brooklyn, and we will give you the

ability in January to purchase up to 100 to 200 all-access

seats for the new Nassau arena."  And are you going to learn

based on the evidence that that's exactly what happened.

         You will see for yourselves approximately 4,000

tickets that Mr. Carton purchased from Barclays and Ticket

Master, all for the purpose of reselling them on the secondary

ticket market.  The bank records, the financial records you

will see, will prove that Mr. Carton spent in excess of $1.5

IAU7CAR2                    Opening - Mr. Gottlieb

1    million on those tickets, and ultimately was able to do so at

2    that higher amount because he had financing becoming available

3    to him as a result of that loan agreement you just heard about

4    with the hedge fund Brigade Capital Management.

5         Now, Brigade, you're going to learn gets involved in

6    this case and with Mr. Carton, because as Mr. Carton's business

7    grew, and once the opportunity to succeed in this business

8    became real to him, Mr. Carton realized that in order to grow

9    and to deal with bulk ticket purchases he needed financing, he

10   needed a larger pool of money to purchase the bulk tickets, and

11   that then brings us to the infamous Joseph Meli.

12        The evidence will show that Mr. Carton first heard

13   about Meli a few years before that, before he even got involved

14   in this business, when he initially became interested in

15   branching out and getting involved in the entertainment

16   promotion business.  And in talking to people in the industry,

17   he was told there was one man you just had to meet, Joseph

18   Meli.

19        The evidence will show that Meli was incredibly well

20   known in this entertainment promotion business; he was

21   considered to be the go-to guy if you were really interested in

22   sports or concert entertainment and promotion.  Mr. Carton then

23   realized if he was going to branch out into that new business,

24   he had to find someone who had the business acumen, the

25   background and the success.  And you will conclude that based

on everything out there about Meli, after meeting him,

Mr. Carton, like countless other people and businesses, was

convinced that Meli was the real deal, and that is why he was

comfortable in hitching his wagon to him, just as so many

others had previously done.

          In August of 2016 you will learn that Meli made all

sorts of representations and promises to Mr. Carton.  He

represented to Mr. Carton he was wildly successful in business.

He told him that he had orchestrated a $75 million investment

with a company called DTI Management, and that was a big deal.

Meli further represented to Mr. Carton that he had deals in

place with his AEG, a company that you just heard about in the

opening statement, to purchase tickets in bulk to several live

very popular concerts, and that he used his separate company --

Meli's separate company, Advance Entertainment, to purchase

these tickets.

          This business plan, you will come to understand, fit

right in the idea that Mr. Carton had, his plan to grow his

business.  And Meli had all the trappings of financial success

swirling around him.  You will hear and understand why

Mr. Carton relied on Meli's representations, his promises and

his touted relationships.  He believed Meli, he thought Meli

was being truthful, he thought Meli was legit.  And you will

learn that Mr. Carton was played.  And you will learn that not

only was he played and deceived, countless others just in the

same way, having nothing to do with Mr. Carton, were similarly

fooled and manipulated and defrauded by Meli before he ever

reached Mr. Carton.  And the evidence will establish that

Mr. Carton, like others, had no reason when he teemed up with

Meli to suspect that Meli was the con, the huckster that he

turned out to be.

Now, at this point in the chronology, having been lied

to by Meli, this is when Brigade enters the picture.  Before

Mr. Carton learned that he had been taken, relying on Meli's

representations, Mr. Carton set out to look for outside

financial backing to fund those purchases of bulk tickets, to

fund them, to buy the bulk tickets once he had them, and to

sell them through Meli's company called Advance Entertainment.

Also separately he had that special deal to buy tickets

directly from Barclays Center.

And so you will hear how it then all unfolded.  First,

he had discussions with a man named Doug Pardon.  Pardon worked

at Brigade Capital Management, a successful hedge fund holding

upwards of $20 billion in assets.  And Mr. Carton and Mr.

Pardon talked about Brigade getting involved in this way --

this is what the evidence and what the agreement is going to

show -- by loaning Mr. Carton's company money, to enable

Mr. Carton to purchase an even larger number of tickets than he

had been able to do, and then having Mr. Carton resell them on

the secondary ticket market.  And you will learn that this

IAU7CAR2                    Opening – Mr. Gottlieb

1   ticket market business was not foreign to Brigade.  You will

2   learn that Brigade was not some vulnerable or novice victim.

3          MR. QUIGLEY:  Objection.

4          THE COURT:  Ground?

5          MR. QUIGLEY:  Relevance, your Honor.

6          THE COURT:  Keep going, Mr. Gottlieb.

7          MR. GOTTLIEB:  Brigade was not a neophyte in the

8   ticket reselling business.  In fact, the evidence will show you

9   that Brigade had previously gotten involved in this very

10  business, in a deal involving a company called Vivid Seats.

11  And Brigade understood the risks that were associated with it,

12  and they were excited, and they were raring to go with

13  Mr. Carton in this new venture.  The evidence will further

14  establish that Brigade did not get involved casually or with

15  closed eyes, subject to anything Mr. Carton said.  It set out

16  to investigate everything about the deal.  It set out to

17  perform its due diligence.  It set out to investigate Meli and

18  his company and all aspects of this deal; and only after it

19  concluded its due diligence, its own investigation of not only

20  Meli and his company but Mr. Carton and his company, only then

21  did Brigade sign on and provide Mr. Carton and his business

22  with that $10 million revolving loan agreement.  And so just

23  like Mr. Carton, Brigade –– believing Meli and his pack of

24  lies –– Brigade jumps in with both feet just like Mr. Carton.

25          You will see the proof that Mr. Carton on his end was

1    entirely transparent with Brigade.  During the loan

2    negotiations, Brigade insisted that Mr. Carton provide it with

3    complete and full access to the records of all of its ticket

4    purchases and sales, and he did.  He went on during this entire

5    period of time to provide them with real-time access to both

6    his company's financial records, the records tracking the use

7    of Brigade's money and the purchases of tickets.  Mr. Carton

8    you will learn even agreed to give Brigade its own log-in and

9    sign-in rights to check the computer, to check the ticket

10   seats.

11          So a few moments ago you heard something about the AEG

12   agreements that turned out to be fake and had been turned over.

13   So let me address it, to be clear.  That's exactly what they

14   turned out to be, fake, but you will learn that Mr. Carton had

15   nothing to do with them.

16          Those agreements were prepared and sent to Mr. Carton

17   to pass on to Brigade without Mr. Carton knowing that they were

18   fraudulent.  You will learn, yes, that Brigade before closing

19   on the revolving loan agreement wanted to see proof that Meli

20   had access to purchase bulk tickets from AEG, as Meli had

21   represented to Mr. Carton, and so this is what the evidence

22   will show really happened:

23          You will hear that at Brigade's request Mr. Carton

24   asked Mr. Meli to send him signed agreements that Meli had

25   promised him he had, and then that's all that then happened,

IAU7CAR2                           Opening - Mr. Gottlieb

1    they were sent to Mr. Carton.

2              It's at this point that a second fraudster, that

3    second name is going to be part of this tragic case for

4    Mr. Carton, another name that will surface over and over again,

5    David Molner.  And the evidence will establish that Molner was

6    Meli's partner in crime; he was intricately intertwined with

7    substantial aspects of Meli's ticket resale business Advance

8    Entertainment, and he was involved in the discussions and

9    dealings with Mr. Carton.

10             You will learn that Molner served as Meli's partner

11   and advisor to his company over the course of several years.

12   It will become patently clear based on the evidence, based on

13   the volume of e-mails back and forth involving Molner and Meli,

14   that for all intents and purposes Molner appeared to Mr. Carton

15   to be just as actively involved in Meli's business operation as

16   Meli himself.

17             So, when Mr. Carton told Meli that Brigade wanted to

18   see the agreements before they provided the loan, before

19   Brigade proceeded with the loan, you're going to learn that

20   Mr. Carton was not at all surprised that his request for the

21   agreements went from him to Meli and then back to Molner.  The

22   evidence will show that Molner prepared and then forwarded

23   these requested fraudulent agreements to Mr. Carton for him to

24   turn over to Brigade.  But at the time Mr. Carton received

25   those agreements from Molner and sent those agreements to

1  Brigade, this trial will prove that Mr. Carton had absolutely

2  no idea, no clue that those agreements were forged and that

3  they were fraudulent.

4         Now, you heard something about the loan agreement.

5  I'm going to briefly just discuss that.  It's going to become

6  important for you to understand the details of that loan.

7         First, it was a loan for up to $10 million, but you're

8  going to see that Brigade didn't just hand over $10 million to

9  Mr. Carton; you're going to learn that this particular type of

10  loan was like a line of credit but even stricter than the

11  normal line of credit that you might be aware of.

12         You're going to learn first with regard to that

13  agreement that Mr. Carton could not just take the money

14  whenever he wanted or in whatever amount he wanted.  Brigade

15  had to make those decisions; brigade decided how much to loan,

16  when to loan it and for what purpose.

17         Second, with regard to the loan, the loan agreement

18  did not require that the requested tickets it sought to

19  purchase -- those requested tickets that were to be purchased

20  by Mr. Carton -- did not require that they be purchased at any

21  specific time, only that they be purchased.

22         Third, Mr. Carton agreed to a security agreement in

23  signing the loan, when he signed that loan agreement he agreed

24  to secure Brigade's loan by protecting Brigade and guaranteeing

25  the loan with his very own personal and business assets.  The

IAU7CAR2                    Opening – Mr. Gottlieb

1    evidence will show, therefore, that if Brigade lost its money

2    in violation of the loan agreement, Mr. Carton -- Mr. Carton

3    personally -- was obligated to make good on Brigade's loan with

4    his own personal and business assets.

5            And, fourth, while the government may introduce

6    evidence during this trial that the money Brigade sent to

7    Mr. Carton was not placed in a separate controlled bank

8    account, the evidence is going to show that that's absolutely

9    true, but what was left out, and what you're going to come to

10   learn during this trial, is that the failure to set up this

11   segregated controlled account was Brigade's fault, it was not

12   Mr. Carton's fault.

13           Brigade you will learn had the responsibility and the

14   very clear authorization directly from Mr. Carton to arrange

15   for a segregated controlled account, and months went by and

16   Brigade failed to set up this account, and are you going to see

17   that clearly from the e-mails that will be introduced to you.

18           And the evidence will show further that Brigade,

19   knowing full well that this account had not been set up,

20   nevertheless forwarded millions of dollars in the month of

21   December of 2016, money for tickets not to Mr. Carton but

22   directly to Meli and his company, just as Brigade insisted on

23   doing.

24           THE COURT:  You have about two minutes left, Mr.

25   Gottlieb.

1      MR. GOTTLIEB:  Thank you, your Honor.  So I will wrap

2   up.  Thank you very much.

3      THE COURT:  That's a good idea, because this isn't the

4   argument at the end of the case; it's just an overview of the

5   evidence.

6      MR. GOTTLIEB:  And with regard to the issue of the

7   money that was actually sent being used exclusively for

8   tickets, let me be clear about what the evidence will be on

9   that point.

10      One, Mr. Carton understood what his obligations were

11   to Brigade in exchange for drawing down on the revolving loan.

12      Two, the $2 million that Brigade initially sent to

13   Barclays for specific shows were not purchased on the day the

14   funds were sent because the shows, while scheduled, were not

15   yet available for sale.

16      The agreement, number three, simply required that

17   Mr. Carton purchase tickets with the loan money in the amount

18   that was drawn from the line of credit.

19      Finally, ladies and gentlemen, you heard something

20   about gambling.  This trial is not about gambling, it's not

21   about casinos; there is nothing illegal, and there is nothing

22   wrong.  You are going to hear that the government did not fully

23   understand the evidence with regard to gambling.

24      Ladies and gentlemen, I'm done with the opening.

25   That's my preview of what this case is, and it's different than

1    what you initially heard from the government.

2              Your Honor, thank you very much.

3              THE COURT:  Call your first witness.

4              MR. QUIGLEY:  Your Honor, the government calls Chris

5    Chaice.

6     CHRIS CHAICE,

7         called as a witness by the government,

8         having been duly sworn, testified as follows:

9    DIRECT EXAMINATION

10   BY MR. QUIGLEY:

11   Q.  Good morning, Mr. Chaice.

12   A.  Good morning.

13   Q.  Where do you work?

14   A.  I work for Brigade Capital Management.

15   Q.  And where is Brigade Capital Management located?

16   A.  Main office is here in New York City.

17   Q.  Manhattan?

18   A.  Correct.

19   Q.  How long have you worked there?

20   A.  Approximately six years.

21   Q.  And what is Brigade?

22   A.  We're an investment firm.

23   Q.  And do you have clients?

24   A.  We do.

25   Q.  Who are some of your clients?

IAU7CAR2                        Chaice – Direct

1    A.   Primarily pensions and large corporations.

2    Q.   And do you invest money on behalf of clients?

3    A.   We do.

4    Q.   What is your role at Brigade?

5    A.   I'm an attorney on the research team.  My title is senior

6    credit attorney.

7    Q.   How much money does Brigade manage in total?

8    A.   We manage approximately $20 million.

9    Q.   Did there come a time when you met someone named Craig

10   Carton?

11   A.   Yes.

12   Q.   How did you first meet Mr. Carton?

13   A.   I was introduced to him by a colleague Doug Pardon.

14   Q.   When was that approximately?

15   A.   October of 2016.

16   Q.   What was the context in which you met him?

17   A.   He had an investment idea he wanted to share with us.

18   Q.   He being Mr. Carton?

19   A.   Correct.

20   Q.   And he had an idea that he wanted to share with Brigade?

21   A.   Sorry?

22   Q.   He had an idea that he wanted to share with Brigade?

23   A.   Correct.

24        THE COURT:  Could you speak up a little bit, Mr.

25   Quigley?

1           MR. QUIGLEY:  Yes.

2           THE COURT:  Thank you.  Thanks so much.

3   Q.  Generally what was that idea?

4   A.  He wanted to invest in tickets, generally in high profile

5   entertainment events.

6   Q.  And who had brought this idea to Brigade?

7           THE COURT:  Mr. Quigley, I can hear the first word.

8   My hearing is not that bad.  You go "And who..."  You can't do

9   that, please.

10  Q.  What industry did you understand Mr. Carton to be in?

11  A.  The entertainment industry.

12  Q.  And what specifically did he do?

13  A.  He was on a radio show.

14  Q.  In connection with this investment idea, what was he

15  looking for Brigade to provide?

16  A.  Money.

17  Q.  Did you and your colleagues at Brigade have follow-up

18  discussions with Carton about this potential investment idea

19  related to tickets?

20  A.  Yes, we did.

21  Q.  Are you familiar with something called a term sheet?

22  A.  I am.

23  Q.  What is a term sheet?

24  A.  Generally speaking a term sheet sets forth the high-level

25  aspects or terms of a potential transaction.

1   Q.   Typically that's early in the negotiation?

2   A.   That's correct.

3   Q.   Did there come a time when Brigade sent Mr. Carton a term

4   sheet regarding the potential investment relating to event

5   tickets?

6   A.   Yes.

7   Q.   Could we publish for the witness only -- the witness and

8   the lawyers -- and also you can look in your binder, Mr.

9   Chaice, Government Exhibit 712.

10  A.   Yes.

11  Q.   Mr. Chaice, do you recognize that document?

12  A.   It's an e-mail -- yes, I do.  It's an e-mail initially sent

13  by Doug Pardon to Craig Carton.

14  Q.   Is there a term sheet attached to it?

15  A.   Yes.

16          THE COURT:  What is attached to it?  Please, no

17  leading questions.  Just ask him open-ended questions, let him

18  testify.

19          MR. QUIGLEY:  Your Honor, the government offers

20  Government Exhibit 712.

21          THE COURT:  Any objection?

22          MR. GOTTLIEB:  No, your Honor.

23          THE COURT:  Admitted.

24          (Government Exhibit 712 received in evidence)

25          MR. QUIGLEY:  Can we publish for the jury, your Honor,

1   Government Exhibit 712.

2   Q.  Focusing on the bottom e-mail, Mr. Chaice, who is this

3   e-mail from?

4   A.  It's from Doug Pardon at Brigade.

5   Q.  What's the date on the e-mail?

6   A.  October 26, 2016.

7   Q.  And who is it to?

8   A.  To Craig Carton.

9   Q.  And is this Mr. Carton's e-mail address?

10  A.  This is the e-mail address we used to communicate with

11  Craig Carton.

12  Q.  Labs123@aol?

13  A.  Correct.

14  Q.  And focusing on the cc line, Chris Chaice is who?

15  A.  I'm Chris Chaice.

16  Q.  And John bail his?

17  A.  John Baylis and Tyler Sinclair are each of my colleagues at

18  Brigade.

19  Q.  What does Mr. Pardon say to Mr. Carton in this email?

20  A.  We say please find attached term sheet.

21  Q.  And can we turn to the term sheet, the second page of the

22  document.

23  A.  Yes.

24  Q.  Do you see where it says project tickets term sheet?

25  A.  I do.

1    Q.   And then under that borrower company Newco.  What does

2    Newco mean?

3    A.   We wanted the borrower to be a new company, one that had no

4    prior existence.  We were going to form that new company, so

5    until we did, we called it new co.

6    Q.   And the borrower was going to be associated with who?

7    A.   This was the entity to be formed by Craig Carton to borrow

8    money from us for this investment -- us being Brigade.

9    Q.   And what does owner mean on the next line?

10   A.   That is the owner of the new co to be formed, that's a

11   vehicle owned by Craig Carton.

12   Q.   Misoluki, Inc.?

13   A.   Correct.

14   Q.   Do you see where it says "Lender:  Certain funds and

15   accounts managed by Brigade Capital Management"?

16   A.   I do.

17   Q.   And do you see where it says under that "use ever

18   proceeds"?

19   A.   I do.

20   Q.   Can you read what it says next to "use of proceeds"?

21   A.   Yes, I can.  "Company to purchase tickets from either DTI

22   Management and/or directly from sponsor/promoter in each case

23   for the purpose of reselling tickets through the secondary

24   market."

25   Q.   You mentioned DTI Management.  What is DTI Management?

1  A.  That's a company that has a platform for selling and buying

2  tickets in the secondary market.

3  Q.  And you mentioned a couple of times now secondary markets.

4  What's does secondary markets mean?

5  A.  Well, the tickets are initially sold from the artist,

6  sponsor or promoter, the originator of the tickets, and then

7  they're sold again into the market for people who want to use

8  them to go to these events.  That's the secondary market.

9  Q.  So those resales are considered the secondary?

10  A.  The resales, correct.

11  Q.  At any point was Brigade thinking about investing with

12  Mr. Carton in anything other than to purchase tickets for the

13  purpose of reselling them through the secondary market?

14  A.  No.

15  Q.  You said before Brigade is an investment fund?

16  A.  Correct, we are.

17  Q.  Does Brigade extend general purpose loans to people?

18  A.  Generally we do not.

19  Q.  It's not a commercial bank?

20  A.  No, we're not, certainly.

21  Q.  Was it important to Brigade that any money that went to

22  Mr. Carton be used to purchase tickets for the purpose of

23  reselling those tickets in the secondary market?

24  A.  Yes, it was.

25  Q.  Were you interested in lending him money for anything else

1    at this time?

2    A.  No, we were not.

3    Q.  So directing your attention back to the term sheets, the

4    drawdown, what do you understand that drawdown paragraph means?

5    A.  Well, this was a revolving loan which is to say it was not

6    to be borrowed all at once but in increments when there was a

7    purpose for that borrowing, and so a drawdown was a specific

8    borrowing of funds under the loan to be used to buy tickets.

9    Q.  So a portion of the $10 million.

10   A.  Correct.

11   Q.  And what were some of the -- what conditions -- what does

12   it say here about the conditions before a drawdown?  What did

13   it say next to drawdown?  Can you read the paragraph?

14   A.  "Each drawdown subject to agreed upon conditions, including

15   consent of lender" -- which is Brigade -- "in its sole

16   discretion and review of resale opportunity and related

17   documentation."

18   Q.  What does review of resale opportunity and related

19   documentation mean?

20   A.  That is to review the tickets or the event for which the

21   proceeds will be used, what we're buying.

22   Q.  And dropping down to where it says "preferred return to

23   lender," where it says "10 percent return on amounts funded by

24   lender," and then under that there is a revenue split, what

25   does that mean in terms of how the returns in this investment

1    are going to work?

2    A.  Well, it was structured as a loan, which is to say we would

3    loan the money to the new co, the borrower.  When the money was

4    returned, it would first go to pay us back our loan.  Any

5    amounts in addition to that would first go to the lender 10

6    percent as a preferred return, and any proceeds in excess of

7    that from the tickets that were sold would be split 50/50

8    between the lender and the borrower.

9    Q.  So they would be split 50/50 between you and Mr. Carton --

10   or Mr. Carton's company.

11   A.  Correct.  Between the new co, which was later called Ticket

12   Jones.

13   Q.  And what does it say?  Above that what does it say about

14   collateral control account?

15   A.  It says, "All funding related to resale opportunities to be

16   made to and from account controlled by lender" -- that's

17   Brigade -- "and pledged to secure the loan.  Further, the loan

18   will be secured by tickets" and we will discuss additional

19   collateral.

20   Q.  And a couple of lines below that where it says control of

21   resale, who is going to be controlling the resale process under

22   this potential agreement?

23   A.  The company, which is the new co or the borrower.

24   Q.  That would be Mr. Carton.

25   A.  Correct.

1          THE COURT:  Mr. Quigley, please do me a favor and

2     don't testify.  Ask the witness.

3          MR. QUIGLEY:  Thank you, your Honor.

4     Q.  Now, did you ultimately end up entering into an agreement

5     with Mr. Carton?

6     A.  We did.

7     Q.  And how did the terms compare to the terms outlined in this

8     term sheet?

9     A.  They generally aligned but were much more extensive in the

10    actual binding agreement.

11    Q.  And about when was the agreement, the final agreement with

12    the defendant, finalized?

13    A.  In early December.

14    Q.  Can you generally describe the process that occurred

15    between this e-mail on October 26 and early December?

16    A.  Yes.  I guess there were two tracks.  One was to draft and

17    negotiate the actual binding contracts, and two was to further

18    diligence or research the investment opportunity before we

19    actually finalized the agreement.

20    Q.  And did Brigade retain outside attorneys to help in those

21    negotiations?

22    A.  We did.

23    Q.  And where were they based?

24    A.  They're based in New York and LA.

25    Q.  Were you also involved in the discussions and negotiations?

IAU7CAR2                      Chaice - Direct

1   A.  I was.

2   Q.  Was Mr. Carton?

3   A.  Yes, he was.

4   Q.  During the negotiations and process, did you meet with

5   someone named Joe Meli?

6   A.  I did.

7   Q.  And how did you meet with him?

8   A.  I was introduced to him by Craig Carton.

9   Q.  To your knowledge, did Meli have any preexisting

10  relationship with Brigade?

11  A.  No, he did not.

12  Q.  What was your understanding of who Meli was?

13  A.  He was someone in the entertainment industry who could or

14  would have access to tickets.

15  Q.  Why did you meet with him?

16  A.  Because we were looking to fund a loan to a company that

17  would be buying tickets, and so having access to tickets to be

18  bought was important to the venture.

19  Q.  And who is we?  Who are you referring to?

20  A.  Brigade.

21  Q.  How many times did you meet with Meli?

22  A.  One time.

23  Q.  Where did that meeting take place?

24  A.  At Brigade's office.

25  Q.  Who else was there?

IAU7CAR2                          Chaice - Direct

1    A.  My colleagues John Baylis and Doug Pardon.

2    Q.  Now, did Craig Carton put you in touch with anyone else

3    leading up to this agreement?

4    A.  Yes, he did.

5    Q.  And who was that?

6    A.  We spoke with a gentleman named Alex Guira from New

7    Amsterdam.

8    Q.  What is New Amsterdam?

9    A.  It's a private equity firm.

10   Q.  Why did you speak with Mr. Guira?

11   A.  His firm and another large private equity firm had made a

12   large investment in a combination of DTI -- the company we

13   mentioned before -- and Joe Meli's company Advance

14   Entertainment.

15   Q.  Did you in fact execute a revolving loan agreement with

16   Mr. Carton?

17   A.  We did.

18   Q.  So can you look in your binder --

19          And put up on the screen for the witness and the

20   lawyers, Government Exhibit 925.

21          Mr. Chaice, do you recognize Government Exhibit 925?

22   A.  I do.

23   Q.  What is it?

24   A.  This is the revolving loan agreement.

25          MR. QUIGLEY:  The government offers Government Exhibit

IAU7CAR2                      Chaice - Direct

1    925.

2              MR. GOTTLIEB:  No objection.

3              THE COURT:  Admitted.

4              (Government Exhibit 925 received in evidence)

5              MR. QUIGLEY:  May we publish it, your Honor?

6              THE COURT:  Yes.  Once I say admitted, you may

7    publish.

8              MR. QUIGLEY:  Thank you, your Honor.

9    Q.  So, Mr. Chaice, looking at the first page, who is this

10   agreement between?

11   A.  This is between Ticket Jones LLC -- which is the new co we

12   were discussing as the borrower -- and the lenders party hereto

13   represents through Brigade funds.

14   Q.  And can we call those Brigade funds the Brigade funds

15   collectively?

16   A.  Sorry?

17   Q.  Can we call those Brigade funds the Brigade funds

18   collectively?

19   A.  Yes.

20   Q.  Directing your attention to Brigade -- page Brigade 073.

21   Who signed this agreement on behalf of Ticket Jones?

22   A.  Craig Carton.

23   Q.  And directing your attention to page 7 of the document,

24   page Brigade 033, how is the term maturity date defined in this

25   agreement?

1    A.  It means the fourth anniversary of the date of this

2    agreement, which is the early December date, so four years from

3    that date.

4    Q.  Directing your attention to section 201 on page Brigade

5    038.  What does this section discuss here, Mr. Chaice?

6    A.  This discusses the mechanics of the loan and initially on

7    what terms we will provide that loan.

8    Q.  And what are some of the requirements that are listed in

9    that section 201(b)?

10   A.  For example, it says when tickets are to be purchased, the

11   event ticket agreement or other written arrangement need to be

12   provided to us before we advance those loans.

13   Q.  And is that at romanette two in that paragraph?

14   A.  I'm looking at 201(b)(iii), romanette three.

15   Q.  Can we highlight that.

16       Then what is the next requirement after that,

17   romanette four?

18   A.  It's a similar requirement.  In this case, when tickets are

19   to be sold, we need to be provided with the contract for the

20   sale of those tickets before we advance any funds.

21   Q.  At this time had Brigade received any event ticket

22   agreements when this agreement was executed?

23   A.  We did.

24   Q.  And who did you get those from?

25   A.  Craig Carton.

IAU7CAR2                        Chaice - Direct

1    Q.  So put aside 925 for a second and I show you Government

2    Exhibit 935, just for the witness, the lawyers and the judge.

3    Do you recognize that, Mr. Chaice?

4    A.  I do.

5    Q.  What is it?

6    A.  This is an e-mail from Craig Carton to me and others at

7    Brigade.

8            MR. QUIGLEY:  Your Honor, the government offers

9    Government Exhibit 935.

10           MR. GOTTLIEB:  No objection.

11           THE COURT:  Admitted.

12           (Government Exhibit 935 received in evidence)

13           MR. QUIGLEY:  Publish it.

14   Q.  And what is attached to this e-mail, Mr. Chaice?

15   A.  Attached to this e-mail are several purchase agreements for

16   tickets.

17   Q.  And then can we show the witness, the lawyers and the judge

18   Government Exhibit 933.

19           Do you recognize that, Mr. Chaice?

20   A.  I do.

21   Q.  What is that?

22   A.  This is an e-mail from Craig Carton to me and others at

23   Brigade.  Again this has attached a ticket purchase agreement.

24           MR. QUIGLEY:  Your Honor, the government offers

25   Government Exhibit 933.

1          MR. GOTTLIEB:  No cans0.

2          THE COURT:  Admitted.

3          (Government Exhibit 933 received in evidence)

4          MR. QUIGLEY:  Publish it briefly.

5   Q.  Now, Mr. Chaice, were these agreements that we saw attached

6   to Government Exhibit 933, 935, were those incorporated back

7   into the revolving loan agreement?

8   A.  Yes, several were.

9   Q.  So, can we go back to Government Exhibit 925, Exhibit C,

10  page Brigade 107.

11  A.  107?

12  Q.  Yes.

13  A.  Yes.

14  Q.  And so what is this behind this page?

15  A.  This is an exhibit to the revolving loan agreement which

16  attaches several of the event ticket agreements.

17  Q.  Can we turn the page and look at the first one?

18  A.  Yes.

19  Q.  Who is this agreement between?

20  A.  This agreement is Advance Entertainment and AEG Live.

21  Q.  And what was your understanding of who operated Advance

22  Entertainment?

23  A.  Joe Meli.

24  Q.  And what performer or performers does this agreement

25  pertain to?

1   A.   Justin Bieber.

2   Q.   And what does this agreement purportedly give Advance

3   Entertainment the right to do?

4   A.   The right to buy $10 million worth of tickets to Justin

5   Bieber's performance.

6   Q.   And who would they be buying that from?

7   A.   AEG Live.

8   Q.   What's your understanding of what AEG Live is?

9   A.   A promoter of concerts and other events.

10  Q.   And directing your attention to Section 2.1 -- I'm sorry --

11  section 2, sale of tickets -- what quantity or what amount of

12  tickets is Advance agreeing to buy from AEG Live here?

13  A.   $10 million worth of tickets.

14  Q.   Was Brigade going to be funding that entire amount?

15  A.   No, we were not.

16  Q.   What was your understanding of where the rest of the money

17  was going to be coming from?

18  A.   Other investors.

19  Q.   Directing your attention to page Brigade 112.  Who signed

20  this agreement on behalf of Advance Entertainment?

21  A.   Joe Meli.

22  Q.   And who signed it on behalf of AEG Live?

23  A.   Gary Gersh.

24  Q.   Can we go to the next agreement on page Brigade 114.

25  A.   Yes.

1   Q.  Who is this event ticket agreement between?

2   A.  Advance Entertainment and AEG Live.

3   Q.  For what performer or performers?

4   A.  The Chainsmokers.

5   Q.  A what does this agreement purportedly give Advance

6   Entertainment the ability to do?

7   A.  The right to buy $10 million worth of tickets.

8   Q.  Was Brigade going to be funding that entire amount?

9   A.  No, we were not.

10  Q.  Where was the rest coming from?

11  A.  Our understanding was other investors.

12  Q.  Can we go to the signature page, Brigade 118.

13  A.  Yes.

14  Q.  And who signed this agreement on behalf of Advance?

15  A.  Joe Meli.

16  Q.  Who signed on behalf of AEG Live?

17  A.  Gary Gersh.

18  Q.  Go to the next agreement, page Brigade 120.

19  A.  Yes.

20  Q.  What performer or performers is this one for?

21  A.  Ariana Grande.

22  Q.  Who is the agreement between?

23  A.  Advance Entertainment and AEG Live.

24  Q.  What does this agreement purportedly give Advance the

25  ability to do?

1    A.  Purchase up to $10 million worth of tickets.

2    Q.  Again, was Brigade going to be funding that entire $10

3    million amount?

4    A.  No, we were not.

5    Q.  What was your understanding of where the rest was going to

6    be coming from?

7    A.  From other investors.

8    Q.  Can go to the signature page on Brigade 124.  Who signed

9    this agreement on behalf of Advance?

10   A.  Joe Meli.

11   Q.  And who signed it on behalf of AEG Live?

12   A.  Gary Gersh.

13   Q.  Can we go to Brigade 108.

14   A.  108?

15   Q.  Yes.  Is this another letter agreement?

16   A.  Yes, it is.

17   Q.  Who is it between?

18   A.  This is Advance Entertainment and AEG Live.

19   Q.  And which performer or performers?

20   A.  Justin Bieber.

21   Q.  And what does this agreement purportedly give Advance the

22   ability to do?

23   A.  Purchase $10 million worth of tickets.

24   Q.  Again, was Brigade going to be funding that entire amount?

25   A.  No, we were not.

1   Q.  And it's signed by Joseph Meli for Advance Entertainment

2   and Gary Gersh for AEG again?

3   A.  Correct.

4   Q.  And we go to the last one, page Brigade 132.

5   A.  Yes.

6   Q.  Sorry, next page.  There we go.  Is this another agreement

7   between Advance Entertainment and AEG Live?

8   A.  It is.

9   Q.  Again, $10 million worth of tickets -- or this gives

10  Advance access to $10 million worth of tickets?

11  A.  Correct, in this case to Roger Waters.

12  Q.  Was Brigade going to be funding that entire amount?

13  A.  No, we were not.

14  Q.  And who is the agreement signed by?

15  A.  Joe Meli for Advance Entertainment and Gary Gersh for AEG

16  Live.

17  Q.  So was it important for you to get these agreements from

18  Mr. Carton, these event ticket agreements, before lending money

19  to him or Meli?

20  A.  Yes, it was a requirement.

21  Q.  If the defendant said he had an oral agreement to get

22  tickets, would you have invested money with him?

23              MR. GOTTLIEB:  Your Honor, objection.

24              THE COURT:  The objection is overruled.

25  A.  No, we would not have.

1    Q.  You would not have.

2    A.  We would not have.

3    Q.  Focusing back on the body of the revolving loan agreement

4    between you and the defendant -- between Brigade and the

5    defendant -- can we look at a few more provisions, specifically

6    section 508 on page Brigade 53.

7    A.  Yes.

8    Q.  What does this provision deal with?

9    A.  There is a use of proceeds section.

10   Q.  And how are the proceeds to be used?

11   A.  The proceeds are required to be used to either make an

12   investment in tickets or for operating expenses of the

13   borrower, but in the later case limited to $25,000 a year.

14            (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. QUIGLEY:

2    Q.  I'm sorry.  How much were operating expenses limited to?

3    A.  25,000.

4    Q.  So other than as set forth here, could the tickets be used

5    to purchase anything other than -- could the loan proceeds be

6    used to purchase anything other than tickets or limited

7    operating expenses?

8    A.  No.

9    Q.  Could we just back up one second and go to Section 201(c)

10   on page Brigade 39.

11   A.  Yes.

12   Q.  What does that provision deal with, Mr. Chaice?

13   A.  As it states, to the maximum extent practicable, payments

14   to fund these event tickets, to buy the tickets, or make the

15   investment shall be made directly to the applicable

16   counterparty, which in this case is the seller of the tickets.

17   Q.  Why do you want to do that?

18   A.  We were loaning money to buy tickets, so the most direct

19   way would seem like the best course of action, so sending money

20   directly to the seller.

21   Q.  To maintain control over the money?

22          THE COURT:  Excuse me.  I can't hear you.  Why did you

23   want to do that?

24   Q.  Why did you want to send money directly to the seller?

25   A.  It was an important part of our monitoring the investment

IAUHCar3                       Chaice - Direct

1   and where the money went and where the tickets were going.

2   Q.  To ensure that the money was used as you --

3         THE COURT:  No, no, you're testifying.  Stop it.  He

4   just answered the question.  Go on to the next question.

5         MR. QUIGLEY:  Thank you, your Honor.

6   Q.  Could we go to page Brigade 054, Section 513.

7   A.  Yes.

8   Q.  Generally, what does this provision deal with?

9   A.  This is corporate separateness.  So this aligns with why we

10  wanted to create a new company that had no existing operations.

11  We wanted the money to be funded to the borrower to be used for

12  one purpose, not commingled or mixed with other cash, other

13  people's money, just this one borrower, to be used for this one

14  sole purpose, which was to buy tickets.

15  Q.  What was Brigade to be paid back under this agreement -- or

16  how was Brigade to be paid back under this agreement?

17  A.  Well, as a loan we were first owed the money back that we

18  had funded and then a 10 percent return, and then there would

19  be a profit split after that.

20  Q.  Who would the profit split be between?

21  A.  Between the borrower and the lender, between Craig Carton's

22  company and the Brigade funds.

23  Q.  Could we go to page Brigade 77.

24  A.  Yes.

25  Q.  What is this part of the revolving loan agreement?

IAUHCar3                         Chaice - Direct

1   A.  This is a security agreement.

2   Q.  And what is the security agreement?

3   A.  This was a secured loan, which means collateral or assets

4   were used to secure its repayment.  And so this sets forth the

5   terms by which those assets would be pledged, or secured, for

6   our loan.

7   Q.  What were the assets used to secure the loan?

8   A.  These were assets of Ticket Jones, which was the borrower;

9   the cash that we provided; the tickets that were purchased; and

10  the contracts that we've been discussing.

11  Q.  When was Ticket Jones formed?

12  A.  Shortly before we made the loan.

13  Q.  Did it have any assets before money was loaned?

14  A.  No.

15          MR. GOTTLIEB:  Objection, your Honor.

16          THE COURT:  I'm sorry.  Hang on.  Just hang on a

17  second.  Objection's overruled.

18  Q.  Did Ticket Jones have any assets before Brigade loaned

19  money to Mr. Carton?

20  A.  It was not supposed to.

21  Q.  Was this loan secured by Mr. Carton personally?

22  A.  No, it was a loan to Ticket Jones, the borrower, so secured

23  by its assets.

24  Q.  By Ticket Jones' assets?

25  A.  Correct.

1   Q.  Now, under this agreement and throughout your discussions

2   with Mr. Carton, what was your understanding of who was going

3   to be purchasing these tickets?

4   A.  Craig Carton.

5   Q.  Who was going to be reselling them?

6   A.  Craig Carton.

7   Q.  So after this agreement gets signed, did the Brigade fund

8   make an initial investment?

9   A.  We did.

10          MR. QUIGLEY:  So can we publish for the judge, the

11  lawyers, and the witness Government Exhibit 907.

12  Q.  Do you recognize this, Mr. Chaice?

13  A.  I do.

14  Q.  What is it?

15  A.  It's a series of emails between Craig Carton and me and

16  others at Brigade.

17  Q.  What's the date on the email?

18  A.  This is December 8, 2016.

19          MR. QUIGLEY:  Your Honor, the government offers

20  Government Exhibit 907.

21          MR. GOTTLIEB:  No objection.

22          THE COURT:  Admitted.

23          (Government's Exhibit 907 received in evidence)

24  BY MR. QUIGLEY:

25  Q.  Mr. Chaice, directing your attention to the first email or

1    the email on 12:06 p.m. on December 8, 2016.  Do you see that?

2    A.  I do.

3    Q.  What are you telling Mr. Carton here?

4    A.  We are discussing the initial loan and how that initial

5    loan or drawdown would be allocated amongst various events.

6    Q.  What are you proposing in terms of the allocation?

7    A.  We're proposing to fund $700,000, $300,000 of which for

8    Katy Perry, $200,000 of which for Justin Bieber, $100,000 of

9    which for Ariana Grande, and $100,000 for Roger Waters.

10   Q.  And how does Mr. Carton respond in the email above that?

11   A.  He says that's confirmed.

12   Q.  And how do you respond?

13   A.  I confirm back to him that we're good to fund that 700,000.

14   I say at that point we had not yet signed the final binding

15   agreements, but we were very close, and they should be done

16   soon.

17   Q.  Now, a few minutes ago we saw some -- if you can go back,

18   just highlight the bottom email on that page again, Mr. Cooney.

19   Thank you.

20        A few minutes ago we'd seen some event ticket

21   agreements between AEG and Advance Entertainment.  Do you

22   recall that?

23   A.  I do.

24   Q.  Do those agreements include agreements for Katy Perry,

25   Justin Bieber, Ariana Grande, and Roger Waters?

IAUHCar3                    Chaice - Direct

1   A.  Yes, they did.

2   Q.  Did Brigade end up wiring the $700,000 to Advance

3   Entertainment on or about December 8?

4   A.  We did.

5   Q.  Would Brigade have wired that money to Carton or Advance

6   Entertainment without having received those contracts for those

7   performers?

8   A.  No, we would not have.

9   Q.  Would Brigade have wired the $700,000 to Carton or Advance

10  Entertainment if the money was not going to be spent on

11  purchasing tickets to concerts by those performers?

12  A.  No, we would not have.

13  Q.  Was Brigade's money to be used to repay debts?

14  A.  No.  It was explicitly to be buying these tickets.

15  Q.  How did you know where to send this $700,000?

16  A.  I believe we were provided wire instructions by Craig

17  Carton.

18          MR. QUIGLEY:  Could we publish for the judge, the

19  lawyers, and the witness Government Exhibit 902.

20  Q.  Do you recognize this document, Mr. Chaice?

21  A.  I do.

22  Q.  What is it?

23  A.  This is an email from Craig Carton to me and others at

24  Brigade.  It contains the wiring instructions for Advance

25  Entertainment.

IAUHCar3                          Chaice - Direct

1           MR. QUIGLEY:  Your Honor, the government offers

2    Government Exhibit 902.

3           MR. GOTTLIEB:  No objection.

4           THE COURT:  Admitted.

5           (Government's Exhibit 902 received in evidence)

6    BY MR. QUIGLEY:

7    Q.  Who is the defendant forwarding that wire info to?

8    A.  Sorry?

9    Q.  Who is the defendant forwarding that wire info to?

10   A.  That was from Joe Meli to Craig.

11   Q.  And you're on this email?

12   A.  I was on the email.  It was forwarded to me and others at

13   Brigade.

14          MR. QUIGLEY:  So if we could publish for the witness,

15   the lawyers, and the judge only the first page of Brigade --

16   sorry, Government Exhibit 2301.

17   Q.  Mr. Chaice, does this fairly and accurately depict the

18   status of Brigade's investments and the opportunity presented

19   by Mr. Carton as of December 8, 2016?

20   A.  It does.

21          MR. QUIGLEY:  Your Honor, we offer the first page of

22   Government Exhibit 2301 as an aid to the jury.

23          MR. GOTTLIEB:  Objection, your Honor.

24          THE COURT:  Ground?

25          MR. GOTTLIEB:  It's foundation as to who prepared it,

1    when it was prepared, on what basis does --

2              THE COURT:  Do you want to voir dire on it?

3              MR. GOTTLIEB:  If the Court wishes me to --

4              THE COURT:  I don't wish you to do anything.  I'm

5    asking if you want to voir dire.

6              MR. GOTTLIEB:  Yes, please.

7              THE COURT:  Fine.  Go right ahead.

8    VOIR DIRE EXAMINATION

9    BY MR. GOTTLIEB:

10   Q.  So who prepared this particular document?

11   A.  Who prepared it?

12             THE COURT:  Yes, sir.

13   A.  I don't know.

14   Q.  When was it prepared?

15   A.  I don't know.

16   Q.  You didn't prepare it?

17   A.  I did not prepare this.

18   Q.  Did you locate this and turn it over to the government?

19   A.  I did not.

20   Q.  Do you know who turned this over to the government?

21   A.  I don't know if anyone turned it over to the government.

22             MR. GOTTLIEB:  Your Honor, we object to this

23   particular document.

24             THE COURT:  The objection's sustained.  You may be

25   able to resuscitate this, but you'll have to ask some more

1    questions.

2    DIRECT EXAMINATION CONTINUED

3    BY MR. QUIGLEY:

4    Q.  Mr. Chaice, were you first shown this document?

5           THE COURT:  When were you shown?

6    Q.  When were you first shown this document?

7    A.  I was shown this by you.

8    Q.  Was that prior to trial?

9    A.  Yes.

10          THE COURT:  So this is not a document that was created

11   at Brigade by somebody who works with you?

12          THE WITNESS:  No, it was not.

13          THE COURT:  No.

14   Q.  Does it fairly and accurately summarize the money Brigade

15   had invested based on the exhibits we just saw?

16   A.  It does.

17          MR. QUIGLEY:  We'd offer it as a demonstrative.

18          THE COURT:  How do you know it's a fair and accurate

19   representation of your investments?

20          THE WITNESS:  Well, because on that date we invested

21   that amount in those concerts.

22          THE COURT:  And you know that because?

23          THE WITNESS:  Because we were the ones who sent the

24   money based upon the contracts for these events.  And we sent

25   the money on that date, and it was wired to that entity,

1    Advance Entertainment.

2              THE COURT:  The objection's overruled.

3              MR. QUIGLEY:  Thank you, your Honor.

4              (Government's Exhibit 2301, page 1, received in

5    evidence)

6              MR. QUIGLEY:  Publish it briefly for the jury.  Thank

7    you.

8    BY MR. QUIGLEY:

9    Q.  Now, Mr. Chaice, if you'd known that the $700,000 was going

10   to be wired out of Advance Entertainment to another entity, not

11   to AEG the next day, would that have been important to you?

12   A.  It would have been critical.

13             THE COURT:  Can we stop for one second.  We goofed.

14   We forgot to pass out your notebooks.  He goofed.  He's going

15   to take the blame.

16             MR. QUIGLEY:  You want me to start over, your Honor?

17             THE COURT:  No, we're not starting over, Mr. Quigley.

18   We're not starting over, no, no, no.

19             But starting now, you may take notes.  Return to

20   testimony.  The notes are for your personal use only.  You can

21   jot down anything that you think is important that you want to

22   remind yourself of at some later date, but you are only allowed

23   to do this because we make a common agreement -- don't worry.

24   One is going to come to you.  Fear not.  We need one down for

25   juror No. 6.  We have some extras -- that your notes are for

1    your use only.  The official record in this case is what's

2    being taken down by the amazing court reporters.  And if two of

3    you disagree during your deliberations about what a witness

4    said on a particular subject, you don't get to solve the

5    disagreement by looking at somebody's notes.  You have to go

6    back to the official record in the case.

7              All right.  Sorry about the interruption, Mr. Quigley.

8              MR. QUIGLEY:  Thank you, your Honor.

9              Could we just publish that exhibit again, 1302, the

10   first page -- sorry, 2301, the first page.  There we go.

11   Q.  Now, after this initial investment on December 8, did the

12   Brigade fund make additional investments in opportunities

13   presented by the defendant?

14   A.  We did.

15   Q.  Who told you about those investment opportunities?

16   A.  Craig Carton did.

17             MR. QUIGLEY:  Can we look at an publish for the

18   lawyers, the witness, and the judge Government's Exhibit 908.

19   Q.  Do you recognize this document, Mr. Chaice?

20   A.  I do.

21   Q.  What is it?

22   A.  It's a series of emails between Craig Carton and me and

23   others at Brigade.

24             MR. QUIGLEY:  Your Honor, the government offers

25   Government Exhibit 908.

1              MR. GOTTLIEB:  No objection.

2              THE COURT:  Admitted.

3              (Government's Exhibit 908 received in evidence)

4    BY MR. QUIGLEY:

5    Q.  Directing your attention on 908 to the email on December 12

6    of 2016 at 7:26 p.m.  Do you see where the defendant says:

7    Dead & Co. and Metallica coming this week, and fingers crossed

8    on Broadway deal?

9    A.  I do.

10   Q.  What did you understand him to mean by that?

11   A.  He was alerting us of two and possibly three additional

12   investment opportunities for which he could get tickets

13   potentially.

14             MR. QUIGLEY:  We can take that down, Mr. Cooney.

15             Could we publish for the witness, the judge, and the

16   lawyers Government Exhibit 910.

17   Q.  Do you recognize that, Mr. Chaice?

18   A.  I do.

19   Q.  What is that?

20   A.  This is a couple emails between Craig Carton and me.

21   Q.  What date?

22   A.  This is from December 15, 2016.

23             MR. QUIGLEY:  Your Honor, the government offers

24   Government Exhibit 910.

25             MR. GOTTLIEB:  No objection.

1            THE COURT:  Admitted.

2            (Government's Exhibit 910 received in evidence)

3    BY MR. QUIGLEY:

4    Q.  Directing your attention to where the defendant says, "8M

5    Dead & Co. allows us to invest 2.4M."  Do you see that?

6    A.  I do.

7    Q.  What do you understand the defendant to be saying there?

8    A.  This is further details on the two performances I just

9    mentioned, one of which is for the Dead & Co., 8 million

10   dollars' worth of Dead & Co. tickets would allow us, our

11   borrower, to invest $2.4 million.

12   Q.  What was your understanding of where the rest of the

13   balance of the 8 million was coming from other than your 2.4?

14   A.  Other investors.

15   Q.  And just below that where it says, "10M Metallica allows us

16   to invest 3M," do you see that?

17   A.  I do.

18   Q.  What was your understanding of where the rest of the

19   balance of the $10 million would be coming from?

20   A.  That would be coming from other investors as well.

21   Q.  If we could just focus on the first line of that email, do

22   you see where Carton says:  "When I get off the air, I will

23   send you the Dead & Co. and Metallica deals"?

24   A.  I do.

25   Q.  What is your understanding of him to be saying there?

IAUHCar3                          Chaice - Direct

1   A.  So as we've discussed, in order to fund money, to loan

2   money to buy tickets, we would need to see the underlying event

3   ticket agreements, the contracts to buy those tickets.  So my

4   understanding is he was saying I will send you soon those two

5   contracts to buy tickets for Dead & Co. and Metallica.

6   Q.  Did you get those contracts?

7   A.  I did.

8         MR. QUIGLEY:  Could we publish just for the lawyers,

9   the judge, and the witness Government Exhibit 912.

10  Q.  Do you recognize this, Mr. Chaice?

11  A.  I do.

12  Q.  What is it?

13  A.  This i san email to me and John Baylis at Brigade.  It was

14  a follow-up to that email that we just discussed with the

15  attached event ticket agreements.

16        MR. QUIGLEY:  Your Honor, government offers Government

17  Exhibit 912.

18        MR. GOTTLIEB:  No objection.

19        THE COURT:  Admitted.

20        (Government's Exhibit 912 received in evidence)

21  BY MR. QUIGLEY:

22  Q.  Directing your attention to the first page of the

23  attachment, who is this agreement between?

24  A.  Advance Entertainment, LLC, and Steal Your Face, LLC.

25  Q.  And what concert or performer does it relate to?

1    A.   Dead & Co.

2    Q.   And if we could focus on the sale of tickets to Advance

3    paragraph.

4    A.   Yes.

5    Q.   Again, what does this reflect?

6    A.   This allows Advance to buy $8 million worth of tickets to

7    the Dead & Co. performance.

8    Q.   And how much was Brigade considering funding?

9    A.   Not the full 8 million.

10   Q.   Can we go to the last page of the agreement, Bates No.

11   Brigade 507.

12   A.   Yes.

13   Q.   Who signed this agreement?

14   A.   Joe Meli on behalf of Advance Entertainment and Sage Scully

15   on behalf of AEG Live.

16   Q.   Could we go to the Metallica agreement on page Brigade 509.

17   A.   Yes.

18   Q.   Is this one of the other attachments to the email?

19   A.   It was.

20   Q.   Who is this agreement reportedly between?

21   A.   Advance Entertainment and AEG Live.

22   Q.   And does this agreement relate to a Metallica concert at

23   any particular venue?

24   A.   I believe this relates to a Metallica tour, so several

25   performances, many.

IAUHCar3                          Chaice - Direct

1  Q.  Directing your attention to the last page of the agreement,

2  who signs on behalf of AEG Live?

3  A.  For AEG Live, Jay Marciano.

4  Q.  Now, did Brigade ultimately end up investing in the Dead &

5  Co. opportunity?

6  A.  We did not.

7  Q.  Did there come a time when the defendant revised the

8  agreement between AEG and Advance for the Metallica tour?

9  A.  I believe so, yes.

10        MR. QUIGLEY:  Could we show the witness Government

11 Exhibit 913.

12 Q.  Do you recognize this, Mr. Chaice?

13 A.  I do.

14 Q.  What is it?

15 A.  This is an email from Craig Carton to me and others at

16 Brigade.

17        MR. QUIGLEY:  Your Honor, the government offers

18 Government Exhibit 913.

19        MR. GOTTLIEB:  No objection.

20        THE COURT:  Admitted.

21        (Government's Exhibit 913 received in evidence)

22 BY MR. QUIGLEY:

23 Q.  What's the date on this email?

24 A.  This is Friday, December 16, 2016.

25 Q.  Can we take a look at the attachment.

1    A.  Yes.

2    Q.  What concert or performer does this relate to?

3    A.  This is the Metallica tour.

4    Q.  And if we go down to the paragraph relating to sales and

5    tickets to Advance.

6    A.  Yes.

7    Q.  How much is AEG supposedly selling Advance here?

8    A.  $10 million worth of tickets.

9    Q.  And was Brigade going to be funding that whole amount?

10   A.  No, we were not.

11   Q.  Directing your attention to page Brigade 461, who signs on

12   behalf of Advance Entertainment?

13   A.  Joe Meli.

14   Q.  And who signs on behalf of AEG Live?

15   A.  Gary Gersh.

16   Q.  Now, based on this agreement, did the Brigade fund end up

17   investing in the Metallica North American tour?

18   A.  We did.

19   Q.  Was getting this event ticket agreement important to you to

20   send money to Advance Entertainment?

21   A.  Yes, it was important.  It was required.

22   Q.  We'll come back to that in a second, but around this time,

23   did the defendant also present you with a ticket-related

24   investment opportunity with a company called Brooklyn Sports &

25   Entertainment?

IAUHCar3                         Chaice – Direct

1    A.   Yes, he did.

2    Q.   What is Brooklyn Sports & Entertainment?

3    A.   It's the company that oversees and runs two venues.  One is

4    the Barclays Center in Brooklyn and the other is the Nassau

5    Coliseum in Long Island.

6    Q.   Can you generally describe the initial opportunity that

7    Carton presented to you regarding Barclays and Nassau?

8    A.   I believe they were two separate performances.  One was for

9    Barbra Streisand and the other was for a Metallica performance,

10   but unlike the tour, was solely one performance at one of these

11   venues.

12              MR. QUIGLEY:  I'm going to show the witness and the

13   lawyers Government Exhibit 916.

14   Q.   Do you recognize that, Mr. Chaice?

15   A.   I do.

16   Q.   What is that?

17   A.   This is an email from or emails between Craig Carton and me

18   and John Baylis.

19              MR. QUIGLEY:  Your Honor, the government offers

20   Government Exhibit 916.

21              MR. GOTTLIEB:  No objection.

22              THE COURT:  Admitted.

23              (Government's Exhibit 916 received in evidence)

24   BY MR. QUIGLEY:

25   Q.   Directing your attention to the bottom email from you at

IAUHCar3                      Chaice - Direct

1    3:15 p.m. on December 16, 2016.  Do you see where it says,

2    "Where would we wire the money for the Nassau deal?"

3    A.   Yes, I do.

4    Q.   What do you mean by "the Nassau deal"?

5    A.   This would be for the Barclays tickets as opposed to the

6    Advance Entertainment tickets.  This was for the Barclays

7    performances of either Barbra Streisand or Metallica or both.

8    Q.   And Nassau's a reference to what?

9    A.   That is one of the two venues controlled by Barclays.

10   Q.   Do you see where above that the defendant says:  "They

11   insisted that it be exclusively through the Tier One platform,

12   so we can wire it to Ticket Jones and then to Tier One"?

13   A.   I do.

14   Q.   Who do you understand the defendant to be referring to when

15   he says "they insisted"?

16   A.   My understanding was that that was a reference to Barclays,

17   the seller of the tickets.

18   Q.   The Brooklyn Sports & Entertainment company?

19   A.   Correct.

20   Q.   And there's a reference in there to Tier One.  What was

21   your understanding of what Tier One was?

22   A.   That was a platform owned and controlled by Craig Carton

23   that was used to sell tickets, sell and list tickets.

24   Q.   And there's a reference in here also again to Ticket Jones.

25   Remind us of what Ticket Jones is.

1    A.  Ticket Jones was the borrower under our loan agreement, the

2    new co. we discussed.

3    Q.  Do you see where the defendant says, "I should have the

4    agreement by 4:00," right under that?

5    A.  Yes, I do.

6    Q.  What do you understand him to be referring to there?

7    A.  My understanding is that's a reference to the agreements

8    that we've been discussing, the event ticket agreements for

9    buying the tickets at the Barclays events.

10   Q.  And again, what was the significance of the event ticket

11   agreement?

12   A.  It was a requirement under the loan agreement to receive

13   those agreements before we wired the money.

14   Q.  Look at this email.  Back out a second.  What day of the

15   week was December 16, 2016?

16   A.  It was a Friday.

17         MR. QUIGLEY:  Can we show the witness, the lawyers,

18   and the judge Government Exhibit 930.

19   Q.  Do you recognize this?

20   A.  I do.

21   Q.  What is it?

22   A.  It's an email from Craig Carton to me and others at

23   Brigade.

24         MR. QUIGLEY:  Your Honor, the government offers

25   Government Exhibit 930 into evidence.

 1              MR. GOTTLIEB:  No objection.

 2              THE COURT:  Admitted.

 3              (Government's Exhibit 930 received in evidence)

 4    BY MR. QUIGLEY:

 5    Q.  What's the date on this email, the top email?

 6    A.  This is the same date as the prior email.  This is Friday,

 7    December 16, 2016.

 8    Q.  Directing your attention to the bottom email, who do you

 9    understand Fred Mangione to be?

10    A.  He was a senior executive at Brooklyn Sports &

11    Entertainment, or the Barclays Center.

12    Q.  Do you see where it says, or he says:  We're willing to

13    work with 30M over inventory in Nassau and Brooklyn?

14    A.  I do.

15    Q.  And we'll give you the ability in January to purchase up to

16    100 to 200 all access seats for the new Nassau arena?

17    A.  I do.

18    Q.  Did Brigade invest in all access seats?

19    A.  We did not.

20    Q.  Was Brigade going to invest in all access seats?

21    A.  We were not going to.

22    Q.  A few lines below that, you see where it says, it begins,

23    "as I mentioned"?

24    A.  Yes.

25    Q.  "As I mentioned, we have three unannounced shows in 2017.

IAUHCar3                     Chaice - Direct

1   Metallica in May, June, and prior two Barbra Streisand shows in

2   April."  Do you see that?

3   A.  I do.

4   Q.  What was the significance of the Metallica and Barbra

5   Streisand shows to you?

6   A.  These were the two events that Craig Carton was showing us

7   to invest in.  These were two possible investments.

8   Q.  These were two of the possible investments?

9   A.  Yes, the Barbra Streisand shows and the Metallica shows,

10  both at the Barclays-controlled venues.

11  Q.  And do you see the sentence below that:  "We can begin the

12  2017 partnership to purchase tickets as we discussed"?

13  A.  I do.

14  Q.  Was that language important to you?

15  A.  This was part of our understanding that Craig Carton had

16  the ability to buy tickets from, among other places, Barclays.

17  Q.  Was this email sufficient to meet the event ticket -- event

18  ticket agreement requirement under the revolving loan

19  agreement?

20  A.  No, it was not.

21  Q.  Why not?

22  A.  We required the binding agreements between the seller and

23  the buyer of tickets to fund loans, to purchase those tickets,

24  so we knew where the money was going, specifically, to go buy

25  those tickets.

1    Q.   This does not meet that criteria?

2    A.   No, it's not.

3    Q.   Later that day did the defendant provide you with an event

4    ticket agreement between him and Brooklyn Sports &

5    Entertainment?

6    A.   I don't know if it was later that day or it was shortly

7    thereafter.

8    Q.   Let's take a look at Government Exhibit 914, just for the

9    witness, the lawyers and the judge.

10   A.   Yes.

11   Q.   Do you recognize this document?

12   A.   I do.

13   Q.   What is it?

14   A.   This is an email from Craig Carton to me and others at

15   Brigade.

16           MR. QUIGLEY:  Your Honor, the government offers

17   Government Exhibit 914.

18           MR. GOTTLIEB:  No objection.

19           THE COURT:  Admitted.

20           (Government's Exhibit 914 received in evidence)

21   BY MR. QUIGLEY:

22   Q.   So focusing on the bottom email, who's the bottom email

23   from?

24   A.   From Fred Mangione, the executive at Barclays, to Craig

25   Carton.

1    Q.  And what's the subject?

2    A.  Follow-up.

3    Q.  And what's the date and time?

4    A.  This is that same day, Friday, December 16, 2016.

5    Q.  According to this email, what does Mr. Mangione say?

6    A.  He's essentially -- I think he's forwarding the Barclays

7    agreements for Craig's review.

8    Q.  Then what happens in the top email?  Who's the top email

9    between?

10   A.  This is between Craig Carton and me and others at Brigade,

11   and he's forwarding those contracts and asking us to review

12   them.

13   Q.  So take a look at -- can we take a look at the attachment.

14   A.  Yes.

15   Q.  What is this?

16   A.  This is an event ticket agreement between Ticket Jones,

17   which is the borrower under our loan, and Barclays, the seller

18   of the tickets.

19   Q.  And focusing on the second paragraph beginning "whereas,"

20   what concerts or performers does this agreement relate to?

21   A.  This relates to the two performances we've been discussing,

22   the Metallica performance and the two Barbra Streisand

23   performances.

24   Q.  Could we go to the last page of the agreement.

25   A.  Yes.

1    Q.  Is this agreement signed by anyone at Brooklyn Sports &

2    Entertainment?

3    A.  This one is not signed.

4    Q.  Did you continue to communicate with the defendant over the

5    weekend about this investment?

6    A.  We did.

7    Q.  By the way, was the unsigned agreement sufficient to meet

8    the event ticket requirement?

9    A.  No, it was not.

10   Q.  So take a look at Government Exhibit 917, just for the

11   witness, the lawyers, and the judge.  Do you recognize this,

12   Mr. Chaice?

13   A.  I do.

14   Q.  What is this?

15   A.  This is an email between me and Craig Carton and others at

16   Brigade.

17         MR. QUIGLEY:  Your Honor, the government offers

18   Government Exhibit 917.

19         MR. GOTTLIEB:  No objection.

20         THE COURT:  Admitted.

21         (Government's Exhibit 917 received in evidence)

22   BY MR. QUIGLEY:

23   Q.  Could we take a look at the bottom email.

24   A.  Yes.

25   Q.  Who's this email from?

1    A.  This is from Craig Carton to me.

2    Q.  And what day is this?

3    A.  This is Saturday, the 17th, the day following the day we

4    were just discussing.

5    Q.  Directing your attention to the first line, do you see

6    where it says:  "We have plenty of choices for Monday, so let's

7    discuss because it's imperative that whichever direction we

8    choose, it needs to be funded by Monday"?

9    A.  I do.

10   Q.  What was your understanding of why the defendant was saying

11   it's imperative that it needs to be funded by Monday?

12   A.  This was the weekend following the Friday we were

13   discussing, and we wanted to be in a position to fund the loans

14   necessary to buy the tickets on that Monday.

15   Q.  And what were the five -- what was your understanding of

16   why the money needed to be funded by Monday?

17   A.  That's when the opportunity was available.

18   Q.  What do you mean by that?

19   A.  Meaning that in order to be able to buy these tickets, we

20   needed to be positioned to buy them on Monday.

21   Q.  So what are the options that the defendant lays out in this

22   agreement -- or, sorry, in this email?

23   A.  Some of which we had just discussed, one was the Metallica

24   North American tour.  Those were the tickets that were

25   available to us through Joe Meli and Advance Entertainment.

1  The next two were two shows through Barclays, the Barbra

2  Streisand performances and the Metallica performance at Nassau.

3  Four was diversifying and mixing between and among those three.

4  And five was an option that we never pursued, this all access

5  seats Nassau option.

6  Q.  You were not interested in the all access seats?

7  A.  We were not.

8  Q.  Do you see, moving up the email chain, your email to

9  Mr. Carton?

10  A.  Yes.

11  Q.  How do you respond?

12  A.  I thanked him for laying that all out.  This was a helpful

13  way to present the options.  I told him our $3 million under

14  the loan was ready to be funded.  So long as we have the

15  executed contracts and the wire instructions for each

16  investment, we'd be able to fund the loan.

17  Q.  And when you say our 3 million is ready to go so long as we

18  have a contract, what do you mean by contract?

19  A.  These are the signed event ticket agreements we've been

20  discussing.  So as was required under the loan, we were ready

21  to go so long as we received the executed ticket agreement and

22  the proper wire instructions.

23  Q.  Did you tell Carton how you wanted that $3 million

24  allocated?

25  A.  We did, but I don't remember if it was at this time.

1   Q.  So could we show the witness, the judge, and the lawyers

2   Government Exhibit 937.

3   A.  Yes.

4   Q.  Do you recognize this, Mr. Chaice?

5   A.  I do.

6   Q.  What is it?

7   A.  This is an email from me to Craig the following day,

8   Sunday, the 18th, and this is confirming the allocation that we

9   had arrived to based upon the options he set forth on the day

10  prior.

11        MR. QUIGLEY:  Your Honor, the government offers

12  Government Exhibit 937.

13        MR. GOTTLIEB:  No objection.

14        THE COURT:  Admitted.

15        (Government's Exhibit 937 received in evidence)

16  BY MR. QUIGLEY:

17  Q.  Again, what's the date on this email, Mr. Chaice?

18  A.  This is Sunday, December 18.

19  Q.  Can you read the first and second paragraphs.

20  A.  I said:  Craig, let's go with the allocation you

21  recommended yesterday:  1 million to Metallica North American

22  tour; 1 million to Metallica at Nassau; and 1 million to Bab's

23  first show at Nassau.  That was reference to Barbra Streisand.

24  Q.  And at this point, had you already received the event

25  ticket agreement for the Metallica North American tour?

1    A.  Yes, I believe so.

2            MR. QUIGLEY:  So if we could just republish briefly

3    Government Exhibit 913.

4    Q.  Do you recognize this, Mr. Chaice?

5    A.  Yes, I do.

6    Q.  Is this the event ticket agreement for the Metallica tour?

7    A.  Yes, it is.

8            MR. QUIGLEY:  Could we go back to 937, Mr. Cooney.

9    Q.  Now, when you say 1 million to Metallica at Nassau and

10   1 million to Bab's first show at Nassau, what were you

11   referring to?

12   A.  These were the two opportunities that Craig had introduced

13   us to through Barclays Center, the Metallica Nassau performance

14   and the Barbra Streisand performance also at Nassau.

15   Q.  And when you say "Craig," who are you referring to?

16   A.  Craig Carton.

17   Q.  Directing your attention to the next paragraph, do you see

18   where it says:  "For the two Nassau shows, we'd like to wire

19   directly per the wire instructions in the contract Brooklyn Co.

20   and for the Metallica tour, we'd like to wire to AE"?

21   A.  Yes, I do.

22   Q.  And why did you want to do that?

23   A.  We wanted to wire the funds directly to the seller of the

24   tickets to make sure we had control over getting the money to

25   the seller and making sure that they would -- would be received

1    by the seller to get the tickets.

2    Q.  Was it important to you that this $3 million be allocated

3    as you had asked in this email?

4    A.  Yes.

5    Q.  Would you have wired the money if it was going to be spent

6    on something else?

7    A.  No, we would not have.

8    Q.  Again, you say for each investment we'll need to finalize

9    contracts as well as confirmation of correct wire instructions?

10   A.  Yes.

11   Q.  Again, would you have wired the money without finalized

12   event ticket agreements?

13   A.  No, we would not have.

14   Q.  Later that day did the defendant send you an agreement

15   related to the Streisand and Metallica concerts at Nassau?

16   A.  I believe it was later that day, yes.

17            MR. QUIGLEY:  Could we take a look at Government

18   Exhibit 920, just for the witness, the lawyers, and the judge.

19   Q.  Do you recognize that?

20   A.  I do.

21   Q.  What is that?

22   A.  This is an email from Craig Carton to me and others at

23   Brigade.

24            MR. QUIGLEY:  Your Honor, the government offers

25   Government Exhibit 920.

1              MR. GOTTLIEB:  Objection -- no objection.

2              THE COURT:  Admitted.

3              (Government's Exhibit 920 received in evidence)

4              THE COURT:  It's almost lunchtime.  I get confused

5      too.

6      BY MR. QUIGLEY:

7      Q.  What's the date on this email, Mr. Chaice?

8      A.  This is the same Sunday, December 18.

9              MR. QUIGLEY:  Could we go to the attachment,

10     Mr. Cooney.

11     Q.  Who is this agreement between?

12     A.  Between Ticket Jones, which was the borrower under our loan

13     agreement, and Barclays.

14     Q.  Barclays Sports & Entertainment Company?

15     A.  Correct.

16     Q.  Can you read to the third whereas clause -- I'm sorry, the

17     paragraph above that.  My error.

18     A.  The one you've highlighted?

19     Q.  Yeah.

20     A.  Barclays desires to sell up to $3 million of premium

21     tickets for (1) a performance of Metallica, currently

22     anticipated to take place prior to commencement of the North

23     American stadium tour, and (2) two separate performances for

24     Barbra Streisand, each currently anticipated to take place in

25     April of 2017, the final dates and allocation of which are

1   subject to further agreement among the parties.

2   Q.   Directing your attention to the paragraph below that, how

3   much -- what amount of tickets was Ticket Jones going to be

4   purchasing under this agreement?

5   A.   $2 million worth of tickets.

6   Q.   And who were going to be funding that purchase?

7   A.   Our loan would fund the proceeds to Ticket Jones to make

8   the purchase.

9   Q.   Brigade?

10  A.   Brigade.

11  Q.   And focusing your attention on the paragraph Purchase and

12  Sale --

13  A.   Yes.

14  Q.   -- at the bottom of the page, do you see where it says:

15  "Ticket Jones hereby retains its rights to invest in all three

16  shows, but specifically agrees to purchase tickets for the

17  Metallica performance at Nassau and the first Barbra Streisand

18  show, also at Nassau, by paying a sum of $2 million to Barclays

19  by wire transfer"?  Do you see that?

20  A.   I do.

21  Q.   From the account of its choosing to the following account,

22  right?

23  A.   Correct.

24  Q.   Were those the two shows that you had told Mr. Carton you

25  wanted to invest in?

1  A.  Yes, those were.

2  Q.  Directing your attention to page Brigade 421, one of the

3  last pages of this agreement.  Who's the agreement signed by?

4  A.  This is signed by Brett Yormark, the CEO of Brooklyn Sports

5  & Entertainment, and Craig Carton on behalf of Ticket Jones

6  LLC.

7          MR. QUIGLEY:  Could we go to the other signature page,

8  Mr. Cooney.

9  Q.  Would you have wired the $2 million to Brooklyn Sports &

10  Entertainment without getting a signed copy of this agreement?

11  A.  No, we would not have.

12  Q.  If Carton had an oral understanding with Brooklyn Sports &

13  Entertainment for the tickets, would that have been sufficient

14  for Brigade to wire $2 million?

15  A.  No, it would not have.

16  Q.  After you got this agreement, did you begin the process of

17  wiring out the money?

18  A.  We did.

19          MR. QUIGLEY:  Your Honor, I don't know if you want me

20  to continue, or is this a logical stopping point?

21          THE COURT:  I don't know if it's a logical stopping

22  point, but I was going to go for about ten more minutes, and

23  then we were going to break for lunch.

24          MR. QUIGLEY:  OK.  That's fine, your Honor.  Thank

25  you.

IAUHCar3                        Chaice - Direct

1              Can we show the witness, the lawyers, and the judge

2    Government Exhibit 926.

3    Q.  Mr. Chaice, do you recognize this?

4    A.  I do.

5    Q.  What is it?

6    A.  This is a series of emails between Craig Carton and me.

7              MR. QUIGLEY:  Your Honor, the government offers

8    Government Exhibit 926.

9              MR. GOTTLIEB:  No objection.

10             THE COURT:  Admitted.

11             (Government's Exhibit 926 received in evidence)

12   BY MR. QUIGLEY:

13   Q.  Directing your attention to the bottom email on the last

14   page at 8:20 a.m. on December 19, 2016, do you see that?

15   A.  I do.

16   Q.  Can you read the first three paragraphs -- first four

17   paragraphs out loud.

18   A.  Craig, to confirm, we'll be wiring 3 million today as set

19   forth below.  My two questions -- two questions:  Regarding the

20   Barclays contract, the party listed at the intro of the

21   contract is Barclays Sports Entertainment Company, and the

22   signatory is Brooklyn Sports Entertainment.  What's the

23   relationship between these two companies?

24   Q.  Go ahead.

25   A.  Should I continue?

1   Q.  Yes.

2   A.  Regarding the Metallica tour contract, it says that

3   50 percent is due concurrent with execution and 50 percent

4   prior.  Please confirm that all 100 percent is due now.

5   Q.  Then can you read the paragraphs below.

6           THE COURT:  This poor woman is trying to take down

7   what you're saying.

8   A.  Today's funding, 2 million.  2 million to be wired to the

9   wire instructions in the TJ Barclays agreement for 1 million of

10  Metallica tickets at Nassau and 1 million of Barbra Streisand

11  tickets at Nassau.  1 million to be wired to Advance

12  Entertainment for the Metallica North American tour.  We should

13  use the below Advance Entertainment wire instructions that we

14  used for the first deal a couple weeks ago.  And then --

15  Q.  You don't have to read the wire instructions.

16          What are you asking Mr. Carton here?  Are you asking

17  him to confirm this information?

18  A.  Yeah.  Well, I'm setting forth what we plan to do and where

19  we plan to send the money, and I'm asking him to confirm that

20  all this is correct before we take any steps further.

21  Q.  Can we go up to Mr. Carton's response.

22  A.  Yes.

23  Q.  Do you see where he says, the 1M to Advance is covering

24  half of the 2M we are now investing in the Metallica tour.  The

25  remaining 900K (1M minus the 100K we're switching from Grande

1    to Metallica) are due ASAP, but shortly before the end of the

2    calendar year.

3              Do you see that?

4    A.  I do.

5    Q.  What do you understand "ASAP" to mean?

6    A.  Right away, as soon as possible.

7    Q.  Do you see where it references the remaining 900K we are

8    switching from grande to Metallica?  What did you understand

9    that to mean there?

10   A.  We had gotten or received advice from Craig Carton that the

11   $100,000 that we allocated on the first day when the deal was

12   signed for Ariana Grande tickets should be reallocated, or

13   better used, be better use of that money to be used to buy the

14   Metallica North America tour tickets.  So we were adding that

15   to the amount of money to buy the Metallica North American tour

16   concerts.

17   Q.  Do you see in the sentence or the paragraph below that

18   where he says, the defendant says, "Brooklyn and Barclays are

19   one in the same.  They started referring to Brooklyn for

20   marketing reasons"?

21   A.  I do.

22   Q.  What do you understand him to be referring to there?

23   A.  He's answering one of my questions in the prior email about

24   why the contract referred to the same entity with two different

25   names.

1   Q.   The event ticket agreement between Brooklyn Sports &

2   Entertainment and Ticket Jones, is that the contract you're

3   referring to?

4   A.   Correct.

5   Q.   Focusing on the email above that, can you summarize what

6   you're saying to Carton here.

7   A.   I thanked him for the information, and I included a

8   colleague of mine who had handled the wires on the email and

9   said that we need to confirm the wire instruction as we always

10  do by calling the recipient before we send the money.

11  Q.   How does Carton respond to that?

12  A.   He says that the Barclays execs, the people at Barclays,

13  the seller of the tickets, were at Orlando and that he'll see

14  if they can get on the phone to make that confirmatory call.

15  Q.   What's the date on this email?

16  A.   This is Monday, the 19th, following the weekend we were

17  just discussing.

18  Q.   How do you respond?

19  A.   I say:  This is all we need to be able to fund.  Barclays

20  would be better.  So if that's OK, that's great.  If it's a

21  pain, then I'll have him call you.

22  Q.   When you said this is all we'll need to be able to fund,

23  what did you mean by that?

24  A.   We had received the signed contracts, and now we needed to

25  confirm the wire instructions before we wired the money.

1    Q.  How does Carton respond to that?

2    A.  It's not a pain.  It's not a problem.  They're in meetings

3    most of the day apparently.  Let me see if there's a time they

4    could take a call.

5    Q.  Can you read your response to that.

6    A.  I thanked him.

7    Q.  All right.  Then do you see above that where he says, the

8    defendant says:  "They're in meetings until 4:30 and then

9    flying home.  If OK on this one, let's use Ticket Jones to

10   confirm"?

11   A.  Yes.

12   Q.  Then you respond:  That works.  I'll call you?

13   A.  "I'll have them call you," yes.

14   Q.  Did Brigade wire 2 million to Brooklyn Sports &

15   Entertainment after this email?

16   A.  We did.

17   Q.  And what was that for?

18   A.  Those were for the two performances we discussed:  One, the

19   Metallica performance at Nassau and also for the Barbra

20   Streisand performances at Nassau.

21   Q.  Was it an error or mistake for Brigade to send that money

22   to Brooklyn Sports & Entertainment?

23   A.  No, it was not.

24   Q.  If you'd known that the defendant was going to redirect

25   that money away from Brooklyn Sports & Entertainment, would you

1   have sent it?

2            MR. GOTTLIEB:  Objection, your Honor.

3            THE COURT:  The objection's overruled.

4   Q.  If you'd known that the defendant was going to redirect

5   that money away from Brooklyn Sports & Entertainment, would you

6   have sent it?

7   A.  No, we would not have.

8   Q.  Did Brigade wire $1 million to Advance Entertainment for

9   the Metallica North American tour?

10  A.  We did.  We wired more than that.

11  Q.  On or about December 19, did Brigade wire $1 million?

12  A.  I believe so.  I believe that was the date, yes.

13  Q.  Would it have been important for you to know that that

14  1 million that you'd sent to Advance Entertainment was not

15  going to be invested in the Metallica North American tour?

16  A.  It would have been critical to know that.

17           MR. QUIGLEY:  Can we take a look at, just for the

18  witness, the lawyers, and the judge, second page of Government

19  Exhibit 2301.

20  Q.  Do you recognize this, Mr. Chaice, page 2?

21  A.  Yes.

22  Q.  This is a document you saw for the first time in a meeting

23  with the government?

24  A.  I've seen it a prior time with you.

25  Q.  Right.  Does this fairly and accurately depict the status

1    of the Brigade fund's investments with Mr. Carton as of

2    December 19, 2016?

3    A.  Yes, it does.

4    Q.  And is that based on your own experience in those

5    transactions in December 2016?

6    A.  Yes, it is.

7    Q.  And your own review of the exhibits that we've just looked

8    through?

9    A.  Yes.

10           MR. QUIGLEY:  Your Honor, the government offers as an

11   aid to the jury page 2 of this exhibit.

12           MR. GOTTLIEB:  Your Honor, for the same reasons

13   before, we object to this type of exhibit coming in through

14   this particular witness.

15           THE COURT:  The objection's overruled.

16           (Government's Exhibit 2301, page 2, received in

17   evidence)

18           MR. QUIGLEY:  Can we publish this to the jury, just

19   page 2?

20           THE COURT:  Ladies and gentlemen, this is what's

21   called a summary exhibit.  It's obviously something that's been

22   created for the trial.  It's admitted to the extent that you

23   find it to be consistent with the testimony that you hear and

24   that you credit, but if you look at this document and you think

25   it's not consistent with the testimony that you've heard and

1  that you credit, then this piece of paper is worth nothing, all

2  right, because the underlying evidence in this case, the

3  testimony, the documents that you've seen this morning is the

4  evidence in the case.  This doesn't change any of that

5  evidence.  If it differs from that evidence, you must disregard

6  this document.

7  BY MR. QUIGLEY:

8  Q.  Mr. Chaice, is this consistent with your own involvement in

9  these transactions and the exhibits we've just seen?

10  A.  Yes, it is.

11  Q.  Focusing on something you mentioned a few minutes ago, you

12  mentioned something about the Ariana Grande investment being

13  reallocated?

14  A.  Yes.

15  Q.  Using this chart, can you just explain that to the jury

16  again.

17  A.  On December 8, 2016, the top entry, among other things, we

18  funded $100,000 to buy Ariana Grande tickets.  As we funded

19  those, that loan, we were advised by Craig Carton that that

20  would be better served buying Metallica North American tour

21  tickets.  So we took that $100,000 and allocated it to the

22  North American tour for Metallica and added an additional

23  900,000 to that to make it a $2 million investment in the

24  Metallica North American tour.

25  Q.  We'll get to the $900,000 investment in a second.

IAUHCar3

1           THE COURT:  Is this a good spot?

2           MR. QUIGLEY:  This is an excellent time, your Honor.

3           THE COURT:  That means he's hungry.

4           Let's go have some lunch, and I'll see you back here

5    at five after 2:00.  Don't discuss the case.  Keep an open

6    mind.  Actually, go with Jim because he's going to show you the

7    jury room.  Of course you haven't been to the jury room yet.

8    He's going to show you the jury room.  That belongs to you.

9    You can park.  You can bring anything you want.  It's your home

10   way from home for the next couple of weeks.

11           (Jury excused)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IAU7CAR4                          Chaice – Direct

1                  (Jury not present)

2                  THE COURT:  Sir, have some lunch.  We'll see you this

3      afternoon.

4                  THE WITNESS:  Thank you.

5                  (Witness temporarily excused)

6                  THE COURT:  Go get some lunch.

7                  How much more do you have with this witness?

8                  MR. QUIGLEY:  Maybe another half-hour, your Honor.

9      We're towards the end.

10                 (Lunch recess)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IAU7CAR4                          Chaice – Direct

1                     A F T E R N O O N   S E S S I O N

2                               2:15 p.m.

3            (Jury not present)

4            THE COURT:  Can I see counsel at side-bar for a

5    moment.

6            (Continued on next page)

7            (Page 109 sealed)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court: jury present)

2              THE COURT:  Did you all get a good lunch?

3              Sir, you are still under oath.

4     CHRIS CHAICE, resumed.

5     DIRECT EXAMINATION (Continued)

6     BY MR. QUIGLEY:

7     Q.  Mr. Chaice, when we left off we were talking about some

8     investments that the Brigade fund had made on December 19,

9     2016.  Do you recall that?

10    A.  Yes, I do.

11    Q.  And could we just publish page 2 of demonstrative exhibit

12    2301.

13              Mr. Chaice, with respect to each of these concerts --

14    the Katie Perry, Justin Bieber and Ariana Grande, Roger Waters

15    on December 8, and the December 19 investments, where had you

16    learned about those opportunities in the first instance?

17    A.  Where did I learn about those?

18    Q.  From who?

19    A.  From Craig Carton.

20    Q.  And in terms of the timing of these investments, who was

21    providing you the information about when they needed to be

22    funded?

23    A.  Craig Carton.

24    Q.  Now, before the break we saw reference to an additional

25    $900,000 that was going to be invested in Metallica.  Do you

IAU7CAR4                          Chaice - Direct

1    recall that?

2    A.  I do.

3    Q.  Can we take a look at just for the witness, the Judge, and

4    the lawyers Government Exhibit 924.

5    A.  Yes.

6    Q.  Do you recognize this, Mr. Chaice?

7    A.  I do.

8    Q.  What is it?

9    A.  It's initially an e-mail from Craig Carton to me and others

10   at Brigade followed by an e-mail back from me to Craig Carton.

11          MR. QUIGLEY:  Your Honor, the government offers

12   Government Exhibit 924.

13          MR. GOTTLIEB:  No objection.

14          THE COURT:  Admitted.

15          (Government Exhibit 924 received in evidence)

16   Q.  Mr. Chaice, do you see the bottom e-mail?

17   A.  I do.

18   Q.  What's the date on that e-mail?

19   A.  Thursday, December 22, 2016.

20   Q.  Who is it from?

21   A.  It's from Craig Carton.

22   Q.  And do you see where it says, "As we get closer to the

23   holidays and putting work aside for a few days, I am sitting in

24   a log cabin in Montana without much heat other then a gas

25   fireplace before 7 a.m. and I had a powerful sense of wanting

1    to write you guys an e-mail?"

2    A.  I do.

3    Q.  And who is this e-mail addressed to?

4    A.  This is to me, John Baylis and Doug Pardon, both of whom

5    work with me at Brigade.

6    Q.  And what was John Baylis' role in the Brigade transaction

7    with Mr. Carton?

8    A.  He is a senior analyst at Brigade who has an expertise in

9    media and this industry.

10   Q.  Who were the primary people at Brigade on this transaction?

11   A.  John Baylis and I were the primary people.

12   Q.  And do you see where Mr. Carton says, "I'm not a finance

13   guy by a long shot, I'm an entrepreneur who has a great morning

14   job that has always yearned for more?"

15   A.  I do.

16   Q.  And then he says, "You guys have allowed me to realize the

17   dream of taking on a new opportunity and make something

18   significant out of it and I can't thank you enough for that."

19   Do you see that?

20   A.  I do.

21   Q.  What was the new opportunity you understood him to be

22   talking about here?

23   A.  This is our investment, our loan from the Brigade fund to

24   Ticket Jones.

25   Q.  And what was that for the purpose of?

1    A.   Buying tickets.

2    Q.   If you could go up to the top e-mail from you to

3    Mr. Carton.

4    A.   Yes.

5    Q.   That's on the same day?

6    A.   Yes.

7    Q.   And what do you say to Mr. Carton?

8    A.   I just received what was a rather personal e-mail, which is

9    unusual in a professional context, so I responded to the

10   substance of the e-mail but also in a slightly personal way, so

11   in it I say, "Thanks, Craig.  Really appreciate the e-mail, I'm

12   very excited about this investment.  This is a fun one, to be

13   sure.  FYI, I'm setting up the $900,000 wire to Advance

14   Entertainment for remainder of the additional $1 million of

15   Metallica tour tickets.  It should be sent today.  I will

16   confirm when it goes."

17   Q.   And what were you referring to when you said "setting up

18   the 900K wire to Advance Entertainment?"

19   A.   I was arranging for $900,000 to be wired from the Brigade

20   funds to Advance Entertainment for the million dollar purchase

21   of Metallica tickets.  The $100,000 difference was going to be

22   a movement of the money from the Ariana Grande concert to this

23   investment.

24   Q.   And just as an aside, you said, "my only question is what

25   the hell is wrong with the 'Cuse'?"  What do you mean by Cuse?

A.   Syracuse University, where both Craig Carton and I went to college.

Q.   And to be clear, did you know Craig Carton before 2016?

A.   No.

Q.   Did this $900,000 wire go to Advance Entertainment?

A.   Yes.

Q.   And again had Brigade received from the defendant an event ticket agreement for that Metallica tour?

A.   We had.

Q.   Could we just republish briefly Government Exhibit 913.

        And who is it signed by on behalf of AEG?

A.   This is signed by Gary Gersh for AEG Live and Joe Meli for Advance Entertainment.

Q.   And would the Brigade's funds have wired that $900,000 without having received the signed agreement from the defendant?

A.   No, it would not have.

Q.   Was it important to the Brigade funds that the $900,000 be used to fund the purchase of Metallica tickets?

A.   Yes, it was critical.

Q.   That's why you sent the money?

A.   Correct.

Q.   Can we go just for the witness, the lawyers and the judge, look at Government Exhibit 2103, page 3.

        Do you see that, Mr. Chase?

1    A.  I do.

2    Q.  And directing your attention, does this chart fairly and

3    accurately depict the investments that Brigade had made as of

4    December 22, 2016?

5    A.  Yes, it does.

6    Q.  And that's based on your own personal involvement in those

7    transactions?

8    A.  Yes, it is.

9    Q.  And your review of the exhibits we have gone through today?

10   A.  Yes.

11           MR. QUIGLEY:  Your Honor, the government offers page 3

12   of 2301 as a demonstrative as an aid to the jury.

13           MR. GOTTLIEB:  Objection.

14           THE COURT:  Objection is overruled.

15           Again, ladies and gentlemen, it's only useful to the

16   extent that it's consistent with the underlying evidence in the

17   case, the testimony and the exhibits.  If you perceive an

18   inconsistency between this document and the testimony and

19   exhibits, tear it up and throw it away.

20           (Government Exhibit 2301 received in evidence)

21           MR. QUIGLEY:  Can we publish the third page of 2301,

22   please.

23   Q.  Again, Mr. Chaice, we talked about this before, but what

24   had happened with the portion of the 12/8 investment that was

25   allocated to Ariana Grande?

1  A.  That was $100,000, and that was added to the $900,000 that

2  we funded on the 22nd of December, to add an additional $1

3  million investment into the Metallica tour concert.

4  Q.  What was the total amount of money the Brigade funds

5  invested in opportunities presented by Mr. Carton between

6  December 8 and December 22, 2016?

7  A.  It was $4.6 million.

8  Q.  Did the Brigade funds make any more investments with

9  Mr. Carton after December 22, 2016?

10 A.  No, we did not.

11 Q.  Did you continue to speak with the defendant about the

12 investments that you had made?

13 A.  Yes, we did.

14 Q.  At any point did he ever tell you that he had secured over

15 $100 million in financing for his ticket-related ventures?

16 A.  No, he did not.

17 Q.  Do you think that's something you would have known?

18         MR. GOTTLIEB:  Objection, your Honor.

19         THE COURT:  Do you think that's something you would

20 have known?

21 Q.  Do you think that's something you would have been aware of

22 based on your involvement?

23         THE COURT:  Were you aware of it?

24 Q.  Were you aware of that?

25 A.  I was not.

1  Q.  Do you know if that's true?

2  A.  I don't know if that's true.

3  Q.  Did you or anyone else at Brigade ever tell him to be "very

4  aggressive in his investing?"

5  A.  No, we did not.

6  Q.  I want to jump ahead about six weeks to late January 2017.

7  Did anything happen around that time that caused you to have

8  concerns about your investment?

9  A.  Yes, Joe Meli was arrested.

10  Q.  Did you speak to the defendant after that?

11  A.  Yes, we did.

12  Q.  How did you view --

13          If we can just put up 2301, page 3, again.

14          How did you view the money that you had invested with

15  Advance Entertainment after learning of Meli's arrest?

16  A.  We had invested $2.6 million at that time, and we viewed

17  that as -- the likelihood of recovering that money went down

18  significantly once we heard he was arrested.

19  Q.  Did the defendant ever tell you that he got any of that

20  money?

21  A.  No, he did not.

22  Q.  Did you decide to take any additional steps with respect to

23  the remaining $2 million investment at Brooklyn Sports and

24  Entertainment?

25  A.  We did.

IAU7CAR4                         Chaice - Direct

1    Q.   What was that?

2    A.   We asked to speak with a senior executive at Barclays to

3    discuss the Barclays investments.

4    Q.   And who did you make that request of?

5    A.   We asked Craig Carton.

6    Q.   And did you speak with a senior executive at Barclays, at

7    Brooklyn Sports and Entertainment?

8    A.   We did.

9    Q.   And what type of meeting was that?

10   A.   How was it arranged?

11   Q.   Well, was it an in-person meeting or --

12   A.   It was a telephone call.

13   Q.   And who did you speak to?

14   A.   Fred Mangione.

15   Q.   And approximately when was that?

16   A.   It was shortly after Joe Meli's arrest on or about February

17   1.

18   Q.   Of 2017?

19   A.   Of 2017.

20   Q.   And who was on the call?

21   A.   Fred Mangione, Fred Carton, John Baylis and I were on that

22   call.

23   Q.   And what was your focus on the call?

24   A.   We wanted to discuss the two concerts or the two

25   performances we had invested in, the Metallica and Barbara

1   Streisand performances, as well as discuss other opportunities

2   that were available at Barclays, understanding the relationship

3   between Craig Carton and Barclays.

4   Q.  Can we publish what is in evidence as Government Exhibit

5   930.

6           On that call, did you show or e-mail Mr. Mangione

7   Government Exhibit 930?

8   A.  No, we did not.

9   Q.  Can we publish Government Exhibit 914 and then just the

10  attachment.

11  A.  No, we did not.

12  Q.  You did not send that to Mr. Mangione?

13  A.  No.

14  Q.  To see if he had sent it to Mr. Carton?

15  A.  Sorry?

16  Q.  You did not send that to Mr. Mangione?

17  A.  No, we did not.

18  Q.  Then can we publish Government Exhibit 920, and just page

19  through this.

20          Did you send or e-mail this agreement to Mr. Yormark

21  or Mr. Mangione to see whether it had been signed?

22  A.  No, we did not.

23  Q.  Did you continue to discuss with the defendant buying

24  Streisand or Metallica tickets through Brooklyn Sports and

25  Entertainment after that call?

1    A.  Given that we had already wired the money to Barclays, and

2    therefore the money was already invested with Barclays for

3    those performances, we discussed with Craig Carton after that

4    the progress of that investment.

5    Q.  OK.  And so what was your understanding based on your

6    conversations with the defendant about where the $2 million

7    that you had sent to Barclays on December 19 was?

8    A.  Well, we had sent it ourselves to Barclays, so that's where

9    we knew it was, and it was being invested in Barbara Streisand

10   tickets as well as Metallica tickets.

11   Q.  And you were never told that it had been redirected away

12   from Barclays.

13   A.  No, we had not.

14   Q.  Take a look at just for the witness, the lawyers and the

15   Judge Government Exhibit 931.  Do you recognize that?

16   A.  Yes.

17   Q.  And what is it?

18   A.  It's an e-mail from Craig Carton to me and others at

19   Brigade.

20           MR. QUIGLEY:  The government offers Government Exhibit

21   931.

22           MR. GOTTLIEB:  No objection.

23           THE COURT:  Admitted.

24           (Government Exhibit 931 received in evidence)

25   Q.  And what is this e-mail chain about, Mr. Chaice?

1    A.  Well, this is Craig forwarding to us e-mail communications

2    between Fred Mangione and Craig about the Nassau, the Barclays

3    performances.

4    Q.  Did the defendant ever tell you that he was buying these

5    tickets with his credit card?

6    A.  No, he did not.

7    Q.  All right.  Did he ever say anything about anyone named

8    Desmond Finger?

9    A.  No, that name never came up.

10   Q.  What was your understanding of how the defendant was buying

11   these tickets?

12   A.  They were being purchased with the proceeds of our loan.

13   Q.  That you sent to Barclays previously?

14   A.  In that case, yes.

15   Q.  Now, did you continue to ask the defendant for updates on

16   the sales of Streisand and Metallica tickets?

17   A.  Yes.

18   Q.  And, by the way, had you invested in anything else other

19   than Streisand and Metallica tickets through Brooklyn Sports

20   and Entertainment?

21   A.  We did not.

22   Q.  No other concerts other than Streisand and Metallica?

23   A.  No.

24   Q.  Can we show to the lawyers, the Judge, and the witness

25   Government Exhibit 938.  Do you recognize this document?

1   A.  This is an e-mail from my colleague John Baylis to Craig

2   Carton.

3   Q.  Are you copied on it?

4   A.  I am.

5           MR. QUIGLEY:  Your Honor, the government offers

6   Government Exhibit 938.

7           MR. GOTTLIEB:  No objection.

8           THE COURT:  Admitted.

9           (Government Exhibit 938 received in evidence)

10  Q.  What's the date on this e-mail?

11  A.  This is Friday, March 3, 2017.

12  Q.  And do you see where Mr. Baylis says, "We are accounting

13  for the Barclays deal in two silos, Barbara and Metallica?"

14  A.  I do.

15  Q.  Then he says, "Lastly, can we get confirmation what our

16  monthly cash end balance is at Barclays?"  That's about the

17  second or third line from the bottom.

18  A.  Yes, I do.

19  Q.  Take that down for one second, and can we show the witness,

20  the lawyers and the Judge Government Exhibit 936.

21          Do you recognize this document, Mr. Chaice?

22  A.  I do.

23  Q.  What is it?

24  A.  It's an e-mail chain between John Baylis, Craig Carton and

25  me.

1          MR. QUIGLEY:  Your Honor, the government offers

2     Government Exhibit 936.

3          MR. GOTTLIEB:  No objection.

4          THE COURT:  Admitted.

5          (Government Exhibit 936 received in evidence)

6     Q.   What's the date on this e-mail chain?

7     A.   This is all on Friday, March 3, 2017.

8     Q.   So, is this after -- the same day as Government Exhibit 938

9     that we just looked at?

10    A.   Yes, I believe so.  It was in response to that e-mail.

11    Q.   OK.  So if you could look down at the bottom e-mail from

12    Mr. Carton to you and Mr. Baylis, what does he say there?

13    A.   He is responding to John's request for an accounting of the

14    two investments we had made by saying we're putting the report

15    together ASAP.

16    Q.   Can we go up to the next e-mail in the chain.  How did

17    Mr. Baylis respond?

18    A.   He thanks him and highlights the most pressing item and

19    information we want is the cash balance with Barclays, which is

20    to say can you give us an accounting of the cash that Barclays

21    has that we wired.

22    Q.   And then how does the defendant respond?

23    A.   He gives that information.

24    Q.   And when he says $831,615 on deposit, what do you

25    understand him to mean there?

1    A.  Of the $2 million that we wired to Barclays, $831,000 of

2    which had yet to be invested in tickets, and the next line

3    indicates how much of that $2 million was in fact invested in

4    tickets.

5    Q.  So did you understand that $831,000 to still be at

6    Barclays?

7    A.  Yes.

8    Q.  Now, at any point in its investment did Brigade ever ask to

9    be "bought out" by Mr. Carton?

10   A.  No, we were not.

11   Q.  Did Carton ask Brigade about buying it out?

12   A.  I don't remember that topic ever being discussed.

13   Q.  Did the Streisand and Metallica concerts at Nassau Coliseum

14   actually happen?

15   A.  They did.

16   Q.  And when was that approximately?

17   A.  It was later that spring.  I forget if it was May or June

18   of 2017, but in that timeframe.

19   Q.  Were there also a Streisand concert at the Barclays Center?

20   A.  Yes.

21   Q.  Based on the agreement you had with the defendant, when did

22   you start -- expect to see returns on your loan?

23   A.  Well, immediately upon the tickets being sold, the cash

24   received was to be used to pay down the loan in the order we

25   discussed before, first the principal amount of the loan and

IAU7CAR4                         Chaice – Direct

1    then any profits were shared 10 percent first to us and then

2    50/50, so immediately thereafter.

3    Q.  And did money start coming back to Brigade when you

4    expected it?

5    A.  Money never came back from the ticket sales.

6    Q.  Did you start asking the defendant where the money was?

7    A.  Yes.

8    Q.  And what did he say?

9    A.  He was unable to return it.

10   Q.  Did he provide any additional information?

11   A.  I believe at one point he said he needed a signatory from a

12   person we had not been introduced to yet, for that money to be

13   released, but in essence his answer was it's not available at

14   this time.

15   Q.  Did there come a point when you personally stopped

16   interacting with the defendant?

17   A.  Yes.

18   Q.  And when was that approximately?

19   A.  Not much after that timeframe, I forget exactly when, but

20   the summer of 2017.

21   Q.  And did lawyers get involved at that point?

22   A.  Yes.

23   Q.  Mr. Chaice, were you one of the primary people at Brigade

24   who dealt with Mr. Carton on this investment?

25   A.  I was.

1    Q.  At any point did Brigade authorize the defendant to invest

2    their money -- invest Brigade's money -- in anything other than

3    to purchase tickets to live events?

4    A.  We did not.

5             MR. QUIGLEY:  No further questions, your Honor.

6             THE COURT:  Thank you.

7             Mr. Gottlieb or Mr. Janey, who will be

8    cross-examining?

9             MR. GOTTLIEB:  Yes, your Honor, if I may just have a

10   second.

11            THE COURT:  Yes.

12   CROSS EXAMINATION

13   BY MR. GOTTLIEB:

14   Q.  Mr. Chaice, every single AEG agreement that you were shown

15   on direct examination, is it fair to say that every single one

16   of those agreements was signed by Joseph Meli?

17   A.  I believe they were, yes.

18   Q.  Is it fair to say that every single one of the agreements

19   that you were shown and the jury was shown in regard to the AEG

20   agreements were not signed in any way on any page by Craig

21   Carton?

22   A.  That's correct.

23   Q.  And if we can go to the government exhibit, the first one,

24   the first agreement, do you have that?  If we can go to the

25   first page of the AEG agreement already in evidence.  And this

1   is covered on the bottom.  Which government exhibit is that?

2   Government Exhibit 935, the front page is addressed to Mr. Gary

3   Gersh, correct?

4   A.  Correct.

5   Q.  And the signature page is signed by Joseph Meli, president

6   of Advance Entertainment, and there is another signature there,

7   Gary Gersh.  Correct?

8   A.  Correct.

9   Q.  And every single agreement, without going through each one

10  now, is similar to this with regard to the signatures, correct?

11  A.  I think they're similar with respect to Joe Meli signing,

12  correct.  I'm not sure.  I do not believe Gary Gersh signed all

13  of the other contracts for the AEG Live, but they're similar.

14  Q.  Now, with regard to each of those agreements that the jury

15  saw, do you know who actually prepared those agreements?

16  A.  No, I do not.

17  Q.  Do you know when those agreements were actually prepared?

18  A.  No, I do not.

19  Q.  Now, before deciding to invest -- to get involved in

20  investing -- is it fair to say that Brigade is committed to

21  investigating the potential investment?

22  A.  We are.

23  Q.  And you do that, is it fair so say, because you want to

24  make sure that not only is Brigade protected financially but

25  your investors are protected, correct?

1    A.  Correct, primarily for our investors, to be sure.

2    Q.  And doesn't Brigade have a large staff to undertake due

3    diligence?

4    A.  We have a sufficient staff, to be sure.

5    Q.  And what employees -- what type of employees at Brigade are

6    assigned to the task of investigating, of engaging in due

7    diligence before committing to an investment?

8    A.  For this particular investment?

9    Q.  For any investment.

10   A.  It differs based on each investment.

11   Q.  But in this type of investment, please tell the jury who is

12   involved in conducting the due diligence.

13   A.  For this investment I was charged, along with the senior

14   analyst John Baylis, with researching this investment.

15   Q.  And beyond the two of you, is it fair to say that you also

16   brought onboard lawyers to investigate and to be part of that

17   due diligence process?

18   A.  That's correct.

19   Q.  And certainly is it fair to say that Brigade has the

20   wherewithal financially and by contacts to pursue any possible

21   lead so that you can be satisfied that the potential investment

22   is legitimate?

23            MR. QUIGLEY:  Objection.

24            THE COURT:  The objection is overruled.

25   A.  Could you ask that again, please.

1                 THE COURT:  Read it back.

2                 (Record read)

3    A.  Yes, we had the wherewithal to do diligence on each

4    investment we pursue.

5    Q.  Mr. Chaice, Brigade controls some $20 billion of assets of

6    investors' money?

7    A.  Correct.

8    Q.  And that money, that $20 billion, is it fair to say just as

9    a general principle it's locked up, meaning it can't be

10   retrieved by the investors for a certain period of time?

11   A.  We have various funds that we manage, and each fund may

12   have different terms on which investors can receive their

13   investments back, but there is a time period for each one, yes.

14   Q.  And that time period could be a matter of years before they

15   could retrieve their money, their investment, correct?

16   A.  That's not my area of expertise within the fund -- the

17   firm -- but I think years would be unusually long for what we

18   do typically.

19   Q.  And before Brigade commits to an investment, isn't it

20   critical to complete a thorough and professional due diligence

21   process?

22   A.  Yes.

23   Q.  And is it fair to say that without being satisfied that a

24   potential investment is legitimate, Brigade would not continue,

25   would not pursue that investment?

A.  Yes.

Q.  Now let's go to mid-October 2016.  I believe you indicated that's when you were introduced to this ticket selling possible deal with Craig Carton, correct?

A.  Yes.

Q.  And you were introduced to this deal initially by Doug Pardon who works at Brigade, correct?

A.  Correct.

Q.  And the deal as you understood it at the time, the business opportunity that was presented, you were advised that it was Joseph Meli's Advance Entertainment that was involved, correct?

A.  When we first began discussing the opportunity with Craig Carton it was more general than that, but, yes, that was at the early stage discussed as one of the primary avenues through which we would get tickets.

Q.  You understood that Craig Carton's role as part of this investment was to purchase tickets from Advance Entertainment, correct?

A.  In part, yes.

Q.  You were informed right at the beginning by Craig Carton that he had access to tickets that could be purchased in bulk by Meli through Meli's company Advance Entertainment, correct?

A.  Correct.

Q.  You were also told right at the beginning when this deal was first brought to Brigade that Meli was looking for

IAU7CAR4                         Chaice - Cross

1    investors to contribute funds that he, Meli, would use to

2    purchase tickets, correct?

3    A.  Yes, correct.

4    Q.  You were told right at the beginning that Craig Carton and

5    his involvement in this was that Mr. Carton had experience

6    selling tickets on a smaller scale because he had a

7    relationship with Brooklyn Sports and Entertainment, correct?

8    A.  I think that was in part the expertise he was bringing,

9    yes, correct.

10   Q.  Now, you are an attorney, correct?

11   A.  Correct.

12   Q.  Your role in this due diligence, this critical

13   investigation, was from a legal perspective for the purpose of

14   making a recommendation to Brigade, correct?

15   A.  Correct.

16   Q.  And right at the outset you got a very prominent firm, the

17   Milbank firm, to assist you in drafting documents and to be

18   sure that everything was on the up and up legally, correct?

19   A.  I don't know if it was at the initial stages but, yes,

20   everything else you said was correct.

21   Q.  It was early on, correct?

22   A.  Relatively speaking.

23   Q.  Let's talk then about the investigation, the due diligence

24   that Brigade undertook.  You learned at the outset that Advance

25   Entertainment was in fact a company owned by Joseph Meli,

IAU7CAR4                          Chaice - Cross

1   correct?

2   A.  Correct.

3   Q.  You learned as well that the company Joseph Meli was

4   combining or merging with DTI, correct?

5   A.  Correct.

6   Q.  And DTI, can you please tell the jury what is DTI?

7   A.  It's a firm that offers services for people looking to buy

8   and sell tickets.  So, if you were looking to buy and sell

9   tickets and have exposure to all of the brokers, for example,

10  StubHub, you could list your tickets on DTI for a commission,

11  and by doing that have access to a broad array of sellers of

12  tickets.  They also offer consulting services that advise

13  people at what price to list the tickets, what time to sell

14  them, early or late, but it was kind of a full suite of

15  services for somebody looking to sell tickets in what I would

16  refer to as the secondary market.

17  Q.  And there was no indication that Craig Carton was involved

18  in DTI, correct?

19  A.  Not directly, but he said he could have access to selling

20  tickets on DTI.

21  Q.  And other than saying he had access, there was no

22  indication that he was part of the DTI business ownership or

23  control, correct?

24  A.  Not the ownership of control, to be sure, no.

25  Q.  And as part of your due diligence, you didn't obtain any

1    information that Mr. Carton had any formal title or role in

2    Meli's business Advance Entertainment, correct?

3    A.  I don't believe he said that he had a role at AEG.

4    Q.  Now, can we please show for your Honor and the attorneys

5    Defendant's Exhibit 15 and 15A.

6          Do you see that exhibit in front of you?

7    A.  I do.

8    Q.  Defendant's Exhibit 15, what is it, please?

9    A.  This is an e-mail from me to Craig Carton with several

10   Brigade people copied.

11   Q.  And what's the date of that e-mail?

12   A.  Tuesday, November 1, 2016.

13         MR. GOTTLIEB:  Your Honor, I ask that that be received

14   in evidence, please.

15         MR. QUIGLEY:  It's hearsay.  Relevance, your Honor.

16         THE COURT:  That's an objection, I take it?

17         MR. QUIGLEY:  Yes, your Honor.

18         THE COURT:  The objection is sustained.

19         MR. GOTTLIEB:  Your Honor, may it be introduced for

20   the state of mind?

21         THE COURT:  Hearsay.  Hearsay.  Move on.

22   Q.  Now, with regard to -- please take a look at 15A.  Looking

23   at Defendant's Exhibit 15A, what is that, sir?

24   A.  This is as it's titled, the initial due diligence list that

25   I believe we sent to Craig Carton.

1    Q.  And that particular list, is that a checklist that's used

2    at Brigade to start off the due diligence in a case such as

3    this?

4    A.  This is specific to this deal.

5    Q.  And do you recall that you sent that to, or believe you

6    sent that to Mr. Carton?

7    A.  I believe so.

8    Q.  And would that have been at the outset, the beginning of

9    the due diligence process?

10   A.  I don't recall, but I believe that would be the case.

11          MR. GOTTLIEB:  Your Honor, I ask that this checklist

12   be received in evidence.

13          MR. QUIGLEY:  Your Honor, same objection, it's an

14   attachment to the e-mail.

15          THE COURT:  The objection is sustained.

16   Q.  You sent to Mr. Carton, did you not, a checklist of steps

17   and information that had to be checked out as part of the due

18   diligence, correct?

19   A.  I don't remember specifically, but --

20          THE COURT:  If you don't remember, you don't remember.

21   Q.  Do you recall that you were interested as part of your due

22   diligence to obtain and review the contract with DTI

23   Management?

24          THE COURT:  Was that something you wanted to do as

25   part of your due diligence, sir?

1          THE WITNESS:  I believe so.

2    Q.  And do you recall that also what you wanted to do right at

3    the outset as part of your due diligence was to speak with the

4    DTI Management?

5    A.  I don't recall that.

6    Q.  Looking at Defendant's 15A, would that refresh your

7    recollection whether or not that was part of the checklist of

8    what you wanted to pursue?

9          THE COURT:  What he is asking you is to look at this

10   document and see if it jogs your memory about whether that was

11   something that you wanted to do as part of your due diligence.

12         THE WITNESS:  I see it written here but --

13         THE COURT:  Not see it written here.  Does it jog your

14   memory that that was something that you all wanted to do as

15   part of your due diligence?

16         THE WITNESS:  Not specifically.

17   Q.  Does it jog your memory that you did want to --

18         Does it jog your memory that you wanted to obtain from

19   Mr. Carton additional data on his 2015 ticket sale history?

20   A.  I don't specifically recall that.

21   Q.  And there is nothing -- looking at 15A, does that jog your

22   memory that that was something that you were interested in

23   learning?

24   A.  It's the same answer as the prior question, I don't recall

25   specifically.

1  Q.  Do you recall being interested in obtaining any security

2  agreements --

3          Withdrawn, your Honor.  Sorry.

4          Were you interested in learning anything more about

5  Mr. Carton and any of his other contacts in the ticket selling

6  business?

7  A.  I do recall that.

8  Q.  Now, as part of your due diligence, is it fair so say that

9  you wanted to initially investigate Mr. Carton?

10 A.  I wouldn't characterize it as investigating Mr. Carton

11 personally, but I wanted to understand his expertise in this

12 business and how that could be incorporated in our investment,

13 correct.

14 Q.  As part of that due diligence, was it important to find out

15 whether or not Mr. Carton had ever done anything wrong with any

16 an investment similar to this ticket selling business?

17         MR. QUIGLEY:  Objection.

18         THE COURT:  The objection is sustained.

19 Q.  If you had learned that Mr. Carton did not have a

20 legitimate ticket selling business, would Brigade have approved

21 going forward with this investment?

22         MR. QUIGLEY:  Same objection.

23         THE COURT:  The objection is sustained.

24 Q.  Now, as part of your due diligence, you learned as a result

25 of the research that there was a well known private equity firm

IAU7CAR4                           Chaice - Cross

1    that put $75 million into a merger with Advance Entertainment

2    and DTI, correct?

3              MR. QUIGLEY:  Objection.

4              THE COURT:  Can I see you guys at the side-bar.  So

5    sorry.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                (At the side-bar)

2                THE COURT:  What is your beef?

3                MR. QUIGLEY:  Judge, I think the issue is that in

4     ruling on the Rule 17 subpoenas you said the level of diligence

5     performed by Brigade is not relevant.

6                THE COURT:  Excuse me.  We'll get to that at jury

7     instructions.  OK?  And I will tell them point blank negligence

8     is not a defense to fraud, insufficient due diligence is not a

9     defense to fraud.  I will tell them all of that.  It will

10    undercut everything he's doing.  All right?  Because that is

11    the law.

12               MR. QUIGLEY:  Thank you, your Honor.

13               (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              MR. GOTTLIEB:  Your Honor, should I repeat it, or can

3     the question be read back.

4              (Record read)

5              THE WITNESS:  I don't recall the exact specific

6     amount, but I do recall that a large private equity firm had

7     made such an investment, yes.

8     BY MR. GOTTLIEB:

9     Q.  And it was critical to your due diligence process to make

10    contact with someone -- when the company is involved in that

11    merger, to get background about that merger, correct?

12    A.  It was an important aspect of our diligence, yes.

13    Q.  And in fact wouldn't you agree with the following, that

14    learning about CVC's involvement with New Amsterdam Growth

15    Capital was the primary launching point for Brigade beginning

16    their due diligence on the investment and Mr. Carton and

17    Mr. Meli?

18    A.  Yes, knowing that they had invested significant amounts of

19    money into DTI and Advance Entertainment was a good basis for

20    to begin our due diligence process, yes.

21    Q.  And because of that information, is it fair to say you

22    pursued conversations with a particular individual by the name

23    of Alex Guira from New Amsterdam Growth Capital to find out

24    about that deal, correct?

25    A.  Yes, Craig put us in touch with Alex Guira.

IAU7CAR4                         Chaice - Cross

1    Q.  At your request; is that not true?

2    A.  Correct.

3    Q.  And in fact while you understood he had previous experience

4    in the ticket resale business, is it fair to say that you

5    trusted and relied on the due diligence of CVC and DTI in

6    evaluating whether or not to proceed with this investment?

7    A.  I wouldn't say we trusted or relied on their due diligence.

8    We did not have access to the due diligence that they did.  But

9    knowing that they invested a significant amount of money in

10   this company was helpful for our process, yes.

11            THE COURT:  So let's move on, please.

12   Q.  As a result of that, you did have a conversation with Alex

13   Guira, correct?

14   A.  Correct.

15   Q.  And when you spoke to Mr. Guira, you looked to confirm that

16   Meli was in fact a source of tickets for DTI, correct?

17   A.  Correct.

18   Q.  You wanted to check out Meli to see if he was legitimate in

19   that deal, correct?

20            MR. QUIGLEY:  Objection to legitimate.

21            THE COURT:  Overruled.

22   A.  I'm not sure what you meant by that.  Can you say that

23   again.

24   Q.  You wanted to check out to see if Meli in fact was able to

25   have access to bulk tickets, correct?

1    A.   We had that view based on the diligence we had up to that

2    point.   This was a good conversation that confirmed what we

3    thought we already knew.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2    BY MR. GOTTLIEB:

3    Q.  When you say confirmed what you already knew, you had

4    already started your due diligence and knew certain facts from

5    Mr. Carton and documents, correct?

6    A.  Correct.

7    Q.  And you wanted to confirm that the information that had

8    already been conveyed to you was in fact true, was accurate,

9    correct?

10   A.  Correct.

11   Q.  In speaking to Mr. Guira, he spoke highly of Meli, did he

12   not?

13            MR. QUIGLEY:  Objection.  Hearsay.

14            THE COURT:  The objection's sustained.

15   Q.  You asked Alex Guira his opinion about Joseph Meli,

16   correct?

17            THE COURT:  The objection's sustained.  Has nothing to

18   do with your client's state of mind, not relevant.

19            MR. GOTTLIEB:  Thank you.

20            THE COURT:  Ladies and gentlemen, one of the reasons

21   that we're having this little tiff, some things are relevant

22   for one purpose and not for another purpose.  As you will learn

23   at the end of the case -- someday I'm going to give the legal

24   instructions first.  It might be a really good idea.  Some

25   judges do that.  They think it's a really good idea --

IAUHCar5                    Chaice - Cross

1    negligence, insufficient looking into things is not a defense

2    to fraud, OK?  You'll learn that, and you'll learn that in the

3    context of a whole lot of legal instructions about what's

4    relevant, what's not relevant.

5          However, there are certain things that are relevant or

6    potentially relevant to the defendant's state of mind, and

7    state of mind is one of the things that the government has to

8    prove beyond a reasonable doubt.  So I'm trying to parse these

9    questions to make sure that I don't leave out anything that

10   might arguably be relevant to Mr. Carton's state of mind, but I

11   don't want to leave you with the misimpression -- that's why

12   the government keeps jumping up and objecting -- that

13   negligence on the part of an investor would somehow be a

14   defense because it's not a defense.

15         All right.  So anyway, I'm listening carefully.  That

16   question couldn't conceivably have had anything to do with your

17   client's state of mind.  Move on.

18   BY MR. GOTTLIEB:

19   Q.  Mr. Chaice, there was nothing that you learned as a result

20   of this part of your due diligence that led you to say that

21   Brigade would not get involved in the investment, correct?

22         MR. QUIGLEY:  Same objection.

23         THE COURT:  Objection's overruled.

24   A.  Sorry.  There were a few negatives.

25         THE COURT:  There were a lot of negatives.

1            You did your due diligence and you invested, right?

2            THE WITNESS:  Correct.

3            THE COURT:  Let's move on.

4            MR. GOTTLIEB:  Well, if we could look at Defense

5    Exhibit 18 just for the Court and the attorneys.

6    Q.  Looking at Defendant's Exhibit 18, do you recognize what

7    that is?

8    A.  I do.

9    Q.  What is that?

10   A.  It looks to be an email chain between me and Craig Carton.

11   Q.  And the date of that is December 6, 2016, correct?

12   A.  Correct.

13           MR. GOTTLIEB:  Your Honor, I ask that that be received

14   in evidence.

15           MR. QUIGLEY:  Objection.  Hearsay.

16           THE COURT:  Overruled.

17           MR. GOTTLIEB:  Your Honor, may it be shown to the

18   jury?

19           THE COURT:  Sure, for what it's worth, you certainly

20   may show it.

21           (Defendant's Exhibit 18 received in evidence)

22   BY MR. GOTTLIEB:

23   Q.  Now, on the bottom of that, the bottom thread is your email

24   to Mr. Carton December 6, 2016, correct?

25   A.  Correct.

1   Q.  And you ask him certain questions about AE, which is

2   Advance Entertainment, correct?

3   A.  Correct.

4   Q.  As well as CVC and DTI, correct?

5   A.  Correct.

6   Q.  If you look at the top of that email thread, is it fair to

7   say that at your request it was Mr. Carton who put you in touch

8   with Alex Guira?

9   A.  Correct.

10          THE COURT:  We've already gone over that.  He's

11  already testified to that.

12          MR. GOTTLIEB:  Thank you.

13  Q.  Now, as part of your due diligence, you also met with Craig

14  Carton numerous times, correct?

15  A.  Correct.

16  Q.  How many meetings did you have before approving this

17  investment with Mr. Carton?

18  A.  I don't recall the specific number.

19  Q.  Well, approximately.

20  A.  It's been a long time.  And whether there were phone calls

21  or meetings, but there was a handful of times, whether by phone

22  or in person, we discussed this investment.  Including phone

23  calls, it was a significant amount of times.

24  Q.  During this entire period of time in the meetings, phone

25  calls, emails, was Mr. Carton cooperative?

IAUHCar5                           Chaice - Cross

1   A.  Yes.

2   Q.  Did he provide you answers to your questions, your

3   inquiries?

4   A.  Some, yes; some, no.

5   Q.  And any questions that he could not answer, did you ask for

6   follow-up, or were you satisfied that he didn't have the

7   information?

8   A.  It's case by case.  I'm sure both happened in different

9   instances.

10  Q.  But there was nothing about these contacts, these meetings,

11  that caused you to rethink whether or not to get involved in

12  the investment, correct?

13  A.  We ultimately made the investment.  So, yes, we were

14  comfortable with that.

15  Q.  You also insisted -- as part of your due diligence, you

16  insisted on setting up meetings with Meli and other members of

17  the Brigade team, correct?

18  A.  I don't recall whether we insisted that.  It may very

19  likely have been that Craig offered that up.  Either way, we

20  would invite that and were happy to have those conversations.

21  Q.  In fact, Meli did meet with you and a number of the other

22  Brigade employees, correct?

23  A.  Correct.

24  Q.  And it was Meli, was it not, who said that he had tickets

25  for Katy Perry, Ariana Grande, and Hamilton, correct?

IAUHCar5                          Chaice – Cross

1    A.  I don't recall what he said at that specific meeting.

2    Q.  Well, at any of the meetings.  At any of the meetings with

3    you and the other Brigade employees, is it not true that Meli

4    represented to you that he had access to tickets for Katy

5    Perry, Ariana Grande, and Hamilton?

6    A.  We only met with Joe Meli one time, and I don't recall

7    whether he represented that during that one meeting.

8    Q.  Do you recall on March 30, 2017, meeting with the

9    prosecutors in this case as well as Sean Sweeney of the Federal

10   Bureau of Investigation?

11   A.  I don't recall the date, and I don't recall whether that

12   was a phone call or meeting.  At some point I did interact with

13   the federal government.

14   Q.  On March 30, 2017, did you not tell the prosecutors and

15   Sean Sweeney that Meli represented that he had access to

16   tickets for Katy Perry, Ariana Grande, and Hamilton?

17   A.  Again, I don't recall.

18           MR. GOTTLIEB:  Your Honor, may I show this document?

19   I have it marked for identification to show the witness for the

20   purpose of refreshing recollection.

21           THE COURT:  You will mark it for identification as?

22           MR. GOTTLIEB:  That would be Defendant's 107, your

23   Honor.

24           THE COURT:  Defendant's 107 for identification.  You

25   of course may show him anything you like --

1          MR. GOTTLIEB:  Thank you.

2          THE COURT:  -- if he says he doesn't recall.

3          MR. GOTTLIEB:  May I approach the witness?

4          THE COURT:  You may.

5          MR. GOTTLIEB:  Thank you.

6   BY MR. GOTTLIEB:

7   Q.  Now, just looking at this document, don't read it, does

8   that refresh your recollection that you made that statement to

9   the prosecutors and Agent Sweeney?

10  A.  I see it.

11         THE COURT:  No, no, no, we don't want you to tell us

12  what's written down.  The only question is does it jog your

13  memory that you said that?

14         THE WITNESS:  I don't recall it.

15         THE COURT:  You don't recall.

16         Let's move on, please.

17  Q.  Do you recall that Mr. Carton never told you that he had

18  individual access by himself without going through Meli?  Did

19  Mr. Carton ever say that to you?

20  A.  Sorry.  I don't follow the question.

21  Q.  Did Mr. Carton say that he, separate from Meli, had access

22  to any of those snows?

23  A.  I don't recall.

24  Q.  Now, can you tell us what investigation you undertook of

25  Advance Entertainment.

1  A.  We met with Craig and talked about his connection with Joe

2  Meli on several occasions and then met with Joe Meli himself,

3  who was the head of that enterprise.

4  Q.  Other than the meetings, did you conduct any other due

5  diligence of Advance Entertainment and Joseph Meli?

6  A.  As we discussed, we had a phone call with New Amsterdam to

7  discuss their investment in DTI and Advance Entertainment.  So,

8  yes, that was part of our diligence process as well.

9  Q.  Didn't you also review Securities and Exchange Commission

10 filings, SEC filings, of Advance Entertainment?

11 A.  We Googled Joe Meli and came up with a Reg. D filing, which

12 is an SEC filing, showing him as I believe, if I recall

13 correctly, director of DTI.

14 Q.  Now, ultimately, would you agree that Brigade gave up

15 responsibility of pricing and the timing of ticket sales to

16 Craig Carton?

17 A.  How do you mean "gave up"?

18 Q.  You relinquished, gave up, your power and left it to Craig

19 Carton the responsibility of pricing and --

20         THE COURT:  I think what he means is was that

21 Mr. Carton's responsibility in your arrangement with him?

22 A.  We were relying on his expertise, but in the loan

23 agreement, there was a provision that allowed us to make the

24 ultimate determination if there were tickets unsold prior to a

25 concert occurring.

IAUHCar5                    Chaice - Cross

Q.  Mr. Chaice, directing your attention to August of 2017,

specifically August 4, 2017, did you not speak with Assistant

U.S. Attorneys Kobre and Quigley and tell them that Brigade

gave the responsibility of pricing and timing of ticket sales

to Carton?  Did you not say that to them?

A.  I don't recall that specific conversation.  However, I do

agree with the fact that we were relying on his expertise in

that area.  That was the basis for the investment.

         MR. GOTTLIEB:  As far as not recalling the

conversation, your Honor, may I have this marked as Defendant's

108, and may I show it to the witness, your Honor, to see if he

recalls?

         THE COURT:  If it refreshes your recollection.  Once

again, don't read anything that's in this document to us.

Don't tell us what the document says.  The question is does it

jog your memory that you had the conversation that Mr. Gottlieb

described to you in his question?

         THE WITNESS:  It doesn't.

         THE COURT:  Thank you.

Q.  By the way, when you -- I'm sorry, your Honor.

         THE COURT:  I just said thank you.

Q.  Before you took the stand today, you met with prosecutors,

didn't you?

A.  Correct.

Q.  You went over your testimony, correct?

1    A.  I was asked questions during those sessions.  I gave

2    answers.  Some of those questions were asked today.  The

3    answers I gave were the same that time as this time.

4    Q.  I'm sure.  Were you shown any of these -- any FBI reports

5    of your prior interviews?

6    A.  I don't believe I was.

7    Q.  Now, as part of Brigade's decision and conditions of doing

8    business with Craig Carton, is it fair to say that Brigade

9    insisted on having its own username and password that would

10   allow Brigade to log in and track the sale of tickets?

11   A.  We asked for that and did receive it, yes.

12   Q.  And is it fair to say that Brigade insisted on Mr. Carton

13   forming a new company to avoid any potential third-party

14   liability issues as a result of this business arrangement?

15   A.  Correct.

16   Q.  And Mr. Carton agreed to that, correct?

17   A.  He did.

18   Q.  Mr. Carton created Ticket Jones in response to this demand,

19   correct?

20   A.  Correct.

21   Q.  Brigade also insisted on having the right of first refusal

22   on any tickets Mr. Carton obtained through Ticket Jones,

23   correct?

24   A.  Correct.

25   Q.  And Mr. Carton agreed to that, correct?

IAUHCar5                          Chaice - Cross

1    A.  Correct.

2    Q.  As part of the AEG contracts that were discussed earlier,

3    you had the wherewithal and ability to contact AEG to see if

4    those agreements were legitimate, correct?

5              MR. QUIGLEY:  Objection.  Relevance.

6              THE COURT:  The objection is sustained.

7    Q.  Well, Mr. Chaice, isn't it true that you didn't reach out

8    to AEG because you wanted to save this deal and didn't want to

9    affect Mr. Carton's relationship with AEG by checking up on

10   AEG, correct?

11             MR. QUIGLEY:  Objection.

12             THE COURT:  The objection's sustained.

13   Q.  Let's go to the revolving loan agreement.  Now, that loan

14   agreement was shown to the jury, and would you agree with the

15   following:  That that revolving loan agreement does not include

16   any time period when tickets need be purchased with the money

17   from the loan, correct?

18   A.  I'm not sure I understand.  Can you explain the question.

19   Q.  There's no provision in there that says, in sum and

20   substance, that within ten days of Brigade wiring the money,

21   tickets in fact had to be purchased, correct?

22   A.  I don't recall, but that was not necessarily how it was

23   structured.

24   Q.  When you say you don't recall, now, certainly before you

25   took the stand you reviewed that revolving loan agreement, did

IAUHCar5                          Chaice - Cross

1    you not?

2    A.   Correct, I did.

3    Q.   You were asked a lot of questions on direct by the

4    government about specific provisions of that loan agreement,

5    correct?

6    A.   Correct.

7    Q.   Are you able to share with the jury that one provision you

8    have never seen was a time restriction by which the tickets had

9    to be purchased?

10   A.   Testifying to the absence of a provision is different than

11   testifying of the existence of one.  So I'm not comfortable

12   saying that does not exist in a 100-page document without

13   reviewing it carefully for that provision.

14   Q.   Looking and considering that loan agreement, is it fair to

15   say that Brigade determined when to loan the money?

16   A.   Correct.

17   Q.   Brigade determined how much to spend by way of drawing down

18   the money from the loan, correct?

19   A.   We controlled how much of the loan would be advanced to the

20   borrower, correct.

21   Q.   Brigade would decide what specific shows to purchase

22   tickets for, correct?

23   A.   We had the right to not fund if we did not approve that

24   specific investment, correct.

25   Q.   And as part of the agreement, you insisted that Mr. Carton

1    provide you with any ticket agreements in support of the

2    tickets you sought to purchase, correct?

3    A.  We had to receive the ticket contracts, yes, correct.

4    Q.  In addition to that loan agreement, you asked for the

5    access so you could track the sale of the tickets, correct?

6    A.  We asked to have access to his website where he would list

7    the tickets so that we could track them, yes.

8           MR. GOTTLIEB:  And looking at Defense Exhibit, your

9    Honor, 34 and 34A, if we could just show that to the Court.

10   Q.  Defendant's Exhibit 34 is what, sir?

11   A.  It's an email from Craig Carton to me and others at

12   Brigade.

13   Q.  Looking at 34A, what is that?

14   A.  It's not up.  There we go.  Is this -- it's continuing to

15   change, so I'm not sure what I'm supposed to be looking at.

16   Q.  34A, one-page document.

17   A.  It's up now.

18   Q.  What is that, sir?

19   A.  This looks to be a screenshot from the Ticket Utils website

20   where Craig Carton was listing and selling the tickets.

21   Q.  What is the Ticket Utils website?

22   A.  What is it?

23   Q.  Yes.

24   A.  What does it do?

25   Q.  Yes.

IAUHCar5                          Chaice – Cross

1   A.  It's where he can list the tickets for sale.

2   Q.  And this particular document, 34A, does that accurately

3   reflect a copy of the document in Ticket Utils reflecting

4   Barbra Streisand tickets that were available to you?

5           MR. QUIGLEY:  Objection.

6           THE COURT:  The objection's sustained.  It's hearsay.

7   Move on, please.

8   Q.  But you kept in your files, did you not, pictures, copies

9   of documents that you checked on your ticket purchases,

10  correct?

11  A.  I didn't, no.

12  Q.  Brigade did, correct?

13  A.  I don't know if others did.

14  Q.  Well, are you aware that Brigade turned over to the

15  government proof of the Ticket Utils that Brigade had access to

16  and reviewed?

17  A.  I don't personally know that.

18  Q.  And the document 34A that's in front of you, does that look

19  familiar to you?

20  A.  I think this is what the Ticket Utils website looked like.

21  Q.  Did you of your own personal involvement, did you ever go

22  on Ticket Utils and do whatever you do to find the app and see

23  a document just like that?

24  A.  I don't remember seeing a document just like this, but I do

25  remember going on the Ticket Utils website.

IAUHCar5                          Chaice - Cross

1    Q.  When you went on the Ticket Utils, it was for the purpose

2    of tracking the purchases of tickets that Brigade requested,

3    correct?

4    A.  It was for the purpose of tracking the tickets that were

5    being sold by Ticket Jones, yes.

6    Q.  In fact, when you went on yourself, you saw that there were

7    tickets that were being sold by Ticket Jones, correct?

8    A.  Correct.

9    Q.  Let's talk about the wiring process, the wiring of funds.

10        You told the jury that Brigade only and insisted on

11   sending money only to the seller of tickets, correct?

12   A.  I believe I said that was the preferred method.

13   Q.  Right.  So other than it being a preferred method, is it

14   fair to say, sir, that Brigade in fact wired money to other

15   entities other than the source, the seller of the tickets?

16   A.  I don't believe so.  We wired the money to Advance

17   Entertainment, which to us was a source of the tickets, and we

18   wired the money to Barclays, which to us was a source of the

19   tickets.

20   Q.  You understood that Advance Entertainment obtained tickets

21   from another business, correct?

22   A.  Correct.

23   Q.  It wasn't that Advance Entertainment had all these tickets

24   in a drawer somewhere to sell, correct?

25   A.  I don't believe they had the tickets in a drawer, that's

1    correct.

2    Q.  So Advance Entertainment wasn't the actual primary seller

3    of the tickets, correct?

4    A.  Correct.

5    Q.  And so that it's clear, Brigade wired money to a non-seller

6    of the tickets, specifically Advance Entertainment, correct?

7              MR. QUIGLEY:  Objection to relevance.

8              THE COURT:  Objection sustained.

9              MR. GOTTLIEB:  Your Honor, only because it came out

10   on --

11             THE COURT:  The objection's sustained.

12   Q.  You wired money you told us on direct in the following

13   amounts on the following days:  December 8, 2016, Brigade wired

14   $700,000 to Advance Entertainment, correct?

15   A.  Correct.

16   Q.  On December 19, 2016, $2 million to Brooklyn Sports &

17   Entertainment, correct?

18   A.  Correct.

19   Q.  December 19, 2016, $1 million to Advance Entertainment,

20   correct?

21   A.  Correct.

22   Q.  December 20, 2016, $900,000 to Advance Entertainment,

23   correct?

24   A.  I don't remember that specific date, but, yes, at or around

25   that time, yes.

1   Q.  And you understood that the arrangement that you had with

2   Advance Entertainment, Meli, was different than the arrangement

3   with Barclays, correct?

4   A.  Correct.

5   Q.  You understood and Brigade understood that any moneys that

6   you were sending to Advance Entertainment was to get a stake in

7   Meli's company, in his business sale, sale of tickets, correct?

8   A.  Not in a stake of his company, but in tickets being sold by

9   his company.

10  Q.  You weren't sending the money for specific tickets at the

11  time you sent the money when you sent it to Advance, correct?

12  A.  When you say "specific tickets," yes, we were sending them

13  for a specific event, yes.

14  Q.  But in sending the money, you didn't send the money

15  expecting to receive a particular seat, such as in row 10,

16  seats A, B, and C, correct?

17  A.  Correct.

18  Q.  Now, with Barclays you understood that the advantage of the

19  Barclays deal was that it cut out the middleman, correct?

20  A.  Well, it was an avenue for investments because it was an

21  additional source of tickets.  That attribute is true.  I

22  believe that there is no middleman there to -- to demand any

23  fees, yes.

24  Q.  And because Barclays was the source of the tickets, which

25  was different than Advance, you found that to be an attractive

1   part of this deal, correct?

2   A.  No.

3           MR. GOTTLIEB:  Your Honor, may I have one moment,

4   please?

5           THE COURT:  Yes.

6           MR. GOTTLIEB:  Now, if we could have Government

7   Exhibit 906.

8   Q.  Mr. Chaice, looking at Government Exhibit 906, what is

9   that, please?

10  A.  I can't see the number at the bottom, but I assume this is

11  Government Exhibit 906.

12  Q.  And what is it?

13  A.  This is an e-mail chain between me and Craig Carton.

14  Q.  And this is an email chain, is it fair to say, pertaining

15  to that payment of $700,000 on or about December 8, 2016,

16  correct?

17  A.  Correct.

18  Q.  If we could look at Government Exhibit 917.  This also is

19  not yet -- this one's in.

20          Your Honor, may this one be shown to the jury?  I

21  understand this has been received.

22          THE COURT:  I don't know.  Is it in evidence?

23          MR. QUIGLEY:  It's in evidence, your Honor.

24          THE COURT:  In that case, it may be shown to the jury.

25          MR. GOTTLIEB:  Thank you.

1    Q.  Looking at Government Exhibit 917, you've already testified

2    that this is emails between you and Craig Carton, correct?

3    A.  Correct.

4    Q.  And Craig Carton on the bottom part of the thread talks

5    about having plenty of choices for Monday, so let's discuss

6    because it's imperative that whichever direction we choose, it

7    needs to be funded Monday.  He then talks about putting

8    $3 million into the Metallica North American tour and discusses

9    $3 million for Barbra Streisand, two shows in Nassau.  Then

10   number five is all access seats, Nassau.

11            You were asked questions about that.  Can you tell us

12   what the all-access-seats proposal was?

13   A.  My recollection is that Barclays would sell a ticket to a

14   seat at one of their venues for any event they hosted at that

15   venue.  So you would own for one ticket one seat to any of the

16   events that year.

17   Q.  Did you ask Mr. Carton for proof that he had an agreement

18   with Barclays for all access seats?

19   A.  I don't recall asking for that.

20   Q.  Do you recall Mr. Carton showing you his agreement with

21   Barclays for this all-access-seats deal where you would, in

22   effect, be owning that seat for all shows?

23   A.  I don't recall him showing me that.

24   Q.  On the bottom of this email, if you look at it, it says

25   under Wire Situation:  "For the Barclays deal, we can do a wire

1   to Ticket Jones and then TJ makes a wire and sends it to

2   Barclays or wire to Advance and have them send for us as we are

3   already under contract with them, and they have been vetted."

4          Do you see that?

5   A.  I do.

6   Q.  So as of December 17, 2016, you would agree that there were

7   options on how to go about the wiring process, correct?

8   A.  Those were the two options that Craig offered to us.

9   Q.  Now, you told us -- thank you.  I'm done with that.

10         Now, you told us that what was important is to have

11  this controlled account set up so that all moneys from Brigade

12  would go into a controlled account?

13  A.  I don't recall discussing that today.

14  Q.  Well, in fact, the issue of the controlled account did come

15  up between Brigade and Mr. Carton before Brigade signed on the

16  dotted line, correct?

17  A.  We discussed having a controlled account throughout the

18  process.  I do not recall exactly when we first discussed that.

19  Q.  Is it fair to say that Brigade wired money for tickets

20  specifically in connection with the investment we're talking

21  about with Mr. Carton?  You wired money even before you

22  understood that the controlled account was set up?

23         MR. QUIGLEY:  Objection to relevance.

24         THE COURT:  The objection's sustained.

25         MR. GOTTLIEB:  Your Honor, may I be heard on that?

1          THE COURT:  At a break.  Ask another question.  We'll

2     break in about five minutes.

3     Q.  In fact, Mr. Chaice, the controlled account, that

4     segregated, controlled account was not set up until March of

5     2017, correct?

6          MR. QUIGLEY:  Same objection.

7          THE COURT:  The objection's sustained.  Go to

8     another -- actually, let's just take a break now, then I can

9     talk to them.

10          We'll take an afternoon break.  I'll see you in ten

11     minutes.  Don't discuss the case.  Keep an open mind.

12          You may step down, Mr. Chaice, and take a stretch

13     break.

14          (Jury excused)

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

IAUHCar5

```
1              (Jury not present)
2              THE COURT:  I'm clearly missing something,
3      Mr. Gottlieb.  I don't understand how this is relevant to state
4      of mind.
5              MR. GOTTLIEB:  Well, your Honor --
6              THE COURT:  I really don't.
7              MR. GOTTLIEB:  Well, your Honor, first it was
8      raised --
9              THE COURT:  I don't understand how this is relevant to
10     any issue that's in the case.
11             MR. GOTTLIEB:  Your Honor, I'm going to do my best to
12     explain.  In the initial term sheet that the government
13     introduced, one of the provisions is the controlled account --
14             THE COURT:  Yes.
15             MR. GOTTLIEB:  -- to begin with, and the testimony was
16     that all of those provisions were critical for the --
17             THE COURT:  Every one of them, yes.
18             MR. GOTTLIEB:  And then we have emails here where
19     Mr. Carton through his attorney during the preliminary
20     negotiations leading up to the signing of the agreement is
21     discussing with Brigade's attorneys, Milbank --
22             THE COURT:  Right.
23             MR. GOTTLIEB:  -- setting up the controlled accounts
24     so that Brigade would be satisfied that what they wanted --
25             THE COURT:  Yes.  So what?
```

IAUHCar5

1          MR. GOTTLIEB:  -- that their investment would be

2     protected.  And to show that --

3          THE COURT:  So what?

4          MR. GOTTLIEB:  I'm right there.  I'm right there.

5          The fact that the money was not segregated, the fact

6     that it was sent somewhere else, the fact that it was not

7     safeguarded only to be used at that time for tickets is out of

8     the case for the following reason:  Brigade knew darn well that

9     when they are wiring -- the amount of money, your Honor, just

10    from the government's own --

11         THE COURT:  Mr. Gottlieb, you asked two questions to

12    which the government lodged an objection.  I want to know why

13    those two questions are relevant.  And don't tell me that the

14    fact that money that got wired from a segregated account to

15    Mr. Carton's account is not relevant to the case.  It's real

16    relevant to the case.

17         MR. GOTTLIEB:  No, no, but it wasn't wired to a

18    segregated account where --

19         THE COURT:  That doesn't make any difference.

20         MR. GOTTLIEB:  Your Honor, but it's a piece of it.

21         THE COURT:  No, no, I don't --

22         MR. GOTTLIEB:  It's a piece of it because the jury

23    properly could say:  Wait a second.  Brigade is sending this

24    money.  They talk about in the term sheet introduced by the

25    government about a controlled account, and then it's never put

IAUHCar5

1   in a controlled account.  Therefore, the logical inference is

2   Mr. Carton is playing games.  That's different than when

3   Mr. Carton is saying:  Set it up and I'm putting you in touch

4   with my banker so that your money could be sent to a segregated

5   account, and they dropped the ball.

6          THE COURT:  I think I speak English.  I don't have any

7   idea -- do you know what he's talking about?

8          MR. QUIGLEY:  I have no idea, your Honor.

9          THE COURT:  I have no idea, and if I don't understand

10  it, then it's not relevant.

11         MR. GOTTLIEB:  Then let me try it again.  I only know

12  how to speak English, your Honor.

13         If the government is suggesting, if the government is

14  going to say this money -- we have the term sheet, we have the

15  agreement that talks about accounts, and the fact that it

16  wasn't in the account, it's already in the case not because of

17  us but by the government.  We should be entitled to say that

18  issue now is out of the case because Brigade didn't do its job

19  in setting up the account.

20         THE COURT:  Wait a minute.  Wait a minute.  Whoa,

21  whoa.  Let me see if I understand what you're saying.  You're

22  saying that Brigade -- yes or no, are you saying that Brigade

23  did not set up a controlled account?

24         MR. GOTTLIEB:  Correct.

25         THE COURT:  OK.  What's the proof of that?

IAUHCar5

 1          MR. GOTTLIEB:  I have the emails.  I have the date

 2   showing when Mr. Carton's lawyers are giving him access to the

 3   bankers to set up the controlled account, which is in March,

 4   long after they have now advanced and sent all this money

 5   willy-nilly to Advance or even to Barclays.

 6          THE COURT:  Do you understand what he's saying?

 7          MR. QUIGLEY:  No, your Honor.  I think it's blame the

 8   victim.  It's completely irrelevant.  And the fact that a

 9   controlled deposit account was or wasn't set up doesn't give

10   Mr. Carton carte blanche to do whatever he wanted.

11          THE COURT:  What you're saying is the controlled

12   deposit account -- can you tell me, was it set up?

13          MR. QUIGLEY:  It was set up after Brigade had invested

14   the money.

15          THE COURT:  So the controlled -- Brigade wires money

16   first.  Controlled account's set up.  Where did Brigade wire

17   the money to?

18          MR. QUIGLEY:  Brigade wired the money to Advance

19   Entertainment and to Brooklyn Sports & Entertainment in

20   December 2016.

21          THE COURT:  And thereafter the controlled account was

22   set up for what purpose?

23          MR. QUIGLEY:  It was set up to be an account, a clean

24   account, for future investments, but there were no future

25   investments because the whole thing fell apart.  It's

IAUHCar5

1   completely irrelevant to where any money went in this case.  It

2   is an effort to blame the victim for not doing, which we

3   dispute that it was their job to do it, but it's completely

4   irrelevant.

5          MR. GOTTLIEB:  Your Honor, can I just respond?  This

6   isn't blaming the victim.  This is --

7          THE COURT:  Most of your questions this afternoon have

8   been in the nature of blaming the victim.  You didn't do enough

9   due diligence.  So what?  That's no defense.

10         MR. GOTTLIEB:  But I'll tell you why, your Honor, it

11  is a defense.

12         THE COURT:  It is not a defense.

13         MR. GOTTLIEB:  No, no.

14         THE COURT:  It is not a defense.

15         MR. GOTTLIEB:  No, no, I understand what you're

16  saying, and I agree with your Honor as far as the law goes.

17  But it is a defense that everything Mr. Carton did, everything,

18  was aboveboard.  And they investigated him and they didn't

19  learn anything to say otherwise, and he did it exactly as

20  required.  He sold the tickets; they purchased the tickets.

21  And this thing that's thrown into this case like a grenade by

22  the government, which they say they don't understand what I'm

23  talking about, about this controlled account --

24         THE COURT:  Well, I have to say I'm prepared to strike

25  all the testimony about the controlled account if there was

IAUHCar5

1  never any controlled account.

2          MR. GOTTLIEB:  No, but, your Honor, I'll tell you why

3  it's important, if I can.  I'll tell you why it becomes

4  important that it wasn't set up.  Because it shows this notion

5  that the money could only be sent to a controlled account and

6  only used for tickets is without a basis because they didn't --

7          THE COURT:  Hang on.  I thought that's what you were

8  arguing.  I have to say, Mr. Quigley, I thought there was a

9  controlled account.  I thought that that was where the money

10  was sent, and then it was siphoned out of the controlled by

11  Mr. Carton, or Mr. Carton said, Don't send it there; send it to

12  me.

13          MR. QUIGLEY:  Yes, he did.  He said send it to

14  Brooklyn Sports & Entertainment.  This controlled account is

15  something completely different.  Brigade said we want to send

16  the money to Brooklyn Sports & Entertainment, the provider of

17  the tickets, an entity that Mr. Carton is not a part of, that

18  Brigade is not a part, the provider of the tickets.  The money

19  was sent there, and Mr. Carton said to Brooklyn Sports &

20  Entertainment:  Oh, big mistake.  Send it to me.

21          THE COURT:  Big mistake, send it to me.

22          MR. QUIGLEY:  That is not --

23          THE COURT:  That has nothing to do with a controlled

24  account.

25          MR. QUIGLEY:  That has nothing to do with a controlled

IAUHCar5

1   account.

2              THE COURT:  I agree.  So why did you introduce

3   information about a controlled account?

4              MR. QUIGLEY:  Why did we introduce information?

5              THE COURT:  Yes, you did.

6              MR. QUIGLEY:  I think we cited to a line of the term

7   sheet, your Honor.

8              THE COURT:  Yes.  Why?

9              MR. QUIGLEY:  Because it was in the term sheet and

10  they opened on it.

11             THE COURT:  That's what I'm not understanding.  It's

12  very confusing to me.  I heard the government story as the

13  money was sent to the Barclays Center.  Carton called the

14  Barclays Center where they'll actually listen to him because

15  they're buddies and says, Ah, big mistake.  Send me the money,

16  and the money gets sent to his personal account and ends up

17  paying his gambling debt, or something like that.  That's your

18  theory of the case, right?

19             MR. QUIGLEY:  Yes.  This controlled account that

20  they're talking about is something completely different.

21             THE COURT:  Then why did you introduce anything about

22  it?

23             MR. QUIGLEY:  Judge, I cited to one line of a term

24  sheet.

25             THE COURT:  I don't care whether you cited to one line

IAUHCar5

of a term sheet or not.  Why did you introduce anything about

it?

          MR. QUIGLEY:  Because he mentioned it, Mr. Gottlieb

mentioned it in his opening.  I didn't want to be accused --

          THE COURT:  So what's the relevance?  I don't care

what he said in his opening.  What's the relevance?

          MR. QUIGLEY:  I don't think there is.

          THE COURT:  You could have stood up and said

"irrelevant," and his first question, if you hadn't introduced

it, I would have said -- we would have had this conversation

two hours ago, and we would have had none of these questions.

          MR. QUIGLEY:  I don't think there's been a lot of

questioning about the controlled account until now.  That's

what he's talking about now.  It's completely irrelevant.  It

was after.  It has nothing --

          THE COURT:  You can take care of that on redirect.

          MR. JANEY:  Your Honor, if I may be heard, the

government raised it because a document that's admitted in

evidence --

          THE COURT:  I'm going to let him ask all the questions

he wants because the government did raise it without having any

reason to do so.

          And you can clean it up on redirect.

          MR. KOBRE:  Your Honor, could I just have one -- I'm

sorry.  I see you leaving the bench.

IAUHCar5

1          THE COURT:  I'd like to go to the bathroom, Mr. Kobre,

2    please.

3          MR. KOBRE:  Your Honor.

4          (Recess)

5          THE COURT:  Case on trial continued.  The parties are

6    present.  The jurors are not present.

7          I think I interrupted Mr. Kobre.

8          MR. KOBRE:  Very kind.  Thank you, your Honor.  Just

9    two real quick things.  One is just an operational matter.

10   Since the podium is too high, is it OK if I question from

11   counsel table which I've done with other trials?

12         THE COURT:  Of course.

13         MR. KOBRE:  Thank you, Judge.

14         THE COURT:  I've already made my one mistake.  I'm not

15   going to do that.

16         MR. KOBRE:  I appreciate that, Judge.

17         Second, last night the government sent defense counsel

18   a set of exhibits that we plan to introduce through the next

19   witness, Victor Pereia.  Defense counsel has told me that they

20   plan to object to all of them based on authenticity.  I think,

21   from the government's perspective, we can lay a foundation and

22   they will be shown to be authentic, but I just wanted to let

23   your Honor know that that objection has been --

24         THE COURT:  Well, if it's made, I'll look at them,

25   I'll rule, or I'll admit them subject to connection on your

IAUHCar5

1     representation.

2               MR. KOBRE:  Thank you.

3               MR. JANEY:  Your Honor, to the extent that you'd like

4     to hear from the defense now so that certain aspects of it

5     won't be discussed in front of the jury --

6               THE COURT:  What's the problem here?

7               MR. JANEY:  There's a known defect in the search.

8               THE COURT:  Hand me the exhibits.

9               MR. KOBRE:  Yes, Judge.

10              MR. JANEY:  With your permission, your Honor, in the

11    3500 material for this particular witness, your Honor, the

12    government produced a report which on its face indicates that

13    there's a defect in this witness' ability to search the emails

14    that are in your hand.  And in the witness' meeting interview

15    with the government, he describes the defect in his search.

16    What's important in this case --

17              THE COURT:  Does that mean that these emails are

18    fraudulent, they're fake, they're not real, they were never

19    sent, or that not all of the emails were produced?  Or what

20    does that mean, defect?

21              MR. JANEY:  It means more along the lines of the

22    latter, your Honor.

23              THE COURT:  Fine.  That's not their problem because

24    they don't have to introduce every email in the whole world.

25    So the objection is overruled.

IAUHCar5                        Chaice – Cross

1            MR. KOBRE:  Thank you, Judge.

2            THE COURT:  Can we finish with Mr. Chaice.  How much

3    more do we have with Mr. Chaice?

4            MR. GOTTLIEB:  Not very long, your Honor.

5            THE COURT:  Then we'll have the redirect, of course.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IAUHCar5                          Chaice – Cross

1          (Jury present)

2               THE COURT:  Sir, you're still under oath.

3               MR. GOTTLIEB:  May I proceed, your Honor?

4               THE COURT:  Please continue, Mr. Gottlieb.

5               MR. GOTTLIEB:  Thank you.

6     BY MR. GOTTLIEB:

7     Q.  Mr. Chaice, there was testimony on direct examination

8     concerning Government Exhibit 925.  If we can get that on the

9     board.

10              This is already in evidence.  This is the revolving

11    loan agreement that you've testified about.  Would you agree

12    that there are a number of areas in which the issue of a

13    controlled account, a control agreement, are contained in the

14    agreement?

15    A.  I'm not sure if it's contained in one area or many, but I'm

16    sure either here or in the security agreement there's reference

17    to.

18    Q.  If we can then go to the provision that you were asked

19    questions about specifically 5.08 on direct examination.

20    A.  Yes.

21    Q.  All right.  Under Section 5.08 you were asked questions,

22    and if you look at the last paragraph there under use of

23    proceeds, it reads:  "The proceeds of each revolving loan shall

24    be transmitted by wire transfer from lender directly to the

25    account designated in the borrowing notice and if such account

IAUHCar5                        Chaice – Cross

1   is an account of borrower, such account shall be subject to a

2   control agreement."

3           Do you see that?

4   A.  I do.

5   Q.  Is it fair to say that as of the date when you executed

6   this agreement in December of 2016, there was no controlled

7   account yet set up, correct?

8   A.  That's correct.

9   Q.  In fact, Brigade was aware that there was no controlled

10  account yet set up, correct?

11  A.  Correct.

12          MR. GOTTLIEB:  If we can go to Defense Exhibit 27,

13  please.  This is for the Court and for counsel.

14  Q.  Do you have that there in front of you?

15  A.  Yes, I do now.

16  Q.  Looking at Defendant's Exhibit 27, that's an email from

17  Mr. Carton to a number of people, including you, correct?

18  A.  Correct.

19  Q.  And it's dated January 4, 2017, correct?

20  A.  Correct.

21  Q.  Do you recognize that email?

22  A.  I do.

23          THE COURT:  Yes or no?

24  A.  I do.

25  Q.  And is that an email --

1          THE COURT:  You can't testify about the contents of

2     the email, Mr. Gottlieb.  And if you're introducing it, it's

3     hearsay.

4     Q.  You've seen that email.  Without discussing what's on it,

5     you've seen it, correct?

6     A.  Yes.

7     Q.  You were aware that -- as of January of 2017, you

8     understood that Mr. Carton was giving Brigade permission to

9     deal directly with his banker to set up a controlled account,

10    correct?

11    A.  Yes, given that this was an account of the borrower, which

12    is Craig Carton's company, it had to --

13    Q.  So the answer is yes?

14    A.  Correct.

15    Q.  In fact, this controlled account wasn't set up until March

16    of 2017, correct?

17    A.  I don't know the date in which it was set up.

18    Q.  You understood that Mr. Carton was giving Brigade access to

19    his banker so that Brigade could facilitate the setting up of

20    this account, correct?

21    A.  I don't believe that's what was going on.  We were trying

22    to help him get the account set up.

23    Q.  Can you tell us what steps Brigade took to set up this

24    account after Mr. Carton is putting you in touch with his bank?

25    A.  I can.

IAUHCar5                        Chaice - Cross

1    Q.  What did you do?

2    A.  He was unable to -- at least he told us he was unable to

3    set up the account with his banker.  So after several

4    weeks/months, we went to our contacts at our banks to get the

5    account set up.

6    Q.  The account finally was set up in March of 2017, correct?

7    A.  Again, I don't remember the specific date.

8    Q.  Is it fair to say that there were millions of dollars that

9    Brigade paid out from that loan prior to the time the

10   controlled account was set up?

11   A.  Correct.

12         MR. GOTTLIEB:  Thank you.  I'm done with that.

13   Q.  You were asked on direct examination, there comes a time

14   that you learned that Meli has been arrested, correct?

15   A.  Correct.

16   Q.  And as a result of that, you wanted to check to make sure

17   that your investment was still safe, correct?

18   A.  Which investment are you referring to?

19   Q.  Well, the investment that you got involved in here, the

20   ticket selling business with Meli as a result of the deal that

21   Mr. Carton first brought to you, you wanted to make sure that

22   everything was OK, right?

23   A.  With respect to the Meli investment, at that point we were

24   pretty sure things were not OK.  He had just been arrested.

25   Q.  Well, so on direct examination, why did you insist on

IAUHCar5                          Chaice - Cross

1    speaking to Fred Mangione?

2    A.   Because that related to the other part of the investment.

3    Q.   And you knew that Meli in some way was involved in this

4    business venture, correct?

5    A.   Not with the Barclays aspect of the investment.

6    Q.   So you contact -- you insist on speaking to Fred Mangione,

7    correct?

8    A.   Correct.

9    Q.   And you wanted to speak directly to Fred Mangione of

10   Barclays, correct?

11   A.   I don't recall if we requested him specifically, but we

12   requested a senior executive, which turned out to be Fred

13   Mangione.

14   Q.   In fact, you specifically and the other people at Brigade

15   specifically wanted to call Mangione directly, correct?

16   A.   Correct.

17   Q.   And you did call Mangione directly, did you not?

18   A.   We did.

19   Q.   And Mr. Carton was also on that call, correct?

20   A.   He was.

21   Q.   And the call was for some 30 to 60 minutes, correct?

22   A.   That sounds about right.

23   Q.   And during that call, you spoke to Fred Mangione about the

24   Streisand and Metallica tickets, correct?

25   A.   Correct.

IAUHCar5                          Chaice - Cross

1    Q.  You also spoke to Fred Mangione about other opportunities

2    at Barclays that might be of interest to you, correct?

3    A.  We were confident, I believe, at the time that there would

4    be no other opportunities that would be of interest to us, but

5    we did want to speak with Fred Mangione about other

6    opportunities he was showing to Craig Carton to further bolster

7    our understanding of their relationship, yes.

8    Q.  You wanted, as a result of this call, to have confirmation

9    that Mr. Carton had this business relationship with Barclays,

10   correct?

11   A.  Reconfirmation, but, yes, that was part of our --

12   Q.  And it was confirmed, correct?

13   A.  Yes, it was.

14   Q.  And this conversation supported your view that Mr. Carton

15   had this business relationship with Barclays, correct?

16   A.  It did.

17   Q.  And after Mr. Meli's arrest, you didn't end your business

18   relationship with Mr. Carton, correct?

19   A.  We still had $2 million outstanding with Barclays, so it

20   was impossible to end it at that point.

21   Q.  So the answer is you didn't end the relationship, correct?

22   A.  No, we did not.

23   Q.  In fact, you then had a series of calls with Mr. Carton to

24   discuss continuing to be in business with him, isn't that

25   correct?

1    A.  We discussed the investments we had outstanding.

2    Q.  Well −−

3    A.  Not additional investments.

4    Q.  Mr. Chaice, do you recall having a personal meeting with

5    Mr. Carton where Mr. Carton produced and showed you the actual

6    Streisand tickets that he had purchased?

7    A.  That sounds familiar, yes.

8    Q.  In fact, Mr. Carton showed up at your offices and had a bag

9    with him filled with Barbra Streisand tickets that he had

10   purchased, correct?

11   A.  I believe so.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. GOTTLIEB:

2   Q.  And the number of tickets that you understood Mr. Carton

3   had purchased as a result of the monies Brigade had paid, it

4   was close to 4,000 tickets, wasn't it?

5   A.  Oh, I don't know how many tickets.

6   Q.  I'm sorry, I didn't mean to cut you off.  Approximately how

7   many tickets did you understand Mr. Carton had gone out to

8   purchase?

9           THE COURT:  If you had an understanding of how many

10  tickets he purchased.

11  A.  I don't know how many pickets he purchased.  We gave him a

12  million dollars to purchase Barbara Streisand tickets.

13          THE COURT:  OK, keep going, please.

14  Q.  As of right now, you're not out of money –– at a loss,

15  correct?

16          MR. QUIGLEY:  Objection.  Relevance.

17          THE COURT:  The objection is sustained.

18          MR. GOTTLIEB:  Your Honor, may I have one moment,

19  please?

20          THE COURT:  Yes.

21          MR. GOTTLIEB:  Your Honor, thank you, I have no

22  further questions.

23          THE COURT:  Redirect.

24          MR. QUIGLEY:  Briefly, your Honor.

25

1    REDIRECT EXAMINATION

2    BY MR. QUIGLEY:

3    Q.  Good afternoon, Mr. Chaice.

4    A.  Good afternoon.

5    Q.  Mr. Chaice, on cross-examination Mr. Gottlieb asked you a

6    couple of questions about who controlled the timing of these

7    investments, right?  Do you recall that?

8    A.  Yes.

9    Q.  So take a look at -- and this is in evidence -- can we

10   publish Government Exhibit 917, Mr. Cooney, and bring up the

11   e-mail at 3:09 a.m.

12          Mr. Chaice, if you could read the top line of that

13   e-mail from Mr. Carton.

14   A.  "We have plenty of choices for Monday, so let's discuss

15   because it's imperative that whichever direction we choose it

16   needs to be funded Monday."

17   Q.  So who was saying it needs to be funded Monday?

18   A.  Craig Carton.

19   Q.  And if you could pull up what is in evidence, Mr. Cooney,

20   as Government Exhibit 926 and go to the e-mail at 9:54 a.m.,

21   and highlight Mr. Carton's e-mail.

22          Do you see paragraph 1 where you're discussing

23   Metallica North American Tour investment?

24   A.  Yes.

25   Q.  Who is this e-mail from?

1    A.  This is from Craig Carton to me.

2    Q.  What does Mr. Carton say in the second sentence of

3    paragraph one.

4    A.  "The remaining $900K ($1 million minus the $100,000

5    deposit) that we are switching from Grande to Metallica is due

6    ASAP but certainly before end of calendar year."

7    Q.  What did you understand ASAP to mean?

8    A.  As soon as possible.

9             MR. GOTTLIEB:  Objection.

10            THE COURT:  Ground?

11            MR. GOTTLIEB:  This wasn't raised certainly on cross,

12   and it's a rehash of what we heard on direct.

13            THE COURT:  The objection is overruled.

14   Q.  Can we publish one more for the witness, the Judge and the

15   lawyers only, Government Exhibit 903.

16            Do you recognize this e-mail, Mr. Chaice?

17   A.  I do.

18   Q.  What is it?

19   A.  This is an e-mail from Craig Carton to me and others at

20   Brigade.

21            MR. QUIGLEY:  The government offers Government Exhibit

22   903.

23            MR. GOTTLIEB:   May I have one moment, please?

24            THE COURT:  Yes.

25            MR. GOTTLIEB:  No objection, your Honor.

1          THE COURT:  Admitted.

2          (Government Exhibit 903 received in evidence)

3    Q.  What is the date on this e-mail?

4    A.  This is Wednesday, December 7, 2016.

5    Q.  Who is this e-mail from?

6    A.  From Craig Carton to me and others at Brigade.

7    Q.  And can you read the paragraph beginning "I am concerned"?

8    A.  "I am concerned though about the sudden pause over the

9    Advance agreement and more concerned about the reality of

10   funding deposits on Thursday as discussed."

11   Q.  Can you read the paragraph below that also.

12   A.  "Please forgive my bluntness, but I need to know so that I

13   can plan accordingly.  Is there any wavering or doubt at all

14   about directly funding the deposits on Thursday as discussed in

15   your office once we have every event agreement in our

16   possession?"

17   Q.  You were asked some questions about a transaction

18   between -- involving Advance Entertainment, DTI and CVC

19   Capital.  Do you recall that?

20   A.  Yes.

21   Q.  Do you recall whether Advance Entertainment actually merged

22   into DTI?

23   A.  That's not my ultimate understanding of what transpired.

24   Q.  What's your you ultimate understanding?

25   A.  That Joe Meli, who was the head of Advance Entertainment,

1    had joined DTI.

2    Q.  So there was no merger between Advance Entertainment and

3    DTI?

4    A.  Other than his joining DTI, correct.

5    Q.  You were asked some questions towards the end of your cross

6    about this controlled account.

7    A.  Yes.

8    Q.  Who was supposed to set up that controlled account in the

9    first instance?

10   A.  Ticket Jones, Craig Carton.

11   Q.  And when did it eventually get set up?

12   A.  Several months after we closed the deal.

13   Q.  And so if you could just put up, Mr. Cooney, Government

14   Exhibit 2301 -- sorry -- the demonstrative, 2301 at page 3.

15               So did any of this money, any of this $4.6 million,

16   go into that controlled account?

17   A.  No.

18   Q.  Did the lack of a controlled account mean Mr. Carton could

19   do whatever he wanted with the money?

20               MR. GOTTLIEB:  Objection, your Honor.

21               THE COURT:  The objection is overruled.

22   Q.  Did the lack of a controlled account mean Mr. Carton could

23   do whatever he wanted with your money?

24   A.  Certainly not.

25   Q.  And what did you understand him to be doing with this

1   money?

2   A.  It had been wired to either Advance Entertainment or

3   Barclays to buy tickets.

4   Q.  Is that the only reason it was wired?

5           MR. GOTTLIEB:  Objection, your Honor.

6           THE COURT:  Overruled.

7   A.  Yes, that was the reason it was wired.

8   Q.  Was it important to Brigade that that's what it be used

9   for?

10  A.  It was critical.

11  Q.  Under the way this deal was set up -- by the way, did Joe

12  Meli ever send you any money, Mr. Chaice?

13  A.  No, he did not.

14  Q.  Did you ever have any text messages or e-mails with him

15  about repaying debts?

16  A.  No.

17  Q.  And, by the way, looking at this agreement, looking at this

18  demonstrative here, how much did Brigade invest?

19  A.  $4.6 million.

20  Q.  And Mr. Gottlieb asked you, he said you continued your

21  business relationship with Mr. Carton after February 2017.  Do

22  you recall that?

23  A.  He did.

24  Q.  And why were you continuing to stay in contact with

25  Mr. Carton after February 2017?

A.  We were trying to recover as much of the loan proceeds as

we could primarily through the Barclays events that had yet

transpired.

Q.  Did you make anymore investments after December 22, 2016?

A.  We did not.

Q.  Based on the representations that Mr. Carton made to you

and your understanding of this transaction, was a dime of the

$4.6 million you invested supposed to go into Mr. Carton's

pocket?

A.  No.

          MR. QUIGLEY:  I have no further questions, your Honor.

          THE COURT:  Anything else?

          MR. GOTTLIEB:  Very brief, your Honor.  Thank you.

RECROSS EXAMINATION

BY MR. GOTTLIEB:

Q.  Mr. Chaice, after the signing of the agreement in December,

do you know how many tickets Mr. Carton actually purchased with

the monies from Brigade?

A.  No.

Q.  Do you know that -- during this entire period of time, is

it fair to say Mr. Carton was willing and was transparent with

you with regard to his relationship with Barclays?

          MR. QUIGLEY:  Objection.

          THE COURT:  The objection is overruled.

          Do you think he was transparent with you?

1         THE WITNESS:  I have reason to believe that perhaps he

2    was not, given that I'm sitting here right now.

3    Q.  Did you ever call Barclays at any point to check to see

4    whether or not Mr. Carton in fact had been purchasing tickets?

5    Did you ever place a call to them to check?

6    A.  We had sent the money --

7    Q.  Yes or no.

8         THE COURT:  Yes or no question.  Did you ever place

9    that call -- such a call?

10        THE WITNESS:  To whom?

11   Q.  To Barclays.

12        THE COURT:  To Barclays.

13   A.  To confirm they received our money?

14   Q.  That Mr. Carton was purchasing tickets during this relevant

15   period of time.  Did you ever call anybody at Barclays?

16   A.  We discussed the information with Fred Mangione?

17   Q.  When?  Craig Mangione or Fred Mangione?

18   A.  Fred Mangione.

19   Q.  When?  When did you discuss it?

20   A.  We discussed that earlier, you and I.

21   Q.  But before Meli is arrested, at any time before that --

22   A.  No.

23   Q.  -- did you ever call Barclays?

24   A.  No, we did not.

25   Q.  Thank you.

1              MR. QUIGLEY:  One brief question, your Honor.

2    REDIRECT EXAMINATION

3    BY MR. QUIGLEY:

4    Q.  You were asked just now some questions about whether you

5    ever called Barclays.  Do you recall that?

6    A.  Yes.

7    Q.  Did you have any reason to believe that the $2 million you

8    had sent on December 19, 2016 was anywhere other than Barclays?

9    A.  We had sent it to directly to Barclays, so we had no reason

10   to believe it was not there.

11             MR. QUIGLEY:  No further questions.

12             THE COURT:  OK.  Thank you, sir.  It's been a pleasure

13   knowing you.  You may leave.

14             (Witness excused)

15             THE COURT:  Call your next witness.

16             MR. KOBRE:  The government calls Victor Pereira.  Mr.

17   Pereira.

18    VICTOR PEREIRA,

19        called as a witness by the government,

20        having been duly sworn, testified as follows:

21   DIRECT EXAMINATION

22   BY MR. KOBRE:

23   Q.  Mr. Pereira, where do you work?

24   A.  I work at the Brooklyn Nets.

25   Q.  Is that also referred to by some other name?

IAU7CAR6                        Pereira - Direct

1    A.   Yes.

2    Q.   What are some of those?

3    A.   Brooklyn Sports and Entertainment, BSE Global.

4    Q.   Is that a company that's related at all to the Barclays

5    Center in Brooklyn?

6    A.   Yes.

7    Q.   How?

8    A.   For me working with the Brooklyn Nets, it's where the

9    Brooklyn Nets team play and also where we hold concerts,

10   events.

11   Q.   What is your position with Brooklyn?

12   A.   Senior director of IT.

13   Q.   And how long have you been working there for?

14   A.   Ten years.

15   Q.   Can you tell us a little bit about your educational

16   background.

17   A.   I graduated from the Chubb Institute in 1998 with a diploma

18   in technical support.

19   Q.   And what are some of your duties and responsibilities as

20   the senior director of information technology with Brooklyn?

21   A.   I oversee the infrastructure environment for the business

22   with regards to servers, storage, networking equipment and

23   endpoints for the user such as desktops and laptops and also

24   printing devices.

25   Q.   What about the e-mail systems at Brooklyn?

IAU7CAR6                          Pereira - Direct

1   A.   The e-mail systems we have hosted with our e-mail provider

2   Intermedia that is a cloud based provider.

3   Q.   But do you all have responsibilities with respect to

4   whatever e-mail interface there is at Brooklyn?

5   A.   Yes.

6   Q.   Are employees at Brooklyn generally provided with e-mail

7   addresses in connection with their work there?

8   A.   Yes.

9   Q.   And are you familiar with the term e-mail box or e-mail

10  account?

11  A.   Yes, I am.

12  Q.   What is that?

13  A.   E-mail boxes are mailboxes that allow the user to send

14  e-mail, compose an e-mail, receive an e-mail, also manage their

15  calendar, their contacts.

16  Q.   And what kind of items are generally stored in a user's

17  mailbox?

18  A.   E-mails that they would receive, sent items, deleted items,

19  drafts, calendars, contacts.

20  Q.   At Brooklyn, as a general matter, how many mailboxes does

21  each employee have?

22  A.   One.

23  Q.   And are the mailboxes for the different employees kept

24  separate from each other?

25  A.   Yes, they are.

IAU7CAR6                          Pereira - Direct

1   Q.  Does Brooklyn retain the e-mails that are sent or received

2   in a user's mailbox?

3   A.  Yes.

4   Q.  Now, first for active employees at Brooklyn, where are

5   those e-mails retained or stored?

6   A.  There are two locations.  One will be on the Intermedia

7   e-mail servers, and the other location would be located on the

8   Microsoft application on the local computer.

9   Q.  So let me just ask you about each of those.  With respect

10  to the local computer, what do you mean by the local commuter?

11  A.  The local computer, there is an application called

12  Microsoft Outlook where they will have a copy of their e-mail

13  living on their computer hard drive.

14  Q.  And is that located at Brooklyn's office facilities

15  wherever the user is?

16  A.  Yes.

17  Q.  You also mentioned Intermedia.  What is Intermedia?

18  A.  Intermedia, they are our e-mail cloud provider; they host

19  the servers for us instead of hosting the managing servers

20  in-house ourselves.

21  Q.  And for active employees who are still employed at

22  Brooklyn, the e-mails are retained in both of those locations?

23  A.  Yes.

24  Q.  And for how long are the e-mails retained for active users?

25  A.  Indefinitely.

1    Q.  Does Brooklyn have a policy with respect to retention of

2    e-mails for employees who have left the employ of Brooklyn?

3    A.  Yes.

4    Q.  And what is that policy?

5    A.  When an employee leaves the company, we keep the e-mail on

6    the backup for one year.

7    Q.  Which e-mails do you keep on backup for one year?

8    A.  For the user, the person who left the company.

9    Q.  All the e-mails in their e-mail box?

10   A.  Yeah, all items.  So a mailbox would contain all items, as

11   I mentioned before, from an inbox, sent and received, contacts,

12   calendar.

13   Q.  OK.  And just briefly if you can describe the process for

14   when somebody leaves Brooklyn, making sure that their mailbox

15   is stored or backed up.

16   A.  So, the IT department such as myself, a member of the IT

17   department, I will log into the website of Intermedia with my

18   user name and password.  On the top right-hand side I will type

19   in the users name, and once it populates the user's name, I

20   will select "add mailbox" and then I will choose the option to

21   back up, and then the backup will begin to download on

22   Intermedia's servers and keep a PST file on their system.

23   Q.  You mentioned the PST file, so please explain what that is.

24   A.  PST stands for personal storage table.  It's a file that

25   contains all the e-mail box items for that mailbox.

1    Q.  Just coming back into the process of backing up an

2    employee's mailbox.  As the senior director of information

3    technology at Brooklyn, do you have access to those whenever

4    you want?

5    A.  Yes, I do.

6    Q.  Mr. Pereira, if you can take a look at what is in front of

7    you in a stack that's clipped together, it's marked with the

8    following exhibit numbers, and I will just read them slowly so

9    you can page through them.  2102 through 2107.

10   A.  OK.

11   Q.  2109?

12   A.  OK.

13   Q.  2111?

14   A.  Yes.

15   Q.  2114 through 2117.

16   A.  Yes.

17   Q.  2119 through 2123.

18   A.  Yes.

19   Q.  2125 through 2129.

20   A.  OK.

21   Q.  2131 through 2134.

22   A.  OK.

23   Q.  And just the last set here, 2142 through 2146.

24   A.  OK.

25   Q.  Generally what are those documents?

1    A.  These are e-mails.

2    Q.  And are they e-mails that were stored on mailboxes that

3    were at Brooklyn?

4    A.  Yes.

5    Q.  And are the e-mails that were sent to or from various

6    employees at Brooklyn?

7    A.  Yes.

8    Q.  Before coming to court today, did you have an opportunity

9    to verify whether these are in fact accurate copies of e-mails

10   that were kept in mailboxes that are at Brooklyn?

11   A.  Yes, I did.

12          MR. KOBRE:  The government offers, your Honor, those

13   exhibits.  And I can read them all again.

14          THE COURT:  I don't think you need to.

15          MR. KOBRE:  Thank you, your Honor.

16          MR. JANEY:  Objection, your Honor.  Relevance and

17   foundation.

18          THE COURT:  You're free to voir dire.  They're

19   certainly relevant.

20   VOIR DIRE EXAMINATION

21   BY MR. JANEY:

22   Q.  Mr. Pereira, good afternoon.  If I mispronounce your name,

23   please correct me.  I apologize in advance.  Did you accumulate

24   these e-mails?

25   A.  These right here?

```
 1    Q.  Yes.
 2    A.  I was provided with them, and I searched them against our
 3    system.
 4    Q.  And how did you search them against your system?
 5    A.  Using the PST file that we have from our research that I
 6    had gotten over a year ago.
 7    Q.  Did there come a point in time in approximately July of
 8    2017 when you contacted Intermediary for the purposes of e-mail
 9    searches?
10    A.  Yes.
11              MR. KOBRE:  Objection, your Honor.  It's beyond the
12    scope of these exhibits, your Honor.
13              MR. JANEY:  Your Honor, I'm trying to understand the
14    nature of the search and the integrity --
15              THE COURT:  Well, the integrity of the search -- the
16    nature of the search is relevant.  The integrity of the search
17    you're entitled to, but ask a few more questions.
18              MR. JANEY:  Thank you, your Honor.
19    Q.  Did there come a time when you were informed by
20    Intermediary that there was a problem with the archiving -- the
21    replication of archived e-mails of some of the --
22              THE COURT:  When is the hearsay objection going to
23    come?  All right?
24              MR. KOBRE:  Objection.
25              THE COURT:  The objection.  Hearsay.  You can't ask a
```

1    question like that.  All right?  It's hearsay, and it's

2    inadmissible.

3              MR. JANEY:  I understand.

4              THE COURT:  So let's move on.

5    Q.  Is Fred Mangione one of the employees for which you

6    performed the e-mail search?

7    A.  Yes.

8    Q.  Please explain the process for pulling e-mails related to

9    Mr. Mangione.

10             MR. KOBRE:  Objection, your Honor.  For which

11   exhibits?

12             MR. JANEY:  I'm looking at 2103 as an example.

13             THE COURT:  So how did you end up pulling that one?

14             THE WITNESS:  I downloaded -- as I mentioned before,

15   so I would log into Intermedia's website, and at the time a

16   year ago, this was in June of 2017 when I downloaded Fred

17   Mangione's mailbox from Intermedia, I downloaded that PST file

18   and loaded it onto my computer.  I had a copy of his mailbox,

19   used Microsoft Outlook application, and through the e-mails

20   that we would have in the mailbox I would do a search, do an

21   advanced search through Microsoft Outlook that allows you to

22   enter the to, the subject, and the body of the text of the

23   e-mail.

24   Q.  This Exhibit 2103 is dated October 18, 2016, correct?

25   A.  Can you repeat that again.

1   Q.  This e-mail is dated October 18, 2016, correct?

2   A.  That's correct.

3   Q.  For the e-mails that you searched in connection with

4   Mr. Mangione for the year 2016, did you have any difficulty

5   pulling these e-mails for that year?

6   A.  Did I have any difficulties?  No.

7   Q.  Were there any -- were there any difficulties replicating

8   Mr. Mangione's e-mails for the year 2016 in any instance?

9   A.  That I don't know.

10  Q.  Does Intermediary report to you?

11           MR. KOBRE:  Objection.

12           THE COURT:  The objection is sustained.

13           Can you bring the voir dire to a close, please?

14           MR. JANEY:  Yes.  Thank you, your Honor.  Thank you.

15           THE COURT:  They're admitted.

16           MR. KOBRE:  Thank you, Judge.

17           (Government Exhibits 2102 through 2107 received in

18  evidence)

19           (Government Exhibits 2109 and 2111 received in

20  evidence)

21           (Government Exhibits 2114 through 2117 received in

22  evidence)

23           (Government Exhibits 2119 through 2123 received in

24  evidence)

25           (Government Exhibits 2125 through 2134 received in

IAU7CAR6                          Pereira - Direct

1    evidence)

2              (Government Exhibits 2142 through 2146 received in

3    evidence)

4    DIRECT EXAMINATION

5    BY MR. KOBRE:

6    Q.  Now, at some point were you asked to conduct certain

7    searches of e-mail accounts of Brooklyn employees in connection

8    with this investigation?

9    A.  Yes.

10   Q.  And did you ultimately conduct several such searches?

11   A.  Yes.

12   Q.  About when were you first asked to conduct a search in

13   connection with this investigation?

14   A.  The first search was June of 2017.

15   Q.  And were you asked at that point to search a particular

16   mailbox of a particular employee or former employee of

17   Brooklyn?

18   A.  Yes, I was.

19   Q.  And what mailbox were you asked to search?

20   A.  The mailbox of Fred Mangione.

21   Q.  Now, who is Fred Mangione?

22   A.  At the time he was chief of staff.

23   Q.  Now, in June of 2017, when you were asked to conduct this

24   search, was Mr. Mangione still employed with Brooklyn?

25   A.  No, he was not.

1    Q.  When did Mr. Mangione leave the employ of Brooklyn?

2    A.  April 2017.

3    Q.  So about two or three months before you were asked to

4    conduct the search?

5    A.  That's right.

6    Q.  And at the time Mr. Mangione -- just rewinding.  At the

7    time that Mr. Mangione left the employ of Brooklyn, were any

8    steps taken to preserve his mailbox?

9    A.  Yes.

10   Q.  What were those?

11   A.  The same steps I mentioned before, log into Intermedia's

12   website using my credentials to sign in, searching for the

13   mailbox such as typing in Fred Mangione.  As soon as the name

14   would populate, I'd click on Fred Mangione's account it would

15   give me account settings, and choosing backup option.

16   Q.  And who actually did that backup at the time that

17   Mr. Mangione left?

18   A.  I did.

19   Q.  And when you were asked to conduct your search in June of

20   2017, was Mr. Mangione's mailbox still archived or backed up at

21   Intermedia?

22   A.  Yes.

23   Q.  And when you were asked to conduct the search, what did you

24   do?

25   A.  I downloaded the mailbox, the PST file, and I opened up

IAU7CAR6                         Pereira - Direct

1   Microsoft Outlook, opened up the file with Microsoft Outlook,

2   and performed the search within Microsoft Outlook.

3   Q.  And were you given certain parameters for those searches

4   that you performed?

5   A.  Yes.

6   Q.  If we can just publish for the Court and for counsel

7   Government Exhibit 2302 and 2303 and 2304.

8           Do you recognize those?

9   A.  Yes, I do.

10  Q.  What are they?

11  A.  These are the search criteria that I performed against the

12  mailbox for Fred Mangione.

13  Q.  Did you prepare these documents?

14  A.  These documents in front of me?

15  Q.  Yes.  Did you prepare those?  Did you make those?

16  A.  I did.

17  Q.  Did you make these documents?  Did you --

18  A.  The PST?

19  Q.  No, the documents on the screen in front of you.

20          THE COURT:  No, no, you can't both talk at the same

21  time.  So, let him finish before you say anything.

22          THE WITNESS:  Got it.

23  Q.  I'm sorry, Mr. Pereira.  The documents that are on the

24  screen, did you create those?

25  A.  I did not.

IAU7CAR6                          Pereira - Direct

1    Q.  Were you shown those at some point in a meeting with the

2    government?

3    A.  Yes.

4    Q.  And do those documents accurately reflect various

5    parameters you were given to perform the searches on various

6    mailboxes of a Brooklyn employee Fred Mangione?

7    A.  Yes.

8              MR. KOBRE:  Your Honor, the government offers 2302,

9    2303 and 2304 simply as aids to the jury.

10             MR. JANEY:  Objection, your Honor.

11             THE COURT:  The objection is sustained.  There is no

12   need to have them in evidence.  Move on.

13             MR. KOBRE:  Can we --

14             THE COURT:  Aids to what?  You want the e-mails in

15   evidence.  The e-mails are in evidence.  Move on.

16             MR. KOBRE:  Your Honor, we're simply asking them to

17   publish them as demonstratives under Rule 611.

18             THE COURT:  They're not.  They don't demonstrate

19   anything that's relevant to the case, so let's move on.

20   Q.  OK.  Mr. Pereira, can you tell us with respect to the first

21   search you were asked to perform what were the parameters of

22   that search?

23   A.  Mailbox of fmangione@brooklynse.com, with the date of

24   December 16, 2016, with the subject of follow-up.

25   Q.  OK.  And so it was the mailbox of Mangione.  And --

1          MR. JANEY:  Objection, your Honor.

2          THE COURT:  Overruled.

3          MR. JANEY:  I was objecting to the diagram continuing

4    on the screen.

5          THE COURT:  Well, it's only on my screen.  I don't

6    think it's on the jury's screen.  If it's on the jury's screen,

7    it's not in evidence.  Strike it.

8    Q.  And what were the two parameters you were asked to search

9    for within the Mangione mailbox?

10   A.  Date December 16, 2016, subject follow-up.

11   Q.  And who gave you those search parameters?

12   A.  The legal department.

13   Q.  And did you conduct that search?

14   A.  I did.

15   Q.  And if you can describe how you went about conducting that

16   search.

17   A.  I performed a search within Microsoft Outlook against the

18   mailbox of Fred Mangione.

19   Q.  And how did you enter the parameters or search the

20   parameters?

21   A.  The search feature within Microsoft Outlook, when you click

22   on advanced search, and you enter in the date of December 16,

23   2016, you can enter in the subject, the follow-up, and choose

24   to search against the mailbox all contents within that mailbox,

25   and click and find.

1  Q.  And with respect to that first search, were you searching

2  for an e-mail sent or received to a particular e-mail address?

3  A.  Yes.

4  Q.  What e-mail address?

5  A.  Labs123@aol.com.

6  Q.  So was that a third parameter?

7  A.  Yes.

8  Q.  And what was the result of your search for an e-mail in the

9  Mangione mailbox meeting those two parameters, meaning sent to

10 the labs123@aol.com on December 16, 2016 with the subject

11 follow-up?  What were the results?

12 A.  No results.

13 Q.  What does that mean, no results?

14 A.  No results found.

15 Q.  So were there any e-mails that you found in the Mangione

16 mailbox meeting those criteria?

17 A.  No.

18 Q.  If we can publish Government Exhibit 914, which is in

19 evidence, and if we can just enlarge first the top header of

20 the e-mail.

21      This is an e-mail from Craig Carton at labs123@aol.com

22 to several individuals at e-mail addresses ending

23 brigadecapital.com.  Do you see that?

24 A.  I do.

25 Q.  And what's the subject of Mr. Carton's e-mail to these

1  people at Brigade?

2  A.  FWD:  Follow-up.

3  Q.  Now, if we can just zoom out and enlarge the e-mail below

4  where it says "original message."

5        I just want to focus your attention on this e-mail.

6  Who does this e-mail purport to have been sent by?

7  A.  Fred Mangione, fmangione@brooklynse.com.

8  Q.  To what address?

9  A.  To labs123@aol.com.

10 Q.  And on what date?

11 A.  December 16, 2016.

12 Q.  What is the subject of this e-mail?

13 A.  Follow-up.

14 Q.  Does this e-mail meet the parameters that you searched for

15 when you searched the Mangione mailbox when you were asked to

16 conduct your first search?

17 A.  Yes.

18 Q.  And were you able to find e-mails in any e-mail meeting

19 these parameters?

20 A.  No.

21 Q.  Now, Mr. Pereira, were there other e-mails in the Mangione

22 mailbox that you searched that were sent on December 16, 2016?

23 A.  Yes.

24 Q.  About how many in total?

25 A.  230 items.

1   Q.  We can take this down.  You said 230 items.  Were those

2   items all e-mails?

3   A.  226 of those were sent e-mails.

4   Q.  And what were the other four items?

5   A.  The other four items were calendar acceptance or decline.

6   Q.  If you can take a look just for the witness and for counsel

7   at Government Exhibit 2137A through F.  And we can just scroll

8   through them, Mr. Pereira.  Do you recognize those?

9   A.  I do.

10  Q.  What are they?

11  A.  They are snapshots of the 230 items in Fred Mangione's sent

12  items for December 16, 2016.

13  Q.  What did you call them?  Snapshots?

14  A.  Snapshots.

15  Q.  Who took them?

16  A.  I did.

17  Q.  And why are there multiple -- there are six in total --

18  instead of just one?

19  A.  I couldn't fit 230 items on one screen, so I did snapshots

20  that will go from the oldest to the latest.  So one screen

21  shot, then I would scroll, I'd take the next screen shot and

22  scroll until I got to the latest one.

23  Q.  Do these screenshots truly and accurately reflect the

24  screens reflecting the e-mails that were in Mr. Mangione's

25  mailbox sent on December 16, 2016?

1    A.  Yes.

2            MR. KOBRE:  The government offers Government's

3    Exhibits 2137A through F.

4            MR. JANEY:  No objection.

5            THE COURT:  Admitted.

6            (Government Exhibits 2137A through F received in

7    evidence)

8    Q.  Now, if we can take a look, Mr. Pereira, at Government

9    Exhibit 2137F, and if you can just walk us through the columns

10   here so we see what we're looking at.

11   A.  First column is from the sender, in this case being Fred

12   Mangione.  The to column is who he is sending the e-mail to.

13   The subject is the subject of the e-mail.  The next column

14   shows column received, showing when the message was sent.  The

15   next column size is the size of the e-mail.  And categories,

16   this allows the user to choose their own personal category for

17   that particular e-mail.

18   Q.  Now let me just ask you, since you told us these are all

19   sent e-mails, e-mails that were sent on December 16, 2016, why,

20   if you can explain, does the column which is above the dates

21   and times say received?

22   A.  When I performed the search against Fred Mangione's mailbox

23   for the sent items, once I received all the items within

24   Microsoft Outlook, I copied all 230 sent e-mails and I moved

25   them into another folder, a subfolder.  When you create a

1   subfolder within Outlook, it's going to inherit these

2   parameters that are set for that folder.

3   Q.  OK.  But in fact the e-mails reflected here are all sent

4   items from Mr. Mangione's mailbox?

5   A.  That's correct.

6   Q.  If we can just zoom out.

7         And are the e-mails ordered in any particular way in

8   these screen shots?

9   A.  By time.  So the top would be the latest to the oldest

10  e-mail.

11  Q.  And if we can focus in on the row that depicts the e-mail

12  that was sent at 4:30 p.m. and the row immediately above it.

13        From your review, Mr. Pereira, of the sent e-mails in

14  Mr. Mangione's mailbox from December 16, 2016, were any e-mails

15  sent by Mr. Mangione between 4:30 p.m. and 6:15 p.m. that day?

16  A.  No.

17  Q.  And if we could just keep that up on the side and put up

18  Government Exhibit 914.  If we can just enlarge the header in

19  Government Exhibit 914.

20        Mr. Pereira, when does the e-mail depicted at

21  Government Exhibit 914, the forwarded e-mail that we're looking

22  at here, purport to have been sent?  At what date and time?

23  A.  Date, December 16, 2016, at 4:50 p.m.

24  Q.  If we can just zoom out now and just focus in on Government

25  Exhibit 914 for a moment.  Mr. Pereira, were you also asked to

1  review the signature box of the e-mail, the forwarded e-mail in

2  Government Exhibit 914, and compare it to other e-mails that

3  were in Mr. Mangione's mailbox that had been sent on December

4  16, 2016?

5  A.  Yes.

6  Q.  And did you find any differences between this signature

7  block, the one in Government Exhibit 914, and all of the other

8  sent e-mails in Mr. Mangione's e-mail box from that day?

9  A.  Yes, I did, there is a difference.

10  Q.  And can you tell us what those are.

11  A.  We focused on title, chief of staff, the middle word "of".

12  In all the 226 sent e-mails the word "of" has a capital O.

13  This one was a lower case.

14  Q.  Any other difference?

15  A.  There is a hard space between the phone and mobile, like a

16  gap.

17  Q.  What is a hard space?

18  A.  A hard space is like a white space between, like you just

19  had an extra space there in the middle.

20  Q.  And those differences are in all of the other e-mails that

21  were sent to Mr. Mangione's sent mail box on that date?

22  A.  That's right.

23  Q.  I'm sorry.  Those are not -- those were not -- the e-mails

24  that -- the other sent mails, did they have a lower case O or

25  an upper case O?

1  A.  The 226 e-mails have an upper case O and a hard space.

2  Q.  Thank you.

3           And if we can leave that up, put that on the side, and

4  go to Government Exhibit 2111, which is in evidence.  And if we

5  can just enlarge the signature block.

6           Well, before we enlarge it, Mr. Pereira, do you see

7  that in Government Exhibit 2111, it's an e-mail from

8  Mr. Mangione on December 16, the same day here at 1:37 p.m.?

9  A.  Yes.

10  Q.  And if we can just enlarge both signature blocks.

11           So, the one on the right is one of the other 226 sent

12  e-mails on that date?

13  A.  Yes.

14  Q.  And the one on the right, 2111, does it have a capital O in

15  the chief of staff?

16  A.  Yes, it does.

17  Q.  And does it have a hard space between the phone number and

18  the mobile number?

19  A.  Yes, it does.

20  Q.  OK.  We can take that down.

21           Now, Mr. Pereira, were you also asked to conduct some

22  additional searches on the Mangione mailbox?

23  A.  Yes.

24  Q.  And how many other searches were you asked to conduct?

25  A.  Two additional searches.

1    Q.  OK.  If you could just describe what those were.

2    A.  So, the search for Fred Mangione's mailbox with the date

3    range of January 1, 2016 to present date, with e-mails received

4    from and sent to the following e-mail addresses,

5    labs123@aol.com, and the second one craig@cureitramb.com.

6    Q.  And were you also asked -- that was a second search that

7    you were asked to perform?

8    A.  Yes, that was a second search.

9    Q.  And was there a third one?

10   A.  There was.

11   Q.  What was that?

12   A.  The third search against Fred Mangione's mailbox was for

13   all e-mail items with a date range of December 15, 2016.

14   through December 16, 2016.

15          THE COURT:  So, the 15th to the 16th of December,

16   2016, those two days?

17          THE WITNESS:  Yes.

18   Q.  Who gave you the search criteria or parameters to conduct

19   those other searches?

20   A.  My legal department.

21   Q.  And did you obtain results for each of those other

22   searches?

23   A.  Yes, I did.

24   Q.  What form did the results come in?

25   A.  The items that were found, they are all in the PST file.

1    Q.  Now if you can take a look at Government Exhibit 2109,

2    which is in evidence.  Mr. Pereira, was this one of the e-mails

3    that you were able to verify was in fact in Fred Mangione's

4    mailbox?

5    A.  Yes.

6    Q.  And if we can just enlarge the header.

7              This is an e-mail that was sent by Fred Mangione to

8    Craig Carton.  And what date and time was it sent?

9    A.  Date December 15, 2016, time 10:51 a.m.

10   Q.  And what's the subject of this e-mail?

11   A.  Subject:  Follow-up.

12   Q.  In we can zoom back out, and if we can put up as well --

13   leave this up but also put up Government Exhibit 930, which is

14   in evidence.

15             Now, just focusing first for a moment on the header of

16   Government Exhibit 930.  Is this an e-mail from Mr. Carton to

17   several individuals with e-mail addresses ending Brigade

18   Capital?

19   A.  Yes.

20   Q.  .com?  And what's the subject of this e-mail?

21   A.  FWD:  Follow-up.

22   Q.  And if we can zoom out for a moment now.  Below that header

23   in Government Exhibit 930, is that a forwarded e-mail?

24   A.  Yes.

25   Q.  And what is the date and time of that forwarded e-mail?

1   A.  December 15, 2016.

2   Q.  At what time?

3   A.  10:50 a.m.

4   Q.  Now, if we can just zoom out for a moment.  Let's just

5   enlarge if we can the body of the e-mail from Craig down to

6   past shows.

7              THE COURT:  In 2109 or in 930?

8              MR. KOBRE:  In both of them.  Thank you, your Honor.

9   In both of them.

10  Q.  Now, Mr. Pereira, comparing the body of the e-mail -- the

11  e-mail in 2109 -- and the forwarded e-mail in 930, through this

12  portion of the e-mail from the word "Craig" down through the

13  final words in this excerpt there and more, are those two

14  portions of the e-mails identical?

15  A.  Yes, they are.

16             THE COURT:  Please don't ask leading questions.

17             MR. KOBRE:  Thank you, your Honor.

18  Q.  If we can just zoom out.

19             Focusing on Government Exhibit 930, are there lines in

20  there that do not appear in Government Exhibit 2109?

21  A.  Yes, there are.

22  Q.  Can you just tell us -- can you read them for us, please.

23  A.  The sentence that begins with "As I mentioned we have three

24  unannounced shows in 2017.  Metallica in May/June prior to

25  their stadium tour and two Barbara Streisand shows in April.

1    We can begin the 2017 partnership by allowing you to purchase

2    tickets as we discussed."

3    Q.  Do those two lines appear in 2109 in the same places where

4    they appear in 930?

5    A.  They do not.

6    Q.  If we can now zoom out of there, and if we can just enlarge

7    the line both in 2109 and in 930 beginning "We would look for

8    ..."

9         Mr. Pereira, the words "good faith" appear in

10   Government Exhibit 2109.  Do they appear anywhere in 930?

11   A.  They do not.

12   Q.  Mr. Pereira, in 2109, the date by which the deposit --

13   right after the words "deposit by" it says December 20.  What

14   is the date that's reflected after the words "deposit by in

15   December" in Government Exhibit 930?

16   A.  19th.

17   Q.  If you can just enlarge the next line in Government Exhibit

18   930, "I will send a term sheet should you wish to invest in

19   these shows."

20        Mr. Pereira, does that line appear anywhere in

21   Government Exhibit 2109?

22   A.  It does not.

23   Q.  Mr. Pereira, before coming to court here today, did you

24   have the opportunity to search the results of your search of

25   the Mangione mailbox and see if you could find the forwarded

1    e-mail that's here at Government Exhibit 930 below the words

2    "original message"?

3    A.  Yes.

4    Q.  And what were the results of your search for that e-mail,

5    the forwarded e-mail, Government Exhibit 930?

6    A.  That e-mail on Government Exhibit 930 was not found.

7    Q.  Were you able to find it?

8    A.  No.

9    Q.  Now, if we can just enlarge the header of the e-mail on

10   Government Exhibit 2109 and the forwarded e-mail on Government

11   Exhibit 930.

12         Mr. Pereira, the sent time of the Exhibit 2109 is

13   10:51 a.m., and in Exhibit 930 it's 10:50 a.m.  In your

14   personal experience have you observed whether different

15   computers sometimes have slightly different clock settings?

16   A.  Yes.

17   Q.  Go ahead, please.

18   A.  So Microsoft Outlook uses the local computer time, and it

19   could be off by milliseconds.

20   Q.  Thank you.  And, Mr. Pereira, were you able to find that

21   e-mail --

22         Just put up Government Exhibit 930.

23         Regardless of the time, did that e-mail exist at all

24   in the Mangione mailbox?

25   A.  No.

1    Q.  Now, if we can take a look at Government Exhibit 2128 which

2    is in evidence.  Do you recognize this?

3    A.  I do.

4    Q.  And was this one of the e-mails that you were able to find?

5    A.  Yes.

6    Q.  And just focusing for a moment on the top e-mail in

7    Government Exhibit 2128, this is an e-mail from Fred Mangione

8    to labs123@aol.com.  And what's the sent date and time of this

9    e-mail?

10   A.  February 15, 2017, 6:27 a.m.

11   Q.  And just to orient ourselves, how many lines does the body

12   of this e-mail have?

13   A.  Four lines.

14   Q.  Now, are there --

15            If we can zoom out, and if we can just enlarge now the

16   second e-mail in this chain.

17            When was this e-mail that is enlarged here, when was

18   that sent?

19   A.  February 15, 2017 at 3:36 a.m.

20   Q.  And who was is sent by?

21   A.  Labs123@aol.com.

22   Q.  And now if we can put up Government Exhibit 931, and just

23   if we can first just enlarge the top e-mail.

24            Well, first, going to the top of Government Exhibit

25   931, this is an e-mail from Craig at labs123@aol.com to several

1    individuals at brigadecapital.com.  Do you see that?

2    A.  I do.

3    Q.  And when was this e-mail sent?

4    A.  February 15, 2017 at 7:12 a.m.

5    Q.  And zooming back out, does this e-mail, 931, contain a

6    forwarded e-mail exchange?

7    A.  Yes.

8    Q.  If we can just enlarge the first message of the forwarded

9    e-mail exchange, and if we can enlarge the first e-mail in the

10   e-mail exchange in 2128.  Thank you.

11           Is the body of these two e-mails identical?

12   A.  The four lines?

13   Q.  Correct.

14   A.  Yes.

15   Q.  Now if we can zoom out and now if we can just enlarge the

16   second e-mail in the e-mail chain, the one below it.

17           Mr. Pereira, can you read, please, beginning the body

18   of the e-mail in 2128 on the left, the one that you were able

19   to find from the words "and if".

20   A.  "And if there is anyway at all to have more than 150

21   tickets please do what you can.  TY."

22   Q.  Do those words appear at all in Government Exhibit 931?

23   A.  They do not.  The only thing that exists is the TY.

24   Q.  Mr. Pereira, before coming to court here today, did you

25   have an opportunity to search the Mangione mailbox for the

1    e-mail exchange that's in Government Exhibit 931, the forwarded

2    e-mail exchange?

3    A.   I did perform a search.

4    Q.   And what were the results of that search?

5    A.   No results found.

6    Q.   So you were not able to find that e-mail?

7    A.   That's correct.

8    Q.   Now, we can take that down.   Thank you.

9            You testified earlier about a company called

10   Intermedia.

11   A.   Yes.

12   Q.   Can you just remind us, what is Intermedia?

13   A.   They are a cloud-based e-mail provider that we use -- and

14   other clients.

15   Q.   And are you aware whether Intermedia also stores sent or

16   received e-mails from Brooklyn employees as the host of the

17   server?

18   A.   Yes.

19   Q.   And following your performing these searches that you

20   performed from the backup of Mr. Mangione's mailbox, did you

21   ask Intermedia to perform certain searches?

22   A.   I did.

23   Q.   And why did you do that?

24   A.   I came across an article from Microsoft that came out about

25   search results.   There were issues with Microsoft Outlook

1    application giving the full search results.  So, I brought that

2    over to the legal department, and I told the legal department

3    our next steps would be to have Intermedia do the search

4    against their servers.

5    Q.  And what is -- you said you learned that there was some

6    issue with searching on Outlook.  Is that what you said?

7    A.  Yes.

8    Q.  Was what you learned, was it specific to Outlook, or was it

9    a general problem searching e-mails?

10   A.  Specific to Microsoft Outlook.

11   Q.  And as far as you know, is Intermedia part of that Outlook

12   interface?

13   A.  No.

14   Q.  And so what searches did you ask Intermedia to perform?

15   A.  The same three searches that I performed that I mentioned

16   earlier against Fred Mangione's mailbox.

17   Q.  OK.  And if you could just remind us, what was the first

18   search parameters for the first search?

19   A.  The first search was for the date of December 16, 2016, an

20   e-mail to labs123@aol.com with the subject of follow-up.  That

21   was the first search.

22   Q.  And did Intermedia provide any responsive records in

23   response to your request for that search?

24   A.  They responded with no results found for that search.

25   Q.  And so just focusing for a moment on Government Exhibit

1    914.

2              If we can just pull that up and enlarge the forwarded

3    e-mail.

4              Did they provide you with this e-mail in response to

5    their search?

6    A.   They did not.

7    Q.   And with respect to -- you said you asked Intermedia also

8    to perform the other two searches that you had performed?

9    A.   Yes.

10   Q.   And can you just remind us what were those again?

11   A.   The second search against Fred Mangione's mailbox was for

12   the date range of January 1, 2016 to present date, with e-mails

13   received from and sent to the following e-mail addresses:

14   Labs123@aol.com, and the second one craig@cureitramb.com.

15   Q.   That was the second search.  And the third one if you can.

16   A.   The third search of Fred Mangione's mailbox was for all

17   items date range of December 15 through December 16 of 2016.

18   Q.   And you testified earlier --

19             If we can just put up Government Exhibit 930.

20             You testified earlier that in the original search that

21   you did of the backup, your backup of Mr. Mangione's mailbox,

22   you were not able to find this e-mail.  Did you search

23   Intermedia's -- well, let me step back for a moment.  Did

24   Intermedia provide you with search results for those two

25   searches?

1  A.  They did provide results.

2  Q.  And what did those consist of?

3  A.  Of PST file to download.  Once I downloaded it, I provided

4  it over to the legal department.

5  Q.  Did you also conduct a search within those Intermedia

6  results for this e-mail, the forwarded e-mail depicted here in

7  Government Exhibit 930 from Mr. Mangione's to labs123 on

8  December 15 at 10:50 a.m. with the subject follow-up?

9  A.  That's correct.

10 Q.  And were you able to find this e-mail in Intermedia's

11 production?

12 A.  This e-mail, no.

13 Q.  And putting up Government Exhibit 931, and if we can just

14 enlarge the middle e-mail there.

15         Did you search Intermedia's production to you in

16 response to your request for them to search for this e-mail

17 here?

18 A.  Yes.

19 Q.  And what were the results of that?

20 A.  No results found.

21 Q.  Were any of your search results different from what

22 Intermedia provided to you in response to your request?

23 A.  No.

24         THE COURT:  Are you almost done with your direct?

25         MR. KOBRE:  I am almost done.

1           THE COURT:  I have a conference call at 5:15, so let's

2      finish the direct, and we will break for the day.

3           MR. KOBRE:  Thank you, Judge.

4      Q.  Taking a look just for the witness and for counsel,

5      Government Exhibit 2113, and if you can just scroll through

6      that for the witness.

7           Do you recognize Government Exhibit 2113?

8      A.  I do.

9      Q.  And if we could just also put up Government Exhibit 2124.

10          What are those documents, without getting into

11     specifics?

12     A.  Wire transfers.

13     Q.  Are they records of various wire transfers?

14     A.  Yes.

15     Q.  And are these records kept at Brooklyn?

16     A.  Yes.

17     Q.  Where are they kept?

18          MR. JANEY:  Objection, your Honor.  This witness is

19     the head of IT.  There is no foundation for these banking

20     financial records from this witness.

21          MR. KOBRE:  Your Honor, I'm in the middle of laying a

22     foundation; I'll get to it.

23          THE COURT:  Keep going.

24     Q.  Are you familiar, sir -- where are the records kept?

25     A.  They are kept on our system.

1    Q.  And where on the system when you say on the system?

2    A.  Electronically on our file server and also in our file

3    storage.

4    Q.  And are you familiar with -- and in what department at

5    Brooklyn?

6    A.  In the finance department.

7    Q.  And are you familiar with the fact that the finance

8    department at Brooklyn keeps records --

9    A.  Yes.

10   Q.  -- relating to wire transfers?

11   A.  Yes.

12   Q.  And is that part of Brooklyn's regular business practices

13   to keep wire transfer records?

14   A.  Yes, it is.

15   Q.  And did you check to see whether these exhibits, 2113 and

16   2124, are in fact accurate depictions of wire records that are

17   kept in the finance department at Brooklyn?

18   A.  Yes.

19   Q.  And were the wire records -- are wire records that are made

20   at Brooklyn by people in the finance department in connection

21   with their duties in the finance department at Brooklyn?

22   A.  Yes.

23   Q.  And are they made at or about the time the wire transfers

24   are occurring or the other communications about them are

25   happening?

IAU7CAR6                         Pereira – Direct

1    A.  Yes.

2              MR. KOBRE:  Your Honor, the government offers

3    Government Exhibit 2113 and 2124 as business records.

4              MR. JANEY:  Objection, your Honor.  Particularly with

5    respect to Exhibit 2124, this handwriting that's on this

6    document, how can it be provided that this is kept in the

7    normal course?

8              THE COURT:  Do you have a redacted copy with no

9    handwriting?

10             MR. KOBRE:  We can redact it, your Honor.

11             THE COURT:  You need to.

12             MR. KOBRE:  OK.  With that we offer Government Exhibit

13   2113 and 2124.  We will redact it.

14             THE COURT:  Thank you.  Admitted.

15             (Government Exhibits 2113 and 2124 received in

16   evidence)

17             (Continued on next page)

18

19

20

21

22

23

24

25

1          MR. KOBRE:  Just one moment, your Honor, if I may.

2          (Counsel confer)

3          MR. KOBRE:  No further questions, your Honor.

4          THE COURT:  OK.  Let's quit for the day.  We will

5     begin tomorrow at 9:30, or as soon thereafter as you are all

6     assembled.  Have a safe trip home.  Don't discuss the case.

7     Keep an open mind.

8          I do have to caution you about one thing.  There is

9     some press interest in this case.  I told you all that

10    yesterday.  So don't go looking for anything about Mr. Carton

11    on the Internet, but if you should see anything in a newspaper,

12    hear anything on the radio -- I can't remember if any of you

13    folks are FAN listeners on a regular basis or sports radio

14    listeners, ESPN listeners, or whatever -- but turn it off, turn

15    away, turn the page.  Ignore anything that you might come into

16    contact with about Mr. Carton or this case.  And should you

17    come across something, in addition to ignoring it and turning

18    away from it, let Mr. O'Neill know what you encountered.

19         All right.  I will see you in the morning.

20         (Jury excused)

21         (Continued on next page)

22

23

24

25

IAUHCar7

```
1              (Jury not present)
2              THE COURT:  See you in the morning, sir.  Sorry we
3      couldn't get you done today.
4              OK.  I have five minutes to get on a conference call.
5              MR. QUIGLEY:  All right, your Honor.
6              THE COURT:  Tomorrow you want to do what?
7              MR. GOTTLIEB:  You had said at the end of the day I
8      could put something on the record with regard to an objection,
9      but I can do it --
10             THE COURT:  Put it on the record.  We're here.  Put it
11     on the record.
12             MR. GOTTLIEB:  Your Honor, just very briefly, thank
13     you.  The objection that was sustained goes to the introduction
14     of evidence that go to state of mind.  What would normally be
15     hearsay from the emails, we seek and we sought to introduce to
16     show the state of mind of the actors.
17             THE COURT:  The problem with that is you can't get
18     around the hearsay rule by saying it's state of mind.  If you
19     want hearsay information, which is to say, your client's
20     out-of-court statements, to be introduced for his state of
21     mind, I'm afraid he's going to have to get on the stand.
22             MR. GOTTLIEB:  But the line of questioning wasn't with
23     regard to what Mr. Carton said.
24             THE COURT:  I don't know.
25             MR. GOTTLIEB:  It was what the witness had heard from
```

IAUHCar7

1    somebody else as part of the due diligence, which we would say

2    goes to the issue as to whether or not statements or issues

3    were material.

4         THE COURT:  No, no, that doesn't have anything to do

5    with Mr. Carton's state of mind.  It has nothing to do --

6    whether I said something to you or didn't has nothing to do

7    with Mr. Carton's state of mind.  Nothing.

8         MR. GOTTLIEB:  Feel better.

9         (Adjourned to October 31, 2018, 9:30 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          INDEX OF EXAMINATION

 2   Examination  of:                              Page

 3    CHRIS CHAICE

 4   Direct By Mr. Quigley  . . . . . . . . . . . .44

 5   Cross By Mr. Gottlieb  . . . . . . . . . . . 126

 6   Redirect By Mr. Quigley  . . . . . . . . . . 182

 7   Recross By Mr. Gottlieb  . . . . . . . . . . 187

 8   Redirect By Mr. Quigley  . . . . . . . . . . 189

 9    VICTOR PEREIRA

10   Direct By Mr. Kobre  . . . . . . . . . . . . 189

11                          GOVERNMENT EXHIBITS

12   Exhibit No.                               Received

13    712   . . . . . . . . . . . . . . . . . . . .47

14    925   . . . . . . . . . . . . . . . . . . . .56

15    935   . . . . . . . . . . . . . . . . . . . .58

16    933   . . . . . . . . . . . . . . . . . . . .59

17    907   . . . . . . . . . . . . . . . . . . . .68

18    902   . . . . . . . . . . . . . . . . . . . .71

19    2301, page 1,  . . . . . . . . . . . . . . .74

20    908   . . . . . . . . . . . . . . . . . . . .76

21    910   . . . . . . . . . . . . . . . . . . . .77

22    912   . . . . . . . . . . . . . . . . . . . .78

23    913   . . . . . . . . . . . . . . . . . . . .80

24    916   . . . . . . . . . . . . . . . . . . . .82

25    930   . . . . . . . . . . . . . . . . . . . .85
```

```
 1    914     . . . . . . . . . . . . . . . . . .87

 2    917     . . . . . . . . . . . . . . . . . .89

 3    937     . . . . . . . . . . . . . . . . . .92

 4    920     . . . . . . . . . . . . . . . . . .95

 5    926     . . . . . . . . . . . . . . . . . .98

 6    2301, page 2,   . . . . . . . . . . . . . 104

 7    924     . . . . . . . . . . . . . . . . . 111

 8    2301    . . . . . . . . . . . . . . . . . 115

 9    931     . . . . . . . . . . . . . . . . . 120

10    938     . . . . . . . . . . . . . . . . . 122

11    936     . . . . . . . . . . . . . . . . . 123

12    903     . . . . . . . . . . . . . . . . . 184

13    2102 through 2107   . . . . . . . . . . . 198

14    2109 and 2111   . . . . . . . . . . . . . 198

15    2114 through 2117   . . . . . . . . . . . 198

16    2119 through 2123   . . . . . . . . . . . 198

17    2125 through 2134   . . . . . . . . . . . 198

18    2142 through 2146   . . . . . . . . . . . 199

19    2137A through F   . . . . . . . . . . . . 207

20    2113 and 2124   . . . . . . . . . . . . . 224
```

```
21                      DEFENDANT EXHIBITS
```

```
22    Exhibit No.                          Received

23     18     . . . . . . . . . . . . . . . . . 144

24

25
```