IAVHCar1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK

2  ------------------------------x

3  UNITED STATES OF AMERICA,

4         v.               17 Cr. 680 (CM)

5  CRAIG CARTON,

6                               Trial
             Defendant.

7  ------------------------------x

8 
                            New York, N.Y.

9                            October 31, 2018
                            9:49 a.m.

10

11  Before:

12                HON. COLLEEN MCMAHON,

13                       Chief District Judge

14                  APPEARANCES

15  GEOFFREY S. BERMAN
      United States Attorney for the

16      Southern District of New York
  ELISHA KOBRE

17  BRENDAN QUIGLEY
      Assistant United States Attorneys

18

19  GOTTLIEB & JANEY LLP
      Attorneys for Defendant

20  BY:  ROBERT C. GOTTLIEB
      DERRELLE M. JANEY

21      SETH J. ZUCKERMAN
      SARAH LEDDY

22  ALSO PRESENT:   MICHAEL ZAVONA, Special Agent FBI
                 SEAN SWEENEY, Special Agent FBI

23

24

25

IAVHCar1

1            (Trial resumed; jury not present)

2            THE COURT:  Case on trial continued.  The parties are

3      present.  The jurors are not.  Have a seat.

4            Mr. Gottlieb, I have to tell you that I was going nuts

5      yesterday afternoon trying to figure out what you were saying,

6      and it finally occurred to me because as I was literally

7      walking out the door, there came out of your mouth a new word

8      that hadn't been said all afternoon, the "M" word, material.

9      After I thought about it for a while, I realized that what you

10     had been trying to say when you kept talking about the state of

11     mind of the witness was something having to do with or touching

12     on materiality, which never for some -- I'm not a mind reader,

13     I'm really not, especially when I'm wearing a neck brace.  And

14     since materiality is judged in a fraud case by an objective,

15     not a subjective, standard and state of mind is a subjective

16     standard, it just didn't occur to me that that's what you were

17     saying.

18            I'm sorry I didn't pick that up.  But can we promise

19     that in the future we will use the right words?

20            MR. GOTTLIEB:  Materiality, that's my response, your

21     Honor.

22            THE COURT:  OK.

23            MR. GOTTLIEB:  I promise you I will not forget that.

24            THE COURT:  Thank you.

25            MR. GOTTLIEB:  Thank you.

IAVHCar1

1          THE COURT:  Just remember, I've just spent five weeks

2     with people screaming at me constantly at a very high decibel

3     level about materiality in a fraud case, so the fact that it's

4     an objective, not a subjective, standard is very, very, very

5     much on my mind.  OK.

6          MR. GOTTLIEB:  Your Honor, thank you very much.

7          THE COURT:  No, no.  I worry about these things, you

8     know.  I want to make sure I understand what you're saying.

9          Mr. O'Neill, how are we doing with jurors?

10         THE LAW CLERK:  Down one.

11         THE COURT:  Down one.  OK.

12         MR. KOBRE:  Your Honor, if --

13         THE COURT:  Mr. Kobre, yes.

14         MR. KOBRE:  Thank you, your Honor.

15         Just to alert the Court to two items this morning, one

16     is we expect the next witness will testify under, hopefully, a

17     grant of immunity issued by the Court.

18         THE COURT:  Is there some reason why we can't put this

19     person on the stand right now while we're waiting for this last

20     juror and do the thing that we have to do out of the hearing of

21     the jury now?

22         MR. KOBRE:  There is no reason we cannot do that.

23         THE COURT:  Let us do that.

24         MR. KOBRE:  We're getting the witness right now.  If I

25     can just hand up to your deputy clerk the application and

IAVHCar1                    Klein – Direct

1   order.

2          THE COURT:  I just hate getting the jurors in here

3   for, I don't know, a 15-minute cross and then telling them to

4   leave again.

5          MR. KOBRE:  Yes, Judge.

6          THE COURT:  Who is this witness?

7          MR. KOBRE:  It's Harvey Klein, your Honor.

8          THE COURT:  Harvey Klein.

9          MR. KOBRE:  Oh, the other item, your Honor, is just

10  after the cross-examination of Mr. Pereira, the government

11  would like to offer some stipulations.  Just to alert your

12  Honor.

13         THE COURT:  That's fine.  You'll offer them; I'll read

14  them.

15         Could the witness come up here, Mr. Klein.  Actually,

16  Mr. Klein's counsel should come up here too.

17  HARVEY KLEIN,

18       called as a witness by the Government,

19       having been duly sworn, testified as follows:

20  DIRECT EXAMINATION

21  BY MR. KOBRE:

22  Q.  Mr. Klein, did you receive a subpoena requiring you to

23  testify at this trial?

24  A.  Yes.

25  Q.  Do you intend to invoke your Fifth Amendment privilege

IAVHCar1                    Klein - Direct

1  against self-incrimination when you're asked questions under

2  oath?

3  A.  Yes.

4  Q.  Do you now invoke that privilege?

5  A.  Yes.

6          MR. KOBRE:  Nothing further, your Honor.  At this time

7  the government would ask that the Court issue the immunity

8  order that's before the Court.

9          THE COURT:  Mr. Janey.

10         MR. JANEY:  Good morning, your Honor.  It's not clear

11 to the defense the basis for the application.

12         THE COURT:  Well, the basis for the application is he

13 says he won't -- I mean, ordinarily one asks at least some of

14 the questions that one is going to ask of the witness and he

15 refuses to answer, and we do that five or six times before I

16 get the hint.  That's usually how it's done.

17         MR. JANEY:  I haven't heard that this morning, your

18 Honor.

19         THE COURT:  Right.  Would you mind asking a few

20 substantive questions of the witness?

21         MR. KOBRE:  Sure.

22         THE COURT:  Thank you, Mr. Kobre.

23         MR. KOBRE:  Sure, your Honor.

24 BY MR. KOBRE:

25 Q.  Did you participate in extending loans at high interest

IAVHCar1                    Klein - Direct

1    rates?

2    A.  I'd like not to answer.

3    Q.  Based on what?

4    A.  I'd like to take my Fifth Amendment.

5    Q.  Did some of those loans, were they extended at very high

6    interest rates?

7    A.  I'd like not to answer.

8    Q.  Why?

9    A.  I'd like to take my Fifth Amendment.

10          THE COURT:  He asked the same question twice.

11   Q.  Did you pay taxes on the loans that you extended?

12   A.  I'd like not to answer.

13   Q.  Based on what?

14   A.  I'd like to take my Fifth Amendment.

15   Q.  Were you asked questions by the FBI in connection with this

16   investigation?

17   A.  I'd like not to answer.

18   Q.  Based on what?

19   A.  I'd like to take my Fifth Amendment.

20   Q.  And did you lie to the FBI in connection with

21   those questions?

22   A.  I'd like not to answer.

23   Q.  Why?

24   A.  I'd like to take my Fifth Amendment.

25          MR. KOBRE:  Nothing further, your Honor.

1          THE COURT:  OK.  I'm going to sign the order of

2    immunity granting the United States Attorney's application

3    compelling Mr. Klein to testify and to provide other

4    information in connection with this matter on the ground that

5    he has indicated credibly that he will invoke his Fifth

6    Amendment right not to testify if he is not immunized.  So he's

7    immunized.

8          MR. KOBRE:  Thank you, Judge.

9          THE COURT:  What that means, Mr. Klein, is that you

10   cannot be prosecuted other than for lying on the stand.  If you

11   lie on the stand, there's no immunity against that.  But you've

12   been immunized from being prosecuted for crimes in connection

13   with the matters that we're litigating here in the case against

14   Mr. Carton, and you're going to have to answer the questions

15   when the time comes, which is not right now.

16         THE WITNESS:  Thank you.

17         THE COURT:  You may step out.

18         Let's go.

19         (Witness excused)

20         (Continued on next page)

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Good morning sir, how are you this

3   morning?

4          THE WITNESS:  Good, Judge.  How are you?

5          THE COURT:  Just fine.  You're still under oath, sir.

6          THE WITNESS:  Yes.

7          THE COURT:  Have a seat.

8          Who will be cross-examining?  Mr. Janey.

9          MR. JANEY:  I will, your Honor.

10          THE COURT:  Thank you.

11   VICTOR PEREIRA, resumed.

12   CROSS-EXAMINATION

13   BY MR. JANEY:

14   Q.  Good morning, Mr. Pereira.

15   A.  Good morning.

16   Q.  May I have Government Exhibit 914 which has been admitted

17   in evidence.

18          Mr. Pereira, drawing your attention to what's been

19   admitted into evidence as Government Exhibit 914, and in

20   particular drawing your attention to the portion of the email

21   from Mr. Mangione to Craig Carton.  Do you see that there?

22   A.  I do.

23   Q.  Your testimony yesterday was that you could not locate this

24   email IN the email searches of the Barclays servers, correct?

25   A.  On the Brooklyn servers, correct.

IAVHCar1                          Pereira - Cross

1    Q.  Thank you.

2           Sometimes I may call it Barclays or Brooklyn.  I mean

3    them interchangeably, if that's OK with you.

4    A.  OK.

5    Q.  Was Mr. Mangione working at Brooklyn when you performed

6    this search?

7    A.  No.

8    Q.  So you were not able to inquire of Mr. Mangione, correct,

9    about the missing email?

10   A.  No.

11   Q.  Based on your experience in IT, there are a variety of

12   reasons as to why this email might not have been found in your

13   search, correct?

14   A.  That I don't know.

15   Q.  I'm sorry.  I didn't hear you.

16   A.  That I don't know.

17   Q.  For example, if Mr. Mangione deleted the email, it would

18   not have appeared in the PST file, correct?

19   A.  That's incorrect.  If he would have deleted the email, the

20   email then would have been placed in a deleted items.

21   Q.  If the email -- withdrawn.

22          In fact, the email could have been permanently

23   deleted, correct, by Mr. Mangione?

24   A.  From the Microsoft Outlook application, you could

25   permanently delete it, not from the server.

IAVHCar1                    Pereira - Cross

1   Q.  If Mr. Mangione --

2           THE COURT:  Hang on a second.  So you could

3   permanently delete it from Microsoft, but there would still be

4   a copy left on the server?

5           THE WITNESS:  Yes.

6           THE COURT:  Thank you.  OK.

7   Q.  Let's explore that.  If Mr. Mangione deleted the email,

8   then emptied the recycle bin, it would not have shown in the

9   search you instructed Intermedia to undertake correct?

10  A.  That's incorrect.

11  Q.  In fact, on October 18, 2018, you met with the prosecutors

12  in this case, correct?

13  A.  I met, yes.

14  Q.  And you explained to them that if Mr. Mangione deleted an

15  email, it would not have appeared in the PST file, correct?

16  A.  There's -- there's multiple steps of a deletion for an

17  email a user needs to take.

18  Q.  And what would those steps have been in order for

19  Mr. Mangione to have deleted this email?

20  A.  So this email's being shown as a sent email.  First, he

21  would had to have to gone into his sent items and deleted the

22  email, which then that email would then go into the deleted

23  items.  Then from there, empty the deleted items folder, all

24  right.  Then next part is there's a recover deleted items

25  within Microsoft Outlook.  If the user has that knowledge to be

IAVHCar1                        Pereira – Cross

1   able to go in there, they could then delete it, then that is

2   permanently deleted from the Microsoft Outlook application.

3   But from experience, I have reached out to Intermedia when I

4   needed an email to be recovered, and they would be able to

5   recover on their end.

6   Q.  So let's take this in parts.  To my first question, based

7   on your testimony today, it's possible that Mr. Mangione could

8   have deleted the email from his Outlook, correct?

9   A.  I don't know.

10  Q.  If he had taken the steps that you described and just

11  testified to, it would have been deleted, correct?

12  A.  Correct.

13          THE COURT:  From Outlook?

14          THE WITNESS:  That's correct.

15          THE COURT:  I want to be clear because I was under the

16  impression that email never dies.  So would there be another

17  copy somewhere?

18          THE WITNESS:  On the server with Intermedia.

19          THE COURT:  Did the type of search that you and

20  Intermedia did, was that designed to recover that or was it

21  designed to recover Microsoft Outlook?

22          THE WITNESS:  My search, no.  If he took, if Fred

23  Mangione took the three steps, no, I would not be able to find

24  it against the PST.  The second, Intermedia, from experience

25  with Intermedia, they have been able to recover a deleted

IAVHCar1                          Pereira - Cross

1    email.  I'm not just aware of how long it would have sit on

2    Intermedia's servers, but from experience they have been able

3    to recover.

4              THE COURT:  You don't know whether Mr. Mangione took

5    the three steps or two steps or any steps?

6              THE WITNESS:  That I don't know.

7              THE COURT:  Thank you.

8    BY MR. JANEY:

9    Q.  Just going back to the nature of the search, you performed

10   these searches, correct?

11   A.  Yes, I performed several searches.

12   Q.  Right.  So when you in your colloquy with Her Honor, what

13   you described in terms of what Intermedia might have been able

14   to do, that's not relevant, correct?

15             MR. KOBRE:  Objection.

16   Q.  In other words, you undertook the search, correct?  I'm

17   sorry.  Go ahead.

18   A.  I -- I did the search, and I also had Intermedia do the

19   search.

20   Q.  And you undertook --

21             THE COURT:  You mean there were two searches?  You did

22   one and they did one?

23             THE WITNESS:  That's right.

24   Q.  Again, just so that we're clear, if Mr. Mangione took the

25   three steps that you described, the email could have been

IAVHCar1                    Pereira - Cross

1    deleted from the PST file, correct?

2    A.   That's correct.

3    Q.   And that would have affected your search and your ability

4    to find this email, correct?

5    A.   That's correct.

6    Q.   Do you know whether Intermedia was able to restore

7    Mr. Mangione's emails in the search that you described?

8    A.   For which search?

9    Q.   Well, what searches did Intermedia perform?

10   A.   Yesterday I stated they performed three searches.  The

11   first search was for the email, the email address of

12   labs123@aol.com, with the date of December 16, 2016; the

13   subject of follow-up.  That was the first search.

14        The second search was for Fred Mangione's mailbox with

15   a date range of January 1, 2016, to the present date with

16   emails received from and sent to labs123@aol.com and

17   craig@cureitbrand.com.

18        So the third search was against Fred Mangione's

19   mailbox for all items of December 15 and December 16 of 2016.

20   Q.   Do you recall whether the search that Intermedia did was

21   able to restore emails from Mr. Mangione's email box for 2016?

22   A.   Yes.

23   Q.   Were they?

24   A.   Yes.

25   Q.   Yesterday you testified that Mr. Mangione had only one

IAVHCar1                        Pereira – Cross

1   email account, correct?

2   A.   One mailbox.

3   Q.   Is there a difference between an email box and an email

4   account?

5   A.   They're the same, an email account, email mailbox.

6   Q.   Right.  And yesterday you testified that the search was

7   undertaken with respect to fmangione@brooklynse.com, correct?

8   A.   That's correct.

9   Q.   Are you familiar with Mr. Mangione's email account

10  fmangione@brooklynnet.com?

11  A.   @brooklynnets.com.

12  Q.   @brooklynnet.com.

13  A.   Net, no.

14            THE COURT:  Net, brooklynnets.com.

15            THE WITNESS:  Nets.com, yes.

16            THE COURT:  Does he have a nets email account?

17            THE WITNESS:  Yes, he has a brooklynnets.com email

18  account.

19  BY MR. JANEY:

20  Q.   So is it fair to say that Mr. Mangione has two email

21  accounts?

22  A.   No, that's incorrect.  I could explain.

23  Q.   Please.

24  A.   So a mailbox, an email account will have a primary email

25  address.  So the primary email address for Fred Mangione is at

IAVHCar1                         Pereira - Cross

1   the time fmangione@brooklynse.com.  What's called in the

2   mailbox there's aliases.  Within the aliases, he has

3   fmangione@brooklynnets.com.  He also had fmangione@NJnets.com,

4   which previously before being the Brooklyn Nets, we were the NJ

5   Nets.

6           So if anybody externally outside of our environment

7   were to email fmangione@brooklynnets.com, it would be received

8   at the fmangione@brooklynse.com mailbox.  So if Fred Mangione

9   were to reply to that email that person sent to him at

10  brooklynnets.com, if he replies, it's going to reply from

11  fmangione from brooklynnets.com because that's the primary

12  email address.  And he has the other email address as aliases.

13  Q.  How did your email search incorporate the aliases, if at

14  all?

15  A.  When you do a search, it does it against the mailbox.  When

16  you log into Intermedia and you're looking for the user, you

17  type in "Fred Mangione"; it pulls up Fred Mangione's mailbox

18  listing all contents from all the domains that I mentioned.

19  Q.  Mr. Pereira, returning your attention to Exhibit 914, do

20  you have that there?

21  A.  I do.

22  Q.  And focusing in particular on the signature block area, in

23  yesterday's testimony you stated that there were several things

24  unusual about this particular document in that area, correct?

25  A.  That's correct.

IAVHCar1                      Pereira - Cross

Q.  You testified that as part of the email search exercise,
you were asked to review that signature block, the signature
box I think you referred to it, of this email and compare it to
other emails that were in Mr. Mangione's mailbox that had been
sent under server 162016.

A.  Correct.

Q.  And you noted two differences:  One, the chief of staff,
the middle word "of."  Do you recall that?

A.  I do.

Q.  You testified that in all of the 226 sent emails, the word
"of" has a capital "O."  Do you recall that testimony?

A.  Yes.

Q.  Now, drawing your attention to two exhibits that have been
admitted in evidence, Government Exhibit 2109 and Government's
Exhibit 2128, they appear here side by side.  Are you able to
see both of them?

A.  Yes.

Q.  Viewing the chief of staff title and comparing them,
neither of these emails have the "O" capitalized in chief of
staff, correct?

A.  Correct.

Q.  Second, drawing your attention to Exhibit 2128, there's a
hard break after "phone," but there's not one in Exhibit 2109,
correct?

A.  Correct.

IAVHCar1                          Pereira - Cross

1    Q.  Isn't it fair to say that your testimony of yesterday that

2    the titles in all of the 226 sent emails is the same is

3    incorrect?

4             MR. KOBRE:  Objection.  Mischaracterizes the witness'

5    statement.

6             THE COURT:  The witness is perfectly capable of saying

7    that it mischaracterizes his testimony.  You don't have to.

8    Objection's overruled.

9             Answer the question, sir.  Was your testimony

10   incorrect yesterday?

11   A.  It was not.

12   Q.  Why wasn't it?

13   A.  Exhibit 2109 with the date of December 15, 2016, know for a

14   fact, looking at all the emails from Fred Mangione, all sent

15   emails show the title with the capital "O" and the hard space

16   between "phone" and "mobile."  For a fact that I know our CMO

17   at the time requested to have Fred Mangione's title corrected.

18   Exhibit 2128 shows the date of February 15, 2017, where I know

19   that not -- I don't know the exact timing, but it was requested

20   by the CMO to myself to correct Fred Mangione's "of" to a lower

21   case before.

22   Q.  Well, that's different than your testimony of yesterday,

23   correct?  In other words, isn't it true that yesterday you

24   said, with the exception of Exhibit 914, that all of the 226

25   emails would have the "O" capitalized and a hard break after

IAVHCar1                          Pereira - Cross

1   "phone," correct?

2   A.  On December 16, 2016, all 226 had the capital "O" and the

3   hard space.

4   Q.  But these are emails that yesterday you indicated were

5   maintained in the normal course, correct?

6              MR. KOBRE:  Objection.

7              THE COURT:  The objection's overruled.

8   A.  The one on the right, it's a different date.

9   Q.  Well, but that wasn't my question.

10  A.  What was it?

11  Q.  You testified yesterday that these were emails that were

12  maintained in the normal course, correct?

13  A.  Yes.

14             THE COURT:  OK.

15  Q.  Now, you're the head of IT at Brooklyn, is that correct?

16  A.  That's correct.

17  Q.  Can you tell us just a little bit more about the scope of

18  your responsibility in that role.

19  A.  Overseeing the infrastructure environment for our business

20  regards to servers, networking equipment, end user computers

21  from desktops, laptops, printing devices, supporting the

22  day-to-day infrastructure.

23  Q.  You testified yesterday that there are several different

24  types of records maintained electronically on Barclays' file

25  server and also in the file storage, correct?

1    A.   Correct.

2    Q.   Are electronic records maintained of tickets purchased in

3    connection with live events or concerts held at properties

4    owned by Barclays?

5    A.   That I don't know.

6    Q.   Are copies of tickets maintained on the file servers?

7    A.   That I don't know.

8    Q.   Are you familiar within what department these records are

9    maintained?

10   A.   Can you be more specific on the records?

11   Q.   Are you familiar with what department maintains either

12   physical or electronic records of tickets related to live

13   events or evidence of the purchase and sales for those events?

14   A.   I would mention the box office department, the finance

15   department.

16             MR. JANEY:  No further questions, your Honor.

17             THE COURT:  Thank you.

18             Do we have any redirect?

19             MR. KOBRE:  I do, your Honor.  Just briefly.

20             If we can actually just leave that exhibit up, yeah,

21   2109 and 2128.

22   REDIRECT EXAMINATION

23   BY MR. KOBRE:

24   Q.   Mr. Pereira, you were just asked a series of questions

25   about these two emails, is that right?

IAVHCar1                          Pereira - Redirect

1   A.   That's right.

2   Q.   Were these two emails that you were able to authenticate

3   and find on Brooklyn's email systems?

4   A.   Yes.

5   Q.   What is the date on the left-hand email, Government

6   Exhibit 2109?

7   A.   December 15, 2016, 10:51 a.m.

8          MR. KOBRE:   If we could just leave that up and

9   enlarge.   And if we can just enlarge the email header on

10  Government Exhibit 2128.

11  Q.   What is the date of this email?

12  A.   February 15, 2017, 6:27 a.m.

13  Q.   Were either of these emails sent on December 16, 2016?

14  A.   No.

15  Q.   When you testified yesterday about the 226 emails all

16  having the capital "O" and the hard space, what time frame were

17  you referring to there?   For what day were you testifying

18  about?

19  A.   December 16, 2016.

20  Q.   So neither of these two emails fall into that period?

21  A.   That's correct.

22  Q.   Let's take a look now at Government Exhibit 914, and if we

23  can just enlarge the....

24          Did you search Brooklyn's email systems for an email

25  meeting the sent by Fred Mangione to labs123@aol.com on

IAVHCar1                         Pereira - Redirect

1   December 16 with the subject follow-up?

2   A.  Yes.

3   Q.  And what was the result of your search?

4   A.  No results were found.

5   Q.  I think you testified yesterday, did you perform a second

6   search with respect to this email?

7   A.  Yes.

8   Q.  Just describe that.

9   A.  The second search for this email was to have our email

10  provider, Intermedia, to do a search against their servers for

11  this email.

12  Q.  And what was the result of that?

13  A.  No results were found.

14          MR. KOBRE:  Just one moment, your Honor.

15          (Counsel confer)

16          MR. KOBRE:  Thank you.  Nothing further, your Honor.

17          THE COURT:  Anything else?

18          Thank you, sir.  You may step down.

19          THE WITNESS:  Thank you.

20          (Witness excused)

21          THE COURT:  Call your next witness, please.

22          MR. KOBRE:  At this time the government would like to

23  offer three stipulations.

24          THE COURT:  Thank you.  Would you pass them up.

25          MR. KOBRE:  We're passing up what's marked Government

IAVHCar1                    Pereira - Redirect

Exhibits 5, 8, and 9.

THE COURT:  You'll remember, folks I told you that a
stipulation is an agreement between counsel, so it's evidence
in the case.  And it's my practice to read the stipulations to
you.  They all begin the same way.

It is hereby stipulated and agreed by and between the
United States of America by Geoffrey S. Berman, United States
Attorney for the Southern District of New York, Elisha Kobre
and Brendan Quigley, Assistant United States attorneys, of
counsel, and Craig Carton, the defendant, by and through his
counsel Robert Gottlieb, Esq., and Derrelle Janey, Esq., that:

1.  Government Exhibits 200 through 264 and 266
through 297 are true and accurate copies of emails and other
files obtained from Google.

2.  Government Exhibits 500 through 537 and 539
through 552 are true and accurate copies of emails and other
files obtained from AOL.

3.  Government Exhibits 700 through 778 are true and
accurate copies of emails and other files obtained from
GoDaddy.

4.  The parties further stipulate and agree that this
stipulation regarding emails and files obtained from Google,
AOL, and GoDaddy, may be received into evidence as a government
exhibit at trial, and it is.

This is Government Exhibit 5 in evidence, and it is

IAVHCar1                    Pereira - Redirect

1   signed -- I couldn't tell you whether it was signed by

2   Mr. Kobre or Mr. Quigley because it's kind of a scrawl.  I

3   think it's signed -- I couldn't tell you whether it's signed by

4   Mr. Gottlieb or Mr. Janey either, but it's signed, OK.  That's

5   good enough for me.

6             So that's the first stipulation that's in evidence.

7             Stipulation No. 2.  It is hereby stipulated and agreed

8   by and between the usual suspects that:

9             1.  Government Exhibit 2000-A is a true and correct

10   copy of a portion of an account statement and other records

11   that were created, kept, and maintained in the ordinary course

12   of business of Citibank, were created by persons with knowledge

13   of or created from information transmitted by persons with

14   knowledge of the information that's shown and were created at

15   or near the time the information became available.

16             2.  Government Exhibits 2017, 2018, 2019, 2019-A,

17   2020, 2021, 2021A, 2022, 2023, 2023-A, 2024, 2025, 2026, and

18   2026-A are true and correct copies of account statements and

19   other records that were created, kept, and maintained in the

20   ordinary course of business of JPMorgan Chase, N.A., and were

21   created by persons with knowledge of or created from

22   information transmitted by persons with knowledge of the

23   information shown and were created at or near the time the

24   information became available.

25             3.  Government Exhibit 2027 is a true and correct copy

IAVHCar1                     Pereira - Redirect

of account statements and other records that were created,

kept, and maintained in the ordinary course of business of M &

T Bank and were created by persons with knowledge of or created

from information transmitted by persons with knowledge of the

information shown and were created at or near the time the

information became available.

     4.  Government Exhibit 2028 is a true and correct copy

of account statements and other records that were created,

kept, and maintained in the ordinary course of business of Bank

of America/Merrill Lynch and were created by persons with

knowledge of or created from information transmitted by persons

with knowledge of the information shown and were created at or

near the time the information became available.

     5.  Government Exhibit 2029 is a true and correct copy

of account statements and other records that were created,

kept, and maintained in the ordinary course of business of

Wells Fargo Bank North America, N.A., and were created by

persons with knowledge of or created from information

transmitted by -- by the way, that's National Association, not

North America -- and were created by persons with knowledge of

or created from information transmitted by persons with

knowledge of the information shown and were created at or near

the time the information became available.

     All that gobbledygook means that they're business

records kept in the ordinary course of business of those

IAVHCar1                        Pereira - Redirect

1    respective banks.

2              The parties further stipulate and agree that this

3    stipulation may be, and it hereby is, received into evidence as

4    a government exhibit at the trial.  That's Government Exhibit 8

5    in evidence.

6              (Government's Exhibit 8 received in evidence)

7              THE COURT:  Finally, Government Exhibit 9.  It is

8    hereby stipulated and agreed by and between the usual suspects

9    that -- why is this not -- this looks like it's exactly the

10   same.  Certainly the first page of this document is exactly the

11   same.  Why are you giving me two of them?

12             MR. KOBRE:  Your Honor, if we could just have a

13   moment.

14             THE COURT:  It's possible you would like to take a

15   look and see how they're different.

16             MR. QUIGLEY:  Sorry, your Honor.  Maybe we have two

17   copies of the same one.  We handed up two copies of the same

18   one.

19             MR. KOBRE:  We have one additional set.

20             THE COURT:  They're marked with different exhibit

21   stickers.  8 is in evidence.

22             MR. QUIGLEY:  Sorry about that.

23             THE COURT:  Government Exhibit 1 is hereby stipulated

24   and agreed by and between the usual suspects that:

25             1.  Government Exhibits 2000, 2001, and 2002 are true

IAVHCar1                    Pereira - Redirect

and correct copies of account statements and other records that

were created, kept, and maintained in the ordinary course of

business of Citibank and were created by persons with knowledge

of or created from information transmitted by persons with

knowledge of the information shown and were created at or near

the time the information became available.

2.  Government Exhibits 2004, 2005, 2006, and 2006-A

are true and correct copies of account statements and other

records that were created, kept, and maintained in the ordinary

course of business of City National Bank and were created by

persons with knowledge of or created from information

transmitted by persons with knowledge of the information shown

and were created at or near the time the information became

available.

3.  Government Exhibits 2016, 2016-A, and 2016-B are

true and correct copies of account statements and other records

that were created, kept, and maintained in the ordinary course

of business of JPMorgan Chase Bank, N.A., and were created by

persons with knowledge of or created from information

transmitted by persons with knowledge of the information shown

and were created at or near the time the information became

available.

4.  The parties further stipulate and agree that this

stipulation may be received into evidence as a government

exhibit at trial.  And it is Government Exhibit 1.

 1            (Government's Exhibit 1 received in evidence)

 2            THE COURT:  Call your next witness.

 3            MR. KOBRE:  Your Honor, just before calling the next

 4    witness, the government would like to offer at this point a

 5    subset of the exhibits that are described in the stipulation,

 6    and those are Government Exhibits 2000 and 2000-A, Government

 7    Exhibit 2004, 2005.

 8            THE COURT:  Is someone writing this down?

 9            Keep going.

10            MR. KOBRE:  2006, 2006-A, 2016, 2016-A, 2016-B, 2026,

11    2026-A, 2028, and 2029.

12            MR. GOTTLIEB:  Your Honor, we would like to check that

13    before responding.

14            THE COURT:  They're admitted.  You knew they were

15    going to offer them.  You should have checked it.

16            MR. GOTTLIEB:  Your Honor, actually, we didn't know

17    they were going to stand up after reading the stipulation --

18            THE COURT:  There's the list.

19            MR. GOTTLIEB:  -- and go forward.

20            THE COURT:  Look, there's the list.  The jury and I

21    will sit here and wait.  OK.  You check.

22            MR. GOTTLIEB:  Your Honor, thank you.

23            THE COURT:  Any objection?

24            MR. JANEY:  None, your Honor.  Thank you.

25            THE COURT:  Thank you.  They're admitted.

IAVHCar1                    Klein - Direct

1          (Government's Exhibits 2006, 2006-A, 2016, 2016-A,

2   2016-B, 2026, 2026-A, 2028, and 2029 received in evidence)

3          MR. KOBRE:  The government calls Harvey Klein.

4          THE COURT:  OK.  I apologize.  Obviously, something's

5   wrong and, really, sitting makes it worse.  So I'm going to get

6   up from time to time.  Forgive me.  If your neck hurts and your

7   back hurts, you get up from time to time too.  But I'm not

8   doing it for any particular reason except that when the pain

9   gets really bad, I need to stand up.  Thank you.

10  HARVEY KLEIN,

11       called as a witness by the Government,

12       having been duly sworn, testified as follows:

13  DIRECT EXAMINATION

14  BY MR. KOBRE:

15  Q.  Where do you live?

16  A.  Monsey, New York.

17  Q.  Can I ask you to pull the microphone up.

18          THE COURT:  Mr. Klein, it's a little hard to hear.

19          THE WITNESS:  Monsey, New York.

20          THE COURT:  Monsey.  Thank you.

21  Q.  What kind of work do you do?

22  A.  I manufacture gifts with logos.  I have a real estate --

23          THE COURT:  I'm right next to you, and I'm having a

24  really hard time hearing you.  I know this is nerve-racking.

25  Use the mic.  Don't do like here, but use the mic, OK, so we

IAVHCar1                    Klein - Direct

1    can all hear you.

2    A.  I put logos on things.  I have a vending company, I have a

3    real estate company, and I have an energy company.

4    Q.  And when you say you "put logos on things," is that through

5    a particular company that you operate?

6    A.  King Ventures and King Logo.

7    Q.  OK.  Those are the names of the companies?

8    A.  Yes.

9    Q.  Are you engaged in the business of selling tickets to live

10   events?

11   A.  No.

12   Q.  Have you ever been engaged in that business?

13   A.  No.

14   Q.  Now, did you receive a subpoena to be in court here today?

15   A.  Yes.

16   Q.  Are you testifying under a compulsion and immunity order

17   that was issued by the Court?

18   A.  Yes.

19   Q.  What do you understand that order to do?

20   A.  What I say today cannot be held against me.

21   Q.  So your testimony today -- can your testimony today be used

22   in a prosecution against you?

23   A.  Only if I lie.

24            (Continued on next page)

25

IAV7CAR2                          Klein - Direct

1    Q.  And is it your understanding that the immunity order

2    protects you from prosecution using evidence other then the

3    testimony in court here today?

4    A.  No.

5    Q.  Do you have any agreements with the government?

6    A.  No.

7    Q.  What is your understanding about why you need immunity to

8    testify?

9    A.  Because I lied to the government.

10   Q.  And in particular who did you lie to?

11   A.  The F.B.I.

12   Q.  Any other reasons?

13   A.  No.

14   Q.  Did you extend loans to individuals?

15   A.  Yes.

16   Q.  And what did you receive in return for extending -- in

17   particular to who?

18   A.  Craig Carton.

19   Q.  And what did you receive in return for those loans?

20   A.  Cash interest.

21   Q.  And what kind of interest?  Were they high interest rates?

22   A.  Yes.

23   Q.  And is it your understanding -- do you have an

24   understanding as to whether those interest rates could be in

25   violation of the law?

1   A.   Yes.

2   Q.   Now, how did you first come to meet Mr. Carton or to

3   communicate with Mr. Carton?

4   A.   Through Michael Wright.

5   Q.   Who is Michael Wright?

6   A.   Michael Wright is someone I became friends with through a

7   different friend, Tommy Genero.

8   Q.   And describe what happened.  How did it come up that you

9   met Mr. Carton through Mr. Wright?

10  A.   Michael Wright called me up, asked me if I would extend a

11  loan together with him to Craig Carton.

12  Q.   And did you ultimately extend loans to Mr. Carton?

13  A.   Yes.

14  Q.   About when did you first lend money to Mr. Carton, what

15  year?

16  A.   2016.

17  Q.   And about how many loans in total did you make to

18  Mr. Carton?

19  A.   Approximately six.

20  Q.   Can you give us a range form the approximate amounts of the

21  loans.

22  A.   Between 250 and $500,000.

23  Q.   And could you give us a range for the term for the length

24  of the loans, how long they were extended for.

25  A.   Anywhere between seven and 30 days.

1   Q.  Did you have conversations with Mr. Carton about what your

2   money would be used for, either by email or by phone?

3   A.  Yes.

4   Q.  And what did Mr. Carton tell you your loans were being used

5   for?

6   A.  Casino gambling.

7   Q.  Did you also have conversations with Mr. Wright about what

8   the purpose of the loans was?

9   A.  Yes.

10  Q.  And what did Mr. Wright say?

11  A.  Casino gambling.

12  Q.  Were any of the loans, to your knowledge, to be used for

13  anything other than casino gambling?

14  A.  No.

15  Q.  Now, you testified earlier that you received interest from

16  Mr. Carton for the loans?

17  A.  Yes.

18  Q.  Could you give us a range for the interest rates that you

19  received on these loans.

20  A.  Ten to 15 percent.

21  Q.  And was that on an annualized basis or just for the period

22  of the loan?

23  A.  On a per-loan basis.

24  Q.  How, if at all, were the loans documented?

25  A.  E-mail.

IAV7CAR2                     Klein - Direct

1   Q.  Just describe what you mean by that.

2   A.  I received an e-mail confirming guarantees from both

3   Mr. Carton and Mr. Wright.

4   Q.  And who did those e-mails come from?

5   A.  Mr. Carton and/or Mr. Wright.

6   Q.  And you said personal guarantees.  Is that what you said?

7   A.  Yes.

8   Q.  Could you just explain what you mean by that?

9   A.  That if for whatever reason the loan wasn't paid back, I

10  was able to go after them personally.

11  Q.  Did Mr. Carton always repay the loans that you extended?

12  A.  Yes.

13  Q.  Were they always repaid in a timely manner?

14  A.  Most of them.

15  Q.  Did it ever happen that it was delayed?

16  A.  Yes.

17  Q.  But ultimately was that loan that was delayed, was it

18  repaid.

19  A.  Yes.

20  Q.  Now, in what form was the principal amount of the loans

21  repaid?  How was that repaid to you?

22  A.  Wire transfer.

23  Q.  And what about the interest?

24  A.  Cash.

25  Q.  Who gave you the cash interest payments?

1    A.  I would get it from Michael Wright.

2    Q.  Now, would you take a look, please, at what's before you in

3    the folder there, Mr. Klein.  There are what is marked as

4    Government's Exhibits 1700 through 1715.  Just take a flip

5    through those, if you can.

6         I after apologies, not 1700.  1701 through 1715.

7    A.  OK.

8    Q.  Do you recognize those?

9    A.  Yes.

10   Q.  What are they just generally describing them?

11   A.  E-mails between Michael Wright, Craig Carton and myself.

12   Q.  And generally what's the general topic of the e-mails?

13   A.  Loan agreements.

14   Q.  And are they true and accurate copies of e-mails amongst

15   you, Mr. Wright and Mr. Carton regarding loans that you

16   extended to Mr. Carton?

17   A.  Yes.

18        MR. KOBRE:  The government offers 1701 through 1715.

19        MR. JANEY:  No objection, your Honor.

20        THE COURT:  Admitted.

21        (Government Exhibits 1701 through 1715 received in

22   evidence)

23   Q.  So let's take a look at some of these e-mails, Mr. Klein.

24   If we can -- Mr. Urbanczyk, if we can please publish for the

25   jury Government Exhibit 1701.

1   So, Mr. Klein, this is an e-mail from Michael Wright

2   to you, and it's September 20, 2016, and the subject is

3   Investment -- FWD:  Investment.  Is this forwarding an e-mail

4   to you?

5   A.  Yes.

6   Q.  And who sent the original e-mail?

7   A.  Craig Carton.

8   Q.  And what was the subject of the original e-mail?

9   A.  Investment.

10  Q.  E-mail reads in the first line, "Allow this e-mail to serve

11  as an agreement between both Harvey and both Craig Carton and

12  Michael Wright.  Harvey is investing in project black which is

13  being run by and overseen by Carton and Wright."

14      What did you understand project black to mean here?

15  A.  Casino gambling.

16  Q.  Do you have an understanding of why it was referred to as

17  project white, why Mr. Carton was referring to it as project

18  black?

19  A.  So his wife doesn't find out about it.

20  Q.  And, Mr. Carton here refers to Harvey as investing.

21  "Harvey is investing."  Was this an investment?

22  A.  No.

23  Q.  Was your return on the money that you were going to loan or

24  that was being proposed here for you to lend Mr. Carton

25  dependent in any way on how Mr. Carton's gambling performed?

IAV7CAR2                          Klein - Direct

1    A.  No.

2    Q.  Now, as stated in Government Exhibit 1701, how much was

3    this loan for?

4    A.  15 percent.

5    Q.  Sorry.  What was the amount of the loan, I should have

6    said.

7    A.  $500,000.

8    Q.  And as proposed by Mr. Carton in this e-mail, when would

9    you extent the loan?  What date?

10   A.  September 20, 2016.

11   Q.  And when did the loan need to be repaid?

12   A.  October 21, 2016.

13   Q.  So about a month long loan?

14   A.  Yes.

15   Q.  And what was Mr. Carton agreeing to pay the interest rate

16   on the loan?

17   A.  15 percent.

18   Q.  So how much would that amount to?

19   A.  $75,000.

20   Q.  For one month?

21   A.  Yes.

22   Q.  What did you understand the purpose of this loan was to be?

23   A.  Casino gambling.

24   Q.  Did you in fact lend Mr. Carton the $500,000 proposed in

25   this e-mail?

IAV7CAR2                          Klein – Direct

1   A.  Yes.

2   Q.  Let's take a look at Government Exhibit 1702.  And if we

3   can just enlarge the top e-mail, all the way down to where it

4   says "sent from my iPhone."

5            So, Mr. Klein, this is another e-mail on September 20,

6   2016.  It's from Michael Wright to you -- the top e-mail,

7   rather.  Do you see that?

8   A.  Yes.

9   Q.  And it forwards an e-mail from Mr. Carton?

10  A.  Yes.

11  Q.  In the e-mail below for the forwarded e-mail from

12  Mr. Carton it says wire info.  Do you see that?

13  A.  Yes.

14  Q.  And what is that?  Right below that, several lines below

15  that, what are we looking at there?

16  A.  Wiring information.

17  Q.  For what?

18  A.  For me to wire the loan money to him.

19  Q.  And what bank were you directed by Mr. Carton to extend the

20  money to?

21  A.  City National Bank.

22  Q.  Now, with respect to this loan, did you wire that money to

23  City National Bank?

24  A.  Yes.

25  Q.  With respect to this particular loan, did Mr. Carton repay

1   the loan on October 21, 2016, as he had agreed?  I'd ask that

2   you just don't refer to anything.  If you don't recall, then

3   that's fine.

4   A.  I don't recall.

5   Q.  OK.  Let's take a look at Government Exhibit 1703.  And in

6   particular if we go to page 2 and just enlarge the bottom

7   e-mail.

8          So, this is an e-mail on November 4, 2016 from

9   Mr. Carton to you and michaelawrightnyc@gmail.com.  Do you see

10  that?

11  A.  Yes.

12  Q.  And in this e-mail Mr. Carton is writing to you, "I'm

13  beyond frustrated and I respect that you are as well.  I'm not

14  going to insult you with their excuses.  I am sending you both

15  $150K out of my own business account as a sign of good faith

16  and promise to deliver."  Do you see that?

17  A.  Yes.

18  Q.  What did you understand that were Mr. Carton was frustrated

19  about and you would be frustrated as well?

20  A.  That he couldn't pay back the loan.

21  Q.  Was that the same September 20th loan that we looked at a

22  moment ago?

23  A.  Yes.

24  Q.  So it was delayed?

25  A.  Yes.

1   Q.  And just going down to the next paragraph it says, "Wire

2   will come from Merrill Lynch and my company is Advance

3   Entertainment."  Do you see that?

4   A.  Yes.

5   Q.  At the time did you have any idea what Advance

6   Entertainment was?

7   A.  No.

8   Q.  Now, Mr. Carton also wrote, just going back now to the

9   first paragraph in that same e-mail, Mr. Carton had wrote to

10  you, "I am sending you both $150K out of my on business account

11  as a sign of good faith and promise to deliver."  He goes on to

12  say, "When the CNB confirms the wire to you in full we can work

13  out sending the overage back to me."

14          Do you understand what Mr. Carton is saying to you?

15  A.  Yes.

16  Q.  Can you explain?

17  A.  He is going to send me $150,000 from his own account.  He

18  will then send me the balance when City National Bank confirms

19  that they sent the $500,000, and then I was going to send him

20  back $150,000.

21  Q.  Now, by this date, November 4, 2016, had you already

22  received any of the money returned for your loan?

23  A.  No.

24  Q.  Let's take a look at Government Exhibit 2004, which is in

25  evidence, and actually if you go to page 1 first and just

IAV7CAR2                    Klein - Direct

1    enlarge the top.

2           This is a personal account agreement for City National

3    Bank, and the account holder is who?

4    A.  Craig Carton.

5    Q.  OK.  And if we go to page 18, and if we can just enlarge

6    the fifth line from the bottom, or just highlight it.

7           Do you see there is a beneficiary column on this

8    document?

9    A.  Yes.

10   Q.  And who is the beneficiary listed in the highlighted

11   portion?

12   A.  Harvey Klein.

13   Q.  And then there is a transaction date.  Do you see that?

14   A.  Yes.

15   Q.  And what's the transaction date?

16   A.  November 4, 2016.

17   Q.  And then do you see that there is an amount listed there?

18   A.  Yes.

19   Q.  And what is the amount that you received as a beneficiary

20   from Mr. Carton on November 4, 2016?

21   A.  250,000.

22   Q.  So on November 4, 2016 you received 250,000?

23   A.  Yes.

24   Q.  And now just going back for a moment to Government Exhibit

25   1703, the second page, and just enlarging the bottom e-mail

1    again.

2              So, can you just explain now what you understood

3    Mr. Carton to be referring to when you talk about the 150K

4    coming.

5    A.  I got 250,000 in a wire already.  There was the balance of

6    250,000 that he was having a problem getting out from City

7    National Bank, so he sent me 150,000 from his own business

8    account.  And when he was going to send me the balance, we

9    suggested that I send him the 150,000 back.

10   Q.  And did that ultimately happen?  Did you send him the

11   $150,000 back?

12   A.  No.

13   Q.  What happened?

14   A.  I got 150,000, which totals 400,000, and then a few days

15   later I received another wire for 100,000.

16   Q.  OK.  And then what about the interest?

17   A.  I received in cash.

18   Q.  OK.  And so you say you received 150,000, as is described

19   in this e-mail?

20   A.  Yes.

21   Q.  I draw your attention to Government Exhibit 2028, and page

22   1 first.

23              If you can just enlarge the upper left-hand corner.

24              Can you read the first line of that for us.

25   A.  Advance Entertainment LLC.

1  Q.  And if we can zoom out, these are records from Merrill

2  Lynch.  And if we can go to page 510 of these bank records, and

3  just go to the bottom wire.

4         Now, do you see there is a number listed on the top

5  line there and an amount of this wire transfer?

6  A.  Yes.

7         MR. JANEY:  Your Honor, these documents speak for

8  themselves.  The witness is doing a lot of interpretation and

9  reading of these documents.  The documents are fairly

10 straightforward.

11        THE COURT:  The objection is overruled.

12 Q.  What was the amount of this wire that you received?

13 A.  $150,000.

14 Q.  And is there a date next to that?

15 A.  November 4, 2016.

16 Q.  What was the purpose of this $150,000 wire transfer to you?

17 A.  Pay back a loan.

18 Q.  Now we saw that this came from a bank account in the name

19 of Advance Entertainment.  Did you have any other business

20 dealings with Advance Entertainment?

21 A.  No.

22 Q.  Did you know at the time what kind of business Advance

23 Entertainment was in?

24 A.  No.

25 Q.  Did you know anyone else who was involved in Advance

IAV7CAR2                         Klein - Direct

1   Entertainment other than Mr. Carton having told you that he

2   runs it?

3   A.   No.

4   Q.   And after receiving this $150,000, did you received the

5   remainder, the remaining $100,000?

6   A.   Yes.

7   Q.   Let's take a look at now Government Exhibit 1705.

8           If we can just enlarge the entirety of the e-mail.

9           This is an e-mail several days later on November 10,

10  2016 from Mr. Carton to yourself and Michael.  Who is Michael?

11  A.   Michael Wright.

12  Q.   Just going down to the second paragraph for a moment,

13  Mr. Carton writes, "Glad this finally got done and hope you

14  accept my apologies for how long it look."  Is that referring

15  to the loan that you just talked about?

16  A.   Yes.

17  Q.   And then just jumping down to the last line of the e-mail

18  "And yes..."  Can you read that line, please.

19  A.   "And yes this weekend in Bimini is an investable trip."

20  Q.   Do did understand Mr. Carton is referring to here?

21  A.   He was going to Resorts World Casino in Bimini on a

22  gambling trip.

23  Q.   And when he says it's an investable trip, what did you

24  understand that to mean?

25  A.   I can extend the loan.

IAV7CAR2                    Klein - Direct

1   Q.  A loan for what purpose?

2   A.  Casino gambling.

3   Q.  And did you in fact extend another loan for casino gambling

4   to Mr. Carton in December of 2016?

5   A.  Yes.

6   Q.  Let's take a look at Government Exhibit 1706.  This is an

7   e-mail from Mr. Carton to mw@sgroupnyc.com and

8   harvey@kinglogo.com.  Who is mw@sgroupnyc.com?

9   A.  Michael Wright.

10  Q.  And harvey@kinglogo.com, who is that?

11  A.  Myself.

12  Q.  And the subject of the e-mail is final trip of 2016.  Do

13  you see that?

14  A.  Yes.

15  Q.  Mr. Carton starts the e-mail by saying, "Guys, hope your

16  holiday was great.  Wrapping up 2016 with two final events."

17  What did you understand Mr. Carton to be referring to when he

18  says final events?

19  A.  Two casino gambling trips.

20  Q.  And then he goes on to say, "Ten to 15 percent return no

21  later than December 19."  Do you see that?

22  A.  Yes.

23  Q.  And then just dropping down to the last paragraph,

24  Mr. Carton says, "First trip is Friday ..."

25          Why don't we stop there.  What do you understand

IAV7CAR2                          Klein - Direct

1     Mr. Carton is referring to?

2     A.   He is going to a casino on Friday.

3     Q.   Let's take a look at Government Exhibit 1707.  First, if we

4     can just focus in on the e-mail below, the bottom e-mail.  Now,

5     this is an e-mail on December 1, 2016 at 5:42 p.m.  Was this

6     e-mail sent to you?

7     A.   Yes.

8     Q.   And what generally is Mr. Carton doing in this e-mail?

9     A.   It's a loan agreement giving me a personal guarantee.

10    Q.   OK.  And just reading the first sentence here, Mr. Carton

11    writes, "Allow this letter to serve as a personal promissory

12    note from Craig Carton to Harvey Klein in regards to Mr. Klein

13    making a short term loan of no less than $500,000 and no more

14    than $1 million for Mr. Carton's ticket business."

15              Do you see that?

16    A.   Yes.

17    Q.   Did you ever extend a loan for Mr. Carton to use in a

18    ticket business?

19    A.   No.

20    Q.   What did you understand Mr. Carton is referring to this

21    loan here, the ticket business?

22    A.   To hide the gambling from his wife.

23    Q.   Did Mr. Carton ever mention to you a ticket business in

24    connection with your extending gambling loans to him other than

25    in this instance?

IAV7CAR2                    Klein - Direct

1   A.  We had a conversation once.

2   Q.  And just generally what was that regarding?

3   A.  If I want to invest in a ticket business.

4   Q.  And did you ever agree to that?

5   A.  No.

6   Q.  Do you remember at what point that was in your extending of

7   loans to Mr. Carton for gambling?

8   A.  Sometime during our loan process.

9   Q.  But just to be clear, did you ever extend a loan or do any

10  business transactions with Mr. Carton relating to ticketing?

11  A.  No.

12  Q.  Now, other than that -- other than that time, did

13  Mr. Carton ever mention a ticket business in connection with

14  bank transactions?

15  A.  No.

16  Q.  Let's take a look at Government Exhibit 1704.  If we can

17  just focus first on the bottom e-mail.  So here we're rewinding

18  a couple of days.  This is November 8, 2016.  And Mr. Carton

19  wrote to you, "Bank asking questions about why you guys are

20  sending me the money and if we have a loan agreement.  They are

21  being cool and want to green light this type of funding more

22  and more but want to know what the relationship between us is."

23        Do you see that?

24  A.  Yes.

25  Q.  What do you understand Mr. Carton is saying here?

1   A.  That he was having problems with the bank.

2   Q.  And in particular can you be more descriptive than that?

3   A.  That the bank was giving him problems.

4   Q.  OK.  And was the bank asking questions?  Was that your

5   understanding?

6   A.  Yes.

7            MR. JANEY:  Objection.  Leading.

8            THE COURT:  The objection is sustained.

9   Q.  And then just going down to the next line, Mr. Carton wrote

10  to you, "I have said you guys fund my ticket business which is

11  both cash and wire."  Do you see that?

12  A.  Yes.

13  Q.  Was that true?

14  A.  No.

15  Q.  And then he goes on to say, "Anything you do or don't want

16  me to say please advise.  I went for a walk around the block."

17            Do you have an understanding of what he means by "I

18  went for a walk around the block"?

19            MR. JANEY:  Objection.  How does he know what is in

20  Mr. Carton's mind?

21            THE COURT:  Did you have an understanding, sir, of

22  what you were being told?  How did you read this e-mail?  What

23  thoughts did it trigger in your mind?

24            THE WITNESS:  That he walked out of the bank.

25  Q.  And if we can just pull out of this and then just enlarge

IAV7CAR2                          Klein - Direct

1    your response to Mr. Carton.  This is your response to

2    Mr. Carton on the same day.  Do you see that?

3    A.   Yes.

4    Q.   And what you wrote was, "I'm fine with the truth that we

5    find your ticket business."

6              First of all, is there any misspelling in there?

7    A.   "Find" should have been "fund".

8    Q.   And was it the truth that you funded Mr. Carton's ticket

9    business?

10   A.   No.

11   Q.   What was the truth?

12   A.   We did casino gambling loans.

13   Q.   And if we can just see Mr. Carton's response.  Mr. Carton

14   responded same day.  Can you read Mr. Carton's response to you,

15   please.

16   A.   "Thank you for confirmation I have told them the same."

17   Q.   Now, if we can just return to Government Exhibit 1707 and

18   just enlarge the e-mail of December 1, 2016 on the bottom.

19             Was this an e-mail in connection with another loan

20   that you extended to Mr. Carton?

21   A.   Yes.

22             THE COURT:  What was this?

23             MR. KOBRE:  Thank you, your Honor.

24   Q.   What was this?

25   A.   This was a loan guarantee from Mr. Carton and Mr. Wright.

1   Q.  And as proposed by Mr. Carton in this e-mail of December 1,

2   2016, how much was the loan for?

3   A.  Between 500,000 and $1 million.

4   Q.  And what was the date Mr. Carton was proposing here for you

5   to make this loan?

6   A.  December 2, 2016.

7   Q.  And by what date was Mr. Carton proposing that the loan

8   would be repaid?

9   A.  December 12, 2016.

10  Q.  Under the terms of the guarantee that Mr. Carton was

11  extending, what would be the interest rate of the loan?

12  A.  10 percent.

13  Q.  And what do you understand the purpose of this loan would

14  be, despite the fact that Mr. Carton refers to --

15          THE COURT:  No.  Just what did you understand?  Stop

16  testifying, Mr. Kobre.

17          MR. KOBRE:  Thank you, Judge.

18  Q.  What did you understand the purpose of this loan to be?

19  A.  Casino gambling loan.

20  Q.  And did you in fact extend this loan?

21  A.  Yes.

22  Q.  If we could take a look at Government Exhibit 2000 in

23  evidence, and if you could just read the name on these records

24  here, the upper left-hand corner.

25  A.  Craig Carton.

IAV7CAR2                         Klein - Direct

1   Q.  And if we can go to page 89 and the fourth entry.  Can you

2   read what it says in the top line here, received, what it says

3   after that.

4              MR. JANEY:  Objection, your Honor.  It speaks for

5   itself.

6              THE COURT:  Read the e-mail, sir.

7   A.  December 2, 2016.

8   Q.  And who is the beneficiary?

9   A.  Craig Carton.

10  Q.  And what is the amount?

11  A.  $500,000.

12  Q.  And who is the originator?

13  A.  Myself.

14  Q.  Now, returning back now to Government Exhibit 1707, if we

15  can enlarge the top e-mail.

16         This is an e-mail from you to Mr. Carton on December

17  11, 2016.  What is the purpose of this e-mail?

18  A.  I was giving him wire instructions where to send the loan

19  money back to.

20  Q.  OK.  We can take that down.

21         Did Mr. Carton repay the $500,000 as you requested in

22  your e-mail December 11?

23  A.  Yes.

24  Q.  And if we can take a look at Government Exhibit 2006-A,

25  page 3, and just enlarge the third -- or at least highlight the

IAV7CAR2                          Klein - Direct

1    third one from the bottom.

2            OK.  If I can just ask, first of all, this is titled

3    wire transfers.  Do you see that?

4    A.  Yes.

5    Q.  If you can just read under "debit party name" for the

6    highlighted line there.

7    A.  Advance M Ltd.

8    Q.  And who is listed under beneficiary?

9    A.  Myself.

10   Q.  There is a column there that is titled tran date.  Can you

11   read the entry.

12   A.  December 12, 2016.

13   Q.  And what is the amount?

14   A.  $500,000.

15   Q.  What did you understand the purpose of this -- why were you

16   receiving this $500,000 on December 12, 2016?

17   A.  Pay back a loan.

18   Q.  What kind of loan?

19   A.  Casino gambling.

20   Q.  Who was -- pay back of a loan to whom?

21   A.  Myself.

22   Q.  From whom?

23   A.  Mr. Carton.

24   Q.  If we can go to Government Exhibit 1708, and if we can just

25   enlarge the bottom e-mail.

1          This is an e-mail from Mr. Carton to you, and can you

2     just read the body of the e-mail.

3     A.   "Should be safely in your account."

4     Q.   What do you understand Mr. Carton is referring to here?

5     A.   The wire transfer of the $500,000 was paid back.

6     Q.   And if we can now just go up to the next e-mail, your

7     response to Mr. Carton.

8     A.   "Wire was received."

9     Q.   And what date was that e-mail?

10    A.   December 12, 2016.

11    Q.   If we can go now to Mr. Carton's response to that.  Can you

12    read that for us, please?

13    A.   "Thank you.  Nice and smooth.  I will see MW by end of week

14    for the paper transfer."

15    Q.   That's fine.  What did you understand MW to be referring

16    to?

17    A.   Michael Wright.

18    Q.   And you are saying I will see Michael Wright by the end of

19    the week -- I'm sorry.  Mr. Carton is saying I will see Michael

20    Wright by the end of the week for the paper transfer.  What did

21    you understand him to be referring to by paper transfer?

22    A.   Meaning 50,000 cash interest.

23    Q.   And interest on what?

24    A.   The loan.

25    Q.   Is that the loan that we just talked about?

IAV7CAR2                    Klein - Direct

1    A.  Yes.

2    Q.  And if we can just now go to that top e-mail and enlarge

3    that.

4           So this is an e-mail from Mr. Carton to you a little

5    bit later on the same day.  The subject is Re:  Wire.  And

6    Mr. Carton writes, "I forgot your dates investment wise but

7    would be remiss if I didn't offer you first dibs.  I'm going to

8    Atlantis and then Bimini December 26 through January 1.  Pay

9    back is January 10th.  10 percent."  Do you see that?

10   A.  Yes.

11   Q.  What do you understand Mr. Carton to be referring to when

12   he talked about Atlantis?

13   A.  He was going to gamble at the Atlantis and at Resorts World

14   Bimini.

15   Q.  Now, do you recall if you ultimately invested in or,

16   rather, you loaned him money as he requested here?

17   A.  I don't remember, but I don't think so.

18   Q.  Now turning to April of 2017 --

19          We can take this down.

20          Did you extend another gambling loan to Mr. Carton in

21   April of 2017?

22   A.  Yes.

23   Q.  Let's take a look at Government Exhibit 1709.  Take a look

24   at the bottom e-mail first.  This is an e-mail on April 12,

25   2017 from Mr. Carton to you, and he says, "Hope you are both

1    well."  Who is he referring to when he says "both"?

2    A.  Myself and Michael Wright.

3    Q.  OK.  He says, "Taking a trip to Hollywood on Friday and

4    wanted to see if you were interested.  Same offer as always."

5    First of all, what did you understand he was referring to when

6    he talked about Hollywood?

7    A.  Hard Rock Hotel and Casino in Hollywood, Florida.

8    Q.  And he goes on to say, "Can take up to $1 and return the

9    following Monday."  What do you understand he is saying there?

10   A.  He would borrow up to $1 million.

11   Q.  And let's just scroll up, if we can, to the second e-mail

12   on the page.  You responded, "I am away for Pesach, but can see

13   if I can figure something out tomorrow.  15 percent for seven

14   days with 2 personal guarantees."  Do you see that?

15   A.  Yes.

16   Q.  What did you mean by 15 percent for seven days with two

17   personal guarantees?

18   A.  15 percent interest for a 7 day loan with two personal

19   guarantees with Craig Carton and Michael Wright.

20   Q.  And referring back now to the top e-mail.  This is an

21   e-mail from Mr. Carton to you replying to your e-mail.  Can you

22   read that, the body of the e-mail, please?

23   A.  "Let's agree on 10 percent for seven days and I'll send the

24   standard e-mail ASAP."

25   Q.  And what did you understand your money was going to be used

IAV7CAR2                    Klein - Direct

1  for should you agree to extend this loan?

2  A.  Casino gambling.

3  Q.  And then there is some wiring information.  What do you

4  understand the purpose of that to be?

5  A.  Where I should be wiring the money.

6  Q.  If we could take a look at Government Exhibit 1710 and just

7  focusing on the e-mail that's at 3:52 a.m.  This is an e-mail

8  from Mr. Carton to you on April 13, 2017.  What are we looking

9  at here?

10  A.  The loan agreement between Craig Carton and myself.

11  Q.  And as stated in this e-mail, how much would this loan be

12  no less than?

13  A.  $500,000.

14  Q.  And by what date would you provide the loan?

15  A.  April 13, 2017.

16  Q.  And when was Mr. Carton proposing the loan would be repaid?

17  A.  Seven business days.

18  Q.  At what interest rate?

19  A.  10 percent.

20  Q.  And what did you understand the purpose of this loan to be?

21  A.  Casino gambling.

22  Q.  Did you lend money to Mr. Carton as he was requesting here?

23  A.  Yes.

24  Q.  Let's take a look at Government Exhibit 2000, page 92.  Or

25  actually if we could just stay on page 1 for a moment.  Could

1    you just read the name on these account records.

2    A.   Craig Carton.

3    Q.   And if we go to page 92 now and focus in on the fourth

4    entry down from the top of the page.  Could you read the date

5    after the word "received"?

6    A.   April 14, 2017.

7    Q.   And beneficiary?

8    A.   Craig Carton.

9    Q.   And the amount?

10   A.   $500,000.

11   Q.   And the originator?

12   A.   Myself.

13   Q.   So how much was this loan for?

14   A.   $500,000.

15   Q.   And if we can now go to Government Exhibit 1712 and just

16   focusing on the bottom e-mail.  This is an e-mail from somebody

17   named Javier Corrales at citi.com to Mr. Carton.  Is this

18   e-mail ultimately forwarded to you?

19   A.   Yes.

20   Q.   And the subject of the e-mail is Harvey Klein 500, and the

21   e-mail says, "Craig, the wire for Harvey Klein has been sent

22   and approved."

23           What did you understand this was referring to?

24   A.   Paying back the loan of $500,000.

25   Q.   If we could just zoom out and just enlarge the next e-mail

1    up.  I'm sorry, two items up.

2              This is an e-mail in response to the e-mail that we

3    just looked at from the person at Citibank.  And who are you

4    responding to here?

5    A.  Craig Carton.

6    Q.  And can you just read that.

7    A.  "No wire arrived.  Can you please request a Fed tracking

8    number."

9    Q.  But at the end of the day did you ultimately receive

10   repayment on this loan?

11   A.  Yes.

12   Q.  We can take that down.

13             Now, Mr. Klein, approximately when was the last time

14   you extended a loan to Mr. Carton?

15   A.  May of 2017.

16   Q.  And if we can take a look at Government Exhibit 1713, and

17   just enlarge that e-mail.

18             This is an e-mail from Mr. Carton to you and Mr.

19   Wright on May 2, 2017.  Do you see that?

20   A.  Yes.

21   Q.  What are we looking at here?

22   A.  The loan agreement.

23   Q.  What's the subject of the e-mail?

24   A.  Biz.

25   Q.  And Mr. Carton writes over here in the first line, "Allow

1  this e-mail to represent a business agreement in which Harvey

2  Klein is investing in a legal business opportunity presented to

3  him by Craig Carton and Michael Wright."  What was the legal

4  business opportunity that Mr. Carton was referring to here?

5  A.  Casino gambling.

6  Q.  And as proposed by Mr. Carton in this May 2, 2017 e-mail,

7  how much was the loan going to be for?

8  A.  $500,000.

9  Q.  And what date would extend the loan?

10 A.  May 3, 2017.

11 Q.  And by what date would Mr. Carton be required to repay the

12 loan.

13 A.  May 11.

14 Q.  Under the terms of that Mr. Carton was proposing here, what

15 would you be receiving in response or in exchange for making

16 this loan?

17 A.  10 percent cash interest.

18 Q.  And did you ultimately loan Mr. Carton the $500,000 as he

19 proposed here?

20 A.  I believe so.

21 Q.  And were you ultimately repaid for this loan?

22 A.  Yes.

23 Q.  Take a look at Government Exhibit 1714.  Just enlarge the

24 e-mail so it's easier to see.

25          This is an e-mail from you to Mr. Carton; the subject

IAV7CAR2                    Klein - Direct

1    is loan wiring instructions.  And what's the date of this

2    e-mail?

3    A.  May 9, 2017.

4    Q.  So was this after you extended the loan that we just looked

5    at?

6    A.  Yes.

7    Q.  And you write here in this e-mail to Mr. Carton, "Hi Craig,

8    I hope you're doing well.  I must have the funds back in my

9    account by Thursday morning for a closing.  Let's see if we can

10   get it done correctly and the day it's actually due back for

11   once.  LOL."  What were you referring to there?

12   A.  Getting the loan paid back on time.

13   Q.  Is this the last loan that you extended to Mr. Carton?

14   A.  Yeah.

15   Q.  And why did you stop?

16   A.  I was contacted by the F.B.I.

17   Q.  What happened when you were contacted by the F.B.I.?  What

18   did the F.B.I. want?

19   A.  They asked me questions.

20   Q.  They asked you questions?

21   A.  Yes.

22   Q.  About when was that?

23   A.  May.

24   Q.  Of what year?

25   A.  2017.

1    Q.  And when you were first approached by the F.B.I., were you

2    asked whether you received interest on loans that you extended

3    to Mr. Carton?

4    A.  Yes.

5    Q.  And what did you say?

6    A.  No.

7    Q.  And was that true?

8    A.  No.

9    Q.  Were you also asked how Mr. Carton -- if you knew how

10   Mr. Carton was using the money that you loaned him?

11   A.  Yes.

12   Q.  And what did you tell the F.B.I.?

13   A.  I said I don't know what he uses the funds for.

14   Q.  Is that true?

15   A.  No.

16   Q.  And were you also asked about how many times you had loaned

17   Mr. Carton money?

18   A.  Yes.

19   Q.  And what did you tell the F.B.I.?

20   A.  Two to three times.

21   Q.  And was that a truthful answer?

22   A.  No.

23   Q.  Why did you lie to the F.B.I.?

24   A.  Because I didn't want to get tripped up.

25   Q.  Did you ultimately correct those misstatements and lies

1    when you spoke with the government?

2    A.  Yes.

3    Q.  Now, if we can post Government Exhibit 1715.  If we can

4    just enlarge that.  Or actually I'm sorry to trouble you.  If

5    we can just enlarge the bottom e-mail.

6            Now, this is an e-mail on May 21, 2017 from Mr. Carton

7    to you, and it says, "Harvey, can you kindly send me the

8    below."  It says, "Dear Craig."  If you just read that e-mail

9    to us?

10   A.  "Please allow this note to confirm that based on your

11   recent payment, Tier One tickets has no further obligation to

12   offer me or to sell me ticket to any show, event or concert

13   that it may have access to.  Furthermore, I have no claim to or

14   for any future ticket opportunities that may arise through Tier

15   One Tickets professionally or Mr. Carton personally.  As

16   always, it was a pleasure doing business with you, and I wish

17   you and your new partners the very best."

18           Now, when you received this e-mail, did you understand

19   what Mr. Carton was referring to here?

20   A.  No.

21   Q.  Had you ever heard of Tier One Tickets before receiving

22   this e-mail?

23   A.  No.

24   Q.  Had you ever been involved in any kind of ticket business

25   with Mr. Carton?

IAV7CAR2                          Klein - Direct

1    A.  No.

2    Q.  And so if we can just now go to your response to this

3    e-mail.  You responded to Mr. Carton on May 22, 2017, and you

4    wrote, "I'm not sure what your e-mail is saying.  It sounds

5    very lawyerese.  Please explain."

6            Can you just explain what you're responding here to

7    Mr. Carton.

8    A.  I'm not sure what he wanted from me.

9    Q.  Now, this e-mail that you received from Mr. Carton on May

10   22, 2017, was that before or after you were contacted by the

11   F.B.I.?

12   A.  After.

13   Q.  And did you subsequently contact Mr. Carton to get some

14   explanation for this e-mail?

15   A.  Yes.

16   Q.  And how did you contact him?  By what means?

17   A.  Phone.

18   Q.  And did you record a phone call with Mr. Carton?

19   A.  Yes.

20   Q.  And did you do that of your own volition, or were you asked

21   by the government?

22   A.  I did it on my own.

23   Q.  If we can hand up -- if you can take a look at what's in

24   front of you marked Government Exhibit 1700.  Do you have that?

25   A.  Yes.

IAV7CAR2                         Klein – Direct

1    Q.   What is it?

2    A.   Recorded phone call.  It's a CD.

3    Q.   OK.  It's a disk?

4    A.   Yes.

5    Q.   And what's on the disk?

6    A.   A recorded phone call.

7    Q.   OK.  And does it also have a transcription that goes along

8    with the recorded phone call?

9    A.   Yes.

10   Q.   And prior to coming to court here today, did you have an

11   opportunity to review first of all the recorded phone call to

12   see if it accurately reflects the call that you recorded with

13   Mr. Carton?

14   A.   Yes.

15   Q.   Did you also have an opportunity to review the transcript

16   of the call, the written transcript, before you came to court

17   here today?

18   A.   Yes.

19   Q.   And does the transcript accurately reflect what is being

20   said on the phone call?

21   A.   Yes.

22   Q.   Both by yourself and Mr. Carton?

23   A.   Yes.

24           MR. KOBRE:  Your Honor, the government offers

25   Government Exhibit 1700.

1           MR. JANEY:  No objection.

2           THE COURT:  Admitted.

3           (Government Exhibit 1700 received in evidence)

4           MR. KOBRE:  And, your Honor, at this time we would ask

5      to play Government Exhibit 1700 for the jury.

6           THE COURT:  Go ahead.

7           (Audio played)

8  Q.  First of all, if I could just ask, you saw CC and HK.  Who

9  is speaking when the audio said CC.

10 A.  Craig Carton.

11 Q.  OK.  And who was speaking when the transcript said HK?

12 A.  Myself.

13 Q.  And when Mr. Carton said at the end of the call there, no,

14 you have nothing to do with the ticketing business, is that

15 true?

16 A.  Yes.

17 Q.  Now, are you familiar with an individual named Dan Cortez?

18 A.  Yes.

19 Q.  Who is Mr. Cortez?

20 A.  He was a host at Sugar House Casino in Philadelphia,

21 Pennsylvania.

22 Q.  Other than lending money for Mr. Carton to gamble with, did

23 you have any other business dealings with Mr. Carton?

24 A.  No.

25 Q.  Did you invest any money in any business of Mr. Carton?

IAV7CAR2                         Klein – Direct

1   A.  No.

2   Q.  Did you ever have any business deals or other business

3   relationship with Mr. Carton relating to the sale of tickets to

4   concerts or live events?

5   A.  No.

6   Q.  Did you ever invest money with Mr. Wright or Mr. Carton to

7   fund the purchase of tickets to a concert or live events?

8   A.  No.

9   Q.  Prior to being asked questions in connection with this

10  investigation, had you ever heard of a company called AEG Live

11  LLC or AEG Presents?

12  A.  No.

13  Q.  Are you familiar with an individual named Gary Gersh?

14  A.  No.

15  Q.  Are you familiar with an individual named Joseph Meli?

16  A.  No.

17  Q.  Had you ever heard that name prior to in the course of this

18  investigation?

19  A.  No.

20  Q.  Are you familiar with a company -- other than having sent

21  or received money in connection with your loans to

22  Mr. Carton -- have you ever heard of a company called Advance

23  Entertainment?

24  A.  No.

25  Q.  Are you familiar with a company named BSE Global, Brooklyn

1    Sports and Entertainment?

2    A.  No.

3    Q.  Are you familiar with an individual named Fred Mangione?

4    A.  No.

5    Q.  Are you familiar with an individual name Brett Yormark?

6    A.  No.

7             MR. KOBRE:  Nothing further.

8             THE COURT:  How much cross are we going to have of

9    this witness?

10            MR. JANEY:  Sorry, your Honor?

11            THE COURT:  How much cross are we going to have of

12   this witness?

13            MR. JANEY:  Substantial, your Honor.

14            THE COURT:  OK.  Let's take a ten minute break now,

15   folks.  Don't discuss the case.  Keep an open mind.

16            (Recess)

17            (Continued on next page)

18

19

20

21

22

23

24

25

IAVHCar3

1          (Jury not present)

2          THE COURT:  Case on trial continued.  The parties are

3    present.  The jurors are not present.

4          Yes.

5          MR. GOTTLIEB:  Your Honor, may I just address

6    something very briefly?

7          THE COURT:  Yes.

8          MR. GOTTLIEB:  Your Honor, I just want to respond to

9    the issue that arose this morning when I asked just to let me

10   check something.  I want your Honor to understand when that

11   occurred, the only reason why I asked for it is we had

12   stipulations.  There were a lot of numbers being thrown out.

13   As an attorney I felt obligated to make sure that the numbers

14   were on the stipulation that were received.  That was the end

15   of it.

16         Now, the only reason why I'm raising it, your Honor,

17   is that the reaction toward me in front of the jury can't do

18   anything else, I fear, than have a jury think there's something

19   wrong here, and that potentially hurts my client.  So I raise

20   it so that your Honor understands I sure the heck was not

21   trying to delay anything.

22         THE COURT:  Thank you, Mr. Gottlieb.

23         Would you bring in the jurors, please.

24         (Continued on next page)

25

IAVHCar3                          Klein - Cross

1              (Jury present)

2              THE COURT:  Folks, this is like very weird, but they

3    found me a stool that I can prop myself up against.  This is

4    all new to me, so I feel like I'm looming over everything.  So

5    pay no attention to me.

6              Who's going to cross?

7              MR. JANEY:  Your Honor.

8              THE COURT:  Mr. Janey.

9    CROSS-EXAMINATION

10   BY MR. JANEY:

11   Q.  Mr. Klein, good morning.

12   A.  Good morning.

13   Q.  In your testimony this morning, you stated that you have no

14   agreements with the government.  Do you recall that?

15   A.  Yes.

16   Q.  Do you recall meeting with prosecutors in this case on

17   October 16, 2018?

18   A.  I don't recall the exact dates.

19   Q.  Do you recall meeting with prosecutors in this case in

20   October of 2018?

21   A.  Yes.

22   Q.  Do you recall that prior to speaking with the prosecutors

23   in this case at that meeting, you were provided a proffer

24   agreement?  Do you recall that?

25   A.  Yes.

1    Q.  Isn't it your understanding that in connection with that

2    meeting in October of 2018, with that proffer agreement, any

3    statements that you made during that meeting would not, in sum

4    and substance, be held against you in any criminal prosecution?

5    A.  Yes.

6    Q.  And you signed that proffer agreement, correct?

7    A.  Yes.

8    Q.  Is it fair to say that on that date you effectuated an

9    agreement with the government?

10   A.  Yes.

11   Q.  Isn't it then fair to say that your testimony this morning

12   when you stated that you don't have an agreement with the

13   government, that's not correct?

14   A.  I didn't understand this question this morning, then, but

15   yes.

16   Q.  You have immunity for your testimony today, isn't that

17   correct?

18   A.  To a certain degree.

19   Q.  In fact, it was ordered by this Court that no testimony or

20   information can be compelled as against you or any information

21   directly or indirectly derived from your testimony or other

22   information may be used against you in any criminal case except

23   a prosecution for perjury, correct?

24   A.  Yes.

25   Q.  You testified earlier upon the government's examination of

1  you that you lied about the loans, correct?

2  A.  Yes.

3  Q.  You further testified that you lied about the interest

4  rates on the loans, correct?

5  A.  Yes.

6  Q.  And when the government asked you the reason for the lies,

7  you stated that you didn't want to get caught, correct?

8  A.  Yes.

9  Q.  What did you mean by that?

10  A.  For not paying taxes on the loans.

11  Q.  Did you pay taxes on the loans, Mr. Klein?

12  A.  2017 taxes have been paid.

13  Q.  That's not my question.

14       THE COURT:  Have you paid all the taxes that were due

15  on the money you made on the loans?

16       THE WITNESS:  I advised my accountant to look into

17  2016.  He suggested he will review it after October 15.

18  Q.  Did you pay taxes on the loans, Mr. Klein, yes or no?

19  A.  Yes, 2017; no, 2016.

20       THE COURT:  The answer is some, not necessarily all?

21       THE WITNESS:  Correct.

22       THE COURT:  Fine.  Move on.

23  Q.  So for your testimony today, the government, in effect,

24  forgives all that, correct?

25       MR. KOBRE:  Objection.

IAVHCar3                     Klein - Cross

1           THE COURT:  Objection's sustained.

2    Q.  Mr. Klein, you are an executive, in fact, the CEO at a

3    utility company called HICO, H-I-C-O, correct?

4    A.  I was.

5    Q.  When did you cease to be an executive at HICO, Mr. Klein?

6    A.  The company was sold March 1, 2018.

7    Q.  That company was based in Monsey, New York, correct?

8    A.  Yes.

9    Q.  And it had operations in New Jersey and Pennsylvania,

10   correct?

11   A.  Yes.

12   Q.  When you operated those businesses in those states, you

13   operated under a license, correct?

14   A.  Yes.

15   Q.  When did you first speak with the government?

16   A.  May of 2017.

17   Q.  I'm sorry.  You just said.  When did you cease to be an

18   executive at HICO?

19   A.  March 1, 2018.

20   Q.  Isn't it true that in February of 2015, your company was

21   the subject of an enforcement action by the New York Attorney

22   General Bureau of Consumer Fraud?

23           MR. KOBRE:  Objection.  Relevance.

24           THE COURT:  Overruled.

25   A.  Yes.

IAVHCar3                         Klein - Cross

1   Q.  And the New York State attorney general reached a finding

2   in February of 2015 that your company engaged in "deceptive

3   business practices" from at least 2011, misleading consumers

4   about savings and prices on electric services they would

5   receive from your company, correct?

6            MR. KOBRE:  Objection.  Hearsay.

7            THE COURT:  Overruled.

8   A.  That was an allegation.

9   Q.  In fact, the New York State attorney general alleged that

10  "HICO made false and misleading savings and price claims on its

11  website, in its door-to-door sales, and through its marketing

12  contractors performing telemarketing and in-person

13  solicitations," correct?

14           MR. KOBRE:  Objection.  Hearsay.

15           THE COURT:  Overruled.  And stop making that

16  objection, Mr. Kobre.

17           MR. KOBRE:  Yes, Judge.

18  A.  That was an allegation as well.

19  Q.  For its deceptive conduct, the New York State attorney

20  general sanctioned HICO $1,250,000 to be used by the New York

21  Attorney General's Office for restitution, moneys reimbursed to

22  certain current and former HICO consumers, correct?

23  A.  Yes.

24  Q.  In terms of the settlement of that enforcement action,

25  there was a formal written agreement by the New York attorney

IAVHCar3                         Klein - Cross

1  general, correct?

2  A.  Yes.

3  Q.  Requiring payment of these moneys, correct?

4  A.  Yes.

5  Q.  And imposing conditions on you and HICO in order to stay in

6  business, correct?

7  A.  Yes.

8  Q.  As the CEO and owner of HICO, you were required to sign

9  that agreement, correct?

10 A.  Yes.

11 Q.  In May of 2014, the New Jersey state attorney general

12 brought an action against you personally and your company

13 alleging that you guaranteed consumers monthly savings of up to

14 10 percent for the first six months on their monthly electric

15 and utility bills, then failed to deliver those savings,

16 correct?

17 A.  That was an allegation.

18 Q.  In January of 2015, you entered into a consent judgment

19 with the New Jersey state attorney general, correct?

20 A.  Yes.

21 Q.  And that consent judgment required that you pay

22 $2.1 million to the state of New Jersey, correct?

23 A.  Yes.

24 Q.  I'm sorry.  I didn't hear you.

25 A.  Yes.

IAVHCar3                      Klein – Cross

1   Q.  You were required to sign that agreement, correct,

2   Mr. Klein?

3   A.  Yes.

4   Q.  Isn't it fair to say that you don't need any further legal

5   troubles, Mr. Klein?

6   A.  Correct.

7             MR. KOBRE:  Objection.

8             THE COURT:  The objection's overruled.

9   Q.  In February of 2015, the Pennsylvania Public Utility

10  Commission brought a complaint against your company alleging

11  multiple violations of Pennsylvania law and Pennsylvania

12  utility commission, Public Utility Commission, orders and

13  regulations whereby consumers were misled and deceived by you

14  as to the price they would pay for their electricity, correct?

15  A.  That was an allegation.

16  Q.  In fact, your license in Pennsylvania was subject to an

17  18-month conditional probation period when it was first

18  instituted based on the high number of complaints that

19  Pennsylvania received from New York in connection with your

20  business, correct?

21  A.  No.

22  Q.  The Pennsylvania Public Utility Commission reached findings

23  against you, Mr. Klein, correct?

24  A.  Yes.

25  Q.  Among those findings, the Pennsylvania commission

IAVHCar3                    Klein - Cross

1    specifically found that you, Mr. Klein, made the business

2    decisions to intentionally overbill approximately 5,700

3    customers enrolled in the guaranteed savings plan during the

4    months of January to April '14 in what was called the polar

5    vortex by approximately $1.8 million, correct?

6    A.  Correct, that was industry-wide.

7    Q.  For these violations and your intentional conduct, you and

8    HICO were ordered to pay the Commonwealth of Pennsylvania a

9    civil penalty in the amount of $1,836,125, correct?

10   A.  That is pending in the state Supreme Court.

11              THE COURT:  What do you mean by that, sir?

12              THE WITNESS:  We filed an appeal.  The Supreme Court

13   took our case, and we're waiting for a judgment.

14   Q.  You testified earlier that you met Mr. Carton through

15   Michael Wright, correct?

16   A.  Yes.

17   Q.  You came to know Michael Wright through a friend of Michael

18   Wright's wife, correct?

19   A.  Through Tommy Gennaro.

20   Q.  When you came to eventually meet Michael Wright, he

21   introduced you to Mr. Carton, correct?

22   A.  Yes.

23   Q.  As you testified, there came a time when you gave

24   Mr. Carton money for gambling, correct?

25   A.  Correct.

IAVHCar3                    Klein - Cross

1   Q.  And there isn't a single instance when you loaned

2   Mr. Carton money for gambling that you did not also require

3   that Michael Wright personally guarantee that money, correct?

4   A.  Correct.

5   Q.  You gave him these loans in order to make a return,

6   correct?

7   A.  Correct.

8   Q.  A handsome profit, correct?

9   A.  Correct.

10  Q.  Approximately 10 to 15 percent, correct?

11  A.  Correct.

12  Q.  And you at the time were aware that the interest rates you

13  were charging on these loans might be inconsistent with law,

14  correct?

15  A.  That was what was offered to me by Mr. Wright and

16  Mr. Carton.

17  Q.  You extended the loans, correct?

18  A.  Yes.

19  Q.  You required that the interest payments be made, correct?

20  A.  Yes.

21  Q.  You accepted the interest payments, correct?

22  A.  Yes.

23  Q.  And often you received the interest payments in cash,

24  correct?

25  A.  Correct.  That's how it was offered to me.

IAVHCar3                        Klein - Cross

1   Q.  That wasn't my question.

2           You received the money in cash, correct?

3   A.  Correct.

4   Q.  Sometimes in a bag delivered to you personally, correct?

5   A.  Correct.

6   Q.  At times when Mr. Carton asked whether you wished for the

7   money to be delivered to you via wire transfer, you insisted

8   that the money be handed to you in cash, correct?

9   A.  I don't recall that.

10  Q.  Drawing your attention to December 2, 2016.  We're in

11  December 2, 2016, Mr. Klein.  You wired $500,000 to

12  Mr. Carton's personal Citibank account, correct?

13  A.  Correct.

14  Q.  And you wired that from Wells Fargo, correct?

15  A.  Correct.

16  Q.  The entity by which you made the transfers is an entity

17  called King Ventures LLC, correct?

18  A.  Correct.

19  Q.  And you agreed to a payback period of January 10, correct?

20  A.  Correct.

21  Q.  You had no reason to question that Mr. Carton used these

22  funds for the reasons that you agreed, correct?

23  A.  Correct.

24  Q.  And you knew that he would use the money for gambling

25  because you had friends in the industry who watched him,

IAVHCar3                        Klein - Cross

1    correct?

2    A.  I never watched him.

3    Q.  Well, that's not my question.

4              You had friends in the casino industry, correct,

5    Mr. Klein?

6    A.  I sell to the casino industry, yes.

7    Q.  You have friends in the casino industry, Mr. Klein?

8    A.  Yes.

9    Q.  And at times when Mr. Carton went to gamble with money that

10   you provided to him, you called your friends at the casinos,

11   correct?

12   A.   Incorrect.

13   Q.  You called your friends to be sure that Mr. Klein was

14   gambling, correct?

15             THE COURT:  Mr. Carton.

16   A.  Mr. Carton.

17   Q.  Mr. Carton.

18   A.  No, incorrect.

19   Q.  You remember meeting with the FBI and the prosecutors in

20   this case prior to this testimony today?

21   A.  Yes.

22   Q.  Do you recall telling them that at places like Seminole

23   Hard Rock that you called your friends at that casino to ensure

24   that Mr. Carton was gambling?

25   A.  I did not call.  I was personally at the Seminole Hard Rock

IAVHCar3                    Klein - Cross

1  after one of Craig Carton's trips.  And I asked if he was there

2  in the past, and the answer was yes.

3  Q.  So you were assured that Mr. Carton was gambling, weren't

4  you, Mr. Klein?

5  A.  Yes.

6  Q.  Drawing your attention to April 2017, you wired Mr. Carton

7  $500,000, correct?

8  A.  Correct.

9  Q.  And earlier, going back to 2016, earlier you testified that

10  in November of 2016, Mr. Carton was delayed somewhat in

11  repaying you the loan that you made him at that time.  Do you

12  recall that testimony?

13  A.  Correct.

14       MR. JANEY:  The Defendant's Exhibit 115, please, shown

15  only to the Court and counsel and the witness.

16  Q.  Mr. Klein --

17  A.  Yes.

18  Q.  -- is this an email from you to Craig Carton and Michael

19  Wright on November 4, 2016?

20  A.  Yes.

21       MR. JANEY:  Your Honor, at this time we move to admit

22  115 into evidence.

23       MR. KOBRE:  Objection.  Hearsay.

24       THE COURT:  You're offering it?  Where is it?

25       MR. JANEY:  I understand.  I withdraw the motion, your

1   Honor.

2              THE COURT:  OK.  We offer exhibits; we don't make

3   motions.  But I'll be happy to rule if I can see it.

4              MR. JANEY:  If I may approach, your Honor?

5              THE COURT:  That would be the easiest way.  It's the

6   old-fashioned way.

7              MR. JANEY:  Thank you, your Honor.

8              THE COURT:  I actually like the old-fashioned way.

9              The objection's sustained.

10  BY MR. JANEY:

11  Q.  In November of 2016 when the payment was delayed, you

12  testified about this earlier, you indicated that the issue was

13  that Mr. Carton had a problem with his bank.  Do you recall

14  that testimony?

15  A.  Yes.

16  Q.  Isn't it, in fact, the case that there came a point where

17  Mr. Carton forwarded to you a letter from City National Bank

18  stating what the problem was, correct?

19  A.  Yes.

20  Q.  And what is your recollection as to what the bank in its

21  letter explained as the problem?

22  A.  I don't recall.

23  Q.  When you made loans to Mr. Carton, you knew that your funds

24  might be pooled with others, correct, Mr. Klein?

25  A.  No -- I'm sorry.  Together with Michael Wright, yes.

IAVHCar3                        Klein – Cross

1   Q.  Well, to clarify, you knew that Mr. Carton might be

2   gambling for other investors at the same time as he's gambling

3   the money that you loaned him, correct?

4   A.  I wasn't an investor.  I made a loan.

5   Q.  You were aware that if others loaned Mr. Carton money to

6   gamble, that your moneys would be mixed in with those, correct?

7        MR. KOBRE:  Objection.  Relevance.

8        THE COURT:  Objection's sustained.

9   Q.  Did you have an understanding that Mr. Carton was only

10  gambling with the loan proceeds from you, Mr. Klein?

11       MR. KOBRE:  Same objection.

12       THE COURT:  Objection's sustained.

13  Q.  When you made the loans to Mr. Carton, you didn't request a

14  formal legal agreement, did you, Mr. Klein?

15  A.  Correct.

16       THE COURT:  By "formal legal agreement," do you mean a

17  written agreement?

18       MR. JANEY:  Yes, your Honor.

19  Q.  You did not request a formal written legal agreement,

20  correct, Mr. Klein?

21       THE COURT:  It's the word "legal" that I'm objecting

22  to, because it's perfectly possible to have a legal unwritten

23  agreement.

24       MR. JANEY:  Yes.  Withdrawn.

25  Q.  You did not request a formal written agreement, did you,

IAVHCar3                         Klein - Cross

1    Mr. Klein?

2    A.   I did.

3    Q.   In what form did you require the agreement?

4    A.   Via email.

5    Q.   At any time did you request that the agreement be in a form

6    other than email?

7    A.   No, not that I can recall.

8    Q.   Did you have a preference for the form of the agreement

9    being an email?

10          MR. KOBRE:   Objection.   Relevance.

11          THE COURT:   Overruled.

12   A.   I wasn't picky as to how I got it.   They could have sent it

13   by fax.   They chose email.

14   Q.   Earlier you testified that Mr. Carton was concerned about

15   his wife finding out about the loans.   Do you recall that

16   testimony?

17   A.   Yes.

18   Q.   And the loans specifically in connection with gambling,

19   correct?

20   A.   Correct.

21   Q.   Isn't it your understanding that that was Mr. Carton's

22   concern, for the reason that he wanted to keep the loans quiet,

23   for lack of a better word?

24   A.   I don't understand your question.

25   Q.   Did you have an understanding that -- well, withdrawn.

1        Did there come a time when Mr. Carton asked for the

2   discussions about the loans to be discussed over email in code

3   terms?

4   A.  Yes -- he didn't ask for it, no.

5   Q.  How did you come to the understanding of that?

6   A.  When I would receive emails confirming the loans, the loan

7   agreements we had, every loan agreement had a different name.

8   Q.  What was your understanding as to the different names of

9   those loans?

10  A.  Operation hide from wife.

11  Q.  And you had that understanding because Mr. Carton didn't

12  want his wife to know about the gambling, correct?

13  A.  Correct.

14        MR. JANEY:  No further questions, your Honor.

15        THE COURT:  Thank you.

16        Redirect.

17        MR. KOBRE:  Thank you, your Honor.  Just briefly.

18  REDIRECT EXAMINATION

19  BY MR. KOBRE:

20  Q.  You were asked some questions on cross-examination about

21  the energy company that you operated.  Do you recall that?

22  A.  Yes.

23  Q.  Do you have any agreement at all with the government with

24  respect to allegations that were made against your company?

25  A.  The government regarding this case?

1   Q.  Do you have any agreements with the U.S. Attorney's Office,

2   I'm sorry, regarding allegations that were made against your

3   energy company?

4   A.  No.

5   Q.  You were also asked some questions about a proffer

6   agreement that you entered into with the government.  Do you

7   remember that?

8   A.  Yes.

9   Q.  Do you recall what period of time that agreement covered or

10  what that agreement covered or related to?

11  A.  Just what was spoken here in court today.

12  Q.  I'm sorry.  The proffer agreement that you were asked

13  about -- do you recall being asked questions --

14  A.  Yes.

15  Q.  -- about a proffer agreement?

16          Do you remember when you signed the proffer agreement?

17  A.  Maybe a month ago.

18  Q.  Do you recall, when you signed the proffer agreement, did

19  you read it before you signed it?

20  A.  Briefly.

21  Q.  Did it relate to a particular time period or did it relate

22  to all time?

23  A.  I believe it's just relating to this period now.

24  Q.  Specifically, did it relate to a particular meeting that

25  you had with the government?

IAVHCar3                    Klein - Redirect

1   A.  I don't recall.

2   Q.  If you looked at the agreement, would it help to refresh

3   your recollection?

4   A.  Yes.

5          MR. KOBRE:  If we can -- if Mr. Quigley can just

6   approach the witness for a moment --

7          THE COURT:  Surely.

8          MR. KOBRE:  -- with what's marked Government

9   Exhibit -- Defense Exhibit, I think, 112.

10  Q.  If we could direct your attention to the top paragraph of

11  the agreement.

12  A.  What's the question?

13  Q.  Yes.  Now, if you could just look up.  Does that refresh

14  your recollection as to whether the proffer agreement relates

15  to a particular date or time?

16  A.  October 16, 2018.

17  Q.  Is it your understanding that that relates to any other

18  dates or times other than a meeting that you had on that date?

19  A.  No.

20  Q.  You were asked some questions on cross-examination about a

21  particular loan that you extended in December of 2016.  Do you

22  remember that?

23  A.  Yes.

24          MR. KOBRE:  If we can just pull up Government

25  Exhibit 1707 and just enlarge the bottom email.

1   Q.   What are we looking at here?

2   A.   A loan agreement from Craig Carton to myself.

3   Q.   And this was the loan that was -- this relates to the loan

4   that Mr. Carton was proposing would be extended when?

5   A.   December 2016, December 2, 2016.

6   Q.   And when was the loan due back to you?

7   A.   December 12, 2016.

8        MR. KOBRE:  If we can now go to 2006-A, the last page,

9   just enlarge that.

10  Q.   And focusing your attention on the third to last entry, did

11  you receive a transfer on December 12, 2016, as reflected here?

12  A.   Yes.

13  Q.   How much was that for?

14  A.   $500,000.

15       MR. KOBRE:  One moment.

16       Nothing further.

17       THE COURT:  Anything else?

18       MR. JANEY:  No, your Honor.

19       THE COURT:  Thank you, Mr. Klein.  You're excused.

20       Call your next witness.

21       (Witness excused)

22       MR. QUIGLEY:  Thank you, your Honor.  The government

23  calls Brett Yormark.

24       THE COURT:  Brett whom?

25       MR. QUIGLEY:  Yormark.

1            THE LAW CLERK:  Come on up.

2            THE COURT:  We're going to try to make this switch.

3            Swear the witness, please.

4    BRETT YORMARK,

5        called as a witness by the Government,

6        having been duly sworn, testified as follows:

7    DIRECT EXAMINATION

8    BY MR. QUIGLEY:

9    Q.  Mr. Yormark, where do you work?

10   A.  I work at BSE Global.

11   Q.  Is that formally known as Brooklyn Sports & Entertainment?

12   A.  That is correct.

13   Q.  OK if we just call it Brooklyn for today?

14   A.  That is fine.

15   Q.  How long have you -- what's your title there?

16   A.  I'm the CEO.

17   Q.  And what is Brooklyn?

18   A.  Brooklyn is a sports entertainment company.  We oversee

19   venues here in the New York metropolitan area.  We own and

20   operate them.  We also own and operate sports teams like the

21   Brooklyn Nets.

22   Q.  You mentioned arenas and venues.  What arenas and venues

23   does Brooklyn run?

24   A.  Specifically, right now Barclays Center located in

25   Brooklyn, the Nassau Coliseum in Long Island, and we have two

IAVHCar3                          Yormark - Direct

1   venues under development.

2   Q.  How long have you been the CEO of the company?

3   A.  Fourteen years.

4   Q.  Where was the company based when you started working there?

5   A.  In New Jersey.

6   Q.  Did there come a time when the company moved to Brooklyn?

7   A.  Yes, sir.

8   Q.  When was that?

9   A.  It was the fall of 2012.

10  Q.  What event did that coincide with?

11  A.  I'm sorry?

12  Q.  When did the Barclays Center open?

13  A.  In the fall of 2012.

14  Q.  You mentioned the Nassau Coliseum.  When did the company

15  start running the Nassau Coliseum?

16  A.  It was April of 2017.

17  Q.  Do you know someone named Craig Carton?

18  A.  Yes, I do.

19  Q.  At any point did you sign an agreement with him giving him

20  the right to purchase Barbra Streisand and Metallica tickets

21  from Brooklyn?

22  A.  No, I did not.

23  Q.  Did you have anyone else sign an agreement like that on

24  your behalf?

25  A.  No, I did not.

1    Q.  Backing up a second, can you talk generally about your

2    duties and responsibilities as a CEO of Brooklyn, what you do.

3    A.  On a day-to-day basis, I have business oversight of

4    everything, Barclays Center, the Coliseum, the development of

5    our venues.  I also am the CEO of the Brooklyn Nets, so I

6    oversee the business operations of the Brooklyn Nets, the New

7    York Islanders, as well as the Long Island Nets.

8    Q.  In your role as CEO of Brooklyn, do you ever sign

9    contracts?

10   A.  Do I ever sign contracts?

11   Q.  Yes.

12   A.  Yes.

13   Q.  Do you personally sign the contracts?

14   A.  Yes.

15   Q.  Every contract?

16   A.  Not every contract.

17   Q.  Based on your 14 years at Brooklyn, who else would be --

18   what types of contracts do you personally sign?

19   A.  Generally speaking, those that are about 100,000 or more.

20   Q.  Based on your 14 years at Brooklyn, who else would be

21   involved in drafting, creating, or approving an agreement for

22   more than a hundred thousand dollars?

23   A.  Our legal department.

24   Q.  For agreements less than that, do you ever authorize those

25   or sign those?

IAVHCar3                          Yormark - Direct

 1   A.   Typically not.   There's an understanding in the legal

 2   department that they have the appropriate latitude.

 3   Q.   And how are those authorized?

 4   A.   Well, they're executed via stamp.

 5   Q.   Whose stamp is that?

 6   A.   My stamp.

 7   Q.   Who maintains the stamp?

 8   A.   The legal department, under lock and key.

 9   Q.   Now, how many people directly report to you at Brooklyn,

10   approximately?

11   A.   At the executive level?   I mean, ultimately, everyone does.

12   Q.   At the executive level.

13   A.   At the executive level, eight.

14   Q.   Do you have a chief of staff?

15   A.   Formerly.

16   Q.   Who was the chief of staff in 2016 and 2017?

17   A.   Fred Mangione.

18   Q.   Does he still work at Brooklyn?

19   A.   He does not.

20   Q.   When did he leave?

21   A.   He left about a year and a half ago.

22   Q.   Was he asked to leave Brooklyn for any reason?

23   A.   Absolutely not.

24   Q.   What was your understanding of why he left?

25   A.   Family reasons.

1    Q.  So shifting back to Mr. Carton, when did you first meet

2    Mr. Carton?

3    A.  It was probably when we arrived in Brooklyn, so I would say

4    it was probably the fall of 2012.

5    Q.  Had you appeared on his radio show before that time in

6    previous years.

7    A.  Yeah, yeah, I can't recall how many, but yeah, I went on

8    the WFAN.

9    Q.  How did you meet him in 2012?  In what context?

10   A.  Well, in the context of us moving to Brooklyn.  We had

11   renewed our radio deal with WFAN, so the Brooklyn Nets have

12   called WFAN their flagship radio station while we're in New

13   Jersey and then, obviously, when we transitioned to Brooklyn.

14   Q.  And over the next several years, how did your relationship

15   with the defendant develop?

16   A.  We had a very good, professional rapport, a business

17   rapport.

18   Q.  Did you view Mr. Carton as an important relationship?

19   A.  I did.

20   Q.  Why was that?

21   A.  You know, he was an influence in the marketplace; obviously

22   had a big voice on WFAN.  Again, you know, the home of the

23   Brooklyn Nets.

24   Q.  Over time, setting aside his radio work for a second, did

25   he come to you with various concepts?

1    A.   Yes, yes.

2    Q.   What were some of the concepts he approached you with?

3    A.   There was a content deal.  There was the --

4         THE COURT:  I'm sorry.  I'm not in your industry.

5    What does that mean?

6         THE WITNESS:  I'm sorry, a programming deal.  There

7    was an opportunity that came to us where Craig thought he might

8    have an opportunity to bring us some events at the Barclays

9    Center.

10   Q.   What other concepts did he bring to you?

11   A.   The Boomer and Carton Kitchen.  There was a concession

12   stand at Barclays Center, so that certainly was a concept that

13   came to us.

14   Q.   Anything else that he approached you with that didn't work

15   out?

16   A.   I mean, there were many deals, concepts that came.  I mean,

17   craig is a pretty aggressive guy, and he likes to do deals.  So

18   lots of different concepts would come to us, and those that

19   certainly made sense, we continued to explore.  And in the case

20   of the content deal and the Boomer and Carton Kitchen, you

21   know, we executed those partnerships.

22   Q.   During the Boomer and Carton Kitchen and the content deal

23   and any other concepts that came to fruition, do you know

24   whether agreements were exchanged between Brooklyn and

25   Mr. Carton?

IAVHCar3                         Yormark - Direct

1    A.   They were.

2    Q.   Were funds transferred between Brooklyn and Mr. Carton?

3    A.   Yes.

4    Q.   Now, you mentioned the content deal.  Are you familiar with

5    something called Brooklyn Direct?

6    A.   Yes, I am.

7    Q.   What is Brooklyn Direct?

8    A.   Brooklyn Direct is our in-house promotional arm.  By that I

9    mean, rather than going the conventional route to bring an

10   event to the Barclays Center using a promoter, an outside

11   promoter, we effectively would act as a promoter and go direct

12   to a manager or an agent to bring a show or an event to

13   Barclays Center.

14   Q.   How does that -- how does bringing an event or show

15   directly to Barclays Center differ from how shows typically

16   come to a place like the Barclays Center?

17   A.   Effectively, we're acting as the promoter and we're

18   effectively taking the risk.  We control most, if not

19   anything -- most, if not everything, around that show.  The

20   typical arrangement is really more about a rental where a

21   promoter will come in and say:  Hey, we've got an artist that's

22   touring, and we want to rent your building on a particular date

23   and bring that show to you.  In that example, we don't control

24   much at all other than the fact that, you know, we're hosting

25   the event in our building.

IAVHCar3                          Yormark - Direct

1    Q.  When an outside promoter brings in a show?

2    A.  Yes.

3    Q.  Focusing back on this Brooklyn Direct concept, did there

4    come a time when Craig Carton became involved with Brooklyn

5    Direct?

6    A.  Yes, he did.

7    Q.  When was that, approximately?

8    A.  I think it was around December 2014, thereabouts.

9    Q.  During the course of your relationship with Craig Carton as

10   it related to Brooklyn Direct, did you meet with anyone else

11   who he was working with?

12   A.  Yes, I did.

13   Q.  Who is that?

14   A.  Joe Meli.

15   Q.  About how long did Carton's relationship with the Brooklyn

16   Direct concept last?

17   A.  Well, we effectively terminated the relationship in March

18   of '15, so it didn't last long, and there was kind of like an

19   exit period which lasted until July of '15.  But effectively,

20   the relationship did not last long.

21   Q.  Just to be clear, did the Brooklyn Direct relationship with

22   Carton have anything to do with the purchase and resale of

23   tickets?

24   A.  No.

25   Q.  Why did the relationship end in March 2015?

1    A.  Well, there were a couple of factors.  One, Craig started

2    working, you know, with a colleague on the Brooklyn Direct

3    business that created some concerns for me, I guess is the best

4    way to put it.  Also, performance wasn't what we had hoped for,

5    so we effectively terminated the agreement.

6    Q.  Who is the colleague who generated concerns?

7    A.  Gentleman by the name of Joe Meli.

8    Q.  Did you convey those concerns to Mr. Carton?

9    A.  I did.

10   Q.  Now, what happened with respect to Meli's relationship with

11   the Brooklyn Direct concept after that?

12   A.  Well, effectively we dismantled the relationship in March,

13   so we were no longer in that business with Craig or Joe.

14   Q.  Did you continue your relationship with Craig Carton after

15   that?

16   A.  We did.  I mean, there was, you know, a period of cooling

17   off, if you will, following, you know, the termination of that

18   agreement.  But, you know, we maintained, you know, a business

19   rapport, and so yes.

20   Q.  Now, over time had the defendant bought event tickets from

21   Brooklyn?

22   A.  Yes.

23   Q.  Now, prior to 2017, how would you describe the frequency

24   and regularity of these purchases?

25   A.  You know, opportunistically.  When Craig would call and he

1    dealt with one of my colleagues, he would ask, you know, to

2    purchase some tickets, and we accommodated that.

3    Q.  At some point around the fall of 2016, did he approach you

4    about a more formal relationship with Brooklyn Sports &

5    Entertainment relating to ticket?

6    A.  He did.

7    Q.  And so if we could publish what's in evidence, and you can

8    either look in the binder, Mr. Yormark, or look on the screen

9    in front of you, whichever's easier, Government Exhibit 2103,

10   and go to the email at 12:17 p.m., the last email in the chain.

11           Mr. Yormark, who's that email from?

12   A.  That is from Craig Carton.

13   Q.  What's the date?

14   A.  It is October 18, 2016.

15   Q.  And what time?

16   A.  At 12:17 p.m.

17   Q.  Who's it to?

18   A.  It's to me and my colleague Fred Mangione.

19   Q.  And what does Mr. Carton say in the email to you?

20   A.  "Would be cool to solidify $10 million deal before we

21   celebrate and honor you tonight."

22   Q.  And what did you understand him to be referring to?

23   A.  Oh, I was being honored that evening at the Gemr televent.

24   Q.  Who was the MC of that event?

25   A.  I don't know who the MC was, but Craig introduced me.

IAVHCar3                        Yormark - Direct

1  Q.  And if we could just put that side by side on the screen

2  with the next page, next email up in the chain.

3  A.  Is there another one?  Oh, OK.  Thank you.

4  Q.  Can you read your response.

5  A.  "Fred, we need to discuss this.  Craig, I am all over it.

6  As soon as Fred is in the office, we'll huddle up.  Thanks for

7  all you are doing for us."

8  Q.  So the original email from Mr. Carton was sent at what

9  time?

10 A.  12:17.

11 Q.  And your email is sent at what time?

12 A.  12:25.

13 Q.  Did you really think anyone was going to solidify a

14 $10 million deal in the next seven hours?

15 A.  Certainly not.

16 Q.  In your 14 years of experience as Brooklyn CEO, how long

17 does it take to solidify a $10 million deal?

18 A.  Months.

19 Q.  Were you seriously entertaining solidifying a $10 million

20 deal in the next seven hours?

21 A.  No, I was not.

22      MR. QUIGLEY:  We can take that down.

23 Q.  Do you think Mr. Carton understood that?

24      MR. GOTTLIEB:  Objection, your Honor.

25      THE COURT:  The objection's sustained.

1   Q.  Now, eventually, did you have a meeting with Mr. Carton

2   about this potential ticketing venture?

3   A.  I'm sorry?

4   Q.  Eventually, did you have a meeting with Mr. Carton about

5   this potential ticketing venture?

6   A.  Yes, we had a meeting.

7   Q.  And who was at that meeting?

8   A.  Myself and Fred Mangione.

9   Q.  And what happened at the meeting, to your recollection?

10  A.  In my recollection, Craig talked a little bit about his

11  vision to getting into the ticketing business.  We listened.  I

12  think, if I recall correctly, I left a little early.  And

13  that's what I recall of the meeting.

14          MR. QUIGLEY:  So can we publish what's in evidence as

15  Government Exhibit 2106 and go to the second page.

16  Q.  Do you see where you say, "Happy holidays.  Have a great

17  time"?

18  A.  Yes, I see that.

19  Q.  Then there's an email above that from Mr. Carton about all

20  access passes and Streisand and Metallica?

21  A.  Yes, I see that.

22  Q.  Then could you go up two more emails.

23          Can you read Mr. Carton's email on 6:22 p.m.

24  A.  "Great.  If at all possible to email me my ability to buy

25  what we discussed would be great and make my investors know I'm

1   not full of shit."

2   Q.   How do you respond?

3   A.   "Let me know exactly what you want me to send."

4   Q.   Then do you see how Mr. Carton responds?

5   A.   Yes, I do.

6   Q.   There's a reference to Streisand and Metallica tickets in

7   there?

8   A.   Yes.

9   Q.   Did Brooklyn ever enter into an agreement with Mr. Carton

10   for Streisand and Metallica tickets for concerts in the spring

11   of 2017?

12   A.   No, we never had an agreement.

13        MR. QUIGLEY:  If you could take that down, Mr. Cooney,

14   and put up Government's Exhibit 2107.  Actually, could we pull

15   that back up for one second.  Sorry.

16   Q.   Do you see where he says, "We are granting you a limited

17   exclusivity to purchase tickets to events at both Nassau

18   Coliseum and Barclays Center"?

19   A.   Yes, I see that.

20   Q.   Had you granted him an limited exclusivity to purchase

21   tickets at both Nassau Coliseum and Barclays Center?

22   A.   No.

23   Q.   Do you see -- focusing on paragraph 2, do you see where it

24   says, "Up to 10M of tickets for Barbra Streisand concerts at

25   Nassau for 2017"?  Do you see that?

1   A.  Yes.

2   Q.  Could you provide that at this point?

3   A.  Could I provide that?

4   Q.  Yes.

5   A.  No.

6   Q.  Why not?

7   A.  Well, I mean, that effectively would mean we were giving

8   the house to Craig Carton; meaning, he was going to control

9   every ticket for the two shows there.  And that's never been

10  done, and we would never do that.

11  Q.  What about up to 3M of tickets for the not yet announced

12  Metallica event?

13  A.  We could not do that either.

14  Q.  Why not?

15  A.  Metallica was doing a tour, and we didn't have that type of

16  access --

17  Q.  So is that --

18  A.  -- to tickets.

19  Q.  -- one of the promoter-brought shows that you described

20  before?

21  A.  Yes, yes.  In fact --

22          MR. QUIGLEY:  We can that I can take that down,

23  Mr. Cooney.  Thank you.  Could we publish what's in evidence as

24  Government Exhibit 2107.

25  Q.  Do you see this, Mr. Yormark, 2107?

IAVHCar3                    Yormark - Direct

1   A.  Yes, I'm reading it.  Yes, I see it.

2   Q.  What's the date on this email?

3   A.  December 14, 2016.

4   Q.  What is Mr. Carton saying to you -- to you here?

5   A.  He's asking for a general email tomorrow saying I can

6   invest up to $30 million in Nassau and Barclays events.

7   Q.  Did you understand he was -- or what does he say in the

8   last sentence beginning "I'm meeting"?

9   A.  "Huge if you can send in the morning.  I'm meeting investor

10  at 12:00."

11  Q.  Now, again, did you ever enter into an agreement for

12  Streisand and Metallica tickets in December 2016 with

13  Mr. Carton?

14  A.  We did not.

15          MR. QUIGLEY:  Can we pull up what's in evidence as

16  Government Exhibit 2119.

17  Q.  What's the date on this email, Mr. Yormark?

18  A.  January 8, 2017.

19  Q.  Can you read the -- who's it from?

20  A.  It's from Craig Carton.

21  Q.  Who's it to?

22  A.  It's to Fred Mangione and myself.

23  Q.  And can you read the first substantive line of Mr. Carton's

24  email under "Guys."

25  A.  "As I mentioned on the phone, I have secured over

1   $100 million in financing and have been given marching orders

2   to be very aggressive in my investing.  The following should

3   encapsulate what I would like to do."

4   Q.  Sorry.  Could you just read the line, the sentence

5   beginning "Thanks as always."

6   A.  Oh.  "Thanks as always for the time and for allowing me the

7   opportunity to discuss and hopefully execute a meaningful

8   agreement with you."

9   Q.  Had Brooklyn executed any agreement with Mr. Carton --

10  A.  No.

11  Q.  -- as of January 8, 2017?

12  A.  No.

13  Q.  Do you see where it references the Streisand and Metallica

14  tickets on paragraph 2, paragraph beginning 2?

15  A.  Yes, yes.

16  Q.  Had you given Mr. Carton any first-look investment

17  opportunity or any investment opportunity in Streisand and

18  Metallica tickets at that point?

19  A.  No.

20  Q.  Then can you read the line of the email above "Thanks," the

21  paragraph above "Thanks," beginning "If possible."

22  A.  I'm sorry.  "If possible, would like to work towards

23  agreement this week."

24  Q.  Could we back up a second.  Mr. Yormark, do you recall

25  where you were on Government Exhibit -- on December 19, 2016?

1    A.   I think I was in New York City that day, Brooklyn and New

2    York City.

3    Q.   Were you in Orlando, Florida, that day?  Were you in

4    Orlando, Florida, that day?

5             MR. JANEY:  Objection.

6             MR. GOTTLIEB:  No, this is mine.

7             MR. JANEY:  I'm sorry.

8             MR. GOTTLIEB:  Objection.

9             THE COURT:  Overruled.

10            Is it possible that you were in Orlando on that day?

11            THE WITNESS:  No.

12            MR. QUIGLEY:  Can we publish what's in evidence as

13   Government Exhibit 2112.  I'm sorry.  Just for the judge, the

14   lawyers, and the witness, Government Exhibit 2112.

15   Q.   Mr. Yormark, do you see up on that screen Exhibit 2112?

16   A.   Yes.

17            THE COURT:  I don't, unfortunately.  Why am I not

18   getting this?

19   Q.   Mr. Yormark, is it a part of -- keeping a calendar for your

20   work at Brooklyn a regular practice of yours?

21   A.   Yes, it is.

22   Q.   Did you or your assistant keep the calendar entry in

23   Government's Exhibit 2112 and your other calendar entries in

24   the course of your regularly conducted activities as the CEO of

25   Brooklyn?

1    A.  Yes.

2    Q.  Were the entries in your calendar made by someone with

3    knowledge of your schedule at or about the time the items were

4    scheduled?

5    A.  Yes.

6         MR. QUIGLEY:  Your Honor, the government offers

7    Government Exhibit 2112.

8         MR. GOTTLIEB:  No objection, your Honor.

9         THE COURT:  Admitted.

10        (Government's Exhibit 2112 received in evidence)

11   BY MR. QUIGLEY:

12   Q.  So, Mr. Yormark, were you in Orlando on December 19, 2016?

13   A.  I was not.

14   Q.  Now, if we could take a look at Government's Exhibit 920,

15   which is in evidence.  If we go to the first page of the actual

16   agreement, Mr. Yormark, have you seen this document before?

17   A.  Only when the U.S. Attorney's Office showed it to me.

18   Q.  And could we go to the -- what's the title of this

19   agreement?

20   A.  Ticket Jones Event Ticket Agreement.

21        MR. QUIGLEY:  Can we go to the last page of the

22   document.  Sorry, second to last page.

23   Q.  Who supposedly signed this agreement?

24   A.  Supposedly, I did.

25   Q.  Did you sign it?

1    A.  No, I did not.

2    Q.  When was the first time you saw it?

3    A.  At the U.S. Attorney's Office.

4    Q.  And when was that?

5    A.  I think it was approximately summer of '17.

6    Q.  Well after December 2016?

7    A.  Yes, sir.

8    Q.  And was it shown to you by prosecutors and agents working

9    on this case?

10   A.  Yes, sir.

11   Q.  How did you react when you saw it?

12   A.  I was very angry.

13   Q.  Why was that?

14   A.  Because I didn't authorize it.

15   Q.  Directing your -- did you ask anyone to sign on your

16   behalf?

17   A.  I'm sorry?

18   Q.  Did you ask anyone to sign this document on your behalf?

19   A.  No, I did not.

20   Q.  Do you recognize your signature on this document?

21   A.  I do.

22   Q.  What is it?

23   A.  It's a facsimile of my signature.

24   Q.  Did you give anyone a facsimile of your signature to put on

25   this document?

IAVHCar3                         Yormark - Direct

1   A.  No, I did not.

2   Q.  Did you tell anyone to stamp your signature on this

3   document?

4   A.  No, I did not.

5   Q.  Do you see under your name it describes you as the CEO of

6   Brooklyn Sports & Entertainment?  Do you see that?

7   A.  Yes, I do.

8   Q.  You mentioned before that you do sign contracts on behalf

9   of your company, is that right?

10  A.  Yes, I do.

11  Q.  And when you sign contracts, do you ever signs at CEO of

12  Brooklyn Sports & Entertainment?

13  A.  I do not.  It's not a legal entity.

14  Q.  What entities do you sign on behalf of?

15  A.  Brooklyn Event Center, Nassau Event Center, but never

16  Brooklyn Sports & Entertainment.  It's just a brand.

17  Q.  If we could go back -- well, did Brooklyn ever enter into

18  this contract with Craig Carton?

19  A.  We did not.

20  Q.  Did Brooklyn ever enter into this contract with Ticket

21  Jones?

22  A.  We did not.

23  Q.  I want to direct your attention back to the first page of

24  the agreement, and focusing on the whereas clause, the third

25  whereas clause, how much is at issue in this agreement

IAVHCar3                         Yormark - Direct

1    supposedly?

2    A.   What was the question?  I'm sorry.

3    Q.   How much, what amount of money is at issue in this

4    agreement supposedly?

5    A.   Says $2 million.

6    Q.   And based on your time at Brooklyn, would you be aware of a

7    contract for above $100,000?

8    A.   Yes, sir.

9    Q.   Would a contract above $500,000 be brought to your

10   attention?

11   A.   Yes, sir.

12   Q.   Would a contract above $1 million --

13            THE COURT:  Let's ask a level.  What's the lowest

14   level contract you see as a regular matter of course?

15            THE WITNESS:  Under 100,000.

16   Q.   And the first time you saw this contract was at the U.S.

17   Attorney's Office?

18   A.   That is correct.

19            THE COURT:  Just humor me.  The next time you ask him

20   a question, Where did you see this contract for the first time?

21   That way you're not answering the question.

22            MR. QUIGLEY:  Thank you, your Honor.

23   Q.   Where did you see this contract?

24            THE COURT:  That's what's called a leading question.

25   Where the lawyer puts the answer in the question, that's a

IAVHCar3                        Yormark - Direct

1  leading question.

2  Q.  Where was the first time you saw this contract,

3  Mr. Yormark?

4  A.  U.S. Attorney's Office.

5  Q.  I want to focus your attention to the very first paragraph

6  of the agreement.  Who are the parties to this agreement

7  supposedly?

8  A.  It says Barclays Sports & Entertainment Company.

9  Q.  And who's the counterparty above that?

10  A.  Ticket Jones.

11  Q.  How long have you been the CEO of Brooklyn?

12  A.  Fourteen years.

13  Q.  Have you ever heard of a company called Barclays Sports &

14  Entertainment Company?

15  A.  No.

16  Q.  Does any company with that name exist?

17  A.  It does not exist.

18  Q.  By the way, is that a different -- is that the same name or

19  different name that's under -- than the one that's under your

20  signature on page 5 of the agreement?

21  A.  If you can go back to that.

22          MR. QUIGLEY:  Would you put page 1 and 5 next to one

23  another.

24  A.  They forgot the word "company," so it's not the same.

25          (Continued on next page)

IAV7CAR4                          Yormark - Direct

1   BY MR. QUIGLEY:

2   Q.  OK.  But what is the name under your signature?

3   A.  Brooklyn Sports & Entertainment.

4   Q.  And if we go back to the first paragraph in the agreement,

5   what's the name there?

6   A.  Barclays Sports and Entertainment Company.  It's completely

7   different.

8   Q.  Again, what's the date on this agreement?

9   A.  December 16, 2016.

10  Q.  And if we go -- who signed this agreement on behalf of

11  Ticket Jones on the last page of the agreement.

12  A.  Craig Carton.

13  Q.  And can we republish what's in evidence as Government

14  Exhibit 2119.  If we highlight the line beginning "Thanks as

15  always..."

16  A.  "Thanks as always for the time and for allowing me the

17  opportunity to discuss and hopefully execute a meaningful

18  agreement with you."

19  Q.  Then can we also highlight the last line beginning "If

20  possible..."

21  A.  "If possible would like to work towards agreement this

22  week."

23  Q.  What's the date on this e-mail?

24  A.  January 8, 2017.

25  Q.  And that's after December 16, 2016?

IAV7CAR4                        Yormark – Cross

1   A.  Yes, it is.

2   Q.  Would there be any reason for Mr. Carton to ask you about

3   executing a meaningful agreement if he already had a $2 million

4   agreement with you?

5           MR. GOTTLIEB:  Objection.

6           THE COURT:  The objection is sustained.

7           MR. QUIGLEY:  I have no further questions, your Honor.

8           THE COURT:  Cross?

9           MR. GOTTLIEB:  Thank you.

10          THE COURT:  Thank you, Mr. Gottlieb.

11  CROSS EXAMINATION

12  BY MR. GOTTLIEB:

13  Q.  Mr. Yormark, you were asked whether or not there was an

14  agreement between Brooklyn and -- any agreements between

15  Brooklyn and Craig Carton with regard to the Barbra Streisand

16  and Metallica concerts, and your answer was no, correct?

17  A.  That is correct, there was not an agreement, a contract,

18  for those tickets.

19  Q.  And taking that, is it fair to say that even though there

20  was no written contract, there were a lot of tickets that

21  Mr. Carton purchased from your company, correct, for Streisand

22  and Metallica?  Correct?

23  A.  Yes, he did buy some tickets for Metallica and Streisand.

24  Q.  Let's talk about some.  How many are in that some?  How

25  many tickets for Barbra Streisand and Metallica did Craig

1    Carton purchase?

2    A.  I don't know exactly the number, but for Barbra Streisand

3    probably a thousand tickets.

4    Q.  Now, when you say a thousand, what's the basis of your

5    knowledge that it's about a thousand?

6    A.  I don't get involved in the day-to-day ticket buying

7    business, but obviously I'm aware that tickets had been

8    purchased for the Barbra Streisand show.

9    Q.  No.  But when you said to this jury that it was about a

10   thousand, was that just a guess or is it based on you having

11   reviewed any records?

12   A.  I've seen some records since then.  I don't recall the

13   exact amount, but I would say it's or around a thousand

14   tickets.

15   Q.  And isn't it true, sir, that for Streisand and Metallica

16   Craig Carton purchased upwards of $1.5 million worth of those

17   tickets?

18   A.  Probably sounds right dollar-wise, just given the cost of a

19   Barbra Streisand ticket.

20   Q.  And in fact that approximately $1.5 million equates to

21   approximately 4,000 tickets, correct?

22   A.  No, I'm not aware of that number, not at all.

23   Q.  Now, is it fair to say there aren't a lot of individuals

24   out there spending $1.5 million for concert tickets, correct?

25   A.  No, I can't say there are.

1    Q.   How does Mr. Carton fit in?  Where does he fit in?  Is he

2    like one of the bigger purchases during this period of time for

3    Streisand and Metallica as compared to the rest of the

4    universe?

5    A.   I can't really speak specifically to Metallica because we

6    had limited inventory, but as it relates to Barbra Streisand,

7    he would have been one of the larger purchasers of those

8    tickets.

9    Q.   And Metallica is different, isn't it, because Metallica,

10   Brooklyn or Barclays didn't have direct control over that,

11   correct?

12   A.   That is correct.

13   Q.   And so if an individual or a company wanted to buy bulk

14   sales of Metallica, they didn't even go through Brooklyn,

15   correct?

16   A.   Yes, that's conceivable.

17   Q.   If a company or an individual wanted to buy bulk sales of

18   Metallica, they could go to Ticket Master, correct?

19   A.   Ticket Master has restrictions on people buying bulk

20   tickets, so I'm not sure if that's possible.  But, you know,

21   who knows, there could have been a resource out there.  I can't

22   say that there isn't.

23   Q.   Well, you were aware as the head honcho there, that for

24   Metallica, Ticket Master was a good source to buy a lot of

25   tickets for Metallica.

1    A.  They restrict purchasing by bulk.

2    Q.  How many did Mr. Carton purchase, the dollar amount of

3    tickets, for Metallica through Ticket Master?

4    A.  I don't know.

5    Q.  Putting aside the dollar amount, how many tickets did

6    Mr. Carton purchase through Ticket Master for Metallica?

7    A.  Don't know that answer.

8    Q.  Now, Mr. Yormark, during this entire period of time that

9    you testified about, did you ever tell Craig Carton, stop

10   bothering me, I'm not interested in any discussion about deals

11   with you?

12   A.  I did not.

13   Q.  Did you ever tell Craig Carton that Brooklyn was not

14   interested in entering any agreements with him in the future?

15   A.  I did not, because --

16   Q.  I didn't ask you because.

17           THE COURT:  Yes or no question.

18   A.  I did not.  I did not.

19   Q.  And in fact, when Craig Carton reached out to talk to you

20   about Barbra Streisand tickets, you went out of your way,

21   didn't you, to give him the impression that you were seriously

22   considering his proposal, correct?

23   A.  Did not.

24   Q.  Do you recall speaking to the F.B.I., to Mr. Quigley,

25   Elisha Kobre, on June 28, 2017?

1   A.  I did have conversations with him.  Sorry.

2   Q.  Do you recall telling them that regarding the e-mail

3   exchange concerning the Barbra Streisand tickets, that you told

4   him that Brooklyn was not able to sell but that you wanted to

5   give Carton the impression they were considering his proposal?

6   Did you tell that to the government?

7   A.  I don't recall saying it that way.  If you let me expand on

8   that thought, I will.

9   Q.  If you can answer the questions.  So your testimony is

10  right now you don't recall whether or not you told the

11  prosecutors in this case that you went out of your way to give

12  Carton the impression that Brooklyn was considering his

13  proposal, correct?

14  A.  I don't recall using those words, but if you say I said it

15  and it's documented, then it's documented.

16  Q.  Now your relationship with Mr. Carton goes back many years,

17  correct?

18  A.  Yes.

19  Q.  When did you first learn of Mr. Carton or begin that

20  relationship?

21  A.  Well, I mean I think the relationship that we had really

22  was effectually started when we moved to Brooklyn, but I'm

23  sure -- and I don't recall -- but I'm sure I might have been on

24  his show prior to that, in advance of coming to Brooklyn.

25  Q.  And in addition to being on his show, is it fair to say you

1    had a number of meetings with Mr. Carton over the years?

2    A.   We would meet a couple of times each year.

3    Q.   Is it fair to say that you had dinner with Mr. Carton?

4    A.   Yes, we had some business dinners.

5    Q.   And you met with him at charity events?

6    A.   He introduced me at one charity event.

7    Q.   So let's talk about that introduction.  I direct your

8    attention to October of 2016.  Is that the year that you were

9    honored as man of the year at T.J. Martell awards?

10   A.   Sounds right.

11   Q.   And you say that Mr. Carton introduced you, correct?

12   A.   Yes, he did.

13   Q.   Did you ask Mr. Carton if he would introduce you at that

14   man of the year function?

15   A.   My colleague Fred Mangione who was running the event on our

16   behalf asked Craig.

17   Q.   And did Mr. Mangione clear that with you before he asked

18   Mr. Carton?

19   A.   I don't recall having that conversation.  Freddie was, like

20   I said, managing the event.

21   Q.   And there was nothing about Mr. Carton being the person to

22   introduce you -- that didn't bother you, did it?

23   A.   No, it did not.

24   Q.   Did you consider him a friend at that time?

25   A.   I considered him someone that we had a very good

1   professional rapport with and a business rapport.

2   Q.  You know, during this time that you've had dealings with

3   Mr. Carton there were a lot of e-mail exchanges between you and

4   Mr. Carton.  We have seen just some of them today, correct?

5   A.  Yeah, yeah.

6   Q.  And in those e-mail exchanges, do you remember how you

7   would address, you know, type on the e-mail when referring to

8   Mr. Carton?  How would you refer to him?

9   A.  I refer to most people buddy, friend.  You know, I'm in the

10  relationship business, and that's typically my trade.  I do

11  about 250 e-mails a day, so I typically do that, friend, buddy,

12  those are the words I typically use in e-mails.

13  Q.  But you didn't really mean that he was your friend,

14  correct?

15  A.  No, my reference to buddy and friend is just a warm

16  gesture; it's kind of an invitation to the conversation.

17  That's how I have been able to get to where I am today, good

18  relationships.

19  Q.  Because that's a very effective way to convey something

20  that you may not really feel, correct?

21  A.  No.

22  Q.  As part of your talents which led you to where you are

23  today you have cultivated that ability to let somebody believe

24  that they were your friend when they really weren't your

25  friend, correct?

IAV7CAR4                         Yormark - Cross

1    A.  Not true.

2    Q.  And during the time that you knew Mr. Carton, you went out

3    of your way to give him the impression that you were open to

4    him doing substantial business with Barclays, correct?

5    A.  No.

6    Q.  Mr. Yormark, you took advantage of Mr. Carton during this

7    period of time, didn't you?

8    A.  I did not.

9    Q.  You knew that you had somebody who was interested in

10   branching out into this ticket reselling business and was

11   interested and willing to purchase a lot of tickets from your

12   company, correct?

13   A.  Based on his e-mails, it seems like he was.

14   Q.  And you did not -- withdrawn.

15           You wanted to continue that relationship because that

16   made financial sense for your company, correct?

17   A.  No, I wouldn't say that.

18   Q.  So if somebody purchases $1.5 million worth of tickets, are

19   you telling us that that did not make financial sense for

20   Brooklyn?

21   A.  I would only say Barbra Streisand sells out every show,

22   sir, wherever she goes; she's an icon.  She has sold out

23   numerous shows at our building.

24   Q.  I know Barbra Streisand.  I go back.  I go back.

25   A.  So do I.  So do I.

1    Q.  But that wasn't my question.  My question was:  It made a

2    heck of a lot of business sense for you to cultivate Mr. Carton

3    and give him the impression that you were open to him buying a

4    lot of tickets, correct?

5    A.  No.

6    Q.  You in the past have asked Mr. Carton to participate in the

7    Barclays Center Partners Summit.  Do you know what that is?

8    A.  Yes, it's a sponsor summit.  And we haven't done one for

9    many, many, many years, so I don't recall that.  It could have

10   happened, but I don't recall.  We haven't done one in years.

11   Q.  If we could go then to the dark nights -- Brooklyn

12   Direct -- I'm sorry, Brooklyn Direct.  You were asked questions

13   about that.  What is exactly that?

14   A.  Exactly is what?

15   Q.  That whole deal, Brooklyn Direct, dark nights?

16   A.  Well, Brooklyn Direct is our branded promotional arm,

17   again, where we go direct to an artist, a manager or their

18   representation, to bring an event to Barclays.  And the

19   relationship that we forged with Craig was relying on his

20   ability to potentially use some of his relationships to bring

21   events to Barclays Center.

22   Q.  Well, let's break that down.  So here was an opportunity to

23   use Craig Carton to help your company fill seats, correct?

24   A.  Not use Craig Carton.  I mean I can't agree to that.  There

25   was a contract that was memorialized that benefited both

1    parties in order for us to work together to bring events to

2    Barclays Center.

3    Q.  You just told the jury the reason why it was especially

4    attractive to enter into this contract with Mr. Carton was

5    because of who he was and who his relationships were with,

6    correct?

7    A.  Well, he had some relationships, so we figured those

8    relationships might benefit both parties, so we forged an

9    agreement and memorialized it with a contract.

10   Q.  And so you entered into a deal, an agreement, a contract,

11   with Mr. Carton to help fill seats at your arena on nights that

12   there were no other events there, correct, the dark nights,

13   correct?

14   A.  That's fair to say.

15   Q.  Because if Mr. Carton didn't do that, no one else did it,

16   then your company would lose money because there would be no

17   events there.

18   A.  No, not correct.  We're the busiest building outside of MSG

19   in North America.

20   Q.  Congratulations.

21   A.  Thank you.

22   Q.  So now you enter into this agreement with Mr. Carton, and

23   there is a company that's formed, correct, for that purpose?

24   A.  Yes.

25   Q.  What's the name of that company?

1   A.   I don't recall what that company was.

2   Q.   Well, in fact, sir, wasn't Mr. Carton a 51 percent owner of

3   that entire enterprise that we're talking about here?

4   A.   I haven't seen the agreement in quite some time, but I will

5   take your word for it.

6   Q.   Don't take my word for it.  Do you have a recollection that

7   in this deal that you, your company, entered into with

8   Mr. Carton, Mr. Carton was a 51 percent owner?

9   A.   That quite possibly could have been the deal parameters.  I

10  just don't know because I haven't seen it lately.  But let's

11  take your word for it.

12  Q.   And it was during this time that you said you met this guy

13  Joseph Meli?

14  A.   Yes.

15  Q.   You didn't know Meli before this date, correct?

16  A.   I did not.

17  Q.   And how long did this agreement, this enterprise, continue?

18  A.   It went on for a couple of months.

19  Q.   And Mr. Carton's title with this company that we're talking

20  about was what?

21  A.   I don't recall.

22  Q.   He was the CEO, wasn't he?

23  A.   OK.

24  Q.   Withdrawn.

25          The CEO named by you was Joseph Meli, correct?

IAV7CAR4                     Yormark – Cross

1    A.  Don't recall that.

2    Q.  By the way, did you do any due diligence on Joseph Meli to

3    check him out before you agreed to have him become involved in

4    this enterprise?

5    A.  The original -- the deal --

6          THE COURT:  Yes or no question.  Did you do any due

7    diligence into Mr. Meli?

8          THE WITNESS:  When the -- it's tough for me to answer

9    that question only because when we originally consummated the

10   deal Joe was not involved.

11   Q.  Now, there comes a time that this enterprise ends.

12   A.  Yes.

13   Q.  And there are formal separation agreements that are

14   prepared concerning or covering Meli and others, correct?

15   A.  That is correct.

16   Q.  And the separation agreements are the agreements saying

17   your services are no longer needed, you are no longer involved

18   in this, here are the terms of you leaving, correct?

19   A.  I didn't read them, but, yes, I would assume that's what

20   they stated.  I haven't seen them in a while.

21         MR. GOTTLIEB:  May we have Government Exhibit 2139,

22   please.  2101.  I'm corrected, your Honor.

23         THE COURT:  OK.

24         MR. GOTTLIEB:  2101.

25         MR. QUIGLEY:  Your Honor, this is not in evidence.

1              THE COURT:  It is not in evidence.  It should only be

2    on my screen.

3    Q.  Mr. Yormark, do you see the document on the screen?

4    A.  Yes, I do.

5    Q.  And is that the separation agreement involving Joseph Meli?

6              Your Honor, do you have it?

7              THE COURT:  I've got it, yes.

8    A.  I have not read it in its entirety, but it looks just that.

9    Q.  And this is the separation agreement between Brooklyn

10   Events Center and you as chief executive officer going back to

11   March 31, 2015, and it's directed to Joseph Meli, correct?

12   A.  Yes, sir.

13   Q.  And you signed that agreement, correct?

14   A.  Yes.

15   Q.  And that agreement was e-mailed to Joseph Meli, correct?

16   A.  I don't know if it was e-mailed.  My legal department would

17   have handled that.

18             MR. GOTTLIEB:  Your Honor, may we have this document

19   that's now been identified received in evidence, please.

20             MR. QUIGLEY:  We have no objection.

21             THE COURT:  It's admitted.

22             (Government Exhibit 2101 received in evidence)

23             MR. GOTTLIEB:  If we could publish that to the jury,

24   your Honor.

25             THE COURT:  OK.  Move on.

IAV7CAR4                          Yormark - Cross

1   Q.  Mr. Yormark, on the first page you see on the top it says

2   by electronic delivery, jmeli74@gmail.com.

3   A.  I see that.

4   Q.  And then we can go to the last page.  Again this is the

5   separation agreement between your company and Joseph Meli, and

6   it has your signature, correct?

7   A.  Yes, it does.

8   Q.  And on the bottom of that there is a stamp there Joe Meli

9   4/6/15.  Correct?

10  A.  Yes.

11  Q.  Thank you.  Now, it's your understanding that Mr. Meli

12  received a copy of this agreement, correct?

13  A.  I would assume so, yes.

14  Q.  And this agreement has your signature right on it, doesn't

15  it?

16          THE COURT:  We've already asked that.  Let's move on,

17  please.

18  Q.  In addition to Mr. Meli, there were a number of other

19  individuals who were working with Meli who received similar

20  agreements, correct?

21  A.  Yes.

22  Q.  With your signature affixed to it, correct?

23  A.  Yes.

24  Q.  I want to ask you on that Ticket Jones event agreement that

25  was shown before, that you testified you didn't sign --

IAV7CAR4                      Yormark - Cross

1    A.  That is correct.

2    Q.  It's your signature on it, correct?  Correct?

3    A.  It looks like a stamped signature, yes.

4    Q.  You don't know who stamped it, correct?

5    A.  Can't say I do.

6    Q.  You don't know when it was stamped, correct?

7    A.  Correct.

8    Q.  Is it fair to say that your signature, your stamped

9    signature, is on many documents out there, correct?

10   A.  That's a fair assumption.

11   Q.  Now, in your operation Fred Mangione works very closely

12   with you, correct?

13   A.  He did, yes.

14   Q.  Is it fair to say that you first learned about a possible

15   deal and investment proposal, you learned about it from Fred

16   Mangione, correct?

17   A.  Well, as I stated earlier, there was an initial ticket

18   meeting where I heard conceptually of a ticket business.

19           MR. GOTTLIEB:  Your Honor, may we just have a yes or

20   no to that?

21           THE COURT:  Simple yes or no, sir.  These fellows in

22   the front will be happy to ask you questions if they need to

23   clarify anything.

24           THE WITNESS:  Can you repeat the question, please.

25   Q.  You came to learn about the investment proposal with regard

IAV7CAR4                         Yormark - Cross

1    to Mr. Carton that you've testified to, you learned about it

2    through your chief of staff Fred Mangione, correct?

3    A.  Yes.

4             THE COURT:  Tell me when is a good time to stop for

5    lunch.

6             MR. GOTTLIEB:  Your Honor, right now, that would be

7    fine.

8             THE COURT:  OK, folks, I will see you in an hour.

9    Don't discuss the case; keep an open mind.

10            (Luncheon recess)

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IAV7CAR4                              Yormark – Cross

1                    A F T E R N O O N   S E S S I O N

2                              2:15 p.m.

3               (Jury present)

4               THE COURT:  Welcome back.

5               Sir, you are still under oath.

6    BRETT YORMARK, resumed.

7    CROSS-EXAMINATION (Continued)

8    BY MR. GOTTLIEB:

9    Q.  Mr. Yormark, when we had left I had asked you the question

10   that you received the information with regard to this proposal

11   by Mr. Carton.  You learned about that from Fred Mangione,

12   correct?

13   A.  Yes, that's what I said.

14   Q.  Now, when you learned about it, you learned that Mr. Carton

15   had presented a proposal to Mr. Mangione to purchase tickets in

16   bulk at face value, correct?

17   A.  I don't have the proposal in front of me, so I can only

18   speculate that that's what was presented to me.

19   Q.  I'm not asking you to speculate.

20               THE COURT:  Then he doesn't know the answer to the

21   question.

22   A.  The answer is I don't know.

23   Q.  Do you have a recollection today --

24   A.  It's a very general question when you say bulk tickets.

25               THE COURT:  No, no, no.  Do you have a recollection

1   today of what the proposal was.

2              THE WITNESS:  No.

3              THE COURT:  He does not.  Next question.

4   Q.  Do you have a recollection that part of the proposal was

5   that Mr. Carton would purchase tickets and sell them on the

6   secondary market in the hopes of making a profit?

7              MR. QUIGLEY:  Objection.  He said he didn't have a

8   recollection.

9              THE COURT:  Do you recall that being part of the

10  proposal?

11             THE WITNESS:  That I do recall conceptually, that

12  that's what Mr. Carton wanted to do, yes.

13  Q.  And when Mr. Mangione gave you that information, did you

14  tell Mr. Mangione that you were opposed to that possibility?

15  A.  No.

16  Q.  Now, Mr. Mangione as your chief of staff was empowered, was

17  he not, to review e-mails that were addressed to you; is that

18  true?

19  A.  That were directed to me independent of him?  The answer

20  would be no.  It's a wide-open question, because sometimes

21  you're cc'd on e-mails.

22  Q.  I didn't ask you that.  So, with regard to your

23  understanding of the proposal that Mr. Carton was presenting to

24  Mr. Mangione, didn't you understand that it would include your

25  company Brooklyn receiving a percentage of the profits that

IAV7CAR4                        Yormark - Cross

1    Mr. Carton and Mr. Carton's company would make on the resale?

2    A.  Yes, I do recall.

3    Q.  And do you recall, what was the percentage of the profits

4    that your company would stand to earn on the tickets that

5    Mr. Carton sold?

6    A.  That I do not recall.

7    Q.  Do you recall that the percentage of profits was 10

8    percent?

9    A.  Do not.

10   Q.  Now, at the time that we're talking about, more

11   specifically in November 2016, did Mr. Mangione have the

12   authority to enter into any revenue sharing agreements with

13   others?

14   A.  Again, I know you're going -- are you talking about

15   specifically to this ticket proposal?

16           THE COURT:  With anybody, with anybody on the planet.

17   A.  Ask the question again, please.

18   Q.  In November of 2016, Mr. Yormark, did Fred Mangione have

19   the authority, the power, to enter into any revenue sharing

20   plans with anybody?

21   A.  On a case-by-case basis.

22   Q.  And on a case-by-case basis, did that mean that

23   Mr. Mangione made the decision on who to enter into these

24   agreements with alone?  Was it his decision to make?

25   A.  No.

IAV7CAR4                          Yormark - Cross

1    Q.  In any revenue sharing plan, did Mr. Mangione have to get

2    your approval?

3    A.  It would depend on the nature of that revenue sharing plan.

4    Q.  And the nature -- what was the demarcation between those

5    proposed plans of revenue sharing that Fred Mangione had the

6    power to approve without you and that he had to clear with you?

7    A.  Let me say that I am the only one in the company that can

8    say yes.  OK?  Mr. Mangione would come to me, we would discuss

9    the magnitude and guidelines of whatever proposal there might

10   be from a revenue sharing perspective, and I ultimately am the

11   person that has the ability and the authority to say yes.

12   Q.  Mr. Yormark, just a few moments ago you said there were

13   some instances where Mr. Mangione had the power to enter into

14   revenue sharing plans, correct?  You said that a few moments

15   ago.

16   A.  In nonmaterial, nonrelative deals that are not material in

17   nature, Freddie would have some latitude to make some

18   decisions.  Anything that was material in nature -- and Freddie

19   used good judgment in determining that threshold -- he would

20   come to me and I would make that decision.

21           THE COURT:  What do you mean by material?

22           THE WITNESS:  Something again that would equate to

23   anything over $100,000, back to what I said this morning.

24   Q.  Thank you.  So anything over -- any revenue sharing that

25   would exceed $100,000, would require --

1    A.  Anything of a six figure nature generally speaking -- there

2    are always exceptions to the rule -- we would sit down and

3    collaborate about.

4    Q.  And before it was agreed to, you would have to know about

5    it, correct?

6    A.  Yes.

7    Q.  And you would collaborate with Mr. Mangione and discuss it,

8    correct?

9    A.  Yes.

10   Q.  And in order for it to go through, you would have to be the

11   person to say it's a go, correct?

12   A.  Yes.

13            MR. GOTTLIEB:  May we have 2106 put up on the board.

14   This is in evidence?  OK.

15   Q.  You were shown this earlier, Government Exhibit 2106, dated

16   December 14 on the bottom, 2016, and it's addressed to you from

17   Mr. Carton, correct?

18   A.  That is correct.

19   Q.  And Mr. Carton writes, "Great.  If at all possible to

20   e-mail me my ability to buy what we discussed would be great

21   and make my investors know I'm not full of shit."  Correct?

22   A.  That's what it says.

23   Q.  And what's your understanding about what had previously

24   been discussed that Mr. Carton is mentioning?

25   A.  Well, I guess he is referencing the e-mail above.

1          THE COURT:  You say you guess.  That's the one thing

2     we don't want to you do.

3          THE WITNESS:  I'm sorry.

4          THE COURT:  Do you know what Mr. Carton is referencing

5     in the e-mail you were just read?

6          THE WITNESS:  As a stand-alone e-mail, no.

7     Q.  So if you look at what we just read, Wednesday, December

8     14, 2016 at 6:22 p.m., and then if you look up, the e-mail

9     above is Wednesday, December 14, 2016, 9 o'clock p.m.  Correct?

10    A.  Yes.

11    Q.  So other than referring that you think it refers to a later

12    e-mail, do you have any other understanding as to what

13    Mr. Carton is referring to concerning what had been discussed?

14    A.  I don't recall, no.

15    Q.  And then at the top of that e-mail, 2106, it just says

16    basic e-mail saying the following:  "craig, per our

17    conversation we are granting you a limited exclusivity to

18    purchase tickets to events at both Nassau Coliseum and Barclays

19    Center.  If you are interested in the opportunity we require

20    good faith deposits of 20 percent of the total investment

21    opportunities."

22          Then if you look to a little bit below that, the

23    paragraph beginning with 2, it reads, "up to $10 million of

24    tickets for Barbra Streisand concerts at Nassau for 2017.

25          "3.  Up to $3 million of tickets for not yet announced

IAV7CAR4                          Yormark - Cross

1    Metallica event.

2              If you agree to invest in these events at face value

3    please remit $3 million no later than December 20."

4              First, do you remember receiving that e-mail?

5    A.  I mean my name is on it, so obviously --

6              THE COURT:  The question is:  Do you as you sit here

7    remember receiving that e-mail?

8              THE WITNESS:  Yes.

9    Q.  And after you received that e-mail -- the lower one and

10   then the upper one at 9 o'clock p.m. -- did you contact

11   Mr. Carton to respond to his proposal?

12   A.  I don't think I did.

13   Q.  Did you tell Mr. Mangione to respond to these e-mails?

14   A.  I don't recall if I did either.

15   Q.  Did you convey or communicate in any way with Mr. Carton to

16   say your proposal is ridiculous, it's rejected?

17   A.  I didn't say yes to the proposal.

18   Q.  Did you tell him that it was under consideration?

19   A.  I don't recall saying that either.

20   Q.  Now, there was a mention earlier regarding all access

21   passes.  Can you please tell the jury what's this all access

22   pass.

23   A.  All the all access pass is a product that was born in

24   Brooklyn when we moved to Barclays Center.  It affords

25   someone -- if you're in the case of Barclays Center a season

IAV7CAR4                        Yormark - Cross

1    ticket holder, you get presale all access -- if it's afforded

2    to the building -- for all those other events.  So it was a

3    nice value proposition.  When we opened up the Long Island

4    Coliseum, we did a bit of a hybrid of the all access pass.

5    Q.  Now, with regard to the all access pass, can we look at

6    Government Exhibit 2135, please, just for the court and

7    counsel.

8              Do you see it there in front of you?

9    A.  I do.

10   Q.  Looking at Government Exhibit 2135, what is that?

11   A.  It's a standard -- it looks like our standard Long Island

12   all access agreement for season seats.

13   Q.  And if you look at the second page, is that a signed

14   agreement?

15   A.  Yes, it is, sir.

16   Q.  And it's a signed agreement by someone who is authorized to

17   sign this agreement on behalf of one of your companies?

18   A.  Yes, our CFO has signatory approval, and that's our former

19   CFO.

20   Q.  And this agreement is an agreement between which parties?

21   A.  It says Craig -- oh.

22   Q.  Let's go to the front page.

23   A.  OK.  Craig Carton and Nassau Events Center.

24             MR. GOTTLIEB:  Your Honor, I would ask that this be

25   received in evidence, please.

1              MR. QUIGLEY:  No objection.

2              THE COURT:  Admitted.

3              (Government Exhibit 2135 received in evidence)

4    Q.  If we could display that for the jury, please.

5              Now, this is an agreement between one of the companies

6    and Craig Carton for complete access to all events based on a

7    particular seat or seats, correct?

8    A.  It's a season ticket holder agreement which affords, you

9    know, whoever that buyer is -- assuming the building has access

10   to those tickets -- which, of course, if we're hosting events,

11   we will -- the ability to purchase them.

12   Q.  And how much does -- how much did an agreement like that

13   cost?

14   A.  Well, I think -- well, I don't know how many tickets there

15   purchased, but if I recall each seat was about -- I see it

16   here, 86.25, so depending on how many seats, you know, you do

17   the math and that's the number.

18   Q.  I am terrible in math.  Could you give us the estimate as

19   to the value of the all access agreement.

20   A.  Can you go to the next slide?  I just don't know if it

21   tallies it here.  I don't know, it looks like it's hundreds of

22   thousands of dollars, but I can't tell.  I don't have a

23   calculator on me to add it up.  I'm kind of like you, not good

24   with numbers.

25   Q.  If you look at section C on that second page it talks about

1    the payment.

2    A.   Yeah.

3    Q.   In consideration for the Long Island --

4    A.   I see it right now, 486,000.

5    Q.   So the value of this agreement is $486,000, correct?

6    A.   Yep.

7    Q.   And that is signed by Craig Carton, correct?

8    A.   That is correct.

9    Q.   Thank you.

10          If we could look at 2107, please.  This is Government

11   Exhibit 2107 in evidence.  It's an e-mail from Mr. Carton to

12   Fred Mangione and to you on December 14, 2016 at 11:04 p.m.

13   Correct?

14   A.   That is correct.

15                  (Continued on next page)

IAVHCar5                    Yormark - Cross

1   BY MR. GOTTLIEB:

2   Q.  Mr. Carton writes:  "So we are on same page and to

3   simplify, all I really need is a general email tomorrow a.m.

4   saying I can invest up to $30 million in 2017 Nassau/Barclays

5   events, including but not limited to, in parenthesis, named

6   shows.  And then it goes on to discussion about making a good

7   faith deposit of no less than $3 million by December 20.

8            Now, Mr. Yormark, you received this email, did you

9   not?

10  A.  Yep, yep.

11  Q.  In response to this email, did you contact Mr. Carton and

12  say, that doesn't clarify anything because that's not our deal?

13  A.  I don't think I responded to this email.

14            MR. GOTTLIEB:  May I see 2119 -- 2109.  OK.  I'm

15  sorry.  Your Honor, 2109, please, first.

16  Q.  Looking at Government's Exhibit 2109 in evidence, this is

17  an email from Fred Mangione to Craig Carton dated the next day,

18  December 15, 2016, and at 10:51 a.m.  And you'll see that

19  Mr. Mangione writes, types:  "Craig, thanks for your time

20  yesterday.  Following up on our conversation.  We are willing

21  to work with $30 million of our inventory in Nassau and

22  Brooklyn and will give you the ability in January to purchase

23  up to 100 to 200 all access seats for the new Nassau arena."

24            First, stopping there, what's your understanding as to

25  who the "we" refers to in that third line, "we are willing"?

IAVHCar5                          Yormark - Cross

1    Who's the "we"?

2    A.  I guess that's the company.  That's how we referred to it.

3    Q.  Continuing:  "If there are any shows that we own ourselves

4    under the Brooklyn Direct umbrella, we will give you the

5    ability to purchase a bulk of tickets for those shows.  Past

6    shows in Brooklyn we have owned have been Billy Joel, Elton

7    John, Jimmy Buffett, and more.  We would look for a $3 million

8    good faith deposit by December 20 to move forward.  We look

9    forward to next steps.  Let me know if you have any questions.

10   Best."

11           Do you recall seeing this email?

12   A.  Not until I saw it, not recently.

13   Q.  Looking at next, we could look at Government Exhibit 526,

14   and this is for the Court and counsel, please.

15           Do you see it, Mr. Yormark?

16   A.  I'm looking at it, yeah.

17   Q.  What is that?

18   A.  It's a -- states here it's a quick overview of ticket

19   business at Barclays and Nassau exclusively.

20   Q.  This is an email that was sent to you and to Fred Mangione

21   from Craig Carton, correct?

22   A.  Yes, it looks that way.

23   Q.  And it's dated March 20, 2017, correct?

24   A.  That is correct.

25   Q.  And this is a -- withdrawn.

1          Your Honor, I would ask this be received in evidence,

2     Government's Exhibit 526?

3          MR. QUIGLEY:  Objection.  Hearsay.

4          THE COURT:  Hearsay overruled.  The objection's

5     sustained.

6     BY MR. GOTTLIEB:

7     Q.  Mr. Yormark, do you recall receiving this email?

8     A.  I do not recall this email.

9     Q.  Do you recall receiving any communications from Mr. Carton

10    in which he discussed the number of tickets that had already

11    been sold and how much Barclays profited?

12    A.  I can't recall.  I can't recall.

13         MR. GOTTLIEB:  Can we look at 2102, please.  This is

14    in evidence.

15         THE COURT:  I don't know, is it?

16         MR. GOTTLIEB:  Oh, yes, it is, your Honor.

17    Q.  Government Exhibit 2102, this is an email, Mr. Yormark,

18    from Mr. Carton to you and to Fred Mangione sent on Monday,

19    October 17, 2016, correct?

20    A.  Yes.

21    Q.  And in it Mr. Carton writes:  "Congrats on all concerts for

22    Nassau.  We just played the promo.  Assuming you have given our

23    chat some more thought, let's see if we can put a deal

24    together."

25         Now, stopping there.  Mr. Yormark, what's your

1    understanding of that chat?  What's he referring to?

2    A.  A conceptual conversation I assume he had with me.

3    Q.  Do you recall having that conceptual conversation that he's

4    referring to in this email?

5    A.  I don't recall this particular email or these specifics.

6    You asked me about what the chat might mean, and that's how I

7    answered it.

8    Q.  Thank you.

9         He goes on to say:  "I sent over the requested

10   sections and rows for Barclays and for Nassau.  It would be

11   first 20 rows in B1 then A1 and C1.  If we could agree to a

12   minimum of 200 seats to every nonsporting event, would

13   consider.  Between the two venues, let's say there are 350

14   events, we would be purchasing at face value 70,000 tickets.

15   Assuming average ticket price of $150, we would prepay you

16   10,500,000.  You would receive 20 percent of the upside with

17   fully transparent reporting."

18        Stopping there.  Mr. Yormark, do you recall learning

19   of that aspect of Mr. Carton's proposal?

20   A.  I don't recall that.

21   Q.  Thank you.

22        You can take that down.  2119, please.  This is in

23   evidence, Government Exhibit 2119.

24        Mr. Yormark, this is an email from Mr. Carton to Fred

25   Mangione and to you dated Sunday, January 8, 2017, at 9:02 p.m.

IAVHCar5                          Yormark – Cross

1    The subject, investment.  It reads:  "Guys, thanks as always

2    for the time and for allowing me the opportunity to discuss and

3    hopefully execute a meaningful agreement with you."

4           Stopping there.  Mr. Yormark, do you recall or what is

5    your understanding as to the time that Mr. Carton is referring

6    to here?

7    A.  I don't, but obviously, we don't have an agreement in

8    place.

9    Q.  Well, you see, Mr. Yormark, I didn't ask you that, did I?

10          THE COURT:  OK.  What does the word "time" refer to,

11   if you know?

12          THE WITNESS:  Can you restate the question, please.

13          THE COURT:  The question was, what does the word

14   "time" in the first sentence of this email refer to, if you

15   know?

16          THE WITNESS:  I don't know.

17          THE COURT:  Thank you.

18          Let's move on, please.

19   BY MR. GOTTLIEB:

20   Q.  On the bottom of this, without going through the middle

21   part, he again refers in paragraph 2 to Streisand and

22   Metallica.  And on the bottom it reads:  "Between all access

23   Streisand and Metallica, we could easily invest $10 million

24   right out of the gate."

25          Again, Mr. Yormark, just sitting here now, now having

1   seen this again, do you recall receiving this email?

2   A.  I don't recall, but obviously my name is on it.

3   Q.  Do you recall responding to this email back to Mr. Carton?

4   A.  I can't say I do recall.

5          MR. GOTTLIEB:  If we could look at Government

6   Exhibit 2126, please.

7   Q.  Looking at Government Exhibit 2126 in evidence,

8   Mr. Yormark, this is an email from Mr. Carton to Mr. Mangione

9   and to you dated Monday, February 13, 2017, at 10:22 a.m.

10  Subject, Metallica.

11  A.  Uh-huh.

12  Q.  And Mr. Carton writes to you:  "Congrats on the official

13  announcement today.  As you know, my investment partner,

14  Brigade Capital, earmarked up to $1 million for a potential

15  Metallica investment/partnership similar to our Streisand

16  investment.  I know you have a limited number of tickets that

17  you control, so I am asking, if at all possible, is there a way

18  we can purchase tickets from LN" --

19          And can you tell us what "LN" is?

20  A.  I think that would stand for Live Nation.

21  Q.  -- "or Metallica or participate in some other financial

22  manner that would afford us the chance to invest as much as

23  possible?  Thanks as always."

24          Do you recall receiving this email?

25  A.  Again, I don't recall, but my name's on it.

1   Q.  Do you recall whether or not you responded to Mr. Carton?

2   A.  I don't recall.

3   Q.  Do you recall whether or not you conveyed in any way to

4   Mr. Carton that your proposal is ridiculous, it's not

5   acceptable?  Did you ever convey that to him?

6          THE COURT:  I think he just said he doesn't recall

7   responding.

8   A.  I never said yes.

9   Q.  Now, looking at Defendant's 29 -- and this is for the Court

10  and counsel -- do you see it up there?

11  A.  Yes, I see that.

12  Q.  All right.  Do you recognize what this is?

13  A.  Looks like -- let me just read it quickly.

14          Yeah, this looks like a reconciliation for the Twenty

15  One Pilots show.

16  Q.  And is it an email addressed to you from Mr. Carton?

17  A.  Yes, it is.

18  Q.  And it's sent Sunday, January 22, 2017, 5:48:19 p.m.?

19  A.  Yes.

20  Q.  You know, when you say Twenty One Pilots, I'm sure everyone

21  knows Twenty One Pilots.  So I'm asking for a friend, what's

22  Twenty One Pilots?

23          MR. QUIGLEY:  Objection.  Relevance.

24          THE COURT:  The objection's sustained.

25  Q.  Well, when you say "reconciliation for the Twenty One

1   Pilots," what does that refer to?

2          MR. QUIGLEY:  Document's not in evidence.  We object

3   on hearsay.

4          THE COURT:  The objection's sustained.

5          MR. GOTTLIEB:  Your Honor, I ask that the email be

6   received in evidence, please.

7          THE COURT:  No.  Hearsay.

8   BY MR. GOTTLIEB:

9   Q.  Do you recall receiving any reconciliations from Mr. Carton

10  concerning any of the shows that took place at your venues?

11  A.  I don't -- well, let me ask you --

12         THE COURT:  No, no, don't you ask him a question.

13         THE WITNESS:  I understand.  You're right, you're

14  right.  Apologize for that.  I'm learning.

15  A.  I do not recall getting reconciliations through the

16  accommodation of ticket buying that we provided Craig with from

17  time to time.

18  Q.  Looking at Defendant's 40, please, for the Court and for

19  counsel.

20         Now, please take a look at it.

21  A.  Yes.

22  Q.  Do you recall on May 2 of 2017, or thereabouts, having a

23  conversation with Mr. Carton regarding additional details of

24  his proposal to you, to Barclays?

25  A.  I don't recall this at all.

IAVHCar5                          Yormark - Cross

1    Q.  Do you recall learning that Mr. Carton discussed with you

2    buying a minimum of 200 tickets?

3              THE COURT:  OK.  It stops now.  This is not coming in.

4    It's hearsay.  You can't read any portion of it.  You can ask

5    him if he's seen it, if he's familiar with it, without telling

6    him, without telling the jury what's in the document.  Is any

7    of it familiar to him, that's all you can do, Mr. Gottlieb.

8    I've let this go on long enough.

9              MR. GOTTLIEB:  I understand.  I understand, your

10   Honor.

11   Q.  Throughout, up and to through May and June of 2017, is it

12   fair to say you continued to have communications with

13   Mr. Carton about details of his proposal, correct?

14   A.  It's fair to say that your client was very solicitous of me

15   with this proposal, and it went on for many months.

16   Q.  Actually --

17   A.  So I would agree with that.

18   Q.  OK.  That's what I'm asking you.

19              And you participated in these conversations as well as

20   Mr. Mangione, correct?

21   A.  I can't speak for how many conversations I was a part of.

22              MR. GOTTLIEB:  Your Honor, if I can have one moment,

23   please?

24              THE COURT:  Surely.

25   Q.  Now, you told us that Mr. Carton was very solicitous of

1   you, is that fair to say?

2   A.   Well, the emails that you've shown me, they're constantly

3   asking for --

4   Q.   Yes or no?

5   A.   -- affirmation.

6   Q.   Was he solicitous?

7   A.   Did he come to me with a lot of different opportunities?

8   Yes.

9   Q.   And in fact, you described him, did you not -- when you

10  spoke to the prosecutors in this case on June 28, 2017, you in

11  fact said to the prosecutors that Mr. Carton was extremely

12  solicitous of you, correct?

13  A.   Yep, I could -- if that's what I said, then that is

14  correct.

15  Q.   And through all these communications, however you responded

16  or however you didn't respond, is it fair to say that you were

17  placating Mr. Carton?

18  A.   Yes, I was.  I was placating him --

19  Q.   Thank you.

20  A.   -- and being very polite --

21        MR. GOTTLIEB:  Your Honor, please.

22  A.   -- in my responses.

23  Q.   Now, there comes a time, you told us, that Mr. Mangione

24  left Brooklyn?

25  A.   Yes, sir.

IAVHCar5                          Yormark – Cross

1   Q.  And when did he leave?

2   A.  I said earlier about a year and a half ago, so I guess it

3   was late spring '17, or thereabouts.

4   Q.  At the time he left, you participated in and arranged for a

5   luncheon with Mr. Carton and Mr. Mangione's replacement,

6   correct?

7   A.  No, not his replacement.  That is not correct.

8   Q.  Mr. Mangione.  I'm referring Mr. Mangione.

9   A.  You said Mr. Mangione's replacement and Mangione, and I

10  said no.  His replacement was not there.

11  Q.  Do you recall going to a luncheon at Fresco by Scotto's?

12  A.  Yes, I do.

13  Q.  Do you recall that Mr. Kavanaugh, Brett Kavanaugh –– not

14  Brett, Brett, oh my Lord.  Paul.

15  A.  Let me help you.  It's Paul.  Did you say Paul?  Good.

16  Q.  I was referring to the Supreme Court justice.  Paul

17  Kavanaugh.

18  A.  OK.

19  Q.  Paul Kavanaugh was present as well, correct?

20  A.  Yes, he was.

21  Q.  And the purpose of the meeting was for Mr. Kavanaugh to

22  meet Mr. Carton, correct?

23  A.  Yes.

24  Q.  And you wanted Mr. Kavanaugh to meet Mr. Carton because

25  Mr. Kavanaugh would now be the person who would be talking to

1    Mr. Carton and interfacing with him, correct?

2    A.   When needed and necessary, yes, that is correct.

3    Q.   And during this luncheon, do you recall discussions about

4    the business deals, the interest, the proposals involving

5    Mr. Carton and Brooklyn?

6    A.   No, I don't -- I don't recall the commentary that -- during

7    that lunch.  I do recall that we made the introduction from

8    Paul to Craig.  Craig had purchased tickets from time to time.

9    We wanted to still accommodate him in an appropriate manner so

10   he would have someone to call if need be.

11   Q.   Now, it's fair to say you don't have luncheons with every

12   customer who purchases tickets from time to time, correct?

13   A.   I have a lot of lunches.

14   Q.   I know, but see, my question is do you often just have

15   lunches with any person who purchases any amount of tickets?

16   A.   You know, I'd hate to say it, but I do.  I've been on suite

17   meeting lunches, season ticketholder lunches.  As I said

18   earlier, I'm in the relationship business.

19              MR. GOTTLIEB:  Got you.  Thank you.

20              Your Honor, no further questions.

21              THE COURT:  Redirect.

22              MR. QUIGLEY:  Brief redirect, your Honor.

23   REDIRECT EXAMINATION

24   BY MR. QUIGLEY:

25   Q.   Mr. Yormark -- can we pull up what's in evidence as

IAVHCar5                          Yormark - Redirect

1    Government Exhibit 2102.

2    A.   It's not on the screen.

3    Q.   I think we're just taking it back.  I'm sorry.  2101.

4              Now, do you recall being asked some questions on

5    cross-examination by Mr. Gottlieb about this agreement?

6    A.   Yes.

7    Q.   And he asked you whether it was sent to Joseph Meli?

8    A.   Yes.

9              MR. QUIGLEY:  Could we just go to the last page of the

10   agreement, Mr. Cooney.

11   Q.   And it has your signature on it and Joseph Meli's signature

12   on it?

13   A.   Yes.

14             MR. QUIGLEY:  Can we put that to the side, Mr. Cooney,

15   and pull up what's in evidence, Government Exhibit 2144.

16   Q.   Who's this email from, Mr. Yormark?

17   A.   It's from Craig Carton.

18   Q.   And who's it to?

19   A.   Jeff Gewirtz and Marie Chindamo.

20   Q.   Do you know who they are?

21   A.   Yes, I do.

22   Q.   Who are they?

23   A.   Jeff Gewirtz is general counsel, and Marie chindamo at the

24   time was overseeing human resources.

25   Q.   And they work in Brooklyn?

IAVHCar5                          Yormark – Redirect

1    A.  Yes.

2    Q.  And what's the subject of the email?

3    A.  Joseph Meli and separation agreement.

4            MR. QUIGLEY:  Can we look at the last page of the

5    attachment, Mr. Cooney.

6    Q.  Appear to be the same signature block as was on the exhibit

7    that Mr. Gottlieb showed you?

8    A.  I'm sorry?

9    Q.  Does that appear to be the same signature block on the

10   email that Mr. Gottlieb had just showed you that we just talked

11   about, Government Exhibit 2101?

12   A.  Yes.

13   Q.  Who is this email from?

14           Go back to the top, Mr. Cooney.

15   A.  From Craig Carton.

16           MR. QUIGLEY:  You can take that down, Mr. Cooney.

17   Thank you.

18   Q.  By the way, after the end of the Brooklyn Direct Dark

19   Knight ventures partnership, did you have any further dealings

20   with Mr. Meli?

21   A.  Did not.

22   Q.  You were asked some questions about the all access pass.

23   Do you recall that?

24   A.  Yes.

25           MR. QUIGLEY:  Can you put up what's in evidence as

IAVHCar5                    Yormark - Redirect

1  Government Exhibit 2135.

2  Q.  Do you recall being shown this agreement by Mr. Gottlieb?

3  A.  Yes, yes.

4  Q.  This is the Long Island all access pass agreement?

5  A.  Yes, it is.

6          MR. QUIGLEY:  Can you look at -- can we look at the

7  second page, Mr. Cooney.  If we could highlight Section C.

8  A.  Yes.

9  Q.  Do you recall Mr. Gottlieb asking you some questions about

10 how much Mr. Carton was going to pay for his participation in

11 the all access pass program?

12 A.  Yes.

13 Q.  Do you know whether Mr. Carton actually made all those

14 payments?

15 A.  I'm not sure if he did.

16         MR. QUIGLEY:  Can we just take down the blowup and put

17 it alongside Government's Exhibit 920.  And go to the first

18 page of 920.  And then go to the first page of 2135.

19 Q.  These are two different agreements, Mr. Yormark, is that

20 correct?

21 A.  Yes.

22 Q.  Do they relate to two different things?

23 A.  Well, I mean, they're both ticketing agreements.

24 Q.  Did you sign the agreement that is Government's

25 Exhibit 920?

IAVHCar5                       Yormark - Redirect

```
 1   A.  It's not listed, but that's -- which one is that?  To the

 2   right?

 3           MR. QUIGLEY:  Take down 2135, Mr. Cooney.  Let's focus

 4   on 920 and go to the last page.

 5   Q.  Did you ever sign that agreement, Mr. Yormark?

 6   A.  No, I did not.

 7   Q.  Did you ever authorize anyone to sign on your behalf?

 8   A.  No, I did not.

 9   Q.  Did you ever have any agreement with Craig Carton regarding

10   the purchase of Barbra Streisand tickets?

11   A.  We never had an agreement with Craig Carton for tickets.

12   Q.  By "we," who do you mean?

13   A.  I'm sorry?

14   Q.  By "we," who do you mean?

15   A.  Our company.

16   Q.  Brooklyn Sports & Entertainment?

17   A.  Well, Barclays.  It's Brooklyn Event Center and Nassau

18   Event Center.  There's no such thing -- this is a brand,

19   Brooklyn Sports & Entertainment.

20   Q.  But did your company ever have any agreement with

21   Mr. Carton --

22           MR. GOTTLIEB:  Your Honor, I'm going to object at this

23   point.  That's been asked and answered.

24           THE COURT:  It has been.

25           MR. QUIGLEY:  Thank you, your Honor.  I have no
```

IAVHCar5                         Yormark - Redirect

1   further questions.

2              THE COURT:  Anything else?

3              MR. GOTTLIEB:  No, your Honor.  Thank you.

4              THE COURT:  Thank you, sir.  You may step down.

5              Call your next witness, please.

6              (Witness excused)

7              MR. QUIGLEY:  Your Honor at this time we ask to offer

8   some emails through an email reader.

9              THE COURT:  Excuse me while I talk to them.

10             Are these things that are in evidence?

11             MR. QUIGLEY:  They've been authenticated, your Honor.

12  We're going to offer them.

13             THE COURT:  They will be in evidence before anybody

14  starts to read anything.  I told you that last week,

15  Mr. Quigley.  Why did you think I would change my mind today?

16  Introduce them.

17             MR. QUIGLEY:  Your Honor, the government offers

18  Government's Exhibit 288, 289.

19             THE COURT:  Jim, can you write these down.

20             MR. QUIGLEY:  291, 292, 293, 744, 745, and 749.

21             THE COURT:  I have copies?  Were these part of the

22  stipulation that was read earlier today?

23             MR. QUIGLEY:  The authenticity stipulation, yes, your

24  Honor.

25             THE COURT:  Yes.  Can I have copies, please.

IAVHCar5

1              Folks, don't discuss the case.  Keep an open mind.  Go

2    have a break.

3              (Jury excused)

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IAVHCar5

1                (Jury not present)

2                THE COURT:  Mr. Quigley, I meant what I said last

3     week.  I don't care if every other judge in this court allows

4     emails that have not previously been admitted into evidence to

5     be read to the jury by someone from the witness stand.  That is

6     not a proper way under the Federal Rules of Evidence of

7     introducing evidence into a case.  You get it admitted, then

8     somebody can read it.  And I don't care who else does it some

9     other way.  That's the way you do it here.  I told you that

10    last week.

11               MR. QUIGLEY:  Your Honor, I'm sorry.  I misunderstood.

12               THE COURT:  How could you have misunderstood?  I don't

13    think I could have been any clearer.

14               MR. QUIGLEY:  I thought you wanted us to introduce

15    them with the witness on the stand one by one.  That's what I

16    thought.  I'm sorry.  I was not meaning to disregard any

17    instructions by you.

18               THE COURT:  I said you couldn't have someone read

19    emails into evidence and think that that was going to get them

20    into evidence.  I said that.  All right.  Email by email I also

21    said because, undoubtedly, there would be objections.

22               So I have before me Government Exhibit 288 which you

23    are seeking to admit as?

24               MR. QUIGLEY:  The fact that it was sent, your Honor.

25    It's Mr. Carton and a coconspirator statement, Mr. Carton

IAVHCar5

1    receiving --

2              THE COURT:  Let's start with how has David Molner been

3    connected to this case as a coconspirator?

4              MR. QUIGLEY:  Your Honor, we'd offer it subject to

5    connection.

6              THE COURT:  Wait till later.  I want Molner connected

7    up before the jury sees this.

8              MR. QUIGLEY:  I understand.  I would ask to take a

9    look at the next several emails that are in the stack.  It's a

10   back-and-forth between David Molner, the defendant, and Joe

11   Meli regarding this agreement.  They're making line edits to

12   it, and the agreement that Mr. Yormark testified that he didn't

13   send, didn't sign.

14             THE COURT:  I said email by email.  We're at 289, OK.

15   This is an email from?

16             MR. QUIGLEY:  Email from the defendant.

17             THE COURT:  It's from Mr. Carton, right?

18             MR. QUIGLEY:  Yes.

19             THE COURT:  Mr. Carton sent this?

20             MR. QUIGLEY:  Yes.

21             THE COURT:  This is a party admission.  It's admitted.

22             MR. QUIGLEY:  Thank you, your Honor.

23             THE COURT:  That's why it's in, it's in because

24   Mr. Carton sent it.

25             (Government's Exhibit 289 received in evidence)

IAVHCar5

1          MR. QUIGLEY:  Just to add to what's going on here,

2    Mr. Carton is providing edits to the agreement that he

3    previously got from Mr. Molner.  He's saying it says Ticket

4    Jones twice everywhere.  And then, again, this is the same

5    agreement.

6          THE COURT:  That may be self-evident to you.  It's not

7    self-evident to me.

8          MR. QUIGLEY:  OK.

9          THE COURT:  You see, it's not self-evident to me that

10   this email is a response to this email with edits, nor would it

11   be self-evident to the jury.  And you certainly aren't going to

12   testify to that.  Who is going to testify about that?

13         MR. QUIGLEY:  Judge, if you look at 289, which is now

14   in evidence, on December 16, Mr. Molner sends, he says, "per

15   your request," right, and there's an executed copy of the

16   purchase agreement.

17         THE COURT:  Correct, right.

18         MR. QUIGLEY:  Then Mr. Carton responds, subject ticket

19   Jones/Barclays agreement, saying it says Ticket Jones twice

20   everywhere.  So that's 289.

21         And then 290 -- sorry, 291, it's Mr. Molner responding

22   again.  I think that's a coconspirator, but it's also not

23   coming in for the truth of the matter asserted.  It's just

24   showing the course of dealing between them, that he sent some

25   agreements back.

IAVHCar5

1          THE COURT:  288 I understand admitting for the purpose

2    of showing that it was said because there's a statement from

3    Mr. Carton that responds to it, and for that purpose, for the

4    fact that it was said, that I understand.

5          291, the top email might conceivably refer to 288 and

6    289, but then we get into a whole new --

7          MR. QUIGLEY:  Your Honor, it's a revision.  It's all

8    the same chain.  It's a revision of the same agreement.

9          THE COURT:  Really?

10         MR. QUIGLEY:  Yes.  If you look at 291, bottom first

11   page, it's a December 16 3:23 p.m. email, all right?

12         THE COURT:  But what's the thing in the middle.

13         MR. QUIGLEY:  That's from Mr. Carton.  That's

14   Mr. Carton's statement from Craig Carton to David Molner and

15   Joseph Meli.  That's a party admission, and this is

16   Mr. Molner's response.

17         THE COURT:  And Mr. Carton is sending what to

18   Mr. Molner?

19         MR. QUIGLEY:  He's sending --

20         THE COURT:  A signature line.

21         MR. QUIGLEY:  A signature line.

22         THE COURT:  Is that what you're suggesting?

23         MR. QUIGLEY:  That goes into the agreement that's

24   actually incorporated into this agreement.

25         THE COURT:  OK.

IAVHCar5

1          MR. QUIGLEY:  And then 292, again, more in the same

2     chain.  This is an email from Mr. Carton.  So that's a party

3     admission.  That comes in.

4          THE COURT:  Anything written by Mr. Carton comes in.

5          MR. QUIGLEY:  Thank you, your Honor.

6          THE COURT:  All right.

7          MR. QUIGLEY:  And then 293, again, this is a response

8     from -- another email further up in the same chain, same course

9     of dealing, a response from Mr. Molner.  I think it comes in

10    for the fact that it was sent and also to show -- and I

11    think -- look, I think we're close to showing that they were

12    coconspirators here.

13         THE COURT:  Yes, you're getting real close, I'll grant

14    you that.

15         MR. QUIGLEY:  I think the statements themselves can be

16    considered, although -- and there's also independent

17    corroborative evidence from the prior exhibits that we just

18    showed it was Mr. Carton himself which was an independent basis

19    for coming in.  Again, same agreement.

20         So that's that email.  And then 744 is an email from

21    Mr. Carton.

22         THE COURT:  Right.

23         MR. QUIGLEY:  745, email between Mr. Carton and

24    Michael Wright.  I mean, we're happy to, for the time being,

25    offer only the bottom email since it's from Mr. Carton.  But I

IAVHCar5

1    think, again, when you consider this, again, what's going on

2    here is this is Wright -- there was testimony yesterday that

3    Brigade wired $3 million to Brooklyn and to Advance

4    Entertainment on December 19, 2017 -- sorry, December -- yes,

5    December 19, 2016, right.  And this is the defendant Michael

6    Wright and Joseph Meli talking about what they're going to do

7    with that money.  I think 744, again, is a party admission.

8    You can consider that.

9              And 745, which is another email on the same topic

10   comes in as a coconspirator's statement.

11             THE COURT:  Mr. Gottlieb, do you want to argue?

12             MR. GOTTLIEB:  Actually, very briefly, your Honor.  On

13   745 --

14             THE COURT:  Wait a minute.  Let me get to 745.  745 is

15   two emails, one from Mr. Carton at the bottom and then one at

16   the top to Mr. Carton from Mr. Wright.

17             MR. GOTTLIEB:  At this point in the state of the

18   record in this case right now, your Honor, we don't believe

19   there's been sufficient evidence, foundation presented to bring

20   this in under --

21             THE COURT:  To bring Mr. Wright's statements in as a

22   coconspirator?

23             MR. GOTTLIEB:  Correct.

24             THE COURT:  That's your argument?

25             MR. GOTTLIEB:  Yes.

IAVHCar5

1              THE COURT:  Well, there, my friend, I disagree with

2       you.  OK.  They're all admitted.

3              MR. QUIGLEY:  Thank you, your Honor.

4              (Government's Exhibits 288, 289, 291, 292, 293, 744,

5       745, and 749 received in evidence)

6              MR. GOTTLIEB:  Your Honor, can I just raise an issue

7       if you're able to just right now because I believe -- I

8       understand your Honor's decisions with regard to anything that

9       Mr. Carton says comes in as a party admission.  I understand

10      that.  But clearly, what's happened here is the government is

11      cherry-picking and in fact --

12             THE COURT:  They can pick whichever ones they want.

13      Sadly, you cannot introduce your client's statements made in

14      emails.  You know that, and that's why I got so very upset when

15      time after time after time, documents you as a very competent

16      criminal defense lawyer know perfectly well you cannot get into

17      evidence, you are reading them to the jury, you're asking the

18      witness.  It's just not right.  It's not right.

19             MR. GOTTLIEB:  Let me at least tell -- and I'll share

20      what my thinking is because I am aware of the rule; I abide by

21      the rule.  But there's also a theory in the law and in trials

22      that you cannot mislead the jury.  And just on a basis of

23      completeness, to take out one when there's --

24             THE COURT:  Sorry.  If you think it's misleading, you

25      have a case that you can put on.  You have a difficult decision

IAVHCar5

| | |
|---|---|
| 1 | to make.  Actually, you don't have a difficult decision to make |
| 2 | at all.  Mr. Carton has a difficult decision to make about |
| 3 | whether he will take the stand.  But the rules are very clear. |
| 4 | His prior out-of-court statements aren't admissible under a |
| 5 | rule of completeness.  They're not admissible under any rule at |
| 6 | all.  The government can take whatever emails of his it thinks |
| 7 | are probative and put a case in front of the jury.  And if you |
| 8 | think that case is misleading, you got to come up with a way to |
| 9 | explain to the jury why it's misleading. |
| 10 | MR. GOTTLIEB:  OK. |
| 11 | THE COURT:  And you know that that's the rule. |
| 12 | MR. GOTTLIEB:  I do.  But, your Honor, to me it's just |
| 13 | so clear that on a basis of completeness the few that we have |
| 14 | tried to get in, I thought your Honor would actually say, you |
| 15 | know what, that makes sense. |
| 16 | THE COURT:  Well, especially in a case -- |
| 17 | Mr. Gottlieb, especially in a case where it's clear that the |
| 18 | government is going to argue that Mr. Carton faked emails, that |
| 19 | Mr. Carton doctored emails, didn't send emails, emails that |
| 20 | weren't found on servers, emails that don't look like their |
| 21 | counterparts.  You know, I've been down this road before in |
| 22 | another case.  They're going to argue that those emails, far |
| 23 | from being rule of completeness, were there such a rule in this |
| 24 | circumstance, emails, they're emails that I'll bet the |
| 25 | government thinks never were sent. |

IAVHCar5

1              Let's just lay it out on the table.  Part of the

2      evidence here, which I didn't fully appreciate until today, but

3      I appreciate it now, is that as part of doing this, part of

4      allegedly scamming people, your client made up emails, made up

5      agreements that people never entered into, that never existed,

6      for his legitimate ticket business.  So, OK, but that's yet

7      another reason to adhere 100 percent to the rule that your

8      client's out-of-court statements can be introduced by the

9      government for any purpose and cannot be introduced by you for

10     any purpose.  All the more reason to adhere to the rule.

11              MR. GOTTLIEB:  Thank you.

12              THE COURT:  Let's bring in the jurors.

13              (Continued on next page)

IAVHCar5

| | |
|---|---|
| 1 | (Jury present) |
| 2 | THE COURT:  I'm so sorry, folks, but it was easier to |
| 3 | talk out loud than to do that at sidebar. |
| 4 | The following exhibits have been admitted:  Government |
| 5 | Exhibit 288, Government Exhibit 299. |
| 6 | MR. QUIGLEY:  It's 289, your Honor. |
| 7 | THE COURT:  I'm sorry? |
| 8 | MR. QUIGLEY:  It was 289. |
| 9 | THE COURT:  289.  Government Exhibit 291, Government |
| 10 | Exhibit -- is there a 292? |
| 11 | MR. QUIGLEY:  Yes, your Honor. |
| 12 | THE COURT:  292, Government Exhibit 293, Government |
| 13 | Exhibit 744, Government Exhibit 745, and Government |
| 14 | Exhibit 749. |
| 15 | The government wishes to present these to you.  So |
| 16 | what they're going to do is they're going to put somebody on |
| 17 | the witness stand here who is going to read, I guess, portions |
| 18 | of those -- some of them are kind of lengthy -- documents into |
| 19 | evidence, and that person is going to be? |
| 20 | THE WITNESS:  Mr. Urbanczyk. |
| 21 | THE COURT:  Raise your right hand.  Do you solemnly |
| 22 | swear that you will read accurately the emails that are being |
| 23 | put in front of you? |
| 24 | THE WITNESS:  I do. |
| 25 | THE COURT:  Thank you.  Have a seat. |

1           You may proceed.

2           MR. QUIGLEY:  Mr. Cooney, can we publish what's in

3   evidence as Government Exhibit 288.

4   LUKE URBANCZYK,

5       called as a witness by the Government,

6       having been duly sworn, testified as follows:

7   DIRECT EXAMINATION

8   BY MR. QUIGLEY:

9   Q.  Mr. Urbanczyk, if you could read the header information and

10  the content of the email.

11  A.  Sure.  It's an email from David Molner to Craig,

12  labs123@aol.com.

13          THE COURT:  Slowly enough so that the court reporter

14  can take it down.

15  A.  CC's Joe Meli, jmeli74@gmail.com.  Subject, Ticket

16  Jones/Barclays agreement.  Says it was sent on Friday,

17  December 16, 2016, at 15:23.  And the body of the email says,

18  "Per your request."

19          THE COURT:  Ladies and gentlemen, this document has

20  been admitted, originally admitted, for the purpose of showing

21  that it was sent.

22          MR. QUIGLEY:  Mr. Cooney, could we go to the first

23  page of the attachment and just publish it to the jury.

24          You don't need to read it in, Mr. Urbanczyk.

25          Could we go to page 5 of the document.

1          Could we go to page 7 of the document, the first page

2    of the second attachment.

3          Take that down, Mr. Cooney.  Thank you.

4          Could we also publish what's in evidence as

5    Government's Exhibit 289.

6    Q.  Mr. Urbanczyk, if you could read the top email in the

7    chain.

8    A.  With the header information?

9    Q.  Yes.

10   A.  Subject reads:  "Re:  Ticket Jones/Barclays agreement."  It

11   says from Craig, labs123@aol.com.  Says sent Friday,

12   December 16, 2016, at 5:26 -- 15:26, excuse me.  Cc'd is Joe

13   Meli, jmeli74@gmail.com.  And it says to David Molner,

14   david.molner@gmail.com.  And the body of the email says, "It

15   says Ticket Jones twice everywhere.  Sent from my iPhone."

16         MR. QUIGLEY:  You can take that down, Mr. Cooney.  Can

17   we put up what's in evidence as Government's Exhibit 291.

18   Beginning with the email, if you could just pull it out so we

19   can see the whole first page, Mr. Cooney.  Thank you.

20   Beginning with the -- and then can we blow up the email from

21   Craig on Friday December 16 at 3:58 p.m.

22   Q.  Can you read the top email in the chain, Mr. Cooney --

23   Mr. Urbanczyk, sorry.

24   A.  Sure.  Says from David Molner to Craig, cc Joe Meli.

25   Subject, "Re:  Ticket Jones/Barclays agreement."  Date, Friday,

1   December 16, 2016, at 3:59 p.m.  Has two attachments, and it

2   says, "Revised per your request."

3           MR. QUIGLEY:  You can take that down, Mr. Cooney.

4   Could we put up what's in evidence as Government Exhibit 292.

5   Q.  Could you read the bottom email from David Molner.

6   A.  On December 16, 2016, at 4:21 p.m.  It's from David Molner,

7   david.molner@gmail.com.  Says, "This reflects the changes just

8   agreed re Tier One.  Let me know if you need anything further.

9   DLM."

10  Q.  Can you read the top email, Mr. Urbanczyk.

11  A.  The subject says, "Re:  Further revised Ticket

12  Jones/Barclays agreement."  It's from Craig at labs123@aol.com.

13  It was sent Friday, December 16, 2016, 16:33, cc'ing Joe Meli,

14  jmeli74@gmail.com, and to David Molner, david.molner@gmail.com.

15  It says, "Please take out first 15 rows.  Leave it as premium.

16  Sent from my iPhone."

17          MR. QUIGLEY:  We can take that down.  Can we put up

18  what's in evidence as Government Exhibit 293.

19  Q.  Can you read the beginning email from Mr. Molner at

20  4:47 p.m.

21  A.  It's from David Molner, david.molner@gmail.com, to Craig

22  cc'ing Joe Meli.  Sent Friday, December 16, 2016, at 4:47 p.m.

23  Subject, re: further revised Ticket Jones/Barclays agreement.

24  It says, "Attached with that revision."

25  Q.  Can we read the email above that.

IAVHCar5                          Urbanczyk - Direct

1   A.   It's from Craig Carton.  Sent Friday, December 16, 2016, to

2   david.molner@gmail.com, cc'ing jmeli74@gmail.com.  Subject, re

3   further revised Ticket Jones/Barclays agreement.  And it says,

4   "Please take my signature off and resend and we are good."

5   Q.   And could you read the email above that.

6   A.   Just the body or the header as well?

7   Q.   Just the body of the email.

8   A.   "Signature removed, but sig page is still separate."

9          MR. QUIGLEY:  Mr. Cooney, if we could just page to the

10  attachments slowly.  That's good.

11         We can take that down, Mr. Cooney.  If we could put up

12  what's in evidence as Government Exhibit 744.

13  Q.   Can you read this email, Mr. Urbanczyk.

14  A.   Including the header information?

15  Q.   Yes, please.

16  A.   It's from Craig, labs123@aol.com.  It was sent December 17,

17  2016, at 9:16 p.m. to mw@sgroupnyc.com and Joseph Meli,

18  jmeli74@gmail.com.  The subject, just a plan.  The body of the

19  email reads:

20         "3 million coming Monday.  1 million going to JM.

21         2 million going to CC.

22         CC sending 750 to MW for CMB.

23         CC sending 950 to MW for dezi."  It's spelled d-e-z-i.

24         "C sending 200 to Ron.

25         C using 100 for personal.

IAVHCar5                          Urbanczyk – Direct

1          Leaves 300 to make Ron whole and 270 more for full

2     return."

3          MR. QUIGLEY:  You can take that down, Mr. Cooney.

4     Could we put up what's in evidence as Government's Exhibit 745.

5     Q.  Could you just read the header information for the bottom

6     email.

7     A.  Sure.  It says from Craig C., craig@cureitbrand.com.  Sent

8     December 20, 2016, at 7:18 a.m., to Michael, mw@sgroupnyc.com.

9     And the subject line is blank.

10    Q.  Go ahead.

11    A.  The bottom of the email reads:

12          "Please use 750 for CMB.

13           966 for Dezi.

14           Total 1,716,000.

15           50 for Harvey.

16           20 for boiler.

17           Total 1,786,000.

18           25, Dan Metzler.

19           100 Ron (you send).

20           Total 1,911,000.

21           9 MW payback.

22           80 Craig Citibank account.

23           Still owed.

24           Cortez 280.

25           MW 41.

1              Ron 700 by dec" -- I assume December -- "29.

2              New deals.  BJ CMB 500, 10 percent return, Jan 10."

3   Q.  Can you read the top email.

4   A.  Including the header information?

5   Q.  Yes, please.

6   A.  It's from Michael Wright, mw@sgroupnyc.com, to Craig C.,

7   craig@cureitbrand.com.  Subject is blank where it says "re."

8   Sent December 20, 2016, 1337.  The bottom reads:  "No wire has

9   come in yet.  Harvey asking and dezi/sea," d-e-z-i, s-e-a.

10  Need to show them proof or fed ID number.  Brigade would

11  absolutely have this instantly."

12              MR. QUIGLEY:  You can take that down, Mr. Cooney.

13  Q.  Then last one, Government's Exhibit 749.  Can you read the

14  bottom email.

15  A.  Sure.  It says December 22, 2016, at 4:40 p.m., Craig,

16  labs123@aol.com wrote:  "Almost in a really good place, but for

17  certain we survived the death bullet.  We should map out

18  January and February when we all return.  Love you guys, and

19  will be nice to start building in the weeks to come.  MW,

20  please send to Joe the Tier One wire info.  Thanks."

21  Q.  Can you read the email above that.

22  A.  "Love you all.  Joe Meli."  And then telephone

23  number 917-664-0256.

24  Q.  And then can you read the email above that.

25  A.  "Great work, my friends.  To do battle another day."

1          MR. QUIGLEY:  Thank you, your Honor.  We have no

2    further emails to publish at this time.

3          THE COURT:  Call your next witness.

4          MR. KOBRE:  The government calls Fred Mangione.

5    FRED MANGIONE,

6         called as a witness by the Government,

7         having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MR. KOBRE:

10   Q.  Good afternoon, Mr. Mangione.

11   A.  Good afternoon.

12   Q.  Where do you live?

13   A.  Glen Rock, New Jersey.

14   Q.  And where do you currently work?

15   A.  Work for the New York Jets.

16   Q.  And what's your position with the New York Jets?

17   A.  Senior vice president of sales and marketing.

18   Q.  When did you start working with the Jets?

19   A.  Approximately April of 2017.

20   Q.  Before joining the Jets in April of 2017, where did you

21   work?

22   A.  Brooklyn Sports & Entertainment.

23   Q.  Does that have any other names that it goes by?

24   A.  Brooklyn Nets.  You know, it was the hierarchy of any

25   properties that we owned.

IAVHCar5                         Mangione - Direct

1    Q.  Is it also sometimes called BSE Global now?

2    A.  Correct.

3    Q.  For about how long did you work for Brooklyn?

4    A.  Seventeen years.

5    Q.  Can you tell us a little bit about your educational

6    background.

7    A.  I went to Centenary University.  I majored in business with

8    a minor in marketing.

9    Q.  Thank you.  If you don't mind pulling the microphone closer

10   to you.

11   A.  Sorry.

12   Q.  What is Brooklyn?

13   A.  What is Brooklyn?

14   Q.  Yeah, what does the company do?

15   A.  It's a sports and entertainment company that runs venues

16   and sports teams.

17   Q.  Can you give us a little bit of the history of the company

18   from the time you started working there in the beginning.

19   A.  I started in 2000.  It was then called the New Jersey Nets,

20   and over the course of time, it was purchased by an owner who

21   was looking to bring sports and entertainment back to Brooklyn.

22   So we eventually ended up moving to Brooklyn in 2012, where we

23   then ran the Barclays Center and as well as what became the

24   Brooklyn Nets.  After a period of time, we acquired other

25   arenas and also ran the New York Islanders.

1    Q.   OK.   The Barclays Center, just so we are all on the same

2    page, what is the Barclays Center?

3    A.   Barclays Center is an arena that's located in Brooklyn that

4    runs sporting events, family shows, concerts, things of that

5    sort.

6    Q.   At a later time did Brooklyn also acquire another venue on

7    Long Island?

8    A.   It did.

9    Q.   What was that?

10   A.   It was NYCD Live, formally known as the Nassau Coliseum.

11   Q.   When did the Barclays Center open?

12   A.   September 2012.

13   Q.   And how about Nassau coliseum?   When did that open?

14   A.   That opened up April of 2017.

15           THE COURT:   Nassau coliseum in April of 2017?

16           THE WITNESS:   Well, it was reopened and renovated --

17           THE COURT:   OK.

18           THE WITNESS:   -- in 2017.

19           MR. KOBRE:   Thank you.

20           THE COURT:   Can we stipulate that the Nassau coliseum

21   has been around for quite a while?

22           MR. GOTTLIEB:   A very long time.

23   BY MR. KOBRE:

24   Q.   You testified that you worked at Brooklyn for about 17

25   years.   About when did you leave?

1    A.  April of 2017.

2    Q.  What was your position at the time that you -- right before

3    you left?

4    A.  Chief of staff.

5    Q.  I'm sorry?

6    A.  Chief of staff.

7    Q.  For about how long were you chief of staff?

8    A.  Six, seven months.

9    Q.  What were some of your duties and responsibilities as chief

10   of staff at Brooklyn?

11   A.  It was really I was the relationship guy for the

12   organization.  You know, I was involved with managing some of

13   our bigger relationships, such as, you know, our guest network,

14   Ticketmaster, what then became the new renovated Nassau

15   Coliseum.  When we opened it up, I was kind of the lead of

16   opening that up.  Also looked at acquiring new venues that led

17   to an acquisition of Webster Hall in New York City and the

18   Paramount Theater in Brooklyn as well.

19   Q.  Before you became chief of staff, what position did you

20   hold at Brooklyn?

21   A.  I was the chief operating officer.

22   Q.  And for about how long did you hold that position?

23   A.  About a year and a half.

24   Q.  What were some of your duties and responsibilities in that

25   role as chief operating officer?

1    A.  That was running the day-to-day business of the Brooklyn

2    Nets, New York Islanders, and the arena sides.  So the

3    sponsorship, ticket sales, marketing, public relations, those

4    sectors all kind of filtered up through me.

5    Q.  Now, in your roles as chief operating officer and then

6    chief of staff, who did you report to?

7    A.  Brett Yormark.

8    Q.  And who's Brett Yormark?

9    A.  He's the CEO of Brooklyn Sports & Entertainment.

10   Q.  Are you personally familiar with the defendant, Craig

11   Carton?

12   A.  Yes.

13   Q.  How did you first come to have -- to meet Mr. Carton?

14   A.  We had a relationship with WFAN through our partnership.

15   They broadcasted all what was New Jersey Nets and then became

16   the Brooklyn Nets, all the NBA basketball teams for the Nets.

17   So you do a lot of promotions and things of that nature.  So I

18   was the lead as managing the WFAN account.  So over the course

19   of time, Craig and his partner would do some promotional events

20   for us, on-air ticket giveaways, things of that nature.

21   Q.  When you say "Craig and his partner," who were you

22   referring to?

23   A.  Boomer Esiason.

24   Q.  And explain to us, if you can just generally, what was it,

25   what was the relationship between WFAN and Brooklyn?

IAVHCar5                         Mangione - Direct

1   A.   WFAN -- WFAN broadcasts all our Nets games live on air.  So

2   any Nets game that was on the air, you can listen to it on

3   WFAN.

4   Q.   Was that part of a formal business relationship between

5   WFAN and Brooklyn?

6   A.   Yes.

7   Q.   About when did you first come to meet Mr. Carton?

8   A.   Probably around 2011, 2012.

9   Q.   Did Mr. Carton ever come to Brooklyn, one of Brooklyn's

10  venues, as part of this relationship?

11  A.   Yes.

12  Q.   In what context?

13  A.   We used to do some promotional things with Craig, as well

14  as him and his partner used to broadcast a Nets game once a

15  year as part of a promotional -- again, part of the promotional

16  relationship with WFAN.

17              (Continued on next page)

18

19

20

21

22

23

24

25

1

2    BY MR. KOBRE:

3    Q.  And did you come to meet him personally when he came to the

4    venues there?

5    A.  Yes.

6    Q.  Now did the relationship between WFAN and Brooklyn lead to

7    any further dealings between Brooklyn and Mr. Carton?

8    A.  Yes.

9    Q.  Can you describe those?

10   A.  Well, when we opened up Barclays Center, one of the

11   initiatives we had was the Boomer Carton Kitchen, which was a

12   concession stand which was Barclays Center, which was open for

13   all the events, and it was a licensing agreement with Craig and

14   Boomer and WFAN.

15   Q.  And in exchange for using Mr. Carton's name, what, if

16   anything, did Mr. Carton receive from Brooklyn?

17   A.  It was a typical licensing agreement.

18   Q.  Were there written agreements between Brooklyn and Carton

19   concerning the Boomer and Carton Kitchen?

20   A.  Yes.

21   Q.  And how, if at all, was the Boomer and Carton Kitchen

22   business relationship formalized?

23   A.  Through an agreement through our legal department and with

24   eventually our CEO Brett Yormark.

25   Q.  Does Brooklyn have policies and a procedures with respect

1    to agreements like the one you just talked about with the

2    Boomer and Carton Kitchen?

3    A.  Yes.

4    Q.  And what are the policies or procedures by which those

5    contracts come into place?

6    A.  Everything is primarily run through our legal department

7    and ultimately led up to Brett.

8    Q.  And are those agreements also, are they required to be

9    signed?

10    A.  Correct.

11    Q.  Who are they signed by?

12    A.  Brett Yormark.

13    Q.  Let me change gears a minute and ask you about programming

14    at Brooklyn's venue.  How does Brooklyn make money from its

15    venues?

16    A.  Well, it makes money by running events, selling tickets and

17    selling sponsorships.

18    Q.  And how does Brooklyn obtain the events that it puts on at

19    those venues?

20    A.  There are 365 days in the calendar year, so the goal is to

21    fill up as many of them as possible.  44 of them were filled up

22    through the Brooklyn Nets, 44 were filled up from the New York

23    Islanders, and the rest would be filled through concerts,

24    family shows and things of that nature.

25    Q.  And focusing on the concerts, how did Brooklyn go about

1    obtaining concerts to put on at, for example, the Barclays

2    Center?

3    A.   We had an agreement with Live Nation and AEG, who are

4    promoters in the concert business who would go out there and

5    bring artists to the building.

6    Q.   What is a promoter?

7    A.   A promoter is someone who has kind of a portfolio of

8    artists that they market and they make touring dates for and

9    they bring around the country.

10   Q.   I think you mentioned the name -- the two names.  Are those

11   promoters?

12   A.   Yes, Live Nation and AEG.

13   Q.   And what's the nature of the relationship with respect to

14   the shows that are brought through promoters to the Barclays

15   Center?

16   A.   Well, a promoter -- usually when an artist goes on tour,

17   they pick out a certain number of venues that they're going to

18   play in, so, you know, Barclays -- you know, obviously there is

19   a lot of arenas in this marketplace, so we were always trying

20   to make sure that we could be one of the top venues that the

21   artist could play in when they came to the area.

22   Q.   And what if anything does Brooklyn receive if you manage

23   the contract with a promoter for a particular concert?

24   A.   There is a general rental fee that you receive, and then

25   there is usually a business equation where the artist gets

1    ticket sales, you know, concessions, things of that nature.

2    They are a little bit different from artist to artist, but

3    generally the promoter is renting a building from you for the

4    night.

5    Q.  And other than contracting with a promoter like AEG or Live

6    Nation, are there any other ways that Brooklyn obtains concerts

7    to put on in its venues?

8    A.  Well, from time to time we were able to go directly to some

9    artists and pay them directly to play an event.

10   Q.  Which one of those is the more common way?  The promoter or

11   Brooklyn contracting directly with an artist?

12   A.  The promoter.

13   Q.  What happens at a venue if on a particular day there is no

14   event through a promoter and also no direct concert gotten

15   through an artist?

16   A.  The venue is dark.

17   Q.  Is there a term for that that you use?

18   A.  It's a dark night.  So, in the industry you hope not to

19   have too many dark nights.

20   Q.  Are you familiar with something called Brooklyn Direct?

21   A.  Yes.

22   Q.  And what is Brooklyn Direct?

23   A.  Brooklyn Direct was a subsidiary that we set up where we

24   went straight to artists who were not touring, and we would pay

25   them directly and not go through a promoter and try to have

1    them do kind of a one-off show at one of our venues.

2    Q.  And how if at all does that relate to the dark night

3    concept you just mentioned?

4    A.  Well, the goal would be any opening nights we had -- you

5    know, the touring business is cyclical; some years it's very

6    active and other years it's not.  So if we did have a lot of

7    dark nights, we would try to file them up by going directly to

8    artists.

9    Q.  At some point did Mr. Carton make any business proposal to

10   you in connection with Brooklyn Direct?

11   A.  He did.

12   Q.  What was that?

13   A.  He felt that he had some inroads to some entertainment and

14   some artists in the artist industry, and he thought that he

15   could help us fill up some of those dark nights.

16   Q.  And so what was his proposal?

17   A.  Hills proposal was a partnership with us to go out and

18   again try to fill up any night that we did not have an event in

19   the arena.

20   Q.  And to be clear, who was it that proposed this business

21   relationship in connection with Brooklyn Direct?

22   A.  Craig brought it to us.

23   Q.  I'm sorry?

24   A.  Craig brought it to us.

25   Q.  About what year did that happen, or what period of time?

1    A.   Probably around 2013, 2014.

2    Q.   Did Mr. Carton have a company through which he proposed to

3    have this business relationship in connection with Brooklyn

4    Direct?

5    A.   He did.

6    Q.   And what was the name of that company?

7    A.   Dark Night Ventures.

8    Q.   Did Mr. Carton say whether he had any partners that he was

9    working with in Dark Night Ventures in connection with this

10   proposal?

11   A.   He did.

12   Q.   And who was that?

13   A.   Joe Meli.

14   Q.   What if anything did Mr. Carton tell you about Meli in your

15   discussions in connection with Dark Night Ventures and Brooklyn

16   Direct?

17              MR. GOTTLIEB:  Objection.

18              THE COURT:  Overruled.

19              MR. GOTTLIEB:  Timeframe?

20              THE COURT:  In connection with the discussions about

21   Dark Night Ventures.

22              MR. GOTTLIEB:  Yes.

23              THE COURT:  Overruled.

24              THE WITNESS:  Sorry.  Can you repeat the question.

25   Q.   What, if anything, did Mr. Carton tell you about Mr. Meli

1    in connection with his business proposal for Brooklyn Direct?

2    A.  Mr. Meli was someone who was in the entertainment industry

3    and he had some direct contact with a lot of artists, and he

4    would be able to bring some of them to Barclays.

5    Q.  To fill the dark nights?

6    A.  Correct.

7    Q.  As part of the discussions with Mr. Carton about Brooklyn

8    Direct, did you end up meeting Mr. Meli?

9    A.  Yes.

10   Q.  And about how many times?

11   A.  Probably five to ten.

12   Q.  Did Brooklyn ultimately enter into an agreement with

13   Mr. Carton as part of Brooklyn Direct?

14   A.  We did.

15   Q.  And to be clear, was it with Mr. Carton personally or with

16   an entity -- or with Mr. Carton's entity?

17   A.  It was with the entity, Dark Night Ventures.

18   Q.  And was that pursuant to a written contract?

19   A.  Yes.

20   Q.  And what if any procedures did that contract -- that

21   written contract with Mr. Carton or Dark Night Ventures go

22   through?

23   A.  It would have went through our normal procedures with

24   Brooklyn.

25   Q.  Meaning what?

1    A.   Through our legal department and ultimately up to Brett.

2    Q.   Was it a signed agreement?

3    A.   Yes.

4    Q.   By who?

5    A.   Brett Yormark.

6    Q.   And under that agreement, who would reap the profits if

7    Mr. Carton or his entity Dark Night Ventures was able to bring

8    a show through Brooklyn Direct to be put on in a venue in

9    Brooklyn?

10   A.   If it was a profitable show, it would have been a revenue

11   share between the two entities of Brooklyn and Dark Night

12   Ventures.

13   Q.   Did Mr. Carton as part of that ever end up proposing any

14   artists to perform on a dark night?

15   A.   Yes.

16   Q.   Did any of those successfully happen?

17   A.   No.

18   Q.   Now, at some point, did that relationship with Dark Night

19   Ventures and Mr. Carton's entity and Brooklyn come to an end?

20   A.   It did.

21   Q.   And who ended it?

22   A.   Brooklyn.

23   Q.   And can you describe how that came about.

24   A.   We received a phone call, specifically Brett, from an agent

25   that Joe Meli was someone in the entertainment --

1          MR. GOTTLIEB:  Your Honor, I'm going to object to

2    this, if he didn't have this phone call.

3          MR. KOBRE:  That's fine, your Honor.  I will move past

4    this.

5    Q.  Was it a result of -- are you aware -- at some point did --

6    at some point were you present at a time when Mr. Yormark

7    received a phone call?

8    A.  I was in a car, yes.

9    Q.  And as a --

10         THE COURT:  You were in a car?

11         THE WITNESS:  I was in a car with Mr. Yormark when he

12   received the call.

13         THE COURT:  I see.  Thank you.

14   Q.  And as a result of that, did Brooklyn end the relationship

15   with Dark Night Ventures?

16   A.  We did.

17   Q.  And did you convey that to Mr. Carton?

18   A.  We did.

19   Q.  And what, if anything, did you tell Mr. Carton about why

20   you were ending your relationship with Dark Night Ventures?

21   A.  We told Craig we were receiving some information from the

22   entertainment industry that Joe promised a lot of things to

23   people he couldn't deliver on, so we did not want to be

24   associated with that.

25   Q.  And when you say Joe, who are you referring to?

IAV7CAR6                         Mangione - Direct

1    A.  Joe Meli.

2    Q.  And specifically -- what specifically did you tell

3    Mr. Carton you had heard about Mr. Meli?

4    A.  We heard that he tried to set up some festivals, and he

5    promised some people some artists to show up who evidently did

6    not show up.

7    Q.  And was it for that reason that Brooklyn ended the

8    relationship with Dark Night Ventures?

9    A.  Yes.

10   Q.  Around -- was this -- do you remember about what year you

11   had this conversation with Mr. Carton to end the relationship?

12   A.  I don't.  I don't.

13   Q.  Was it at a time period prior to the year 2016?

14   A.  Yes.

15   Q.  Now, in addition to -- you discussed the Boomer and Carton

16   Kitchen and Dark Night Ventures.  Did Mr. Carton make other

17   business proposals to you?

18   A.  There was a Greek stand that he was pursuing to put into

19   the arena as well.

20   Q.  Sorry.  What is a Greek stand?

21   A.  A Greek stand was another concession stand that just served

22   Greek food for all the events that would come to Barclays.

23   Q.  And how long did that go on for?

24   A.  It was like a year or two.

25   Q.  OK.  And did Mr. Carton make any proposal in connection

1    with band aids?

2    A.  He did.

3    Q.  Just briefly what was that about?

4    A.  He had a licensing agreement with a band aid company that

5    would put sports team logos on band aids, so he approached us

6    to see if we would be interested in doing that as a giveaway

7    one night.

8    Q.  Did that ever happen?

9    A.  No, we tried to get a sponsor for it, and we just couldn't

10   get one.

11   Q.  Did Mr. Carton at one point also make a business proposal

12   in connection with some art?

13   A.  He showed us some art and some pictures of some NBA players

14   specifically that he could make for the Nets and have something

15   that we could give to our season ticket holders, yes.

16   Q.  Did that ever happen?

17   A.  No.

18   Q.  Now, directing your attention to 2015, that year, did

19   Mr. Carton purchase tickets to various events at Brooklyn's

20   venues?

21   A.  He did.

22   Q.  In what sorts of quantities?

23   A.  Various quantities, but, you know, it was smaller amounts,

24   20, 40, you know, things of that stuff.

25   Q.  20, 40 tickets?

1    A.  20, 40 tickets.  I'm sorry.  Yeah.

2    Q.  At a time?

3    A.  Yeah, at a time.  It really depended on the event and when

4    we were looking to sell them to him.

5    Q.  What did you understand Mr. Carton was going to do with the

6    tickets -- keeping the focus on 2015, what was the purpose of

7    his purchase of the tickets?

8    A.  He said he was going to purchase the tickets to put on the

9    secondary market.

10   Q.  What do you mean by the secondary market?

11   A.  Secondary market is when a fan, a consumer, takes a ticket

12   that they purchased from a venue or Ticket Master, and they put

13   it on a website online, primarily StubHub or Vivid Seats, a

14   couple different ones that are out there, hoping to make a

15   profit off it.

16   Q.  Did Brooklyn have any agreement in place with Mr. Carton

17   relating to the sale of the tickets in 2015?

18   A.  We did not.

19   Q.  Now, did Mr. Carton continue to request -- to ask to

20   purchase tickets from Brooklyn in 2016?

21   A.  He did.

22   Q.  If we can publish Government Exhibit 2102, and if we can

23   just enlarge this.

24        Mr. Mangione, this is an e-mail from Mr. Mr. Carton to

25   yourself and Brett Yormark on December 17, 2016.  Do you see

1   that?

2   A.  Yes.

3   Q.  And just focusing your attention for a moment on the fourth

4   line down.  "If we can agree to a minimum of 200 seats to every

5   nonsupporting event, we will consider."  Do you see that?

6   A.  Yes.

7   Q.  Did you ever agree to this proposal?

8   A.  No.

9   Q.  And was this proposal possible, in your view?

10  A.  Well, it was possible.  We just didn't know how many events

11  we would have.

12  Q.  Is this something you considered actually entering into?

13  A.  No.

14  Q.  And why not?

15  A.  Again, we just didn't know how many events were coming in,

16  and every event the ticket allocation is different.

17  Q.  When you say every event the ticket allocation is

18  different, did that relate at all to what you described earlier

19  in terms of promoter events versus events that Brooklyn

20  contracted directly with an artist?

21  A.  It's a promoted versus self-promoted event.

22  Q.  Just explain what that means and how that relates to this

23  proposal.

24  A.  Well, again what that means is if Live Nation or promoter

25  brings us an event, they usually control the ticket allotment

1    and the venue itself controls a very, very limited amount.

2    When it's a sell promoter, then you basically bought the show

3    out, so you control all the inventory for that specific

4    evening, the sell promoter.

5    Q.   How does that relate to your view of this proposal?

6    A.   We just wouldn't know at this time what was self promoted

7    versus self-promoted events.

8    Q.   You familiar with the term premium seating?

9    A.   Yes.

10   Q.   What is premium seating?

11   A.   Premium seating is usually defined as the first ten rows

12   around stage, or if you're at a sporting event, around the

13   court or ice.

14   Q.   So in this e-mail if we can drop down -- actually if you

15   can just go to the third line, so just one line up.  "I sent

16   over the requested sections and rows for Barclays and for

17   Nassau it would be 20 rows in B1 and then A1 and C1."  Do you

18   see that?

19   A.   I do.

20   Q.   The seats that Mr. Carton is describing here, would these

21   be considered premium seating?

22   A.   Yes.

23   Q.   And is Brooklyn able to sell premium seats to a performance

24   before it is booked either through a promoter or directly?

25   A.   Again, it varies by event, so we wouldn't be able to

1  guarantee what events we could or couldn't.

2  Q.  Are you familiar with the term all access seats?

3  A.  Yes.

4  Q.  What are all access seats?

5  A.  Well, we had two versions of all access seats.  In Brooklyn

6  all access seats is if you owned a season ticket for the

7  Brooklyn Nets, you had the ability to get a presale for any

8  concert that was coming into Barclays.

9  Q.  Sorry.  Let me just stop you there for a minute.  When you

10  say you would be able to get a presale, can you just explain

11  that.

12  A.  OK.  Sorry.  A presale is when before it goes on sale to

13  the general public there is usually a 48 hour window to let a

14  specific universe of people be able to buy a ticket before it

15  goes on sale to the general public.  So, all Nets season ticket

16  holders had a 48 hour window to buy a concert before it went on

17  sale to the general public.

18  Q.  That's the meaning of all access at --

19  A.  In Brooklyn.

20          In Nassau we had about 200 seats that were put aside

21  where you basically bought a seat that guaranteed you a ticket

22  to every event at their renovated Nassau Coliseum.

23  Q.  So am I right that at Barclays the all access seats were an

24  option; is that the idea?

25  A.  Correct, you had your opportunity to pick and choose from

IAV7CAR6                    Mangione - Direct

1    the presale, where in Nassau when you bought that seat you got

2    it for every event no matter how many events there were.

3    Q.   How do all access seats differ, if at all, from when you

4    say premium seating that you described a moment ago.

5    A.   Well, the all access seats were just general seating in a

6    bowl, bowl meaning not seats on the floor but seats in what we

7    would call stationary seat in the arena.

8    Q.   Are they the same seats?

9    A.   You get the same seat for every event, yes.

10   Q.   No, I'm sorry.  Are premium seats and all access seats the

11   same?

12   A.   No.  Well, they were not located by the stage, so they

13   wouldn't have been premium.  They were good seats but they just

14   weren't premium seats.

15   Q.   And are all access seats available to the public to

16   purchase?

17   A.   Yes.

18   Q.   Do you have to be anybody special to buy those seats?

19   A.   No.

20   Q.   Now if we could just put back up 2102.

21        Do you recall how, if at all, you responded to

22   Mr. Carton's proposal in here to agree to a minimum of 200

23   seats to every nonsporting event?

24   A.   I'm sorry, could you repeat the question.

25   Q.   Yes.  Do you remember how, if at all, you responded to

1  Mr. Carton's proposal here for a minimum of 200 seats to every

2  nonsporting event?

3  A.  I do not recall.

4  Q.  Did you ever agree to this?

5  A.  No.

6  Q.  Let's go to Government Exhibit 2103 which is in evidence.

7  And in particular if we can go to the last, page 3, the e-mail.

8           This is an e-mail from Mr. Carton to you and

9  Mr. Yormark on October 18, 2016, and in the e-mail Mr. Carton

10  says, "Would be cool to solidify a $10 million deal before we

11  celebrate and honor you tonight."  What did you understand

12  Mr. Carton was referring to when he talked about a $10 million

13  deal here?

14  A.  He was looking to follow up with the e-mail as far as

15  trying to get a deal in place to have $10 million worth of

16  inventory for some concerts that were coming in.

17  Q.  When you say $10 million of inventory, to do what with that

18  inventory?

19  A.  To resell on the secondary market.

20  Q.  To purchase it from Brooklyn?

21  A.  To purchase it from Brooklyn, and then try to resell on the

22  secondary market.

23  Q.  And how did you view his proposal that this deal would be

24  solidified, a $10 million deal, before the night came?

25  A.  Well, you couldn't turn a contract over that quick, so...

1              THE COURT:  You're dropping your voice.

2              THE WITNESS:  Sorry.  You wouldn't be able to turn a

3    contract over that quick.

4    Q.  So how did you view this?

5    A.  We didn't at that time.

6    Q.  OK.  And if we can go to earlier -- a little bit later in

7    this e-mail chain, in particular the e-mail on the top of page

8    2, the one at 4:05 p.m.

9    A.  OK.

10   Q.  So this is a little bit later the same day, October 18,

11   2016 at 4:05 p.m.  You wrote to Mr. Carton, and I am going to

12   focus you on the third line down.  Why don't we start from the

13   top.  It says, "Craig, taking Brett off.  Working with the box

14   office."  Then you go on to say, "Issue is the zones you want

15   we actually do not control."  Do you see that?

16   A.  Um-hum.

17   Q.  What did you mean by this issue about the zones you want we

18   don't control?

19   A.  It just gets back to some of the locations he requested, we

20   just didn't control the seats that he requested.

21   Q.  So does that relate at all to the proposal that he had

22   made?

23   A.  Well, it was to the prior e-mail he was saying he was

24   looking for certain areas, when he said he wanted to get A1,

25   B1, C1.

IAV7CAR6                    Mangione - Direct

1    Q.  And then a little bit further down you said, "So working on

2    locations" -- same e-mail -- "So working on locations for you

3    to review.  It changes event by event."  What did you mean by

4    that?

5    A.  Again depending on the concert, the promoter, some events

6    you get some better seats and some events you do not.  So again

7    it just depends.  There is a lot of artists who keep them all

8    in their control because they want their friends, family, VIPs

9    fan clubs to have the best seats possible.

10   Q.  And as a result of that, were you able to sell a certain

11   amount of premium seating for every event?

12   A.  No, it was event by event.

13   Q.  If we can just go up to page 1 and focus on the e-mail at

14   4:18 p.m.  So, this is later the same day October 18, 2016 at

15   4:18 p.m.  And Mr. Carton writes to you, "We can draft an

16   agreement that says we have the right to buy up to $20 million

17   of premium tickets to both venues prior to presale based on

18   inventory you control or have access to."  Do you see that?

19   A.  Yes.

20   Q.  Were there any conversations that led to the amount of

21   money that the contract would be from 10 million -- which was

22   just several hours earlier -- to 20 million a few hours later?

23   A.  Not that I recall.

24   Q.  Now, if we could just go to the top e-mail, the one at 4:20

25   p.m.  So a few minutes later you responded.  Can you just read

1    the first line of your response.

2    A.  "I would charge you event by event no need to prepay."

3    Q.  What are you saying here?

4    A.  That as events come in, we would let Craig know, seeing

5    what locations we had available, and then if he wanted to buy

6    them, he could buy them.  There was no reason to give us a

7    bunch of money upfront.  Again, we don't know the locations or

8    even how many events were coming in, so I didn't feel the need

9    for him to give us anything upfront.

10   Q.  Did Mr. Carton ever send you a draft agreement relating to

11   the bulk purchase of tickets.

12   A.  Yes.

13   Q.  Did you ever at any time sign such an agreement?

14   A.  Did not.

15   Q.  Were you authorized as chief of staff in Brooklyn to sign

16   such an agreement?

17   A.  I was not.

18   Q.  Let's take a look at Government Exhibit 2104.  If we can

19   just enlarge the top e-mail.  It's in evidence.

20          It's an e-mail from Mr. Carton to you on the following

21   day, October 19, 2016.  Do you see that?

22   A.  Yes.

23   Q.  And the subject is Re:  Tonight.  And Mr. Carton says,

24   "Fred.  Great seeing you last night.  I have attached a basic

25   term sheet which is more for me and the people who invest in my

1    fund than anything."

2          What did you understand Mr. Carton was referring to

3    when he said it's more for him and the people who invest in his

4    fund than anything?

5    A.   Just that it was something he was showing to potential

6    investors as far as, you know, trying to get tickets for

7    venues.

8    Q.   OK.   And if we can go, Mr. Urbanczyk, to the attachment

9    here, to the first page of the attachment.   And if we can just

10   enlarge the top of the page through the first paragraph.

11         So this is a document that's titled on the top, it

12   says Misoluki.   And who is it addressed to?

13   A.   Myself.

14   Q.   And just focusing your attention on the first paragraph

15   that's displayed there, who does this agreement purport to be

16   between?

17   A.   Misoluki and Brooklyn Sports and Entertainment.

18   Q.   Through your conversations with Mr. Carton, did you learn

19   what Misoluki is?

20   A.   I don't recall.

21   Q.   Did you have any understanding of who controlled Misoluki?

22   A.   I understood that Craig did.

23   Q.   And dropping down to paragraphs 1 and 2 on this document

24   here, and just focusing your attention on the paragraph 2, it

25   says, "Sale of tickets to Misoluki LLC.   Seller hereby agrees

1    to sell to Miso, and Miso hereby agrees to purchase from seller

2    up to $20 million worth of tickets ..."

3              And if you just look higher up in paragraph 1, the

4    last sentence there, can you read that sentence beginning with

5    "Ticket".

6    A.  "Ticket means a physical ticket entitling the bearer to a

7    single admission within any of the premium sections of a

8    respective venue."

9    Q.  So was this something that Brooklyn was able to accommodate

10   consistent with the seating that was available to it?

11   A.  No.

12   Q.  And why not?

13   A.  Again, it changes event by event, so we just couldn't

14   guarantee that we get the same sections and the same locations

15   for every event that came through.

16   Q.  And if we can now go to the last page of this document and

17   just enlarge the portion on which there is writing.

18              This is the signature page.  And focusing your

19   attention on the right-hand side, this is the signature block

20   for Brooklyn Sports and Entert.  Do you see that?

21   A.  I do.

22   Q.  Who is listed there as the person who would be the signer

23   of that?

24   A.  I assume it's supposed to be me, but my last name is

25   spelled wrong.

IAV7CAR6                        Mangione - Direct

1   Q.  How is it spelled wrong, in what way?

2   A.  There is an S at the end instead of an E.

3   Q.  Did you ever agree to or execute this agreement?

4   A.  I did not.

5   Q.  We can take that down.

6           Now, I want to focus your attention on December of

7   2016.  Was Brooklyn then in discussions with various artists or

8   performers or promoters to bring specific shows to its venues?

9   A.  We're always in discussion, so that's a year-round process,

10  yes.

11  Q.  Do you recall any particular ones that at that time you

12  were in discussions with?

13  A.  Well, we were starting to get our venue going for the new

14  Nassau Coliseum, so we were starting to program that venue, and

15  primarily it was Billy Joe, Barbra Streisand and Metallica at

16  that time.

17  Q.  And focusing on Metallica for a minute, the discussions

18  centered around which venue for Metallica?

19  A.  The new Nassau Coliseum.

20  Q.  And you also mentioned that Barbra Streisand you were

21  discussing at that timeframe?

22  A.  Correct.

23  Q.  And what venues or venue or venues were you in discussions

24  with for Barbra Streisand?

25  A.  Both venues, both Barclays and Nassau Coliseum.

1  Q.  Now, as of December of 2016, had Brooklyn finalized

2  contracts for performances by either of those artists?

3  A.  Not at that point, no.

4  Q.  At some point during December 2016 did Mr. Carton approach

5  you to purchase tickets for those artists?

6  A.  Yes.

7  Q.  And if we can pull up Government Exhibit 2143.  If we go to

8  page 2 at the bottom, the e-mail at 2:49 p.m.

9          So this is an e-mail on December 14, 2016 at 2:49 p.m.

10  from Mr. Carton to you.  He says, "Great.  Yes on these.  Is

11  Metallica a show you own.  And when is it, please."

12          What did you understand Mr. Carton to be referring to

13  when he says is Metallica a show that you own?

14  A.  He was asking if that was a show we went directly to the

15  artist for where we would control the venue.

16  Q.  And what's the difference in that regard to how many

17  tickets, if at all, you could sell to Mr. Carton or anyone?

18  A.  Again, if you control the event, you own about 90 percent

19  of the building as opposed to a smaller percentage if a

20  promoter comes in.

21  Q.  And if we could just go up to the e-mail at 2:52 p.m., page

22  2 in the middle.  What is your response to Mr. Carton?

23  A.  "We have not closed yet.  Will know in a week."

24  Q.  What will you know in a week?

25  A.  We did not have a deal with Metallica at that point, and we

IAV7CAR6                         Mangione - Direct

1    would know within a week if, one, they were coming and, two, if

2    it was our show or a direct show.

3    Q.   And a little later in the e-mail chain, the 3:09 e-mail.

4    Here Mr. Carton is responding to you, and Mr. Carton says, "So

5    we are on the same page.  Nassau 300 all event seats

6    (sections?) approximately $3 million."  What was Mr. Carton

7    referring to there?

8    A.   The all access seats.

9    Q.   And was that related in any way to the Streisand and

10   Metallica concerts?

11   A.   No.

12   Q.   OK.

13   A.   That was a separate product.

14   Q.   And then Mr. Carton goes on to say, "Streisand two dates

15   (?) I will buy as many as possible but for sake of a minimum

16   let's say 5,000 per show $10 million per show."  What did you

17   understand he was referring to here when he says Streisand two

18   dates?

19   A.   Well, he was asking us if we were going to get both dates,

20   because we were trying to get her to play in both of our

21   buildings, not just one of them.  And then he is saying -- we

22   made him aware at that point that Streisand if she did come was

23   going to be a self-promoted show, so we would be selling all

24   the tickets for that one ourselves.

25   Q.   And then Mr. Carton says, "Metallica.  If your show I will

IAV7CAR6                     Mangione - Direct

1    take 5,000 seats."  What did you understand him to mean when he

2    said "if your show"?

3    A.  Same thing, if we were promoting the show and it was a

4    direct to the artist, that he was willing to purchase 5,000

5    sheets for the show.

6    Q.  At this point did you know whether it was going to be your

7    show?

8    A.  We did not.

9    Q.  And if it wouldn't be your show, would there be any way you

10   could sell him 5,000 seats.

11   A.  No.

12   Q.  If we can just go up a little later in the chain, the

13   e-mail that's at 3:55 p.m., your response.  So you respond to

14   Mr. Carton saying, "We have already sold a bunch of the seats.

15   I'll have more of a grasp of the inventory after the holidays."

16   What were you referring to here?

17   A.  That was the all access seats.

18   Q.  Did you respond at all in this e-mail to his request of the

19   Streisand and Metallica concerts?

20   A.  I did not.

21   Q.  Why not?

22   A.  I just didn't have that information yet.

23   Q.  Now, later that day, December 14, 2016, did Mr. Carton ask

24   you for an e-mail he would be able to provide to his investors?

25   A.  I don't recall.

1    Q.  OK.  Let's take a look at Government Exhibit 2107, and if

2    we can just enlarge that.

3          And this is an e-mail, first of all, later that same

4    date, December 14, 2016, at 1104 p.m.  Do you see that?

5    A.  Yes.

6    Q.  Mr. Carton to you and to Mr. Yormark, and he says, "So we

7    are on the same page and to simplify.  All I really need is a

8    general e-mail tomorrow a.m. saying I can invest up to $30

9    million in 2017 Nassau/Barclays events.  Including but not

10   limited to (name shows)."  Do you see that?

11   A.  I do.

12   Q.  What did you understand specifically focusing on the

13   portion of the line where he says "including but not limited to

14   (name shows)"?

15   A.  Well, he was hoping that I could lay out what shows were

16   going to be coming to the venues.

17   Q.  Hoping you could lay it out where?

18   A.  In the e-mail.

19   Q.  OK.  And were you able to do that?

20   A.  No.

21   Q.  Why not?

22   A.  I was not aware of all the shows that were coming in at

23   that point.

24   Q.  Further in this e-mail does Mr. Carton say when he is

25   meeting with his investors?

1    A.  Yes.

2    Q.  When is he meeting with his investors?

3    A.  12 o'clock.

4    Q.  And did you send Mr. Carton an e-mail for his investors as

5    he requests in this e-mail?

6    A.  I did.

7    Q.  Let's take a look at Government Exhibit 2109.  If you can

8    just enlarge the header there for a moment.

9            This is an e-mail sent by you to Mr. Carton.  And when

10   did you send this e-mail?

11   A.  December 15, 10:51 a.m., 2016.

12   Q.  What's the subject of the e-mail?

13   A.  Follow-up.

14   Q.  And if you can zoom out and just enlarge the entire e-mail.

15           Do you recall this e-mail?

16   A.  I do.

17   Q.  And where generally did you know what to put into this

18   e-mail?  How did you come up with what to put in this e-mail?

19   A.  Well, I constructed it based on what Craig sent us.

20   Q.  OK.  And let's just look at it.  You write, "Craig, thank

21   you for your time yesterday.  Following up on our conversation.

22   We are willing to work with $30 million of our inventory in

23   Nassau and Brooklyn.  And we will give you the ability in

24   January to purchase up to 100 to 200 all access seats for the

25   new Nassau arena."  Do you see that?

1    A.  I do.

2    Q.  What are you referring to there with the 100 to 200 all

3    access seats?

4    A.  Again, they were the all access seats that were going to be

5    for the new coliseum.

6    Q.  And was that something you were able to say at this point?

7    A.  Yes.

8    Q.  And did your reference to the all access seats in the new

9    Nassau arena have anything whatsoever to do with the particular

10   performance of Streisand and Metallica that you had discussed

11   with Mr. Carton previously?

12   A.  No.

13   Q.  And then you go on to say, "If there are any shows we own

14   ourselves under the Brooklyn Direct umbrella.  We will give you

15   the ability to purchase a bulk of tickets for those shows."

16   What are you saying there?

17   A.  Again, those would be shows that we would own directly, so

18   then we would have the ability to sell a mass amount of

19   tickets, hence the purchase of bulk tickets for those shows.

20   Q.  And in the next line you say "Past shows in Brooklyn we

21   have owned have been Billy Joe, Elton John, Jimmy Buffett and

22   more."  Do you see that?

23   A.  Yes.

24   Q.  Is there anywhere in this e-mail that you specify future

25   specific performances that you would be able to sell to

1    Mr. Carton?

2    A.  No.

3          MR. GOTTLIEB:  Your Honor, objection.  The e-mail

4    speaks for itself.

5          THE COURT:  It does speak for itself.  You know, make

6    your argument at the end of the case.

7          MR. KOBRE:  Thank you, Judge.

8    Q.  Just going back for a moment to 2107, just enlarge that.

9          You testified a moment ago that Mr. Carton had

10   asked -- look at the words "including but not limited to (name

11   shows)"

12   A.  Yes.

13   Q.  Were you able to comply with this request?

14   A.  I was not.

15   Q.  We can go back to 2109, and just enlarge that.

16         Was this e-mail a commitment to purchase any

17   particular -- to sell to Mr. Carton any particular shows or

18   events?

19   A.  Just the all access.

20   Q.  But any particular performances?

21   A.  No.

22   Q.  Did you say anything in this e-mail about performances for

23   Barbra Streisand or Metallica?

24   A.  I did not.

25   Q.  Could you at the time have told Mr. Carton you would sell

IAV7CAR6                          Mangione - Direct

1   ticket for those shows?

2   A.  No.

3   Q.  Did you write anything in this e-mail about a term sheet?

4   A.  No.

5   Q.  Is there anything in this e-mail about a quantity of

6   tickets that you were going to be willing to sell to

7   Mr. Carton?

8             MR. GOTTLIEB:  Your Honor, objection.

9             THE COURT:  I'm sorry.  I'm sorry.  I need to talk to

10  Mr. O'Neil for a minute.

11            Objection is overruled.

12  Q.  Did you say anything about the quantity of tickets that you

13  were committing to sell Mr. Carton at this point?

14  A.  Again, just the all access seats.

15  Q.  Now, you also testified earlier about certain procedures

16  that Brooklyn went through when contracts were executed.  Did

17  any of those -- is what is laid out in this e-mail here, was it

18  ever formalized -- did you ever go through any of those

19  procedures?

20  A.  No.

21  Q.  Why did you send Mr. Carton this e-mail?

22  A.  Craig was looking for some investors, as he stated in the

23  one before, and we were trying to help him.

24  Q.  Mr. Urbanczyk, if we can pull up Government Exhibit 930.

25            And just focusing on first for a moment the header of

1    the e-mail, it's an e-mail from Mr. Carton on December 16, 2016

2    to several individuals, with e-mail addresses ending in

3    brigadecapital.com.  Do you see that?

4    A.  Yes.

5    Q.  And the subject here is FWD:  Follow-up.

6    A.  Yes.

7    Q.  If we could just zoom out and then enlarge the forwarded

8    e-mail, below where it says original message.  And focusing

9    your attention on the header, it purports to be an e-mail from

10   you to Mr. Carton on December 15, 2016 at 10:50 a.m.  Do you

11   see that?

12   A.  Yes.

13   Q.  And the subject is follow-up.

14   A.  Yes.

15   Q.  Mr. Urbanczyk, if we can put up Government Exhibit 2109

16   side by side with 930 and just enlarge them.

17            Just pointing your attention to Government Exhibit 930

18   on the left-hand side, through the following line where it says

19   "as I mentioned" and the next line as well, were either of

20   those two lines contained in an e-mail you sent to Mr. Carton

21   on December 15, 2016?

22   A.  No, no.

23   Q.  And just focusing your attention on the highlighted portion

24   of that e-mail, it states, "As I mentioned we have three

25   unannounced shows in 2017.  Metallica in May/June prior to

1    their Stadium Tour and two Barbra Streisand shows in April."

2            Was it true that Brooklyn had those three shows at

3    that time on December 15, 2016?

4    A.  Not at that point.

5    Q.  Just explain why not?

6    A.  We were still in negotiations with the artist.

7    Q.  So was that a true statement?

8    A.  Yes.

9    Q.  Was it a true statement --

10   A.  True statement that we were negotiations with the artist.

11   Q.  Yes, thank you, Mr. Mangione.  But focusing on what's being

12   written in the e-mail that we have these three unannounced

13   shows, was that true?

14   A.  No.

15   Q.  Mr. Mangione, did you send the e-mail that's depicted in

16   Government Exhibit 930, the forwarded e-mail there?

17   A.  I did not.

18   Q.  Focusing on the next line down in Government Exhibit 930,

19   the line beginning "we would ..."  If we can highlight that.

20   And if we can highlight the sentencing beginning "we would" in

21   Government Exhibit 2109.  In the e-mail you wrote in Government

22   Exhibit 2109 you wrote, "We would look for a $3 million good

23   faith deposit ... "  Do the words good faith appear in

24   Government Exhibit 930?

25   A.  No.

IAV7CAR6                    Mangione - Direct

1   Q.  After the $3 million?

2           THE COURT:  You know, Mr. Kobre, you have your 16

3   people carefully chosen, all of whom can read; we know this

4   from the voir dire.  Make your arguments at the end of the

5   case.

6           MR. KOBRE:  Thank you, Judge.

7   Q.  Just pointing your attention to one more line.  If we can

8   just go down to the line in Government Exhibit 930, "I will

9   send a term sheet..."  Did you write that line in your e-mail?

10  A.  I did not.

11  Q.  Thank you.  We can take that down.

12          Actually if I can direct your attention --

13          can we put up Government Exhibit 930 for just one more

14  moment, and if we just enlarge the line beginning "As I

15  mentioned" in the forwarded e-mail.

16          Is there anything misspelled in this e-mail?

17  A.  Barbra is misspelled.

18  Q.  How would you spell it properly?

19  A.  Barbra has a distinct way she spells her name, B-a-r-b-r-a.

20  Q.  Is that an error that you --

21  A.  I would not have done that.

22  Q.  Why not?

23  A.  Unfortunately when she came to our venue in 2012 someone on

24  my marketing team spelled her name wrong, and it was a bad day

25  for me when her manager called me and -- it wasn't a good day,

1    let me put it that way, so if there was any name I would spell

2    right, it was Barbra Streisand moving forward.

3    Q.  Thank you.  We can take that down now.

4          Now, and just to follow up, you saw a line in that

5    Government Exhibit 930 regarding a term sheet.  Was it

6    generally part of your responsibility to prepare term sheets in

7    connection with business dealings at Brooklyn?

8    A.  It was not.

9    Q.  Let's take a look at Government Exhibit 2111, and focusing

10   on page 2 on the top, the top e-mail.  This is an e-mail on

11   December 16, 2016 at 1:28 p.m.  It says, Mr. Carton writes to

12   you, "For background.  Will the Metallica concert be one that

13   you own it (like Barbara) or is it a promoter event?"  What is

14   it you understand Mr. Carton is asking here?

15   A.  If Metallica will be a promoted event through Live Nation

16   or if we would own it like we were going to own Barbra,

17   self-promoted event.

18   Q.  Was that along the lines with what he asked previously,

19   what you saw in previous e-mails?

20   A.  Um-hum.

21   Q.  Barbra, is it spell correctly here?

22   A.  It is not.

23   Q.  Now, going to page 1 of Government Exhibit 2111, and

24   focusing your attention on the bottom e-mail, the one at 1:30

25   p.m.  You respond to Mr. Carton on December 16, "Not a hundred

1    percent yet.  Minimum of 50/50."   What did you mean by that?

2    A.   The Metallica show was not a hundred percent contracted

3    yet, and at a minimum a 50/50 meant that we were in talks

4    potentially owning half the show and a promoter doing half of

5    it.  So the term copro means that the venue owns half the show

6    and then the promoter owns half it, so there was an opportunity

7    that we were maybe going to do that.

8    Q.   Had that been finalized by this date and time, December 16,

9    2016?

10   A.   No.

11   Q.   And then you go on to say "Arfa's group who runs Billy.  So

12   just a matter of how much risk each side wants to take.  More

13   clarity in two weeks."  What were you referring to "Arfa's

14   group who runs Billy"?

15   A.   Arfa is Dennis Arfa who is Billy Joel's promoter and agent,

16   who we had dealings with for Billy Joe's concerts, and then

17   again it was going through negotiations of seeing how much risk

18   each side wanted to take.

19   Q.   And when you said more clarity in two weeks, what was that?

20   A.   In two more weeks hopefully we would finalize it.

21   Q.   And if we can just go up to the e-mail at 1:32 p.m.  Here,

22   Mr. Carton writes, "I am going to ask my investor for $3

23   million for it."  So what did you understand Mr. Carton was

24   going to ask his investor for?

25   A.   $3 million towards Metallica.

1   Q.  And then he goes on to say, "So please consider me an all

2   in investment partner.  When would show be."

3           And if you could just take a look at your response a

4   little bit further up on the page.  You respond to Mr. Carton

5   on December 16, 2016, you say, "OK just want to make sure you

6   know the structure can change.  So don't want to put you in a

7   tough spot if economics change."

8           What do you mean here when you told Mr. Carton you

9   didn't want to put him in a tough spot if the economics change?

10  A.  I just didn't want him to promise something to his

11  investors that wasn't going to happen.

12  Q.  And what was it that might not happen?

13  A.  Again, well, one, we could not get the show, and then it

14  could be a promoted show or copro show.  There was just a lot

15  of different -- there was just a lot of different things that

16  were going against the show to see if they were going to even

17  come to the building first and foremost.

18  Q.  And just maybe to jump to the end, what was the ultimate

19  result of the Metallica show?

20  A.  Well, they did come, and it ended up being a Live Nation

21  event; it was a promoter event.

22  Q.  How if at all did that effect your ability to sell

23  Mr. Carton tickets?

24  A.  Our inventory became limited.

25          THE COURT:  Mr. Kobre, find a spot where it's going to

1    be a good spot in the next five, ten minutes or so to break for

2    the day.

3              MR. KOBRE:  Sure, your Honor.  We could break now, or

4    I can go another few minutes.

5              THE COURT:  Go another few minutes.

6              MR. KOBRE:  Yes, Judge.

7    Q.  If we can pull up Government Exhibit 914, which is in

8    evidence, and if we can just enlarge first for a moment the

9    header of the page.

10             This is an e-mail from Mr. Carton to several

11   individuals with e-mail addresses ending at Brigade capital,

12   and it's sent on December 16, 2016.  Do you see that?

13   A.  I do.

14   Q.  And it also has an attachment.  It says "Attached:  TJ

15   Barclays.PDF.  Do you see that?

16   A.  Yes.

17   Q.  It's a forwarded e-mail.  It's subject is FWD:  Follow-up.

18   Do you see that?

19   A.  Yes.

20   Q.  If we can just zoom out and just enlarge the forward

21   e-mail.

22             This is an e-mail that purports to have been sent by

23   you, Fred Mangione, to labs123@aol.com.  By the way, do you

24   recognize that e-mail address?

25   A.  I do, yes.

1    Q.  Whose e-mail address is it?

2    A.  Craig Carton's.

3    Q.  And it purports to have been sent on December 16, 2016 at

4    4:50 p.m. with the subject follow-up.  And you wrote, "Craig,

5    if everything is in place please execute and we will do the

6    same."  Do you see that?

7    A.  I do.

8    Q.  And, Mr. Urbanczyk, if we can just pull out of this e-mail

9    and just show Mr. Mangione, scroll through the attachment.

10        Mr. Mangione, if we go back to the top e-mail -- Mr.

11   Mangione, did you ever send this e-mail?

12   A.  I did not.

13   Q.  And if we can display on page 2, the agreement.

14        Prior to being shown this document by the F.B.I., had

15   you ever seen that document before?

16   A.  I had not.

17   Q.  Did you ever send this document by e-mail or otherwise?

18   A.  I did not.

19   Q.  Where were you?  Going back to the e-mail, the e-mail

20   purports to have been sent on December 16, 2016.  Where were

21   you on that date?

22   A.  I was in Orlando, Florida.

23   Q.  And how do you know that?

24   A.  I was meeting with the president of the Orlando Magic.

25   Q.  If you can show Mr. Mangione -- just the witness and

1   counsel and the Judge -- 2110 and 2140.

2            Do you recognize those documents, Mr. Mangione?

3   A.  Yes, it's my calendar.

4   Q.  And was keeping a calendar for your work at Brooklyn a

5   regular practice of yours?

6   A.  Yes.

7   Q.  Did you keep the calendar in the course of your regular

8   duties and responsibilities as COO and chief of staff of

9   Brooklyn?

10  A.  My assistant did, but yes.

11  Q.  And did your assistant make the entries in your calendar at

12  or about the time that events on your calendar needed to be

13  scheduled?

14  A.  Yes.

15           MR. KOBRE:  The government offers 2110 and 2140.

16           THE COURT:  Any objection?

17           MR. GOTTLIEB:  Your Honor, may I just have one moment,

18  please?

19           THE COURT:  Sure.

20           MR. GOTTLIEB:  Your Honor, we just want to clarify.

21  Looking at 2140 --

22           THE COURT:  Are you asking for a voir dire?

23           MR. GOTTLIEB:  It might even be simpler the other way,

24  but I can ask the witness, your Honor.

25           THE COURT:  Why don't you.  If you want to voir dire,

1   voir dire.

2            MR. GOTTLIEB:  OK.

3   VOIR DIRE EXAMINATION

4   BY MR. GOTTLIEB:

5   Q.  Mr. Mangione, Government Exhibit 2140, is that your

6   calendar?

7   A.  Yes.

8   Q.  That's your calendar that indicates a meeting.  If you just

9   look at it without telling us what's in it, looking at that

10   calendar --

11            THE COURT:  The answer was yes, it's his calendar.

12            MR. GOTTLIEB:  OK, no objection then.

13            THE COURT:  Fine, they are admitted.

14            (Government Exhibits 2110 and 2140 received in

15   evidence)

16   DIRECT EXAMINATION

17   BY MR. QUIGLEY:

18   Q.  Mr. Urbanczyk, if we can public Government Exhibit 2110 for

19   the jury. and if we just enlarge first for a moment the 7 a.m.

20   to 10 a.m. time slot.

21            What were you doing the morning of December 16, 2016?

22   A.  I was flying to Orlando, Florida.

23   Q.  And zooming out for a moment, what were you doing during

24   the period from about 4:30 until about 6:15?

25   A.  We were having a meeting with the executive team, Orlando

IAV7CAR6                          Mangione – Direct

1    Magic's executive team, me meaning Brett Yormark and myself.

2    Alex Martins was in there as the president, Charlie Freeman is

3    the COO.

4              MR. KOBRE:  Your Honor, this would be a good place to

5    take a break.

6              THE COURT:  OK, folks, then we're going to break until

7    tomorrow, and we will start probably about a quarter of ten.

8    Don't discuss the case tonight.  Keep an open mind.  See you

9    tomorrow.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  OK.  I'm going to excuse Mr. Mangione for

3     the day.

4           How much more do you have, Mr. Kobre?

5           MR. KOBRE:  A fair amount, your Honor.

6           THE COURT:  Yes, somehow I thought Mr. Mangione was

7     going to be a pretty significant witness.

8           MR. KOBRE:  Yes.

9           THE COURT:  Who else does the government have up

10    tomorrow?

11          MR. KOBRE:  Can you just give us one moment just to

12    caucus?

13          THE COURT:  Yes.

14          MR. KOBRE:  Your Honor, so in addition to

15    Mr. Mangione -- who I think will go on direct probably another

16    hour or so -- we also have Ron DelGaudio, who also is a

17    significant witness; Rick Kinsella likely.  We have a custodian

18    we plan to call tomorrow, and we also plan to read some

19    additional e-mails.

20          THE COURT:  OK.  If DelGuadio is a significant

21    witness -- I figure Mr. Mangione is going to take up pretty

22    much the morning, including cross.

23          MR. KOBRE:  That's a good prediction.

24          THE COURT:  OK.  So, Mr. DelGuadio -- am I saying his

25    name correctly?

1          MR. QUIGLEY:  That's right.  I would estimate his

2     direct maybe 45 minutes, maybe even a little bit less.  I don't

3     know how much cross they have.

4          THE COURT:  We can certainly put the custodian on

5     right after lunch and get the custodian out of the way.

6          MR. QUIGLEY:  Yes, it's a very brief witness.

7          THE COURT:  Right.  Look, I'd love to get through

8     three or four more witnesses tomorrow.

9          MR. QUIGLEY:  I think honestly, your Honor, I think

10    we're on pace where we thought we would be going with the

11    trial.

12         THE COURT:  Well, that just depends, where you thought

13    you would be.  I mean I could see a scenario where the

14    government would rest tomorrow.  I could see a scenario where

15    you would want to go on for another week.  I don't appreciate

16    that one, but --

17         MR. QUIGLEY:  I think we thought we would bring the

18    case in less than two weeks, and I think we're well on track.

19         THE COURT:  I should hope so.

20         OK.  All right.  See you tomorrow.

21         (Trial adjourned to November 1, 2018 at 9:45 a.m.)

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2     Examination of:                              Page

 3     HARVEY KLEIN

 4     Direct By Mr. Kobre  . . . . . . . . . . . . 233

 5     VICTOR PEREIRA

 6     Cross By Mr. Janey . . . . . . . . . . . . . 237

 7     Redirect By Mr. Kobre  . . . . . . . . . . . 248

 8     HARVEY KLEIN

 9     Direct By Mr. Kobre  . . . . . . . . . . . . 257

10     Cross By Mr. Janey . . . . . . . . . . . . . 297

11     Redirect By Mr. Kobre  . . . . . . . . . . . 312

12     BRETT YORMARK

13     Direct By Mr. Quigley  . . . . . . . . . . . 316

14     Cross By Mr. Gottlieb  . . . . . . . . . . . 339

15     Redirect By Mr. Quigley  . . . . . . . . . . 376

16     LUKE URBANCZYK

17     Direct By Mr. Quigley  . . . . . . . . . . . 393

18     FRED MANGIONE

19     Direct By Mr. Kobre  . . . . . . . . . . . . 399

20                        GOVERNMENT EXHIBITS

21     Exhibit No.                              Received

22      8   . . . . . . . . . . . . . . . . . . . . 254

23      1   . . . . . . . . . . . . . . . . . . . . 256

24      2006, 2006-A, 2016, 2016-A, 2016-B, . . . . 257

25            2026, 2026-A, 2028, and 2029
```

1701 through 1715  . . . . . . . . . . . . . 263

1700    . . . . . . . . . . . . . . . . . 293

2112    . . . . . . . . . . . . . . . . . 333

2101    . . . . . . . . . . . . . . . . . 351

[Exhibits]*[received]  . . . . . . . . . . . 363

289   . . . . . . . . . . . . . . . . . . 384

288, 289, 291, 292, 293, 744, 745, and 749   389

2110 and 2140  . . . . . . . . . . . . . . 445