IB17CAR1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                          17 Cr. 680 (CM)

5   CRAIG CARTON,

6                                       Trial
                Defendant.
7   ------------------------------x

8
                                        New York, N.Y.
9                                       November 1, 2018
                                        10:00 a.m.
10

11  Before:

12                  HON. COLLEEN MCMAHON,

13                                      Chief District Judge

14                      APPEARANCES

15  GEOFFREY S. BERMAN
        United States Attorney for the
16      Southern District of New York
    ELISHA KOBRE
17  BRENDAN QUIGLEY
        Assistant United States Attorneys
18
    GOTTLIEB & JANEY LLP
19      Attorneys for Defendant
    BY:  ROBERT C. GOTTLIEB
20       DERRELLE M. JANEY
         SETH J. ZUCKERMAN
21       SARAH LEDDY

22  ALSO PRESENT:   MICHAEL ZAVONA, Special Agent FBI
                    SEAN SWEENEY, Special Agent FBI
23

24

25
```

IB17CAR1

1          (Trial resumed; jury not present)

2          THE COURT:  Mr. Gottlieb?

3          MR. GOTTLIEB:  Good morning.  If I may, your Honor, I

4     wanted to raise an evidentiary issue just very briefly.

5          Through Mr. Mangione, during cross-examination, we

6     will seek to introduce a number of his e-mails to Craig Carton.

7     We have made certain redactions.  I have provided a copy to the

8     government of the proposed defense exhibits.  I have a copy for

9     the Court, which I will refer to.  So, if your please, right at

10    the beginning, we are seeking to introduce these e-mails

11    pursuant to Federal Rules of Evidence 801, specifically for the

12    purpose of showing only that the statements were made and --

13    without any ambiguity, without any doubt -- not for the truth

14    of the matter asserted.  They are, therefore, not hearsay.

15         THE COURT:  You're trying to establish that these

16    conversations took place.

17         MR. GOTTLIEB:  Right, the conversations.  And it was

18    part of what was conveyed to Mr. Carton.  It no secret what the

19    defense is.

20         THE COURT:  No, it's no secret.  Your client kept

21    having press conferences.

22         MR. GOTTLIEB:  And even without a formal agreement,

23    more particularly material relevant to these e-mails,

24    Mr. Carton believed and had a sound reasonable basis to believe

25    that he had access to the bulk tickets.  And we can get that

IB17CAR1

1      through the oral testimony.  These e-mails also go directly to

2      that issue.

3                THE COURT:  OK, got that.  Got that.  And I said

4      yesterday that I was going to be very, very strict about

5      Mr. Carton's e-mails, because we have in the record now -- I'm

6      sorry about this; now I can't see Mr. Quigley -- we have in the

7      record now evidence which, if the jury credits it, would tend

8      to show that Mr. Carton's e-mails may not all be real and that

9      he doctored e-mails, and that he doctored e-mails not only from

10     Mr. Mangione but from other people.  So, I don't know what the

11     government's position is on these particular e-mails and these

12     particular conversations.

13                Obviously, the fact that there were conversations

14     between them about tickets, it's admissible evidence.  The

15     government disputes its relevance, but it's admissible

16     evidence, and in that sense e-mails demonstrating that they had

17     these conversations -- about what Mr. Mangione testified

18     yesterday; he testified that they had conversations -- would

19     ordinarily be admissible on cross.

20                I just need to know.  This is a complicated factor in

21     this case.  Mr. Kobre?

22                MR. KOBRE:  Your Honor, it is a complicating factor,

23     but even putting aside the doctoring of e-mails, your Honor,

24     this set of e-mails that defense counsel handed up are

25     objectionable based on, first of all, hearsay, because they are

IB17CAR1

 1   still -- we do not believe they're being put in just for the

 2   fact that they were said.

 3           THE COURT:  Well, but if I tell the jury that that's

 4   what they're in for, then they're not hearsay.

 5           MR. KOBRE:  That's true, your Honor.  But that brings

 6   us to the second objection, which is relevance.  These are

 7   e-mails, your Honor, many of which go back to 2015.  They have

 8   zero to do with the allegations in this case.  They have zero

 9   to do with the tickets that Mr. Carton promised his investors

10   that he had access to.  They are just simply wholly irrelevant,

11   and that's why, your Honor, the government believes this is

12   basically in essence a way to try to backdoor into the quote

13   unquote legitimate ticket defense, which goes back to the

14   hearsay objection.

15           So, I think, you know, on both of those grounds, they

16   are simply irrelevant; they have nothing to do with this case.

17           MR. GOTTLIEB:  Your Honor, if I could just respond

18   very briefly, the reason why they are material, why they are

19   relevant even in 2015, is that that's what forms his knowledge

20   leading up to the discussions with Brigade.  It's on the basis

21   of those conversations --

22           THE COURT:  I understand.  I will let them in.  You

23   already know there is going to be a caveat given to the jury

24   very clearly that prior legitimate dealings -- should they have

25   happened -- are no defense to subsequent illegitimate dealings;

IB17CAR1

1   they cannot be used to justify subsequent illegitimate

2   dealings.  The evidence about the particular deals on which the

3   government is focusing -- and correctly so, with laser-like

4   precision -- is what it is.  It is what it is.  So, as

5   background information -- not a word from Mr. Carton in here,

6   right?  Everything is --

7           MR. KOBRE:  Your Honor, no, there are.  There are

8   e-mails in here, numerous --

9           THE COURT:  Every word from Mr. Carton has to be

10  blacked out.

11          MR. GOTTLIEB:  We thought we did.  So if we didn't,

12  it's coming out.  That's why it was all blacked out.

13          THE COURT:  Well, start with the top, the first one,

14  top of the first page.  Oh, that's from Fred Mangione.  From

15  Fred Mangione.

16          MR. GOTTLIEB:  Right.

17          THE COURT:  OK.

18          MR. GOTTLIEB:  And on 2 it's from Fred Mangione.

19          THE COURT:  Well, just take care of them.  All right?

20          MR. GOTTLIEB:  Thank you.

21          THE COURT:  I have told you, I have told the

22  government I'm going to give some leeway on this, to try to

23  develop a defense.  But you can have a legitimate ticket

24  business which goes bad, and when you start faking e-mails and

25  taking money and using it to pay down gambling debts -- if that

IB17CAR1

1    is what the jury concludes the evidence shows -- the fact that

2    you've done a million legitimate ticket deals in the past is no

3    defense OK.  Are we ready to go?

4                Where is the witness?

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IB17CAR1                        Mangione - Direct

1              (Jury present)

2              THE COURT:  Hello, everybody.

3              Mr. Mangione, take your seat.  Remember you are under

4    oath.

5              I believe you were questioning, Mr. Mangione.

6              MR. KOBRE:  Thank you.

7    FRED MANGIONE, resumed.

8    DIRECT EXAMINATION (Continued)

9    BY MR. KOBRE:

10   Q.  Mr. Urbanczyk, can you publish for the jury Government

11   Exhibit 914, and if we can just enlarge the original message

12   down.

13             Mr. Mangione, I showed you this e-mail yesterday?

14   A.  Yes.

15   Q.  And did you ever send this e-mail with its attachment?

16             MR. GOTTLIEB:  Your Honor, our monitor seems to be on

17   the fritz here.

18             THE COURT:  OK.  My monitor has a miniature.  OK.  Now

19   I've got it.

20             MR. GOTTLIEB:  There we go.

21   Q.  So, Mr. Mangione, we were talking about this e-mail

22   yesterday; it's an e-mail that purports to have been sent by

23   you to labs123@aol.com on December 16, 2016 at 4:50 p.m., and

24   it has an attachment.

25             Mr. Urbanczyk, if we can just show Mr. Mangione the

1    first page.

2              Now, did you send that e-mail, sir?

3    A.  I did not.

4    Q.  And when we left off, we were looking at Government Exhibit

5    2110, which is in evidence.

6              Can we put that up, Mr. Urbanczyk.

7              And focusing on the period on –– what is this that

8    we're looking at here?

9    A.  This is my calendar.

10   Q.  For what date?

11   A.  For December 16, 2016.

12   Q.  And, Mr. Urbanczyk, if we can just enlarge the period from

13   4 to 6 or ––

14             What were you doing that day between 4:30 and 6:30?

15   A.  I was meeting with the president and chief operating office

16   of the Orlando Magic in Orlando, Florida.

17   Q.  And where did that meeting take place?

18   A.  It took place at the Amway Center, home of the Orlando

19   Magic.

20   Q.  In Orlando, Florida?

21   A.  Yes.

22   Q.  And do you recall whether you sent any e-mails during the

23   period of that meeting?

24   A.  Highly doubtful.

25   Q.  Why do you say that?

1   A.  I'm meeting with the president of the Orlando Magic, so I

2   want to be respectful.

3   Q.  OK.  If we can go back now, Mr. Urbanczyk, to Government

4   Exhibit 914.

5          I want to focus your attention now on the attachment

6   to this e-mail.  If we could just enlarge from the top of the

7   page through the first paragraph.

8          Now, this is titled event ticket agreement.  And just

9   focusing here on the first paragraph, who did the agreement

10  purport to be between?  What parties are there to the

11  agreement?

12  A.  Ticket Jones and Barclays Sports and Entertainment.

13  Q.  Now, Barclays Sports and Entertainment Company, is there

14  any such company, to your knowledge?

15  A.  There is not.

16  Q.  Have you ever heard of the company that you worked for, BSE

17  Global or Brooklyn Sports and Entertainment, referred to as

18  Barclays Sports and Entertainment Company?

19  A.  No.

20  Q.  Was the name ever used for marketing purposes?

21  A.  No.

22  Q.  The other party listed here is Ticket Jones LLC.  Did you

23  have any understanding from Mr. Carton at any point about what

24  Ticket Jones was?

25  A.  It was one of his ticket companies.

1    Q.  Did Mr. Carton ever send you any other documents that had

2    the name Ticket Jones on it?

3    A.  Yes.

4    Q.  And approximately when was that that he sent you the

5    document with Ticket Jones on it?

6    A.  It was around March of '17.

7    Q.  Now if we can just scroll down here and go to the second

8    whereas clause.  So this paragraph says, "Wheres, Barclays

9    desires to sell up to $3 million worth of premium tickets," and

10   then it refers to a performance of Metallica currently

11   anticipated to take place prior to the commencement of its 2017

12   North American Stadium Tour.

13           At this time, on December 16, 2016, where were your

14   negotiations or discussions with Metallica?  Where were those?

15   What was going on?

16   A.  We were still in negotiations with them.

17   Q.  Did you have a finalized contract at that point?

18   A.  Not at that point, no.

19   Q.  And were the discussions -- did they relate to bringing

20   Metallica through a promoter or directly?

21   A.  Both.  Both were being discussed at that point, but nothing

22   was finalized at that time.

23   Q.  And just scrolling down to the second -- sorry -- just

24   looking at the second Roman numeral there, the first two

25   separate performances of Barbra Streisand each currently

1    anticipated to take place in April of 2017, where were your

2    discussions with Barbra Streisand, where did they stand on

3    December 16, 2016?

4    A.  We were still negotiating those dates as well.

5    Q.  Would Brooklyn ever have agreed to sell tickets to these

6    performances on December 16, 2016?

7    A.  I'm's sorry, could you repeat that.

8    Q.  Would Brooklyn ever have agreed to sell tickets to these

9    performances listed here on December 16, 2016?

10   A.  Not at that point.

11   Q.  And why is that?

12   A.  Again we just didn't have an agreement if the performances

13   were definitely coming.

14   Q.  Now, if we could just turn to page 6 of this document, and

15   just enlarge that if we can.

16          So, this is the signature page here, and it's

17   unsigned.  Who is listed on the signature block as the person

18   who will sign on behalf of Brooklyn?

19   A.  Myself, Fred Mangione.

20   Q.  And did you have authority to sign such an agreement even

21   if you had it before you?

22   A.  I did not.

23   Q.  What entity is listed below your name there?

24   A.  Brooklyn Sports and Entertainment.

25   Q.  Is that the same name that we looked at earlier in the

1   first paragraph in the agreement?

2   A.  It was not.

3   Q.  Now, I'm going to ask you to take a look at Government

4   Exhibit 288, which is in evidence.  This is an e-mail from

5   somebody named David Molner to Craig labs123@aol.com, copying

6   Joe Meli, with the subject Ticket Jones/Barclays agreement.  Do

7   you see that?

8   A.  Yes.

9   Q.  It's being sent on December 16, 2016, and it has

10  attachments to it.

11          If we can, Mr. Urbanczyk, just scroll, and let's just

12  look at the first page of the attachment.  And if we can just

13  scroll through the attachment starting at that second page and

14  going through page 5.  If we can just enlarge -- let's just go

15  back to the second page if we can for a moment, and just

16  enlarge the first paragraph.  And now if we can just enlarge

17  the second whereas clause paragraph.

18          Does this agreement also refer to different shows?

19  A.  Yes, same Metallica and Barbra Streisand shows.

20  Q.  And now going down to page 5 of the agreement, if we can

21  just enlarge that.

22          This purports to be signed by you.  Do you see that?

23  A.  I do.

24  Q.  Is that your signature?

25  A.  It is not.

IB17CAR1                      Mangione - Direct

1    Q.  Does it appear similar to the way you sign documents?

2    A.  Does not.

3    Q.  Did you ever sign this agreement?

4    A.  I did not.

5    Q.  Did you have the authority to sign such an agreement?

6    A.  No.

7    Q.  Mr. Urbanczyk, if we can just leave that up on the side,

8    Government Exhibit 288, and put up Government Exhibit 2135

9    which is in evidence.  Go to the fifth page of 288 and the

10   second page of 2135, and just enlarge -- just for a moment.

11   That's fine.  Can you just scroll up here on 2135 for a moment.

12         Do you recognize that document, Mr. Mangione?

13   A.  Yes.

14   Q.  What is it?

15   A.  It's a Long Island all-access agreement.

16   Q.  Just what is that?

17   A.  For anyone who purchased a Long Island all-access pass at

18   the renovated Nassau Coliseum, this was a contract that

19   everyone would have to sign to purchase their ticket.

20   Q.  And this particular one is with who?  Who is the person who

21   had purchased the all-access passes as reflected here?

22   A.  Craig Carton.

23   Q.  And now if we can just scroll down to page 2 and just

24   enlarge from below participants through the signature and the

25   name.

1          Is Government Exhibit 2135 signed by anyone?

2    A.   Yes.

3    Q.   As reflected on the screen?

4    A.   Yes.

5    Q.   Who it signed by?

6    A.   It says Craig Carton.

7    Q.   OK.  Mr. Urbanczyk, we can take that down.

8          Now, let me direct your attention to Government

9    Exhibit 2114 in evidence.  This is an e-mail from Mr. Carton to

10   you on December 19, 2016 at 8:57 a.m.  The subject is question.

11   Can you read the e-mail to us, please.

12   A.   "Is there a difference between Barclays Sports and

13   Entertainment Company and Brooklyn Sports and Entertainment"?

14   Q.   Is there a difference?

15   A.   Yes.

16   Q.   What that's the difference?

17   A.   Barclays Sports Entertainment Company doesn't exist.

18   Q.   Did you ever have any discussion with Mr. Carton about why

19   he was asking this question?

20   A.   I don't recall.

21   Q.   Do you recall whether you ever responded to this e-mail?

22   A.   I don't.

23   Q.   Let's take a look now at Government Exhibit 2142, and in

24   particular the bottom of page 1.  Well, let's just first look

25   at the bottom.  So this is an e-mail from you to several

1     individuals listed there:  Gerald Sauvigne, Deborah Holden and

2     Rob Sailers.  Who are those individuals?

3     A.  Those individuals worked in the accounting department at

4     Barclays Center.

5     Q.  And you sent the e-mail on December 19, 2016 at 11:25 a.m.

6     Do you see that?

7     A.  I do.

8     Q.  And in the e-mail you wrote to these I think you said

9     people who worked in finance?

10    A.  Correct.

11    Q.  You wrote, "Can any of you buzz me when you can.  Need to

12    track down an arena wire."  What are you referring to there?

13    A.  There was a wire that was going to come into the arena I

14    was tracking down.  Craig told me that his investors sent the

15    wire to us in Brooklyn by accident instead of him directly.

16    Q.  And when you say Craig, you mean Mr. Carton, right?

17    A.  Correct.

18    Q.  And now what did Mr. Carton -- had you had discussion with

19    Mr. Carton before December 19, 2016 about a wire coming into

20    Brooklyn?

21    A.  Yes.

22    Q.  What if anything did Mr. Carton say before this date?

23    A.  Just that he was able to lock down some, you know, his

24    investors wiring us some money that he would then put into

25    invest in tickets.

IB17CAR1                        Mangione - Direct

1    Q.  OK.  And did he say which tickets he was going to buy with

2    it or how he was going to use the money once he received it?

3    A.  No.  We were just going to kind of use it as a slush fund

4    for events he wanted to draw against.

5    Q.  And then when you got a call from Mr. Carton, what did he

6    say on this day, on December 19, 2016, about the wire?

7    A.  He just said it was sent accidentally to Brooklyn instead

8    of to his company.

9    Q.  Did he say how much it was for?

10   A.  $3 million.

11   Q.  And did he say what the error was, what the mistake was?

12   A.  No, he just said it was sent by accident.

13   Q.  And what did he ask you to do?

14   A.  He said if we did receive the wire, could we forward it to

15   his company.

16   Q.  Did he say what he was going to do with the money once you

17   forwarded it to his company?

18   A.  No, he didn't.

19   Q.  And how did you respond to Mr. Carton's request?

20   A.  I said let's track it down first, and then we'll talk then.

21   Q.  Did you actually expect what Mr. Carton told you before,

22   that the wire was going to be sent to Brooklyn, did you

23   actually expect to see the wire?

24   A.  I didn't think there was going to be a wire coming though,

25   no, I didn't.

1    Q.  Why didn't you think so?

2    A.  It was kind of out of the blue that all of a sudden we

3    would get wired $3 million.

4    Q.  If we scroll up to the e-mail at 11:40 a.m.  So, this is an

5    e-mail from Deborah Holden back to you.  And Deborah Holden

6    worked where?

7    A.  She was in the finance department.

8    Q.  And this is later in the morning.  "Hi, Fred, just spoke to

9    Bank of America.  They do not see the $3 million coming through

10   yet from Brigade today, but if the client can provide the fed

11   reference number they can try to track it down with the wire

12   room."  Do you see that?

13   A.  Yes.

14   Q.  What did you know when Deborah Holden was talking about

15   Brigade?

16   A.  Brigade was Craig's investors.

17   Q.  And Ms. Holden refers to a fed reference number.  What was

18   that about?

19   A.  That's just the number they would have used to deploy the

20   wire.

21   Q.  And just scroll up to the prior two e-mails, if you can

22   just enlarge the rest.

23          Taking a look at this, what did you do with

24   Ms. Holden's e-mail letting you know that the wire had not yet

25   been registered or received?

1    A.  I just let Craig know at that time we didn't see a wire.

2    It does sometimes take a little while to go through the system,

3    so.

4    Q.  OK.  And then focusing on the top e-mail, and maybe we can

5    just enlarge that, just the top e-mail.

6           Mr. Carton sends you an e-mail back about 12:02 p.m.

7    And what does he say in here?

8    A.  "When it arrives please send it to Tier One Tickets."

9    Q.  And what is he referring to when he says "it"?

10   A.  The wire.

11   Q.  Did you ultimately receive the wire?

12   A.  We did.

13   Q.  Was it for $3 million?

14   A.  It was $2 million.

15   Q.  And where did you wire the money to?

16   A.  We wired it to the JP Morgan account here at Tier One

17   Tickets.

18   Q.  And directing your attention to 2113 which is in evidence.

19   Do you recognize this document?

20   A.  Yes.

21   Q.  What is it?

22   A.  It's a wire request fund from Barclays Center.

23   Q.  Is it a form that you use at Brooklyn?

24   A.  Yes.

25   Q.  And if we can just look at -- if you can just enlarge the

1     top portion.

2               Where was the wire made payable to?

3     A.  Brigade Leveraged Capital/Tier One Tickets.

4     Q.  Can you explain that.  I thought a moment ago you said the

5     wire was paid to Tier One Tickets.

6     A.  Yes.

7     Q.  Why is Brigade Leveraged Capital listed here, if you know?

8     A.  I am not aware.

9     Q.  If you can just read what it says for reference.

10    A.  "wire payable to Brigade Leveraged Capital/Tier One

11    Tickets.

12    Q.  I'm sorry, just the last line on the enlarged portion?

13    A.  Sorry.  "Return of wire sent in error."

14    Q.  Now, as of this date, December 20, 2016, did Mr. Carton

15    have any agreement whatsoever with Brooklyn to purchase tickets

16    to live events?

17    A.  No.

18    Q.  Before you agreed to wire the money to Tier One Tickets as

19    Mr. Carton requested, did you contact anyone at Brigade to

20    confirm that that's what should happen with the money?

21    A.  Did not.

22    Q.  Why not, sir?

23    A.  I trusted Craig; I believed him.  At that point the ticket

24    purchases that were going through he was putting through his

25    personal credit card, so obviously he was investing some money

1  already, so I just trusted that that was sent in error.

2  Q.  Now, we just talked about this $2 million wire that

3  Brooklyn received from Brigade.  And now at any time before

4  this wire from him -- when did you receive that wire?

5  A.  What date?  It was the 19th.

6  Q.  OK.

7  A.  December 19, 2016.

8  Q.  At any time prior to that had Brooklyn ever received a

9  deposit from Mr. Carton along the lines of the fund that you

10  mentioned from which tickets would ultimately be purchased?

11  A.  No.

12  Q.  At any time before December 19, 2016 had Brooklyn ever

13  received a deposit from anyone else on behalf of or associated

14  with Mr. Carton?

15  A.  No.  That normally is not a normal business practice to

16  have that, but we did OK to take the wire if did come through

17  from Craig.

18  Q.  But it wasn't a normal business practice?

19  A.  No.

20  Q.  And in fact at any time at all did Mr. Carton ever have

21  money on deposit with Brooklyn to be used for the future

22  purchase of tickets?

23  A.  No.  Any tickets that he did want, he paid for right

24  upfront.

25  Q.  So he paid for it and in response got the tickets.

1    A.  Correct.

2    Q.  Did anyone else, to your knowledge, ever wire money for a

3    deposit at Brooklyn on Mr. Carton's behalf or associated with

4    him?

5    A.  When was that time?  I'm sorry.

6    Q.  Any time.

7    A.  Eventually there was a wire a few months later for some

8    Barbra Streisand tickets.

9    Q.  But again was that money that was on deposit?

10   A.  No, no, they went right to the tickets, nothing was on

11   deposit.

12   Q.  Sorry?

13   A.  They went right to the ticket purchase.

14   Q.  Moving to 2017, did Mr. Carton continue to ask to purchase

15   tickets?

16   A.  Yes.

17   Q.  And how would you describe the frequency or regularity of

18   his requests?

19   A.  He would be persistent, looking to just get an update on

20   what shows were coming in, if we can come through and get him

21   any allotments he was looking for, things of that nature.

22   Q.  How did he convey the requests?

23   A.  E-mail, calls, text, any way he could try to get in touch

24   with Brett or I.

25   Q.  And were there different times in the day that he made the

1   requests?  What times did they come in?

2   A.  Early, middle of the day, late in the day, all different

3   times.

4   Q.  Let's take a look at Government Exhibit 2017.  Let's

5   enlarge this.

6          So this is an e-mail from Mr. Carton to you on January

7   3, 2017.  What was the time of this e-mail?

8   A.  2:11 a.m.

9   Q.  And the first line there, Mr. Carton says on the first line

10  two thirds of the way in, "When you can please let me know

11  about the following as I'm ready to fund as much as you will

12  allow."  What do you understand Mr. Carton to be saying there

13  when he said he's ready to fund as much as you will allow?

14  A.  He was just looking to purchase as many tickets as we were

15  able to sell him.

16  Q.  And then just looking at the second point there, how many

17  Metallica tickets does he ask to purchase?

18  A.  As much as possible.

19  Q.  And with respect to the next bullet point, Streisand?

20  A.  Both dates as many as possible.

21  Q.  And if you can just read the next line for that.

22  A.  "Would gladly be your investment partner or take a hundred

23  percent of the risk on the shows you would own like Streisand

24  and of course provide the agreed upon percentage of net sales."

25  Q.  What do you understand Mr. Carton to be asking for here?

1    A.  That it would be a revenue share, meaning any profits that

2    go over the initial investment would be split amongst the

3    parties.

4    Q.  And is that something you had discussed with Mr. Carton, a

5    revenue share?

6    A.  No.

7    Q.  Did you ever have a discussion with Mr. Carton about

8    revenue sharing?

9    A.  We had in the past, but it was nothing we ever really did

10   with him.

11   Q.  What do you mean by that?

12   A.  Well, we had some discussions early on that, hey, why don't

13   we get into a revenue share, where again we would split the

14   profits between his company and ours.  So there was some

15   discussion on it, but we never proceeded with it.

16   Q.  And did you ever in fact receive any money from Mr. Carton

17   as part of a revenue sharing agreement?

18   A.  A revenue share?  No.

19   Q.  Now, at this point did Brooklyn have any agreement with

20   Metallica or Streisand in place?

21   A.  Not at this point, no.

22   Q.  Let's take a look at Government Exhibit 2119.  This is an

23   e-mail several days later on January 8, 2017 from Mr. Carton to

24   you, and the subject is investment, and he starts the e-mail by

25   saying, "Guys, thanks as always for the time and for allowing

1  me the opportunity to discuss and hopefully execute a

2  meaningful agreement with you."  Do you see that?

3  A.  Yes.

4  Q.  What was Mr. Carton referring to there when he referred to

5  hopefully executing a meaningful agreement?

6  A.  Again, he was just thanking us.  We must have had a phone

7  call or a meeting, and he was just following up and asking us

8  that hopefully we can get an agreement together.

9  Q.  Did you have an agreement with Mr. Carton at this point?

10  A.  No.

11  Q.  And just jumping down to point 2, if we can just enlarge

12  that.

13         Mr. Carton says here, "Barclays and Nassau owned

14  events such as Streisand/Metallica we are a committed financial

15  partner and again would ask for first look co-investment

16  opportunity where we pre-pay at face value."  What do you

17  understand Mr. Carton is asking for?

18  A.  Just again looking to purchase tickets for both those

19  events.

20  Q.  And what is his proposed co-investment opportunity?

21  A.  Well, again, we were in negotiations whether we were going

22  to own this show or potentially be a co-investor in the show,

23  so he's saying he would invest with us if we did that.

24  Q.  And he says here Barclays -- he refers to Streisand and

25  Metallica as Barclays and Nassau-owned events.  Is that

1  correct?

2  A.  Well, both sides knew that if Streisand was coming, it was

3  going to be an owned event; so should she come, that was going

4  to be a hundred percent owned.

5  Q.  At this point was it a sure thing that she was going to

6  come?

7  A.  It wasn't contracted yet, but we were still in

8  negotiations.

9  Q.  And what about Metallica, was it a sure thing that

10 Metallica was going to be a Brooklyn owned event?

11 A.  No.

12 Q.  Did Metallica ultimately turn out to be a Brooklyn owned

13 event?

14 A.  It did not.

15 Q.  And then if we could just look down at the last line of the

16 e-mail.  Mr. Carton says, "If possible would like to work

17 towards agreement this week."

18         Was there any agreement entered into that week?

19 A.  No.

20 Q.  Let's take a look at Government Exhibit 2120.  If we can

21 just enlarge the first -- just enlarge the whole e-mail.

22         This is later in January, January 13, 2017 from

23 Mr. Carton to you, the subject being overview.  And Mr. Carton

24 starts by saying, "Fred, here is how I would like to invest for

25 the first five months of 2017."  And then in point 2 what he is

1    asking for?

2    A.  Barbra Streisand tickets.

3    Q.  And how much money does he want to invest?

4    A.  A million minimum per show at two shows for a $2 million

5    investment.

6    Q.  And what about in point 3?

7    A.  Metallica.

8    Q.  And?

9    A.  $1 million investment.

10   Q.  Were you in a position at this point in January 13, 2017 to

11   agree to sell him those tickets?

12   A.  No.

13   Q.  Now, let's take a look now -- before we move on for a

14   moment, if you look at point 2, are there any words misspelled?

15   A.  Barbara.

16   Q.  Let's take a look at Government Exhibit 2121.  And if we

17   can just for a moment just enlarge from where it says on

18   January 25 through the bottom, which is a little higher up

19   there.  Just the second e-mail down.  There we go.

20          So the bottom e-mail here is an e-mail from Mr. Carton

21   to you on January 25, 2017 at 5:02 a.m., and there is writing

22   in black and blue.  Can you just describe what that refers to.

23   A.  There was an e-mail from Craig where he asked me to get

24   some clarity on some events coming in, number 1 through 8, so

25   he asked me the events in black, and I replied in blue.

1   Q.  OK.  So the e-mail on top which is from you at 7:47 a.m. is

2   your reply to his e-mail?

3   A.  Correct.

4   Q.  And I want to ask you about this.  So Mr. Carton's e-mail

5   starts by saying, "Sorry for being a pain in the ass, not my

6   usual style.  As you can imagine, when you have people ready

7   and willing to spend tons of money, they are persistent about

8   20 times a day in asking me about upcoming opportunities."

9            Do you see that?

10  A.  Yes.

11  Q.  What did you understand Mr. Carton was referring to about

12  the people who are ready and willing to spend money being

13  persistent?  Who was that referring to?

14  A.  His investors.

15  Q.  Then he goes on to say, "They are also asking me if I can

16  produce a document that coincides with the e-mail you sent me

17  suggesting that there would be up to $30 million of investable

18  opportunities between your properties."  Do you see that?

19  A.  Yes.

20  Q.  First of all, was there any such document that coincided --

21  what e-mail, first of all, did you understand Mr. Carton was

22  referring to?

23  A.  There was an e-mail that I sent to Craig just kind of

24  laying out some opportunities and talking about a good faith

25  deposit to draw upon for upcoming events.

IB17CAR1                      Mangione - Direct

1   Q.  And if we can leave this up?

2   A.  That I sent to him in December.

3   Q.  And if we can just leave this up, Mr. Urbanczyk, and put up

4   side by side Government Exhibit 2109, and just enlarge.

5           Is this the e-mail you understood Mr. Carton was

6   referring to?

7   A.  Yes.

8   Q.  And he asks in Government Exhibit 2121, he says that his

9   investors are asking if he can produce a document that

10  coincides with this e-mail.  Was there any such document that

11  coincided with that e-mail?

12  A.  There was not.

13  Q.  Now, let's just go back to 2121, and if you just enlarge

14  the bottom e-mail.

15          So Mr. Carton goes on to say, "When you can let's get

16  some clarity on" -- and then he lists some events there.  Do

17  you see that?

18  A.  Yes.

19  Q.  And just in point 2, one of the first -- one of the items

20  he wants clarity on is both Babs.  What is he refers to there?

21  A.  Barbra Streisand.

22  Q.  When he says "both," what does that mean?

23  A.  There was a date in Brooklyn and a date at Nassau Coliseum.

24  Q.  What is was your response to Mr. Carton on January 25,

25  2017?

1    A.   "Contract still not finalized."

2    Q.   And just dropping down to the next bullet point, 3, he is

3    asking for clarity on Metallica.  What was your response to

4    that?

5    A.   "Contract still not finalized."

6    Q.   And based on that information, was Brooklyn in a position

7    to sell Mr. Carton seats to those performances on this date?

8    A.   No.

9    Q.   Now, turning your attention --

10            We can take this down.

11            Turning your attention to Friday, January 27, did you

12   learn on that date that Joe Meli had been arrested?

13   A.   Yes.

14   Q.   And on that date did you receive any phone calls from

15   Mr. Carton?

16   A.   Yes.

17   Q.   Just describe.  Many?  One?

18   A.   Well, I left the office early that day and was out of the

19   office, and the legal department sent me a couple articles

20   about what happened with Joe Meli.  So, Craig called me a

21   couple times that night but I was at a dinner.  Ironically, it

22   was my daughter's birthday, so I was out to dinner that night;

23   I didn't pick up my phone.  As I left the restaurant, I spoke

24   to Brett briefly, and called Craig back later that night.

25   Q.   And describe the conversation you had with Mr. Carton the

IB17CAR1                         Mangione - Direct

1   night that Mr. Meli was arrested.

2   A.  Craig just wanted to check in with us and let us know it

3   had nothing to do with what he was doing in the ticket industry

4   and business and one had nothing to do with the other regarding

5   Mr. Meli's arrest.

6   Q.  Just explain what you mean -- what you understood

7   Mr. Carton was saying when he said one had nothing to do with

8   the other.

9   A.  Well, Mr. Meli got arrested for some Broadway tickets and

10  some other things, and he just wanted to make us aware that he

11  was no longer in business with him.

12  Q.  When you say he, you mean Mr. Carton was no longer --

13  A.  Right.

14  Q.  -- was no longer in business with Mr. Meli.

15  A.  Yeah, he had no dealings with him.

16  Q.  Was it that he had stopped it as a result of the arrest

17  or --

18          THE COURT:  The objection to the form of the question

19  is sustained.

20          You can ask him what he said.  You can't tell him what

21  you think he said.

22  A.  Because of our history with Dark Night Ventures, he knew we

23  didn't really think very highly of Mr. Meli, he was just

24  letting us know.  And I took his word for it.

25  Q.  And shortly after that date, did Mr. Carton ask you to

1   participate in a call with an investor?

2   A.  He did.

3   Q.  And what investor was that?

4   A.  Brigade Capital.

5   Q.  And did you agree to participate in the call?

6   A.  I did.

7   Q.  And about when did that take place?

8   A.  It was that Tuesday or Wednesday the following week.

9   Q.  And who else was on the call?

10  A.  Well, what I was told, it was two investors from Brigade.

11  But again it was a phone call, I don't know who else.  And

12  Mr. Carton.  Craig was on too.

13  Q.  I mean you spoke with the people on the phone call, so who

14  else did you hear on the phone call?

15  A.  Two people from Brigade.

16  Q.  OK.  And Mr. Carton?

17  A.  Correct.

18  Q.  Anybody else?

19  A.  Not that I was aware of, no.  Myself.

20  Q.  And about how long did the call last?

21  A.  About a half hour.

22  Q.  And describe to the best of your recollection what

23  happened, what was discussed during the call.

24  A.  We discussed what was just going on with our buildings as

25  far as just potential events that would come in.  They kind of

1   asked me some one-on-one ticket business, like how do you get

2   an event, how does it work between Live Nation and AEG, a

3   potential self promote event, what usually are the percentages

4   of self promote versus promoted, you know, kind of like a

5   ticketing 101 of how we manage the business.

6   Q.  Were any documents exchanged during the call like by e-mail

7   or in any other way?

8   A.  No.

9   Q.  Was there any reference to whether there was an agreement

10  between Mr. Carton and Brooklyn that was referenced?

11  A.  Not that I recall.

12  Q.  You said before that it was like ticket 101.  Just describe

13  what you mean by that?

14  A.  They were just asking questions about how the inventory

15  works and the allotment works in a self promoted event versus a

16  promoted event.

17  Q.  How would you describe the level of generality of the call?

18  A.  It was more of an informative phone call the way I read it.

19  Q.  Let's take a look at Government Exhibit 2123.  I you can

20  just enlarge the bottom e-mail here.

21          First of all, this e-mail is from Mr. Carton to you;

22  it's on February 1, 2017, on Wednesday.  Where does that date

23  fit in from when you learned Mr. Meli was arrested?

24  A.  Mr. Meli was arrested I believe the Friday before.

25  Q.  And the subject of the e-mail from Mr. Carton is "Today's

1    call at 3 o'clock."  Do you see that?

2    A.  Yes.

3    Q.  Does that help refresh your recollection about what date

4    the call with Brigade took place?

5    A.  Yes.

6    Q.  And was that on February 1, 2017?

7              MR. GOTTLIEB:  OK, your Honor, at this point I'll

8    object.  We had his answer.

9              MR. KOBRE:  I'm sorry.  I withdraw the question, your

10   Honor.

11   Q.  What date did the call take place?

12   A.  February 1.

13   Q.  And Mr. Carton e-mails you and says, "Just to refresh, the

14   terms of the ticket agreement from December 16 between me

15   (Ticket Jones) and you guys that they agreed to invest on says

16   the following."  Then in point 2 do you see where it says,

17   "Ticket Jones agrees to fund 2 million for Streisand and

18   Metallica specifically."  Do you see that?

19   A.  Yes.

20   Q.  Do you recall receiving this e-mail before the phone call

21   with Brigade?

22   A.  I don't, but it says I did, so.

23   Q.  Do you recall reading it before you had the phone call?

24   A.  No.

25   Q.  About how long did you receive this e-mail before the phone

IB17CAR1                    Mangione - Direct

1   call took place with Brigade?

2   A.   12 minutes.

3   Q.   And when was the e-mail sent, what time?

4   A.   2:48.

5   Q.   And when was the call?

6   A.   3.

7   Q.   Looking back at -- Mr. Carton's e-mail here to you says

8   that under this purported agreement Ticket Jones agrees to fund

9   2 million for Streisand and Metallica specifically.  Was it

10  true that there was an agreement in place with Brooklyn for

11  that funding?

12  A.   There was not.

13  Q.   And just to be clear, other than this e-mail, did

14  Mr. Carton ever in his communication refer with you or refer to

15  a purported December 16th agreement?

16  A.   Not that I recall.

17  Q.   And in fact looking back at your e-mail in Government

18  Exhibit 2109, had you mentioned anything about Streisand or

19  Metallica in 2109?

20  A.   No.

21  Q.   Just going back to 2123, did you respond to Mr. Carton's

22  e-mail?

23  A.   I responded to it, yes.

24  Q.   And what is your response here?

25  A.   "Let me know when you're going to send the Babs money."

1   Q.  What did you mean by that?

2   A.  I was asking him when he was going to send the Barbra

3   Streisand money.

4   Q.  And did you respond to his statement that there was a

5   December 16 agreement?

6   A.  Not that I recall.

7   Q.  And why not?

8   A.  Because there was none.

9   Q.  Other than this phone call that you described with Brigade,

10  did you ever have any other contact with anybody from Brigade

11  Capital?

12  A.  No.

13  Q.  Let's go to Government Exhibit 2126.  If we can just

14  enlarge this.

15          So this is an e-mail from Mr. Carton to you on

16  February 13, 2017 and he writes, "Congrats on the official

17  announcement today.  As you know my investment partner, Brigade

18  Capital, earmarked up to $1 million for a potential Metallica

19  investment/partnership."  What is Mr. Carton saying here when

20  he talks about the official announcement?

21  A.  There was an announcement made about the Metallica tour.

22  Q.  And what was the announcement?

23  A.  That they were going on a major stadium tour, that they

24  were going to open the tour at the new renovated Nassau

25  Coliseum before they went to stadiums.

1   Q.  And so did Metallica -- as a result of that, was Metallica

2   going to be a show that Brooklyn owned directly or a promoter?

3   A.  The promoter owned the show.

4   Q.  Mr. Carton goes on to say, "Similar to our Streisand

5   investment...."  What did you understand him to mean by that?

6   A.  Well, at this point he wasn't aware that it was a Live

7   Nation show at that point, so he was saying similar to the

8   Streisand investment he'd buy as many tickets as he could.

9   Q.  Well, let's look down at the next sentence.  He goes on to

10  say, "I know you have a limited amount of tickets that you

11  control so I'm asking if at all possible is there a way we can

12  purchase tickets direct from LN or Metallica ..."

13          He refers to knowing you have a limited amount of

14  tickets.  What do you understand that to mean?

15  A.  That it was a Live Nation show.

16  Q.  And Live Nation is what?

17  A.  The promoter.

18  Q.  And he asks that because you have a limited number of

19  tickets if there is a way he could purchase tickets direct from

20  Live Nation or Metallica.  Was that a possibility?

21  A.  No.  I mean they controlled all the ticketing.  That again

22  is the difference between a show that's direct and a show

23  that's run through the promoter, but because they hold them for

24  the bands, the VIPs, fan clubs, radio promotions and things of

25  that nature.

1   Q.  And were you ultimately able to sell Mr. Carton any tickets

2   to Metallica?

3   A.  Yes.

4   Q.  In total, about how many tickets were you able to sell Mr.

5   Carton for Metallica?

6   A.  It was like a hundred.

7   Q.  A total of a hundred tickets?

8   A.  Yes.

9   Q.  Let's go back for a moment to 2123.  Remember, this is the

10  e-mail that Mr. Carton sent to you on the day of the call with

11  Brigade?  Do you remember this one?

12  A.  Yes.

13  Q.  Just in your response to Mr. Carton, which is later on on

14  February 1, 2017, you said, "Let me know when you are going to

15  send the Babs money."  What were you referring to there?

16  A.  The Barbra Streisand money.

17  Q.  And specifically for what?

18  A.  The two shows she was going to play.  At that point it was

19  confirmed she was going to have one in Nassau and one in

20  Barclays.

21  Q.  And was that -- was that pursuant to any agreement that you

22  had with Mr. Carton?

23          MR. GOTTLIEB:  Your Honor, objection.  This has been

24  going on for quite a bit.

25          THE COURT:  Yes, you're right at the edge of where I

1   was told this was going to end in terms of time, so let's wrap

2   it up.

3   Q.  Let's go to Government Exhibit 2127, and just enlarge the

4   top e-mail.  Actually if we can just enlarge the top two

5   e-mails.

6          The top e-mail is an e-mail from you to Mr. Carton re

7   Metallica.  Do you see where you say, "only will have 150 for

8   you"?

9   A.  Yes.

10  Q.  What is that referring to?

11  A.  150 tickets.

12  Q.  And you testified a moment ago that it was 100 tickets that

13  you were ultimately able to sell.  Can you just describe that.

14  A.  Again it was a promoted show through Live Nation, so we had

15  a limited amount of inventory.

16  Q.  Do you recall whether it was 150 or 100?

17  A.  I don't recall the exact number.

18  Q.  Did Mr. Carton ultimately buy your 100 or 150 seats for

19  Metallica?

20  A.  Yes.

21  Q.  And how did he pay for it?

22  A.  Credit card.

23  Q.  Did you also discuss with Mr. Carton selling him suites for

24  Metallica?

25  A.  Yes.

1    Q.  And did that, to your knowledge, ever happen?

2    A.  I don't recall if it ever went through, no.

3    Q.  I just want to direct your attention to Government Exhibit

4    2128.  This is an exchange between you and Mr. Carton.  And if

5    we could just look at the e-mail that's in the middle of the

6    page on February 15, 3:36 a.m.  Mr. Carton writes, "Please send

7    me the AA and Metallica locs and suite info as early as

8    possible, and if there is any way at all to have more than 150

9    tickets, please do what you can."  What did you understand

10   Mr. Carton was referring to when he said if there is any way to

11   have more than 150 tickets please do what you can.

12   A.  Again he is asking if we can do anything to sell him more

13   than 150 tickets.

14   Q.  And let me go to your e-mail in response.  You respond,

15   "Have to remember that we are in presale mode.  We cannot move

16   ticket locations per our contract until we are in public on

17   sale mode which is Friday.  So working on locations today but

18   will probably be later in the day.  We cannot touch tickets

19   internally until public on sale."

20            What's your response to Mr. Carton's request for more

21   tickets?

22   A.  I'm just letting him know we're in presale mode.  There is

23   usually a credit card who gets access to the tour, that

24   sponsors the tour, so all their credit card holders get a

25   chance to buy prior, and because of that the tour runs the

IB17CAR1                    Mangione - Direct

1  inventory so we really can't do anything with our internal hold

2  until that time period comes.

3  Q.  We can leave up 2128 but put up Government Exhibit 931.

4  And if we can just enlarge 2128 and 931 e-mails that are on

5  February 15, 2017 at 3:36.  We can take that down.

6         Now you mentioned a few moments ago that Mr. Carton

7  bought tickets for Barbra Streisand performances.

8  A.  Yes.

9  Q.  And about when did those tickets go on sale?

10 A.  I don't recall the exact date, but I believe it was

11 sometime late February, early March.

12 Q.  Of 2017?

13 A.  Correct.

14 Q.  And about how much did Mr. Carton spend on Streisand

15 tickets?

16 A.  It was just about a million dollars.

17 Q.  At which venue were those?

18 A.  Between both venues, both Brooklyn and Nassau.

19 Q.  And how did Mr. Carton pay for those tickets?  What means

20 did he use?

21 A.  There was a wire to pay for, as I recall, most of it, and

22 he put the remainder on his credit card.

23 Q.  Did Mr. Carton ever report to you about how successful he

24 was, if at all, in selling the Streisand tickets?

25 A.  I recall he was struggling a little bit, and he wanted to

1    know if we can possibly take some back, if he can return some

2    of them.

3    Q.  And at least while you were still employed by Brooklyn, did

4    that ever happen, that you take tickets back for Streisand?

5    A.  No, that's not something that really happens in the concert

6    industry in general, not only Brooklyn.

7    Q.  Now, we had seen a couple of times in e-mails Mr. Carton

8    asked for all-access seats.

9    A.  Yeah.

10   Q.  Did Mr. Carton buy all-access seats?

11   A.  Yes.

12   Q.  Do you remember about how many?

13   A.  I don't recall the final number.  We were going back and

14   forth with the quantities; and when it was done, I was no

15   longer there.

16   Q.  You also testified a little bit earlier that there came a

17   point where Mr. Carton sent you a document relating to Ticket

18   Jones?

19   A.  Yes.

20   Q.  Let's put up Government Exhibit 2132, and if we could just

21   enlarge the top.

22          It's an e-mail on April 3, 2017 from Mr. Carton to you

23   and Brett Yormark.  Can you read the subject.

24   A.  "Ticketing partnership updated."

25   Q.  And Mr. Carton writes, "Attached is the final version of

1    the one page term sheet.  I appreciate the fact you have set

2    aside time today to discuss the merits of the business

3    opportunity."

4           And if we could now turn to the attachment and just

5    enlarge the top half.

6           It's entitled Ticket Jones LLC.  Do you see that?

7    A.  Yes.

8    Q.  And what's the date listed here?

9    A.  April 2, 2017.

10   Q.  And who are the parties that are listed in this term sheet?

11   A.  Ticket Jones and Barclays.

12   Q.  And overall what's Mr. Carton proposing here?

13   A.  He was at this point just looking for some working capital

14   to invest in his company.

15   Q.  And so what was he proposing Barclays would do?

16   A.  Basically put in $5 million towards the company and partner

17   up with him, business partner.

18   Q.  And what would that money be used for?

19   A.  It would be used to purchase tickets at other venues across

20   the country.

21   Q.  So not to be used at Brooklyn?

22   A.  Not primarily, no.

23   Q.  Did you seriously consider this proposal?

24   A.  We had a discussion, but it was nothing we would be able to

25   do.  Brett and I had a discussion about this, but it was

1    nothing we could really do.

2    Q.  Why is that?

3    A.  It's just not something you do in a business, invest in

4    other arenas.

5    Q.  To your knowledge, did anything come of this?

6    A.  Not that I know of, not that I'm aware.

7    Q.  To your knowledge, did Brooklyn ever enter into any

8    contract or agreement with Mr. Carton to sell him Metallica or

9    Streisand tickets?

10   A.  No.

11            MR. KOBRE:  Nothing further, your Honor.

12            THE COURT:  Cross.

13            MR. GOTTLIEB:  Thank you.

14   CROSS EXAMINATION

15   BY MR. GOTTLIEB:

16   Q.  Mr. Mangione, it's unusual, isn't it, for you to spend as

17   much time by way of e-mail, telephone calls, conference calls

18   with an individual who is purchasing tickets?

19   A.  Yes.

20   Q.  Is it fair to say that Mr. Carton was an individual who was

21   incredibly persistent?

22   A.  Yes.

23   Q.  Wasn't Mr. Carton at times a pain in the neck?

24   A.  Yes.

25   Q.  Mr. Carton would communicate with you, you told us, all

IB17CAR1                              Mangione - Cross

1    hours of the day, correct?

2    A.  Yes.

3    Q.  He would send e-mails -- we saw just a moment ago -- at

4    2:11 a.m., correct?

5    A.  Correct.

6    Q.  You told us just a few moments ago about a phone call

7    following Meli's arrest, a phone call that you had along with

8    Mr. Carton with Brigade Capital, correct?

9    A.  Correct.

10   Q.  And you understood prior to that phone call that Brigade

11   Capital was an investor with Mr. Carton, correct?

12   A.  Correct.

13   Q.  And you were asked, were you not, to participate in that

14   phone call by Mr. Carton?

15   A.  Yes.

16   Q.  Again, isn't it unusual for you to participate in a

17   conference call with an investor at the behest of an individual

18   who is just buying some tickets?

19   A.  Yes.

20   Q.  And you understood that Mr. Carton wanted you to get on the

21   phone with Brigade to answer any questions that were presented

22   to you, correct?

23   A.  Correct.

24   Q.  And you got own the phone, correct?

25   A.  Correct.

IB17CAR1                     Mangione - Cross

1   Q.  How long did that phone call last?

2   A.  Approximately a half hour, from what I recall.

3   Q.  Prior to that phone call, Mr. Carton told you he was not

4   involved with anything that Meli had done illegally, correct?

5   A.  Correct.

6   Q.  Now, you were referred a few moments ago --

7             If we could have Government Exhibit 2123 put up on the

8   board, please.

9             Looking at Government Exhibit 2123, this is an e-mail

10  from you to Mr. Carton on February 1, 2017 at 4:42 p.m.,

11  correct?

12  A.  Correct.

13  Q.  And this was your response to an earlier e-mail in which

14  Mr. Carton laid out what he thought his deal was with you,

15  correct?

16            MR. KOBRE:  Objection.

17            THE COURT:  The objection is sustained.

18  Q.  Let's look at that earlier e-mail.

19            Your Honor, may I have a moment, please?

20            THE COURT:  Yes.

21            MR. GOTTLIEB:  Your Honor, my apologies.  I didn't

22  look at the bottom part of 2123.

23            THE COURT:  OK.

24  Q.  On the bottom, the first communication from Mr. Carton on

25  February 1, 2017, at 2:48 p.m., you told us that was just a few

1    minutes before the scheduled 3 o'clock call with Brigade,

2    correct?

3    A.   Correct.

4    Q.   And in that e-mail Mr. Carton says, "Just to refresh the

5    terms of the ticket agreement from December 16 between me

6    (Ticket Jones) and you guys that they agreed to invest on says

7    the following."  And then he lays out his understanding of what

8    the agreement was.

9              MR. KOBRE:  Objection.

10   Q.   Isn't it true that he is laying it out, as you understood

11   that e-mail?

12             MR. KOBRE:  Objection.

13   Q.   Isn't it true that's what you understood he was doing?

14   A.   In his view, yes.

15             MR. KOBRE:  Objection.  Move to strike.

16             THE COURT:  It's a Government Exhibit; it's in

17   evidence; he can testify about it.

18             MR. KOBRE:  It's the characterization of --

19             THE COURT:  Too bad.  He is asking for his

20   understanding, not what is in Mr. Carton's head, but what he

21   understands he is reading.

22             You introduced it into evidence, so he can testify he

23   got it, he had some understanding of it.

24             That's all that it means, ladies and gentlemen.  He

25   can't testify about what is in Mr. Carton's head -- I think you

1      understand that intuitively -- only about what is in his head.

2      Q.  So after you get this e-mail in which Mr. Carton says what

3      he says about his understanding of the agreement -- that's at

4      2:48 p.m. -- and then you have te 3 o'clock meeting, correct?

5                  MR. KOBRE:  Objection.

6                  THE COURT:  Look, the problem is the form of the

7      question.  Your question implies that there was an agreement.

8      OK?  That's an implication that's in your question because he

9      used the word "the agreement".  So, as you know, that's a point

10     of contention here, and there has been testimony from

11     Mr. Mangione there was no agreement.  So let's be careful how

12     we --

13                 MR. GOTTLIEB:  Your Honor, I understand.

14     Q.  Following the receipt of Mr. Carton's e-mail at 2:48 p.m.,

15     you then have the conference call with Brigade, correct?

16     A.  Correct.

17     Q.  And you had not responded to Mr. Carton's 2:48 p.m. e-mail,

18     correct?

19     A.  Correct.

20     Q.  And then your response -- your next communication with him

21     is on that same day, February 1, at 4:42 p.m., correct?

22     A.  I don't know if that was my last communication with him,

23     but that's replying to the e-mail, correct.

24     Q.  Now, you have no reason to believe that there was another

25     e-mail in this thread.  You're not saying there was another

1    e-mail.

2    A.   Not a thread, but we could have had a phone call.

3    Q.   Do you have a recollection of any phone call between the

4    end of the Brigade conference call and sending this e-mail at

5    4:42 p.m.?

6    A.   Not that I recall.

7    Q.   So your next response to Mr. Carton is "let me know when

8    you're going to send the Babs money," correct?

9    A.   Correct.

10   Q.   And Babs is Barbra -- b-r-a -- Streisand, correct?

11   A.   Streisand, correct.

12   Q.   Now, you saw Mr. Carton as a very valuable source of

13   potential business for Barclays and Brooklyn, correct?

14   A.   No.

15   Q.   During this entire period of time that you are talking

16   about, you didn't consider Mr. Carton someone who should be

17   cultivated for potential business?

18   A.   We had a unique relationship with Craig, but we didn't need

19   him for business.

20   Q.   I didn't ask you if you needed him.  Did you view him as a

21   valuable good potential source of business?

22   A.   Not of business, no.

23            THE COURT:  I'm sorry.  Are you saying that you viewed

24   him as being valuable for some other reason?

25            THE WITNESS:  He was valuable because he was a big

1 voice in the marketplace, but we weren't looking to get Craig

2 for financial reasons.

3 Q. Well, being a value source in the marketplace, you didn't

4 view him positively in that regard just because you liked to be

5 rubbing shoulders with a celebrity, correct?

6 A. Correct.

7 Q. You saw him being big in the marketplace, that's the sports

8 marketplace, correct?

9 A. Correct.

10 Q. And being he is valuable and well known in the sports

11 marketplace, you knew that that might -- just might --

12 translate in business for Barclays, correct?

13 A. Correct.

14 Q. Now, you are the chief of staff to Brett Yormark, correct?

15 A. Yes, I was.

16 Q. And you ran the day-to-day operations, ticket sales and

17 sponsorships at Barclays, correct?

18 A. Correct.

19 Q. And you first met Mr. Carton when?

20 A. 2011, 2012, during that time.

21 Q. And you met him under what circumstances?

22 A. Some promotional appearances through WFAN and our

23 partnership.

24 Q. You would have breakfast with him at times, correct?

25 A. Eventually, yeah.

1    Q.  Lunches and dinners, correct?

2    A.  Um-hum.

3    Q.  You have to answer.

4    A.  Yes, correct.

5    Q.  And again you don't do that with all individuals who

6    purchase tickets, do you?

7    A.  We do with partners.

8    Q.  You do it with partners.

9    A.  Um-hum, people we do business with.  He owned the kitchen,

10   you know, so he did some other things with us.

11   Q.  So you viewed Mr. Carton as a partner.

12   A.  It was unique.  It was a unique relationship.

13   Q.  No.  But I asked you, did you view him as a partner?  You

14   used the word partner.

15   A.  We had a unique relationship with Craig.

16   Q.  So you wouldn't view him as a partner?

17   A.  No, we viewed him more as a friend.

18   Q.  You never viewed at any time the relationship as being a

19   "partnership".

20   A.  No.

21   Q.  And you're sure of that.

22   A.  Yes.

23   Q.  Now, over time you began to have discussions with

24   Mr. Carton about his interest in purchasing tickets, correct?

25   A.  No.

IB17CAR1                         Mangione - Cross

1   Q.  Well, did you have any communications with him about

2   purchasing tickets at your facilities?

3   A.  Craig approached us.

4   Q.  And as a result of him approaching you, you had

5   conversations with him, correct?

6   A.  Um-hum.

7   Q.  Right?

8   A.  Correct.

9   Q.  Is it fair to say you had an incredible number of

10  conversations with him beginning in 2015 through 2017, correct?

11  A.  Yes, correct.

12  Q.  And the amount of conversations, the volume of e-mails and

13  telephone calls, exceeded what you typically would have with

14  other purchasers of tickets, correct?

15  A.  Correct.

16  Q.  And at some point Mr. Carton discussed with you his idea,

17  his proposal, of purchasing tickets on a bulk level in

18  partnership with Barclays, correct?

19  A.  He wanted to purchase bulk tickets, correct.

20  Q.  And you understood that part of his proposal, Mr. Carton's

21  proposal, is that if it was successful, Brooklyn, Barclays,

22  would get a percentage of the profits, correct?

23  A.  It was talked about, but it was something we never pursued.

24  Q.  No, no, no.  I simply asked you, Mr. Carton, what

25  Mr. Carton is saying to you.

IB17CAR1                    Mangione - Cross

1    A.  In Mr. Carton's view, yes.

2    Q.  Sir, if I can just ask the question now.  From Mr. Carton's

3    perspective, you understood, and he discussed with you, his

4    idea of purchasing bulk tickets, and if it was successful,

5    Barclays would get a percentage of the profits, correct?

6    A.  In his view, yes.

7    Q.  And you didn't tell him -- when he threw out this proposal,

8    you didn't tell Mr. Carton that is a ridiculous idea.  You

9    didn't say that.

10   A.  Not that I recall.

11   Q.  Well, is there some doubt in your mind as you're sitting

12   here now when you say you don't recall?  Is there some doubt in

13   your mind whether or not you told him it's a ridiculous idea?

14   A.  No, we never wanted any upside from Craig.  When we had

15   tickets available, we sold him tickets.

16        MR. GOTTLIEB:  I didn't ask him that, your Honor.

17   Q.  I didn't ask that.  I'm simply asking you when you say you

18   didn't want any upside, you didn't want to make a profit from

19   ticket sales from Mr. Carton?

20   A.  No.  We're in the business of just selling tickets.

21        THE COURT:  Answer his questions yes or no.  The folks

22   at the front table will have an opportunity to let you expand

23   on anything, but he is going to ask you questions that can be

24   answered yes or no.  Answer them yes or no.

25        THE WITNESS:  Understood.

1    Q.   Your relationship with Mr. Carton was all about a

2    professional relationship, correct?

3    A.   Yes.

4    Q.   You weren't a personal friend of his, correct?

5    A.   We became friends over time.

6    Q.   Also, did you view your relationship as both a personal

7    friendship and a professional business relationship?

8    A.   Yes.

9    Q.   And as a result of that relationship you often discussed

10   his ideas about getting involved in the ticket resale business,

11   correct?

12   A.   Again, he approached us on it, yes.

13           MR. GOTTLIEB:  Please, your Honor.

14           THE COURT:  Yes or no.

15           THE WITNESS:  Yes.

16           THE COURT:  Thank you.

17   Q.   And in fact during this relationship you had with him, you

18   knew that Mr. Carton had a real interest -- had an

19   entrepreneurial interest in other businesses beyond his radio

20   show, correct?

21   A.   Yes.

22   Q.   You told us on direct you learned that he had a business

23   with band aids and getting the logos of teams on band aids?

24   A.   Yes.

25   Q.   That would be attractive to fans of that particular team,

1     correct?

2     A.  Yes.

3     Q.  He opened a concession stand at Barclays, correct?

4     A.  Yes.

5     Q.  Did you learn about his having the exclusive rights to

6     Muhammad Ali's estate to put Muhammad Ali's greatest sayings on

7     jewelry?

8     A.  Yes.

9     Q.  And it was in 2015 that you understand that Mr. Carton

10    began purchasing tickets for resale, correct?

11    A.  Yes.

12    Q.  And at the beginning, isn't it correct that the number of

13    ticket he was purchasing was fairly modest, fairly small,

14    correct?

15    A.  Yes.

16    Q.  Then that beginning changes, does it not, sometime in 2016,

17    specifically what Mr. Carton has an idea to do?

18    A.  Sorry.  Can you repeat the question?

19    Q.  That was a lousy formed question.

20              THE COURT:  It was.

21    Q.  In 2016, isn't that when Mr. Carton began his discussions

22    with you about purchasing a greater bulk number of tickets?

23    A.  As I recall, yes.

24              (Continued on next page)

25

1    BY MR. GOTTLIEB:

2    Q.  He discussed with you purchasing a block of tickets to

3    events that would take place both at Barclays in Brooklyn and

4    at Nassau Coliseum, correct?

5    A.  Correct.

6    Q.  And he told you that his idea was that this bulk purchase

7    would be an investment, correct?

8    A.  Yes.

9    Q.  You understood, beginning in 2016, that his idea is that

10   this investment would hopefully be profitable for him as well

11   as for Barclays, correct?

12   A.  Yes.

13   Q.  Mr. Carton then proceeded to bombard you, did he not, with

14   emails about his plans and how it would be structured?

15   A.  Yes.

16   Q.  In those emails, would you agree, he would often get very,

17   very specific about the number of tickets he would propose to

18   buy and for what shows, correct?

19   A.  Sometimes, yes.

20   Q.  He would actually in some of these emails that have already

21   been received, without going through this, but in some of those

22   emails, he would actually break down how much money could be

23   obtained and profit based on his ideas about his business,

24   correct?

25   A.  Sometimes, yes.

1    Q.  Now, after being the recipient of this bombardment of

2    emails from Mr. Carton day and night, you never once said to

3    him, Craig, stop with the emails.  You never said that,

4    correct?

5    A.  I have told him, yes.

6    Q.  Well, did you tell him stop with the emails because you

7    weren't interested in his idea, or was it because you wanted to

8    get some sleep rather than being --

9    A.  It was a little bit of both.  But as I said, we sold him

10   tickets event by event on what we could sell to him.

11   Q.  OK.  The bottom line is with all these emails and telephone

12   calls where Mr. Carton is sharing with you what his ideas are,

13   did you ever disabuse him of his ideas, his plans about this

14   ticket resell business?

15   A.  I told him it would be event by event on multiple

16   occasions.

17   Q.  See, I didn't ask you that.  Did you ever disabuse him of

18   his grandiose plan about the ticket resale business that he had

19   been discussing?

20   A.  There were occasions, yes.

21   Q.  When did you tell him that it was impossible, it would not

22   work, his plan?

23   A.  I can't recall an exact date off the top of my head.

24   Q.  Mr. Carton specifically in these emails often raised the

25   Barbra Streisand concert, correct?

IB1HCar2                         Mangione - Cross

1    A.   Correct.

2    Q.   The Metallica concert, correct?

3    A.   Correct.

4    Q.   You didn't tell him when he raised Streisand and Metallica

5    that there was no way this could work because they're not even

6    coming to Barclays.  You didn't tell him that, did you?

7    A.   We didn't know that.

8    Q.   You didn't tell him, did you, yes or no?

9    A.   He knew we were in negotiations.

10            THE COURT:  Having seen the evidence that's come in

11   thus far, I think it's fair to allow him to answer the question

12   in the way that he did, all right.

13            MR. GOTTLIEB:  Thank you.

14   Q.   Did you tell him that Streisand was not even in the process

15   of being booked?

16   A.   No.

17   Q.   Did you ever tell him that Metallica was not ever going to

18   be playing at Barclays or Nassau?

19   A.   We didn't know.  We were negotiating.

20   Q.   And in fact, we just saw the government's exhibit, did we

21   not, where you said with regard to Streisand and Metallica in

22   an email that the contract was still being formed, correct?

23   A.   Correct.

24   Q.   So is it fair to say that your statements to Mr. Carton

25   were an indication that Streisand and Metallica were

1   possibilities once the contract was signed, correct?

2   A.   Correct.

3   Q.   Now, you testified about certain agreements that Mr. Carton

4   sent to you on direct examination.  And do you recall, you did

5   see those agreements at the time they were sent, correct?

6   A.   I don't know which agreements you're talking to.

7   Q.   The ticket agreements that you testified to a few moments

8   ago.

9           THE COURT:  You need to show him the document.  There

10  have been many.

11  A.   I've seen some of them, not all of them.

12          THE COURT:  There have been many things labeled

13  "agreement" that have come into evidence, so can we be very

14  specific here.

15          MR. GOTTLIEB:  Yes, I will, your Honor.  Your Honor.

16  I'm going to get to that, then, in a moment to pull it out.

17  Thank you.

18  Q.   With regard to Mr. Carton's investment proposals, would you

19  agree that you determined very early on that there were flaws

20  in his investment proposals?

21  A.   Yes.

22  Q.   And in fact, it got to the point that with what Mr. Carton

23  was proposing, that you actually concluded that it was

24  laughable, correct?

25  A.   Yes.

IB1HCar2                          Mangione - Cross

1    Q.  Did you tell Mr. Carton that you thought his proposals were

2    laughable?

3    A.  No.

4    Q.  Didn't it become clear to you that Mr. Carton's ideas,

5    these proposals, that it appeared that he really had no clue

6    about the intricacies of the ticket selling business?

7    A.  Yes.

8    Q.  In fact, this business of selling tickets and reselling

9    tickets is a very complex business, isn't it?

10   A.  It's harder than people think, yes.

11   Q.  Would you agree that Mr. Carton came across to you as very

12   naive with his ideas?

13   A.  Yes.

14   Q.  Did you ever tell him that his ideas were naive?

15   A.  No.  I said the numbers would be challenging, but the ideas

16   weren't naive.

17   Q.  Fair to say that during this entire period of time we're

18   talking about, Mr. Carton continued to be excited and

19   optimistic about his proposals succeeding, correct?

20   A.  Correct.

21   Q.  You told us that while you listened to his proposals, you

22   never seriously considered his request to buy tickets in bulk

23   because it was impossible to deliver on, correct?

24   A.  Yeah, you never know how many shows are coming in and out

25   of your venues, correct.

1  Q.  Did you ever tell him that it was impossible to deliver on?

2  A.  I never -- I don't know if I used the word "impossible,"

3  but again, I told him I would try to deliver event by event,

4  which I did.

5  Q.  Is it fair to say that in the way you were handling

6  Mr. Carton, you didn't want to turn him off from purchasing

7  tickets from Barclays and Brooklyn, correct?

8  A.  Correct.

9  Q.  You continued to encourage him, did you not?

10  A.  No.

11  Q.  Now, during this entire period of time we're talking about,

12  did you ever even consider entering into a legally binding

13  agreement with Mr. Carton?

14  A.  No.

15  Q.  Did you ever tell him that, sir?

16  A.  Yes, I said we would sell you tickets event by event and

17  accommodate you when we can.

18  Q.  But did you ever tell him specifically that anything beyond

19  that you would never, ever consider?

20  A.  No.

21  Q.  Now, would you describe the way you were handling

22  Mr. Carton, you were placating him, going along with him?

23  A.  No.

24  Q.  Well, you gave him the impression you were interested in

25  what he had to say, didn't you?

1   A.  It wasn't interested.  I was just -- we were going to help

2   event by event if we could accommodate.  It was an

3   accommodation.

4   Q.  So you were accommodating Mr. Carton and his ideas that he

5   was presenting to you.  That was just an accommodation?

6   A.  If we were able to help, yes.

7   Q.  Now, just a few moments ago on direct I believe you

8   indicated that you never had any deal or deals with Mr. Carton,

9   correct?

10   A.  In what regards?

11   Q.  Well, business deals, ticket selling deals?

12   A.  Talking about tickets?

13   Q.  Correct, correct.  You said that, correct?

14   A.  Correct.

15   Q.  And that's true, you never considered that you had any

16   deals with Mr. Carton, correct?

17   A.  Correct.

18   Q.  Also regarding this notion of revenue sharing with

19   Mr. Carton, you never considered that you had a revenue sharing

20   deal with him, correct?

21   A.  We were never paid any revenue share from Craig.

22   Q.  I didn't ask you if you were paid.  Did you consider that

23   you had a revenue sharing deal --

24   A.  No.

25   Q.  -- with Mr. Carton?

IB1HCar2                    Mangione - Cross

1    A.  No.

2            MR. GOTTLIEB:  Can we have Defendant's 16 for the

3    Court and for counsel.

4    Q.  Do you see that up on the screen before you?

5    A.  Yes.

6    Q.  What is that?

7    A.  It's an email from myself to Craig.

8    Q.  And the date on that is November 21, 2016, at 4:26:05 p.m.,

9    correct?

10   A.  Correct.

11           MR. GOTTLIEB:  Your Honor, I ask that be received into

12   evidence.

13           MR. KOBRE:  Objection.  Hearsay.

14           THE COURT:  Overruled.

15           MR. GOTTLIEB:  If we can show that to the jury,

16   please.

17           THE COURT:  Now, ladies and gentlemen, this is being

18   admitted into evidence as a prior inconsistent statement, and I

19   need to explain to you about prior inconsistent statements

20   because they're a special kind of evidence.

21           The testimony in this case is what the witness says

22   here on the witness stand, right, not something that the

23   witness said on some prior occasion.  But if a witness made a

24   different statement on a previous occasion, that could cause

25   you maybe to doubt the truth of what he was saying on the

1    witness stand.  So that's why we allow lawyers to confront

2    witnesses with what lawyers think are prior inconsistent

3    statements.  Sometimes juries don't see any inconsistencies

4    where lawyers do, but that's up to you because you're the fact

5    finder.

6            You can't consider the prior inconsistent statement as

7    evidence in the case.  You can only consider it as you evaluate

8    the credibility of the witness.  It may or it may not undermine

9    the witness' credibility in your minds.  That's why we do this.

10           OK.  Please continue.

11   BY MR. GOTTLIEB:

12   Q.  Mr. Mangione, looking at your email on November 21, 2016,

13   you write to Mr. Carton:  "Hey, they went into the mail late

14   today.  You will have them by Wednesday."

15           First, what are you referring to that "they went into

16   the mail"?

17           THE COURT:  The only reason this is in, for one

18   statement in here, not the rest of it.

19           MR. GOTTLIEB:  Your Honor, the prior colloquy we had,

20   it's also that the entire statement was made, not -- it's not

21   being introduced for prior inconsistent but for that the

22   statement itself is made.

23           THE COURT:  Sorry.  It's admitted for a prior

24   inconsistent statement.  Focus on the alleged inconsistency.

25           MR. GOTTLIEB:  Then we will shoot down to the fourth

1    line:  "This will start the beginning of our deal and the rev

2    share."

3    Q.  So, Mr. Mangione, here you are indicating, as of this

4    moment, it's the start of our deal.  First, who's "our"?  Who

5    does "our" refer to?

6    A.  I guess Barclays and Mr. Carton.

7    Q.  When you say "guess," you wrote it.

8    A.  Yeah, yeah.

9    Q.  What did you mean when you said "our"?

10   A.  Between Barclays and Mr. Carton.

11   Q.  The deal, what's the deal?

12   A.  I don't know.

13   Q.  But you wrote it.

14   A.  Yeah, two years ago.  I don't recall the exact deal.

15   Q.  And then you said, "And the rev share."  What's rev share?

16   A.  Rev share would be a split of profits.

17   Q.  And what deal involving rev share, splitting of profits,

18   are you referring to here?

19   A.  I don't recall.

20   Q.  Thank you.

21          We could take that down.

22          Now, this entire business of Barclays selling blocks

23   of tickets to brokers, other people, for resale for which

24   Barclays would get a share of the profits, would you agree that

25   that's frowned upon in the entertainment business?

IB1HCar2                        Mangione - Cross

1    A.   Yes.

2    Q.   Would you agree that there are many artists out there who

3    object to this reselling business, the profit sharing off of

4    the resale of business?  There are many artists out there who

5    object to it?

6    A.   Yes.

7    Q.   And that if it was widely known out there that Barclays was

8    doing it, would you agree that potentially it could hurt

9    Barclays' reputation?

10   A.   Potentially.

11   Q.   Would you agree that's because selling blocks of tickets to

12   a broker, the public has fewer tickets to purchase at fair

13   market value?

14   A.   That's an industry issue, not just a Barclays issue.

15   Q.   And when Barclays and other venues, businesses that engage

16   in this practice, it causes the price of tickets to escalate

17   for the general public?

18   A.   It does, yes.

19   Q.   Now, did you ever tell Mr. Carton that Barclays would have

20   nothing to do with his plan about reselling tickets because it

21   could hurt Barclays' reputation?  Ever say that to him?

22   A.   I don't recall.

23   Q.   Well, when you say you don't recall, is it that you don't

24   recall you may have or you didn't?

25   A.   I don't recall how specific I may have told him.  I don't.

IB1HCar2                        Mangione - Cross

1   Q.  Now, there came a time that Mr. Carton told you that his

2   plan was that he wanted to invest some $3 million, correct?

3   A.  Correct.

4   Q.  And he told you he wanted to invest $3 million for tickets

5   that would be available to him or his investors, correct?

6   A.  Correct.

7   Q.  And this $3 million is the amount of money that Mr. Carton

8   often discussed with you, that particular number, 3 million,

9   correct?

10  A.  There was a lot of numbers.

11  Q.  Well, would you agree that Mr. Carton repeatedly told him

12  he wanted to invest some $3 million?

13  A.  Give or take, yes.

14  Q.  Now, one of the agreements that you did sign, well,

15  Barclays signed, the company signed, was the all-access

16  agreements, correct?

17  A.  There were some signed.  I don't know how many you're

18  talking about.

19  Q.  And the all-access tickets agreement provided to Mr. Carton

20  specified seats for any and all events at the venue, correct?

21  A.  Yes, specific seats, correct.

22  Q.  Like a season pass to go to the Giants?

23  A.  Correct.

24  Q.  Every Giants game?

25  A.  Correct.

IB1HCar2                              Mangione - Cross

1   Q.   Can you tell us, how many other all-access agreements did

2   Brooklyn, did Barclays, sell?

3   A.   Well, that product was only available in Nassau.

4   Q.   How many of these agreements did Brooklyn sell for the

5   Nassau Coliseum?

6   A.   I don't know what the final number is.

7   Q.   Approximately?

8   A.   I have no idea.  They're still selling them today, I would

9   assume.  I wasn't there.

10  Q.   Let's just talk about the time you were there.

11  A.   Couple hundred seats.

12  Q.   You think it's upwards to couple hundred?

13  A.   Couple hundred probably.

14  Q.   And the all-access agreements, do they not provide for

15  credit card payments?

16  A.   Yes.

17  Q.   In fact, as part of the all-access agreements that were in

18  effect when you were there, there's a page that provides for

19  credit card information so that it could be charged at the time

20  the seats --

21  A.   Yes.

22  Q.   -- or payment is due --

23  A.   Yes.

24  Q.   -- correct?

25  A.   Correct.

IB1HCar2                         Mangione - Cross

1    Q.  Mr. Carton in fact paid on his personal credit card,

2    correct?

3    A.  Correct.

4    Q.  When did the Barbra Streisand tickets first become

5    available for sale?

6    A.  I don't recall the exact date, but it was probably around

7    late winter, early spring.

8    Q.  If we could just look at Government's 2122, please.

9         Government Exhibit 2122, on the top you'll see it

10   indicates that's an email from you to Mr. Carton, correct?

11   A.  Correct.

12   Q.  You indicate Streisand presale is not until the 6th, on

13   sale is the 10th, and then you would be referring to February?

14   A.  Correct.

15   Q.  Then you said but no tickets for Streisand -- doesn't say

16   that, but you're referring to Streisand get sold until the 6th,

17   February 6th, correct?

18   A.  Correct.

19   Q.  Mr. Carton on the thread right below there on January 31,

20   2017, at 11:32 indicates:  "Also, can you please give me

21   clarity on Streisand exact presale date.  Imperative that I

22   have and can start listing to coincide with presale."  He also

23   goes on in that next to last sentence:  I "also give you the

24   new card for all charges," correct?

25   A.  Correct.

1   Q.   Thank you.

2            That can be taken down.  May I have Government

3   Exhibit 2128.

4            This is an email, Government Exhibit 2128, from you to

5   Craig Carton, correct?

6   A.   Correct.

7   Q.   Looking down below on the first part of the thread, on

8   February 15, 2017, at 3:36 a.m., Craig writes:  "Please send me

9   the AA and Metallica locations and suite info as early as

10  possible.  And if there is any way at all to have more than 150

11  tickets, please do what you can," correct?

12  A.   Correct.

13  Q.   And "AA" is what?

14  A.   All access.

15  Q.   Down below the first part of that thread on February 14,

16  2017, at 10:23 p.m., you write to Craig Carton:  "Hey bud,

17  heading to Nassau in a.m., then will be in the office.  My

18  ticket guy was out today, so I'll have info tomorrow.  Have two

19  suites and 20 to 30 more AA.  Can't move them all because they

20  are attached to sponsor deals.  Manilow we will know the

21  inventory tomorrow as well.  We have a call with their

22  production team.  Talk to you then."

23           Then, finally, on the top from you to Mr. Carton,

24  February 15, 2017, at 6:27 a.m., you're responding that early:

25  "Have to remember we are in presale mode.  We cannot move

1    ticket locations per our contract until we are in public and on

2    sale mode which is Friday.  So working on locations today, but

3    will probably be later in the day.  We cannot touch tickets

4    internally until public on sale," correct?

5    A.  Correct.

6    Q.  Thank you.

7            If we could take that down.

8            You were asked questions about that return of the

9    wire, the $2 million wire?

10   A.  Uh-huh.

11   Q.  Now, at about that time, you were in Florida, correct?

12   A.  Correct.

13   Q.  When did you arrive in Florida?

14   A.  I was there for a day, December 16.

15   Q.  And when did you leave?

16   A.  That morning, December 16.

17   Q.  To go to Florida?

18   A.  To go to Florida.  It was a day trip.

19   Q.  And you came back?

20   A.  I came back.

21   Q.  And when you came back, did you get in touch with

22   Mr. Carton?

23   A.  I don't remember.  I arrived late.

24   Q.  Did you tell Mr. Carton -- get in touch with him, telling

25   him that you had arrived and you were back in New York?

1    A.  Not that I'm aware of.

2    Q.  Prior to going down there, do you recall having a

3    discussion with Mr. Carton and informing him that you were

4    going to be going down to Florida?

5    A.  I don't recall, but I may have.  I was going to see the

6    Nets play.  Wasn't really a secret or anything.

7    Q.  Now, you often would have conversations with Mr. Yormark,

8    Brett Yormark, about Mr. Carton's interest in purchasing

9    tickets, correct?

10   A.  Correct.

11   Q.  How often did you have that type of discussion with

12   Mr. Yormark?

13   A.  I'm not sure.

14   Q.  There were a lot of them, right?

15   A.  There were some.

16   Q.  Now, when you discussed with Mr. Yormark any of the plans,

17   do you recall having a conversation with him about Mr. Carton's

18   interest in purchasing Metallica tickets for resale?

19   A.  I don't recall, but I'm sure I did.

20   Q.  Well, do you recall telling the prosecutors, the government

21   in this case, on June 28, 2017, that you and Mr. Yormark,

22   pertaining to a February 13, 2017, email, discussed the amount

23   of tickets they should allow Carton to purchase.  Mangione was

24   cautious, referring to you --

25             MR. KOBRE:  Objection, your Honor.

1            MR. GOTTLIEB:  I withdraw that comment.

2            THE COURT:  Thank you.

3    Q.  You told him that --

4            THE COURT:  Start over again.

5            MR. GOTTLIEB:  I'm sorry?

6            THE COURT:  Just start over again.

7            MR. GOTTLIEB:  OK.

8    Q.  You told them that you had discussed the amount of tickets

9    that you should allow Carton to purchase and that you were

10   cautious because Metallica did not want their tickets to be

11   sold on the secondary market.

12           Do you recall telling the government that?

13   A.  I don't recall.

14   Q.  Would looking at any document help you remember, jog your

15   memory?

16   A.  Yeah.

17           MR. GOTTLIEB:  Your Honor, may I have this marked for

18   identification Defendant's 123.

19           THE COURT:  Defendant's 123 for identification.  He's

20   going to show you this document.  Don't read it.  It's not in

21   evidence.  What you want to do is look at it and see if it jogs

22   your memory as you sit here today.

23           Does that jog your memory on that subject, causes you

24   to remember something that you didn't remember a minute ago?

25           THE WITNESS:  Not really, but....

1           THE COURT:  OK.  Next question.

2   BY MR. GOTTLIEB:

3   Q.  Mr. Mangione, didn't Mr. Carton describe the relationship

4   as a partnership?

5   A.  I'm sorry.  Could you repeat the question.

6   Q.  Didn't Mr. Carton describe the relationship he had with

7   Brooklyn/Barclays as a relationship?

8           MR. KOBRE:  Objection to relevance.

9           THE COURT:  The objection's sustained.  It's hearsay,

10  Mr. Carton's out-of-court statements.

11  Q.  The total amount of money that you indicated Mr. Carton

12  spent on tickets was some $1.5 million?

13  A.  I don't know the total number off the top of my head.

14  Q.  Have you seen any -- were you asked to look at any of

15  Barclays' records concerning the total number of purchases,

16  tickets, that Mr. Carton paid for?

17  A.  I was not.

18          MR. GOTTLIEB:  If we could show Government

19  Exhibit 2136, please, for the Court and for counsel, please.

20  Q.  Do you see it up there now?

21  A.  Yes.

22  Q.  Looking at Government Exhibit 2136, do you recognize what

23  that is?

24  A.  It's events at Barclays.

25  Q.  Do you recognize that as a business record generated,

IB1HCar2                          Mangione - Cross

1    prepared at Barclays?

2    A.  I haven't ever seen it like this, but yes, yes.

3    Q.  Well, please take a look at it.  You've indicated you

4    recognize it as the shows and purchase of tickets at Barclays,

5    correct?

6    A.  Correct.  And there's Nassau too, but correct.

7    Q.  Does that particular document pertain to Mr. Carton's

8    purchase of tickets for Barclays and Nassau?

9    A.  I couldn't confirm it's a hundred percent because I'd have

10   to -- but yeah.

11   Q.  Is that particular document made in the regular course of

12   business at Barclays and kept and retained in the regular

13   course of business at Barclays?

14   A.  I'm sorry.  Could you repeat the question.  I don't know.

15   Q.  Yes.  Is it made in the regular course of business in the

16   financial office at Barclays to keep records like this?

17   A.  Yes.

18   Q.  And records like this and this particular record is then

19   kept and retained in the office, in the files?

20   A.  It's not in our files.  It's in the Ticketmaster system, I

21   mean, yeah.

22           MR. GOTTLIEB:  Your Honor, I ask that be received into

23   evidence, please.

24           MR. KOBRE:  Could I just have one moment, your Honor?

25           THE COURT:  Who created this document?  Did you say

1    Ticketmaster?

2             THE WITNESS:  Wasn't said who created it.

3             MR. GOTTLIEB:  I've asked him whether or not it's from

4    Barclays, your Honor.

5             THE COURT:  Well, OK.  But then he just said

6    Ticketmaster, that's why I'm confused.

7             MR. GOTTLIEB:  I said --

8             THE COURT:  Is this a document that was created at

9    Barclays?

10            THE WITNESS:  I don't know who created this.

11            THE COURT:  Or a document created at Ticketmaster?

12            THE WITNESS:  I don't know who created it.

13            THE COURT:  Then OK.  Objection's sustained.

14   BY MR. GOTTLIEB:

15   Q.  Now, the total number of tickets as far as you know

16   Mr. Carton purchased for shows both at Barclays and Nassau,

17   would you agree it's close to 4,000 tickets?

18   A.  I wouldn't know the number.

19   Q.  Do you have an approximate number, sir?

20   A.  I don't.

21            THE COURT:  Fine.  Let's move on.

22            MR. GOTTLIEB:  With that answer, your Honor, I am.

23   Q.  After December 16, 2016, referring to the time after that

24   date, did you, Barclays, continue to do business with

25   Mr. Carton?

IB1HCar2                         Mangione - Cross

1    A.  Yes.

2    Q.  After that date, December 16, 2016, isn't it true that

3    Mr. Carton purchased some Metallica tickets?

4    A.  No.

5    Q.  When did he purchase the Metallica tickets, sir?

6    A.  The Metallica tickets didn't go on sale until February the

7    prior year.

8    Q.  I'm saying December 16, 2016.  After December 16, 2016.

9    A.  Oh, after.  Correct, went on sale later that winter, yeah.

10   Q.  So after he purchased Metallica tickets?

11   A.  I didn't hear the whole question.

12   Q.  And after that date, December 16, 2016, he purchased Barbra

13   Streisand tickets, correct?

14   A.  He did.

15   Q.  He paid for them, correct?

16   A.  Correct.

17   Q.  Using his credit card, correct?

18   A.  Barbra was some wire, some credit card.

19   Q.  Now, there comes a time that you leave Brooklyn for the

20   Jets?

21   A.  Correct.

22   Q.  And before leaving, do you recall that Mr. Yormark wanted

23   you to meet together with Mr. Carton, together with Paul

24   Kavanaugh?

25   A.  Correct.

IB1HCar2                          Mangione - Cross

1    Q.  And Paul Kavanaugh was coming in to assume some of your

2    responsibilities, correct?

3    A.  Well, he was already working for Brooklyn.

4         THE COURT:  Was he, yes or no?

5         THE WITNESS:  Partial of my responsibilities.

6         THE COURT:  He was going to take on some of your

7    responsibilities?

8         THE WITNESS:  Some, yes.

9         THE COURT:  OK.

10   BY MR. GOTTLIEB:

11   Q.  Do you recall that one of the purposes is that you didn't

12   want to lose Mr. Carton as somebody who was a potential source

13   of business, correct?

14   A.  Incorrect.

15   Q.  The purpose of the meeting with Mr. Kavanaugh was what?

16   A.  Just -- just to let Craig know that I was leaving, and any

17   potential purchases in the future, that Paul would manage for

18   him.

19   Q.  So part of the purpose of this meeting was to let

20   Mr. Carton know that any future purchases would not be handled

21   by you but by Paul Kavanaugh, correct?

22   A.  Correct.

23        MR. GOTTLIEB:  Your Honor, I don't know what you want

24   to do.  I have just a number of exhibits that I'm going to be

25   going through now.  I don't know if you want to take a break.

IB1HCar2                         Mangione – Cross

1              THE COURT:  Let's take a short break, folks.  Don't

2    discuss the case.  Keep an open mind.

3              (Jury excused)

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IB1HCar2                         Mangione - Cross

1                (Jury not present)

2                THE COURT:  Let's try to make this short.  You've got

3      your pile of exhibits.  How much more do you have with

4      Mr. Mangione?

5                MR. GOTTLIEB:  I'm going to reduce the pile right now.

6      I think, your Honor, probably 20 minutes.

7                THE COURT:  Good.  Take advantage of this break.

8                MR. QUIGLEY:  Your Honor, just so you're aware, we've

9      handed up some emails to Mr. O'Neill that we've --

10               THE COURT:  Which I've looked at, and there's one that

11     I have a question about.  And it's Government Exhibit 542, a

12     lot of names I never heard of.  I'll be back.

13               MR. QUIGLEY:  Thank you, your Honor.  We'll hold off

14     on offering that now.

15               (Recess)

16               (Continued on next page)

17

18

19

20

21

22

23

24

25

1              (Jury present)

2                   THE COURT:  Still under oath, sir.

3                   THE WITNESS:  Yes, your Honor.

4                   THE COURT:  All right.

5                   MR. GOTTLIEB:  Thank you.

6      BY MR. GOTTLIEB:

7      Q.  Mr. Mangione, do you recall during cross-examination that

8      you told the jury that you never told Mr. Carton that you

9      considered to be in partnership with him, correct?

10     A.  Correct.

11     Q.  In fact, I think you actually said when I asked are you

12     sure, you said "yes," correct?

13     A.  Correct.

14                  MR. GOTTLIEB:  If we could have Defendant's 95 for

15     identification, please, for the Court and for counsel.

16     Q.  Do you see it up there in front of you?

17     A.  Yes.

18     Q.  Looking at Defendant's 95, what is that?

19     A.  An email.

20     Q.  From who?

21     A.  Myself.

22     Q.  To who?

23     A.  Craig.

24     Q.  On December 24, 2015, correct?

25     A.  Correct.

1          MR. GOTTLIEB:  Your Honor, I ask that that be received

2    in evidence.

3          MR. KOBRE:  Not for the truth, your Honor.

4          THE COURT:  As a prior inconsistent statement, yes,

5    under that rule, it's received.

6          (Defendant's Exhibit 95 received in evidence)

7          MR. GOTTLIEB:  Display to the jury.

8    Q.  Mr. Mangione, taking a look at Defendant's 95, you were

9    wrong about never conveying or telling Mr. Carton that you

10   considered the relationship to be a partnership, correct?

11   A.  Correct.

12   Q.  In fact, going as early as December 24, 2015, is it fair to

13   say that based on all of your emails back and forth and

14   telephone calls, that led you to say on that day, "Appreciate

15   the partnership and let's connect soon," correct?

16   A.  There was not really anything going on regarding the

17   tickets at this point.

18   Q.  See, now I didn't ask you that.  I simply said and asked

19   you --

20   A.  We had a relationship with the kitchen at this point.

21   Q.  Mr. Mangione.

22          THE COURT:  Look, I told you, you answer his questions

23   yes or no.  I'll guarantee you Mr. Kobre will ask you some

24   follow-up questions.  Guarantee.

25          THE WITNESS:  Understood.

1            THE COURT:  I can predict it with great certainty.

2            THE WITNESS:  Understood.

3    BY MR. GOTTLIEB:

4    Q.  Fair to say that as early as December 24, 2015, you

5    conveyed to Mr. Carton that you considered the relationship you

6    had a partnership, correct?

7    A.  Yes.

8    Q.  Thank you.

9            Take that off.

10           Looking at Defendant's 1 for identification.  Now,

11   Mr. Mangione, before asking any questions about this, the way

12   you communicated most of all with Mr. Carton was by way of

13   email, correct?

14   A.  A lot of phone calls.

15   Q.  But there were more emails than phone calls, wouldn't you

16   say?

17   A.  Correct.

18   Q.  The way that you conveyed to him what you wanted to convey

19   to him about the business relationship oftentimes was by way of

20   email, correct?

21   A.  Correct.

22   Q.  Now, this document, Defendant's 1, is an email to

23   Mr. Carton from you in April, going back to April 29, 2015,

24   correct?

25   A.  That's what it says, correct.

1          MR. GOTTLIEB:  Your Honor, I ask that this be received

2     in evidence.

3          MR. KOBRE:  No objection.

4          THE COURT:  Admitted.

5          MR. GOTTLIEB:  Your Honor, again -- thank you.

6          (Defendant's Exhibit 1 received in evidence)

7     BY MR. GOTTLIEB:

8     Q.  Just looking at this, going back to April 29 of 2015, on

9     the bottom at 5:15 p.m., you write to Mr. Carton:  "Craig,

10    Brett hit me up about chatting about your ticket idea.  I'll

11    work on getting us on a call to try and run out.  Thanks."

12         It's fair to say you're referring to Brett Yormark?

13    A.  Correct.

14    Q.  Thank you.

15         You could take that off.

16         Looking at Defendant's 6 for Her Honor and counsel.

17    Now, again, here before we look at it, Mr. Mangione, is it fair

18    to say that Barclays didn't sell tickets to Mr. Carton only

19    when he would pick up the phone or send an email saying that I

20    want this number of tickets for this particular date, correct?

21    A.  No.

22    Q.  In fact, Barclays, you in particular, oftentimes would

23    reach out to Mr. Carton and offer a lot of tickets to him,

24    correct?

25    A.  Incorrect.

IB1HCar2                          Mangione - Cross

1    Q.  So looking at Defendant's 6, is this an email to Mr. Carton

2    from you May 11, 2016, at 2:50:21 p.m.?  Yes?

3    A.  I see it, yes.

4            MR. GOTTLIEB:  Your Honor, I ask that this be received

5    in evidence.

6            MR. KOBRE:  Objection, your Honor.  Rule of

7    completeness.  The bottom email explains the context.

8            THE COURT:  Overruled.  Overruled.  Then you do it on

9    redirect, OK, Mr. Kobre.  You go right ahead.

10            MR. KOBRE:  Yes, Judge.

11            MR. GOTTLIEB:  Ask that it be received, your Honor.

12            THE COURT:  Admitted.

13            (Defendant's Exhibit 6 received in evidence)

14   BY MR. GOTTLIEB:

15   Q.  Showing to the jury, looking at Defendant's 6, here you say

16   CC, that's Craig Carton, correct?

17   A.  Correct.

18   Q.  You say:  "Here are the next 15 events we have availability

19   for.  Just wanted to make sure you were OK before I processed.

20   Only thing missing is first night of Bad Boy and Summer Slam.

21   We are dry on both.  Thanks."

22            Then you list all sorts of concerts that are upcoming,

23   correct?

24   A.  Correct.

25   Q.  And you're conveying in this email, hey, listen, if you

IB1HCar2                    Mangione - Cross

1   want to buy more than one or two tickets, here are the events

2   coming up available to purchase, correct?

3   A.   Just listing the events, correct.

4   Q.   Thank you.

5        You can take that down.

6        Finally, looking at Defendant's 33 for the Court and

7   for counsel.  Now, again, as to the question of Barclays going

8   out of its way to reach out to Mr. Carton for the purpose of

9   encouraging him to purchase tickets, you would send him emails,

10  wouldn't you?

11  A.   No.

12  Q.   You would send him emails, would you not, giving him

13  updates on future events as we just saw?

14  A.   Yes.

15  Q.   And you hoped that by providing this information, he would

16  be interested and purchase a lot of tickets, correct?

17  A.   No.

18  Q.   You weren't interested in having him purchase a lot of

19  tickets?

20  A.   No.

21       MR. GOTTLIEB:  Your Honor, I have no further

22  questions.  Thank you.

23       THE COURT:  Mr. Kobre.

24       MR. KOBRE:  Just briefly, your Honor.  And if I might

25  have just one moment?

1              THE COURT:  Yes.

2              (Counsel confer)

3    REDIRECT EXAMINATION

4    BY MR. KOBRE:

5    Q.  Mr. Mangione, do you recall you were just shown by defense

6    counsel, you were asked about an email relating to a series of

7    tickets that you sent to Mr. Carton?  Do you remember that?

8    A.  Just saw it, yes.

9    Q.  And if I can show you -- if we can just put up the redacted

10   version Defendant's Exhibit 6 that you were just shown.

11             THE COURT:  Pull that microphone in, Mr. Kobre.

12             MR. KOBRE:  If we can show the witness and counsel and

13   the judge the unredacted version of Defense Exhibit 6.

14             THE COURT:  OK.

15             MR. KOBRE:  Now, your Honor, we offer this under the

16   rule of completeness.

17             MR. GOTTLIEB:  Your Honor, may we have a short

18   sidebar, please?

19             THE COURT:  No, we may not.  It's in.

20             MR. KOBRE:  Thank you, Judge.

21             (Defendant's Exhibit 6 unredacted received in

22   evidence)

23             MR. KOBRE:  Focusing first, Mr. Urbanczyk, on the

24   first top half of this email.

25   Q.  Now, this was the portion of the email that you were shown

```
 1    by defense counsel, correct?

 2    A.  Correct.

 3    Q.  And you were asked whether you were the one who initiated

 4    in sending this email to Mr. Carton, initiated the selling of

 5    these tickets that are described here to Mr. Carton, correct?

 6    A.  Correct.

 7    Q.  Zooming back out, sir, was that true?

 8    A.  No.

 9    Q.  If we could just enlarge the lower portion of the email.

10              MR. GOTTLIEB:  Your Honor, objection.

11              THE COURT:  The objection -- it's now in evidence.

12    Sorry, Mr. Gottlieb.

13    Q.  This is an email from Mr. Carton to you earlier that day.

14    Can you just read it for us, please.

15    A.  "Would you kindly sell me 20 best-available tickets to your

16    next 15 events.  Happy to explain."

17    Q.  So the email above that, why did you send that email to

18    Mr. Carton?

19    A.  Craig requested the next 15 events.

20              MR. KOBRE:  If we can put up Defense Exhibit 95.

21              We'll have it in just a moment, your Honor.

22    Q.  And you were asked -- do you remember this email,

23    Mr. Mangione, Defense Exhibit 95?  It's an email from you to

24    Mr. Carton on December 24, 2015.

25    A.  Yes.
```

1   Q.  In the email you wrote you appreciate the partnership and

2   let's connect soon.  Could you explain what you were referring

3   to there.

4   A.  Just the relationship we had with each other.

5   Q.  What, if any, business relationship did you have with

6   Mr. Carton in December of 2015?

7   A.  At that point it was still the kitchen.  I don't recall if

8   we still had the Greek stand or anything else.

9   Q.  At that period of time, were you selling Mr. Carton any

10  significant amount of tickets?

11  A.  No, there were only a couple shows at that point.

12  Q.  And what about in terms of just the number of tickets?

13  A.  There were minimal.

14          MR. KOBRE:  OK.  We can take that down.

15  Q.  Did you remember you were also asked, Mr. Mangione, a

16  series of questions about whether you had ever told

17  Mr. Carton -- outright rejected Mr. Carton's proposal about

18  purchasing bulk tickets.  Do you remember that?

19  A.  Yes.

20          MR. KOBRE:  Could we put up Government Exhibit 2111.

21  In this email, if we can just enlarge from the top of the page

22  down through two-thirds, sent from my iPhone.

23  Q.  In the lower email, Mr. Carton's asking -- tells you he's

24  going to ask my investor for $3 million for it.  Do you

25  remember, by the way, what the "it" is referring to here?

1   A.  It was for the Metallica show.

2   Q.  OK.  How did you respond to Mr. Carton?

3   A.  My response was:  "OK.  Just want to make sure you know the

4   structure can change.  So don't want to put you in a tough spot

5   if economics change."

6   Q.  And what was the tough spot that you were referring to

7   Mr. Carton would be in if the economics change?

8   A.  I just didn't want Craig to promise something that we

9   couldn't deliver.

10  Q.  What would that something be?

11  A.  That he can buy a certain amount of tickets.

12          MR. KOBRE:  If we can put up Government Exhibit 2103,

13  the second page, and just enlarging the first full email on the

14  page, which is at 4:05 p.m.

15  Q.  This is an email from you to Mr. Carton on October 18.  And

16  you say in this email you're working with the box office, and

17  the issue is the zones you want, we actually do not control.

18          What were you referring to there when you wrote that

19  to Mr. Carton?

20  A.  Seating locations he requested.

21  Q.  And what about them?

22  A.  That some of the seating locations he requested are not in

23  our control.

24          MR. KOBRE:  If we can now just take a look at

25  Government Exhibit 2128 and just enlarge the top email, if we

1    can.

2    Q.  Do you remember being shown this on cross-examination?

3    A.  Yes.

4    Q.  It's an email from you to Mr. Carton on February 15, 2017,

5    and you wrote to Mr. Carton:  "Have to remember we are in

6    presale mode.  We cannot move ticket locations per our contract

7    until we are in public on sale mode, which is Friday."

8           Just to clarify, when you wrote "our contract," what

9    contract were you referring to there?

10   A.  It was our contract with the promoter.

11   Q.  And who was the promoter?

12   A.  Live Nation.

13          MR. KOBRE:  Could I just have one moment, Your Honor?

14          THE COURT:  Yes.

15          (Counsel confer)

16          MR. KOBRE:  Nothing further.

17          THE COURT:  Any recross?

18          MR. GOTTLIEB:  No, your Honor.  Thank you.

19          THE COURT:  Good bye, Mr. Mangione.

20          THE WITNESS:  Thanks, your Honor.

21          (Witness excused)

22          THE COURT:  I think you have a short witness now.

23          MR. QUIGLEY:  No, your Honor, we're not calling that

24   custodian.  Our next witness is longer.  We'd like to offer

25   instead two stipulations.

1            THE COURT:  OK.

2            MR. QUIGLEY:  We offer Government Exhibit 3 and 4.

3            THE COURT:  Government Exhibit 3.  It is hereby

4    stipulated and agreed by and between the usual suspects that:

5            1.  RWBB Management Limited is Resorts World Bimini, a

6    casino.

7            2.  Paradise Enterprises is Atlantis Paradise Island,

8    also a casino.

9            3.  The parties further stipulate and agree that this

10   stipulation may be received into evidence as a government

11   exhibit at trial, which it is.

12           (Government's Exhibit 3 received in evidence)

13           THE COURT:  Government Exhibit 4.  It is hereby

14   stipulated and agreed by and between the usual suspects that:

15           1.  Government Exhibit 50 consists of data stored on a

16   cellular telephone obtained from Joseph Meli on or about

17   January 27, 2017.

18           2.  Exhibit 51 consists of data stored on a cellular

19   telephone obtained from Craig Carton on or about September 6,

20   2017.

21           3.  Government Exhibit 52 consists of data stored on a

22   cellular telephone obtained from Michael Wright on or about

23   September 6, 2017.

24           4.  The parties further stipulate and agree that this

25   stipulation may be received into evidence.

1              And it is so received as Government Exhibit 4.

2              (Government's Exhibit 4 received in evidence)

3              THE COURT:  Next.

4              MR. QUIGLEY:  Your Honor, we'd like to offer several

5    emails into evidence which we gave to your Honor before.

6              THE COURT:  OK.  So one by one, please.

7              MR. QUIGLEY:  Your Honor, the government offers

8    Government Exhibit 224.

9              THE COURT:  Any objection?

10             MR. JANEY:  No objection, your Honor.

11             THE COURT:  Admitted.

12             (Government's Exhibit 224 received in evidence)

13             MR. QUIGLEY:  226.

14             MR. JANEY:  No objection, your Honor.

15             THE COURT:  Admitted.

16             (Government's Exhibit 226 received in evidence)

17             MR. QUIGLEY:  228.

18             MR. JANEY:  No objection, your Honor.

19             THE COURT:  Admitted.

20             (Government's Exhibit 228 received in evidence)

21             MR. QUIGLEY:  248, your Honor.

22             THE COURT:  248?

23             MR. QUIGLEY:  I'm sorry.

24             THE COURT:  The one I have is 276.  Oh, there's 248.

25   Sorry.

1           MR. QUIGLEY:  248.

2           THE COURT:  248.

3           MR. JANEY:  No objection, your Honor.

4           THE COURT:  Admitted.

5           (Government's Exhibit 248 received in evidence)

6           MR. QUIGLEY:  281.

7           THE COURT:  Not 276?

8           MR. QUIGLEY:  We offer 276 also.

9           THE COURT:  I don't know.

10          MR. QUIGLEY:  We're offering, yes, 276.  Sorry.

11          THE COURT:  I think they're trying to get a copy of

12     it.

13          MR. GOTTLIEB:  276?

14          MR. JANEY:  No objection, your Honor.

15          THE COURT:  Admitted.

16          (Government's Exhibit 276 received in evidence)

17          MR. QUIGLEY:  All right.  281, your Honor.

18          MR. JANEY:  No objection, your Honor.

19          THE COURT:  Admitted.

20          (Government's Exhibit 281 received in evidence)

21          MR. QUIGLEY:  283.

22          MR. JANEY:  No objection, your Honor.

23          MR. QUIGLEY:  286.

24          MR. JANEY:  No objection, your Honor.

25          MR. QUIGLEY:  295.

```
 1            MR. JANEY:  No objection.

 2            MR. QUIGLEY:  297.

 3            MR. JANEY:  No objection.

 4            MR. QUIGLEY:  539.

 5            MR. JANEY:  No objection.

 6            MR. QUIGLEY:  280.

 7            MR. JANEY:  No objection.

 8            THE COURT:  280?

 9            MR. QUIGLEY:  Sorry, your Honor.  Yes.  We're not

10    offering 543 and 545 at this time.  And that's all for know.

11            THE COURT:  That's all for this round?

12            MR. QUIGLEY:  Yes.

13            THE COURT:  They're admitted.

14            (Government's Exhibits 280, 283, 286, 295, 297, and

15    539 received in evidence)

16            MR. QUIGLEY:  I'm sorry, your Honor.  Few more.  732.

17            MR. JANEY:  No objection.

18            THE COURT:  Admitted.

19            (Government's Exhibit 732 received in evidence)

20            MR. QUIGLEY:  736.

21            MR. JANEY:  No objection.

22            THE COURT:  Admitted.

23            (Government's Exhibit 736 received in evidence)

24            MR. QUIGLEY:  738.

25            MR. JANEY:  No objection.
```

1              THE COURT:  Admitted.

2              (Government's Exhibit 738 received in evidence)

3              MR. QUIGLEY:  739.

4              MR. JANEY:  No objection.

5              THE COURT:  Admitted.

6              (Government's Exhibit 739 received in evidence)

7              MR. QUIGLEY:  741.

8              MR. JANEY:  No objection.

9              THE COURT:  Admitted.  OK.

10             (Government's Exhibit 741 received in evidence)

11             MR. QUIGLEY:  Your Honor, we'd publish certain of them

12       at this time through email reader.

13             THE COURT:  Yes, yes.  OK.

14             (Continued on next page)

IB17CAR3

1   BY MR. QUIGLEY:

2   Q.  Mr. Cooney, can you publish what is in evidence as

3   Government Exhibit 295.

4           And can you read this, Mr. Urbanczyk, beginning with

5   the bottom e-mail on October 12, 2016.

6   A.  Sure.  It's an e-mail from Michael Wright to Craig Carton

7   on October 12, 2016, and the subject is Don't Stop Believin.

8           The e-mail reads, "I don't stop believing in you, you

9   have a relentless will.  You have a desire to sacrifice

10  yourself for others so you can keep them employed and stand by

11  your word.  My concern is getting deeper that we are when

12  payments will be due to some that won't take a refi.  I've

13  started peppering a refi to our investors, as you know it's a

14  game.  We have big debt and more sources have been refi'd a

15  couple times so there is concern.  I'll see what I can scrape."

16          THE COURT:  I am sorry.  Can you spell refi.

17          THE WITNESS:  Sure.  Refi is R-e-f-i.

18          MR. QUIGLEY:  I think it's refi, your Honor.

19          THE COURT:  Well, I do too.  I was trying to figure it

20  out.

21  Q.  Thank you.  What's the date on this e-mail?

22          Highlight this e-mail, Mr. Cooney.  Take that down.

23          And can we publish what is already in evidence as

24  Government Exhibit 712.  And just highlight the header

25  information on the top.  And can you read the header

IB17CAR3

1    information on the bottom e-mail, Mr. Urbanczyk.

2    A.  Sure.  It says:  From:  Doug Pardon.  Date:  October 26,

3    2016.  To:  Labs123@aol.com.  Cc'ing Chris Chaice, John Baylis,

4    Tyler Williams-Sinclair.  And the subject is term sheet.

5    Q.  Can you read the header information above that?

6    A.  It says from Craigs labs123@aol.com.  Sent 10/16/2016 to

7    Joseph Meli, Michael, mw@sgroupnyc.com.  Subject:  Confidential

8    term sheet.  And there appears there is an attachment, Tickets

9    Term Sheet, and untitled attachment.

10   Q.  Can we publish what is in evidence as Government Exhibit

11   276.

12            And can you read the e-mail beginning from Craig

13   Carton on December 5, 2016, 9:59 a.m.

14   A.  Sure.  "What we really need is not the overall agreement as

15   we did that yesterday.  We need a template for specific show

16   investment.  So AE has the rights to buy" -- and then there is

17   a blank line and dollar signs -- "of tickets to ___ show.  Per

18   signed agreement TJ has the right to buy X amount of tickets as

19   a coinvestment with Advance."

20   Q.  Read the e-mail above that.

21   A.  It's an e-mail on December 5, 2016 from David Molner.  It

22   says, "Here is the purchase agreement for Roger Waters, as an

23   example."

24   Q.  Can you read the e-mail above that.

25   A.  Sure.  It's from Craig, labs123@aol.com, to David Molner,

IB17CAR3

1   and it says, "Please change the amount to $10 million from $3
2   million."
3   Q.  If you could take that down and publish what is in evidence
4   as Government Exhibit 732.
5        Can you read beginning at the bottom e-mail from Craig
6   Carton.
7   A.  Sure.  It's from Craig Carton to wm@sgroupnyc.com on
8   December 5, 2016.  Subject -- I believe it's "important," but
9   there is AOMPORTANT.  The body reads, "I need Tier One company
10  info assets and connection to Ticket Jones ASAP."
11  Q.  And go to the next e-mail in the chain.
12  A.  It's from Michael to Craig Carton on December 5, 2016.
13  Subject:  Re: IOMPORTANT.
14       "Assets like zero but will provide when not driving."
15  Q.  And the e-mail above that.
16  A.  It's from Craig Carton, labs123@aol.com, to
17  mw@sgroupnyc.com.  Subject is the same.  Body says, "Thanks.
18  Also need company info address etc.  I will explain that you
19  are CFO of Ticket Jones and Misoluki and we put your name to
20  protect me radio wise."
21  Q.  Take that down.  Can we put up in evidence what is
22  Government Exhibit 736.
23       Can you read this e-mail?
24  A.  From Craig Carton, labs123@aol.com, sent on December 5,
25  2016 to jmeli74@gmail.com and mw@sgroupnyc.com.  The body

IB17CAR3

1    reads, "Ron DelGaudio:  $970,000 December 20.  Harvey Klein:

2    $550,000 this Friday.  Sands:  $280,000 ASAP.  If we add band

3    aids etc.:  $250,000."

4    Q.  Put up what is in evidence as Government Exhibit 738.

5         Can you read from the header information on down.

6    A.  It says from Craig, labs123@aol.com.  It was sent on

7    December 8, 2016 to Michael, mw@sgroupnyc.com, and Joseph Meli,

8    jmeli74@gmail.com.  Subject:  Congrats.

9         The body of the e-mail reads, "Deal is done.  Funding

10   coming per below.  Saving money for Metallica and Dead and Co

11   deals as well.  $700,000 split:  Katy Perry, 300K down payment

12   for $3 million of tickets; Justin Bieber, 200K down payment for

13   $2 million of tickets; Ariana Grande, 100K down payment for $1

14   million of tickets; Roger Waters, 100K down payment for $1

15   million of tickets.

16   Q.  Can we put up what is in evidence as Government Exhibit

17   739.

18        And can you read the bottom e-mail up.

19   A.  Sure.  The bottom e-mail is from Craig, labs123@aol.com.

20   It was sent on Thursday, December 8, 2016 to Craig Malakauskas,

21   Michael and Joseph Meli.  Subject:  Wire.

22        The body of the e-mail reads, "Greg, please send wire

23   info for AdvanceM."

24   Q.  Take that down.  And can we put up what is in evidence as

25   Government Exhibit 741.

IB17CAR3

1          And can you read the bottom e-mail from Craig Carton.

2     A.  Sure.  It's December 1, 2016 from Craig Carton, it says,

3     "Allow this letter to serve as a personal promissory note from

4     Craig Carton to Harvey Klein in regards to Mr. Klein making a

5     short term loan of no less than $500,000 (five hundred thousand

6     dollars) and no more than $1 million (one million dollars) from

7     Mr. Carton's ticket business.  Mr. Carton will return the full

8     amount of the loan plus 10 percent no later than December 12,

9     2016, and is personally guaranteeing the return regardless of

10    the outcome of the businesses success.  As per previous

11    agreements this business loan is also being personally secured

12    by Michael Wright.  Mr. Klein will wire the funds into the

13    agreed upon account the morning of Friday December 2, 2016.

14    Regards, Craig Carton."

15    Q.  Take that down.  And can we just highlight the next e-mail

16    in the chain.  Can you read the first two paragraphs?

17    A.  Sure.  It's from Harvey Klein to Craig Carton and

18    mw@sgroupnyc.  Subject:  Re: Le Chaim.

19          It says "Hi Craig, here are the wiring instructions

20    for the $500K loan payback tomorrow."

21    Q.  Can you read the date on this e-mail?

22    A.  December 11, 2016.

23    Q.  And can you read the e-mail above that.

24    A.  From Craig to Michael.  Subject:  Fwd: Le Chaim.

25          The body reads, "Please do as soon as you get up."

IB17CAR3

Q.  Take that one down.  Finally, can we publish what is in

evidence as Government Exhibit 248.

        Can you read the bottom e-mail first.

A.  Sure.  It is from Michael Wright to Joe Meli and Craig

Carton on December 13, 2016.  Subject:  Investments.

        It says, "2 investments are coming that are non

refi-able.  Cbm is owed $750K paper on 12/20.  DesiSea group is

$966K on 12/22.  All debt in their minds was assumed by Joe

Meli and AE.  Michael."

Q.  And read the e-mail above that.

A.  Sure.  It's from Craig Carton to

Michaelawrightnyc@gmail.com and jmeli74@gmail.com.  Re:

investments.

        The body reads, "Add Ron to that $500 of principal

left and then $270 interest.  I'm trying to bring in $3 million

this week for Metallica and Dead and Co.

        "Assuming I do, can we count on DEzi to reinvest in

January to allow us to buy tickets."

Q.  Thank you, Mr. Urbanczyk.

        I have no further e-mails to publish at this time.  Do

you want us to call a witness?  He's a somewhat lengthy

witness.

        THE COURT:  OK.  So let's go have lunch, and we will

be back at 2 o'clock, and we will have the government's next

witness.  Don't discuss the case; keep an open mind.

IB17CAR3

 1          (Jury not present)

 2          THE COURT:  OK.

 3          MR. KOBRE:  Your Honor, just one very quick thing.  I

 4     just wanted to alert the Court there is going to be another

 5     witness testifying in the afternoon, a short witness, for whom

 6     we expect to ask the Court to enter an order of immunity, so I

 7     just wanted to let the Court know whenever you want to take

 8     that up.

 9          THE COURT:  I want to take it up before I bring the

10     jurors out, so I don't have to send them back.  I mean I don't

11     know how long your next witness is.

12          MR. QUIGLEY:  He is probably about 45 minutes on

13     direct.  I don't know how much cross there is, but I think we

14     will get to it -- assuming there is not more than an hour and a

15     half of cross, we will get to the next witness this afternoon.

16          THE COURT:  OK.  Well, then we will do your witness,

17     send the jury out on an afternoon break and do the immunity

18     order.

19          (Luncheon recess)

20          (Continued on next page)

21

22

23

24

25

1                          AFTERNOON SESSION

2                              2:11 p.m.

3              (In open court; jury present)

4              THE COURT:  Call your next witness, please.

5              MR. QUIGLEY:  Your Honor, the government calls Ron

6      DelGaudio.

7      RONALD DELGAUDIO,

8           called as a witness by the Government,

9           having been duly sworn, testified as follows:

10     DIRECT EXAMINATION

11     BY MR. QUIGLEY:

12     Q.  Mr. DelGaudio, what do you do for a living?

13     A.  I'm a pharmacist and have my own pharmacies.

14     Q.  Where are you from originally?

15     A.  Brooklyn, New York.

16     Q.  When did you start out working as a pharmacist?

17     A.  In 1979.

18     Q.  You said you had several of your own pharmacies.  When did

19     you start owning pharmacy?

20     A.  1983.

21     Q.  How many pharmacies do you currently own?

22     A.  Four.

23     Q.  Where are they located?

24     A.  Three are in Brooklyn and one is in Manhattan.

25     Q.  I want to focus your attention on 2016 and 2017.  Did you

IB1HCar1                         DelGaudio - Direct

1   invest money with anyone named Craig Carton?

2   A.  Yes, I did.

3   Q.  And how did you first meet Mr. Carton?

4   A.  I met Mr. Carton through a friend of mine, a colleague who

5   introduced me to Craig about a Band-Aid idea that he had he

6   wanted help with.

7   Q.  What was your colleague's name?

8   A.  Doug Krampel.

9   Q.  Had you heard of Mr. Carton before you were introduced to

10  him?

11  A.  From the radio, yes.

12  Q.  When did you first meet the defendant?

13  A.  In my pharmacy in Park Slope, Brooklyn.

14  Q.  When was that?

15  A.  August of 2016.

16  Q.  Was anyone else at the meeting that you recall?

17  A.  I'm sorry?

18  Q.  Was anyone else at the meeting that you recall?

19  A.  I don't -- Craig and his associate.

20  Q.  Generally at this meeting in August 2016, what did you

21  discuss?

22  A.  The fact that he had these CureIt Band-Aids that he wanted

23  to help with.  And I had access to some of the large drug

24  distributors, and he was looking for access to that and also

25  other investments that he may be able to get into.

1    Q.   So focusing on the Band-Aid idea for a second, what, if

2    anything, did you do with respect to this idea with respect to

3    Band-Aids?

4    A.   I took the information and I contacted McKesson Corporation

5    and their product division and told them about it, and I gave

6    him some information that he needs to contact to start that

7    process going.  They were interested.

8    Q.   You said I gave him information.  Who were you referring

9    to?

10   A.   I gave information to Mr. Carton.

11   Q.   To your knowledge, did anything become of that Band-Aid

12   investment?

13   A.   Not that I'm aware of.

14   Q.   Now, in addition to the Band-Aid idea, did you also

15   discuss -- what other investments did you discuss at this

16   meeting in August 2016?

17   A.   He discussed that he had access to tickets for concerts,

18   such as the Adele tour concert that was coming up.

19   Q.   Again, when you say "he," who are you referring to?

20   A.   Mr. Carton, Craig Carton.

21   Q.   Were you interested in this ticket investment with

22   Mr. Carton?

23   A.   Did I?  Yes.

24   Q.   Why were you interested in it?

25   A.   Well, Adele was a very -- she was a superstar right then

1    and there.  She was coming in and doing a tour, and he had

2    claimed that he got tickets at face value and could resell them

3    at a profit.

4    Q.  When you say "he," who are you referring to?

5    A.  Craig Carton.

6    Q.  How did this August meeting leave off in terms of the

7    potential ticket investment?

8    A.  Craig got back to me regarding the access to the tickets

9    and when he was going to give me the details on.

10   Q.  Did there come a time when he sent you a draft agreement

11   for the tickets?

12   A.  Yes.

13   Q.  So I'd like to show for the witness the lawyers and the

14   judge only Government's Exhibit 546.

15          Do you recognize this document, Mr. DelGaudio?

16   A.  Yes.

17   Q.  What is it?

18   A.  That's a funding agreement with myself, with Craig, and the

19   Adele concert tickets.

20          MR. QUIGLEY:  Your Honor, the government offers

21   Government's Exhibit 546.

22   A.  546.

23          THE COURT:  Any objection?

24          MR. JANEY:  No objection, your Honor.

25          THE COURT:  Admitted.

1            MR. QUIGLEY:  Could we publish it for the jury.

2            (Government's Exhibit 546 received in evidence)

3   BY MR. QUIGLEY:

4   Q.  So what's the date on this email, Mr. DelGaudio?

5   A.  August 17.

6   Q.  And who's it from?

7   A.  Craig Carton.

8   Q.  And who's it to?

9   A.  I'm sorry?

10  Q.  Who are the recipients of the email?

11  A.  It's Adele agreement, the Adele tickets.

12  Q.  Who's on the "to" line of the email?

13  A.  I can't hear you.  I'm sorry.

14           THE COURT:  Who was the email addressed to?

15           THE WITNESS:  Oh, it's addressed to Scott Mannes.

16  Q.  That's smannes1@optonline.net?

17  A.  Yes.

18  Q.  And who is the other recipient, rondel1?

19  A.  Rondel1, that's myself.

20  Q.  What's the subject of the email, the subject?

21  A.  The subject, funding agreement for DelGaudio -- Adele,

22  August 16.

23           THE COURT:  S here's the problem Mr. DelGaudio, you're

24  just a little too close to the microphone.

25           THE WITNESS:  I'm sorry.

1      THE COURT:  There is a fine art to it.  Right now

2   you're about perfect.  Thank you.

3   Q.  Did you accept this agreement right away?

4   A.  No.

5   Q.  What happened next?

6   A.  The agreement I got, I hired some attorneys to take a look

7   at the agreement and speak with Craig about the terms of it.

8      MR. QUIGLEY:  Can we show the witness, the lawyers --

9   actually, could we just go to the attachment for a second, just

10  publish it briefly.  Can we show the lawyers, the witness, and

11  the judge Government's Exhibit 540.

12  Q.  Do you recognize that document, Mr. DelGaudio?

13  A.  Yes.

14  Q.  And what's that?

15  A.  That was an email from Craig regarding the Adele tickets

16  and also sent to Scott, his friend Gus, and myself.  And just

17  prompting, so to speak, to keep me in the loop of the Adele

18  tickets were being sold, and each week that passes would put us

19  two weeks back in regards to available inventory.

20      MR. QUIGLEY:  Your Honor, the government offers

21  Government's Exhibit 540.

22      MR. JANEY:  No objection, your Honor.

23      THE COURT:  Admitted.

24      (Government's Exhibit 540 received in evidence)

25  BY MR. QUIGLEY:

1    Q.   Can you read the first paragraph of the email,

2    Mr. DelGaudio.

3    A.   "Just want to keep you in the loop of Adele.  As I am sure

4    you are aware, all of the August dates have now past, and we

5    are on to September dates.

6    Q.   Can you read the paragraph after that also.

7    A.   "Tour starts again on September 6th.  Assuming you are

8    ready to invest this week, we are looking at the second week of

9    September for concert dates.  Every week that passes will

10   essentially put us two weeks back in regards to available

11   inventory."

12   Q.   What do you understand the defendant to be saying when he

13   says "every week that passes will essentially put us two weeks

14   book in regards to available inventory"?

15   A.   The only thing I could think of is that receiving the funds

16   on such a date, that there was a lag time in getting the

17   tickets.

18   Q.   Now, sometime after this did you and the defendant finalize

19   an Adele contract?

20   A.   Yes.

21            MR. QUIGLEY:  So could we take this exhibit down and

22   put up for the witness, the lawyers, and the judge Government's

23   Exhibit 1300.

24   Q.   Do you recognize this agreement, Mr. DelGaudio?

25   A.   Yes.

1   Q.   What is it?

2   A.   This is the agreement between Mr. Carton and Advance

3   Entertainment for access to the tickets for various events.

4   Q.   You said between Mr. Carton and Advance Entertainment.   Is

5   it an agreement involving you also in the first paragraph?

6   A.   Oh, yes, yes.

7          MR. QUIGLEY:   Your Honor, the government offers

8   Government Exhibit 1300.

9          MR. JANEY:   No objection, your Honor.

10          THE COURT:   Admitted.

11          (Government's Exhibit 1300 received in evidence)

12          MR. QUIGLEY:   So if we could blow up the first

13   paragraph.

14   Q.   Do you see where it says:   "This funding agreement dated as

15   of August 2016 is made by and among Ron DelGaudio, an

16   individual residing in New York, investor, and Misoluki LLC, a

17   New York limited liability company, with its principal place of

18   business at 155 Wooster Street, Suite 4F, New York, New York

19   defined as 'Miso,' or the company"?   Do you see that?

20   A.   Yes.

21   Q.   Whose company was Misoluki LLC?

22   A.   Craig Carton's company.

23   Q.   And if we could go down to the fourth paragraph with the

24   "whereas" in front of it.   Do you see where it says, "Whereas,

25   Advance Entertainment owns or controls tickets to the events

1    pursuant to an agreement with September and has the right to

2    sell tickets to resellers such as the company"?  Do you see

3    that?

4    A.  Yes.

5    Q.  What was your understanding of who operated Advance

6    Entertainment?

7    A.  At that particular time, I wasn't really aware of that.  My

8    agreement basically was with Craig, and I guess this is who he

9    had his agreement with.

10   Q.  Did you later learn who operated Advance Entertainment?

11   A.  Yes.

12   Q.  Who is that?

13   A.  Joe Meli.

14   Q.  If you could look at the paragraph below that, do you see

15   beginning on the second line where it says:  "Company has

16   agreed to purchase from Advance, Advance's allotment of tickets

17   and for the purpose of reselling up to $4.5 million aggregate

18   face value amount of tickets"?  Do you see that?

19   A.  Yes.

20   Q.  How much were you going to invest?

21   A.  It was a million dollars.

22   Q.  So what was your understanding of where the rest of that

23   $4.5 million would be coming from?

24   A.  From other investors.

25   Q.  Can we go down to paragraph 1.1 on page 2, and where it

1    says "Funding" and kind of the middle of the paragraph

2    beginning -- the paragraph beginning "the funds shall be used

3    by the company."  Can you read that, those next two sentences,

4    Mr. DelGaudio.

5    A.   "Funds shall be used by the company exclusively for the

6    purchase of the tickets."

7    Q.   And then the sentence after that.

8    A.   "In the event that the company does not purchase the

9    tickets within 20 days of receiving the funds from investor (or

10   uses only a portion of the funds for such purchase), the unused

11   funds shall be returned promptly to investor via wire

12   transfer."

13   Q.   Under this agreement could your money be used to buy

14   anything other than Adele tickets?

15   A.   Only Adele tickets.

16   Q.   Was the fact that your money was going to be used to buy

17   Adele tickets important to you?

18   A.   Yes.

19   Q.   Was that the reason you agreed to send Craig Carton a

20   million dollars?

21   A.   Yes.

22   Q.   Were you interested in extending him a general purpose

23   loan?

24   A.   No.

25   Q.   Were you interested in helping him pay casinos?

IB1HCar1                    DelGaudio - Direct

1    A.  No.

2    Q.  Did you, in fact, wire $1 million to Misoluki for this

3    investment?

4    A.  Yes.

5    Q.  Did you get anything back within 20 days?

6    A.  No.

7    Q.  Now, if we go to Section 2.1, can you read that paragraph.

8    A.  "Company agrees that investor's entitlement to proceeds

9    hereunder shall rank *pari passu* with any other investor with

10   which company enters in such arrangement and that no preference

11   shall be given to the recoupment of any other party,

12   particularly in scenarios where there are not sufficient

13   proceeds to repay any investor's original investment."

14   Q.  Then can you read the paragraph below that.  Do you see

15   where it says, "Company shall use its best commercial efforts

16   to resell the tickets for profit, using its good faith business

17   judgment"?

18   A.  Yes.

19   Q.  Were you going to have any involvement in reselling any

20   Adele tickets under this agreement?

21   A.  No.

22   Q.  Who was going to be reselling them?

23   A.  Craig Carton.

24   Q.  Now, can we go into the next page.

25        Do you see where it says, "The proceeds from

1    investor's pro rata entitlement to proceeds based on Miso's

2    resale of the tickets will be distributed as follows:  On or

3    before November 15, 2016, unless Miso gives investor written

4    notice of a delay based on good cause such as, without

5    limitation, the tour being extended."  Do you see that?

6    A.  Yes.

7    Q.  And then what does it say under that?

8    A.  What does it say after that?

9    Q.  In paragraphs (a) and (b).

10   A.  "First 100 percent to the investor until investor has

11   received 100 percent of its advanced funds plus an amount equal

12   to 10 percent of its advanced funds."

13            MR. QUIGLEY:  Can we go, skip ahead, to the next page,

14   Mr. Cooney, page after that.

15   Q.  Did you sign this agreement, Mr. DelGaudio?

16   A.  Yes.

17   Q.  Did Craig Carton eventually sign this agreement?

18   A.  Yes, he did.

19            MR. QUIGLEY:  So can we take that down and put up

20   Government's Exhibit 547 just for the lawyers, the witness, and

21   the judge.

22   Q.  Do you recognize that, Mr. DelGaudio?

23   A.  Yes.

24   Q.  What is it?

25   A.  That's an email from Craig Carton with the signed agreement

1   from him.

2           MR. QUIGLEY:  Your Honor, the government offers

3   Government's Exhibit 547.

4           MR. JANEY:  No objection, your Honor.

5           THE COURT:  Admitted.

6           (Government's Exhibit 547 received in evidence)

7   BY MR. QUIGLEY:

8   Q.  What's the date on this email, Mr. DelGaudio?

9   A.  August 25, 2016.

10          MR. QUIGLEY:  You can take that down.  Can we show the

11  witness, the lawyers, and the judge Government Exhibit 548.

12  Q.  Do you recognize that, Mr. DelGaudio?

13  A.  Yes.

14  Q.  What is it?

15  A.  An email from Craig Carton to myself talking about that

16  we're going to make a lot of money together in the investment

17  and please, you know, enjoy your vacation.  Send me the wire as

18  soon as you can.  If you ever need to chat, call me directly.

19  Craig Carton.

20          MR. QUIGLEY:  Your Honor, the government offers

21  Government Exhibit 548 into evidence.

22          MR. JANEY:  No objection, your Honor.

23          THE COURT:  Admitted.

24          (Government's Exhibit 548 received in evidence)

25          MR. QUIGLEY:  Could we highlight the first paragraph,

IB1HCar1                          DelGaudio – Direct

1    Mr. Cooney.

2              THE WITNESS:  "Thank you for your belief in me and the

3    business I have created.  We are going to make a lot of money

4    together and have a great time doing it."

5    BY MR. QUIGLEY:

6    Q.  What do you understand the defendant to be saying when he

7    said "the business I have created"?

8    A.  I only thought of it as ticket business.

9    Q.  Did you end up wiring the money, the million dollars, to

10   Craig Carton for the Adele investment?

11   A.  Yes.

12   Q.  Do you remember when that was?

13   A.  In September, beginning of September 2016.

14             MR. QUIGLEY:  So if we could take that down and put up

15   what's in evidence as Government's Exhibit 2005 and go to the

16   last page.  Actually, stay on the first page one second,

17   Mr. Cooney.  Sorry about that.

18   Q.  Mr. DelGaudio, what's the name on this account?

19   A.  Misoluki Inc., a New York corporation.

20             MR. QUIGLEY:  Could we go to the last page,

21   Mr. Cooney.  And if we could just blow up the first entry on

22   this.

23   Q.  Do you recognize the entity Kings Park Slope –– Kings Park

24   Slope Inc., Mr. DelGaudio?

25   A.  Yes.

IB1HCar1                         DelGaudio - Direct

1    Q.  What is that?

2    A.  That's Kings Park Slope.  That's one of the pharmacies I

3    own, the corporate name.

4    Q.  Do you see there's a million-dollar wire to Misoluki on

5    September 6, 2016?

6              MR. JANEY:  Objection.  Leading.

7    A.  Yes.

8              THE COURT:  The objection's sustained.

9    Q.  Do you recognize what this transaction is, Mr. DelGaudio?

10   A.  Yes.

11   Q.  What is it?

12   A.  The wire.

13   Q.  The wire for your Adele tickets?

14   A.  Yes, that was the wire for the purchase of Adele tickets.

15   Q.  Thank you.

16             Now, after sending this wire, did you continue to

17   correspond with the defendant?

18   A.  Yes.

19             MR. QUIGLEY:  Can we show the witness, the lawyers,

20   and the judge Government's Exhibit 504.

21   Q.  Do you recognize this?

22   A.  Yes.

23   Q.  Who's this an email from?

24   A.  What is it?

25   Q.  Yeah, what is it?

1    A.  It's an email from Craig Carton to myself and Scott Mannes

2    saying that the mechanics for Adele specifically have changed

3    based on a delay and unable to fund.  All good, though.

4              MR. QUIGLEY:  Your Honor, the government offers

5    Government Exhibit 504.

6              MR. JANEY:  No objection, your Honor.

7              THE COURT:  Admitted.

8              (Government's Exhibit 504 received in evidence)

9              MR. QUIGLEY:  Can we highlight the first paragraph,

10   Mr. Cooney.

11             THE WITNESS:  "Can't sleep, so allow me to update you.

12   As I mentioned on the phone, everything is great as promised.

13   The mechanics for Adele specifically have changed based on our

14   delay in being able to fund.  All good, though."

15   BY MR. QUIGLEY:

16   Q.  Do you see below that where the defendant says:  "JPMorgan

17   funded the entire deal but agreed to allow us through Advance,

18   as planned, to buy into their deal for the exact same

19   parameters as we discussed"?  Do you see that?

20   A.  Yes.

21   Q.  Before this had you heard of JPMorgan being linked to this

22   ticket deal?

23   A.  No, I had not.

24   Q.  Was this change acceptable to you?

25   A.  Yes.

IB1HCar1                        DelGaudio – Direct

1   Q.   Why was that?

2   A.   Well, JPMorgan funding the entire deal, I guess, made it

3   seem more real, I guess.

4   Q.   Then do you see below that where it says:  "Only difference

5   is we won't be able to monitor every sale in real time through

6   Tier One tickets.  We will get a weekly report provided by

7   Advance throughout the process and full access to Advance

8   management"?  Do you see that?

9   A.   Yes.

10  Q.   And was that acceptable to you?

11  A.   Yes, as long as we got the reports, yes.

12  Q.   Did you try to pull back your million dollars from

13  Mr. Carton at this point?

14  A.   No.

15  Q.   Did you end up getting weekly reports provided by Advance

16  Entertainment?

17  A.   No.

18  Q.   Did you get any updates on the Adele investment?

19  A.   Got updates, only what Craig sent me.

20          MR. QUIGLEY:  So can we show the witness, the lawyers,

21  and the judge Government Exhibit 1301.

22  Q.   Do you recognize that email, Mr. DelGaudio?

23  A.   Yes.

24  Q.   And what is it?

25  A.   It's an email to -- from myself to Craig regarding the

1    investment after he said to me that the investment has been

2    exhausted.  All good news.

3              MR. QUIGLEY:  Your Honor, the government offers

4    Government Exhibit 1301.

5              MR. JANEY:  No objection, your Honor.

6              THE COURT:  Admitted.

7              (Government's Exhibit 1301 received in evidence)

8              MR. QUIGLEY:  Could we publish it.

9    Q.  I'm going to direct your attention to the bottom email in

10   the chain.  Who is this email from?

11   A.  Yes.

12   Q.  Who's it from, the email at 3:02 a.m.?

13   A.  Email is from Craig Carton.

14   Q.  Do you see where he says:  "Great news.  I received a note

15   from Joe regarding the investment.  The investment has been

16   exhausted, and we are waiting for reconciliation for the final

17   few shows for November"?

18   A.  Yes.

19   Q.  Who do you understand Joe to be in this email?

20   A.  Joe Meli.

21   Q.  Do you see where it says -- and what do you understand the

22   investment to refer to?

23   A.  The investment as far as --

24   Q.  When the defendant says, "Great news.  I received a note

25   from Joe regarding the investment," what do you understand the

IB1HCar1                          DelGaudio - Direct

1   investment to refer to?

2   A.   I just -- when he sent this, I thought it was -- you know,

3   the investment was all completely bought out and the return was

4   already calculated.

5   Q.   The investment in what?

6   A.   Yes.

7   Q.   Investment in what?

8   A.   Investment in the Adele tickets.

9   Q.   Directing your attention to the fourth paragraph down where

10  it says "the 990,000 that was carved out," do you know why

11  990,000 was supposedly carved out of your million-dollar

12  investment?

13  A.   No.

14  Q.   Do you see where it says below that, the sentence right

15  next to that:  "We plan on returning the principal and

16  agreed-upon interest by November 1, a full two weeks ahead of

17  schedule"?

18  A.   Yes.

19  Q.   Did you get paid back on December -- on November 1?

20  A.   No.

21  Q.   What was your understanding of why not?

22  A.   He said that there was a delay and everything should be

23  returned back by the 15th.

24  Q.   Who said there was a delay?

25  A.   Craig Carton.

IB1HCar1                         DelGaudio - Direct

1    Q.  Did you get paid back by November 15?

2    A.  No.

3    Q.  Did you have an understanding of why not?

4    A.  No, not exactly.

5    Q.  Did there come a time when you spoke to Joe Meli about this

6    investment?

7                MR. JANEY:  Objection.

8                THE COURT:  Overruled.

9    A.  I spoke to Joe Meli for a short moment, yes.

10   Q.  And describe that conversation.

11   A.  Joe Meli, the only thing I spoke to him about, he claimed

12   that he was hammering out a deal with JPMorgan, and he would

13   get back to us tomorrow with a conversation and tell us what

14   happened and when we're going to have our money.

15   Q.  How did that conversation with Joe Meli take place?  Was

16   that in person or phone call?

17   A.  It was by telephone.

18   Q.  Who else, if anyone, was on --

19   A.  I believe Craig Carton.

20   Q.  Did you ever get paid back on the Adele investment?

21   A.  Yes.

22   Q.  When was that, approximately?

23   A.  In December and January, December 2016 and January 2017.

24   Q.  And how were the payments made?

25   A.  By wire transfers.

1    Q.  Did Craig Carton send you payments for anything else in

2    December 2016 other than a return on your Adele investment?

3    A.  No.

4            MR. QUIGLEY:  So if we could look at what's in

5    evidence as Government's Exhibit 2000.  Just highlight the

6    upper left-hand corner, Mr. Cooney.  And then if we go to

7    page 103.  And then there's an entry on the entry right there,

8    perfect.

9    Q.  What's the date on this entry, Mr. DelGaudio?

10   A.  12/2/2016.

11   Q.  And what do you understand -- who's the beneficiary of this

12   wire?

13   A.  Ronald DelGaudio, myself.

14   Q.  What do you understand this to be?

15   A.  It was part of the money coming back for the Adele

16   investment.

17           MR. QUIGLEY:  We can take that down.  I'm showing you

18   what -- can we show the lawyers, the witness and the judge

19   what's been marked for identification as Government

20   Exhibit 1302.

21   Q.  Do you recognize this document, Mr. DelGaudio?

22   A.  Yes.

23   Q.  What is that?

24   A.  Investment returns.  It's a -- an email from myself to

25   Craig Carton about the money being -- coming back without

1    returns.  I said -- because I think he said the money was

2    coming at the end of the month, or whenever it was.  And I

3    said, "OK.  No worries.  That includes the profit as well, not

4    just the interest, right?"

5         MR. QUIGLEY:  Your Honor, the government offers

6    Government Exhibit 1302.

7         MR. JANEY:  No objection, your Honor.

8         THE COURT:  Admitted.

9         (Government's Exhibit 1302 received in evidence)

10   BY MR. QUIGLEY:

11   Q.  Do you see where it says:  "Ron, Joe's agreed to send me a

12   letter stating that he personally guarantees the full return of

13   principal and interest prior to December 24th as we discussed"?

14   Do you see that?

15   A.  Yes.

16        MR. QUIGLEY:  Can we take that down and go back to

17   Government's Exhibit 2000, page 107.

18   Q.  What's the date on this entry, Mr. DelGaudio?

19   A.  12/23/2016.

20   Q.  And what is this?

21   A.  Wire transfer from Craig Carton to myself.

22   Q.  What did you understand this wire transfer to be?

23   A.  That was the return coming in from the sale of Adele

24   tickets.

25        MR. QUIGLEY:  And we could take that down.

1    Q.  Did you get paid back your entire principal and interest on

2    the Adele tickets?

3    A.  Yes.

4    Q.  Now, did there come a time when you made a second

5    ticket-related investment with Mr. Carton?

6    A.  Yes.

7    Q.  Now, between the time you got paid back on your first

8    investment and the time you made the second investment, did you

9    have a conversation with Mr. Carton about Joe Meli?

10   A.  Yes.

11   Q.  What had happened to Mr. Meli in about late January 2017?

12   A.  He was arrested.

13   Q.  Did that give you concern in terms of investing with the

14   defendant again?

15   A.  Well, obviously it gave me some concerns, but Craig Carton

16   basically told me that, you know, he himself lost money with

17   Joe Meli.  And he wasn't arrested, so I didn't think he had

18   anything to do with that situation.

19   Q.  Were there any other factors that caused you to reinvest

20   with him?

21   A.  I also made money on the first investment, and so if he had

22   another investment, I would listen to it and --

23   Q.  Did he tell you whether he'd gotten any money from Joe

24   Meli?

25   A.  I don't recall.

1    Q.  What was the second investment you did with Craig Carton?

2    A.  The second investment was the purchase of tickets for

3    all-access seats at Nassau Coliseum and other -- other events,

4    concert tickets for Barclays Center and Nassau Coliseum.

5            MR. QUIGLEY:  If we could take a look at, for the

6    lawyers, the witness, and the judge, Government Exhibit 549.

7    Q.  Do you recognize this, Mr. DelGaudio?

8    A.  Yes.

9    Q.  What is it?

10   A.  It's an email from Craig Carton to myself about, I guess,

11   some of the tickets that are posting for shows in Nassau

12   Coliseum, I would think.

13   Q.  Do you see where it says -- your Honor, the government

14   offers Government Exhibit 549.

15           MR. JANEY:  No objection, your Honor.

16           THE COURT:  Admitted.

17           (Government's Exhibit 549 received in evidence)

18   BY MR. QUIGLEY:

19   Q.  What's the date on this email?

20   A.  February 28.

21   Q.  Do you see where it says, "If you could wire today so all

22   accounting is on point, that would be greatly appreciated"?

23   A.  Yes.

24   Q.  Did you end up wiring money to Mr. Carton shortly after

25   this?

1    A.  Yes.

2    Q.  What was your understanding of what that money was for?

3    A.  That money was for the purchase of 20 all-access tickets.

4    For all-access tickets for all the events in Nassau Coliseum.

5    Q.  How much did you wire on about that time?

6    A.  $400,000.

7    Q.  Was it important to you that that money be -- that money

8    you were investing be used towards those all-access passes?

9    A.  Yes.

10   Q.  Were you extending Mr. Carton a personal loan?

11   A.  No.

12           MR. QUIGLEY:  If we could go to what's in evidence as

13   Government's Exhibit 2016 and look at page 60, and can we

14   highlight the upper left-hand corner, the name of the entity.

15   A.  Yes.

16           MR. QUIGLEY:  Then, Mr. Cooney, if we could highlight

17   the first addition.

18   Q.  Do you recognize that, Mr. DelGaudio?

19   A.  Yes, I do.

20   Q.  What is that?

21   A.  That's the first wire transfer sent to him on March 31,

22   2017.

23   Q.  You said --

24   A.  The purchase of those tickets.

25   Q.  -- "sent to him."  Who are you referring to?

1   A.  Craig Carton.

2   Q.  And who sent that wire transfer?

3   A.  Yes.

4   Q.  Who sent that wire transfer?

5   A.  I sent the wire.

6   Q.  Now, after this did the defendant continue to send you

7   additional information about ticket investments?

8   A.  Yes.

9           MR. QUIGLEY:  Can we show the witness, the lawyers,

10  and the judge Government's Exhibit 532.

11  Q.  Do you recognize this document, Mr. DelGaudio?

12  A.  Yes.

13  Q.  What is it?

14  A.  It's an email from Craig Carton to myself telling me about

15  if I invested a million dollars, $400,000, which was already

16  received, that there were 30 more all-access seats or tickets

17  available.

18          MR. QUIGLEY:  Your Honor, the government offers

19  Government Exhibit 532.

20          MR. JANEY:  No objection, your Honor.

21          THE COURT:  Admitted.

22          (Government's Exhibit 532 received in evidence)

23  BY MR. QUIGLEY:

24  Q.  Do you see where it says, "Total investment is 1M"?

25  A.  Yes.

1    Q.   Then it says, "400K has already been funded and received."

2    Do you see that?

3    A.   Yes.

4    Q.   What do you understand that 400K to refer to?

5    A.   The 400,000 was for the original 20 all-access passes and

6    tickets.

7    Q.   Then do you see down at the bottom there's a paragraph

8    beginning "the remaining funds"?

9    A.   Yes.

10   Q.   Can you read that paragraph.

11   A.   "The remaining funds will be used to purchase Katy Perry,

12   Paul McCartney at Barclays and Paul McCartney at Nassau, among

13   other potential opportunities, as part of this agreement and

14   level of funding."

15   Q.   Then do you see below that where the defendant says, "If

16   possible to wire 500K today, please use the below"?

17   A.   Yes.

18   Q.   Did you wind up wiring the defendant $500,000 that day?

19   A.   Yes, I did.

20   Q.   Was it that day or later?

21   A.   I'm sorry?

22   Q.   Was it that day or later?

23        THE COURT:  Do you remember what day you did it?

24   A.   Oh, yes, it was April 25, I believe.

25   Q.   And what's the date on this email?

1    A.  April 21.

2            MR. QUIGLEY:  If we could take that down and just show

3    the witness, the lawyers, and the judge Government's

4    Exhibit 550.

5    Q.  Do you recognize this, Mr. DelGaudio?

6    A.  Yes.

7    Q.  What is it?

8    A.  It's the funding agreement for all access.  I guess for the

9    second part of it.

10           MR. QUIGLEY:  Your Honor, the government offers

11   Government Exhibit 550.

12           MR. JANEY:  No objection, your Honor.

13           THE COURT:  Admitted.

14           (Government's Exhibit 550 received in evidence)

15           MR. QUIGLEY:  Can we go to the body of the agreement.

16   Q.  Did you end up sending Craig Carton an additional $500,000?

17   A.  Yes, I did.

18   Q.  Focusing on this agreement in the third -- the first -- the

19   second and third -- actually, all the whereas clauses, do you

20   see where it refers to designated tickets and undesignated

21   tickets?

22   A.  Yes.

23   Q.  What was your understanding of the difference between

24   designated tickets and undesignated tickets?

25   A.  Designated tickets, the 670,000 was for the original 20

1    all-access tickets, and then an additional 30 more at $9,000

2    each, which is 270,000.  So that would total 670,000; meaning,

3    those were all for the all-access seats designated tickets.

4    Q.  What was the other 230,000 to be used for?

5    A.  The other 230,000 was that Craig had said he had access to

6    other high celebrity shows going on at Barclays and Nassau, and

7    we'd be using that money to increase the profit potential,

8    which would be undesignated tickets.  But we would be using

9    those funds just for the purchase of those ticket shows and

10   concerts.

11   Q.  Can we take a look at Section 1.2 of this agreement.  Can

12   you read the paragraph, the sentence about two-thirds of the

13   way down beginning "until" on the far right side of the page,

14   "until such time."

15   A.  "Until such time as any unused undesignated ticket funds

16   are used and applied as set forth above, Carton shall hold for

17   the benefit of investor and segregate from his other funds all

18   such undesignated ticket funds.  Investor at any time upon five

19   days' prior notice may demand the return of any undesignated

20   ticket funds that have not been used by Carton to purchase

21   undesignated tickets, upon which demand Carton shall

22   immediately return to investor the full amount of the unused

23   undesignated ticket funds."

24           MR. QUIGLEY:  We can take that down.  If we could go

25   to Section 2.1 of this agreement.

IB1HCar1                          DelGaudio - Direct

1    Q.  First of all, who was going to be involved in reselling

2    these tickets?

3    A.  Craig Carton.

4    Q.  How were profits going to be distributed?

5    A.  As shows were booked and ticket sales were made, it was

6    supposed to be done on a monthly basis.

7    Q.  Was it important to you that the money you sent Mr. Carton

8    on April 25, 2017, be invested in the purchase of tickets?

9    A.  Yes.

10   Q.  Was that why you were sending him the money?

11   A.  Is that what?  I'm sorry.

12   Q.  Is that why you were sending him the money?

13   A.  I don't quite get you.

14   Q.  Were you sending him --

15          THE COURT:  What was the reason you were sending him

16   the money?

17   A.  Oh, strictly to buy the tickets.

18          THE COURT:  See how easy it is when you just ask a

19   nonleading question.

20          MR. QUIGLEY:  Thank you, your Honor.

21          THE COURT:  Boom, he answers the question.  It's so

22   amazing.

23   Q.  Have you gotten any ticket proceeds or any money back from

24   Mr. Carton since April 25, 2017?

25   A.  Small amount.

IB1HCar1                          DelGaudio - Cross

1   Q.  About how much?

2   A.  24,000.  $24,900 I believe.

3   Q.  How much have you sent him since March -- on March 1 and

4   April 25 of 2017 total?

5   A.  900,000.

6          MR. QUIGLEY:  Your Honor, I have no further questions.

7          THE COURT:  Cross.

8          MR. JANEY:  Yes, thank you, your Honor.

9   CROSS-EXAMINATION

10  BY MR. JANEY:

11  Q.  Mr. DelGaudio, good afternoon.

12  A.  Good afternoon.

13  Q.  If we can start with what's been admitted in evidence as

14  Government's Exhibit 1300.  Are you able to see that there,

15  Mr. DelGaudio?

16  A.  Yes.

17  Q.  If we can turn to the last page.  Thank you.

18          You testified earlier that that's your signature,

19  correct?

20  A.  Correct.

21  Q.  You read this agreement before you signed it, correct?

22  A.  Yes.

23  Q.  And you believe that you understood it when you signed it,

24  correct?

25  A.  Yes.

1    Q.  Let's look at the first page of the agreement.  Turning

2    your attention to the third recital paragraph beginning

3    "Whereas, Advance Entertainment," do you see that there?

4    A.  Yes.

5    Q.  And it says, "Whereas, Advance Entertainment owns and/or

6    controls tickets to the events."  Do you see that language?

7    A.  Yes.

8    Q.  All right.  Who at the time that you signed and understood

9    this agreement did you understand Advance Entertainment to be?

10   A.  I only -- a company that had access to large-scale events

11   around the country.

12   Q.  Did you understand Advance Entertainment to be Craig

13   Carton?

14   A.  No.

15   Q.  Did you understand --

16   A.  That I know of.

17   Q.  I'm sorry.  Go ahead.

18   A.  No, not that I know of.

19   Q.  Did you understand Advance Entertainment to be Joseph Meli?

20   A.  My situation was my agreement was with Craig Carton, so --

21   Q.  My question, my question --

22   A.  Yes.

23   Q.  -- is did you understand Advance Entertainment to be Joseph

24   Meli?

25   A.  I saw his signature on an agreement, yes.

1    Q.  So understanding that Advance Entertainment was Joseph

2    Meli, when you read this agreement and signed it, isn't it fair

3    to say that you understood, as the language in the third

4    recital paragraph describes, that Advance Entertainment, or

5    Joseph Meli, owns and/or controls tickets to the events

6    pursuant to this funding agreement?  Isn't that fair to say?

7    A.  Be honest with you, I didn't really put much emphasis in

8    that.

9             THE COURT:  But that's not his question.  His question

10   is, isn't that what it says on the piece of paper?

11            THE WITNESS:  Yes, it is.

12            THE COURT:  Thank you.

13   Q.  Looking at the recital paragraph immediately below that

14   where it reads:  "Whereas, pursuant to that certain funding

15   agreement dated July 26, 2016, entered into by Advance and the

16   company," now who did you understand the company in connection

17   with this funding agreement to be, Mr. DelGaudio?

18   A.  Where are you looking at that?  I'm sorry, sir.

19   Q.  In the fifth recital paragraph.

20            THE COURT:  In the next paragraph below the one we

21   were just discussing, sir, the one that begins, "Whereas,

22   pursuant to that" -- don't change the page.  On that page, you

23   see a paragraph that begins, "Whereas, pursuant to that certain

24   funding agreement"?  Do you see that paragraph?

25   A.  Yes, yes, your Honor.

1          THE COURT:  OK.  That's the one I think he wants you

2     to look at.

3          THE WITNESS:  OK.

4     BY MR. JANEY:

5     Q.  Now, that paragraph makes reference to Advance

6     Entertainment, or Joseph Meli, if you will, and the company.

7     Now, you've already testified here on cross that you understood

8     Advance Entertainment to be Joseph Meli, correct?

9          THE COURT:  Why don't we just not ask the same

10    question for the fourth time.  What he said was he saw

11    Mr. Meli's signature on one occasion for Advance Entertainment.

12    That's what he said.

13         MR. JANEY:  OK.

14    Q.  Looking at the top of the agreement, Mr. DelGaudio,

15    immediately under "Funding Agreement," do you see the last line

16    there?

17    A.  The top of the agreement, yes.

18    Q.  Yes, right.  Isn't it fair to say that the agreement

19    defines Misoluki as the company?

20    A.  Yes.

21    Q.  Right.  So then isn't it fair to say in that fifth recital

22    paragraph, what's being explained is that the source of the

23    tickets is pursuant to an agreement between Joseph Meli and

24    Craig Carton, correct?

25    A.  At that particular time, I didn't know.

1    Q.  Well, I'm not asking you that.

2    A.  That was very in the initial signing of the agreement, so I

3    didn't...

4    Q.  Isn't that what the agreement says, Mr. DelGaudio?

5    A.  Yes.  Yes, I would say so.

6    Q.  All right.  So isn't it then fair to say that on the face

7    of the agreement, it's apparent that Craig Carton is not the

8    source of the tickets that you're providing the funding for,

9    isn't that correct?

10   A.  It was my understanding that he was.

11   Q.  Yes or no, based on the agreement that you signed --

12            THE COURT:  What does the agreement say, sir?

13   A.  Well, the agreement says he has access to 4 1/2 million

14   dollars' worth of tickets from Advance.

15   Q.  Thank you.

16            And you were aware, then, that Craig Carton would be

17   entering into a separate contract with Joseph Meli's company to

18   provide the Adele tickets, correct?

19   A.  Yes.

20   Q.  The funding agreement that you signed here marked as

21   Government Exhibit 1300 for the $1 million loan was different

22   and apart from the written agreement with Joseph Meli to

23   actually provide the tickets, correct?

24   A.  Well, yes, I guess it was.

25   Q.  Did you ever come to see the contract between Mr. Carton's

IB1HCar1                         DelGaudio - Cross

1   company and Joseph Meli's company for these Adele tickets?

2   A.  Yes.

3   Q.  How did you come to be familiar with that document?

4   A.  I believe my attorneys asked for it, and they -- Mr. Carton

5   sent it over.

6   Q.  And when Mr. Carton sent it over, did you read the

7   document?

8   A.  I don't know if I read it so -- I don't remember reading

9   it, to be honest with you.  My attorneys were looking at it.

10  Q.  Did your attorneys advise you about that agreement between

11  Mr. Carton and Joseph Meli?

12          THE COURT:  You can answer the question yes or no.

13  A.  Yes.

14  Q.  Did you keep a copy of that document as part of your

15  records of this loan transaction referred to in Government

16  Exhibit 1300?

17  A.  The agreement with Advance Entertainment?

18  Q.  Yes.

19  A.  Yes, I believe so.

20  Q.  Did you produce a copy of that agreement to the prosecutors

21  in this case as a part of this investigation?

22  A.  Yes.

23  Q.  Marking for identification Defendant's Exhibit 122,

24  publishing it only to the Court and counsel, and the witness.

25          Mr. DelGaudio, looking at this agreement, do you

1    recall this as the document that you handed over to the

2    prosecutors that I just mentioned?

3             THE COURT:  Well, do you recognize this document?

4             THE WITNESS:  Yes, I do.

5             THE COURT:  Is that something you've seen before?

6             THE WITNESS:  Yes.

7             THE COURT:  What is it?

8             THE WITNESS:  It's the agreement with, I think,

9    Advance Entertainment and the amount of access they had to

10   various events around the country.

11            MR. JANEY:  Your Honor, we request that Defendant's

12   122 be admitted in evidence.

13            MR. QUIGLEY:  Your Honor, it's already in evidence.

14   It's page 5 of the Government Exhibit 1300, but we have no

15   objection.

16            THE COURT:  Well, now separately in evidence, OK.

17            (Defendant's Exhibit 122 received in evidence)

18   BY MR. JANEY:

19   Q.  Mr. DelGaudio, turning your attention to what I'll describe

20   as the center of page 1, immediately below the -- well, at the

21   third recital paragraph of the exhibit, do you see that there

22   beginning "Whereas, company owns and/or controls tickets"?

23   A.  Yes.

24   Q.  And here again, this is an agreement between Advance

25   Entertainment and Mr. Carton's company, Misoluki, correct?

1    A.  Correct.

2    Q.  And company is being defined as Advance, Joseph Meli's

3    company, correct?

4    A.  I assume so.

5    Q.  Well, that's what the agreement says, correct?

6    A.  Yes.

7    Q.  And this in the middle paragraph there, it's explaining,

8    isn't it fair to say, that the company, that is, Joseph Meli's

9    company, owns and/or controls the tickets to the events listed

10   in that paragraph, correct?

11   A.  Advance Entertainment, yes.

12   Q.  Thank you.

13          You can take that down.  Now, if I could have

14   Government's Exhibit 1300 back, please.

15          Now, returning to the loan for the million dollars.

16          MR. QUIGLEY:  Objection to the characterization.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1          THE COURT:  The objection is overruled.  You can argue

2     at the end of the case that it's nothing of the sort.

3          MR. QUIGLEY:  Thank you, your Honor.

4     Q.  Turning back to this loan or funding agreement for the

5     million dollars, Mr. DelGaudio, isn't it fair to say that this

6     agreement with Craig Carton dealt only with the financial

7     aspect of this arrangement for tickets?

8     A.  Financial arrangement with what?

9     Q.  In other words, you were only expecting Mr. Carton, isn't

10    it fair to say, to repay the monies with the other conditions

11    on those monies, that is, the interest and the premium that's

12    defined here in this agreement, correct?

13    A.  My understanding was totally that the money given to Craig

14    Carton was solely for the purchase of buying Adele tickets.

15    Q.  I'm not asking that.  I'm asking that this funding

16    agreement, isn't it fair to say, your expectation is that he

17    would return your principal and pay interest and premium on top

18    of that, correct?

19    A.  Depending on the sale of the tickets, the agreement was --

20         THE COURT:  What was it that you could hope to receive

21    at the end of the day?

22         THE WITNESS:  Depending on the sale of the tickets,

23    according to him the investment was achieving a 1.53 times its

24    investment, so it would be the million dollars plus 10 percent

25    and then the proceeds after that were to be split 50/50, so

IB17CAR5                              DelGaudio - Cross

1  whatever amount the tickets yield would determine what the

2  amount of money would be.

3  Q.  He returned the $1 million principal, correct?

4  A.  Yes.

5  Q.  And you realized a 30 percent return on that $1 million

6  from Mr. Carton, correct?

7  A.  Yes.

8  Q.  Is it fair to say that you were pleased with the 30 percent

9  return?

10          MR. QUIGLEY:  Objection.

11          THE COURT:  Overruled.

12  A.  30 percent return?

13  Q.  Were you pleased with the 30 percent return on the million

14  dollars?

15  A.  Yeah, it turned out to be.

16  Q.  Were you satisfied with that rate of return, Mr. DelGaudio?

17  A.  Yes.

18  Q.  Is it fair to say that when you realized or received 30

19  percent return on the million dollars, that you did not feel

20  cheated in any way by Craig Carton in connection with this

21  loan?

22          MR. QUIGLEY:  Objection.

23          THE COURT:  The objection is sustained.

24  Q.  With respect to your investment --

25          You can take this down.

1          With respect to your investment in the all-access

2    seats referenced at Government Exhibit 550, there was never any

3    question in your mind about legitimacy of that agreement with

4    Craig Carton, was there?

5              MR. QUIGLEY:  Objection.

6              THE COURT:  Sorry?

7              MR. QUIGLEY:  Objection.

8              THE COURT:  Read back that question, please.

9              (Record read)

10             THE COURT:  The objection is overruled.

11   Q.  Please answer.

12   A.  Yes.

13             THE COURT:  He asked was there any time you questioned

14   the legitimacy of that agreement?

15             THE WITNESS:  The all-access tickets?  No.

16   Q.  In fact that particular investment, the all-access

17   investment, was the one arrangement by which Craig Carton

18   himself was providing you direct access to the seats, correct?

19   A.  That agreement he had directly with the center, Nassau

20   Coliseum.

21   Q.  You didn't have any question that those seats existed, did

22   you?

23   A.  At the time I did, yes.

24   Q.  At the time that you entered into the arrangement did you

25   have a question that those seats existed?

IB17CAR5                          DelGaudio - Cross

1    A.  No, that was the basis of the agreement.

2    Q.  Let's turn back to Joseph Meli, Mr. DelGaudio, and let's go

3    back to the funding agreement described in Government Exhibit

4    1300.  When you were approached about investments in these

5    Adele tickets, you performed due diligence, correct?

6           MR. QUIGLEY:  Objection to relevance.

7           THE COURT:  The problem is that I can't see anything.

8    The objection is sustained.

9    Q.  Mr. DelGaudio, you referenced a telephone call in your

10   testimony today, a telephone call to Mr. Meli.  Do you recall

11   that testimony?

12   A.  Yes.

13   Q.  And why did you call Mr. Meli?

14   A.  I was introduced to him through Craig Carton, and he said

15   if you want to speak to Joe, you can get it right from him,

16   because the monies weren't coming in, and that's why I asked to

17   speak to him.

18   Q.  And is it fair to say that you asked to speak to Mr. Meli

19   because you understood Mr. Meli to be the source of the Adele

20   tickets?

21   A.  I wanted just the latest update on what the outcome was

22   going on on the deal that he had with JP Morgan and the Adele

23   investment.

24   Q.  But, again, isn't it fair to say that you called Joseph

25   Meli because you understood from Craig Carton that Joseph Meli

1  was the guy?

2  A.   That Joseph Meli was the --

3  Q.   He was the guy in control of the tickets.

4  A.   I didn't -- you know, at that time he was the one that was

5  getting the money from JP Morgan, so he was in charge of that

6  supposedly.

7  Q.   He was the guy in charge of the tickets, as the agreement

8  said that you read and understood, correct?

9            THE COURT:   That's argumentative.

10            MR. JANEY:   Withdrawn.

11            No further questions, your Honor.

12            MR. QUIGLEY:   No redirect, your Honor.

13            THE COURT:   Thank you very much, sir.   You may step

14  down.

15            (Witness excused)

16            THE COURT:   So, what's next?

17            MR. KOBRE:   Your Honor, it's at this point the next

18  witness that we discussed over the break.

19            THE COURT:   OK.   So I have to talk to the lawyers out

20  of your hearing for three minutes, so why don't you take a

21  break now, and then we will put another witness on the stand.

22  Don't discuss the case; keep an open mind.

23            (Continued on next page)

24

25

```
 1              (Jury not present)
 2              THE COURT:  OK.  Bring in your witness.
 3              MR. KOBRE:  And if I can just hand up the application
 4    and order.
 5              THE COURT:  Thank you.
 6              Is Mr. Finger's counsel present?  Thank you.
 7    DESMOND FINGER,
 8         called as a witness by the government,
 9         having been duly sworn, testified as follows:
10    DIRECT EXAMINATION
11    BY MR. KOBRE:
12    Q.  Mr. Finger, good afternoon.
13    A.  Good afternoon.
14    Q.  Did you receive a subpoena requiring you to testify at this
15    trial?
16    A.  Yes.
17    Q.  And do you intend to invoke your Fifth Amendment privilege
18    against self-incrimination when asked questions under oath?
19    A.  Yes.
20    Q.  Do you now invoke that privilege?
21    A.  I'm sorry?
22    Q.  Do you now invoke your Fifth Amendment privilege?
23    A.  Yes.
24              THE COURT:  Could we please do this the right way.
25              MR. KOBRE:  Yes, I'm going to ask him additional
```

IB17CAR5                          Finger - Direct

1   questions.

2               THE COURT:  Thank you.

3   Q.  Do you now invoke that privilege?

4   A.  Yes.

5   Q.  Are you familiar with an individual named Craig Carton?

6   A.  Under advice of counsel, I assert my Fifth Amendment rights

7   against self-incrimination.

8   Q.  Did you extend certain loans to Craig Carton?

9   A.  Yes.

10  Q.  Are you going to answer that question?

11              MR. JANEY:  Your Honor, he has already answered.

12              THE COURT:  He did.

13              Counsel, you should be with your client.

14  Q.  And, Mr. Finger, when you extended those loans to

15  Mr. Carton, did you do so at high interest rates?

16  A.  On advice of counsel, I assert my Fifth Amendment rights

17  against self-incrimination.

18  Q.  Were you also at some point in the course of this

19  investigation approached by the Federal Bureau of

20  Investigation?

21  A.  Yes.

22              MR. JANEY:  Objection, your Honor.  There is no

23  audible response from the witness to the question.

24              THE COURT:  Would you please respond to the question.

25  A.  On the advice of counsel, I assert my Fifth Amendment right

IB17CAR5                              Finger - Direct

1     against self-incrimination.

2     Q.  And were you truthful when you were questioned by the

3     Federal Bureau of Investigation?

4     A.  On the advice of counsel, I assert my Fifth Amendment right

5     against self-incrimination.

6               MR. KOBRE:  Your Honor, at this point the government

7     would ask the Court enter an immunity order and compel the

8     witness to testify.

9               MR. JANEY:  Your Honor, a similar situation to

10    yesterday.  The way in which the questions are being asked for

11    the application, it is utterly unclear to the defense the basis

12    for which he is invoking.

13              THE COURT:  Well, geez, if you can't figure it out, I

14    certainly have.  I'm granting the application.  I'm signing the

15    order of immunity November 1, 2018 at 3:18 p.m.

16              Mr. Finger, we're going to take a little break, and

17    after that you're going to be called to the witness stand.

18    Your lawyer will not be with you, and you will be asked to

19    testify.  I have immunized you so that you may give testimony

20    without worrying about being indicted.  Except if you lie while

21    you're giving testimony on the witness stand, you're not

22    immunized against that, and you could be prosecuted for perjury

23    if you lie on the witness stand at the trial.  Do you

24    understand that?

25              THE WITNESS:  Yes.

1                THE COURT:  OK.  Let's take a break.

2                (Recess)

3                MR. GOTTLIEB:  Just before the jury comes in, I asked

4      the assistants just a few moments ago during the break --

5      whether or not -- I'm sorry, the witness is on the stand.

6                THE COURT:  Do you want to have a sidebar?

7                MR. GOTTLIEB:  Yes, please.

8                (At the sidebar)

9                MR. GOTTLIEB:  A few moments ago during the break I

10     asked the assistants whether or not they have this witness's

11     prior criminal record, his rap sheet.  I haven't received any

12     last night, and I did not receive any notification, so I don't

13     know what the status is except Mr. Kobre about 30 seconds ago

14     said that I guess since I spoke to them somebody checked and he

15     doesn't have it, but that would have to be turned over to us.

16               MR. KOBRE:  No, just to be clear, your Honor, what I

17     told Mr. Gottlieb is that several weeks ago we ran this

18     witness's criminal record, he has no criminal record, but I

19     said to Mr. Gottlieb that just so he can satisfy himself and

20     see the piece of paper, that we had our paralegal run

21     downstairs and print out the check, and we will provide that to

22     Mr. Gottlieb.

23               MR. GOTTLIEB:  Thank you.

24               THE COURT:  Great.

25               (Continued on next page)

1          (Jury present)

2          THE COURT:  OK.

3          MR. KOBRE:  May I inquire?

4          THE COURT:  You may call your next witness.

5          MR. KOBRE:  Yes, your Honor.  Thank you, Judge.  The

6    government calls Desmond Finger.

7    DESMOND FINGER,

8         called as a witness by the government,

9         having been duly sworn, testified as follows:

10   DIRECT EXAMINATION

11   BY MR. KOBRE:

12   Q.  Good afternoon, Mr. Finger.

13   A.  Good afternoon.

14   Q.  Where do you live?

15   A.  New York City.

16   Q.  And where do you work?

17   A.  Sapphire -- Sapphire.

18   Q.  Is that Sapphire Club?

19   A.  Yes, Sapphire Gentlemen's Club.

20   Q.  And what is your position at the Sapphire Club?

21   A.  General manager.

22   Q.  Who is your boss at the Sapphire club?

23   A.  Michael Wright.

24   Q.  And what is Michael Wright's position at the Sapphire Club?

25   A.  The chief operating officer.

1   Q.  For about how long do you know Michael Wright?

2   A.  Roughly seven years, seven and a half years.

3   Q.  Did you receive a subpoena to be in court here today?

4   A.  Yes.

5   Q.  And are you testifying today under a compulsion and

6   immunity order that was entered by the Court?

7   A.  Yes.

8   Q.  And what do you understand that order does with respect to

9   the testimony that you give here today in court?

10  A.  I'm not sure.

11  Q.  What's your understanding about whether you can be

12  prosecuted for anything that you say here during your testimony

13  today?

14  A.  Yes, I can be prosecuted.

15  Q.  Can your testimony -- can the testimony that you're giving

16  here today in court be used against you?

17  A.  No.

18  Q.  Is that true even if you lie in court?

19  A.  No.

20  Q.  Can you be prosecuted if you lie?

21  A.  Yes.

22  Q.  Is it your understanding that you could be prosecuted for

23  crimes that you may have committed using evidence other than

24  your testimony in court today?

25  A.  Yes.

IB1HCar6                          Finger - Direct

1    Q.  Do you have any agreements with the government?

2    A.  No.

3    Q.  What is your understanding about why you need immunity to

4    testify?

5    A.  Because I lied to the F.B.I.

6    Q.  Any other reason?

7    A.  Yes, for the amount -- the percent of the pay-backs.

8    Q.  On what?  Pay-backs for what?

9    A.  For loans.

10   Q.  And who did you make loans to?

11   A.  Craig Carton.

12   Q.  How did you come to lend money to Mr. Carton?  Describe

13   what happened.

14   A.  Mike Wright, my friend and boss, he talked to me, and he

15   says he has a great deal, he has tried it out several times

16   where he felt comfortable enough.  I trusted him because I

17   think he's a good guy, and so he decided what the deal was

18   going to be is that he would fly out, Craig would go to casino

19   gambling places, and they would match because he's a celebrity,

20   they would match whatever he would do, so it was kind of a win

21   win situation.

22   Q.  And what were you asked to do by Mr. Wright and Mr. Carton?

23   A.  To make the loan.

24   Q.  And about what year was it that Mr. Wright first approached

25   you about lending money to Mr. Carton?

IB1HCar6                        Finger - Direct

1    A.  I believe it was 2016.

2    Q.  And what, if anything, did Mr. Wright tell you about how

3    Mr. Carton was going to use the money?

4    A.  He said for casino gambling.

5    Q.  And did you in fact lend money to Mr. Carton for casino

6    gambling?

7    A.  Yes, I did.

8    Q.  About how many times in total from that first time?

9    A.  Roughly seven, I think it was.

10   Q.  Did you have any written agreements with Mr. Wright or

11   Mr. Carton that documented the loans?

12   A.  No.

13   Q.  Can you give us a range of approximately how much these six

14   or seven loans were for?

15   A.  Between 100,000 and 500,000.

16   Q.  And about how long were the loans extended for?  What was

17   the period of time?

18   A.  Anywhere from 60 to 90 days.

19   Q.  What did you receive in exchange for making the loans to

20   Mr. Carton?

21   A.  Ten to 15 percent interest.

22   Q.  And was that interest on an annualized basis, or was it for

23   the period of the loan?

24   A.  For the period of the loan.

25   Q.  Did you believe the loans would be repaid?

IB1HCar6                         Finger - Direct

1    A.  Yes, I did.

2    Q.  Why?

3    A.  Because Craig is a celebrity, and I trusted Michael, my

4    boss, to make a good decision.

5    Q.  Were the loans always repaid?

6    A.  No.

7    Q.  How many of the loans were not repaid?

8    A.  Just the last one was not repaid.

9    Q.  Now, when you made the loans, where did the money -- did it

10   come from a particular account?

11   A.  Yes, Dezzi Sea Entertainment.

12   Q.  Can you spell Dezzi Sea Entertainment?

13   A.  D-e-z-z-i Sea Entertainment.

14   Q.  And what is Dezzi Sea Entertainment?

15   A.  That is my business account.

16   Q.  And when you received the return money for the loans you

17   extended, in what form did that come back to you?

18   A.  In a wire form.

19   Q.  Was it always by wire?

20   A.  Not the first two times.

21   Q.  How was your money returned to you the first two times?

22   A.  Cash.

23   Q.  And what about with respect to the interest on the loan,

24   how did that money come back to you?

25   A.  It came back for the first two loans at around 10 percent.

IB1HCar6                          Finger - Direct

Q.  Now, if we can publish, Mr. Urbanczyk, for everyone
Government Exhibit 2029 which is in evidence, if we can just
enlarge the bottom half of the page starting from "related
customer information."

          What's the customer name on this account?

A.  Desmond Finger.

Q.  If I can just direct you to the second line down, Customer
1 name.  Do you see that?

A.  Dezzi Sea Entertainment, Inc.

Q.  And is that the company you were just referring to?

A.  That's correct.

Q.  And who owns Dezzi Sea Entertainment?

A.  It's my company.

Q.  Now, if we can go to page 171, and if I can direct your
attention to the first entry for December 22, 2016.  This is an
entry on December 22, and what is the amount listed here?

A.  $690,000.

Q.  And is that money that you received coming into your
account or going out of your account?

A.  Coming into my account.

Q.  And if I could direct your attention to the middle column
there.  Where did this $690,000 come from?

A.  The Wright Strategy Group.

Q.  And what did you understand why you were receiving the
$690,000?

1    A.   Casino gambling.

2    Q.   And why were you receiving the money?

3    A.   It was a loan pay-back.

4    Q.   From who?

5    A.   From Craig Carton.

6    Q.   Let's take a look now going back a little bit, page 145.

7    You know what, actually, I'm sorry, if we can go back to 171.

8    This is an entry on --

9               Can you just enlarge the entry there, December 22.

10              What year is this?

11   A.   2016.

12   Q.   If we can go down to page 145, and the entry on top, the

13   entry on August 22.  So this is an entry on August 22, 2016,

14   and what does this wire represent?

15   A.   Craig Carton.

16   Q.   And did Craig Carton send you money, or did you send him?

17   A.   I sent him.

18   Q.   How much money?

19   A.   500,000.

20   Q.   And how does this 500,000 that you sent to Mr. Carton

21   relate, if at all, to the 690,000 that we just looked at?

22   A.    It was the same thing, another loan for the interest that

23   we had talked about.

24   Q.   Was this the loan that you extended Mr. Carton?

25   A.   Yes.

1   Q.  And what was the purpose of this loan, this $500,000 loan?

2   A.  Casino gambling.

3   Q.  By who?

4   A.  Craig Carton.

5   Q.  One more, Mr. Finger.

6           If we can go to page 181, and if you can just enlarge

7   for us the top of the page, the very top.

8           What period of time is this statement referring to

9   here?

10  A.  2017, February 1.

11  Q.  February 1 until when?

12  A.  February 28.

13  Q.  And now if we can go to the entry on February 6, 2017.

14  First of all, just looking all the way to the left-hand side,

15  what is the date of this entry?

16  A.  February 6.

17  Q.  And what year are we referring to here?

18  A.  I don't see a year.

19  Q.  Why don't we go back to the top of the page if we can.

20  A.  Oh, yes, February 1 to February 28.

21  Q.  So coming back to the February 6 entry, is that February 6,

22  2017?  Is that February 6, 2017?

23  A.  Yes.

24  Q.  And the records reflects 500,000.  Is that money coming

25  into your account or going out?

IB1HCar6                          Finger - Direct

```
 1   A.  Going out.
 2   Q.  And where did you send the money to?
 3   A.  Tier One Tickets.
 4   Q.  Now, what was the purpose of your sending this $50,000 to
 5   Tier One Tickets on February 6, 2017?
 6   A.  Casino gambling.
 7   Q.  Was it a loan?
 8   A.  It was a loan for casino gambling.
 9   Q.  To who?
10   A.  Craig Carton.
11   Q.  When you sent the money to Tier One Tickets, at the time
12   what if anything did you understand about Tier One Tickets?
13   A.  I really didn't think about it.  It was a quick text and
14   then sent out the wire.
15   Q.  You didn't think much about it?
16   A.  No.
17            MR. GOTTLIEB:  Objection.  Leading the witness.
18            THE COURT:  Stop it.
19   Q.  Did you ever -- did you ever have any business -- any other
20   business other than this wire with Tier One Tickets?
21   A.  No.
22   Q.  In making this loan on February 6, 2017, was it important
23   to you that your prior loans to Mr. Carton had been repaid?
24   A.  Yes.
25   Q.  Were any of the loans that you extended to Mr. Carton for
```

1    the purpose of investing in the purchase of tickets for resale?

2    A.  Not to my knowledge.

3    Q.  Have you ever invested in that sort of business, the

4    purchase of tickets to live events or concerts?

5    A.  No.

6    Q.  Now, at some point were you interviewed by law enforcement

7    as part of this investigation?

8    A.  Yes, I was.

9    Q.  About when was that?

10   A.  The summer of 2017.

11   Q.  And before being approached by law enforcement, had you

12   ever heard of an individual named Joseph Meli?

13   A.  No.

14   Q.  Are you familiar with -- had you ever done any business

15   with Advance Entertainment?

16   A.  No.

17   Q.  Were any of the wire transfers that you made in connection

18   with your prior loans to Mr. Carton sent to Advance

19   Entertainment?

20   A.  Yes.

21   Q.  And what, if anything, did you understand about Advance

22   Entertainment?

23   A.  It was for casino gambling.

24   Q.  Did you have any other business dealings with Advance

25   Entertainment?

IB1HCar6                         Finger - Direct

 1    A.  No.

 2    Q.  Did you know who ran Advance Entertainment?

 3    A.  No.

 4    Q.  Did any of those transactions with Advance Entertainment

 5    relate in any way to the purchase of tickets?

 6    A.  Not to my knowledge.

 7    Q.  Are you familiar with anyone by the name of Gary Gersh?

 8    A.  No.

 9    Q.  Are you familiar with an entity named AEG Live or AEG

10    Presents?

11    A.  No.

12    Q.  Are you familiar with an entity sometimes known as Brooklyn

13    Sports and Entertainment?

14    A.  No.

15    Q.  Now, when you were approached by the F.B.I., were you

16    asked -- did they ask you some questions?

17    A.  Yes, they did.

18    Q.  And in particular did they ask you what interest rates --

19    did they ask you about the loans you extended to Mr. Carton?

20    A.  Yes.

21    Q.  And did they ask you what interest rate?

22            MR. GOTTLIEB:  Your Honor, objection on direct now.

23            THE COURT:  Correct.  And what did they ask you?  What

24    did they ask you?

25    Q.  What if anything did they ask you about the interest rates

IB1HCar6                         Finger - Direct

1    on the loans?

2    A.  They asked me what I was receiving on the loans, and I told

3    them -- I lied, and I told them it was five or 10 percent.

4    Q.  And what, if anything, did they ask you about the last loan

5    you extended to Mr. Carton?

6    A.  I'm sorry?

7    Q.  What, if anything, did they ask you about the last loan

8    that you extended to Mr. Carton?

9    A.  They asked me if I received it.  I don't remember.

10   Q.  Did they ask you anything about the amount of that last

11   loan?

12   A.  I believe so.

13   Q.  Do you remember what you told them?

14   A.  Yes, 200,000.

15   Q.  Was that truthful?

16   A.  No.

17   Q.  And why did you lie to the F.B.I.?

18   A.  They came to my house in the middle of the day, and I was

19   just waking up, and I was terrified; I never had the police in

20   my house, or the F.B.I. for that matter, and I didn't know what

21   to do.

22   Q.  Now, at some point in 2017 did you have a meeting with

23   Mr. Carton personally?

24   A.  Yes.

25   Q.  First of all, where did that meeting take place?

1    A.   At Sapphire.

2    Q.   At the Sapphire Club?

3    A.   Yes, Sapphire Club.

4    Q.   How did the meeting come about?

5    A.   Because the loan wasn't paid back, and I asked Michael what

6    was going on, and he suggested that we have a talk.

7    Q.   When you say the loan wasn't being paid back, which loan

8    are you referring to?

9    A.   The last loan.

10   Q.   Was that the one in February of 2017?

11   A.   Yes.

12   Q.   And during the meeting with -- who else was at that

13   meeting?

14   A.   Michael Wright.

15   Q.   And Mr. Carton?

16   A.   Mike Wright and Craig Carton.

17   Q.   And who did most of the talking at the meeting?

18   A.   Craig.

19   Q.   And can you describe what was said during the meeting?

20   A.   He said that -- you know, he kind of yessed me and yessed

21   me and yessed me, and we never got a factual date on when the

22   loan was coming back and, you know, he said everything I had

23   was in casino gambling.

24   Q.   I'm sorry?

25   A.   Everything that was sent to me was through casino gambling.

1            MR. KOBRE:  Nothing further, your Honor.

2            MR. GOTTLIEB:  May I, your Honor?

3            THE COURT:  You may.

4    CROSS EXAMINATION

5    BY MR. GOTTLIEB:

6    Q.  Mr. Finger, do you reside here in New York City?

7    A.  Yes, sir.

8    Q.  That's your home?

9    A.  Correct.

10   Q.  It's not in New Jersey, is it?

11   A.  No.

12   Q.  Can we have Government Exhibit 2029.  And as that's

13   propping up, your company is also Dezzi Sea Entertainment?

14   A.  Correct.

15   Q.  This is in evidence, Government Exhibit 2029, that business

16   account application, Wells Fargo Bank, Customer information,

17   Dezzi Sea Entertainment, sole owner; Customer 2, Desmond

18   Finger.  Then the checking is Dezzi Sea Entertainment, Inc.,

19   and the address is 14 Carlough Road, Upper Saddle River, New

20   Jersey.  Is that where you live?

21   A.  No, that's where Michael Wright lives.

22   Q.  Is Michael Wright an officer of Dezzi Sea Entertainment?

23   A.  No.

24   Q.  Now, did you authorize -- well, withdrawn.

25           When this business application was set up, did you

1   give the address at 14 Carlough Road, Upper Saddle River, New

2   Jersey, which is Michael Wright's address, to the bank?

3   A.   That's correct.

4   Q.   Yes or no?

5   A.   I said yes.

6            THE COURT:   He said yes.   Listen to him.

7            MR. GOTTLIEB:   OK.

8   Q.   And you knew you were giving Michael Wright's address to

9   the bank on that day.

10  A.   That is correct.

11  Q.   Now, you told the jury that you didn't have any agreements

12  with the government prior to your testifying.

13  A.   Correct.

14  Q.   But that's not true, is it?

15  A.   I don't understand the question.

16  Q.   In fact, Mr. Finger, after you lied to the F.B.I., you

17  learned that the prosecutors wanted to speak to you, correct?

18  A.   Correct.

19  Q.   And before speaking to the prosecutors you went and you

20  retained a lawyer, correct?

21  A.   Correct.

22  Q.   And before speaking to the prosecutors you understood that

23  your lawyer was working out the terms of you even speaking to

24  the prosecutors, correct?

25           MR. KOBRE:   Objection.

1      THE COURT:  Objection sustained.

2  Q.  Well, you understood that before speaking to the

3  prosecutors you were insisting on what is called a proffer

4  agreement, where what you told the prosecutors could not be

5  used against you, correct?

6  A.  I don't understand the question.

7  Q.  Directing your attention to September 19, 2017.  Did you

8  meet with the government prosecutors?

9      You can take that down.

10 A.  I met with the prosecutors; I just don't remember the exact

11 date.

12 Q.  How many times did you meet with the prosecutors?

13 A.  Roughly three.

14 Q.  And each time you were with the prosecutors, is it not true

15 that you signed, and your lawyer signed, and the prosecutor

16 signed a proffer agreement?

17 A.  That's correct, while we were in whatever room it was.

18 Q.  And before you answered the questions, that proffer

19 agreement with the government was signed, correct?

20 A.  Correct.

21 Q.  And you did that three times for each meeting, correct?

22 A.  That is correct.

23 Q.  And you understood that for whatever you told them during

24 this meeting nothing could be used against you should the

25 prosecutors decide to charge you with a crime, correct?

IB17CAR5                         Finger - Cross

1    A.   That is correct.

2    Q.   But you also have another agreement, another order --

3            MR. KOBRE:   Objection.

4    Q.   -- called --

5            Do you understand that the government -- before you

6    took the stand the government told you that they were going to

7    request that you be granted immunity from prosecution, correct?

8    A.   Correct.

9    Q.   And you understood that before you were to testify, the

10   government said to you in effect that they were going to ask a

11   judge to grant you immunity so that after all the crimes you

12   committed in connection with your testimony you could not be

13   charged and prosecuted, correct?

14   A.   If I lie, I guess I get prosecuted, right?

15   Q.   Yeah, but I'm talking about the crimes that you have

16   committed previously, you're not going to be prosecuted,

17   correct?

18   A.   I believe so.

19   Q.   Now, you told us that when you met with the F.B.I. you

20   lied, correct?

21   A.   Correct.

22   Q.   And you lied, and that was a meeting at your house,

23   correct?

24   A.   That was at my house, yes.

25   Q.   And other than lying to the government, the F.B.I., and

| 1 | committing crimes in connection with loans, what other crimes |
| 2 | did you lie about to the government? |
| 3 | A.  I don't know what you're asking. |
| 4 | Q.  Now, when you spoke to the F.B.I. on August 21, 2017, you |
| 5 | told them that you only made loans to other individuals to use |
| 6 | for gambling, correct? |
| 7 | A.  Correct. |
| 8 | Q.  Is that true? |
| 9 | A.  That's true. |
| 10 | Q.  And when you used the plural S, individuals -- |
| 11 | A.  The S would be just Michael Wright and Carton, that's it. |
| 12 | Q.  So that wasn't a lie, correct?  When you told that to the |
| 13 | F.B.I., that wasn't a lie, was it? |
| 14 | A.  No. |
| 15 | Q.  Then you told them that you earned some five to 10 percent |
| 16 | return on loans you made to individuals for gambling, that's a |
| 17 | lie, correct? |
| 18 | A.  That was a lie, correct. |
| 19 | Q.  Because the amount of money was higher than that, wasn't |
| 20 | it? |
| 21 | A.  That's correct. |
| 22 | Q.  And you never made any investment in concert tickets, you |
| 23 | told them.  That wasn't a lie, was it? |
| 24 | A.  Nope. |
| 25 | Q.  You lied to them with regard to the outstanding amount of |

1   the gambling loan, correct?

2   A.  That is correct.

3   Q.  Now, you told us that you're partners with Michael Wright

4   at the Sapphire Club, which is a gentlemen's club, a stripper's

5   joint, right?

6   A.  That is correct.

7   Q.  And you're partners with Michael Wright, correct?

8   A.  Yeah, it depends on how you want to say it.  If he's your

9   boss and partner, yes, he works the outside, I work the inside

10  so, yes, he's my partner.

11  Q.  Well, you told the F.B.I. on August 21, 2017 that you were

12  partners in the Sapphire Club with Wright, correct?

13  A.  Correct.

14  Q.  Now, other than working at the Sapphire Club, do you have

15  any other outside jobs?

16  A.  Yeah, I have real estate.

17  Q.  What type of real estate?

18  A.  I rent homes out.

19  Q.  And how many homes do you rent out?

20  A.  Two homes.

21  Q.  Does that generate substantial money each year?

22  A.  I mean everything is substantial, isn't it?

23  Q.  Do you earn substantial money just from the rental of the

24  homes?

25  A.  I do OK.

1    Q.  How much approximately each year do you earn in the rental

2    of the two homes?

3    A.  Can I plead the Fifth on this?

4              THE COURT:  Folks, can I ask you all to leave the

5    room.  Don't discuss the case; keep an open mind.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  OK, guys, I'm sitting here waiting.  The

3    government hasn't objected to this line of questioning, so...

4           MR. KOBRE:  Well, your Honor, I was allowing it to go

5    a few questions.  I'm not aware of any good faith basis for

6    this line of questioning.  It's certainly --

7           THE COURT:  I just think I heard one.

8           The fact is you've allowed it, Mr. Kobre.  You've

9    allowed it.  Now he wants to plead the Fifth.  Is this covered

10   by his immunity agreement?

11          MR. KOBRE:  It does, your Honor.

12          THE COURT:  I don't know where you want to put him,

13   Mr. O'Neil.

14          (Witness not present)

15          THE COURT:  I assume the defense theory is that if he

16   hasn't been honestly reporting his income to the IRS, that that

17   reflects on his credibility.  Am I assuming correctly?

18          MR. GOTTLIEB:  That's one assumption, yes, your Honor.

19          THE COURT:  Well, the amount of income he makes from

20   outside sources is not of any relevance to this case.

21          MR. GOTTLIEB:  If I could suggest one reason why it

22   might be relevant and material, your Honor.  There is a lot of

23   money that this fellow -- who works a strip joint here in

24   Manhattan -- is loaning somebody, some 500,000 and more, based

25   on what is hard to understand unless he's got some other

1    illegal income out there.

2            THE COURT:  I appreciate your little tin box theory,

3    but he's not on trial, so the only reason that the source of

4    the money that he lends to Mr. Carton would be of any relevance

5    is if he is lying about it to someone else, thereby casting

6    doubt on his credibility.

7            MR. GOTTLIEB:  I agree.

8            THE COURT:  Otherwise it's of no relevance whether he

9    gets the money from his grandmother or from, you know, any sort

10   of side business.

11           MR. GOTTLIEB:  It goes to credibility, your Honor,

12   yes.

13           MR. KOBRE:  Your Honor, to the extent that the

14   question is --

15           I mean, your Honor, the government's view is that

16   defense counsel should be able to ask whether he reported the

17   income to the IRS, he should be compelled to testify about

18   that, and that really is it.  That's the extent of the

19   relevance.

20           THE COURT:  Fine.  And is that covered?  His lawyer is

21   sitting in the back.

22           MR. KOBRE:  Yes, yes, yes.

23           THE COURT:  That's covered by the immunity agreement.

24           MR. KOBRE:  Yes, your Honor.  But perhaps --

25           THE COURT:  In that case he really needs to have his

1    lawyer explain that to him or he needs me to explain that to

2    him, one of the two.

3              MR. KOBRE:  Maybe it makes sense to have his lawyer

4    explain that to him and take a short break for that.

5              THE COURT:  Very short break, please.

6              (Recess)

7              (Continued on next page)

1           (Jury present)

2                THE COURT:  Sir, you understand you are to answer the

3      questions.

4                THE WITNESS:  Yes, I am.

5                MR. GOTTLIEB:  May I have the last question read back.

6                (Record read)

7      A.  Roughly 40,000.

8      Q.  And other than your share at the Sapphire Club and the

9      $40,000, do you have any other sources of income?

10               MR. KOBRE:  Objection.

11               THE COURT:  Overruled.

12     A.  Casual consulting.  Casual consulting.

13     Q.  What is casual consulting?

14     A.  I take guests out and entertain them.

15               THE COURT:  Thank you.

16               Move on, please.

17     Q.  How much money did you loan in connection with this case

18     for gambling?  What's the total amount of money?

19     A.  I don't have that answer.

20     Q.  Well, you told us on direct, Mr. Finger, that there were

21     seven times that you loaned money for gambling, correct?

22     A.  That is correct.

23     Q.  OK.  So on the first time, when was that?

24     A.  Sometime in 2016.

25     Q.  You can't be any more definite, correct?

IB17CAR5                         Finger - Cross

1    A.  I don't remember.

2    Q.  OK.  So the first time, how much money did you loan?

3    A.  100,000.

4    Q.  And where did that $100,000 come from?

5    A.  From Dezzi Sea Entertainment.

6    Q.  Dezzi Sea Entertainment that has the address at Michael

7    Wright's home, correct?

8    A.  Correct.

9    Q.  The second time how much did you loan?

10   A.  I think it's the same.  I don't remember.

11   Q.  $100,000?

12   A.  That's correct.

13   Q.  And where did you get that money, $100,000?

14          MR. KOBRE:  Objection to relevance.

15          THE COURT:  The objection is sustained.

16   Q.  What's the source of that money?

17          MR. KOBRE:  Objection.  Relevance.

18          THE COURT:  Objection sustained.

19   Q.  The third time, how much did you loan?

20   A.  200 maybe.

21   Q.  And the source of that money?

22          MR. KOBRE:  Objection.

23          THE COURT:  The objection is sustained.

24   Q.  OK.  The fourth time, how much money?

25   A.  I don't want to give you the wrong quote.  I'm not sure.

IB17CAR5                          Finger - Cross

1   Q.  Fifth time, how much money?

2   A.  That's a good question.

3   Q.  Thank you.  Sixth time?

4   A.  Sixth time, I think right around 500.

5   Q.  And the timeframe we're talking about for these loans is

6   when?

7   A.  I believe they were like two months to 90 days.

8   Q.  In what year?

9   A.  Started in 2016.

10  Q.  And the sixth time, how much did you loan?

11  A.  500, I believe it was, 500,000.

12  Q.  And the sixth time?

13          MR. KOBRE:  Asked and answered.

14  Q.  The last time, how much did you loan?

15  A.  The last time?

16  Q.  Yeah.

17  A.  The one that never came back was 500,000.

18  Q.  And all of this money that you're loaning, it wasn't your

19  money, was it?

20  A.  Absolutely was my money.

21  Q.  And it came from that company Dezzi Sea?

22  A.  No, it came from my work.

23          MR. KOBRE:  Objection.

24  Q.  And that money, did you wire the money each time?

25  A.  Yes.

1    Q.  And when you received money back, how did you receive it,

2    in what form?

3    A.  The first two times cash, and then it was wired back in the

4    wire.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. GOTTLIEB:

2   Q.  Now, is it fair to say that all of your conversations about

3   these loans for gambling, all of the conversations except that

4   last one you told us about was with Michael Wright, correct?

5   A.  Yes.

6   Q.  Michael Wright was the person who spoke to you initially

7   about loaning money that Craig Carton could use for gambling,

8   correct?

9   A.  That is correct.

10  Q.  And each time Michael Wright reached out to you for

11  additional moneys for gambling, you complied, correct?

12  A.  Yes.

13  Q.  And all of the conversations about paying gambling loans

14  came from Michael Wright, correct?

15  A.  Yes.

16  Q.  It wasn't until the end, after the last loan, whatever the

17  amount was -- I believe you said some $500,000?

18  A.  That's correct.

19  Q.  -- you say you personally met with Craig Carton, correct?

20  A.  That is correct.

21  Q.  And that was the only time you met with Craig Carton about

22  these gambling loans, correct?

23  A.  Oh, yes.

24  Q.  At this last meeting with Craig Carton, he explained to you

25  that the money in fact was used for gambling -- for gambling,

1    correct?

2    A.   Correct.

3    Q.   You understood and agreed to have Craig Carton use your

4    money so that you could actually make some money on his

5    gambling, correct?

6    A.   That is correct.

7    Q.   That was your hope and expectation, correct?

8    A.   Yes.

9    Q.   And Mr. Carton assured you that even that last loan, that

10   you would make a profit on it, correct?

11   A.   That is correct.

12   Q.   Because you knew that he liked to gamble, correct?

13   A.   Yes.

14   Q.   And you knew that he was good at gambling and he often made

15   money, correct?

16              MR. KOBRE:  Objection.

17              THE COURT:  The objection's sustained.

18   Q.   Other than that one conversation with Craig Carton that you

19   told us about with regard to gambling, you didn't have any more

20   conversations with him, correct?

21   A.   That is correct.

22              MR. GOTTLIEB:  Your Honor, I have no further

23   questions.  Thank you.

24              MR. KOBRE:  No redirect, your Honor.

25              THE COURT:  You may step down.

1            THE WITNESS:  Thank you.

2            (Witness excused)

3            MR. QUIGLEY:  Your Honor, the government calls Daniel

4   Cooney to the stand.

5            THE COURT:  OK.

6            MR. QUIGLEY:  Your Honor, he's actually going to

7   testify about a summary chart.

8            THE COURT:  I'm sorry?

9            MR. QUIGLEY:  He's actually going to testify about a

10  chart.

11           THE COURT:  Actually going to testify?

12           MR. QUIGLEY:  Yes.

13           THE COURT:  Would you mind swearing the witness,

14  please.

15  NATHANIEL COONEY,

16       called as a witness by the Government,

17       having been duly sworn, testified as follows:

18  DIRECT EXAMINATION

19  BY MR. QUIGLEY:

20  Q.  Good afternoon, Mr. Cooney.

21  A.  Good afternoon.

22  Q.  Where do you work?

23  A.  I work at the United States Attorney's Office for the

24  Southern District of New York.

25  Q.  And what do you do there?

1    A.  I'm a paralegal.

2    Q.  How long have you been working at the U.S. Attorney's

3    Office?

4    A.  Roughly four months.

5    Q.  When did you start working on this case, approximately?

6    A.  About the start of September.

7            MR. QUIGLEY:  Can we publish what's in evidence as

8    Government's Exhibit 4.  Can we highlight where it says,

9    "Government's Exhibit 50 consists of data stored on a cellular

10   telephone obtained from Joseph Meli on or about January 27,

11   2017."

12           Thank you, Mr. Urbanczyk.

13           Then can we highlight the paragraph below that:

14   Q.  Can you read that, Mr. Cooney.

15   A.  "Government Exhibit 51 consists of data stored on a

16   cellular telephone obtained from Craig Carton on or about

17   September 6, 2017."

18   Q.  Mr. Cooney, in preparation for this trial, were you asked

19   to do anything with Government's Exhibit 50 and 51?

20   A.  I was.

21   Q.  Generally, what was that?

22   A.  I was asked to reformat specific segments of these phone

23   reports to be reviewed and to make it more easily legible.

24   Q.  Who picked the excerpts that you pulled out of the phone

25   reports?

1   A.   The prosecutors.

2           MR. QUIGLEY:  Can you take a look, can we publish for

3   the witness Government's Exhibit 54, witness and the lawyers

4   and the judge, Government Exhibit 54.

5   Q.   Do you recognize that, Mr. Cooney?

6   A.   I do.

7   Q.   What is that?

8           Just go to the first page.

9           What is Government's Exhibit 54?

10  A.   This is the reformatted versions that I discussed for

11  Government Exhibit 50, which I believe is Meli's phone,

12  extractions from Meli's phone.

13          MR. QUIGLEY:  Can we take that down and put up

14  Government's Exhibit 53.

15  Q.   What is that, Mr. Cooney?

16  A.   This is the same thing but instead for Mr. Carton's phone

17  from Government Exhibit 51.

18  Q.   Does Government Exhibit 54 fairly and accurately depict

19  text messages and other electronic communications found on

20  Government's Exhibit 50?

21  A.   It does.

22  Q.   And does Government's Exhibit 53 fairly and accurately

23  depict text messages and other electronic communications found

24  in Government's Exhibit 51?

25  A.   It does.

1           MR. QUIGLEY:  Can we go to Government's Exhibit 54,

2    Segment A.

3    Q.   Do you recognize that, Mr. Cooney?

4    A.   I do.

5    Q.   What is it?

6    A.   It is one of these segments of SMS messages that I

7    reformatted from the original phone extraction.

8    Q.   When you say "reformatted," did you change any of the

9    actual content or text?

10   A.   No.

11          MR. QUIGLEY:  Your Honor, the government offers

12   Segment A of Government Exhibit 54.

13          MR. GOTTLIEB:  Objection.

14          THE COURT:  Ground?

15          MR. GOTTLIEB:  This witness is not qualified based on,

16   I'm sure, exemplary experience in the law to have now

17   reconfigured an exhibit that we have stipulated to that now

18   suddenly has a different form.

19          THE COURT:  The objection's overruled.

20          (Government's Exhibit 54 Segment A received in

21   evidence)

22          MR. QUIGLEY:  Thank you, your Honor.

23          THE COURT:  Ladies and gentlemen, if you should

24   perceive some substantive difference between this document that

25   this paralegal prepared and the real underlying exhibit, you

1    ignore this document and pay attention only to the real

2    underlying exhibit, OK?

3           This was done so that they can kind of highlight an

4    argument that they're trying to make to you.  So they've

5    reformatted what was at the top and in the middle and the

6    bottom is now this way and this way and that way.  If they blew

7    it, if they changed the date, if the text is wrong, if it

8    doesn't say in here exactly what it says in the original

9    document, you tear this up and throw it away, OK?  And you pay

10   attention to the original document.

11          Move on, please.

12          MR. QUIGLEY:  Could we publish Segment A of

13   Government's Exhibit 54.

14   Q.  What does the date column here reflect, Mr. Cooney?

15   A.  The date of the message and the original phone extraction.

16   Q.  And what's the time reflect?

17   A.  The time from that same extraction.

18   Q.  And incoming/outgoing reflect?

19   A.   It reflects whether the phone that the extract is from --

20   so for, I believe this one's Meli's phone, it says whether the

21   text message was sent by that phone or it was incoming to that

22   phone.

23   Q.  What does the "from" and "to" mean?

24   A.  The numbers and contact information of who that message was

25   sent to or received from.

1   Q.   And can you read the text message.

2   A.   Sure.  "CC –– MW and I caught up today and are formulating

3   a schedule to clean up the debt.  It makes sense that we as a

4   three man connect Monday and all agree on a plan, timing, and

5   mechanism with division of responsibilities to execute.  This

6   will be definitive and have no deviation.

7        "We will all be absolutely in sync so nobody has to

8   worry moving forward.

9        "Let me know a good time and location, brother.  Love

10  you both."

11  Q.   Again, which phone is this from?

12  A.   This is from Joseph Meli's phone.

13       MR. QUIGLEY:  Can we go to, just for the witness, the

14  lawyers, and the judge, Segment P of Government's Exhibit 54 on

15  page 19.

16  Q.   Do you recognize this, Mr. Cooney?

17  A.   I do.

18  Q.   And what is this?

19  A.   Similarly to Segment A, it's another section from that

20  original phone extract that we reformatted.

21       MR. QUIGLEY:  Your Honor, the government offers

22  Segment P of Government's Exhibit 54.

23       MR. GOTTLIEB:  Objection, your Honor.

24       THE COURT:  Overruled.

25       (Government's Exhibit 54 Segment P received in

1    evidence)

2    BY MR. QUIGLEY:

3    Q.  Can you read that.  Can you we read -- publish Segment P.

4    And, Mr. Cooney, can you read it.

5    A.  Sure.  Incoming from Wright:  "Ron up your ass still?"

6               Outgoing:  "I am sure."

7               Incoming Wright:  "I'm going to print up our debt list

8    for tomorrow's meeting.  Do you want me to put in what you're

9    owed, and if so, how much?"

10              Outgoing:  "I will bring that."

11              Outgoing, again, this time to Wright and Carton:  "We

12   are doing this tmrw now, right?"

13              Incoming Carton:  "Correct."

14              Incoming Carton:  "Can we get tickets this week for

15   Dead & Co.?"

16              Incoming Carton:  "They go on sale Friday."

17              Outgoing to both Wright and Carton:  "Only if they

18   accept our deal."

19              Incoming Carton:  "I can have Brigade put $500,000 and

20   1 million in.  Starts returning money right away."

21   Q.  Go to the next page.

22   A.  Incoming Carton:  "Would be a legit way to raise dough."

23              Incoming Carton:  "When do you find out?"

24              Outgoing Wright and Carton:  "CC -- We will discuss

25   tomorrow.  There is an issue with the math, which we will

IB1HCar6                          Cooney - Direct

figure out in person."

        Incoming Carton:  "What math?  Money owed or something else?"

        Outgoing Wright and Carton:  "We use Brigade money to repay debts.  Where do we get the money to buy tickets, and furthermore, what deal do we offer the money provider for the tickets?  We cannot pay Brigade with other people's money right away because it does not work.  We need Brigade to buy deals with long lead times and earn money in the interim and use the earned money to replace the Brigade funds in ticket deals on the future.  That is the math we have to figure out and work it into a schedule to get down to zero."

        Incoming Carton:  "Agreed.  My thought was if we could sell a bunch of Dead & Co. tickets next two weeks, we would have legit profit to use and at the same time create amazing goodwill with Brigade."

Q.  Go to the next page, please.

A.  Outgoing Wright and Carton:  "What is the profit split with Brigade?"

        Outgoing Wright and Carton:  "Let's sit tomorrow and grind out a one-year schedule which could include Dead & Co., etc."

        Incoming Carton:  "I get 50 percent net after they get 10 percent pref."

        Outgoing Wright and Carton:  "Great deal."

1          Incoming Carton:  "Yes."

2          Incoming Carton:  And they told me they will quickly

3    go to 25 to 30M," million, "if all goes well."

4          Incoming Carton:  "Dead & Co."

5          Incoming Wright:  "Can you go to Brigade, tell them

6    the 800 is already earmarked for deposits, but we have a

7    1 million opportunity for dead?"

8          Incoming Carton:  "Yes."

9    Q.  Next page.

10   A.  Incoming Carton:  "They will eat it up."

11        MR. QUIGLEY:  Could we go to Segment U on page 27,

12   just for the witness, the lawyers, and the judge.

13   Q.  Mr. Cooney, do you recognize this?

14   A.  I do.

15   Q.  What is it?

16   A.  It's another segment from the same phone extract.

17        MR. QUIGLEY:  Your Honor, the government offers

18   Segment U of Government Exhibit 54.

19        MR. GOTTLIEB:  Objection.

20        THE COURT:  Overruled.

21        (Government's Exhibit 54 Segment U received in

22   evidence)

23   BY MR. QUIGLEY:

24   Q.  Can you read this one, Mr. Cooney.

25   A.  Sure.  The first message is 12/23/2016, 7:49 a.m.

1        Incoming Carton:  "Guys, please make sure wires get
2   done today."
3        Incoming Wright:  "Probably won't be done today.  I'm
4   not by my bank, and Chase said if a wire's not processed by 12,
5   it usually takes a day to clear.  That's on my end.  Quickest
6   would be for Joe to wire Ron direct."
7        Incoming Carton:  "Joe, could you wire to me direct
8   today?"
9        Incoming Carton:  "I have everything in place based on
10  receiving the 600."
11       Incoming Carton:  "Today."
12       Incoming Wright:  "I think that would be most
13  efficient.  I wouldn't get to my bank till 2 or 3, which means
14  the wire wouldn't clear until Tuesday.  Monday is a bank
15  holiday."
16       Incoming Carton:  "Plus, I have no choice."
17       Incoming Carton:  "Based on everything I've said and
18  set in motion."
19       Incoming Carton:  "Please send my wire ABA 021000089."
20       Outgoing Wright and Carton:  "Guys, we have a prob.
21  There was a storm that took out all WIFI and Internet.  I have
22  no access thru any hotel in the region.  I get texts
23  sporadically.  I can't send the wire, let alone contact my
24  banker."
25  Q.  Next page.

IB1HCar6                        Cooney – Direct

A.   Incoming Carton:  "4971314713 account."

          Outgoing Wright and Carton:  "Send me account info.  I will try to reach my dad and see if he can bridge immediately."

          Outgoing Wright and Carton:  "Is account name Craig Carton?"

          Incoming Carton:  "Yes."

          Incoming Carton:  "MW, give my account please."

          Incoming Wright:  Citibank ABA 021000089.  "Account, 4971314713.  Name, Craig Carton."

          Outgoing Carton:  "Coming in several wires, 400, 150, and 50."

          Incoming Carton:  "Late yesterday it cleared."

          MR. QUIGLEY:  You can take that down.

          Your Honor, I have no further questions.

          THE COURT:  Anything?

          MR. GOTTLIEB:  No, your Honor.  Thank you.

          THE COURT:  OK.  Next.

          MR. QUIGLEY:  Call Mr. Urbanczyk again to read some emails your Honor.

          THE COURT:  OK.  Still under oath.

          MR. QUIGLEY:  Mr. Cooney, could we publish what's in evidence as Government's Exhibit 297.

LUKE URBANCZYK,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

IB1HCar6                        Urbanczyk – Direct

1    DIRECT EXAMINATION

2    BY MR. QUIGLEY:

3    Q.   Can you read that, Mr. Urbanczyk.

4    A.   Sure.  It's from Craig labs123@aol.com.  It was sent

5    Wednesday, August 31, 2016, to Joseph Meli, jMeli74@gmail.com,

6    and Michael Wright, michaellawwrightnyc@gmail.com.

7         The body of the email reads:  "Guys, hope you are

8    planning a great Labor Day with the great news I brought you

9    yesterday regarding Jay and Ron.  I have some selfish bad news

10   and frankly need help.

11        "When Borgata froze the money, I attempted to get the

12   cash I was responsible for by playing cards.  Long story short,

13   I was able to produce the cash and the wires we needed on time,

14   but by creating significant debt that is coming due.  On top of

15   that, I had been funding out of pocket Jarrett, Jason, and

16   Charod" -- it's C-h-a-r-o-d -- "and the Band-Aid company and

17   jewelry company and the office also out of pocket.

18        "Totally my responsibility, but I am out of good luck

19   charms, and the money is lost the last few casino visits and

20   have approximately 2.5 in outstanding debt that comes due over

21   the next 30 days or so starting September 9.

22        "I've shit every casino account down, so no worries

23   about that, but I am really fucked.

24        "Need some ideas and help from the only two guys I can

25   mention this to."

1          MR. QUIGLEY:  Could we publish what's in evidence as

2     Government Exhibit 224.

3          MR. JANEY:  No objection, your Honor.

4          THE COURT:  Admitted.

5          (Government's Exhibit 224 received in evidence)

6     BY MR. QUIGLEY:

7     Q.  Can you read the email from Michael Wright.

8     A.  Sure.  It's from Michael Wright to Joseph Meli and Craig

9     Carton on Monday, September 5, 2016.  Subject, tomorrow,

10    10:30 a.m.

11         The body reads:  "For the sake of our conversation

12    tomorrow, we have an idea of what we have in totality, but have

13    to discuss timing, particularly what is past due and due next

14    week.

15         "Here is the debt past due and due next week with

16    ideas:

17         "1.  245K paper due to CBM LLC (past due).  I spoke to

18    one member who is reasonable that has 100K in.  He would

19    refinance for two more weeks, but the interest would have to be

20    in advance at 15 percent due to how long we have been holding

21    it.

22         "2.  Rod Hutter, 86,250 due on 9/7.  Joe said AE will

23    pay fully (We can discuss future credits later).

24         "3.  The Bamberger effect due on 9/9, 825K, no

25    solution at this time."

1   Q.  You can stop right there.  We'll publish the rest of the

2   email.  Then can you read the response from the defendant in

3   the top email.

4   A.  Sure.  It's from Craig Carton to michaelwrightnyc@gmail.com

5   and jmeli74@gmail.com.  Subject, re tomorrow 10:30 a.m.

6          And the body reads:  "Don't forget I have 1 million

7   coming tomorrow from ticket investor.  Will need to be

8   discussed how to handle."

9          MR. QUIGLEY:  Could we publish what's in evidence as

10  Government's Exhibit 226.

11  Q.  Can you read the email from the defendant.

12  A.  Sure.  It's from Craig.  Subject is re brand.  Sent

13  Thursday, September 8, 2016, to Michael Wright.

14         The body of the email says:  "Margin started calling

15  yesterday.  Mortimer for 500 and 500 more is coming Friday for

16  Minday.

17         "First two didn't clear, so the game now begins, but

18  it's a shitty game.

19         "EB has been cool.  Not a word.  But next week will

20  want it back in full.

21         "If my Ron investor greenlights my use of his dough

22  today, and he should, then we can take care of CMB (240), EB

23  interest (75), SH (200), Trop (300), GN (200) and extends

24  payback to November."

25         MR. QUIGLEY:  Can we publish what's in evidence as

1   Government Exhibit 539.

2   Q.  And just read the email above up to the dashes right now.

3   A.  It's from Craig Carton to eric.bamberger@ignitionone.com on

4   September 8, 2016.

5           It says:  "Micky's Bday today.  Amazingly, she's 16.

6   So I may be out of pocket at the DMV and then who knows.

7           "Let me know if safe to bring paper to football (Kim's

8   busting my balls about going since her dinner is at 6:30, so I

9   may not go.  If I don't, let's hook up for the paper part

10  tomorrow and for sure before I spend it on cheap tequila.

11          "Wire was sent in two pieces.  Confirmed Monday for

12  number one will immediately flip to you.

13          "Confirmed Friday worst case for number two again will

14  flip to you.  Thus bringing an end (till next time) one of the

15  great summers of all time."

16  Q.  We can take that down and then highlight the second part of

17  the email.

18  A.  "Separate issue.  Confidential.

19          "The ticket business Joe and I have been working on

20  for two years is now a legit rocket ship about to take off.

21  (I'll explain in detail in person.

22          "I have set up a company that has an exclusive ticket

23  access to literally every single Live Nation and AEG show

24  anywhere.  All premium seats, etc. ... all trackable in real

25  time.

1          "My company can buy up to 30 percent of the entire

2     allotment for any show, every show, or no shows, totally my

3     call.  I, of course, am syndicating it out and creating what

4     amounts to a fund.  Money back first plus 10 percent pref and

5     then 50/50 split on net.  There will be legitimately well over

6     100 million in opportunity.  Avg returns would be at least 1.5x

7     and up.  If worth a conversation, let me know.  Peace."

8          MR. QUIGLEY:  We can take that down.  Finally, can we

9     publish what's in evidence as Government Exhibit 228.

10    Q.  Can you read from the email from Craig Carton on Tuesday,

11    September 13, at 6:36 a.m. to Michael Wright.

12    A.  All right.  It reads:  "Is it better for me to pay the CMB

13    and the 62.5 today or the casinos?"

14    Q.  Read the next email up.

15    A.  It's from Michael Wright to Craig Carton on September 13,

16    2016.  Subject, re paper due.

17          It says:  "I can refi 100 of the 245 of CMB, but that

18    will cost 15 percent and will be due 9/30.  Today we need 160K

19    to get CMB off of us.  15K would be the interest.  So on 9/30

20    only 100K would be due.

21          "The 62.5, if AE pays back the 115K to NV LLC, I can

22    probably push another 30 days.

23          "Can we get to here?"

24    Q.  Can you read the response from the defendant.

25    A.  This is Craig Carton to Michael Wright, September 13, 2016:

1    Email reads:  "We still have 50 in there plus the Ron dough,

2    420 plus 50 is 470.

3              "If we get the 500 from Harvey, it's 970.

4              "245 to CMB leaves 725."

5              MR. JANEY:  Objection, your Honor.

6              THE COURT:  It's not CMB.

7    A.   Sorry.  "CBM," I apologize.  I'll restart that line.

8              "245 to CBM leaves 725.

9              "200 to GN leaves 525.

10             "62.5 leaves 465.

11             "300 to Sands leaves 165.

12             "Would leave debt to dezi, etc., (700 principal).

13             "Ron due 1.3-1.4 on November 15."

14   Q.   Can you read the top email.

15   A.   It's from Michael Wright to Craig Carton on September 13,

16   2016, says:  "Sent offer to Harvey."

17             MR. QUIGLEY:  You can take that down.

18             We have nothing further at this time.

19             Mr. Urbanczyk, you can step down.

20             Your Honor, could we approach?

21             THE COURT:  Sure.

22             (Continued on next page)

23

24

25

IB1HCar6

1                (At sidebar)

2                THE COURT:  Yes.

3                MR. QUIGLEY:  We have some more emails we could read.

4    Most of our other witnesses are on Monday, if you want to --

5                THE COURT:  I understand.  They're all coming in

6    Monday and rest Monday.

7                MR. QUIGLEY:  I think we'll rest Tuesday morning, or

8    sometime on Tuesday.

9                THE COURT:  Let's get rid of the jury.  I want to tell

10   them that things are moving swimmingly, and I want to send them

11   home for the weekend and we can chat.

12               (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

IB1HCar6

1          (In open court; jury present)

2          THE COURT:  So that's it for the day.  That's it for

3  the week.  Now, the good news which they just whispered to me

4  is that the government's case is going in faster than it

5  expected.  So when they told me it was going to take them two

6  full weeks to put in their case, they overestimated.  So we're

7  ahead of the game right now, all right.  I have every reason to

8  believe that you'll be deliberating on this case next week.  So

9  take that home and enjoy it for the weekend, and I will see you

10  on Monday morning.

11          Don't discuss the case over the weekend.  Don't look

12  up anything about the case.  Don't try to find out anything

13  about the case.  And if something happens to cross your eyes,

14  close them; your ears, plug them; and just pay no attention to

15  anything.

16          I will see you, have a wonderful weekend, on Monday

17  morning, 9:45.

18          (Jury excused)

19          (Continued on next page)

20

21

22

23

24

25

IB1HCar6

1        (Jury not present)

2        THE COURT:  Have a seat.

3        Who do we have left to hear from, from the government?

4        MR. QUIGLEY:  Your Honor, we're going to go back and

5    discuss.  I'm not sure we're going to call everyone who is on

6    our list at this point, but you know, I think in terms of the

7    length -- in terms of the other potential witnesses, there's

8    another potential investor or two that we could call.  There

9    may be some, potentially some, witnesses from casinos, a

10   summary chart witness.  I think he'll probably be the

11   lengthiest -- one of the lengthier witnesses remaining, right,

12   and potentially a witness from AEG who I think will be, you

13   know, the concert promotion company who I think will be

14   relatively -- at least his direct will be relatively short.

15   And there are a number of witnesses who are, I think, frankly

16   more of a custodial-type nature, getting business records and

17   things like that.  I think there are a number of witnesses, but

18   most of them are pretty short.

19       THE COURT:  Mr. Gottlieb, Mr. Janey, you obviously are

20   going to have some decisions to make over the weekend, but were

21   you to put on a case, any estimate of how long it might last?

22       MR. GOTTLIEB:  I don't think it would be

23   extraordinarily long, your Honor.  I think it would be a matter

24   of a few days.

25       THE COURT:  A few days would be extraordinarily long

IB1HCar6

1    for a defense case in my --

2            MR. GOTTLIEB:  No, your Honor, I'm factoring in

3    everything under the -- no final decisions have been made.

4            THE COURT:  Nor do they need to be made.

5            MR. GOTTLIEB:  And that's why I hedged in saying that.

6            THE COURT:  And they don't need to be communicated to

7    me.

8            MR. GOTTLIEB:  So it could be I believe the case is

9    resolved next week.

10           THE COURT:  I will get you by email tomorrow a draft

11   charge, just so you have something to look at over the weekend.

12   Good.  Onward.

13           MR. GOTTLIEB:  Your Honor, I would simply ask -- the

14   government actually has been very cooperative here in letting

15   us know which witnesses -- if they can give us some idea

16   certainly for Monday.

17           THE COURT:  They should.

18           MR. QUIGLEY:  Just on that note, your Honor, this may

19   be kind of a fool's errand, but I think in your pretrial order

20   it said if the defense is going to call any witnesses, they too

21   should provide a witness list the Friday before.  So I would

22   just put that on for the record.

23           THE COURT:  That's true.

24           MR. QUIGLEY:  A witness list of anyone they intend to

25   call.

IB1HCar6

1          THE COURT:  Anyone they may call.

2          MR. QUIGLEY:  Right.

3          THE COURT:  They don't have to make any decisions.

4     But, yes, it does say that, and I expect that to be complied

5     with.

6          MR. QUIGLEY:  Thank you, your Honor.

7          THE COURT:  OK.  Great.

8          MR. GOTTLIEB:  We will make sure they get that over

9     the weekend also, your Honor.

10         THE COURT:  Terrific.  It was supposed to be by

11    Friday.

12         MR. QUIGLEY:  I believe it's by Friday.

13         THE COURT:  I actually wrote it down in an order.  It

14    is tomorrow.  In a written order, yes, I did.

15         MR. GOTTLIEB:  I lost track of the days, your Honor.

16         THE COURT:  It's OK.  I know.  We've been together for

17    four days also.

18         MR. GOTTLIEB:  It's gone very quickly, your Honor.

19         THE COURT:  It has.

20         So I'll see you all on Monday.

21         MR. QUIGLEY:  Thank you, your Honor.

22         MR. GOTTLIEB:  Thank you, your Honor.

23         (Adjourned to November 5, 2018, at 9:45 a.m.)

24

25

```
 1                           INDEX OF EXAMINATION

 2    Examination  of:                              Page

 3    FRED MANGIONE

 4    Direct By Mr. Kobre  . . . . . . . . . . . 457

 5    Cross By Mr. Gottlieb  . . . . . . . . . . 493

 6    Redirect By Mr. Kobre  . . . . . . . . . . 536

 7    RONALD DELGAUDIO

 8    Direct By Mr. Quigley  . . . . . . . . . . 553

 9    Cross By Mr. Janey . . . . . . . . . . . . 583

10    DESMOND FINGER

11    Direct By Mr. Kobre  . . . . . . . . . . . 596

12    DESMOND FINGER

13    Direct By Mr. Kobre  . . . . . . . . . . . 600

14    Cross By Mr. Gottlieb  . . . . . . . . . . 613

15    NATHANIEL COONEY

16    Direct By Mr. Quigley  . . . . . . . . . . 629

17    LUKE URBANCZYK

18    Direct By Mr. Quigley  . . . . . . . . . . 640

19                           GOVERNMENT EXHIBITS

20    Exhibit No.                              Received

21    3   . . . . . . . . . . . . . . . . . . . 541

22    4   . . . . . . . . . . . . . . . . . . . 542

23    224   . . . . . . . . . . . . . . . . . . 542

24    226   . . . . . . . . . . . . . . . . . . 542

25    228   . . . . . . . . . . . . . . . . . . 542
```

```
 1    248    . . . . . . . . . . . . . . . . . . 543

 2    276    . . . . . . . . . . . . . . . . . . 543

 3    281    . . . . . . . . . . . . . . . . . . 543

 4    280, 283, 286, 295, 297, and 539   . . . . . 544

 5    732    . . . . . . . . . . . . . . . . . . 544

 6    736    . . . . . . . . . . . . . . . . . . 544

 7    738    . . . . . . . . . . . . . . . . . . 545

 8    739    . . . . . . . . . . . . . . . . . . 545

 9    741    . . . . . . . . . . . . . . . . . . 545

10    546    . . . . . . . . . . . . . . . . . . 557

11    540    . . . . . . . . . . . . . . . . . . 558

12    1300   . . . . . . . . . . . . . . . . . . 560

13    547    . . . . . . . . . . . . . . . . . . 565

14    548    . . . . . . . . . . . . . . . . . . 565

15    504    . . . . . . . . . . . . . . . . . . 568

16    1301   . . . . . . . . . . . . . . . . . . 570

17    1302   . . . . . . . . . . . . . . . . . . 574

18    549    . . . . . . . . . . . . . . . . . . 576

19    532    . . . . . . . . . . . . . . . . . . 578

20    550    . . . . . . . . . . . . . . . . . . 580

21    54 Segment A   . . . . . . . . . . . . . 632

22    54 Segment P   . . . . . . . . . . . . . 634

23    54 Segment U   . . . . . . . . . . . . . 637

24    224    . . . . . . . . . . . . . . . . . . 641
```

25                    DEFENDANT EXHIBITS

Exhibit No.                                      Received

95    . . . . . . . . . . . . . . . . . 531

1    . . . . . . . . . . . . . . . . . 533

6    . . . . . . . . . . . . . . . . . 534

6 unredacted    . . . . . . . . . . . . 536

122    . . . . . . . . . . . . . . . . 589