UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                                    Plaintiff,

        v.

CRAIG CARTON,

                                    Defendant.

Case No. 17 Cr. 680 (CM)

## SENTENCING MEMORANDUM ON BEHALF OF
## DEFENDANT CRAIG CARTON

GOTTLIEB & JANEY LLP
Derrelle M. Janey, Esq.
Robert C. Gottlieb, Esq.
111 Broadway, Suite 701
New York, New York 10006
T: (212) 566-7766
F: (212) 374-1506

*Attorneys for Defendant Craig Carton*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ........................................................... 1

I.     RELEVANT FACTUAL BACKGROUND .................................. 5

II.    MR. CARTON'S APPLICABLE LOSS AMOUNT AND REPAYMENT TO BRIGADE ............................................................................... 11

III.   MR. CARTON'S MEDICAL HSTORY AND GAMBLING ADDICTION ........... 14

IV.    DRAFT UNPUBLISHED BOOK CHAPTER ........................... 15

V.     MR. CARTON'S ONGOING REHABILITATION ................... 16

VI.    SECTION 3553(A) FACTORS ANALYSIS AS APPLIED TO MR. CARTON's CASE ...................................................................................... 17

VII.   CONSIDERATION OF SECTION 3553(A) FACTORS MERIT A LENIENT SENTENCE ........................................................................... 19

       A.    History and Characteristics of the Defendant .................. 19

             a.   Mr. Carton's Charitable Work Related to Tourette Syndrome ............... 22

             b.   Mr. Carton's Additional Community Service ............................. 24

       B.    Nature and Circumstances of the Offense ........................ 28

       C.    A Non-Guidelines Sentence Serves the Purposes of Sentencing ...................... 29

             a.   The Need to Afford Adequate Deterrence to Criminal Conduct and Just Punishment for the Offense ..................................................... 29

             b.   Need to Protect the Public ....................................... 30

             c.   Need to Provide the Defendant with Correctional Treatment in the Most Effective Manner ..................................................... 32

       D.    Need To Avoid Unwarranted Sentencing Disparities ........................ 32

       E.    The Proposed 18-Level Enhancement Overstates The Seriousness of the Offense And Disproportionately Affects the Sentencing Guidelines Range ... 33

      F.     Restitution..............................................................................................34

VIII.    MR. CARTON'S PERSONAL AND PROFESSIONAL BACKGROUND............35

CONCLUSION ..........................................................................................................39

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States,*
    552 U.S. 38 (2007)..................................................................................................... 18, 19

*Koon v. United States,*
    518 U.S. 81 (1996)........................................................................................................ 19

*Rita v. United States,*
    551 U.S. 338 (2007)...................................................................................................... 17

*United States v. Adelson,*
    441 F. Supp. 2d 506 (S.D.N.Y. 2006)................................................................. 19, 30, 34

*United States v. Booker,*
    543 U.S. 220 (2005).................................................................................................. 17, 18

*United States v. Carboni,*
    204 F.3d 39 (2d Cir. 2000)........................................................................................... 34

*United States v. Cavera,*
    550 F .3d 180 (2d Cir. 2008)........................................................................................ 18

*United States v. Cooper,*
    394 F.3d 172 (3d Cir. 2005)......................................................................................... 21

*United States v. Emmenegger,*
    329 F. Supp. 2d 416 (S.D.N.Y. 2004).......................................................................... 34

*United States v. Greene,*
    249 F. Supp. 2d 262 (S.D.N.Y. 2003)......................................................................... 21

*United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. Oct. 24, 2012) (11 Cr. 907 (JSR)),
    Dkt. No. 127............................................................................................................... 18

*United States v. Marino,*
    654 F.3d 310 (2d Cir. 2011)......................................................................................... 35

*United States v. Merritt,*
    988 F.2d 1298 (2d Cir. 1993)....................................................................................... 19

*United States v. Parris,*
    573 F. Supp. 2d 744 (E.D.N.Y. 2008) ......................................................................... 34

*United States v. Rita,*
    551 U.S. 338 (2007)..................................................................................................... 19

*United States v. Serafini,*
    233 F.3d (3d Cir. 2000)..................................................................... 20, 21

*United States v. Silkowski,*
    32 F.3d 682 (2d Cir. 1994).................................................................. 35

*United States v. Thurston,*
    544 F.3d 22 (1st Cir. 2008)................................................................ 20

*United States v. Tomko,*
    562 F.3d 558 (3d Cir. 2009)............................................................... 20, 21

*United States v. Zangari,*
    677 F.3d 86 (2d Cir. 2012).................................................................. 35

## Statutes

18 U.S.C. § 3553(a) ............................................................................ *passim*

18 U.S.C. § 3663(A)..........................................................................…..35

18 U.S.C. § 3663(A)(b)(4)..................................................................…..11

18 U.S.C. § 3663(A)(c)(1)(B)..............................................................…..35

18 U.S.C. § 3664(e) ..........................................................................…..35

18 U.S.S.G. §2B1.1............................................................................12

## Other Authorities

American Psychiatric Association Committee on Nomenclature and Statistics, *Diagnostic and Statistical Manual of Mental Disorders* 585-598 (5th Ed. 2013) ...................................................2

Johnston, E. Lea, *Retributive Justifications for Jail Diversion of Individuals with Mental Disorder*, 35 Behav. Sci. & Law 8 (2017)…….............................................................2

Defendant Craig Carton comes before the Court for sentencing on April 5, 2019, following his conviction on November 7, 2018.    Mr. Carton respectfully submits this memorandum, by and through undersigned counsel, to assist the Court in determining the sufficient sentence in this case.

## PRELIMINARY STATEMENT

The retributive theory of punishment—the prevailing underlying principle of criminal law in the United States today—mandates that Craig Carton be punished for his criminal law violations.  A jury of his peers found him guilty of the charged conduct and, here, at sentencing, **Mr. Carton acknowledges and accepts that he committed crimes**; he made misrepresentations to victims in this case.  More particularly, Mr. Carton told them that he would use money loaned to him to purchase tickets; however, at least with respect to monies he received, Mr. Carton most often used those to support his gambling addiction.  Indeed, while it is undeniable that Mr. Carton purchased over 3,400 tickets in connection with the Brigade relationship, those tickets were acquired with assets other than the specific funds loaned to Mr. Carton (e.g., his AMEX credit card).  These are the crimes, in sum and substance, for which Mr. Carton was convicted and he accepts full responsibility for those crimes.

Further, **Mr. Carton acknowledges that he will be punished**, and, consistent with the principles of retributive punishment, that he will be punished in proportion to his level of culpability.  In other words, Mr. Carton's precise role in the scheme matters.  As we will elaborate below, we offer facts about his role not so as to re-litigate the trial; rather, we emphasize certain facts in order to highlight what Mr. Carton did and did not do in order to aide Your Honor in defining a punishment that is proportionate and sufficient to achieve the objectives of Section 3553(A).  Additionally, as we discuss at length herein below, including

with the support of forensic psychiatric analysis, we submit that it is imperative to take into account Mr. Carton's severe gambling addiction as a mitigating factor in shaping the appropriate punishment.  Again, to be clear, Mr. Carton accepts that the just desert theory of punishment means that the severity of his sanction should convey the degree to which Your Honor believes he should be censured.   On the other hand, ordinal proportionality also tells us that blameworthiness is "an amalgamation of the harm caused by an offense and the offender's culpability in effecting that harm."[1]  Where, as here, mental disease, and the predicates that lead to it—in this case, repeated instances of childhood rape and other childhood traumas—plays a material role in a defendant's commission of a criminal act, there should be a sentencing adjustment.   Simply, mental conditions capable of exerting such extraordinary psychological pressure warranting sentencing adjustment include compulsive disorders, which traditionally have been conceptualized as involving volitional or control deficiencies.   *Id*.   As a report attached to this memorandum describes at length, Mr. Carton has a severe gambling addiction, sponsored by horrific and repeated instances of childhood traumas, that provides context for some of the underlying behavior here.   We submit that his gambling addiction—a disorder recognized in DSM-5 as a mental disease—is a mitigating factor for sentencing purposes.[2]  Mr. Carton has a "control deficiency" for which he has been receiving treatment throughout most of the pendency of this action and more intensely since trial, as more full described herein below.

To be clear, Mr. Carton is **not** arguing that either his gambling addiction or the fact that he is a victim of childhood sexual assault is an excuse for his crimes; there is no excuse for

---

[1]  *See* Johnston, E. Lea, *Retributive Justifications for Jail Diversion of Individuals with Mental Disorder*, 35 Behav. Sci. & Law 8 (2017).
[2]  *See* American Psychiatric Association Committee on Nomenclature and Statistics, *Diagnostic and Statistical Manual of Mental Disorders* 585-598 (5th Ed. 2013); attached hereto as **Exhibit A-1** are the Diagnostic Criteria for Gambling Disorder as described in DSM-5.

violations of the criminal law.[3]   Rather, as is appropriate for sentencing purposes, and as elaborated more fully herein, Mr. Carton provides context for what Your Honor will inevitably find to be the "Janus faced" person, a defendant praised as an important contributor to society as recounted by character letters in support and the person presented to Your Honor at trial as someone who lied in order to gain access to money.  The report included here by Dr. Potenza (Professor of Psychiatry at the Child Study Center and of Neuroscience of Yale University Medical School), the leading analyst on gambling addiction certainly in the United States, lends his scientific expertise based on his experience and evaluations of Mr. Carton to help explain the role Mr. Carton's severe gambling addiction and childhood traumas played in these crimes.

Again, Mr. Carton does not offer the fact and analysis of his severe gambling addiction, or the childhood trauma that underlies the addiction, in order to excuse his conduct but to provide the court with a more complete context for his behavior for sentencing purposes.  To avoid all doubt that the childhood traumas Mr. Carton has experienced are somehow manufactured for the purposes of sentencing and, more specifically, our sentencing request, we include here, attached as **Ex. C** a draft chapter that was intended to be included in Mr. Carton's 2013 autobiography, Loudmouth, published by Simon & Schuster.  Upon reading the draft chapter recounting in detail Mr. Carton's experience as a victim of childhood rape, the publisher advised Mr. Carton not to include the chapter.  We include the unpublished, draft chapter here, in the form provided to undersigned counsel, in order to eliminate any potential speculation that Mr. Cartons' rape trauma is a contrivance.

This discussion about gambling addiction (and the predicates that led to it) is important, for the reasons we elaborate herein below, because ordinal proportionality in the retributive theory of punishment considers both the harm caused by an offense and the offender's

---

[3] Attached herein as **Exhibit A-2** is a letter from Mr. Carton to Your Honor in which he makes no excuses.

culpability in effecting that harm.  Critical to that notion is that mitigating factors, such as mental disease (here, gambling addiction) creates partial culpability which, we submit, has a direct effect on sentencing.

Further still, we submit that punishment itself is only one aspect of the sentencing consideration—justice is the other.  Consistent with fundamental tenets of the criminal law in this country, and reflected within the Sentencing Guidelines framework, justice means reparation of the wrongs suffered; restitution of the losses incurred; compensation for the suffering endured. Justice is not always possible.  Arguably, in murder cases justice is not possible because no amount of money can restore the life of the victim.  In a wide number of white collar cases, justice is also elusive because the court's restitution order is all-too-often a dead letter. However, here, as elaborated below, justice is possible, as long as punishment is proportionate and balanced.  More particularly, as evidenced by a letter addressed to Your Honor attached here as **Ex. A-3**, Mr. Carton's former employer, WFAN Sports Radio, is willing to discuss Mr. Carton re-joining WFAN "if Craig was sentenced to probation or any other non-prison based punishment."  Additionally, Mr. Carton's employer during the pendency of the case, SportsGrid, as demonstrated by a letter addressed to Your Honor attached here as **Ex. A-4**, in sum and substance, is willing to re-hire Mr. Carton if he is able to "remain in the work force after sentencing."  These letters are important because they demonstrate a non-speculative basis to assert that Mr. Carton has a capacity to immediately earn substantial money to repay his victims. In this regard, it is worth noting at least a few things.  First, Mr. Carton earned over $2 million per year when he was employed by WFAN.  If he earned even half of that salary at this point, his capacity to make restitution would be substantial.  As Your Honor is aware, this ability to provide justice to victims is hardly viable in many, many white collar cases.  However, justice

can exist here.  Second, as the letter to Your Honor from WFAN suggests, Mr. Carton could further contribute by using his native talents to "help educate…[audiences] on the dangerous allure of extreme gambling."  Mr. Carton has a unique platform, based on his outsized talent, to also compensate society writ-large by engaging radio audiences about extreme gambling and, frankly, also about the sorts of traumas that might lead to that dark place, specifically childhood traumas.

For these, and all of the Section 3553(A) factors, elaborated upon herein below, we respectfully submit that Your Honor should determine a non-guidelines sentence in the case of Craig Carton.

## I.    RELEVANT FACTUAL BACKGROUND

Your Honor presided over a 6-day trial in which the Government put on its case against Mr. Carton.  So, we know Your Honor is very familiar with the case facts.  Nevertheless, Mr. Carton wishes to emphasize the following facts relevant for sentencing in order to explain his actual role so that, in turn, the Court can more fully assess his culpability in the scheme:

Aside from his career as a radio broadcaster, Mr. Carton established a business acquiring bulk tickets to live events, including sporting events and concerts, which he in turn would resell on the secondary ticket market.  On the basis of a pre-existing and long established relationship with executive management at Brooklyn Sports and Entertainment[4] ("Barclays"), Mr. Carton was presented with an opportunity to sell blocks of seats from their arenas in the secondary ticket market.  More particularly, beginning in 2015, senior executive management at Barclays presented Mr. Carton with opportunities to purchase tickets to live events at both Barclays Center and Nassau Coliseum.  Tr. at 415:17 – 416:15.[5]  Mr. Carton purchased and sold tickets

---

[4] The PSR refers to Brooklyn Sports and Entertainment as the "Sports and Entertainment Company."
[5] "Tr." denotes the Trial Transcript of Mr. Carton's criminal trial.

under this arrangement.  In fact, the Government does not deny that Mr. Carton sold tickets. (*See* Government's Opposition to Motion for Clarification, ECF No. 119, 2, 5) ("Carton finally purchased...tickets to Streisand and Metallica performances").

As the secondary market ticket resale venture grew, in May 2016, Mr. Carton formed Tier One Tickets with Michael Wright and, concurrently, Mr. Carton gambled prolifically at casinos such as Resorts World Bimini in the Bahamas; Atlantis Paradise Island Resort and Casino located in the Bahamas; Borgata Casino, Hotel and Spa located in Atlantic City, New Jersey; and Sands Casino located in Bethlehem, Pennsylvania, among others.  In partnership with Michael Wright and Joseph Meli, Mr. Carton sought loans and investors to fund the gambling operation.  In some instances, Mr. Carton gambled on behalf of others, persons who invested large sums of money with him based on his gambling prowess.[6]  One of these lenders was Mr. Meli himself.  According to Mr. Meli, he loaned Mr. Carton "approximately $8 million, most of which was used to help cover Carton's gambling debts, because Carton led Joe to believe that he would one day help Joe obtain valuable tickets to live events."  (*See* Joseph Meli's Sentencing Memorandum, Case 1:17-cr-00127 (KMW) (S.D.N.Y.)).  Even though Mr. Carton legitimately pursued a ticket business, over the course of 2016 and 2017, Mr. Carton accumulated substantial debt and admittedly was under incredible pressure to repay his gambling investors.  (*See e.g.* Gov. Ex. 224, 295).

In the summer of 2016, Mr. Carton started purchasing tickets in large bulk and reselling them—mostly to events at the Barclays Center.  Over the next few years Mr. Carton would purchase thousands of tickets in connection with his ticket business.  At trial, the Government stipulated to the authenticity of over 3,400 tickets purchased by Mr. Carton in connection with

---

[6] *See e.g.* Tr. 718: 6 – 10; Gov. Ex. 1451 (Showing that in August 2016 Mr. Carton won in excess of $2,000,000 at Seminole Hard Rock Hotel and Casino in Hollywood, Florida).

his relationship with Barclays. Tr. at 796:10 – 797:20. Further, at trial, Brett Yormark, Chief Executive Officer of Barclays, confirmed that Mr. Carton purchased approximately $1,500,000 worth of tickets for the Metallica and Streisand shows. Tr. at 340:15 – 19.

In or around August 2016, Joseph Meli represented to Mr. Carton that he had helped orchestrate a $75 million investment by CVC Capital Partners and New Amsterdam Growth Capital ("New Amsterdam"), private equity firms, in DTI Management (DTI). DTI operated a web-based portal that sold tickets to live events and worked with sports teams and ticket brokers providing software solutions and fulfillment services. Mr. Meli further represented to Mr. Carton that he had deals in place with Anschutz Entertainment Group Live, LLC ("AEG")[7] to purchase tickets in bulk to several live events. As Mr. Meli told it, he planned to use a separate business that he owned, Advance Entertainment, LLC[8], to purchase the AEG tickets. Relying on Mr. Meli's representations and purported relationships, Mr. Carton then sought outside investments to fund purchases of the tickets with Advance Entertainment and Barclays.

In or around September 2016, Mr. Carton began discussions with Brigade Capital Management ("Brigade")[9], a hedge fund, regarding a potential investment in his ticket resale business. Over the next few months, Mr. Carton fully complied and assisted with Brigade's due diligence and background investigation. Notably, Mr. Carton facilitated meetings for Brigade with Mr. Meli and separately with Alex Guira of New Amsterdam to discuss the DTI deal and Mr. Meli's ticket contacts. Tr. at 54:4 – 55:14.

During this process, Mr. Meli directed David Molner to send Mr. Carton several letter agreements for deals Mr. Meli purported to have in place with AEG ("AEG Agreements")—the purpose of the deals focused on bulk ticket purchases to various upcoming live performances.

---

[7] The PSR refers to AEG as the "Concert Promotion Company."
[8] The PSR refers to Advance Entertainment as the "Meli Entity."
[9] The PSR refers to Brigade as the "Hedge Fund."

Mr. Carton, in turn, forwarded the letter agreements to Brigade.  Mr. Carton played no role in the creation of these agreements and the Government never argued at trial or any other related proceeding involving this case to the contrary.  We submit that this is important for sentencing purposes because it clarifies Mr. Carton's actual role.   Brigade relied on Joseph Meli's relationship with AEG before determining to release funds for the ticket business and ultimately sending $2,600,000 directly to Mr. Meli's company, Advance Entertainment.  Tr. at 63:17 – 26; 69:20 – 25; 70:2 – 8; 114:7 – 17.  Accordingly, while Mr. Carton misrepresented how Brigade monies would be used (which he used for gambling), we submit that his role should not be overstated; there was never evidence adduced at trial to show that Mr. Carton knew the AEG agreements to be false.

On December 8, 2016, Brigade agreed to provide Mr. Carton with a revolving loan agreement ("Loan Agreement") of up to $10,000,000, for the purpose of funding investments in the purchase of tickets to live events.  Gov. Ex. 925.  Again, at this time, Mr. Carton was under extraordinary pressure to repay his gambling debts.  This is evident in his communications with Michael Wight and Joseph Meli.  On December 6, 2016, Joseph Meli texts Mr. Carton and Michael Wright:

> We use brigade money to repay debts. Where do we get the money to buy tickets and further more what deal do we offer the money provider for the tickets? We can not pay brigade with other people's money right away because it does not work. We need brigade to buy deals with long lead times and earn money in the interim and use the earned money to replace the brigade funds in ticket deals on the future. That is the math we have to figure out and work it into a schedule to get down to zero (sic)

Gov. Ex. 54, p. 20.  Mr. Carton responds, "Agreed. My thought was if we could sell a bunch of dead and co tickets next two weeks we would have legit profit to use and at the same time createbamazing good will with. Brigade."  *Id.*  However, the fact that Mr. Carton was being

squeezed by his gambling investors" in late 2016 and the fact that he was attempting to run a legitimate ticket business are not incongruous. Ultimately, in the age-old proverbial expression, Mr. Carton "robbed Peter to pay Paul," here, Paul being gambling investors and his gambling addiction. However, that does not mean that Mr. Carton set out purely and simply to steal from Brigade. That is important because it goes to the level of harm he sought to cause.

Following the completion of the Loan Agreement, Brigade subsequently provided advances in the amounts of $2,600,000 and $2,000,000 to be used as deposits for the purchase of ticket events from and/or through Advance Entertainment and Barclays, respectively. In total, Brigade loaned Mr. Carton's ticket business approximately $4,600,000. The $2,000,000 was specifically earmarked for the purchase of upcoming Metallica and Barbara Streisand shows from Barclays. *See e.g.* Tr. at 82:6 – 11, 86:4 – 10, 92:19 – 23, 93:9 – 14, 96:14 – 20, 102:14 – 20. The $2,600,000 was specifically allotted for events with AEG and was transferred directly to Advance Entertainment. Gov. Ex. 2301.

On January 27, 2017, Joseph Meli[10] was arrested and charged in the Southern District of New York under indictment No. 17 Cr. 127 (KMW). The Government alleged that Mr. Meli duped investors and misrepresented his agreements to purchase tickets. In Mr. Meli's case, as described at his sentencing, he specifically set out to steal from investors, including childhood friends by feigning ticket opportunities that were totally fabricated.[11]

Shortly following Mr. Meli's arrest in January 2017, Brigade—eager to substantiate its $2,000,000 investment at Barclays—asked Mr. Carton to speak with a senior executive at Barclays to discuss their investment. Tr. at 118:1 – 5. Over the next few months, Mr. Carton

---

[10] Mr. Meli pleaded guilty on October 31, 2017 to securities fraud in violation of 15 U.S. Code, Sections 78j(b) & 78ff; S.E.C Code 1085; and 18 U.S. Code, Section 2. On April 3, 2018, he was sentenced to 78 months imprisonment and restitution in the amount of $58,777,813.

[11] *See* Joseph Meli's Sentencing Hearing, Case 1:17-cr-00127 (KMW) (S.D.N.Y.), ECF No. 126, 28 – 31.

continued to sell hundreds of tickets through opportunities provided by Barclays. In total, Mr. Carton bought almost 2,000 tickets in connection with the Metallica and Barbara Streisand shows—the events specifically allocated for in connection with Brigade's $2,000,000 deposit. Tr. at 796:10 – 797:20; Def. Ex.'s 76, 81, 82.

Unable to financially abide by the terms of the Loan Agreement, on August 18, 2017, Mr. Carton entered into a forbearance agreement (the "Forbearance Agreement") with Brigade regarding the advances under the Loan Agreement. *See* **Exhibit E**. The purpose of the Forbearance Agreement was to guarantee that Brigade would receive monies pursuant to the Loan Agreement. More particularly, while the Loan Agreement was predicated on collateral from the ticket business, including receivables, under the Forbearance Agreement, Mr. Carton personally agreed to a payment schedule to repay Brigade's loan. Notably, Brigade did not seek repayment of either the $2,600,000 that it transferred directly to Mr. Meli's company, Advance Entertainment, or approximately $384,000 of losses that were incurred in the normal course of business of purchasing and reselling tickets for a Barbara Streisand performance. *Id*. Additionally noteworthy, the Forbearance Agreement was further ensured by Mr. Carton's family and friends serving as guarantors and pledging real assets. Specifically, Mr. Carton's childhood best friend (Steve Kent) and uncle (Martin Edelman) served as guarantors to the Forbearance Agreement.[12]

In accordance with the Forbearance Agreement, on August 18, 2017, Mr. Carton immediately transferred $616,689.99—actual ticket sales proceeds—to Brigade. *See* **Exhibit F** (Ticket Jones, LLC[13] Citibank statement for August 2017). As of July 1, 2018, months before

---

[12] PSR ¶ 67 states that the Government does not believe that any of this money should be credited against the loss.
[13] The PSR refers to Ticket Jones, LLC as the "Carton Entity."

Mr. Carton's trial before Your Honor, the Forbearance Agreement was fully satisfied and Brigade has been repaid $1,619,689.99.

On November 7, 2018, Mr. Carton was convicted of (1) Conspiracy to Commit Securities Fraud and Wire Fraud in violation of 15 U.S.C. §§ 78j (b) & 78ff, 17 C.F.R § 240.10b-5, and 18 U.S.C § 1343; (2) Wire Fraud in violation of 18 U.S.C. §§ 1343 and 2; and (3) Securities Fraud in violation of 15 U.S.C. §§ 78j (b) & 78ff, 17 C.F.R § 240.10b-5, and 18 U.S.C § 2.

## II.   MR. CARTON'S APPLICABLE LOSS AMOUNT AND REPAYMENT TO BRIGADE

In pertinent part, the case facts described above are important to contextualizing Mr. Carton's position on the loss amount in this case. First, with respect to Brigade, Mr. Carton does not dispute Probation's inclusion of legal fees (PSR ¶ 66)[14] or the initial amount of Brigade's loan. Further, as the Government concedes, Mr. Carton **repaid** Brigade $619,689.99[15] before he was arrested. Moreover, pursuant to the Forbearance Agreement, Mr. Carton's childhood best friend (Steve Kent) and uncle (Martin Edelman), as guarantors to the Forbearance Agreement, paid $1,000,000 in satisfaction of their obligation on the agreement.[16] On a net basis, after applicable legal fees incurred by Brigade, Mr. Carton (and others on his behalf) paid in excess of $1,300,000 related to the Loan Agreement of the outstanding amount after Joseph Meli was arrested.

---

[14] The MVRA requires a defendant to reimburse a victim for "necessary...other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663(A)(b)(4). "Other expenses" include attorneys' fees and accounting costs. *United States v. Amato*, 540 F.3d 153, 159 (2d Cir.2008).

[15] *See* Government's Sentencing Memorandum for Michael Wright, ECF No. 164, 5.

[16] It is worth noting that the Government has previously indicated that *Kent v. Carton*, Case No. 2:17-cv-13057 (D.N.J. 2017) concerns a guarantor of the Forbearance Agreement between Mr. Carton and Brigade where the guarantor sued Mr. Carton in the context of that agreement. *See* ECF No. 76 (Government's Reply Memorandum of Law in Support of Motion to Quash Rule 17 Subpoenas). That is not the case. The particular case cited by the Government concerns collection by a plaintiff on a promissory note wholly unrelated to the Forbearance Agreement and the plaintiff is not Steven Kent.

██████████████████████████████████████████████████████████

█████████████████████████████████████████████ For that reason, we
elaborate here the reasons Mr. Carton should be credited with these repayments. First, Mr.
Carton transferred these monies to Brigade in connection with a Forbearance Agreement which
guaranteed these monies and was finalized **before** Mr. Carton was arrested on September 6,
2017.[17] Mr. Carton's arrest is the first time he knew or reasonably should have known that his
offense of conviction was detected or about to be detected by a victim or government agency.
The Government even concedes in its sentencing memorandum in connection with Michael
Wright that a portion of these monies—$619,689.99—was repaid by Mr. Carton to the Hedge
Fund before the fraud was discovered and should be credited against the loss.[18]   (*See*
Government's Sentencing Memorandum, ECF No. 164, 5).

Further, Mr. Carton's actions plainly reinforce his reasonable belief that he had not been
suspected of any illegal activity up until the time of his arrest. For example, in the months
following the finalization of the Loan Agreement on December 8, 2016 between Brigade and
Ticket Jones, Mr. Carton facilitated a telephone call between Brigade and Barclays and
participated in an interview including the Federal Bureau of Investigation ("FBI"), the United
State Attorney's Office for the Southern District of New York and the Securities Exchange
Commission ("SEC"). Both encounters buttress Mr. Carton's complete unawareness that either
the Government or Brigade had *detected* any offenses committed by him.

---

[17] U.S.S.G. § 2B1.1 Application Note 3(E)(i) provides that loss shall be reduced by the "money returned...by the
defendant...to the victim before the offense was detected." U.S.S.G. §2B1.1. The time of detection is the earliest of:
(1) the time the offense was discovered by the victim or the government; or (2) the time the defendant knew or
reasonably should have known that the offense was detected or about to be detected by a victim or government
agency. *Id.*
[18] Ticket Jones' Citibank account verifies that Mr. Carton transferred these monies on August 18, 2017, *See* **Exhibit
F**.

In late summer 2017, with no knowledge or awareness he would be arrested in the coming weeks, Mr. Carton put into place an ironclad mechanism to protect Brigade from any potential or anticipated losses. To wit, on **August 18, 2017**, Mr. Carton entered into the Forbearance Agreement with Brigade regarding the advances under the Loan Agreement. In accordance with the Forbearance Agreement, on August 18, 2017—**a date that the Government concedes was before the fraud was discovered**—Mr. Carton immediately transferred the $616,689.99—actual ticket sales proceeds—to Brigade. Shortly after, Mr. Carton was arrested and personally unable to maintain the Forbearance Agreement's payment schedule. Nevertheless, the Forbearance Agreement proved to be a steadfast safeguard for Brigade. While Brigade had to enforce the agreement (outside of any court intervention), over the following year Brigade did receive payment in accordance with the Forbearance Agreement. As of July 1, 2018, the Forbearance Agreement was fully satisfied and Brigade has been repaid any monies allegedly lost. While Brigade did not receive the rest of the monies owed under the Forbearance Agreement until after Mr. Carton's arrest, it is of no consequence for the purposes of the loss calculation. Mr. Carton consummated an agreement with Brigade guaranteeing Brigade's financial restoration **before** his arrest—the moment in which the offense was detected.

As the above-described facts in the record demonstrate that Mr. Carton neither knew nor reasonably should have known that the offenses of conviction were detected or about to be detected at the time of the implementation of the Forbearance Agreement, the $1,619,689.99 that Mr. Carton has repaid Brigade should be credited against the loss calculation.

## III.    MR. CARTON'S MEDICAL HISTORY AND GAMBLING ADDICTION

On March 11, 2019, Dr. Marc Potenza, Senior Research Scientist at The Connecticut Council on Problem Gambling, and Professor of Psychiatry, Child Study and Neuroscience at Yale University School of Medicine prepared an assessment and evaluation of Mr. Carton including a summation of Mr. Carton's medical history.[19]



---

[19] Dr. Potenza's report is attached hereto as **Exhibit B.**
[20] *Id*. at 17.
[21] *See US v. Caspersen*, 16-cr-0414 (SDNY 2016), ECF No. 37, Dr. Potenza testified at defendant's sentencing hearing regarding the biological nature of gambling disorder, life events that may have contributed to gambling disorder, and the results of her clinical examination, which Judge Rakoff took into account.

## IV.   DRAFT UNPUBLISHED BOOK CHAPTER

Attached hereto as **Exhibit C** is a draft of the unpublished chapter from Mr. Carton's book.

## V.    MR. CARTON'S ONGOING REHABILITATION

Almost immediately following his arrest, Mr. Carton checked himself into Algamus Gambling Recovery Center, an in-patient rehabilitation center in Prescott, Arizona.  To his friends, "[t]his showed… that he now recognized the root of his problem and was willing to sacrifice precious days of freedom with his family to begin the healing process for their future benefit."[22]  Shortly after, Mr. Carton started to attend regular Gamblers Anonymous meetings in New York and New Jersey.  Over the past 16 months, Mr. Carton has consistently attended these meetings every week.  There have been only two weeks in which Mr. Carton has not attended a Gamblers Anonymous meeting.  In addition to these meetings, Mr. Carton has proactively taken ownership of his addiction by self-excluding himself from all New Jersey Internet gaming sites with the New Jersey Division of Gambling Enforcement (*See* **Exhibit G**) and proudly not making a wager of any kind in almost ten months.

Concurrently, Mr. Carton has been continuing with his therapeutic treatment.  Until October 2018, Mr. Carton was under the care of Dr. Ron Hanover for over a year.  When treatment with Dr. Hanover became cost prohibitive, Mr. Carton began to see Peter Turco, a psychologist, at the Government's offering and expense.  Since the start of January 2019, Mr. Carton has attended weekly sessions with Mr. Turco, who, in turn, recommended that Mr. Carton also meet with Dr. Malgorzata Witek, a psychiatrist.  Again, with the Government's blessing and at their expense, Mr. Carton met with Dr. Witek.  Recently, Mr. Carton has started seeing Mr. Turco twice a week.

Since his arrest in September 2017, Mr. Carton has tirelessly dedicated a very significant amount of his time and all of his remaining financial resources towards rehabilitation.

---

[22] *See* **Exhibit D-18** (Letter from Christopher Oliviero, former colleague and friend of Mr. Carton's for 20 years).

## VI.   SECTION 3553(A) FACTORS ANALYSIS AS APPLIED TO MR. CARTON'S CASE

It is imperative in our nation's form of criminal sentencing that a defendant not be overly punished for his crime.  This is the essence of the Supreme Court's guidance with respect to the sentencing factors enumerated in 18 U.S.C. § 3553(a).  *See Rita v. United States*, 551 U.S. 338 (2007).  With this goal in mind, the factors required to be considered under § 3553(a) include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentence range established for –
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[;]
> …
> (5) any pertinent policy statement –
> …
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1)-(7); *see also United States v. Booker*, 543 U.S. 220 (2005).  In light of the multi-faceted inquiry under § 3553(a), the Supreme Court has held the Guidelines are no

longer mandatory, but rather are advisory and constitute one factor to be considered by the sentencing court in fashioning a sufficient sentence. *See Booker*, 543 U.S. 220.

In *Gall v. United States*, 552 U.S. 38 (2007), the United States Supreme Court reiterated the importance of the sentencing court's discretion in fashioning an appropriate sentence for the particular criminal defendant before it. In particular, the court made clear that a departure from the Guidelines, even one resulting in an unusually lenient sentence, may be justified if the sentencing court can clearly explain why it is appropriate in a particular case with sufficient justifications. *Id*. *Gall* definitively instructs the sentencing court that a Guidelines calculation is a necessary starting point for determining a sentence, but it cannot be the end of the court's analysis. The Second Circuit has confirmed that "a sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F .3d 180, 188 (2d Cir. 2008). This is particularly important in cases involving financial crimes, such as security fraud, where rigid adherence to the mathematical Guidelines sentencing formula can yield harsh sentences that do not match the need for punishment on the facts of a particular case. The Guidelines "reflect an even more draconian approach to white collar crime, unsupported by any empirical data." Sentencing Memorandum and Order at 4, *United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. Oct. 24, 2012) (11 Cr. 907 (JSR)), Dkt. No. 127. These points are especially important here, in Mr. Carton's case, where the Guidelines range propose 70-87 months, at least as calculated by Probation.[23] We submit for the reasons described above and herein below, that range overstates the offense conduct, especially after taking into account the **Section 3553(A)** factors.

---

[23] The Probation Guidelines range is predicated, at least in part, on a loss amount of $4.8 million.

## VII. CONSIDERATION OF SECTION 3553(A) FACTORS MERIT A LENIENT SENTENCE

### A. History and Characteristics of the Defendant

Mr. Carton's "history and characteristics" counsel heavily in favor of a non-Guidelines sentence. Section 3553(a) allows a sentencing court to consider a defendant in all of his unique humanity. It is long been recognized that a defendant's character is always "a central consideration in the fashioning of a just sentence." *United States v. Merritt*, 988 F.2d 1298, 1307 (2d Cir. 1993). "[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006); *accord Gall*, 552 U.S. at 52 ("'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue'" (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).

In that vein, submitted herewith are 90 letters written by Mr. Carton's family, friends and former colleagues that paint a vivid picture of Mr. Carton's overwhelming generosity, caring, and selflessness. (**Exhibit D-1 – 90**). We urge the Court to read each of these letters to truly understand who Mr. Carton truly is and the myriad ways he has positively affected others through his good deeds and charitable works. A defendant's history of charitable activities can be considered as one of the factors appropriate in imposing a sentence under the advisory guidelines. *See United States v. Rita*, 551 U.S. 338, 364-65 (2007) (Stevens, J., concurring) ("[m]atters such as…charitable, or public service are not ordinarily considered under the Guidelines [but are] matters that § 3553(a) authorizes the sentencing judge to consider").

Notably, several courts have granted a defendant a variance or downward departure based on the defendant's "exceptional" good works. For example, in *United States v. Serafini*, 233 F.3d 758 (3d Cir. 2000), the Third Circuit upheld the district court's downward departure where many of the letters supporting Serafini, an elected official, "contain[ed] substantive descriptions of Serafini's generosity with his time as well as his money." *Serafini*, 233 F.3d at 773. Finding that Serafini was "an exceptionally giving person," the Third Circuit upheld the District Court's downward departure for community and charitable activities. *Id.* at 774, 775. The Third Circuit specifically noted three letters describing Serafini's good works: (1) a letter from a friend who sought and received from Serafini a $300,000 guarantee to secure treatment for a family member's brain tumor; (2) a letter from Serafini's constituent who, having sustained serious injury in an accident that rendered him incapacitated, was hired by Serafini and who credits Serafini with "turning his life around"; and (3) a letter from a widow who approached Serafini because she was about to lose her home and to whom Serafini gave a check for $750 with no expectation of repayment. *Id.* at 773-74.

As *Serafini* and other cases make clear, whether it is categorized as a downward departure or the basis for a non-guidelines variance owing to the criteria delineated in 18 U.S.C. § 3553(a), a life of extraordinary good works towards others remains a vital factor for a sentencing court to consider. *See, e.g., United States v. Tomko*, 562 F.3d 558, 572 (3d Cir. 2009) (affirming variance to a sentence of probation due largely to the defendants "exceptional" charitable acts and good works); *United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (affirming a sentence of three months incarceration and 24 months supervised release from a recommended guideline sentence of 60 months imprisonment based in part on the defendant's "charitable work, community service, generosity with time, and spiritual support and assistance

-20-

to others"); *United States v. Greene*, 249 F. Supp. 2d 262 (S.D.N.Y. 2003) (granting 7-level departure in a tax case based on the defendant's extraordinary charitable good works in devoting his life to orphaned children while a salaried employee, and his extraordinary family circumstances); *United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005) (noting that "[d]ownward departures for good works…are permissible when the works are exceptional," and upholding the departure where the defendant's good works included "hands-on personal sacrifices, which have had a dramatic and positive impact on the lives of others"; defendant did not simply donate money to charity but organized and ran youth football team in depressed area and helped members attend better schools and go to college).

Significantly, many of the courts that have addressed a defendant's good works have recognized that the defendant's contribution of his time and energy is more valuable than simply his monetary contributions. *See, e.g., Tomko*, 562 F.3d at 572 (describing how the defendant's "charitable acts that involved not only money, but also his personal time."); *Cooper*, 394 F.3d at 177 (noting that personal sacrifices "are qualitatively different from the detached donation of money"); *Serafini*, 233 F.3d at 775 (noting that Serafini's contributions "weren't acts of just giving money, they were acts of giving time, of giving one's self").

As described below, Mr. Carton has single-handedly changed the course of the lives for countless people through his sheer time and energy, including many children suffering from Tourette Syndrome. The letters attached hereto paint the picture of someone with remarkable kindness, good character and consistent willingness to go out of his way to help and assist in the lives of those around him. Given Mr. Carton's extraordinary history of impacting those suffering from Tourette Syndrome, organizing community charitable endeavors, coaching youth sports, championing our policeman, fireman and first responders and his generosity and charitable acts,

both big and small, we submit that Mr. Carton's charitable contributions and personal characteristics justify a non-Guidelines sentence.

### a.    Mr. Carton's Charitable Work Related to Tourette Syndrome

In growing up with Tourette Syndrome, Mr. Carton was all too aware of the struggles that children diagnosed with the neurological disorder encounter. Many children who suffer with Tourettes are ostracized—they are bullied at school and have an extremely difficult time fitting in and making friends. When two of Mr. Carton's children, Mickey and Sonny, were also diagnosed with the neurological disorer, rather than standing on the sidelines, Mr. Carton determined to develop a platform that would both assist his children and, importantly, others. On June 6, 2013, Mr. Carton launched the Tic Toc Stop Foundation ("Tic Toc Stop"), a not-for-profit charity aimed at making the lives of children with Tourette Syndrome easier. Over the next five years through various charity events, Mr. Carton raised millions of dollars for Tic Toc Stop. These funds were used to sponsor a $340,000 study by the University of Tennessee College of Dentistry to develop a groundbreaking dental appliance, called the Tic Guard, which alleviates the severity of the tics associated with the neurological disorder. The Tic Guard is currently under review by the Food and Drug Administration and has shown an average tic reduction (both motor and vocal) of 39 percent.[24]

Tic Toc Stop also fully funded Camp Carton, a sleep-away summer camp serving children ages 9–13 years old that are suffering from Tourette Syndrome. Many of the campers, their parents and volunteers attest in their letters to the Court that the camp functions as an annual safe haven by empowering the campers to be "free to be me," which is the camp's motto.

---

[24] *See* **Exhibit D-22** (Letter from William Balanoff attaching *Improved Yale Total Tic Severity Score Due to Craniofacial Manipulation With an Oral Appliance*, published in the U.S. National Library of Medicine National Institutes of Health).

Without Camp Carton, these children—unable to acclimate at a regular summer camp—would not otherwise have the opportunity to experience the joys of a summer camp and be around other kids facing the same challenges.[25]  During these summer sessions, Mr. Carton went above and beyond to ensure the campers felt at home.   Aimee Skier, the Executive Director of Camp Carton, writes to the Court:

> Craig spends personal time with each child and his or her family.  At camp, he plays games and perhaps most importantly, tells them how to not let Tourette's stand in the way of achieving their goals and dreams. Craig inspires the kids and gives each and every child hope…He has changed their lives…He makes sure the campers and their families understand he is available 24/7 if they ever need him or just feel isolated, lonely or just need someone to talk to. He gives 100% of himself to them on top of everything else he has going on in his life.[26]

███████████, Camp Carton attendee, recounts:

> All I can really say is, that while you're there, it's like the best dream ever. And the second you leave and go back to your regular life where nobody understands you, is like going back to reality, and knowing that the perfectness isn't there anymore.[27]

Connie Smith, parent of a Camp Carton attendee, describes how Camp Carton inspired her son and writes:

> [Camp Carton] gave ████ the courage and self-esteem needed for him to start educating his peers and advocating for himself in his struggles with bullying at school which is far too common in people who suffer from this very stigmatizing disorder. Seeing Craig successfully living with Tourette's, hearing his inspiring words of encouragement at each encounter, and the personal connection Craig established with him and maintains still to this day, has made ████ feel more confident in dealing with his daily struggles.[28]

Another parent, Ethan Kleinberg, writes:

> Camp Carton provided a safe place for ████ to feel like a normal kid for a week - to be surrounded by other kids battling the same thing, not having to feel embarrassed, to feel "normal" for just a few days. He made friendships that will

---

[25] *See* **Exhibit H** (Camp Carton highlight video for the summer of 2016).
[26] **Exhibit D-34** (Letter from Aimee Skier).
[27] **Exhibit D-5** (Letter from Jessica Brown).
[28] **Exhibit D-10** (Letter from Connie L. Smith).

last a lifetime, and learned wonderful coping methods, all while having the most fun he's ever had.[29]

Margarita M. Velez, a volunteer at Camp Carton, echoes this sentiment and writes:

> Mr. Craig Carton was the founder of a camp that; in my opinion, performed miracles…One by one, these often shy and reserved children realized that no one was looking at them differently, that they all moved, twitched and made different noises but there was no judgement.[30]

Since 2015, Camp Carton has served as a beacon of hope, awareness and acceptance for children and their families struggling with the daily challenges of Tourette Syndrome. As summarized by Barbara Lutsky's letter to the Court, "[w]ithout this camp they would not have met others with Tourette's. Every summer they would count the days till they could see Craig Carton and have the best week of the summer."[31] In Camp Carton, Mr. Carton created a truly special place where these children could finally feel "normal," be safe from ridicule and just be another kid.

### b. Mr. Carton's Additional Community Service

Mr. Carton's relentless desire to help others has not stopped with combatting Tourette Syndrome. Mr. Carton's generosity, compassion and profound effect on others resound through and across the letters from his acquaintances, friends and colleagues. Letter after letter details Mr. Carton's kindness and willingness to lend a hand to any person he comes into contact with. While most people in Mr. Carton's position use their celebrity to further enrich themselves, Mr. Carton has used his professional success to help and *care* for others, even complete strangers.

Mr. Carton cared enough to reach out to Michael Nichols, a high school hockey player who suffered a paralyzing injury, and organize a charity hockey game involving National Hockey League ("NHL") alumni to raise money for Michael's medical bills and spinal cord

---

[29] **Exhibit D-75** (Letter from Ethan Kleinberg).
[30] **Exhibit D-41** (Letter from Margarita M. Velez).
[31] **Exhibit D-72** (Letter from Barbara Lutsky, parent of a Camp Carton attendee).

injury research and awareness.[32]  This year will mark the 5th annual NHL alumni charity game.[33] The impact that this annual event has had on Michael and his family is beyond measure—"[i]f it wasn't for Craig, I don't know where my family and I would even be."[34]

Mr. Carton cared when he afforded the parents of recently deceased twin girls with a brief escape from their bereavement by taking them to a World Series game featuring the New York Mets.[35]

Mr. Carton cared when he learned that Air Force Technical Sergeant and lifelong basketball fan, Joseph G. Lemm, was killed in action and organized a charity basketball game to help Sgt. Lemm's partner support her two children.[36]  In Sgt. Lemm's partner's own words, "I didn't know that a total stranger could be so amazing, compassionate and patriotic an individual."[37]

Mr. Carton cared when three New York Police Department ("NYPD") officers were shot and killed on duty in a six month span[38] and was the "driving force" along with Boomer Esiason behind the "True Blue" charity softball game to benefit the Silver Shield Foundation and the New York City Police Benevolent Association Widow's and Children's Fund.[39]  In fact, Mr. Carton cared enough about the NYPD that he was instrumental in organizing several charitable fundraisers which raised over $100,000 to assist the families of slain and injured officers.[40]  This resulted in Mr. Carton being recognized as the "Man of the Year" in 2015 and 2016 by the

---

[32] **Exhibit D-19** (Letter from Michael Nichols).
[33] *Id.*
[34] *Id.*
[35] **Exhibit D-70** (Letter from Christopher Cavanagh).
[36] **Exhibit D-14** (Letter from Christine DeGuisto-Lemm, partner of Joseph G. Lemm) .
[37] *Id.*
[38] **Exhibit D-20** (Letter from Shaun McGill, 001 Pct., PBA Delegate, Training).
[39] **Exhibit D-21** (Letter from Jerry Recco, colleague at WFAN Sports Radio); *see* CBS New York's coverage of Mr. Carton's involvement in the "True Blue" event: https://www.youtube.com/watch?v=-nn6qhlj71s ; *see also* highlight videos of the event posted on YouTube: https://www.youtube.com/watch?v=sfO0vs9QqHI.
[40] **Exhibit D-8** (Letter from Joseph Millan, Retired NYPD Lieutenant and Member of the NYPD Holy Name Society).

Detectives Endowment Association and by the Retired Detectives of The NYPD and in 2017 as well by the NYPD Holy Name Society.[41]

Mr. Carton cared when he hired Jorge Molina, a parking attendant near Mr. Carton's apartment in Tribeca who was struggling to support his family on minimum wage, as a driver.[42] However, Mr. Carton wasn't merely Mr. Molina's boss. They became close and sincere friends and their families went on vacations and celebrated birthdays together.[43] In Mr. Molina's own words, "[h]e changed my families life…[t]he best four years of my families lives in America were the years I was working with Craig."[44] The list of Mr. Carton's virtuousness goes on and on. For these good deeds, Mr. Carton asked for nothing in return.

Additionally, as a lifelong sports fan, Mr. Carton has strived to provide inner city kids, particularly in the downtown Manhattan area, with an opportunity to play organized sports. Over the past decade, Mr. Carton has organized and run several youth sports leagues introducing thousands of kids to the benefits of playing sports: teamwork, cooperation, leadership and discipline. For example, in 2014, Mr. Carton created a youth baseball tournament throughout the five boroughs called the Borough Cup. This tournament was endorsed by both Major League Baseball and the five Borough presidents and "grew to give over 7,000 inner city kids the chance to improve their baseball skills, but more importantly…an opportunity to meet their counterparts from all over the city, make new friends, have fun and offer a positive alternative to the streets."[45] However, Mr. Carton's contributions to inner city youth sports did not stop with baseball as he also started similar programs for soccer and football.

---

[41] *Id.*
[42] **Exhibit D-31** (Letter from Jorge Molina and Lina Garcia).
[43] *Id.*
[44] *Id.*
[45] *See* **Exhibit D-45** (Letter from Thomas C. Brasuell, head of constituent services for the lower Manhattan City Council district and head of Community Affairs for Major League Baseball).

Mr. Carton founded, funded, and managed Tribeca Travel Soccer, the first downtown travel sports program for kids in the Tribeca and Battery Park areas.[46]  Mr. Carton also started the first flag football program in downtown Manhattan.  This program ultimately partnered with the Downtown Giants Youth Sports ("Downtown Giants"), a non-profit youth sports program in lower Manhattan for boys and girls from first to eighth grade.  Whenever the Downtown Giants encountered funding issues, without being asked, Mr. Carton was the first to make sure the necessary donations were procured.[47]  Mr. Carton also facilitated for the program to play in venues such as MetLife Stadium and Columbia University's football field providing "memories to children that will last a lifetime."[48]

In addition to the sports programs that Mr. Carton has established, he also worked with the Hudson Valley Chapter of the Make-A-Wish Foundation on creating a celebrity softball game to raise money for granting wishes and Basketball City on expanding its community outreach program.  Time and time again, "[w]hether coaching youth sports, organizing community charitable endeavors, championing our policeman, fireman and first responders, or providing friendly advice, Craig has always been there for the people in his life and the community at large."[49]

Yet even men so good have the capacity and sometimes do, in fact, make mistakes, and even serious mistakes, that they must be called to account for.  But that calling to account should not deprive society of what good Mr. Carton can continue to do, so willingly, in every passing minute of the remainder of his life—good that will be passed forward, and improve the lives of people he has never even met.  And that calling to account should weigh that "he has always

---

[46] *See* **Exhibit D-67** (Letter from Gary Spindler, parent of Tribeca Travel Soccer participant.
[47] *See* **Exhibit D-16** (Letter from Michael Barbieri, Executive Director of Downtown Giants Youth Sports).
[48] *Id.*
[49] *See* **Exhibit D-84** (Letter from Dan Sanborn).

gone above and beyond to take care of the less fortunate and really (for that matter) anyone that needed something….fortunate or not," against Mr. Carton's worst act as one letter pleads.[50]  To proceed otherwise would be inconsistent with the high ideals upon which our justice system is founded and that make it so inimitable.

One of those high ideals is that punishment should not be greater than *necessary* to accomplish its goals for the benefit of society.  As expressed by these letters, especially the letters from Camp Carton attendees and their parents, Mr. Carton has changed these children's lives forever.  One parent of a Camp Carton attendee writes that "Craig has truly been a blessing to [my son] and our family.  I honestly can't imagine where we would be right now without him."[51]  Another parent reinforces in her letter that "[her daughter] never felt accepted or normal until she was allowed to attend Mr. Carton's amazingly inclusive camp."[52]  They need him, and our society needs people like Mr. Carton in its midst—the rare person who does not waver over periods of years, and who consistently devotes himself to others.  This is part of the reason we are respectfully requesting a non-Guidelines sentence in this case.

**B.  Nature and Circumstances of the Offense**

In Section I *supra*, we discussed at length the nature and circumstances of this particular offense.  Further, Your Honor is well aware of the circumstances of the offense through the trial itself.  So, we will avoid unnecessary repetition here.  Nevertheless, we submit that the offense conduct here warrants a non-Guidelines sentence.

More particularly, as we have noted, Mr. Carton legitimately attempted to build a business for acquiring tickets in bulk to live events, such as concerts, to be resold on the secondary ticket market.  On the basis of a pre-existing and long established relationship with

---

[50] *See* **Exhibit D-27** (Letter from Hamilton Baiden, former roommate and over 25-year friend of Craig Carton).
[51] **Exhibit D-10** (Letter from Connie L. Smith).
[52] **Exhibit D-15** (Letter from Susan Korenberg).

executive management at Barclays, in 2015, Mr. Carton was presented with an opportunity to sell blocks of seats from their arenas in the secondary ticket market. In the summer of 2016, Mr. Carton started purchasing tickets in large bulk and reselling them—mostly to events at the Barclays Center. Over the next few years Mr. Carton would purchase thousands of tickets in connection with his ticket business. At trial, the Government stipulated to the authenticity of 3,401 tickets purchased by Mr. Carton in connection with his relationship with Barclays. Tr. at 796:10 – 797:20. This is important because these facts make this situation materially different from schemes that are entirely predicated on an effort purely and simply to deceive and steal. Again, while Mr. Carton's gambling addiction is not a justification for his crimes, the addiction explains the circumstances under which the crimes took place and distinguish the instant context.

### C.  A Non-Guidelines Sentence Serves the Purposes of Sentencing

#### a.  The Need to Afford Adequate Deterrence to Criminal Conduct and Just Punishment for the Offense

For the reasons described throughout this memorandum, the facts and circumstances at bar raise no genuine question as to the need to deter Mr. Carton from committing further crimes. Mr. Carton is a 50 year-old radio personality and integral pillar of his community who has had no criminal history prior to this case, and has never been charged with any criminal offense other than in connection with this case. In fact, Mr. Carton exhibits several of the characteristics that the Sentencing Commission has identified as indicators of reduced risk of recidivism. He is 50 years old, has a stable employment history (with incredibly strong ties to his colleagues and their families) and is a nonviolent offender.

As the letters submitted on his behalf attest, Mr. Carton is genuinely remorseful and has taken battling his addiction earnestly. If a custodial sentence is deemed necessary, the deterrent effect is accomplished by a short prison term. "[T]here is considerable evidence that even

-29-

relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *Adelson*, 441 F. Supp. 2d at 514.   We further submit that Mr. Carton has already been punished in part, as a result of his actions, by the termination of his dream job on WFAN Sports Radio, endless condemnation in the media and by his extreme embarrassment and shame as a result of the prosecution and conviction among family, friends, colleagues, and attendees of Camp Carton—children who rely on Mr. Carton and his camp to maintain any sense of "normalcy" in their lives.   Mr. Carton has suffered tremendously throughout this process which has played out on a very public stage.   He has been devastated personally, professionally, financially and reputationally.   He is bankrupt and on the verge of being homeless.   His family has been uprooted and tarnished beyond repair.

### b.  Need to Protect the Public

Mr. Carton poses no threat whatsoever to the public, and to the contrary, his continued presence in his community is of benefit to them.   The numerous supportive letters submitted to the Court from Mr. Carton's friends, colleagues, business associates and beneficiaries of his enduring generosity highlight the following regarding Mr. Carton:

- "If you were in trouble, and you needed to call someone to get you and couldn't tell them why you were in trouble, who would come help you out without being told the reason why.   I chose Craig…If I were in trouble and needed help, he would be there, no questions asked.   Even in the situation he is in today, if I called him he would be there for me."[53]

- "Craig is the type of person who will drop everything he's doing to help others."[54]

- "I have witnessed firsthand his kindness to less fortunate individuals many times. Many people in his position could have taken a different path with their celebrity, but not Craig. He has helped so many over the years most without recognition because that is the way he wanted it. His work with his foundation and others is endless."[55]

---

[53] *See* **Exhibit D-26** (Letter from Al Dukes, Producer of the Boomer & Carton Show for 10 years).
[54] *See* **Exhibit D-32** (Letter from Brandon Steiner, Friend of Mr. Carton for over 10 years).
[55] *See* **Exhibit D- 33** (Letter from Chris Beldotti, Attended Syracuse University with Mr. Carton and has been of Mr. Carton's for over 30 years).

- "He is a man that is always trying to help people. Whether it be his friends or friends of friends he is a man that has always been willing to go out of his way to help people. In my time with Craig he has always had a soft spot in his heart for kids or adults who have not been givin a fair shake in life. He has demonstrated this with his countless hours devoted to charity whether it be his own charities or someone else."[56]

- "[H]e always puts others before himself. Craig goes above and beyond for the less fortunate and those in need. Many of these acts, most people will never hear about. Craig doesn't do these things for the public recognition, he's just a good-hearted person who wants to help others."[57]

- "He has done more for those in need than most of us will in an entire lifetime."[58]

Such powerful testimony establishes that Mr. Carton does not hesitate at any opportunity to positively contribute to the lives of others—even those he barely knew at the time that he offered to help.

Further, a proportionate, sufficient non-Guidelines sentence would allow Mr. Carton to remain on the air and serve as a powerful voice on the afflictions surrounding addiction, gambling and childhood traumas. Mr. Carton has a long history of using his radio personage to publicize worthy causes. Whether it was discussing Michael Nichols' charity hockey game,[59] putting out an amber alert for a friend's kidnapped daughter,[60] or bringing awareness to Amyotrophic Lateral Sclerosis,[61] Mr. Carton has always been keen to use his pulpit for good. It is also undeniable that Mr. Carton has a talent to communicate and connect with an audience—when he talks, people listen. At a time when the gambling industry is on the precipice of becoming widely prevalent in the United States, especially in the tristate area,[62] Mr. Carton's

---

[56] *See* **Exhibit D-29** (Letter from Christopher Simms).
[57] *See* **Exhibit D-50** (Letter from Emelio C. Rodriques).
[58] *See* **Exhibit D-21** (Letter from Jerry Recco, Colleague of Mr. Carton's at WFAN Sports Radio for over 10 years).
[59] *See* **Exhibit D-19** (Letter from Michael Nichols).
[60] *See* **Exhibit D-3** (Letter from Cortney L. Baird).
[61] *See* **Exhibit D-53** (Letter from Marc Clinque, founder of Cinque Foundation for Fighting ALS).
[62] On June 11, 2018, New Jersey became the second state to legalize sports betting following the previous month's landmark U.S. Supreme Court ruling to overturn the Professional and Amateur Sports Protection Act and allow states to decide for themselves whether to legalize sports betting. Nick Corasaniti, *New Jersey Legalizes Sports*

-31-

story would serve as both a necessary cautionary tale and beacon for addiction awareness and recovery. "Craig C can begin to put a face on the downside of gambling, a voice where there isn't one today."[63]   Akin to how Mr. Carton has dedicated himself to helping children cope with the daily challenges of Tourette Syndrome, Mr. Carton will completely devote the rest of his life to the public discourse of the dangers of uncontrollable gambling.

### c. Need to Provide the Defendant with Correctional Treatment in the Most Effective Manner

Given Mr. Carton's individualized circumstances, and the facts of the commission of the offense at issue, a disproportionate sentence would be counterproductive to his efforts to pursue correctional treatment. We respectfully submit that this end would best be served by Mr. Carton continuing his therapy and rehabilitation and remaining within or returning quickly to his community, where he can continue to give back in an effort to in part right the wrong of this offense, while complying with the terms of probation set at this Court's discretion.

### D. Need To Avoid Unwarranted Sentencing Disparities

For the purpose of Section 3553(A) analysis, it is important to discuss the sentences of Joseph Meli and Michael Wright, respectively.

As the Court might be aware, Joseph Meli was sentenced on April 3, 2018 to 78 months imprisonment and restitution in the amount of $58,777,813.[64]   His Guideline range was 78 to 97 months.[65]   This is particularly important because Mr. Carton's Guideline range is based on a mathematical calculation of 70 to 87 months.[66]   If nothing else, these facts underscore that pure

---

*Betting*, The New York Times, June 11, 2018, https://www.nytimes.com/2018/06/11/nyregion/sports-betting-legalized-nj.html (last visited Feb 26, 2019); *see also* Hilary Russ, *Place your bets! New Jersey kicks off era of legalized sports betting*, Reuters, June 14, 2018, https://www.reuters.com/article/us-usa-gambling-new-jersey-idUSKBN1JA2PE (last visited Feb 26, 2019).
[63] *See* **Exhibit D-7** (Letter from Mary Hawley, Co-attendee of Mr. Carton's Gambler's Anonymous Meetings).
[64] *See* Joseph Meli's Sentencing Hearing, Case 1:17-cr-00127 (KMW) (S.D.N.Y.), ECF No. 126, 33.
[65] *Id.*
[66] *See* PSR ¶ 176.

mathematical basis for determining a sufficient sentence for Mr. Carton is inappropriate.  Mr. Carton simply does not have the culpability of Joseph Meli.  During Mr. Meli's sentencing, Judge Wood stressed that "he is among the most culpable of fraud defendants in the United States" [67] and the "extraordinary" seriousness of the harm that he caused to *more than 100 victims*.[68]  While Mr. Meli was representing the existence of utterly fabricated arrangements with AEG, Mr. Carton legitimately attempted to build a business for acquiring tickets in bulk to live events based on a pre-existing and long established relationship with executive management at Barclays.  Again, the context for Mr. Carton's crimes is gambling addiction.  Mr. Meli's context is pure greed.  Mr. Carton's conduct should not be evaluated under the same microscope as Mr. Meli's—a scheme entirely predicated on an attempt solely to deceive and steal.

With respect to Mr. Wright, Your Honor sentenced him on March 7, 2019 to 21 months and restitution in the amount $1,614,542.51.[69]  In granting his variance sentence, Your Honor took particular account of Michael Wright's history of good work.[70]  We respectfully submit that Mr. Carton be given similar consideration.  In light of Mr. Carton's dedication to his family, hard-working and relentless approach to his professional career, and exceptional history of charitable work all in the face of a severe gambling disorder, we request a consistent approach to Mr. Carton's sentencing.

### E.   Probation's 18-Level Enhancement Related to Specific Offense Characteristics Overstates the Seriousness of the Offense And Disproportionately Affects the Sentencing Guidelines Range

The 18 point increase wields an enormously disproportionate influence on the Guidelines range calculation.  More particularly, the disproportionate effect on the total offense level of 27

---

[67] *See* Joseph Meli's Sentencing Hearing, Case 1:17-cr-00127 (KMW) (S.D.N.Y.), ECF No. 126, 33.
[68] *Id.* (Noting Joseph Meli's victims were unable to retire on time, unable to purchase a home, unable to afford college funds and suffered substantial financial hardship).
[69] *See* Michael Wright's Sentencing Hearing, March 8, 2019, Tr. at 38.
[70] *Id.* at 37.

and ultimate Guideline range is misaligned with sentencing objectives. The Guidelines analysis in this case, even if legally correct, demonstrates an oft-criticized aspect of the Sentencing Guidelines:

> Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.

*Gupta*, 904 F. Supp. 2d at 350 (2012) (emphasis added); *Adelson*, 441 F. Supp. 2d at 509 ("As many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as…the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors."). This is particularly true when addressing the Guidelines' loss enhancements, which are "a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004). As several courts have concluded, the sentencing Guidelines as applied to securities fraud have "so run amok that they are patently absurd on their face." *United States v. Parris*, 573 F. Supp. 2d 744, 745 (E.D.N.Y. 2008) (quoting *Adelson*, 441 F. Supp. 2d at 515).

### F.   Restitution

We understand that restitution in this matter is governed by 18 U.S.C. § 3663(A) *et seq.* ("MVRA"). Under the MVRA, "a court's power to order restitution is limited to actual loss." *United States v. Carboni,* 204 F.3d 39, 47 (2d Cir. 2000). Further, a restitution order must be tied to the victim's actual, provable, loss. *See United States v. Marino*, 654 F.3d 310, 319-20 (2d

Cir. 2011). Thus, the government may only seek restitution for the victims' losses "directly caused by the conduct composing the offense of conviction." *United States v. Silkowski,* 32 F.3d 682, 689 (2d Cir. 1994). Indeed, the MVRA applies only when "an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663(A)(c)(1)(B). Finally, in seeking restitution, the Government bears the burden of proving the amount of loss sustained by the victim resulting from the offense by a preponderance of the evidence. 18 U.S.C. § 3664(e); *see United States v. Zangari*, 677 F.3d 86, 92 (2d Cir. 2012).

Since the Government has not demonstrated that Gerard LoDuca[71] has suffered any actual loss, Mr. LoDuca's $450,000 should not be included in the amount of restitution owed. Although Mr. Carton acknowledges that Mr. LoDuca was a victim of the offense of conviction, the Government has not met its burden as it failed to offer any evidence at trial pertaining to the actual loss sustained by Mr. LoDuca. Notably, Mr. Loduca did not testify at trial. Instead, the Government called Mr. Loduca's chief financial officer, Rick Kinsella, as a witness on his behalf. During the direct examination of Mr. Kinsella, the Government neglected to ascertain if Mr. LoDuca gained or lost any money as a result of his investment with Mr. Carton.

## VIII.   MR. CARTON'S PERSONAL AND PROFESSIONAL BACKGROUND

Craig Carton was born in Bronx, New York on January 31, 1969, the son of Paul Carton and Roberta Carton. His father was an orthopedic surgeon and his mother was previously a registered nurse, and later a real estate broker. Both of Mr. Carton's parents currently reside in an assisted living residence in Port Washington, New York. Mr. Carton also has two siblings, Jeffrey and Caryn. Jeffrey is a licensed attorney in the State of New York and resides in West Harrison, New York. Caryn is a homemaker and resides in Old Brookville, New York.

---

[71] The PSR refers to Mr. LoDuca as "Investor-6."

At the age of three, Mr. Carton's family moved from the Bronx to New Rochelle, New York where he spent the duration of his childhood. Mr. Carton was raised Jewish and attended Hebrew school every Sunday. During his childhood, Mr. Carton's parents imparted on him the importance of hard work. While his parents forced him to quit varsity sports in high school so that he could join the high school marching band and focus on his studies, Mr. Carton grew up an avid sports fan and dreamed of playing on the New York Mets.

After graduating from New Rochelle High School, Mr. Carton attended the S.I. Newhouse School at Syracuse University and earned a degree in broadcast journalism in 1991. While at Syracuse University, Mr. Carton was a member of the Pi chaper of the Psi Upsilon fraternity and occasionally broadcasted for the college radio station at Syracuse University. Upon graduating from college, Mr. Carton made several demo tapes of play-by-play basketball and general sports talk and sent them out to various stations across the country. This ultimately landed Mr. Carton a job with WGR Radio in Buffalo, New York doing sports radio.

Mr. Carton's uniquely brash style quickly garnered attention. In 1992, Mr. Carton moved from Buffalo to WWWE in Cleveland, Ohio as the new nighttime host and was an instant success. Within a year, local ratings had never been higher for his time slot and he had been asked to host pregame and postgame shows for Cleveland Cavalier basketball games. Mr. Carton leveraged this success to infiltrate the major east coast markets and in 1993 he started at WIP Radio in Philadelphia as a full time host. Over the next 4 years, Mr. Carton served as both a weekend host and filled in on WIP's morning show. In 1994, he was the first person to break the news story that the Philadelphia Eagles had been sold to Hollywood producer Jeffrey Lurie. When Mr. Carton first started at WIP, he was an inexperienced and raw radio host. Four years later, he was a seasoned reporter who was well versed in delivering an entertaining and

successful sports radio show daily. During his time in Philadelphia, Mr. Carton also opened and operated a successful tavern known as Labradors Pub where he would meet his future wife, Kim. They would later marry in 1999.

In 1997, Mr. Carton left Philadelphia and spent the next few years working for CBS SportsLine in Fort Lauderdale, Florida and then two radio stations in Denver, Colorado. Both of Mr. Carton's shows in Denver were the top rated local shows in their respective time slots. However, in 1999, Mr. Carton and his wife decided to move back to the East Coast to start a family and he soon joined WNEW-FM's *Sports Guys* morning radio program in New York City.

In 2002, Mr. Carton joined New Jersey's KKXW station and within months was co-hosting the number-one, most-listened-to afternoon radio show in the United States. CBS Radio ("CBS") took notice. Following Don Imus's firing in 2007, CBS hired Mr. Carton along with Boomer Esiason to replace *Imus in the Morning* and co-host WFAN's morning show opening. One year later, the program, called *Boomer & Carton*, accomplished something that had not been done before in the history of WFAN: it became the number one radio program in the United States in every male demographic and the highest-rated show in the entire station. The show would later be simulcast on MSG Network from September 14, 2010 until September 11, 2013. Since January 2014, the show has been simulcast on the CBS Sports Network. Mr. Carton co-hosted *Boomer & Carton* until his arrest in September 2017.

Simultaneous with his burgeoning radio career, Mr. Carton had an insatiable entrepreneurial spirit and started several innovative businesses including: Quarterback Challenge with Boomer, the first ever National Football League app in the app store; CureIt, a band aid company which owned the rights to all professional football, basketball and baseball teams; 23-9 Design, a jewelry company that owned the rights to Muhammad Ali's estate and was the

exclusive designer and provider for Frederick's of Hollywood; Junk Balm, a deodorant for men;
Boomer and Carton Kitchen, a concession stands at Barclays Center;   and CHC Foods, a
restaurant business that would later fund one of the top restaurants in Palm Beach, Florida.

On March 29, 2018, Mr. Carton returned to radio as the host of *Carton & Friends* on
FNTSY Sports Network, a Canadian specialty television and streaming service.  In May 2018,
Sports Byline USA acquired rights to syndicate the program on terrestrial radio.

Despite having an incredibly demanding and exhausting profession, Mr. Carton has
prioritized his family above all else.  With Kim, Mr. Carton has raised four wonderful children:
Mickey J., age 18; Sonny D., age 16; Lucky T., age 14; and Anthony I., age 7.  The letters from
friends, family and colleagues provide a glimpse into the utmost dedication Mr. Carton has to his
family.  Judith Chalme, a co-worker and friend of Mr. Carton's for almost 20 years, writes to the
Court:

> Having worked in the radio industry for the last 30 years, I can tell you that in our
> business, Craig is anomaly. Throughout the years we worked together, when
> others were looking forward to their next personal appearance, Craig was rushing
> home to his family. When others in our industry were getting caught up in the
> fame, Craig was trying to make his wife and kids proud. When others were
> fighting for more money to buy fancy cars, Craig was planning out another
> charity event…As a mother of 4 and grandmother of 5, I have NEVER seen the
> level of devotion to one's children that Craig has. Period.[72]

Doug Wells, a friend of Mr. Carton for over 12 years, states:

> I came to realize that when he was away from the microphone Craig was a simple
> guy who always went out of his way to help others out and he was the type of guy
> that would rather be at home with his kids than at an event…family came first his
> job came second.  They knew he was the type of guy who could never say no
> when someone needed help.[73]

Jerry M. Geffen, Mr. Carton's father in law, describes him as "a loving family man who would
do anything for his children…He is the definition of a hands on Dad and is deserving of the

---

[72] **Exhibit D-9** (Letter from Judith Chalme).
[73] **Exhibit D-64** (Letter from Doug Wells).

adulation that he receives from his children.  He always made time for all the kids events whether it be a sporting event, dance recital, fishing trips, etc."[74]  Chris Cannon, former colleague and friend of Mr. Carton's for over fifteen years, marvels "[i]n Craig I realized it was possible to be hard-working AND a dedicated parent. I had never known or believed that a man had the capacity to be both…But if you're asking me Craig's biggest fault it's simple. Generosity."[75]  No matter the circumstances, Mr. Carton has maintained an unyielding commitment to his family.

## CONCLUSION

For the reasons set forth herein, we respectfully submit that a non-Guidelines sentence provides sufficient punishment for Mr. Carton, in accordance with the sentencing factors enumerated in 18 U.S.C. § 3553(a).

DATED:     New York, NY
           March 22, 2019

Respectfully submitted,

GOTTLIEB & JANEY LLP

By: Derrelle M. Janey, Esq.

Robert C. Gottlieb, Esq.
Derrelle M. Janey, Esq.
111 Broadway, Suite 701
New York, NY 10006
Tel.: (212) 566-7766

*Attorneys for Defendant Craig Carton*

---

[74] **Exhibit D-1** (Letter from Jerry M. Geffen)
[75] **Exhibit D-13** (Letter from Chris Cannon)