UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

      - v. -

CRAIG CARTON,

          Defendant.

:
:
:       17 Cr. 680 (CM)
:
:
:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## THE GOVERNMENT'S SENTENCING MEMORANDUM


GEOFFREY S. BERMAN
United States Attorney for
the Southern District of New York


Brendan F. Quigley
Elisha J. Kobre
Assistant United States Attorneys
    - Of Counsel

The Government makes this submission in advance of the sentencing of Craig Carton ("Carton" or "the defendant"), which is scheduled for Friday, April 5, 2019.  The Probation Department calculates the applicable Guidelines range as 70 to 87 months' imprisonment.  As set forth below, the Government submits that a sentence within that range, along with forfeiture and restitution, is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Carton's arguments in favor of a lesser sentence rely principally on his charitable endeavors, his gambling issues, and childhood trauma.  These arguments ignore the duration, extent, and nature of the offense conduct here.  Carton's fraud was not the result of an isolated loss of impulse control or a one-time stumble when faced with purported "crushing gambling debts." Nor was it an arms-length fraud against anonymous or faceless counter-parties.  Instead, over a period of months, Carton repeatedly met with his victims, communicated with them, and lied to them.  He lied to get their money, and he lied to lull them into a false sense of security about the status of their investments.  He took the time to create fake contracts and to forge emails.  He communicated with his co-conspirators about moving investor funds through different bank accounts.  In short, Carton was far from charitable to his victims and instead perpetrated a deliberate, extended, and serious fraud, one that is deserving of a serious punishment.

## BACKGROUND

From at least in or about August 2016 through at least in or about August of 2017, Carton defrauded investors out of millions of dollars, by falsely promising them he would invest their funds in an event-ticket enterprise.

### I.     Late Summer 2016: Carton Defrauds an Investor in Adele Tickets

In August 2016, Carton was introduced to Ron DelGaudio, a Brooklyn pharmacy owner. (Tr. 554).  While meeting with DelGaudio, Carton represented that he had "access to tickets for

concerts," including an upcoming concert tour by Adele and was seeking financing for the purchase and re-sale of those tickets. (Tr. 555). Carton provided DelGaudio with an agreement, purportedly giving Carton's company, Misoluki, access to up to $4.5 million worth of Adele tickets that had been obtained by Joseph Meli and Advance Entertainment, GX 1300, and, over the next few weeks, discussed with DelGaudio the possibility of investing in the Adele tickets. (*See generally* Tr. 555-56). During these discussions, Carton continually pushed the pace, telling DelGaudio, for example, that "every week that passes will essentially put us two weeks behind in available inventory." (GX 540). Based on Carton's representations, DelGaudio wired $1,000,000 to Carton on September 6, 2016 to fund the purchase of the Adele tickets, which would be re-sold on the secondary market. (Tr. 562-63). However, the previous day, in an email chain discussing their debts, Carton had told his co-conspirators, Meli and Michael Wright, "don't forget I have $1m coming tomorrow from ticket investor[.] will need to be discussed how to handle." (GX 224).

Carton and his partners-in-crime "handle[d]" DelGaudio's money by spending it on everything other than Adele tickets. Although Carton then wired $990,000 of DelGaudio's money to Meli's company, Advance Entertainment, within days, almost all of that money was back in another one of Carton's back accounts. (GX 2305 (summary chart)). Carton sent $100,000 of DelGaudio's funds to yet another of his bank accounts, he sent $480,000 to two casinos, used $250,000 to pay off another individual who had made him a gambling-related loan, and sent $30,000 to a landscaping company. (*Id.*). Over the next few months, Carton and Meli both gave DelGaudio purported updates on the status of his Adele investment—even though they had stolen the money almost immediately after receiving it. (GX 1301; Tr. 570-72).

II.       **Carton Defrauds an Investment Fund**

Weeks later, after misappropriating DelGaudio's Adele investment, Carton began negotiating with a New York-based investment fund, Brigade Capital, about financing Carton and Meli's purchase of tickets to live events.

By early December 2016, Carton was nearing completion of his negotiations with Brigade for a $10 million revolving loan, the proceeds of which were to be used exclusively for the purchase of bulk tickets to particular live events for resale at a profit.  (PSR ¶ 21).

At the same time he was closing the deal with Brigade, Carton and his co-conspirators were discussing Carton's debts, including the need to pay back DelGaudio a return on his purported Adele investment.  For example, on December 5, 2016, Carton e-mailed Meli and Wright, stating "Ron DelGaudio: $970,000 December 20[;] Harvey Klein: $550,000 [t]his Friday[;] Sands: $280,000 ASAP."  (GX 736).  In a text message sent the next day, December 6, 2016, Meli expressly proposed to both Wright and Carton misappropriating the Hedge Fund's loan "to repay debts":

> *We use [the Hedge Fund] money to repay debts*.  Where do we get the money to buy tickets and further more what deal do we offer the money provider for the tickets? We can not pay [Hedge Fund] with other people's money right away because it does not work. *We need [Hedge Fund] to buy deals with long lead times and earn money in the interim and use the earned money to replace the [Hedge Fund] funds in ticket deals on the future*. That is the math we have to figure out and work it into a schedule to get down to zero [.]

(GX 54 (emphasis added); PSR ¶ 22).

Carton and Brigade closed on the revolving loan agreement on December 8, 2016 ("the Investment Agreement").  A key provision of the Investment Agreement was that, before Brigade would forward money for a ticket investment, Carton was required to provide Brigade with a

written agreement "under which the applicable [tickets] shall be procured" (a "Ticket Agreement"). (*See* GX 925 at 12-13; Tr. 57).

Over the next two weeks, Brigade invested $4.6 million in three separate purported ticket investment opportunities presented by Carton. Each time Carton presented Brigade with an investment opportunity, he gave them a fraudulent Ticket Agreement and misappropriated the investment. None of the $4.6 million was actually invested in tickets to events.

*First,* on December 7, 2016, Carton sent Brigade agreements supposedly between Meli and Anschutz Entertainment Group ("AEG"), which gave Meli the right to purchase blocks of tickets to concerts by Katy Perry, Justin Bieber, the Chain Smokers, and Ariana Grande. (GX 933, GX 935). AEG had not, in fact, entered into any of these Ticket Agreements, and the Ticket Agreements contained the forged signature of an AEG executive (Tr. 662-67). The following day, December 8, 2016, Brigade sent $700,000 to Advance Entertainment, Meli's company, to finance the purchase of tickets to concerts pursuant to the Ticket Agreements with AEG. (*See* GX 2306 (summary chart)). The very next day, December 9, Meli wired $700,000 to a bank account controlled by Carton and Wright. (*See id.*) From there, Carton sent $200,000 of that money to Sugarhouse Casino, and $500,000 to Harvey Klein, *see id.*, who testified at trial under a grant of immunity. Ten days earlier, Carton had used a loan from Klein to pay DelGaudio back a purported return on his Adele investment, *see id.*, and Carton then used a portion of Brigade's initial investment to pay back Klein.

*Second,* on December 15 and 16, 2016, Carton sent Brigade additional Ticket Agreements between Meli and Brigade, purportedly giving Meli access to tickets to concerts by the Dead and Company and Metallica. (GX 912, 913). Once again, AEG had not, in fact, entered into any of these Ticket Agreements, and the Ticket Agreements contained the forged signatures of AEG

4

executives.  (Tr. 667-72).  On December 19, 2016, based on Carton's representations that the funds would be used to purchase tickets pursuant to the Metallica Ticket Agreement, Brigade wired $1 million to Advance Entertainment, which Meli used to pay back two prior investors.  (*See* GX 2309).  Three days later, Brigade sent Advance Entertainment a further $900,000 to invest in the Metallica tickets.  (*See* GX 2310).  Meli used $500,000 of this money to pay back a prior investor, and then sent a total of $600,000 to Carton's personal bank account, where it was further misappropriated, as discussed more fully below.

*Finally*, on December 18, 2016, Carton sent Brigade a Ticket Agreement that purportedly gave him access to tickets to Metallica and Barbra Streisand concerts at Barclays Center and Nassau Coliseum, put on by Brooklyn Sports and Entertainment ("BSE").  (GX 929).  This agreement was also fake; BSE had never entered into any such contract with Carton, and the document contained a forged signature of BSE's CEO.  (Tr. 333-34).  In addition, to induce Brigade to invest in these concerts put on by BSE, Carton sent Brigade multiple doctored emails. These included, GX 930, where Carton forwarded Brigade an email from BSE's Chief of Staff but added certain content, to make it appear as if he had a more definitive arrangement with BSE, and GX 914, where Carton created, out of whole cloth, a purported email from BSE's Chief of Staff attaching a draft Ticket Agreement and instructing Carton to "please execute and we will do the same," which Carton forwarded onto Brigade.

Based on Carton's representations, Brigade wired $2 million to BSE on December 19, 2016, to finance the purchase of tickets to Metallica and Streisand shows at the Nassau Coliseum. Carton, however, had other plans for this money.  Unbeknownst to Brigade, Carton contacted BSE and told them, falsely, that Brigade's wire had been sent "in error" and should be re-directed to an account for TierOne Tickets, which was controlled by Carton and Wright.  (*See* GX 2113; Tr.

5

466). Based on its longstanding close relationship with Carton, BSE believed him and complied with this request. (Tr. 469-70). Once in the TierOne Tickets account, Wright wired much of the money to accounts that he controlled and used approximately $690,000 to pay back Desmond Finger, who had previously extended Carton a loan which Wright guaranteed. (GX 2308). Most of the rest of the money Brigade had earmarked for the BSE investment was further transferred from TierOne to Carton's personal Citibank account. (*See id.*) There, along with the money Carton had received from Meli, it was used to pay, *inter alia*, DelGaudio an additional purported return on his Adele investment; various expenses for Carton's other businesses; and to pay advances for Carton to take a holiday gambling trip to Seminole Hard Rock Casino:



(*See* GX 2311).

On December 22, 2016, after misappropriating the $1.9 million Brigade had sent to Meli over the previous three days, and the $2 million Brigade had sent to BSE on December 19, Carton, Meli, and Wright congratulated each other on their fraud, with Carton telling his co-conspirators that they had "survived the death bullet":

From:      "Michael Wright" <mw@sgroupnyc.com>
To:        "'Joseph Meli'" <jmeli74@gmail.com>, "'Craig'" <labs123@aol.com>
Subject:   RE: Hey
Sent:      Thu, 22 Dec 2016 17:17:14 -0500

Great work my friends
To do battle another day


-----Original Message-----
From: Joseph Meli [mailto:jmeli74@gmail.com]
Sent: Thursday, December 22, 2016 2:48 PM
To: Craig <labs123@aol.com>
Cc: Michael <mw@sgroupnyc.com>
Subject: Re: Hey

Love you all

Joe Meli
917-664-0256

> On Dec 22, 2016, at 4:40 PM, Craig <labs123@aol.com> wrote:
>
> Almost in a really good place but for certain we survived the death
bullet.
>
> We should map out January and February when we all return.
>
> Love you guys and will be nice to start building in the weeks to come
>
> MW please send Joe the TierOne wire info. Thanks
>
> Sent from my iPhone

(GX 749).

### III.      Meli Gets Arrested; Carton Continues the Fraud

A little over a month later, on January 27, 2017, Meli was charged in this District with securities fraud, wire fraud, and conspiracy to commit those offenses, and arrested by the FBI. Carton, however, continued his fraud.

In February and early March, Carton solicited a $400,000 investment from DelGaudio, to be used to purchase All Access tickets to events at Nassau Coliseum.  (Tr. 576-77).  To assuage

7

DelGaudio's concerns, and to induce him to invest again, Carton falsely told DelGaudio he himself had been a victim of Meli.  (Tr. 575 (DelGaudio testimony that "Craig Carton basically told me know that . . . he himself lost money with Meli").

On March 15, 2017, after being contacted by the FBI, Carton met with agents, the Government, and representatives of the SEC at the U.S. Attorney's Office.  (*See* 10/25/18 H'rg Tr. at 20-24 (testimony of Agent Sweeney)).  Although the Government's investigation was still in its relatively early stages, the meeting raised additional questions for the Government regarding Carton's involvement with Meli.  (*See id.*)  Among other things, although claiming to have been victimized by Meli, Carton declined to provide specifics as to the reasons for certain wire transfers between him and Meli and failed to disclose anything about Brigade's investment with BSE.  Shortly after the meeting, the SEC contacted Carton's prior counsel with requests for additional information about the wire transfers involving Carton and Meli.  Ultimately, neither the Government nor the SEC received responses to those requests for information.

Carton's fraud continued.  In late April, Carton solicited an additional $500,000 investment from DelGaudio, which was to finance the purchase of tickets to events at Nassau Coliseum.  (Tr. 579-83).  Carton, however, immediately re-directed this money to Harvey Klein, to pay back a gambling-related loan.  (GX 2314).  And just weeks later, in early May, Carton solicited a $450,000 investment from Gerard LoDuca.  Carton represented to LoDuca and the Chief Financial Officer of LoDuca's business, Rick Kinsella, that the money would be used first to buy out a prior investor in Carton's ticket business and credited towards an investment by LoDuca in the ticket business.  (Tr. 690-91).  Carton sent LoDuca and Kinsella an email from "Harvey K," suggesting to them that "Harvey K," actually Harvey Klein, was the ticket investor who LoDuca was buying out.

8

From:        Craig C
To:          Rick Kinsella; Gerry Loduca
Sent:        5/10/2017 1:51:13 AM
Subject:     Fwd: Loan wiring instructions

Investor i mentioned

Sent from my iPhone

Begin forwarded message:

**From:** Harvey K
**Subject: Loan wiring instructions**

Hi Craig,

I hope your doing well.
I must have the funds back in my account by Thursday morning for a closing. Let's
see if we can get it done.
Here are the wiring instructions.

Wells Fargo Bank
Account # 7176412547
Routing number 026012881

Please let me know once it's done.

Thanks
H

(GX 1102). Unbeknownst to LoDuca and Kinsella, Klein, of course, had loaned money not for

tickets but for gambling, and LoDuca's money was never used towards any ticket-related

investment. (*See* GX 2313).

####     IV.      **Procedural History**

Carton was arrested on September 6, 2017, on a criminal complaint charging him with

securities fraud, wire fraud, and conspiracy to commit those offenses. A grand jury later

returned an indictment charging Carton with those same crimes. Carton's trial began on October

30, 2018, and ended on November 7, when the jury convicted him on all counts.

V.     **The Guidelines Calculation**

The Government agrees with the Guidelines calculation in the Presentence Report.

Specifically:

- Counts 1, 2, and 3 are grouped, pursuant to U.S.S.G. §3D1.2(d), because the offense level is determined largely on the basis of the total amount of harm or loss.

- Because the offense of conviction has a statutory maximum term of imprisonment of 20 years, the base offense level is 7, pursuant U.S.S.G. §2B1.1(a)(1).

- Because the loss that resulted from the instant offense was greater than $3,500,000, but less than $9,500,000, the base offense level is increased by 18 levels, pursuant, U.S.S.G. §2B1.1(b)(1)(J).

- Because the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense, two levels are added pursuant to U.S.S.G. §2B1.1(b)(17)(A).[1]

Accordingly, the total offense level is 27. Because Carton is in Criminal History Category

I, the Guidelines range is 70 to 87 months' imprisonment.

**The PSR Correctly Calculates the Loss Amount**

Carton takes issue with the loss amount in the PSR, largely because of the August 18, 2017

Forbearance Agreement between Carton and Brigade. In doing so, Carton confuses the similar

but distinct concepts of "loss" under the Guidelines and restitution. Restitution is discussed further

below.

---

[1] The Probation Department raised the applicability of this enhancement, and Carton does not appear to object. While the Government did not include this enhancement in Wright or Meli's plea agreements, it does appear applicable here. Carton personally received more than $1,000,000 of Brigade's money, albeit some of it indirectly. (*See* GX 2311). Further, Brigade is a "financial institution" for purposes of the Guidelines. The Guidelines define a "financial institution" as including an "investment company." *See* U.S.S.G. §2B1.1 (Definitions). An "investment company" "includes a company substantially engaged in the business of investing in securities of other companies." *United States* v. *Savin*, 349 F.3d 27, 37 (2d Cir. 2003). That definition clearly applies to Brigade, an "investment firm" that invests money on behalf of its clients. (Tr. 44-45).

As to loss under the Guidelines, Carton correctly notes that "loss shall be reduced by . . . the money *returned* by the defendant or other persons acting jointly with the defendant before the offense was detected."  U.S.S.G. §2B1.1 App. Note 3(E) (emphasis added).

The application note goes on to explain that "[t]he time of detection of offense is the *earlier of* (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency."  *Id.* (emphasis added)

Here, at the *latest*, Carton "knew . . . the offense was detected" on September 6, 2017, the day he was arrested.[2]  As Carton concedes, only $619,689.99 had been "returned" to Brigade before Carton's arrest.  (*See* Def.'s Sent. Mem at 13 ("While Brigade did not receive the rest on the monies owed under the Forbearance Agreement until after Mr. Carton's arrest . . .")).  Thus, even if additional money was later paid to Brigade under the Forbearance Agreement, executed in August 2017, only funds actually "returned" to the victim before detection of the offense, *see* U.S.S.G. §2B1.1 App. Note 3(E), not "pledged" or "promised" to be returned, should be credited against loss under the Guidelines.

Thus, Brigade's "loss" for Guidelines purposes is $3,980,310.01.  In addition, as reflected in the PSR, other victims of Carton's ticket-investment scheme lost a combined $1.32 million,

---

[2] While it ultimately does not make a difference to the loss amount under the Guidelines, there are good reasons to believe that Carton knew or should have known that "the offense was detected" before his arrest and before entering the Forbearance Agreement and paying Brigade $616,000 on August 17, 2017.  By mid-August 2017, *inter alia*, Carton's co-conspirator, Meli, had been arrested; the FBI had sought to interview Carton, and investigators sought additional information from Carton following the interview, which was never provided; Brigade had sent Carton a Notice of Default, *see* Def Sub., Ex. E at 1; Carton appears to have fraudulently induced Brigade to enter into the Forbearance Agreement, claiming that Brigade's money "remained with [BSE]," *see id.*, when in fact it had been misappropriated, and as discussed in pre-trial motion practice, Carton had conducted numerous Internet searches related to "Ponzi scheme" and similar topics.

putting the total loss amount at $5,300,310.01, i.e., easily within $3.5 million to $9.5 million range for the 18-level enhancement under U.S.S.G. §2B1.1(b)(1)(J).   Accordingly, the PSR correctly calculates the loss amount.

## DISCUSSION

### I.  The Court Should Impose a Guidelines Sentence

The Court should impose a Guidelines sentence.   Such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

### A.  The Nature and Circumstances of the Offense, and the Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment Require a Guidelines Sentence

To begin with, a Guidelines sentence is appropriate in light of "the nature and circumstances of the offense," and the "need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  18 U.S.C. § 3553(a)(1)-(2).

The fraud here was extremely serious and deserving of significant punishment.

*First*, the scheme here involved both providing investors with fraudulent documents and the misappropriation of investor funds, and Carton was centrally involved in both aspects of the fraud.  To induce Brigade to invest, Carton provided Brigade with fake agreements both between Meli and AEG and between Carton and BSE.[3]  He repeatedly modified legitimate emails from

---

[3] Carton claims that he had no knowledge that the agreements between Meli and AEG were fake. (Def. Sub. at 8).  At the same time, he does not seriously contest that he provided Brigade with a fake agreement between him and BSE.  Notably, the trial evidence showed that both the AEG agreements and the BSE agreement was originally drafted by David Molner, and that Meli was copied on sets of communications regarding both types of agreements.  Thus, it defies logic to think that Carton was unaware that the AEG documents, created with the same individuals, at the same time, and for the same purposes as the BSE agreement, were legitimate while knowing that the BSE agreement was not.  Moreover, Carton dictated terms for the purported agreements

BSE, before forwarding them onto Brigade.  (*Compare, e.g.*, GX 2109 (original email from Fred Mangione to Carton) *with* GX 930 (email from Carton to Brigade, adding references to "Barbara [sic] Streisand" and Metallica, "a term sheet," and a "$3mm deposit by December 19th" to the original email from Mangione)).  He created, out of whole cloth, GX 914, an email in which Mangione purportedly told Carton to "please execute" the fraudulent Ticket Agreement between Carton and BSE "and we will do the same."  Later, he sent LoDuca an email from Harvey Klein, insinuating that Klein was an "investor" in Carton's ticket enterprise.  (GX 1102).

Carton also directed and benefitted from the misappropriation of investor funds.  Between September 2016 and April 2017, Carton solicited almost over $6.5 million from investors in his ticket enterprise, and over $5 million of this money went to Carton or to pay back money Carton owed to others.[4]  Further, Carton and Wright's own representations to Meli notwithstanding, significant amounts of these investor funds were used to do things other than retire gambling debts that Carton "was under extraordinary pressure to repay."  (*Cf.* Carton Sentencing Submission ("Def. Sub."), at 8).  While $500,000 of Brigade's initial $700,000 investment was used to re-pay a short-term loan from Harvey Klein, Carton had used most of the Klein loan proceeds—in classic Ponzi-scheme fashion—to pay DelGaudio a purported return on his Adele tickets investment.  (*See* GX 2306).  Similarly, on GX 2311, a summary chart of certain of Brigade's later investments, $500,000, or almost half of the payments reflected on the exhibit, went to Seminole Hard Rock Casino.  There, they were used to *fund* Carton's subsequent gambling activity at that casino, not

---

between Advance and AEG, despite having no relationship with AEG, including *after* he had already sent this agreements to Brigade.  (*See* GX 276, 277, 285, 286).

[4] These figures are based on the investments by Brigade, DelGaudio, and LoDuca, discussed above, as well as a $150,000 investment by another individual ("Investor-7"), who was ultimately repaid his principal and interest, *see* PSR ¶¶ 41-47.

repay past debts, that Carton was supposedly being "squeezed" to pay. (*Cf.* Def. Sub. at 9; *see* Tr. 711 (testimony of Seminole representative that the funds "were drawn at table games to play at a table")). Similarly, the $100,000 sent to "Paradise Enterprises" appears to have been used to fund Carton's subsequent gambling activity at Resorts World Bimini. (*See* GX 3 (stipulation identifying Paradise Enterprises as Resorts World Bimini)). As also reflected on GX 2311, Carton sent another $250,000 to DelGaudio as another purported re-payment on DelGaudio's Adele ticket investment. Finally, the $2,195 sent to Headwin Global Logistics, as reflected on GX 2311, appears to have been made in connection with shipping costs related to one of Carton's other fledging businesses. In short, Carton's misappropriation of investor funds served a variety of purposes: re-paying prior ticket investors in a Ponzi-like fashion, funding Carton's subsequent activities, and supporting Carton's other business ventures. Whatever the purpose, however, the prime beneficiary was Craig Carton.

In short, from beginning to end, Carton was centrally and personally involved in all aspects of this fraud, and he benefitted directly from the false representations he made to investors and from the misappropriation of investor funds.

*Second*, this was not an arms-length fraud. Carton's victims were people with whom he had cultivated relationships, and he used his public persona to add a further veneer of credibility. As noted in the PSR, victims of Carton's fraud "believed that [they] had formed a friendship with Carton," PSR ¶ 63, and "trusted" Carton, PSR ¶ 68. And while many of the letters in support of Carton highlight his charitable works and—in particular, his work with the Tic-Toc Stop Foundation—Carton's scheme involved deceiving a fellow board member of that foundation. (*See* PSR ¶ 65). Moreover, while BSE is not a "victim" of the fraud for restitution or loss purposes, Carton traded on his years-long relationship with BSE to effect his fraud, most particularly when

falsely telling BSE that Brigade's $2 million wire had been sent "in error" and should be re-directed to Carton. (Tr. 469-70 (Mangione testimony that "I trusted Craig; I believed him . . . . I just trusted that that was sent in error"); Tr. 500 (Mangione testimony that he viewed Carton "as a friend")). In short, Carton took advantage of people who knew him, he believed in him, and who trusted him.

*Third*, Carton lied to his victims for months. He not only induced them to invest in the first instance, but he also provided them with false updates about the status of their investments, even though he knew well that he had already misappropriated their money. (*See, e.g.*, GX 1301 (10/10/16 email from Carton to DelGaudio that "the [Adele] investment has been exhausted and we are waiting for reconciliation on the final few shows for November"); GX 936 (3/3/17 email from Carton to Brigade that there was "$831,615 on deposit at Barclays [and] $1,168,385 invested")). Indeed, it bears noting that Carton continued his fraud after being interviewed by the Government in March 2017, defrauding DelGaudio and LoDuca out of almost one million dollars in the following months. And, as noted above, even as late as August 2017, Carton falsely represented to Brigade that he had not received any of the money Brigade invested with Meli and that some of Brigade's funds were still "on deposit" at BSE. (*See* Def. Sub., Ex. E at 1).

In short, this was a serious fraud that deserves a serious punishment. Carton was involved in all aspects of the scheme; he created fake contracts and doctored-up emails and he stole investor money to benefit himself. His victims were people who believed they had formed a relationship with him. And his lies continued for months.

### B. The Court Should Reject Carton's Argument that His Gambling and Childhood Trauma are Mitigating Factors

The Court should reject Carton's arguments that his gambling and childhood trauma are mitigating factors here.

*First*, the current Sentencing Guidelines explicitly state that "[a]ddiction to gambling is not a reason for a downward departure."  U.S.S.G. §5H1.4.

*Second,* to state the obvious, Carton was convicted of participating in a ticket-investment scheme, not of gambling related offenses.  Put another way, Carton cannot claim to have been addicted to lying to investors, creating fake contracts, altering emails, or moving misappropriated investor funds through multiple bank accounts, *i.e.* the things that resulted is his conviction.  At best, Carton's gambling was what motivated him to access more and more money.  Money that was not his.  Money that he stole from his investors through fraud and deceit.  And as Judge Kaplan observed in denying a downward departure based on a gambling addiction in a fraud case, "all crimes are committed out of motives.  Many are committed out of motives created by behavior that might be described as addictive or compulsive."  *United States* v. *Grillo*, No. 03 Cr. 0249( LAK), 2003 WL 22999219, at *2 (S.D.N.Y. Dec. 22, 2003); *see also United States* v. *Kim*, 313 F. Supp. 2d 295, 298 (S.D.N.Y 2004) (rejecting the defense argument that a departure for diminished capacity was appropriate where the "alleged compulsion would only relate to the motive for [the crime], not the [crime] itself.")).  In short, there is nothing extraordinary about crime having a gambling-related motive so as to justify departure or variance.

*Third*, that is particularly true here because Carton's scheme was not the result of a fleeting loss of impulse control or a frenzied attempt to repay gambling debts.  Instead, as discussed above, Carton committed a sustained and systematic fraud, involving repeated volitional conduct over at least a year, including multiple meetings and communications with his investors, the drafting of fake contracts, the creation of shell entities used to carry out the fraud such as TicketJones and AdvanceM, and coordination with his co-conspirators.

*Finally*, the trauma Carton reportedly suffered as a child is tragic, abhorrent and indeed criminal.  That said, Carton's psychologist report links the abuse to Carton's gambling disorder and does not appear to suggest that those events otherwise contributed to Carton committing this crimes.  (*See* Def. Sub., Ex. B at 13).  As discussed above, Carton's gambling disorder is not a significant mitigating factor here.  In any event, Carton's childhood trauma does not excuse, or even explain, his actions four decades later in stealing millions of dollars, particularly since, in the intervening years, he has been able to lead a highly productive and successful life.

In short, Carton's gambling issues and reported childhood trauma do not lessen the seriousness of the offense conduct, nor are they otherwise a substantial mitigating factor here.

### C.  A Guidelines Sentence Is Necessary for General and Specific Deterrence, and to Protect the Public

In addition, a Guidelines sentence is necessary for general and specific deterrence.  18 U.S.C. § 3553(a)(2)(A).

As to specific deterrence, it is notable that this was not a crime borne out of poverty or a result of a difficult family situation.  In contrast to many defendants who come before this Court for sentencing, Carton grew up in an upper middle class home, he benefitted from a university education, and he made millions of dollars a year through his legitimate job.  Moreover, given Carton's stature and profile, many doors were opened to him that would not be open to the general public, even highly successful members of the general public.

Further, despite having been convicted by a jury, Carton's sentencing submission still suggests an unwillingness to come to grips with the nature of his offense conduct.  Carton blithely asserts, for example, that he was "[u]nable to financially abide by the terms of the [Investment] Agreement" with Brigade.  (Def.'s Sent. Mem. at 10).  The reason, of course, that he was "unable to financially abide" by the Agreement was that he had stolen Brigade's money.  In the same

paragraph, Carton notes—apparently in support of mitigation—that "[n]otably, Brigade did not seek payment of either $2,600,000 that it transferred to directly to Mr. Meli's company or approximately $384,000 of losses that were incurred in the normal course . . ." (*See id.*). Again, the reason, of course, is that Carton had lied to Brigade about what happened to this money—falsely claiming that he was a victim of Meli's and that he did not know what happened to the money, that he had never received any of the $2.6 million Brigade sent to Meli, and that the money Brigade had sent directly to BSE had been either "invested" or was "on deposit," *see* GX 936. Carton also states, again in apparent mitigation, that he bought "over 3,400 tickets in connection with the Brigade relationship." (Def.'s Sent. Mem. at 1). It is unclear what exactly "in connection with the Brigade relationship" means, but, as the trial record made plain, Carton's buying thousands of tickets on his credit card (and through another loan from Desmond Finger) after Meli's January 2017 arrest was certainly contrary to the representations he had made to induce Brigade to enter into said "relationship."[5]

Second, general deterrence is also crucial. As the Court is aware, this case, and Carton's trial in particular, received substantial media attention.[6] The Court's sentence will undoubtedly send an important message to the public.

In this regard, the Court should reject the argument that a lenient sentence would benefit society because it would allow Carton to return to work and "'help educate . . . [audiences] on the dangerous allure of extreme gambling.'" (Def. Sub., at 5 (quoting Def. Ex. A-3)). The

---

[5] In addition, as the Government noted at trial, a substantial number of the tickets Carton actually purchased were to events other than the Barbra Streisand and Metallica tickets that formed the basis of his agreement with Brigade.

[6] While this case would have undoubtedly received media attention, it also bears noting that Carton himself contributed to this media attention by holding press conferences and giving multiple interviews discussing the case.

Government submits that the vast majority of the general public is already well aware of the obvious "danger[s]" of "extreme gambling."  Instead, a lenient sentence, followed by a quick return to the airwaves, would send the message that the misappropriation of investor funds, the forging of signatures, and the creation of fake contracts and e-mails have few lasting consequences, especially for public figures.

Relatedly, the Court should also reject Carton's suggestion that a non-Guidelines sentence is necessary to help him make restitution.  As a threshold matter, this argument is nearly always available to white collar defendants and, if adopted, would simply provide fraudsters a way to purchase their liberty at the sentencing phase.  Further, it appears the defendant could use some portion of his current assets, valued at $3.1 million, PSR ¶ 165, to contribute significantly in the near-term to the restitution in this case.[7]

In short, a Guidelines sentence would promote specific and general deterrence, both of which are important factors in this case.

### D.  A Guidelines Sentence Would Not Result in Unwarranted Sentencing Disparities

Further, a Guidelines sentence would not cause an unwarranted sentencing disparity. Carton's Guidelines range is 70 to 87 months.  This Court sentenced his co-conspirator Wright to 21 months.  Judge Wood sentenced co-conspirator Joseph Meli to a bottom-of-the Guidelines sentence of 78 months.

---

[7] In addition, although not reflected in the "Assets" section of the PSR, it also appears that Carton owns land in Arizona and has IRA accounts, both of which he will retain 100 percent of, under his separation agreement with his wife.  (PSR ¶ 170).  In short, it appears Carton already has significant assets which can be used to satisfy a significant portion of any restitution order in the near-term.

*First*, Wright and Meli both pled guilty and accepted responsibility for their conduct, receiving a three-point Guidelines reduction, and sparing the victims and others affected by their fraud from the time, expense, and stress of testifying.  Carton did not.

*Second*, with respect to Wright, Wright's main role was to move misappropriated investor proceeds.  Wright never met with Brigade, DelGaudio, or LoDuca.  There was no evidence he was involved in, or even aware of, the fake Ticket Agreements that Carton presented to Brigade. And Carton perpetrated the frauds of DelGaudio and LoDuca apparently without any meaningful involvement from Wright, and as a result, Wright's stipulated Guidelines range did not include DelGaudio and LoDuca's losses.  Moreover, while Wright personally received approximately $1.06 million of Brigade's money, most of these funds went to re-pay a loan that Desmond Finger had extended to Carton.  (*See* GX 2308 (summary chart); Tr. 605-06 (Finger testimony that transfer was a re-payment for a loan he had extended to Carton)).  In short, the primary beneficiary of Wright's offense conduct was Craig Carton.

*Finally*, Carton's generosity and charitable works do not meaningfully distinguish him from his co-conspirators or from other similarly situated defendants.  To begin with, as noted above, Carton's relationship with one of the victims of his fraud developed through the Tic-Toc Stop Foundation, *see* PSR ¶ 65, which features prominently in Carton's sentencing submission. In any event, as having recently sentenced Wright, the Court is aware that Wright pointed to his own significant works of kindness and generosity in seeking a lenient sentence.  Perhaps not surprisingly, so did Meli.  His sentencing submission argued that he "lived an extraordinary life of dedication to family, good deeds, and charitable acts" and a "life of generosity" and attached more than 100 letters in support.  (*See* Defendant's Sentencing Submission, *United States* v. *Joseph Meli*, 17 Cr. 127 (KMW) (S.D.N.Y. Mar. 23, 2018), ECF No. 133 at 4-17).  Among other

things, Meli noted that his "extraordinary acts of loving kindness to all of the people he has come across in his life" and that he had raised hundreds of thousands of dollars for acquaintances who had been diagnosed with cancer.  (*See id.* at 4-17.*).*

Indeed, in this regard, Judge Marrero's observations in *United States* v. *Fishman*, 631 F. Supp. 2d 399 (S.D.N.Y. 2009), apply here.  Judge Marrero recognized that in white collar cases where the defendant can afford able counsel, the plea for leniency at sentencing follows a "pattern": the list of the defendant's achievements and virtues is "long and impressive"; they are "good family men," "caring spouses," "loving parents," and "loyal and reliable to friends"; they are "outstanding professional and business partners"; "[t]o their community's charities and public causes, they are generous patrons and sponsors"; and letter writers "underscore the loss they and the larger community would suffer if deprived of the defendant's invaluable contributions to their public services."  *Id.* at 400-01.  Although any defendant's generosity and charitable works are certainly commendable, such a presentation "is flawed by what it omits.  In particular, it makes no account of several other circumstances courts are instructed to weigh adequately in ordering a fitting sentence: to reflect the severity of the crime; to promote general respect for the law; to avoid unwarranted sentencing disparities; and to consider the impact of the crime not only on its immediate victims, but on the larger social order."  *Id.* at 401.

In short, Carton's charitable works do not meaningfully distinguish him from his co-conspirators in this case, or from many white-collar defendants more generally.  And Carton's focus on his charitable endeavors fails to take into account the other facts courts are to take into account in determining an appropriate sentence.

***

In short, given the nature and extent of the fraud here, Carton's deep personal involvement in that fraud, and the need for the sentence imposed to promote specific and general deterrence, the Court should impose a sentence within the applicable Guidelines range.

## II.        The Court Should Order Restitution

The Court should also order restitution.

The Mandatory Victims Restitution Act, 18 U.S.C. § 3663A ("MVRA"), applies to the offense at issue because Carton's offenses were committed by fraud or deceit. *See* 18 U.S.C. § 3663A(c)(1)(A)(ii).   The MVRA provides that, regardless of a defendant's economic circumstances, the Court, in its order of restitution, "shall order restitution to each victim in the full amount of each victim's losses as determined by the court."   18 U.S.C. § 3664(f)(1)(A)*; see United States* v. *Coriaty*, 300 F. 3d 244, 253 (2d Cir. 2002) (observing "the statutory focus on the victim's losses and upon making victims whole").

The Government bears the burden of demonstrating the loss amount sustained by the victim because of the offense.   18 U.S.C. § 3664(e).   Any dispute as to the proper amount or type of restitution is to be resolved by the court by a preponderance of the evidence.   *Id.* "Findings of the amount of loss may be based upon reasonable estimates."   *United States* v. *Agate*, 613 F. Supp. 2d 315, 323 (E.D.N.Y. 2009) (citing *United States* v. *Uddin*, 551 F.3d 176, 180 (2d Cir. 2009)).

Here, the Government submits that the Court should order restitution to the victims identified in paragraph 62 of the PSR. [8]   The Government is confirming the final amounts due and owing to those victims and will submit a proposed restitution order prior to sentencing.

---

[8] Carton argues that Gerard LoDuca is not entitled to restitution because he did not testify at trial. (Def.Sub., at 35).  The Court should reject this argument. There is no basis for saying that a victim must testify at trial to be entitled to restitution.  Here, based on LoDuca's statements in the PSR, his letter to the Court, and the testimony of his Chief Financial Officer at trial, the Government has easily shown by a preponderance of the evidence that LoDuca lost the entirety

### III.     The Court Should Impose Forfeiture

The Court should also impose forfeiture, in the form of a money judgment for $4,599,000, representing the amount of proceeds traceable to the commission of the offense received by Carton.

The forfeiture statute pertaining to securities fraud broadly provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to [the] violation."  18 U.S.C. § 981(a)(1)(C).

In addition to seeking forfeiture of specific property that was derived from or used to facilitate a crime, the Government may obtain a money judgment against the defendant to recover the amount of the defendant's crime proceeds.   *E.g.*, *United States* v. *Baker*, 227 F.3d 955, 970 (7th Cir. 2000) (a forfeiture order may include a money judgment for the amount of money involved in an offense; the money judgment acts as a lien against the defendant personally for the duration of his prison term and beyond).

The amount of the money judgment should be equal to the gross proceeds of the defendant's crime, without deducting expenses. *See, e.g.*, *United States* v. *Uddin*, 551 F.3d 176, 181 (2d Cir. 2009); *United States* v. *Nicolo*, 597 F. Supp. 2d 342, 347 (W.D.N.Y. 2009) ("With respect to forfeiture of fraud proceeds under § 981, then, a defendant may be ordered to forfeit all monies received by him as a result of the fraud, regardless of his net profits from the scheme.");

A money judgment is appropriate even if the defendant did not retain the proceeds of his crime or does not have the resources to pay the money judgment. *United States* v. *Awad*, No. 06 Cr. 600 (DLC), 2007 WL 3120907, at \*4-5 (S.D.N.Y. Oct. 24, 2007) ("Where a defendant lacks

---

of his $450,000 ticket-related investment with Carton and is entitled to that money, and associated legal fees compensable under the MVRA, as restitution.

the assets to satisfy the forfeiture order at the time of sentencing, the money judgment against the defendant is effectively an in personam judgment in the amount of the forfeiture order.").

Here, as set forth in Appendix A, Carton personally received $4,599,000 from the offense contact.  Accordingly, the Court should impose a money judgment in this amount representing the gross proceeds Carton received from his participation in the scheme. The Government will provide a proposed money judgment prior to sentencing.

## CONCLUSION

For the reasons set forth above, the Court should impose a Guidelines sentence and order forfeiture and restitution.

Dated: New York, New York
       March 29, 2019

                               Respectfully submitted,

                               GEOFFREY S. BERMAN
                               United States Attorney
                               for the Southern District of New York

                   By:    _____/s/_____
                               Brendan F. Quigley
                               Elisha J. Kobre
                               Assistant United States Attorneys
                               Tel.:  (212) 637-2190/2599

**Appendix A**
**Forfeiture Calculation**

| **Investment** | **Amount (USD)** | **Source (GX)** |
|---|---|---|
| DelGaudio 9/6/16 Investment | 999,000 | 2305 |
| Brigade 12/8/16 Advance Investment | 700,000 | 2306 |
| Brigade 12/19/16 BSE Investment | 950,000 | 2308 |
| Brigade 12/19 and 12/23/16 Advance Investments | 600,000 | 2310, 2312 |
| DelGaudio Spring 2017 Investments | 900,000 | 2314 |
| LoDuca 5/11/17 Investment | 450,000 | 2313 |
| | | |
| **Total** | **4,599,000** | |