# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                                  16-CR-00414 (JSR)

ANDREW CASPERSEN,

              Defendant.

------------------------------x

                          New York, N.Y.
                          November 4, 2016
                          2:00 p.m.

Before:

                HON. JED S. RAKOFF,

                          District Judge

                   APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
CHRISTINE I. MAGDO
     Assistant United States Attorney

BRACEWELL, LLP
     Attorneys for Defendant
PAUL L. SHECHTMAN
MARGARET LYNAUGH

1      THE DEPUTY CLERK:  Will the parties please identify

2   themselves for the record.

3      MS. MAGDO:  Good afternoon, your Honor.  Assistant

4   United States Attorney Christine Magdo on behalf the

5   government.  With me at counsel table is Criminal Investigator

6   Kurt Hafer of our office.  Good afternoon.

7      THE COURT:  Good afternoon.

8      MR. SHECHTMAN:  Good afternoon, your Honor.  Paul

9   Shechtman for Mr. Caspersen, and Maggie Lynaugh is with me from

10   my law firm, and obviously Mr. Caspersen is here.

11      THE COURT:  Good afternoon.  Please be seated.  We're

12   here for sentencing.

13      Before we turn to the interesting gambling disorder

14   issue, I think we need to first talk about the guideline

15   calculation.  So, the presentence report has the total offense

16   level at 34, the criminal history category at I, and the

17   guideline range at 151 to 188 months.

18      Both sides seem to agree to that, although each side

19   sort of hints that they have minor disagreements with that.

20   The government seems to suggest that the Court should maybe

21   have a higher guideline range based on loss amount.

22      MS. MAGDO:  No, your Honor, we're not suggesting a

23   higher range.  We're just suggesting that in this case, the

24   guidelines actually underestimate the seriousness of the loss

25   amount.

1          THE COURT:  Okay.  And defense counsel has some

2     problems with I think the broker enhancement, broker

3     adjustment.

4          MR. SHECHTMAN:  Again, your Honor, no.  It may

5     underscore the fact that some of these enhancements have an

6     arbitrary quality to them, but it certainly fits and applies,

7     and that's why we agreed to it.

8          THE COURT:  Okay.  So, I'll adopt the presentence

9     report calculation, total offense level of 34, criminal history

10    category of I, guideline range of 151 to 188 months.

11         But I want to note at the outset, in case the

12    government wants to comment, that as I indicated at the time of

13    plea, I think the calculation borders on the irrational.

14    First, the great bulk of the calculation comes about from the

15    loss amount.  So, the total offense level is 34, 22 points are

16    based on the loss amount.  I don't see why loss amount should

17    occupy in this sense, as it does in so many guideline cases,

18    such an inordinate position, overwhelming every other factor.

19         And I also don't understand what the rational basis

20    was for the commission coming up with any particular figure.

21         The defense has put in indications when the guidelines

22    were first promulgated, the same loss amount would have led to

23    an addition of 11 points, rather than 22 points.  I'm not sure

24    what's changed between then and now that makes suddenly makes

25    this offense so much more guideline culpable.  But maybe the

1    government wants to say something about that.

2           MS. MAGDO:  Your Honor, I'm not certainly an expert on

3    why the guidelines have changed, but my understanding is that

4    Congress had the intent to punish white collar criminals in a

5    way that was more equal to the way they were punishing people

6    who had committed drug offenses and violent crimes offenses.

7           THE COURT:  When the guidelines were first promulgated

8    in the early 1980s, all the guidelines were intended to reflect

9    in some sense what was the mean average, except for white

10   collar crimes, which were intended to be higher.  And since

11   then, they've been ratcheted up every few years so that they're

12   now many times what they were when the guidelines first came in

13   and said that they should be higher than they had been

14   historically.  So what's rational about that?

15          MS. MAGDO:  I believe actually in 2014, they were

16   ratcheted down slightly.

17          THE COURT:  That was the first time that that had

18   happened, but that was after all these major increases that

19   I've just referred to.

20          MS. MAGDO:  Well, as I said in my sentencing

21   submission, the guidelines are a starting point --

22          THE COURT:  I consider them.  Consider them

23   considered.  But I don't see why they are a main starting

24   point.  I think they are, to be frank, a pernicious starting

25   point, because they carry the aura but not the reality of

1   something that is rationally arrived at.

2          Where many of these numbers come from and why, for

3   example, should the amount of the loss be given so much more

4   weight than, for example, the abuse of trust, which is, you so

5   correctly point out in your memoranda, was one of the most

6   dislikeable things that this defendant committed in his

7   substantial fraud.  And yet that is what, two points or

8   something like that?  As opposed to 22 points for the loss?  It

9   makes no sense.

10         MS. MAGDO:  I think we can agree that the loss amount

11  should factor in in some way in sentencing an individual.

12         THE COURT:  We can agree on that.  Maybe we'll just

13  leave it at that.

14         So let's turn to the gambling disorder which is

15  offered as a mitigating factor.  I think that the defense has a

16  witness they'd like to call.

17         MR. SHECHTMAN:  We do, your Honor.

18         THE COURT:  Go ahead.

19         MR. SHECHTMAN:  The defense would call Dr. Marc

20  Potenza.

21         THE DEPUTY CLERK:  Please take the witness stand.

22  Remain standing.

23         (Witness sworn)

24         THE DEPUTY CLERK:  Please be seated.  State your name

25  and spell it slowly for the record.

1          THE WITNESS:  Marc Nicholas Potenza.  Marc, M-A-R-C,

2     Nicholas, N-I-C-H-O-L-A-S, P-O-T-E-N-Z-A.

3          THE COURT:  So, since this is offered in effect as a

4     mitigating factor, the defense bears the burden, so we'll hear

5     first from the defense.  Go ahead, Mr. Shechtman.

6          MR. SHECHTMAN:  Judge, I sent the Court and the

7     government yesterday a copy of Dr. Potenza's curricula vitae.

8     My intent --

9          THE COURT:  It was much too long to read, but I filed

10    it away.  I gathered from your submissions that, first, that he

11    was had a very distinguished academic career at Yale, it's not

12    Swarthmore, of course, as you, Mr. Shechtman, would recognize.

13    But it's not a bad place.  And now he's a well-credentialed,

14    well-published authority on addiction and gambling addiction in

15    particular, yes?

16         MR. SHECHTMAN:  That's correct, your Honor.

17         THE COURT:  So noticed.

18         MR. SHECHTMAN:  I'll proceed.

19     MARC N. POTENZA,

20          called as a witness by the Defendant,

21          having been duly sworn, testified as follows:

22    DIRECT EXAMINATION

23    BY MR. SHECHTMAN:

24    Q.  Dr. Potenza, what drew you to study compulsive gambling?

25    A.  Back when I was in the medical scientist training program,

1    which is a combined M.D. PhD program, I was thinking about

2    which area on which to focus my research.  And I thought that

3    the brain was the most complicated organ in the body, and that

4    during my lifetime we were not going to understand fully how it

5    functions, particularly with respect to health and illness, and

6    thought I would focus on neuroscience.

7             THE COURT:  So, I've read your report, which is very

8    helpful.  But it seems, reading between the lines, that we

9    don't know very much about gambling addiction; particularly, we

10   don't know much about what causes it.  We have various

11   theories, you have theories, other people have theories.  But

12   it is something of a mystery still.  Yes?

13            THE WITNESS:  I think that we've learned a lot over

14   the past several decades, but we still have a lot more to

15   understand, so there are many unanswered questions.

16            THE COURT:  Well, for example, when we're dealing with

17   a chemical addiction, like a drug addiction, we can test

18   various chemical reactions in the brain, the drug is ingested,

19   things happen chemically as a result.

20            Here, we don't really know why whatever is happening

21   in the brain, how it's being brought about.  Do I have that

22   right?

23            THE WITNESS:  I think in many ways, yes, that is

24   correct.  We don't have the same set of animal models, for

25   example.  Although there are inroads, Catharine Winstanley and

1   others are trying to address this in ways that I think people

2   in the substance abuse field have been addressing this for a

3   number of decades.  But we're far behind.

4          THE COURT:  So, what we really have then, if I

5   understand your report right, is we have a series of symptoms

6   that appear to be common to a meaningful number of people and

7   that are characterized in the DSM by various criteria.  Yes?

8          THE WITNESS:  Yes, and I think that's similar to a

9   number of other psychiatric disorders.

10         THE COURT:  So, but even those have changed, if I

11  understand the evolution from the DSM-3 to the DSM-5.  There

12  has been some change, for example, illegal activity is no

13  longer a necessary criterion.  Yes?

14         THE WITNESS:  It is no longer an inclusionary

15  criterion for pathological gambling or now gambling disorder.

16         THE COURT:  Because one could be a compulsive gambler

17  and never break the law at all.

18         THE WITNESS:  One could.  It is also not there for

19  substance use disorders or substance addictions, and, like with

20  gambling disorder, there are links with illegal activities for

21  substance use disorders.

22         THE COURT:  So, is it your view that there exists an

23  effective treatment for gambling disorder?

24         THE WITNESS:  I've been treating people for about 20

25  years in our public gambling treatment service in Connecticut.

1   I believe we have striven to make advances with respect to both

2   the behavioral therapies and using empirically validated

3   therapies, behavioral therapies.  We've also undertaken

4   randomized clinical trials to see if medications might be

5   helpful for people with gambling problems.  But currently,

6   there are no medications that have an FDA indication for

7   pathological gambling or gambling disorder.

8          THE COURT:  If I understand correctly, some of the

9   studies indicate that persons with gambling disorder relapse

10  80, 90 percent of the time.

11         THE WITNESS:  I think that the course of gambling

12  disorder, we don't understand quite as well as, say, for

13  substance use disorders, because there have been fewer

14  longitudinal studies to investigate this.

15         That being said, there is also controversy as to what

16  constitutes a relapse, whether it be a slip, a lapse, or one

17  might consider a full-blown relapse.

18         THE COURT:  So, let's take Mr. Caspersen.  So, my

19  understanding is that he engaged in irrational investment

20  gambling, for lack of a better way to put it, for many years.

21  Yes?

22         THE WITNESS:  Yes, I think that his pattern of using

23  options was highly risky and fits the definition of gambling.

24         THE COURT:  What reason is there to believe that even

25  though he's now receiving some treatment, that he won't resume

1   the same compulsive behavior after a moderate period of time?

2          THE WITNESS:  Well, I think that while one cannot say

3   with absolute certainty what the future might hold, there may

4   be factors that people have reported as being linked to better

5   versus worse treatment outcome.

6          So, for example, in a study of Gamblers Anonymous, it

7   was found that attendance and participation in particular as

8   well as social supports were related to maintenance of

9   abstinence versus relapse.

10          So I think those would be some of the factors that

11  might be valuable or worthwhile to consider with respect to the

12  hope of a more positive outcome.

13          THE COURT:  Hope is a wonderful thing, but my

14  understanding, first of all, is that psychiatrists and

15  psychologists are not so good at predicting the future as

16  opposed to analyzing the past.  And that in any event, with

17  something as still uncertain in its causes and its treatment as

18  gambling disorder, that predicting the future is pretty

19  problematic.  Yes?

20          THE WITNESS:  I might see it a little bit differently,

21  given that part of my job during the week is to see people and

22  try to help people not experience the harms that they have

23  experienced from gambling and the harms that other people have

24  experienced from gambling.  So, I try to utilize the tools that

25  we have, and the information that we have at the present time,

1    to help people maintain abstinence and not experience the harms

2    that they have experienced or that others have experienced from

3    their gambling.

4            THE COURT:  Are you familiar with an article in the

5    Canadian Medical Association Journal called "Gambling Treatment

6    Options:  A Roll of the Dice"?

7            THE WITNESS:  It's not coming to my mind.  I'm not

8    sure if I've read it.

9            THE COURT:  That particular source in that particular

10   publication said that a person with gambling disorder relapse

11   about 90 percent of the time.

12           You came to the conclusion Mr. Caspersen had a severe

13   gambling disorder.  Yes?

14           THE WITNESS:  Correct.

15           THE COURT:  And that was based on a

16   two-and-a-half-hour interview plus a review of his records.

17           THE WITNESS:  Correct.

18           THE COURT:  Is that an adequate basis to make such a

19   diagnosis?

20           THE WITNESS:  I followed the approach that I use in

21   making clinical diagnoses by performing a psychiatric

22   evaluation.  And that is the approach that I use within

23   clinical settings and other settings.

24           THE COURT:  Well, I'm just wondering, how can one make

25   such a substantial diagnosis on the basis of such a short

1    interview?

2            THE WITNESS:  Based on the interview, and the

3    collateral information and the current DSM criteria for

4    gambling disorder, which state that one needs to meet four or

5    more of the nine inclusionary criterion, and if they meet eight

6    or more of the criterion that is a severe gambling disorder.

7    That is the basis of my conclusion.

8            THE COURT:  He also suffers from alcoholism, yes?

9            THE WITNESS:  Yes, he -- he currently at the time of

10   the interview, he was abstinent from alcohol, by his report I

11   think since March of this year.  But yes, he met the criteria

12   for alcohol use disorder.

13           THE COURT:  And from depression?

14           THE WITNESS:  Yes, he has a history of depression by

15   my interview.

16           THE COURT:  So, putting all that together, wouldn't

17   his likelihood of relapse be even higher?

18           THE WITNESS:  Well, I think that gambling addiction

19   disorder or pathological gambling frequently co-occurs with

20   other psychiatric disorders, including alcohol use disorders

21   and major depression.  And we have proposed that based on the

22   existing data, that that may actually be helpful with respect

23   to guiding the specific therapies.

24           So, I'm not aware that that would necessarily increase

25   the risk for relapse.  But I think, from my perspective, I

1    would try to target those domains within a clinical treatment

2    setting in order to optimize the likelihood that he would not

3    relapse.

4            THE COURT:  All right.  Go ahead, counsel.  Any

5    questions you wanted to put.

6    BY MR. SHECHTMAN:

7    Q.  Dr. Potenza, I take it I'm right that the DSM-3, 4 and 5

8    classify compulsive gambling as a mental illness.  Do you agree

9    with that?

10   A.  I do.

11   Q.  Why?

12   A.  Well --

13           THE COURT:  By the way, I'm sorry.  This is a totally

14   cheap shot, but I can't resist.  Isn't it true that

15   homosexuality was classified by the DSM-1 and 2 as a mental

16   disorder?

17           THE WITNESS:  That's my understanding.

18           THE COURT:  So, perhaps this is not quite the most

19   reliable publication.

20           THE WITNESS:  Well, I think it's one of the main books

21   of nomenclature for the psychiatric field.  And I do think that

22   as more knowledge is gained over time, that these books try to

23   reflect the increases in knowledge.

24           So we can go back and look at, for example, in this

25   case, teen dependence or tobacco use disorder, and if one goes

1    back to the time of DSM 1 and 2, those were not considered as

2    harmful as they are now.  So, I think things evolve over time.

3          THE COURT:  Yes, but what I guess frankly what I'm

4    getting at is I wondered to what extent the DSM reflects, if

5    you will, ideological views of the time as opposed to something

6    more scientifically objective.

7          THE WITNESS:  I think that that is a fair comment to

8    bring up, and particularly in the area of psychiatry,

9    psychology, where only over the past, say, quarter of a century

10   have we gained better techniques to understand the biology.

11   So, I think the field tries to incorporate knowledge in a

12   meaningful way, and I having been involved in the DSM-5

13   process, involved in the research work group, I can appreciate

14   the importance that they place on understanding the

15   neurobiology of these conditions.

16         THE COURT:  Go ahead, counsel.

17   BY MR. SHECHTMAN:

18   Q.  Why do you agree that this is a mental illness?

19   A.  So, as a psychiatrist, I was trained to try to understand

20   and help people with respect to psychological distressing or

21   harmful thoughts or behaviors.

22         And I've seen a large number of people, several

23   hundred people with gambling problems, and I've seen the impact

24   that it can have on their, their mental states and their

25   functioning, and believe that it is a very serious, can be a

1   very serious disorder for people.

2   Q.  Pathological gambling or gambling disorder has been called

3   an addiction without a drug.  Is that an apt phrase, and what

4   does it convey?

5   A.  So, I think that it's an appropriate phrase.  It's one that

6   I've used at times.  I think one can think of the term

7   "addiction" and what it means and what it's derived from.

8          I think the use of the term "addiction" has varied

9   over the course of history, derived from the Latin word meaning

10  bound to or enslaved by.  It was not linked to excessive

11  substance use going back 100 years, excessive patterns of

12  alcohol use.  In the 1980s the DSM work group on substance use

13  disorders I think felt almost unanimously that it could be

14  defined by compulsive drug use.

15         In the 1990s, Howard Shaffer and others proposed

16  several core elements of addiction, continued engagement in the

17  behavior despite adverse consequences, compulsive engagement or

18  diminished control over engagement in the behavior, and in a

19  craving state that often preceded engagement in the behavior.

20         If one thinks of these as the core elements of

21  addiction, it perhaps can be applied to a broader range of

22  behaviors and substance use behaviors, and I think the data

23  that have been gained over the past 20 years with respect to

24  the neurobiological, genetic, co-occurring disorders,

25  epidemiological clinical phenomenon, among other areas, led the

GB43CASS                          Potenza - direct

1   DSM-5 substance use disorder group to reclassify pathological
2   gambling together with substance use disorders into a substance
3   related and addictive disorders category.
4   Q.  You agree with that categorization?
5   A.  I do.  Some of the -- the two work groups in which I was
6   involved, the research work groups, I was asked the question
7   whether gambling disorder and substance use disorders shared
8   similar features or not.  And to go through systematically the
9   different domains.

10        And the other research work group looked at obsessive
11  compulsive spectrum disorders and whether, for example,
12  pathological gambling was similar to or distinguished from
13  obsessive compulsive disorder.  Those data were published and
14  used by the work groups.

15        THE COURT:  Well, my understanding is, correct me if
16  I'm wrong, that even our understanding of addiction has changed
17  considerably over the last few decades.  And that, for example,
18  certain addictive drugs like cocaine don't involve really
19  serious withdrawal symptoms in the way other drugs do, yet they
20  still act in an addictive way because they, if you will, trick
21  the brain into thinking that the right choice is to use the
22  drug.  Do I have that basically right?

23        THE WITNESS:  I think that there are both similar and
24  unique aspects to different drugs.  And so, for example, with
25  cocaine, when one is coming off of an acute intoxication, there

1    is often what people describe as a cocaine crash.  So, for

2    about the 24 hours after the high of the cocaine, people become

3    very somnolent, difficult to rouse, and oftentimes, if they're

4    in the emergency department, will pull the sheet over their

5    head.

6             Opiates have a very different pattern of withdrawal.

7    Kicking the habit and other terms like cold turkey are derived

8    from opiate withdrawal.  Because of the piloerection and the

9    myoclonic jerks that people experience during opiate

10   withdrawal.  So each drug has a different --

11            THE COURT:  That's a good point.  So my question then

12   is how does gambling disorder operate in that respect?

13            THE WITNESS:  So there's been an inclusionary

14   criterion for withdrawal in the DSM criteria for pathological

15   gambling as well as gambling disorder.  What that typically

16   involves is some irritability or unease during the acute period

17   of having gambled and then not gambling, and perhaps there

18   being other, for example, occupational obligations that keep

19   one from gambling when one is preoccupied with the urge to

20   gamble.  It is a criterion that's acknowledged by a good number

21   of individuals, but population-based data suggests that it's

22   less frequently acknowledged than, say, tolerance.

23            THE COURT:  Counsel.

24   BY MR. SHECHTMAN:

25   Q.  Dr. Potenza, the legal literature talks about psychological

1    gambling and sometimes uses the phrase, and some of the case

2    law says "pathological gambling hijacks the brain."  Is that a

3    useful image?

4    A.  It's a term that I try not to use, but I think the

5    concept -- because it's a little dramatic for me, but I think

6    the concept that the gambling behaviors and thoughts preoccupy

7    an individual and essentially take priority over other

8    obligations, I think is an apt one.

9              So one can think of one's time as being limited and

10   one's, you know, motivating behaviors as fitting within that

11   timeframe.  And as gambling or substance use, whatever the

12   focus of the addiction is, takes more and more time, it forces

13   out the other areas of life functioning that I think are

14   important.

15   Q.  There have been brain imaging studies relating to

16   compulsive gambling.  What, if anything, do we learn from them?

17   A.  Well, I think that the brain imaging field is at a

18   relatively early stage.  There are preliminary data that

19   suggests that there are some similarities with substance use

20   disorders, particularly with involvement of brain regions like

21   the ventromedial prefrontal cortex and the ventral striatum.

22   These are considered decision-making and reward-related

23   regions, although they serve a large number of other functions.

24             But, some of the data suggests that there are linkages

25   between gambling disorders and substance use disorders, come

1    from use of a monetary processing task called the monetary

2    incentive delay task.  Where initially, Halmer and colleagues

3    found that individuals with alcoholism showed blunted

4    activation of the ventral striatum in anticipation of monetary

5    reward.  That finding was replicated by a group in Germany.  It

6    was subsequently shown that individuals who are family history

7    positive versus family history negative for alcoholism also

8    showed this blunted activation of the ventral striatum.  So

9    individuals have risk for addiction, as well as adolescents who

10   are smokers versus non-smokers.

11        More recently, our group and one from Korea found that

12   individuals with pathological gambling showed a similar pattern

13   of a blunted ventral striatum activation in anticipation of

14   monetary reward.

15        THE COURT:  So, just to return to what I asked you

16   earlier.  My understanding from your own submission is this is

17   at most suggestive, this is far from anything that is firmly

18   established to a scientific certainty or anything like that.

19   Right?

20        THE WITNESS:  I agree with that.  I think most of the

21   imaging studies that have been performed to date are relatively

22   small.  And there are now efforts, for example, the ABCD

23   Initiative is one where NIH is supporting data collection from

24   starting at age 9 or 10, and they're targeting over a five-year

25   period to get serial data, including brain imaging data, on

1      over 10,000 individuals.

2                    THE COURT:  So we might know a lot more in a few

3      years.

4                    THE WITNESS:  I'm hopeful.

5                    THE COURT:  But I've got to sentence Mr. Caspersen

6      today, unfortunately.  So there we are.  Go ahead.

7      BY MR. SHECHTMAN:

8      Q.   The judge touched on this, but is there a relationship

9      between pathological gambling and alcohol consumption?

10     A.   Yes.  I think that relationship is perhaps complex.  There

11     have been studies that suggest that as people drink more, they

12     gamble more heavily.  And gamble more heavily towards losses.

13     There are also data that suggest that the two disorders

14     co-occur more frequently than by chance, both in clinic-based

15     data and in community population based data.

16                   So there are data that suggests that there are both

17     shared genetic and shared environmental contributions to the

18     co-occurrence of pathological gambling and alcohol abuse or

19     dependence, and that was a study involving male twins where one

20     can make estimates of the genetic and environmental

21     contributions.

22     Q.   Is there a relationship between pathological gambling and

23     depression and add to that life trauma?

24     A.   Yes.  So similarly is there a relationship between

25     pathological gambling and major depression.  Again, there are

1    higher odds that are seen in clinical and population based

2    samples.  There are also shared genetic contributions.  The

3    best fitting model in this case from the same cohort of male

4    twins suggested that the overlap between the two was driven

5    100 percent by genetic factors, although these models

6    overestimate somewhat the genetic contributions.  There is

7    likely a substantial biological genetic link between the two.

8              THE COURT:  I am not sure which way this cuts.  So,

9    are you saying someone who has a gambling disorder has it in

10   part because of the depression, or are you saying the

11   depression exists in part because of the gambling disorder, or

12   what?

13             THE WITNESS:  Or whether there is a common ideology to

14   both conditions.  One can make a plausible description of any

15   of those three factors.

16             So one can, one of the inclusionary criteria for

17   pathological gambling or gambling disorder is gambling to

18   escape from a negative mood state or from dysphoria.  So, if

19   one experiences the depression, they may, for negative

20   reinforcement purposes, so to take away the negative mood

21   state, they may engage in gambling behaviors.

22             Alternatively, if one gambles excessively and, for

23   example, loses large sums of money, that may have a negative

24   impact on their mood, and may lead to depression, or there may

25   be a common vulnerability factor for experiencing both

1    disorders.

2             THE COURT:  Well, so, if you have a drug addiction, my

3    understanding is that a part of what goes on is that while you

4    may take the drug originally to get pleasure, that eventually

5    you need to take the drug just to feel normal physically.  But

6    I don't see quite how that translates into the gambling

7    disorder situation.  At least I didn't see any evidence, maybe

8    I missed it, that Mr. Caspersen had to gamble to feel

9    physically normal.  It may have been he had to gamble to feel

10   mentally normal, but not physically.

11            THE WITNESS:  Yes.  I think that that same logic can

12   also be applied to gambling disorder.  And it resonates with

13   people who I see in treatment who say that, you know, over

14   time, it's not about the money.  It used to be a good day at

15   the casino was winning $100, but then a good day at the casino

16   is losing the $100, but losing it over eight or 10 hours,

17   rather than over the first 20 minutes that they're there.

18            So there is something about the gambling behavior that

19   is different, it brings them to a different state.  And there

20   are studies --

21            THE COURT:  But my only point is saying it is more in

22   the nature of a psychological change than a physical change.

23            THE WITNESS:  Well, so there are physiological changes

24   that occur when people gamble.  Some of these differ in people

25   with gambling problems and those without.  Gerhard Meyer in

1    Germany obtained heart rate and pulse and biochemical measures

2    of people as they gambled, people with varying level of

3    gambling severity.  Along with the --

4              THE COURT:  Is that for people who gambled generally

5    as opposed to people with gambling disorder?

6              THE WITNESS:  So he was going into a casino, assessing

7    their problem gambling severity, so whether they had a gambling

8    problem or not, and was collecting the data so he could look at

9    those sorts of questions.

10             THE COURT:  I see.

11             Counsel.

12   BY MR. SHECHTMAN:

13   Q.  And life trauma.

14   A.  And life trauma.  Yes, so there have been multiple studies

15   that have looked at -- although not as many as in some other

16   areas of problem pathological gambling -- that have looked at

17   reports of trauma in individuals with gambling problems.  And

18   there are high rates of trauma that are reported, and some

19   studies over 60 percent of individuals with gambling problems

20   report emotional trauma, over 20 percent report sexual trauma,

21   and there are links between pathological gambling and trauma

22   related conditions, like post-traumatic stress disorder.

23   Q.  Again, a question the judge touched on.  Would you speak

24   more broadly about the relationship between severe pathological

25   gambling and crime and embezzlement and theft?

1  A.   Yeah.  So there have been studies, several studies that

2  have looked at this question.  Some have looked at data from

3  population based studies, so Mariana Tosheko Stein did an

4  analysis of different classes of individuals, a data driven

5  approach, and found that it was the illegal behaviors tended to

6  cluster in the most severe group of individuals with gambling

7  problems.  And that seems to fit with my clinical experience.

8  And we've also looked at data from people calling from a

9  gambling helpline and looked at people who reported illegal

10 behaviors related to gambling versus those who did not, and

11 there were factors that suggested there were more severe

12 psychological, psychiatric concerns, as well as impacts like

13 debt and suicidality.

14          THE COURT:  But, again I'm not totally sure which way

15 this cuts.  If someone commits an embezzlement out of greed,

16 let's say, they make a more or less rational determination, I

17 can get away with it, and I'll be rich, and live the lifestyle

18 that I always wanted.  And then they're caught and they receive

19 some honest prison time, and they say, hmm, I made the wrong

20 bet, and I'm not going to do it again, because it's not -- the

21 downside outweighs the upside.

22          But, if you have someone, as I understand what you're

23 telling me about gambling disorder, they won't be making a

24 rational choice.  And therefore, it would take, one might

25 argue, a much more severe sentence to really bring home to them

1    there is no way that even someone in their diminished state

2    could understand that this is a bad bet.

3            So maybe this is not a question for you really, more

4    for counsel.  I'm not sure which way this cuts.

5            THE WITNESS:  Well, and there may be individual

6    differences within that group that I think are important to

7    consider.  I've seen a number of people in practice, clinical

8    practice, who, for example, have led very what one might

9    consider exemplary lives, but have embezzled money related to

10   their gambling, but otherwise morally upstanding citizens.  And

11   those are some of the people actually I've seen over the longer

12   term who have done well, and have given back to the community

13   in a positive way.

14           THE COURT:  Counsel.

15   BY MR. SHECHTMAN:

16   Q.  When we spoke on Wednesday, you talked about one older

17   woman who fell in that category.  Would you tell the Court

18   about that?

19   A.  I think that there are several older women who I've seen in

20   treatment who have had problems with casino gambling and have

21   embezzled money.  And, you know, some may volunteer time to

22   help people with gambling problems, some go back to jobs and

23   contribute to society in a meaningful way and have meaningful

24   relationships.

25   Q.  They taught me at my college that it's hard to prove a

1    negative.  But, is there a sense of why some pathological

2    gamblers don't steal?

3    A.  Well, there may be differences, and I was touching bases on

4    some of the illegal behavior data that we and other groups have

5    looked at.  There may be different individual differences that

6    people have that they experience, either inherently or they

7    experience in life experiences.  And there are differences

8    between people with gambling problems, and it is important to

9    understand those individual differences.

10   Q.  Opportunity play a role?

11   A.  Also, with respect to opportunity, and I think that that

12   does play a role with respect to gambling behaviors and the

13   extent of gambling problems that people can experience.  So

14   having the opportunity to obtain or have large amounts of

15   money, I think that's an important consideration.

16        When we were doing our initial study of gambling

17   urges, and I solicited the advice of several people in the

18   state who had more experience than I did at the time with

19   respect to treating individuals with gambling problems, and

20   they noted that one of the triggers for people is to come into

21   a large amount of money, and that's one of the opportunities

22   that I think may play a significant role for people with

23   gambling problems.  And some of the behavioral therapies work

24   on financial management aspects, and whether other people are

25   going to manage finances for the individual with the gambling

GB43CASS                        Potenza - direct

problem, for example, is sometimes a very important

consideration.

        THE COURT:  So you think that the best thing I could

do for Mr. Caspersen is put him on welfare and make sure he has

no money whatsoever.

        THE WITNESS:  That wasn't the approach that we take in

our clinic.  But what we try to do is if there is a conservator

who -- or some like a spouse, for example, who is may be

engaged in Gam-Anon, may be able to able to set limits and help

protect the vulnerabilities in someone who they may care for.

That's more where I was going.

Q.  How severe did you find Mr. Caspersen's gambling addiction

to be?

A.  As I mentioned briefly, I would grade it as a severe

gambling disorder.

        THE COURT:  Meaning that he hits a large number of the

criteria set forth in the DSM, yes?

        THE WITNESS:  Yes, but I should also mention that of

all the people I've seen in treatment, I cannot recall anyone

who had lost the amount of money that -- the financial amount

of money that he did.  I've seen people who have come in with

six figure debts and went through bankruptcy.  That's not -- I

mean, I can think of a number of people.  But this amount of

money is --

        THE COURT:  In one sense, the reason the amounts of

1  money were so large is he was gambling in investments as

2  opposed to gambling at the casino, correct?

3           THE WITNESS:  I think he could gamble more money in

4  this area, yeah.

5           THE COURT:  Go ahead.

6  Q.  For a part of 2013, for about seven months, from roughly

7  six months from May to November, Mr. Caspersen did not gamble.

8  Does that alter your conclusion about his pathology?

9  A.  No.  I still think he meets the criteria for a severe

10 gambling disorder.  There may be different factors, and some

11 that we don't understand, that influence why people go from

12 gambling large amounts of money to nothing.  Same with

13 substance use disorder and trying to understand those patterns

14 I think is important.

15          With gambling problems, a number of people have told

16 me that while they may feel the urge to gamble, they don't have

17 the money at hand, so that can be one of the main factors.  But

18 there may be others.  Sometimes, you know, I think that the

19 number of people do feel ambivalent about gambling, people with

20 gambling problems, and there may be things that sway them one

21 way or the other.  Something that triggers and moves them to

22 gamble, and something that helps intervene and something

23 that -- close friends, relatives, treatment providers,

24 hopefully help them restrain them from gambling.

25 Q.  I want to go back to a question that Judge Rakoff asked

1    you.  He asked about physical symptoms.  And I think when we

2    spoke, you told me about a patient or patients suffering from

3    pain and the effect of gambling on them?

4    A.  So there have been some people who have chronic pain

5    conditions who have reported to me that when they are in the

6    process of gambling, that that kind of dissipates, it goes

7    away.  So this fits into this negative reinforcement model of

8    getting to -- of gambling and perhaps gambling excessively in

9    order to relieve an uncomfortable state.

10              THE COURT:  Did Mr. Caspersen report that?

11              THE WITNESS:  No.

12   Q.  One gets the sense from the literature, and I think, again,

13   Judge Rakoff alluded to this, that for many gamblers, money

14   doesn't matter after a certain point.  It's about being in the

15   action.  Is that consistent with your experience?

16   A.  A number of people who I've seen with gambling problems do

17   report that.  That it's less about the wins and losses than it

18   is about the act of gambling, and what they experience from

19   gambling.

20   Q.  Then again to my last question, to go back to another topic

21   that Judge Rakoff asked you about, what can be done mitigate

22   the risks of Mr. Caspersen recidivating?

23   A.  I think that there are -- while there is a lot that we

24   don't know about what is most helpful for people, there are

25   factors that have been linked to successful treatment outcome.

1    Some of that is engagement in professional treatment, some of

2    that is engagement in 12-step programs, so Gamblers Anonymous,

3    which is modeled after Alcoholics Anonymous, has been around

4    for more than half a century and is widely available around the

5    world.  Hasn't been as well studied as some other forms of

6    treatment, I think because of its anonymous nature.  But data

7    do suggest, for example, from Nancy Petry's trial, that people

8    who attend GA tend to fair better than those who do not with

9    respect to gambling treatment outcome.  And some of the factors

10   such as adherence and participation and the associate support

11   do appear linked to better treatment outcome within a group of

12   people attending GA, so those would be I think important

13   factors.

14   Q.  I won't take you through all 12 steps, but I'll ask you

15   about the first one and why you think it is significant.

16   A.  Yes.  So I think some people have described addictions as a

17   disorder of decision making or as motivated behaviors gone

18   awry, and I think that the first step that to admit that one is

19   powerless over the behavior, that essentially removes that

20   aspect of the decision-making process.  And if people can

21   accept that, and can accept that they cannot go back to

22   gambling because it leads to all these negative consequences,

23   then it removes that, and it actually empowers them to lead to

24   more healthy lives.

25   Q.  Mr. Caspersen is, as part of his therapy, has been

1    prescribed naltrexone, if I say it right.  Will you tell the

2    Court what that drug does.

3    A.  Naltrexone blocks opioid receptors.  It is a medication

4    that has an FDA indication for opioid use disorders and alcohol

5    use disorders.  So going back now close to a quarter of a

6    century, there were clinical trials that found that for people

7    with alcohol use problems, that it seemed to target alcohol

8    urges or cravings and lead to better outcomes.  We, amongst

9    other groups, have hypothesized it may be helpful for people

10   with gambling problems based on that aspect as well as how it's

11   thought to work with respect to influencing reward pathways in

12   the brain.  And there have been several placebo controlled

13   trials that have found naltrexone to be superior to placebo,

14   but the data are mixed and we don't have an FDA medication for

15   gambling disorder.

16   Q.  Just so the record is clear, you saw Mr. Caspersen for two

17   and a half to three hours, reviewed his medical records, the

18   option trading experts report, his own therapist's report, and

19   his trading records.  Do I have the universe?

20   A.  Yes, that is correct.

21            MR. SHECHTMAN:  Judge, I thank the Court.

22            THE COURT:  All right.  Any questions from government?

23            MS. MAGDO:  Yes, your Honor.

24   CROSS-EXAMINATION

25   BY MS. MAGDO:

1    Q.  Good afternoon, Dr. Potenza.

2    A.  Good afternoon.

3    Q.  So, you testified that you've seen hundreds of individuals

4    with pathological gambling and other impulse control disorders,

5    right?

6    A.  Correct.

7    Q.  And would it be fair to say that of those hundreds, there

8    were many whose disorders you would character identify as

9    severe?

10   A.  Yes.

11   Q.  And of those who had severe disorders who came in for

12   treatment, they came for a variety of different reasons I

13   imagine, right?

14   A.  Correct.

15   Q.  So maybe some of them came because they'd lost all their

16   money?

17   A.  Yeah.

18   Q.  Some may have lost their house?

19   A.  I'm not -- no one is coming to my mind with their house.

20   But people have lost a lot of money, people have been sent by

21   the legal system, particularly people with substance use

22   problems, but also some people with gambling problems.  There

23   are a number of factors, spouses finding out about gambling

24   behaviors.

25   Q.  Okay.  So, is it fair to say that the vast majority of

1   those that you've seen with a gambling disorder have not come

2   because they've been arrested?

3   A.   Majority have not come because they have been arrested,

4   that is correct.

5   Q.   I think you mentioned some things that you use.  Some

6   options that you use to treat people with gambling disorders.

7   There is individual therapy, right?

8   A.   Correct.

9   Q.   Group therapy, GA meetings, right?

10  A.   Group therapy.  What was the --

11  Q.   GA?

12  A.   GA, yes.

13  Q.   What about involving their families in treating.  Can you

14  explain how that would work?

15  A.   Yes.  So, I'm the medical director and the psychiatric

16  consultant to the Problem Gambling Services Program for

17  Connecticut.  It's gone through various iterations over the

18  past 20 years.  But we have counselors within the program, some

19  of whom, for examples, are social workers, and some who are

20  very focused on involving family members, and it is something

21  that we consider in treatment.  Sometimes that's done in

22  couples, sometime that's done individually, because sometimes

23  it's helpful for spouses or partners to gain skills that will

24  be helpful for themselves.  Because oftentimes people who are

25  close to people with gambling problems experience psychological

1    distress and maybe go through depression, anxiety.  So we try

2    to help them get the help that they need, as well as help them,

3    assuming that they want to maintain the relationship and be in

4    the dynamic relationship going forward, to help them gain

5    skills that would be helpful for that relationship to be

6    healthy.

7    Q.  You mentioned that there are certain safeguards that are

8    sometimes put in place, such as having a conservator take over

9    an individual's assets.  Is that something you frequently use

10   in therapy or in connection with therapy?

11   A.  So, having someone help with financial management more

12   broadly, whether that's an official conservator, that's less,

13   less frequent than perhaps not having the person have credit

14   cards, not -- you know, having an amount of money that they get

15   over a certain period of time to allow them to get done what

16   they need to get done, but to minimize the risk of getting into

17   a place where they accrue, for example, credit card debt.

18   Q.  Do any other safeguards come to mind that you put in place

19   to make sure that people aren't subject to temptation that

20   causes the behavior or that brings on the behavior?

21   A.  Well, there are a number of options that we consider and

22   that we may implement on a patient-by-patient basis.  Some of

23   that involves skill building, so having people deal more

24   effectively with triggers.  So sometimes people are not aware

25   of those triggers, sometimes people are not aware of the

1    internal stakes that are generated by those triggers, so

2    helping them manage.  Identify those and manage those in a more

3    healthy way I think is important.

4          Some of it depends on the type of gambling that's

5    problematic.  So, in Connecticut we have two large casinos, two

6    of the world's largest casinos, so a number of people I see

7    have problems with casino gambling, and both casinos in

8    gambling have self-exclusion options.  So some people

9    self-exclude in order to minimize the temptation for casino

10   gambling, for example.

11   Q.  So following on that example, if you had a patient who was

12   employed at a casino, for example, and had trouble with casino

13   gambling, would you encourage that patient to find a different

14   job?

15   A.  I would go over the potential risk of exposing one to being

16   at a casino and to consider that.

17   Q.  Do you find that these types of precautions are met with

18   success on at least some occasions?

19   A.  Yes.

20   Q.  So, those people who have gambling disorder -- and I just

21   want to clarify what you've said in your report and just make

22   sure we're all on the same page.  They haven't lost their

23   ability to control their behavior.  I believe what you wrote is

24   that they have diminished self-control.  Can you explain what

25   that means?

GB43CASS                           Potenza - Cross

1    A.   Yeah.   So I think this applies to addictions more broadly.

2    That it is a decision-making process whether or not to engage

3    in a motivating behavior.   And that, that process I think is

4    not operating in a healthy fashion in people with addictions,

5    including with gambling disorder.

6    Q.   Now, a couple questions specific to the defendant in this

7    case.   You mentioned in your report, and I quote from page 23,

8    that the defendant reports having struggled with trying to stop

9    trading, setting self-imposed limits, and then breaking them.

10   Now, you start the sentence off with "he reports," so that's

11   something that he told you, right?

12   A.   Hmm-hmm.

13   Q.   That's not something that you verified or were able to

14   verify, right?

15   A.   Well, in a psychiatric interview, that's the language that

16   I use.   It's done usually on a one-to-one basis, and people are

17   sharing information.   For struggles, it's an internal state.

18   It's kind of like how do you assess depression.   You know, how

19   do you assess someone's internal mood state.   And it's usually

20   through direct asking and trying to understand it within the

21   context.

22          THE COURT:   But I think what the prosecutor is trying

23   to get at is the psychiatrist is necessarily dependent for

24   information to a substantial degree on what the patient tells

25   the psychiatrist.   And if the patient has a motive to lie, then

1   that information might not be as reliable as it would otherwise

2   be.

3           So, the question is, in this case, theoretically,

4   Mr. Caspersen has a motive to want to be diagnosed as a severe

5   gambling addict.  So, was there any way, other than the -- you

6   had some records, but was there anything else that was done to

7   sort of test whether he was giving you the truth, the whole

8   truth, and nothing but the truth, as opposed to an

9   exaggeration, for example?

10          THE WITNESS:  Well, in looking through the records

11  that were provided to me as collateral information, what he

12  reported to me seemed to fit well with the records with respect

13  to things like preoccupation and placing of options, like,

14  right when the -- when the market opened, the -- it seemed

15  genuine to me during the interview, and it seemed to fit with

16  the psychiatric report for people who had been seeing him over

17  a longer period of time and arguably may have known him better

18  through more repeated contact.

19          THE COURT:  The earlier questions put by the

20  prosecutor, I wasn't quite sure what she was getting at, but

21  she seemed to be suggesting that the Court might want to

22  imprison Mr. Caspersen in part because it would take him away

23  from all temptation.  I concede, I'm sure the warden would make

24  an excellent fiduciary of his assets, but I don't know if this

25  is within your area of expertise, but are there respects in

1      which imprisonment would in your view make his condition worse?

2              THE WITNESS:  Well, I have interviewed some people in

3      prison.  And it doesn't -- there is, one, there is gambling

4      that goes on in prison.  There isn't always optimal access to

5      treatment in prison.  So I think there are some aspects of

6      imprisonment that may not be very good.

7              THE COURT:  Counsel.

8      BY MS. MAGDO:

9      Q.  You mentioned that you -- the things that Mr. Caspersen

10     told you in your assessment were consistent with the reports of

11     other therapists that you had reviewed.  So, I believe you

12     reviewed a report or a report of Dr. Goldman.  And isn't it

13     true that Dr. Goldman has only been the defendant's treating

14     psychiatrist after his arrest?

15     A.  That's my understanding, yes.

16     Q.  The notes that you reviewed from prior to his arrest, those

17     were from 2012 and 2013, right?

18     A.  And some I think earlier too, from the early 2000s.

19     Q.  So in the early 2000 reports, those were purely medical

20     reports as opposed to psychological reports, right?

21     A.  Yes.  There may have been a psychological testing, I don't

22     recall the date of that.

23     Q.  For the most part, the pre-arrest psychological report that

24     you relied on are the notes from Dr. Brody in his seven

25     sessions with Mr. Caspersen, right?

1   A.   That's my recollection.

2   Q.   Okay.  And in those notes, did the defendant say to

3   Dr. Brody that he had stopped his gambling behavior, if you

4   recall?

5   A.   I don't recall whether he had mentioned that.  I know that

6   there was more of a focus on the gambling after the arrest.  I

7   think that my experience with people with gambling problems is

8   that oftentimes it is difficult for them to come into

9   treatment, and I think part of that may have occurred early in

10  the 2000s.  He may have been a bit more forthcoming later on,

11  around 2012.

12          But I think that it's not uncommon for me to see there

13  being different barriers, be it guilt, embarrassment, shame, be

14  it ambivalence about acknowledging the gambling problem and

15  addressing the gambling problem.  It's consistent with what

16  I've encountered, and I think data suggests that it's about

17  10 percent of individuals with gambling problems who engage in

18  some form of treatment.

19  Q.   I guess what I'd like to differentiate between is the

20  treatment that he had after he was arrested.  By that point, he

21  knows that he's been charged with crimes, and he knows that he

22  will eventually be sentenced.  Right?

23  A.   I --

24  Q.   Presumably?

25  A.   I presume so.

1    Q.  So as the judge implied --

2            THE COURT:  Well, if he doesn't know that by now, he's

3    under a great illusion.

4            MS. MAGDO:  Right.

5    Q.  My point is that in the therapy that he engaged in after he

6    was arrested, didn't he have an incentive to exaggerate his

7    symptoms, knowing this was in preparation for sentencing?

8            I'm not asking whether he did or not.  Is it logical

9    to assume that one would have a different incentive after one

10   is arrested than before one is arrested?

11   A.  That's one possibility.  But it's not the only possibility.

12   I think that as his trading records indicate, he was gambling

13   large amounts of money, and I imagine -- and it's consistent

14   with his reports that this was associated with significant

15   psychological distress.

16   Q.  Are you aware that by the time he sought treatment, in

17   November 2012, he had already committed a fraud of over $2

18   million?  Yes?

19   A.  Yes.

20   Q.  Are you aware that he lied to that therapist, that, for

21   example, he said that he was actively pursuing career options

22   outside of the financial services industry?

23   A.  Well, lying about gambling behaviors is actually one of the

24   criteria that persists in DSM-5, so again, it wouldn't surprise

25   me.  I think it speaks to the ambivalence that many people have

1    about giving up gambling.

2    Q.  And isn't it true that Dr. Brody recommended that he hire a

3    financial manager to stand between him and his remaining

4    assets?

5    A.  That may well be true.

6    Q.  Do you know whether he did that?

7    A.  I don't believe that that happened, but I'm not certain.

8    Q.  So, would you agree with Dr. Brody's conclusion in his

9    report that, prior to his arrest, earlier this year,

10   Mr. Caspersen had not made any serious attempts to stop

11   gambling?

12        MR. SHECHTMAN:  Judge, I'll stipulate to that.  But he

13   couldn't say that prior to the arrest, because this is 2012.

14   So there's --

15        MS. MAGDO:  I'm sorry.  Not Dr. Brody.  Dr. Goldman's

16   assessment post-arrest.  I misspoke.

17   Q.  Dr. Goldman, who has been the defendant's treating

18   psychiatrist since April of this year who has been seeing him

19   twice a week.  And in his report, which I believe you reviewed,

20   he concludes that the defendant never made any serious effort

21   to stop gambling.

22        Do you agree with that conclusion?

23   A.  I think it depends on what you describe as a serious

24   effort.  I think that he did not engage in formal treatment,

25   which would have been a more serious effort.  I imagine that he

1     may have struggled with his behavior, and that is consistent

2     with what he reported with the self-imposed limits.

3              THE COURT:  A variation on that, assuming he didn't

4     make a serious effort, on the one hand, that might be

5     consistent with his not taking the problems and deceits he was

6     imposing on others very seriously.  But on the other hand, it

7     might just simply reflect the severity of his own gambling

8     disorder.  Yes?

9              THE WITNESS:  Yes.  That's my feeling, my impression.

10    Q.  I'd just like to go briefly over some other psychiatric

11    disorders that are in the DSM-5 I believe.  Exhibitionist

12    disorder.  Are you familiar with that?

13    A.  It's not an area that I focused on.

14    Q.  Would you say that people who have this disorder have a

15    diminished ability to stop exposing themselves to other people?

16    A.  So, people who seek treatment for or engage in

17    exhibitionist behavior I would imagine do have some impaired

18    self-control over their behaviors.  Although, I can't recall

19    having seen someone with exhibitionism, so it is really not my

20    area of focus in psychiatry.

21             THE COURT:  Counsel, where do you see -- I'm looking

22    at the DSM criteria, DSM-5 criteria for gambling disorder.  And

23    I'm not seeing exhibitionism.  Maybe I'm missing it.

24             MS. MAGDO:  I'm sorry.  I'm moving on to other

25    disorders, not gambling disorders.

 1          THE COURT:  Oh.

 2          MS. MAGDO:  But other disorders that may lead to

 3    antisocial or illegal conduct, and I'm just trying to elicit

 4    that these are also classified as mental illnesses and mental

 5    disorders in the DSM-5, and that these disorders such as

 6    pyromania, cleptomania, pedophilic disorder, may make it more

 7    difficult for people to control these behaviors.  That's all I

 8    want him to opine on.

 9          THE COURT:  Okay.  I thought you were making a comment

10    on the current political contest for the presidential election,

11    but I guess I was wrong.  Go ahead.

12          MS. MAGDO:  I hadn't gotten to sexual sadism disorder

13    yet, which is a thing.

14    Q.  So is it fair to say that people who have these disorders

15    may have some impaired ability to control their behaviors?

16    A.  I think impaired impulse control does apply to a broad

17    range of psychiatric conditions, across different

18    categorizations.  I think the DSM-5 as compared to the DSM-4

19    was trying to take what was a heterogeneous grouping of

20    disorders, in which pathological gambling was placed, and when

21    it was classified with cleptomania and pyromania, and separate

22    it from and include it in the addictive disorders.  And now

23    that what used to be impulse control disorders not elsewhere

24    classified in DSM-4 is now disruptive impulse control and

25    conduct disorders.

1              So they've grouped together disorders that are more

2    categorized by going up against social norms, if you will, and

3    removed gambling disorder together with the addictive and

4    substance abuse.

5    Q.   That's arbitrary.  If we lived in a society where gambling

6    were illegal, it would be next to cleptomania, presumably.

7    A.   Well, I'm not going to speculate.

8    Q.   My point simply is that these disorders, maybe they're not

9    in the same chapter of the DSM, they have certain things in

10   common.  Namely, that they may impair somebody's ability to

11   control their behavior.  I'm opposing that to disorders where

12   someone has no ability whatsoever to control their behavior.

13              So would you say that these disorders that I've named

14   have that in common, they diminish someone's capacity to

15   control their behavior?

16   A.   I think that having no control over one's behavior is

17   not -- I can't think of any instances where that happens on a

18   regular basis.  I think it is more that a number of conditions

19   are categorized by impaired impulse control.  And it goes

20   across a broad range of categories.

21   Q.   For example, someone who is diagnosed with pedophilic

22   disorder, do you know, is that a mitigating factor for someone

23   who has committed a crime of child molestation?

24              THE COURT:  Counsel, these are fair arguments when we

25   hear argument from counsel, but I don't think it really is a

GB43CASS

1    question for this witness.  You can certainly make that

2    argument in a few minutes when I hear from counsel on this.

3              MS. MAGDO:  That's fine.  Thank you, your Honor.

4              THE COURT:  Very good.  Anything further from defense?

5              MR. SHECHTMAN:  Nothing, your Honor.

6              THE COURT:  Thank you so much.  You may step down.

7              THE WITNESS:  Thank you.

8              (Witness excused)

9              THE COURT:  So, before we turn to other aspects of

10   this sentence, let me hear from counsel and I'll tell you what

11   my initial take on this is, subject to being further influenced

12   by counsel.

13             So, I think that while we don't know nearly as much

14   about it as we know about some other disorders, I think it is

15   more likely than not that there is such a thing as gambling

16   disorder and that Mr. Caspersen suffered from it, and that it

17   diminished his ability to make rational decisions.  What

18   follows from all that is less clear.

19             But just on those propositions, let me hear if counsel

20   want to make further argument before I adopt those very limited

21   initial determinations.

22             MR. SHECHTMAN:  Judge, I don't have further argument.

23   Our point on calling Dr. Potenza was to establish just those

24   points.  I think the question what follows from that is

25   sentencing.

GB43CASS

```
 1              THE COURT:  We'll get to that in a minute.

 2              MR. SHECHTMAN:  I mean that not glibly.  But what

 3    follows from that is a very difficult moral judgment for the

 4    Court.  And what's important to us is to realize that this is a

 5    fellow with a severe, most severe pathological gambling

 6    problem.  This is a fellow who acted irrationally for a long

 7    period of time as to his own money and then as to others.  And

 8    that all of that should weigh heavily in the balance this

 9    afternoon.

10              THE COURT:  Okay.  Let me hear from the government.

11              MS. MAGDO:  Your Honor, I agree with Mr. Shechtman

12    that the remaining issue is really what weight the Court should

13    give to Mr. Caspersen's gambling addiction as a mitigating

14    factor, rather than whether he had one.  So, I don't oppose --

15              THE COURT:  I think there are two aspects of that,

16    that maybe you want to comment on.  There was at least a

17    suggestion in the government's papers, and there are certainly

18    some reported cases and some statements of the sentencing

19    commission at an earlier time, that suggest that it should have

20    no weight.  And I'm frank to say I don't understand that.

21    Among the most fundamental programs of our legal system when it

22    comes to crime are that we distinguish between people who

23    commit crimes because they have made a rational choice that

24    they would rather do something antisocial and harmful to others

25    in order to gain their material benefits or other benefits, and
```

GB43CASS

1    those who act with diminished capacity and who are to some

2    degree not acting with a full deck.

3        And the reason the legal system makes that distinction

4    is because the criminal justice system in particular is an

5    expression, among other things, of fundamental moral

6    principles.

7        So for example, there was a suggestion in one of the

8    cases the government brought to my attention, although I think

9    I interpreted it somewhat differently than the government did,

10   that motive is irrelevant.  How can that be?

11           MS. MAGDO:  Well --

12           THE COURT:  How can it be that if someone steals a

13   loaf of bread, to take the classic example, because they're

14   starving, they are treated the same as someone who steals a

15   loaf of bread because they walked down street and saw a nice

16   loaf of bread and thought he'd like to eat it right then and

17   there rather than when he got home to his 20 other loaves of

18   bread.

19       So, it seems to me it is relevant.  Maybe I'm

20   mischaracterizing government's position.

21           MS. MAGDO:  That's certainly not our position, your

22   Honor.

23           THE COURT:  Okay.

24           MS. MAGDO:  And we are not saying that gambling

25   disorder could never be a mitigating factor in sentencing.  And

1    we're not saying that it should be ignored here in this case.

2    We are saying that the Court should consider it.  But, that in

3    the context of this defendant, and of these crimes, that there

4    are other things that outweigh whatever mitigation the gambling

5    disorder provides.

6         THE COURT:  That's important.  I want to get to those

7    in a minute.  But let me just raise the other concern I had

8    while we're still on the gambling disorder.

9         I'm somewhat troubled by the fact that I don't think

10   we know enough about gambling disorder to be able to speak of

11   an effective treatment with any degree of confidence.  There

12   are some studies that suggest some drugs may help.  There are

13   some studies that suggest that cognitive therapy may help.

14   These are all very soft, very preliminary, very many of them

15   have not been attempted to be reproduced, many of them have not

16   been subject to long-term studies.  Our very excellent expert

17   pointed out, for example, that statistically a lot of studies

18   so far have dealt with very small numbers, and that a much

19   bigger study is underway but it isn't there yet.

20        And so while gambling disorder may be a mitigating

21   factor in the sense it reduces the immorality of the underlying

22   behavior, if it is to take the extreme incurable -- and I'm not

23   suggesting that that's the extreme, but just to give that as

24   the end of the curve so to speak, then I'm not sure that it

25   should weigh that much with the Court, because the guy will be

GB43CASS

1   a recidivist.

2          Now, again, I'm not saying that's the situation here,

3   but I'm concerned about that aspect of it.  I don't know if

4   either side wanted to comment on that.

5          Maybe that's more of a question for Mr. Shechtman.

6          MS. MAGDO:  Actually, it is something that I've

7   thought about a lot, which is that to the extent that he gets a

8   break for his motivation or his lack of nefarious motivation at

9   the outset, there is also the continuing disorder which he will

10  presumably be struggling with to some extent or another for the

11  rest of his life, just the way an alcoholic is never fully

12  cured.

13         I think it is interesting, actually, in some child

14  exploitation cases, the fact that the defendant does not have a

15  sexual interest in children and was merely trading the child

16  pornography for money, is actually a reason that people say

17  that that person will not reoffend, because they weren't doing

18  it out of a disorder.  It makes perhaps the initial motivation

19  more egregious and more worthy of punishment, but perhaps the

20  recidivism risk is lower, whereas here it's just the opposite.

21         So, I think that's another reason that a significant

22  sentence is warranted, especially because we submit that this

23  defendant is already a bit of a recidivist.  In 2012 he

24  committed a fraud on his mother and his brother over $2

25  million.  I mean, he's lucky that they didn't, you know, go to

GB43CASS

1    the police with that.  That's a crime.  And yet, even that was

2    only enough to deter him for a few months.

3            He's not undeterrable.  He stopped trading for a long

4    period in 2013.  But, that was not enough to make him commit

5    seriously to getting himself better.  So that's why we think a

6    substantial sentence is needed to convince him of that.

7            THE COURT:  Mr. Shechtman, before we hear your general

8    comments, I want to give you a chance to comment on the

9    comments just raised.

10           MR. SHECHTMAN:  Judge, let me say something just about

11   the facts of 2013, which I shared with Ms. Magdo last week.

12   And the facts really go to your question, your last question I

13   think to Dr. Potenza about the severity of the gambling,

14   meaning not dealing with this appropriately in 2012.

15           And Mr. Caspersen would be the first person to tell

16   you that, that he didn't.  2012 treatment records end in March

17   of 2013 with a statement "the gambling disorder is in

18   remission."  It wasn't.

19           And what's particularly interesting is in the first

20   months of 2013, while he was getting treatment, he was getting

21   relatively small -- for Mr. Caspersen -- distributions from the

22   family, $50,000, $20,000, four or five of them.  And each time

23   he got them, money went directly to his trading account.  He

24   gambled and he lost everything.

25           And then in April 2013, he had no more.  And when it

1   got to the end of that year, he had a $4,900 bonus the end of

2   2013.  And the day he got it, he put it into his trading

3   account, and he traded.  So, I would say the 2013 story is the

4   story of most severe pathological gambler.

5        Look, I've done this for a long time, you've done it

6   and sat in judgment of people even longer, and I can't tell you

7   that Andrew Caspersen won't recidivate.  It's been a bad

8   history since 2000.

9        But I can tell you that he is seeing a therapist who

10  believes in him and has written the Court in a long portion of

11  that letter why he thinks that there is a real likelihood here,

12  a high likelihood here of non-recidivism.

13       I'm not going to point them out, but you've got four

14  pathological gamblers in the back, two of them lawyers, and

15  they have not gambled for a long period of time.  And they have

16  not gambled because the craziest thing is, Gamblers Anonymous,

17  which, look, I would joke about Alcohol Anonymous, I would say

18  it is a place where people go to date, right, I think people

19  who take it seriously go for treatment.

20       And what you learn about Gamblers Anonymous, and what

21  Mr. Caspersen's learned, is it's an extraordinary support

22  group.  He went Tuesday night and discouraged people from

23  coming today in the view that you didn't need to see the faces

24  of 30 pathological gamblers.  But all of them have stayed out

25  of trouble by propping each other up.  His two supporters, his

1    two principal supporters are here today.

2         Look, they will tell you that there are people in that

3    group who fail.  But they'll also tell you that the vast

4    majority of people in those groups have succeeded because of

5    each other.  And that is fairly remarkable.  And I know how

6    committed Andrew Caspersen is, I don't think he'll disappoint

7    the Court.

8         I suppose if he does, we'll be back before you or

9    somebody else and some other lawyer won't be able to say what

10   I'm saying today.  But, today what I'm saying is I don't think

11   Andrew Caspersen is a high risk of recidivism.

12        I think he went through an enormous trauma.  His

13   girlfriend's death, his father's death, and his own depression,

14   and always found a way --

15        THE COURT:  I didn't ask the expert about those

16   traumas because I didn't think he had particularly, he mentions

17   them in his report, but it wasn't a focus.  But, I'm not sure

18   how much weight, if any, I should put on them, and I'll tell

19   you why, and then you can respond.

20        So, undoubtedly the death of his girlfriend in 9/11

21   was very traumatic.  But, he turned his life around in that

22   respect, and he entered into a loving relationship with another

23   fine woman, and he married her and had children and was from

24   all reports a good father and so forth.

25        So he overcame that from all objective indicia in the

1    way that other people overcome the traumas that all of us in

2    life sooner or later encounter.

3         With respect to his father, which again, I don't mean

4    to minimize at all, but my understanding is that his father

5    killed himself at the age of something like 67, I believe,

6    because he was in great pain from incurable cancer.  And so it

7    was -- this is unfair, perhaps -- but as a form of euthanasia,

8    and he left a note indicating that so to speak.  And so,

9    undoubtedly, when one loses a parent that one is close to, that

10   has traumatic effects.  I don't mean to minimize that.  But it

11   wasn't -- I'm having some difficulty associating either of

12   those events with the pathological gambling.

13         MR. SHECHTMAN:  Let me say this.  If I was sitting

14   where you were, I could add a point to that, which is his

15   gambling began before Cat's death, and indeed he lost $2

16   million before Cat's death.  But having said that, I would add

17   the following.  That was for Andrew Caspersen an

18   extraordinarily traumatic event.  You have Mrs. MacRae's

19   description of it, you have Andrew's mother's description of

20   it, of really a sort of almost a year-long suicide watch.

21         And the story of his father's death is more

22   complicated.  It is alluded to in Dr. Goldman's letter.  There

23   were, as Dr. Goldman says, financial improprieties connected to

24   that.  So the reason for the suicide that is given in press

25   accounts I think is not the full story of that event, and this

1    was a reverential relationship, and for good reason.  If one

2    knows of Ben Caspersen, he was as philanthropic a man as one

3    could find.  And whether Princeton or Harvard --

4              THE COURT:  I've forgiven him that.

5              MR. SHECHTMAN:  And it was a real trauma, and the full

6    story of it weighed heavily on Andrew Caspersen.

7              I guess I'd say this.  That's as good a woman as there

8    is.  That's the wife I am being rude and pointing to.  But, we

9    all know from the lives of our friends, you can be married to a

10   very fine person and hide depression.  And I think Andrew

11   Caspersen went through most of his adult life with depression

12   that was exacerbated by two very real and meaningful events,

13   and is a piece of this story.

14             But I'll go back to where I started, which is there

15   are no guarantees.  Your Honor has probably sentenced many

16   people who stood before you and said "I'll never do it again,"

17   only to see them again at probation hearings.  There are no

18   certainties.

19             It's a bad day to say "I bet."  But I bet on Andrew

20   Caspersen not recidivating.

21             THE COURT:  All right.  So, let's move to the general

22   factors that bear on sentence, which are set forth in Section

23   3553(a) of Title 18.  And I think it's worth remembering what

24   that statute says.  This is the mandate of Congress.  Unlike

25   the guidelines, this is binding on the Court.

GB43CASS

1          And it begins:  The Court shall impose a sentence

2     sufficient, but not greater than necessary, to comply with the

3     purposes set forth in paragraph two of this subsection.

4          The Court, in determining the particular sentence to

5     be imposed, shall consider, and the first item, not the one

6     referred to as paragraph two, but before we even reach

7     paragraph two, we have paragraph one:  The nature and

8     circumstances of the offense and history and characteristics of

9     the defendant.

10          Now, here I think as to the first part of that, there

11     is no disagreement among counsel that this was an egregious

12     offense by any possible measure or view.  It was a substantial

13     fraud, it was a fraud that involved the deception of numerous

14     people who had great confidence and faith in the defendant.  It

15     was a fraud that used people.  And it was a fraud that had

16     continued for a substantial period of time, and might have

17     continued for even more time, had one of the victims not become

18     wary.

19          I think there is less agreement, but I think maybe now

20     substantial agreement nevertheless, on the history and

21     characteristics of the defendant.  Which I think there is

22     agreement that, other than this very considerable lapse, that

23     he led a very upstanding life, was an outstanding citizen, very

24     well regarded for good reason, all set forth in the many

25     excellent letters that I've received on his behalf.  And that

GB43CASS

1   his failing was at least in material part a reflection of a

2   gambling disorder.

3           So unless there is disagreement about that, I'd like

4   to move to the paragraph two.  But let me find out if there is

5   anything further either counsel wants to say about paragraph

6   one.

7           MR. SHECHTMAN:  Nothing, your Honor.

8           MS. MAGDO:  Just briefly, your Honor.  You mentioned

9   that the crime was committed in material part to feed the

10  gambling addiction.  And I know that the defense has

11  characterized this as mere serendipity, but I don't think it's

12  just bad luck when a fraudster pays off a $2 million apartment

13  that's leveraged to the hilt entirely with crime proceeds, and

14  at the same time purchases a $3 million -- $3.2 million home in

15  Westchester, at around the same time.

16          I think it's just a little bit disingenuous to say

17  that -- they literally used the words "no choice."  I just, I

18  cannot let that stand without comment.

19          THE COURT:  I thought there was agreement that he had

20  diminished capacity, but still had voluntary capacity, and

21  could have stopped this at any time.

22          But what is also notable is that at times when he had

23  made a ton of money, and could have paid everyone back, he went

24  and reinvested that money in another of these extraordinarily

25  high risk bets, and lost it all.  So, that is at least I think

GB43CASS

1    strongly indicative of someone who is not playing with a full

2    deck.  Because you can well imagine -- and he had gone through

3    that process several times before.  And so now, he hits it big,

4    he's in a position to pay off everyone, and I think if I recall

5    correctly, have about $50 million left for himself.

6         So, every rational part of his mind would have said

7    thank God I've escaped, they'll never know, I can go back to a

8    less stressful existence, and I'll wind up a rich man, and the

9    whole thing will be over.  And instead, goes and repeats the

10   same high risk betting as he did before.

11        To my mind, that was very strong evidence of the

12   severity of his gambling disorder.

13        MS. MAGDO:  Your Honor, as we've said, we're not

14   challenging that he had some impairment due to a gambling

15   disorder.  I just don't want the record to reflect that there

16   was no use of victim money for personal benefit, other than

17   gambling.

18        THE COURT:  At no time was Mr. Caspersen leading the

19   life of the 99 percent as opposed to the 1 percent.  I will

20   take that as a given.

21        I'm sorry, you had other things?

22        MS. MAGDO:  I just had one other thing briefly.  Your

23   Honor referenced the -- I believe you used the word "excellent

24   letters."  And no doubt those are excellent letters.  But I

25   would just like to point out that three of the four people who

GB43CASS

1    have known the defendant since birth, namely his three older

2    brothers, have not written letters. And I think that just

3    bears mentioning.

4               THE COURT: That's not irrelevant. If I were in your

5    place, I would be more inclined to emphasize the letters from

6    the victims that were submitted by the government, which point

7    out quite eloquently in their own right how much the victims

8    were hurt by this crime. Not only in their investments, but in

9    their reputation in the kind of businesses that they were

10   conducting. All of that was put at risk, and Mr. Caspersen was

11   quite prepared to put it even more at risk.

12              MS. MAGDO: Oh, absolutely.

13              THE COURT: I think that's -- I'm not sure how much

14   inference one should draw from the absence of any particular

15   person writing a letter. I think the Court should pay more

16   attention to what is before the Court than to what is not

17   before the Court, is my only point.

18              MS. MAGDO: Certainly. Thank you.

19              THE COURT: Let's turn to Subsection 2 of Section

20   3553(a). The need for the sentence imposed (A) to reflect the

21   seriousness of the offense, to promote respect for the law, and

22   to provide just punishment for the offense.

23              And I read that to mean that under any conceivable

24   analysis there has to be prison time or (A) would not be

25   achieved. The big question, of course, is how much prison

GB43CASS

1    time.

2              Then we get to (B) and (C).  (B) is to afford adequate

3    deterrence to criminal conduct, and (C) is to protect the

4    public from further crimes of the defendant.

5              I think (B) when read in context of (C) is talking

6    about specific deterrence, and (C) is talking about general

7    deterrence.  So, on specific deterrence, this is the point I

8    raised earlier, I think the disorder cuts both ways.  If it is

9    so severe as everyone, all the psychologists seem to agree,

10   then at least the argument can be made that that calls for a

11   higher prison time because it really requires meaningful prison

12   time to convince the defendant never to do it again.

13             However, all the studies I've read over the years in

14   many white collar cases, all suggest that that is in fact not

15   how deterrence, specific deterrence works in white collar

16   contexts.  None of this is hard science or anything like that.

17   But, there are many studies that suggest that even modest

18   prison time operates as an effective deterrent on white collar

19   defendants as a group.

20             And if you exclude sort of professional comment types,

21   the recidivism rate for white collar defendants who have

22   received even modest time, it is quite low.

23             So, one turns then to general deterrence.  General

24   deterrence, of course, when the crime is as large as this one,

25   calls for substantial time.  But I'm not sure there is any

GB43CASS

```
 1    magic in any given number of years.  And in fact, again to talk

 2    about the studies, which are not very scientific at all, but

 3    nevertheless the studies suggest that there is no way to

 4    measure how much more general deterrence, if any, is achieved

 5    by adding two years or five years or 10 years to a prison term.

 6    A meaningful prison term is necessary to have general

 7    deterrence, but how much prison time is really largely a matter

 8    of guesswork, or of taking account of the other factors other

 9    than general deterrence into sentence.

10         So let me stop there.  I've covered (B) and (C).  Let

11    me hear what the parties want to say about (B) and (C).  I

12    think here the government is bearing the burden on this, so

13    we'll hear from the government first.

14         MS. MAGDO:  I think, your Honor, we've touched upon

15    deterrence already.  In particular in talking about the

16    recidivist risks of someone who has a serious mental health

17    issue.  And I do think that that mitigates in favor of a

18    substantial sentence.  I was not implying that there should be

19    a prison term in order to remove temptations from gambling.  It

20    was a different point.

21         THE COURT:  No, I misunderstood your point, but you

22    clarified it.

23         MS. MAGDO:  Okay.

24         THE COURT:  Although, just the very image of a prison

25    warden acting as a conservator was an image I won't likely
```

GB43CASS

1   forget.  When I'm in the mood for bad jokes, I will remember

2   it.  But, that was not your point.

3       MS. MAGDO:  And your Honor, with respect to general

4   deterrence, I think it goes back to the first part of

5   Subsection two, which is the seriousness of the offense, and I

6   can address that now or later, and just punishment.

7       We've spoken a lot about Mr. Caspersen.  We haven't

8   spoken very much about his victims yet.  But, I do think that

9   we have to -- they are front and center here.  I have met with

10  all but one of them myself personally, and I've seen the impact

11  that this has had on them.  Even doubly worse is the fact that

12  they didn't feel at liberty to tell the Court about that

13  themselves.

14      So, I do think that in considering the need for

15  deterrence, we should also think about the fact that this is

16  not a victimless crime.  This is not just a crime that

17  benefited the defendant.  It also really hurt other real

18  people.  So, that's pretty much all I'd like to say on that.

19      THE COURT:  All right.  Mr. Shechtman.

20      MR. SHECHTMAN:  I'll speak briefly as well, your

21  Honor.  I know those same deterrent studies that your Honor

22  referred to, and they seem to tell us what Jeremy Bentham told

23  us long ago, which is lent seems to be less important than the

24  sentence itself, and the immediacy, and that that's what

25  deters.

GB43CASS

1          But, I want to say one other thing, and that is one of

2     the things that I think --

3          THE COURT:  The only trouble is, half the people here

4     won't know who Jeremy Bentham is.  He didn't play for the

5     Chicago Cubs, so why should they know.

6          MR. SHECHTMAN:  They'll know.  But, more seriously, it

7     couldn't be a more serious afternoon.  If you look in this

8     audience, these are Andrew Caspersen's friends, classmates, not

9     a single one of them knew that he was a compulsive gambler.

10    None of them.  That's how well he hid it.  None of them knew

11    that he'd blown through 23 million of his own money or he was

12    stealing from other people, including the good gentleman in the

13    front row who he tried to steal from, or the gentleman in the

14    second row that he did steal from.

15         And I say that because if you want deterrence, in

16    large measure it comes from exposure and humiliation.  And

17    that's what's happened here.  And it's happened in spades, it's

18    happened to people who grew up with him, right, now know the

19    illness, now know the suffering he inflicted on his wife, all

20    of whom are as close to his wife as they are to him.  And there

21    was a time in this country when exposure was the punishment,

22    right.  I think today that exposure ought to give the Court a

23    strong sense that there is deterrence here, because I don't

24    think any of those people, they all were mortified, they all

25    couldn't believe -- one of them said I thought it must have

1  been April Fool's Day when I read this, and I looked at the

2  headline again.

3          But they're all here today because they really do

4  think this is mental illness, and I really think that exposure,

5  that humiliation, is a way of guaranteeing the Court that a

6  lengthy sentence isn't necessary to deter.

7          Specific, general deterrence, who knows.  Government

8  says in its brief that there is a public outcry that justifies

9  a harsh sentence here.  I'm not a great believer in public

10  outcry.  I would say this, without --

11          THE COURT:  I'm not going to dwell on that, because I

12  think that was only a passing remark by the government and

13  really was not central to their argument.  And you did respond

14  to it.

15          MR. SHECHTMAN:  I just --

16          THE COURT:  But, just for the record, so to speak, the

17  one thing no judge in imposing sentence should ever take

18  account of is immediate public views.  The public in the much

19  broader sense, of course, is ultimately the boss.  But

20  immediate momentary public views should not be taken account of

21  for two different reasons.  One is, the people who are making

22  an outcry, if they are, which I don't think was necessarily

23  true in this case anyway, are acting on limited information.

24  They don't have the benefit of what I have, and what counsel

25  has, with all the things we've been discussing here today.  And

GB43CASS

it's very notable that many, many studies have shown that in many high profile cases, where the public as a whole was calling for a very high sentence, the jury that heard the evidence and found the defendant guilty, when polled, asked for a low, lenient sentence.  And the difference was because the jury knew the facts.  And the other reason is because the role of a judge is to apply the law to the facts and reach a reasoned conclusion.

While in a very ultimate sense my boss is the people of the United States, much what their direction or what the institution directs judges, the Constitution directs federal judges to do, is to do their best to apply reason to the legal and factual issues before them, and not to take account of anything else.

So, I probably went on too long on a matter that's really very secondary in any event.  But, you don't have to be concerned about that.

MR. SHECHTMAN:  Let me then next just make one last point.  I take it the notion of general deterrence is were the public to see a sentence for Andrews that is not severe, someone would say to themselves, I can get away with a large theft.  And it's hard for me to imagine that anyone would take that lesson from this case.  I don't know that I can say this better than your Honor did about the fundamental precept of our legal system being to distinguish between people who make

GB43CASS

1    rational choices and people who don't.  But, this was not a

2    rational choice, it was certainly one where capacity was

3    diminished.  And if there is somebody out will who says to

4    themselves, I can steal, I can buy my island off of Nova Scotia

5    and I can fool a judge, I reread your Carucci decision this

6    morning.  Goes back to 1999.  And I remember the case because I

7    think remnants of it were still at the U.S. attorney's office

8    when I was, and if my memory is right, it's a massive scheme on

9    the stock exchange fraud to trade ahead of customers.  And it

10   looked s like Mr. Carucci was a problem gambler.  But, his

11   cohorts came to him and said we have a great scheme, will you

12   join.  And he said count me in and he joined.  And he stood in

13   court and said geez, I was a pathological gambler, and that's

14   why I traded ahead with my fellow workers.

15          And I guess if there's people out there who will say

16   to themselves Andrew Caspersen got leniency and I can fool a

17   judge into leniency, my response would be not this one, and not

18   very many judges, if any, in this district that I've ever

19   practiced in front of.

20          THE COURT:  All right.  There is only one other

21   provision of Subsection two, and that is (D), to provide the

22   defendant with need educational or vocational training, medical

23   care, or other correctional treatment in the most effective

24   manner.

25          While the bureau of prisons attempts to give medical

GB43CASS

1     care as best it can, the kind of psychological care that would

2     be called for here is provided, but not probably nearly in the

3     most effective manner.  But, I don't want to dwell on this

4     because I think it is a very minor aspect of the sentence one

5     way or the other.

6          The only other part of Section 3553(a) that I thought

7     counsel might want to comment on, although you have both

8     briefed this issue, is the disparity issue.  The government

9     argues that in other cases high sentences have been imposed.

10    The defense argues that those cases are all very different from

11    the case before the Court here.

12          I have very carefully considered both sides of that

13    argument, but if there is anything further anyone wanted to

14    say, this would be your opportunity.  Anything further from the

15    government on that issue?

16          MS. MAGDO:  Not on that, your Honor.  Thank you.

17          THE COURT:  Anything from the defense?

18          MR. SHECHTMAN:  No, your Honor.

19          THE COURT:  No.  Before I hear from the defendant, if

20    he wishes to be heard, let me hear any final statements that

21    each counsel wants to make, starting again with the government.

22          MS. MAGDO:  Your Honor, as we said earlier, we're not

23    asking the Court to ignore or dismiss the mental health issues

24    that the defendant had.  But we do submit that they need to be

25    seen in the entire context of what was going on here.  And

GB43CASS

1    there are two particularly salient factors that come to mind

2    when we look at the whole context.

3              One, is what your Honor has already mentioned to some

4    extent, the egregiousness of the crime. But what I'd like to

5    focus on in particular is the effect of the victims, the

6    non-financial effect on the victims. There are at least three

7    such effects.

8              One is the fact the defendant committed this crime by

9    stealing the identities of two people, one of those people was

10   a friend of his, whom he had already defrauded, and he used his

11   driver's license in an attempt to get another $50 million

12   investment in the month that he was arrested.

13             Second, the reputational harm to the victims who have

14   not come forward. Many of these people, as I noted in my

15   brief, are themselves investment professionals, and who have

16   told me that when they know someone as well as they knew

17   Mr. Caspersen, they make million or multimillion dollar deals

18   with a handshake because of the level of trust that they have.

19   And not only do they feel that that trust was abused and

20   betrayed, but they are very afraid that they themselves will be

21   publicly exposed and ridiculed for having had the naivete as

22   people may judge them to have had to enter into this kind of an

23   arrangement.

24             And third, is the employee at Park Hill Group that

25   Mr. Caspersen dragged into this mess when one of the investors

GB43CASS

1    wanted to have immediate redemption of his investment because

2    he had become suspicious.   Mr. Caspersen created a fake domain

3    name, a fake e-mail address, he set up a telephone number, he

4    impersonated someone on the phone, but apparently all of that

5    not enough.   So when the person asked to speak to someone else

6    at Park Hill Group to verify that the redemption was underway,

7    Mr. Caspersen turned -- he was at this point a partner, and he

8    turned to one of the employees and said please get on the line

9    with this investor and tell them that their redemption is

10   pending.   So, to endanger the reputation and the profession of

11   a junior employee in that way I think is also particularly

12   egregious.

13          The second main factor is the fact that Mr. Caspersen

14   was uniquely positioned to seek help for his addiction.   We

15   don't dispute that he had an addiction, but he had many

16   opportunities, and he refused them.   In particular, I'd like to

17   focus on the events of late 2012 and early 2013, as we already

18   have, when he conned two members of his family into giving him

19   two and a quarter million dollars, proceeded to lose it in

20   options trading, first tried to blame the brokerage house for

21   losing the money.   But apparently, because those kinds of thing

22   just don't happen, he was forced to confess to those family

23   members that he had lost their money in trading.   So they very

24   correctly told him he needed to get help, and he went to see a

25   psychiatrist.

1    And he did not make the slightest effort to avail

2    himself at that point.  He had already been exposed as a

3    fraudster.  He had already harmed his family.  He had already

4    lost $19 million of his and his family's money by that point.

5    I think it's pretty clear that that's a very bad situation to

6    find yourself in.  And what did he do when he went to the

7    therapist?  He lied, he failed to take the therapist's advice,

8    he went for seven 45-minute sessions and then stopped going.

9    He called six months later to get a refill on a

10   prescription.  The psychiatrist told him you should continue

11   therapy, I'm not going to prescribe any medication to you until

12   you do, and he never went back.

13   It's that behavior that we're asking the Court to hold

14   the defendant accountable for.  He had the resources, the

15   means, the intelligence, and the family support, that very few

16   addicts have.  His family, his wife has stood by him even in

17   light of what's happened in 2016.  There is no reason to think

18   she wouldn't have stood by him in 2012, if he had enlisted her

19   help.  All the things that he's been doing since March, since

20   his arrest, inpatient psychiatric treatment, twice a week

21   individual counseling, attending GA meetings, enlisting the

22   support of his family.  Those things have worked.  He hasn't

23   gambled since then.  He hasn't had a drink since then.  And

24   there is no reason to think those things would not have worked

25   if he had made an effort earlier on.

GB43CASS

1          He had a chance.  He had a moment of intervention by

2     outside forces.  And he completely refused to do anything.  In

3     the words of the psychiatrist who has been treating him since

4     March, he didn't even try.  And there has to be some

5     accountability for that failure.

6          Like Carucci that the defendant just cited, your Honor

7     pointed out that in that case, the defendant did not engage in

8     anything like a Dostoevskian struggle to rid himself of his

9     addiction.

10          THE COURT:  I remember that guy.  He was a

11     contemporary of Jeremy Bentham.

12          MS. MAGDO:  And similarly, here, there was no

13     struggle, Dostoevskian or otherwise, there was not even a

14     meaningful effort.

15          For all the addicts who have struggled and who have

16     been in and out of treatment, who have made real efforts, and

17     yet cannot overcome their addiction, there has to be justice

18     for someone who had the means, the support, the resources, the

19     education, to know that he needed to get help.  And refused.

20          THE COURT:  Thank you.  Let me hear from defense

21     counsel.

22          MR. SHECHTMAN:  Judge, I will not speak at length, but

23     I hope what I say will help the Court and Mr. Caspersen.

24          In another courtroom I would begin by telling the

25     judge that the sentencing guidelines are a failure and should

GB43CASS

1    not be our guide today.  Your Honor, however, knows that quite

2    well.  Sentencing is a time for moral judgment, and a grid

3    cannot capture the complexity of a life.

4          In another courtroom, I might discuss the neuroscience

5    literature on pathological gambling.  Dr. Potenza has done that

6    today.  Suffice it to say we know far more today than we did 10

7    years ago, and we'll know far more in 10 years than we know

8    today.

9          But what is beyond dispute is that pathological

10   gambling is a mental illness.  That does not mean that

11   Mr. Caspersen's actions were involuntary.  It does not excuse

12   his actions.  Stealing $38.5 million from family and friends is

13   inexcusable.  But his illness should affect how one assesses

14   his culpability, and should affect it for the reasons that your

15   Honor said earlier.

16         If there is any doubt that these crimes arose from

17   mental illness, I remind you of these undisputed facts.  Andrew

18   Caspersen lost $23 million of his own money betting options.

19   Andrew Caspersen's trading, his coin flips were doomed to

20   failure.  Mr. Rosen, the options expert, writes they were a

21   recipe for inevitably losing everything.  Again, in Mr. Rosen's

22   words, only an irrational state, only a person in an irrational

23   state would embark on and would remain on the path

24   Mr. Caspersen pursued.

25         Your Honor referred to those trades earlier as high

GB43CASS

```
 1    risk.  And respectfully, I don't think that's the right
 2    characterization.  If you stand here and flip a coin, and each
 3    time you win you double that bet, heads, heads, heads, that
 4    coin's going to come up tails at some point, and you're going
 5    to lose everything.  That's what Andrew Caspersen's bets were.
 6    And the crazy thing is, he knew it.  He once showed his father
 7    that it didn't seem like the greatest strategy, and he pursued
 8    it, 2007, 2008, all the way until his arrest.
 9              Mr. Caspersen may be angry at me for doing this,
10    because it's a story that he told me that he heard in that
11    church basement.  But there is a fellow who owned a store and
12    the store had a slot machine in it, and it was rigged.  And the
13    fellow was a pathological gambler.  The store owner.  And he
14    played his own slot machine knowing it was rigged, because that
15    was the action.  Pulling that machine.  And that was the action
16    here, flipping that coin.  Heads, the stock market's going to
17    go down, heads it's going to go down.  And eventually at the
18    end of February of this year, it went up.
19              So, as I say, respectfully, this isn't high risk.
20    This trading pattern bordered on madness.
21              A graduate of Princeton and Harvard Law School, Andrew
22    Caspersen spent much of his waking hours staring at and even
23    recording the ticks of the S&P index.
24              Another story he won't be happy with me telling, but I
25    have this feeling if I walk out of this courtroom and if I
```

1      don't say everything, that I know I'll be disserving the judge.

2              This is a fellow who went with his wife to see

3      Hamilton, and he spent Hamilton looking at his cell phone to

4      look at the S&P index so that the people behind him said what's

5      your problem, sir.  And you know what his problem was, I know

6      what his problem was.  And I joked with Ms. Lynaugh there are

7      10 criteria in the DSM index.  I can give you one.  If you

8      can't watch Hamilton without looking at the S&P index, that's a

9      serious mental illness.

10             What else do we know.  We know that his trading

11     records for 2012 spanned 440 pages, and that's roughly true for

12     most of these years.  We also know that when he stole for the

13     first time in November of 2014, he had a $4 million bonus

14     coming in 19 days, and he couldn't wait 19 days, he couldn't go

15     19 days without trading.

16             And of course, as your Honor said, he had $112 million

17     in his trading account on February 11 of this year, 126

18     intraday.  And he placed a $103 million bet the next morning,

19     everything in on a bet that the market would go down.  And if

20     you look at those trading records, that bet was placed at 9:31

21     that morning.  The broker who tolerated all this, the broker

22     said to him I should spread the trades over the course of the

23     day, $103 million in the option market is a big trade.  And the

24     answer was see if you can get it done by 10 o'clock.  And he

25     did.  And so he went from 126 million up to betting 103 and

GB43CASS

1    quickly down to almost nothing.

2          What else do we know?  We know that the commissions in

3    January alone were $444,000.  This was a very expensive casino

4    indeed.

5          So, it's not a disputed topic today and maybe I've

6    spent too much time on it.  But this was indeed a severe

7    gambling disorder.

8          When I think of Andrew Caspersen, I think of -- and

9    I've said this in what I've submitted to the Court, Alexei

10   Ivanovich, Dostoyevsky's gambler, who said even as I approach

11   the gambling hall, as soon as I am two rooms away, I almost go

12   into convulsions.

13         Andrew Caspersen was Dostoevsky's gambler.  Whether it

14   was to relieve the pressure, whether it was the thrill of being

15   in the action, what mattered and only mattered in the last few

16   years was being in the action.

17         Like all compulsive gamblers, like the one I spoke

18   about who had the slot machine in his store, Andrew Caspersen

19   believed that his wrongs were temporary, and would be conquered

20   by persistent betting.  He suffered what's been called a

21   gambler's fallacy, a win was sure to follow from a streak of

22   losses.  Studies show if you ask a pathological gambler if

23   there is skill involved in playing a slot machine, he will tell

24   you it is equal chance and skill.  A compulsive gambler

25   believes he's in control when he's out of control.  And that,

 1    too, is Andrew Caspersen.  No matter how many times he lost

 2    everything, he was convinced he would win it all back.

 3            These were friends, these were relatives, that he did

 4    not intend to harm, because he thought he would win.  And that

 5    was madness again, because he was destined to lose and he hurt

 6    people who were very close to him.

 7            He seemed to never understand with these trades, as

 8    they say, what goes up must come down.  And that's true of the

 9    stock market.

10            If you read the letters from Andrew's friends, you

11    find a constant theme.  Andrew was the adult in the room, he

12    was everyone's role model, everyone's moral compass.  By

13    November 2014 when he started stealing from his friends, his

14    moral compass was broken.  He was no longer pointing straight.

15    He needed to be all in every day.

16            Judge, I'm new to pathological gambling.  This is my

17    second case.  I've tried to read as much of the literature as I

18    could.  What I'm more familiar with is a not unrelated illness,

19    anorexia.  As you know, too many young women, and it seems to

20    be women in our country, and often the brightest, are afflicted

21    with the disorder.  It is an epidemic.  And like pathological

22    gambling, it causes people to act irrationally.  Telling an

23    anorexic to eat is like telling a compulsive gambler to stop

24    betting.  Were it so easy.  Like pathological gambling,

25    anorexia often kills.  Part of the motto of Gamblers Anonymous

GB43CASS

 1   is this:  Many pursue it into the gates of prison, insanity, or

 2   death.  The two disorders are akin in this way as well.

 3   Neither is a moral failing.  We'll learn more about both in the

 4   next decade.  But what we know should teach us not to judge

 5   those who are afflicted too harshly.

 6          A European essayist has written these words:  The test

 7   of one's humanity is whether one is able to accept this fact

 8   not as lip service, but with the shuttering recognition of

 9   kinship.  There but for the grace of God go I.

10          Why was Andrew Caspersen afflicted?  I don't know.

11   Dr. Potenza doesn't know.  Dr. Goodman doesn't know.  In our

12   lifetime we'll probably never know.  But afflicted he surely

13   was.

14          When Andrew Caspersen first came to see me after his

15   hospitalization, my office was close to his Park Hill office

16   where he worked.  He came with his hat pulled over his eyes.

17   He was afraid he would bump into a colleague on the street, and

18   he feared their disapproving looks.  He was deeply ashamed.  He

19   remains ashamed, but he's now met with several of the victims,

20   and their lawyers, and tried to explain his conduct to them.

21   He has cried and asked for their forgiveness.

22          Because of GA, Dr. Goldman, his wife, and his many

23   friends, Andrew holds his head up higher now and doesn't hide

24   his face.

25          He has lost his career, the SEC has barred him from

GB43CASS

the securities industry, and he has lost much more.  But

slowly, he's regained his self worth, and I truly believe that

slowly he has regained his good judgment.

In a word, Andrew Caspersen is not the same man who

was arraigned in this building seven months ago and then rushed

to a suicide watch.  He has stopped gambling, he has stopped

drinking, he has attended GA and AA regularly, his sponsors are

here today to support him as they have this past seven months.

They know in 2016 no drug, no elixir exists to treat

pathological gambling.  The treatment that may work best is GA.

And I've said it before today, men and women coming together,

often in a church basement, to share and reinforce their

commitment to sobriety.

Andrew has also seen an experienced therapist

regularly, and benefited greatly from their relationship.  As

Dr. Goldman writes, he's been through therapy honestly and

seriously.  With therapy comes insight, and Andrew has gained

valuable insight.

He's also reconciled with his mother and his wife.

Their anger towards him has been replaced with their pleas for

leniency.  And Andrew is now the doting father of two young

children, who had lost his full attention when his attention

was rivetted on the S&P index.

Judge, you've always recognized that even when the

guidelines were their most procrustean, that sentencing is a

1    day of moral reckoning which takes into account all aspects of

2    crime and the offender.  Andrew Caspersen is an uncommonly good

3    man who lost his way.  I know you will judge him fairly.

4              I thank the Court.

5              THE COURT:  Thank you very much.  Now let's hear from

6    the defendant, if he wishes to be heard.

7              THE DEFENDANT:  Your Honor, I've committed serious

8    crimes and frauds.  I have no one to blame but myself.  My

9    victims include lifelong friends, former colleagues, my former

10   employer, my mother, my brother, and my wife.  All of these

11   people had one thing in common.  They trusted me.  And I abused

12   that trust in immoral and illegal ways so that I could gamble.

13   I lost their money, I abused their friendships, I destroyed my

14   family's name.  I humiliated my wife, and I subjected my

15   children to the future knowledge that I did all of this.

16             There has been a lot of talk about compulsive gambling

17   today.  While it explains what I did, I know in no way does it

18   excuse it, and it certainly does not take away any of the

19   financial or emotional devastation I brought to my victims.

20             It is, I learned, a cautionary lesson for a compulsive

21   gambler watching this hearing, what path to take before you get

22   to the stage where victims are defrauded.  The first path is

23   what I did for almost 20 years.  I chose gambling over

24   everything.  Over everything I loved and treasured.  I chose it

25   over my morals, my conscience, my relationships, my family, my

1    career, my wife, my children, and eventually the law.  I was

2    willing to do anything to continue, and eventually I did.

3        The second path that a compulsive gambler could take

4    is what I've tried to take since my arrest.  It's involved

5    psychotherapy, honesty, most importantly Gamblers Anonymous.

6    Yes, this path I took after I was arrested, after I was

7    publicly humiliated, that's what -- that's what it took for me.

8    I wasn't willing to seriously stop in 2012 or 2013 or 2001.  It

9    wasn't until outside forces intervened and put me in jail, and

10   then put me in the psychiatric ward, that I realized enough was

11   enough, and I couldn't continue down this path.

12       The only thing worse than committing all these frauds

13   against all these people I loved would be not to learn from it

14   and actually go out and gamble and drink again.

15       I stand before you asking for mercy.  I don't know

16   what the right sentence is for what I did, but I do know for

17   the rest of my life, regardless of this sentence, I will be

18   making amends.

19       As for the risk of relapse, it's always possible for

20   an addict.  The numbers are not great.  But I do know in the

21   program that I've participated in, many times a week, the

22   people who go through the steps and the people who attend

23   succeed.  It is, the big book says, rarely has someone who's

24   followed our steps thoroughly failed.  I intend to follow those

25   steps thoroughly one day at a time.  I am finally on the right

GB43CASS

1    path.

2              I am terribly sorry.  I could not be more sorry that

3    it took the devastation that I brought upon these victims to

4    get to this right path.  I'm not going to waste the opportunity

5    now that I am.  Thank you.

6              THE COURT:  Thank you very much.  So, a point that

7    this Court has made before, and that Mr. Shechtman also picked

8    up on, is that a sentence more than anything else is a moral

9    judgment.

10             Among my many other problems with the guidelines,

11   putting aside their irrationality, putting aside their

12   draconian far too punitive approach to all crimes, not just

13   white collar crimes, putting aside their very real

14   responsibility for the portion of the mass incarceration of

15   which this country should be so ashamed, is the fact that they

16   regard sentencing as an exercise in bean counting, as opposed

17   to one of the most difficult tasks that those fallible human

18   beings we call judges have to undertake, which is a moral

19   judgment on a fellow human being.

20             But, Congress, in its wisdom in enacting Section 3553,

21   has very clearly recognized the moral judgments involved,

22   because they put first and foremost that the Court must focus

23   on the nature and circumstances of the offense, in this case

24   egregious, and history and characteristics of the defendant, in

25   this case impaired.  And they direct how the Court is to

GB43CASS

 1   resolve that tension.  And also to take account of the somewhat

 2   more abstract, but still very fundamental purposes, of

 3   sentencing such as deterrence, just punishment, and the like.

 4        By decreeing that the Court shall impose a sentence

 5   sufficient, but not greater than necessary, to comply with

 6   these various purposes, that's an expression of a moral

 7   judgment, too.  That's an expression of the notion that even in

 8   this cruel world where people commit, as the defendant has

 9   here, terrible offenses, the punishment of prison is not one

10   that can ever be justified beyond the purposes that Congress

11   has specified.  It can never be an act of revenge, it can never

12   be an act of gratuitous expression of outrage.  Life is too

13   precious to permit that kind of sentence.

14        So how does one apply all that to this case.  The

15   guideline range of 15 years or so is absurd.  The probation

16   officer, sort of cutting the baby in half, recommends a

17   sentence of about seven and a half years.  And there is a

18   certain rough justice to that for, as the government points

19   out, one cannot overlook not just the size of the fraud, but

20   also the real impact on victims of the fraud.  And the fact

21   that the crime was committed by a person who had so many

22   benefits, so many gifts, so many opportunities to say I'll stop

23   and did not.

24        But, having said all that, in addition to his very

25   real gambling disorder, which I am quite convinced very

GB43CASS

seriously impacted his exercise of rational control and

rational decision making, there is also the fact that no

purpose will be served by letting him rot in prison for years

on end.  It will serve no purpose that the Court can justify.

          The conclusion is that there must be a serious prison

sentence here, but not the kind that the guidelines suggest.

          The sentence of the Court, therefore, is that the

defendant is sentenced to four years in prison -- 48 months --

to be followed by three years of supervised release on terms

that I'll get to in a moment.  Restitution will be ordered in

the amount of $27,831,791.06.

          This is without prejudice, of course, to the claims

that Mrs. Caspersen has made which I will resolve in a separate

order.

          And there is also a mandatory special assessment of

$200.

          By the way, the sentence is concurrent on all counts,

on both counts.

          The terms of supervised release are:  First, the

mandatory conditions that the defendant shall not commit

another federal, state or local crime; that the defendant shall

not illegally possess a controlled substance; that the

defendant shall not possess a firearm or destructive device;

that the defendant shall cooperate in the collection of DNA.

          But the one other mandatory condition, the mandatory

drug condition is suspended because I will impose instead a

special condition requiring both drug testing and alcohol and

drug -- excuse me, both alcohol and mental health treatment.

There will also be imposed the standard conditions of

supervision one through 13, they appear on the face of the

judgment, and will be gone over with the defendant by the

probation officer when he reports to begin his period of

supervised release.

And then there are the special conditions:  First,

that the defendant shall participate in a mental health

treatment program approved by the probation office, on the

standard terms and conditions.  Second, that the defendant will

participate in an alcohol treatment program as prescribed by

the probation officer on the standard terms and conditions.

Third, that the defendant shall provide the probation officer

with access to any requested financial information.

Particularly, well, any requested information financial

information, including trading information.  Fourth, that the

defendant shall not incur new credit charges, open additional

lines of credit, or open securities trading accounts without

the approval of the probation officer, unless the defendant is

in compliance with the installment payment schedule.  Fifth,

that the defendant shall pay 20 percent of his gross monthly

income towards the restitution requirement beginning 30 days

after his beginning of his supervised release.  Sixth, that the

GB43CASS

1    defendant will report to the nearest probation office within 72

2    hours of his release from prison, and he will be supervised by

3    the district of his residence.

4          I will enter a separate order specifying the more

5    particularized terms of the restitution.  And there is a

6    forfeiture to which the defendant has previously agreed.

7          So, before I advise the defendant of his right of

8    appeal, and we set a surrender date, is there anything else

9    that either counsel needs to raise with the Court?

10          Yes, ma'am.

11          MS. MAGDO:  Your Honor, with respect to the

12   restitution, the government would respectfully ask the Court to

13   hold off on making a restitution order.  Even in the PSR, it's

14   noted that there are some shifting amounts.  One victim is

15   paying back another victim.  There may be additional fees that

16   certain victims are entitled to.  Therefore, we would request

17   an additional 90 days --

18          THE COURT:  That's fine.  But am I right that that

19   doesn't really change the 27 million total, it just affects the

20   allocation?

21          MS. MAGDO:  Actually, it does.  The amount that the

22   defendant agreed to was a minimum of 36 million and change.

23   And that's just the direct loss to the victims.  In addition,

24   certain victims may be entitled to attorneys' fees in

25   connection with their participation in the criminal

1    investigation.

2         THE COURT:  I hear you.  So, but sooner than in 90

3    days you need to make a submission, and if there is any

4    disagreement about it, then the defense will make a submission

5    also in less than 90 days, so I can comply with the 90-day

6    limit that the law sets.

7         MS. MAGDO:  Yes.

8         THE COURT:  I will hold off on restitution until that

9    is determined.  Anything else?

10        MS. MAGDO:  No, thank you, your Honor.

11        THE COURT:  Anything further from the defense?

12        MR. SHECHTMAN:  Judge, I don't know what your practice

13   is in terms of recommending an institution.

14        THE COURT:  I'm happy to recommend, but it is, as you

15   know in this day and age, those recommendations are often not

16   followed by the bureau of prisons.  But I have no problem

17   recommending.  Where do you want me to recommend?

18        MR. SHECHTMAN:  That's the question.  I don't know if

19   your Honor would allow us until Monday just to think about

20   that.  Otisville is the best for visitation, but there are not

21   very many beds at the inn.

22        THE COURT:  That's fine.  Why don't you submit

23   something in writing on Monday.  If the government has any

24   problems with it, they can submit something on Tuesday and then

25   I'll hold off entering the judgment until Wednesday.

GB43CASS

| | |
|---|---|
| 1 | MR. SHECHTMAN:  That's great.  Thank you, Judge. |
| 2 | THE COURT:  In terms of a surrender date.  Let me ask |
| 3 | my courtroom deputy what she has in mind. |
| 4 | THE DEPUTY CLERK:  Like Wednesday, January 4? |
| 5 | THE COURT:  January 4.  That's good because that's |
| 6 | after the holidays.  Any problem with that? |
| 7 | MR. SHECHTMAN:  No, your Honor. |
| 8 | MS. MAGDO:  No, your Honor. |
| 9 | THE COURT:  2 p.m. at the designated institution on |
| 10 | January 4, 2017. |
| 11 | Before I advise the defendant of his right of appeal, |
| 12 | anything else from defense? |
| 13 | MR. SHECHTMAN:  Nothing, your Honor. |
| 14 | THE COURT:  Mr. Caspersen, you have the right to |
| 15 | appeal this sentence.  Do you understand that if you can't |
| 16 | afford counsel for the appeal, the Court will appoint one free |
| 17 | of charge?  Do you understand that? |
| 18 | THE DEFENDANT:  Yes. |
| 19 | THE COURT:  Very good.  Thanks very much.  The Court |
| 20 | will adjourn.  There is another matter that counsel are aware |
| 21 | of that we'll take up in 10 or 15 minutes. |
| 22 | MS. MAGDO:  Thank you, your Honor. |
| 23 | o0o |
| 24 | |
| 25 | |